✎AO 241
(Rev 10/07)

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Southern District of New York |
|---|---|

| Name (under which you were convicted): Mark Richardson | 18 CV 7694 | Docket or Case No.: 3534/2008 |
|---|---|---|

| Place of Confinement: Sing Sing Correctional Facility 354 Hunter Street Ossining, New York 10562 | Prisoner No.: 11-A-5084 |
|---|---|

| Petitioner (include the name under which you were convicted) Mark Richardson | v. | Respondent (authorized person having custody of petitioner) Michael Capra, superintendent Sing Sing Correctional Facility |
|---|---|---|

| The Attorney General of the State of New York, Barbara D. Underwood |
|---|

## PETITION

1.   (a) Name and location of court that entered the judgment of conviction you are challenging:

      Supreme Court of the State of New York, New York County

    (b) Criminal docket or case number (if you know): 3534/08

2.   (a) Date of the judgment of conviction (if you know):

    (b) Date of sentencing: October 27, 2011

3.   Length of sentence: 25 years to life; 20 years; 15 years all concurrent

4.   In this case, were you convicted on more than one count or of more than one crime?   ☒ Yes   ☐ No

5.   Identify all crimes of which you were convicted and sentenced in this case:

    Murder in the Second Degree, NYS P.L. § 125.25(3)
    Robbery in the First Degree, NYS P.L. § 160.15(1)
    Robbery in the Second Degree, NYS P.L. § 160.10(1)

6.   (a) What was your plea? (Check one)

    ☒ (1) Not guilty   ☐ (3) Nolo contendere (no contest)

    ☐ (2) Guilty   ☐ (4) Insanity plea

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

(c) If you went to trial, what kind of trial did you have? (Check one)

☒ Jury   ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☐ Yes   ☒ No

8. Did you appeal from the judgment of conviction?

☒ Yes   ☐ No

9. If you did appeal, answer the following:

(a) Name of court: Appellate Dinsion, First Department

(b) Docket or case number (if you know):

(c) Result: Affirmed

(d) Date of result (if you know): 2/21/17

(e) Citation to the case (if you know): 147 A.D. 3d 577

(f) Grounds raised:

1. Erroneas denial of suppression of statements

2. Brady violation

3. Denial of constitutional right to confront witnesses

(g) Did you seek further review by a higher state court?   ☒ Yes   ☐ No

If yes, answer the following:

(1) Name of court: New York State Court of Appeals

(2) Docket or case number (if you know):

(3) Result: Leave to appeal denied

(4) Date of result (if you know): 6/22/17

(5) Citation to the case (if you know): 29 N.Y. 3d 1085

(6) Grounds raised: 1. erroneous denial of suppression of statements

2. Brady violation

3. denial of constitutional right to confront witnesses

(h) Did you file a petition for certiorari in the United States Supreme Court?  ☐ Yes  ☒ No

If yes, answer the following:

(1) Docket or case number (if you know):

(2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

10.  Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions

concerning this judgment of conviction in any state court?  ☐ Yes  ☒ No

11.  If your answer to Question 10 was "Yes," give the following information:

(a)      (1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes  ☐ No

(7) Result:

(8) Date of result (if you know):

(b) If you filed any second petition, application, or motion, give the same information:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ☐   Yes    ☐   No

    (7) Result:

    (8) Date of result (if you know):

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☐ No

(7) Result:

(8) Date of result (if you know):

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:   ☐ Yes   ☐ No

(2) Second petition:   ☐ Yes   ☐ No

(3) Third petition:   ☐ Yes   ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:


12.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: Petitioner was denied his 5th + 14th Amendment constitutional rights when the trial court denied suppression of a videotaped + written statement that was not attenuated from an initial unlawful, suppressed statement and where the police failed to scrupulously honor petitioner's invocation of this right to remain silent.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

see attached sheet


(b) If you did not exhaust your state remedies on Ground One, explain why:

(c)      **Direct Appeal of Ground One:**

     (1) If you appealed from the judgment of conviction, did you raise this issue?    ☒ Yes    ☐ No

     (2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post-Conviction Proceedings:**

     (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

         ☐ Yes    ☒ No

     (2) If your answer to Question (d)(1) is "Yes," state:

     Type of motion or petition:

     Name and location of the court where the motion or petition was filed:

     Docket or case number (if you know):

     Date of the court's decision:

     Result (attach a copy of the court's opinion or order, if available):

     (3) Did you receive a hearing on your motion or petition?    ☐ Yes    ☐ No

     (4) Did you appeal from the denial of your motion or petition?    ☐ Yes    ☐ No

     (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

     (6) If your answer to Question (d)(4) is "Yes," state:

     Name and location of the court where the appeal was filed:

     Docket or case number (if you know):

     Date of the court's decision:

     Result (attach a copy of the court's opinion or order, if available):

     (7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One:

**GROUND TWO:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c)     **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?     ❏  Yes     ❏  No

    (2) If you did <u>not</u> raise this issue in your direct appeal, explain why:

(d)     **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        ❏  Yes     ❏  No

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition:

    Name and location of the court where the motion or petition was filed:

    Docket or case number (if you know):

    Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?        ☐  Yes    ☐  No

(4) Did you appeal from the denial of your motion or petition?   ☐  Yes    ☐  No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐  Yes    ☐  No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you :
have used to exhaust your state remedies on Ground Two

**GROUND THREE:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground Three, explain why?

(c)      **Direct Appeal of Ground Three:**

　　　　(1) If you appealed from the judgment of conviction, did you raise this issue?      ☐ Yes    ☐ No

　　　　(2) If you did not raise this issue in your direct appeal, explain why:

(d)      **Post-Conviction Proceedings:**

　　　　(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

　　　　　　　☐  Yes    ☐  No

　　　　(2) If your answer to Question (d)(1) is "Yes," state:

　　　　Type of motion or petition:

　　　　Name and location of the court where the motion or petition was filed:

　　　　Docket or case number (if you know):

　　　　Date of the court's decision:

　　　　Result (attach a copy of the court's opinion or order, if available):

　　　　(3) Did you receive a hearing on your motion or petition?      ☐ Yes    ☐ No

　　　　(4) Did you appeal from the denial of your motion or petition?      ☐ Yes    ☐ No

　　　　(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☐ Yes    ☐ No

　　　　(6) If your answer to Question (d)(4) is "Yes," state:

　　　　Name and location of the court where the appeal was filed:

　　　　Docket or case number (if you know):

　　　　Date of the court's decision:

　　　　Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three:

**GROUND FOUR:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground Four, explain why:

(c)     **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☐ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes     ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?            ☐ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?       ☐ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ☐ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four:

13.     Please answer these additional questions about the petition you are filing:

(a)     Have all grounds for relief that you have raised in this petition been presented to the highest state court
having jurisdiction?   ☒ Yes   ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not
presenting them:

(b)     Is there any ground in this petition that has not been presented in some state or federal court?  If so,
ground or grounds have not been presented, and state your reasons for not presenting them:   N/A

14.     Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction
that you challenge in this petition?        ☐ Yes   ☒ No

If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues
raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy
of any court opinion or order, if available.

15.     Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for
the judgment you are challenging?        ☐ Yes   ☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the
raised.

16.   Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:


(b) At arraignment and plea:


(c) At trial: Thomas Klein, of counsel, The Legal Aid Society 49 Thomas Street, New York, NY

(d) At sentencing: Thomas Klein, of counsel, The Legal Aid Society

(e) On appeal: Denise Fabiano, of counsel, The Legal Aid Society, Criminal Appeals Breau, 199 Water Street, New York, NY 10038

(f) In any post-conviction proceeding: N/A


(g) On appeal from any ruling against you in a post-conviction proceeding: N/A



17.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?          ☐ Yes   ☒ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:



(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?          ☐ Yes   ☐ No

18.   TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C.   § 2244(d) provides in

part that:

    (1)      A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

          (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

          (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

          (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

          (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)      The time during which a properly filed application for State post-conviction or other collateral review
with respect to the pertinent judgment or claim is pending shall not be counted toward any period of
limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:

*grant the writ of habeas corpus*

or any other relief to which petitioner may be entitled.

_____
Signature of Attorney (if any)

*( DF 7595 )*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for

Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on _____ (date).

_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

GROUND ONE

(a) Supporting facts

Helen Abbott's body was discovered in a back bedroom inside her apartment in the Wagner Houses, at 2400 Second Avenue, shortly after 3:00 p.m. on January 13, 2008.  Detective Gerard Dimuro was assigned to assist the lead detective, Detective Ruben Henriquez, in the murder investigation that same day. Abbott's daughter had last spoken to her mother on January 11, around noon.

The police found two residents who indicated that they had seen Abbott on January 12th and that a man named Sidney Gotler had been seen entering and leaving the apartment on Saturday morning, January 12. Dimuro learned that Abbott had been a frequent drug user and let people use her apartment for $10 to use drugs, cook, or have sex.  Around January 31, 2008, the police were told by the Office of the Chief Medical Examiner that amylase—found in saliva and sweat—had been found on Abbott's breast. No semen was found on the body.

Video surveillance from the building showed Abbott leaving her building on January 11, 2008, at 3:45 a.m. and re-entering at 3:53 a.m.  She was not seen on the video again.  The video also showed appellant, Mark Richardson, entering the building on January 11, at 1:00 a.m., along with Anthony Hall, and leaving the building at 3:36 a.m. He re-entered the building the next morning at 11:37 a.m. and exited again at 12:15 p.m.  He entered again a few minutes later at 12:37 p.m. and left again at 1:52 p.m.  He entered the building a final time at 2:28 p.m., on Friday, January 11, and left around 5:00 p.m.

In January 2008, Desiree Allen, appellant's then-girlfriend, told the police that they should look at Richardson with respect to the Abbott murder.

On February 5, 2008, Mark Richardson voluntarily agreed to speak to the police. Dimuro read him his Miranda rights, although he made clear that he was not under arrest and could leave at any time.  Richardson waived his rights.  Richardson told Dimuro that on Friday, January 11, 2008, he worked from 7:30 a.m. to 3:30 p.m., when he returned home to take a shower.  He then went to his girlfriend's, Desiree Allen's, apartment at 40 Palladino Avenue. Desiree was drinking and doing drugs with Anthony Hall when Richardson arrived.  Richardson had lent Hall money a few weeks earlier and had not been paid back.    Richardson asked for his money and Hall told him he was going to get it at "Mama's" house. Richardson left with Hall and went back to Hall's apartment on the 11th floor of 2400 Second Avenue.  They went up to "Mama's"

apartment on the 12th floor and Richardson used the bathroom and waited in the living room while Hall went into the kitchen with Mama. According to Richardson, a fight "broke out" between Hall and Abbott, with Hall demanding his money, as he slammed Abbott against the refrigerator in the kitchen. Richardson separated them and left the apartment while they were still arguing and things were "getting heated" between Hall and Abbott. Dimuro wrote this statement down, Richardson signed it and then asked for a ride home.

At some point, the police obtained Abbott's cell phone records. The last activity on the phone was an outgoing call made at 4:59 p.m. on January 11, 2008, made from outside of Abbott's apartment. There were numerous calls made earlier in the day from inside the apartment. These calls were ultimately determined--sometime after Richardson was interviewed on February 5-- to have been placed to Richardson's family members.

On July 3, the Office of the Chief Medical Examiner found a match between Richardson and the DNA found on Abbott's breast. Mr. Richardson was arrested on July 10, 2008, and taken to the interview room at the detective squad, arriving at about 8:45 a.m. Dimuro, along with Henriquez and Torres, spent about ten minutes with Richardson in the interview room, telling him that the case had "progressed," that they had "so much more than the first time" they talked, and that this time—unlike on February 5th-- Richardson "would not be leaving." The officers then left Richardson alone in the interview room.

Dimuro went back into the interview room at about 9:45 a.m., along with Detectives Torres and Henriquez. Without reading him his Miranda rights, Detective Dimuro began to question Mr. Richardson about the crime. Dimuro read Richardson his February 5th statement twice, in attempt to "solidify" what he had said at that time. He asked Richardson if each part was true and Richardson confirmed the same. Dimuro then confronted Richardson with the new evidence against him: Abbot's cell phone records with phone calls made to Richardson's family members and the video surveillance, which showed Richardson coming and going from the victim's building on January 11. Dimuro told Richardson that this was "concrete evidence" and not just what people said. Dimuro then "hit him with the fact we had DNA . . . . [a]nd [] wait[ed] for a reaction". Richardson became "very agitated" and told Dimuro that "theoretically she could have been sitting on my lap and I could have been sucking on her titties," before immediately stating that his statement of February 5 was his statement and that he did not want to talk to the police. At that point, Dimuro finally read him his Miranda rights and Richardson reiterated that

he would not answer any questions.  He was brought to a holding cell.

When asked why he had not read Richardson his Miranda rights when he first began questioning him at 8:30 a.m., Dimuro stated that as long as was reviewing what Richardson had said in February, he was not concerned about giving him Miranda warnings. He acknowledged that at the end of the session he "want[ed] to jolt [Richardson]" with the new DNA evidence which was "new ground" according to Dimuro and had planned to read him Miranda, but did not.  Dimuro conceded that "in retrospect maybe I should have done it right away."

At about 11:20 a.m., Richardson asked to use the bathroom.  Henriquez brought him from the holding cell to the bathroom.  While walking back to the holding cell, Richardson asked "How serious is this?  Am I going to do a lot of time for this?"   Henriquez told him he was going to be "straight" with him, telling him that it was "bad" because he was facing a murder charge.  Henriquez told him that an elderly woman had been killed, that his DNA was there, that he was on video going into the building, and the phone records from the victim's phone showed phone calls to his family.  Richardson started crying and Henriquez told him that the police were giving him "every opportunity to tell your side of the story."  Henriquez pointed out to Richardson that he was crying and that he wasn't a "monster" and that he had something "heavy in his heart" that he should get out.  He asked if there was "something he need[ed] to say".  Richardson broke down and said he would talk.

Both Henriquez and Dimuro went back into the interview room at about 11:55 a.m.  Richardson was upset and crying and Dimuro believed that "he was ready to tell the real story."  Dimuro told him "we're not going to have to go through the same bullshit again, are we?" and told him that if he wanted to talk he would have to give them new information. Dimuro read Richardson his Miranda rights and Richardson agreed to speak.  Dimuro spoke to Richardson for about an hour.  Richardson gave a statement which Dimuro wrote down and Richardson signed.

In the statement, Richardson indicated that he went to his girlfriend's apartment on January 10, 2008. Anthony Hall was there, smoking crack and drinking.  He had met Hall a few weeks prior and lent him some money.  Richardson asked for his money back and Hall said that he would take him to get the money.  They went to Hall's apartment building at 2400 Second Avenue.  They ran into one of Hall's friends in the elevator named Johnny, whom Richardson had never seen before.  Johnny said that he was going to "Mom's" apartment to do "the thing."  Hall stopped at his apartment on the 11th floor with Richardson and then told him to come

upstairs to get his money.  They went up to the 12th floor where Helen Abbott lived.  Johnny was in the kitchen doing drugs.  While Richardson was in the living room, Hall and Abbott began arguing in the kitchen over money.

Richardson went into the kitchen and asked where his money was and Hall pointed to Abbott and said she had his money.  Richardson asked Abbott for his money and she said, "I ain't going to give you shit."  Richardson saw money sticking out of Abbott's bra so he reached into her shirt and took the money.  Abbott hit Richardson in the face and, as he turned to leave, she grabbed his shirt from behind.  Johnny grabbed Abbott around her neck.  Hall grabbed "something silver" from the kitchen and hit her in the stomach—Richardson thought he was just punching her but when he saw blood he realized that Hall had stabbed her with something.  As he left the apartment, Johnny was still holding Abbott and she was screaming.  At the end of the statement, Dimuro told Richardson that this "is the statement that you are going to live by.  You signed it and this is it."

Richardson was then left alone in the interview room until ADA O'Connell arrived at 6:00 p.m. to videotape Richardson's statement, a process which took about two hours.  The ADA read Richardson his Miranda rights, reminding Richardson that he had earlier waived his Miranda rights with Detectives Dimuro and Henriquez, who were sitting in the room.  Richardson agreed to speak.

Immediately after reading him his Miranda rights, the ADA referred to Richardson's written statement from earlier that day, asking Richardson if he wrote it.  She then asked Richardson to tell her "what happened."  Richardson repeated his earlier statement.  Richardson stated that when the officers questioned him on February 5th, he left the part out about Hall having a silver object in his hand because he was on parole.  The ADA asked if Henriquez and Dimuro, who were sitting next to her, had gone over his February 5th statement with him earlier that day.  She further asked if the officers told him they had DNA and phone records that implicated him.  Richardson said they had and that he had refused to talk any further.  Richardson explained to the ADA that he had a change of heart because Henriquez had said things that "touched" him.  The ADA asked if Dimuro had written out his statement earlier that day and whether he had time to look it over and sign it.  Richardson indicated that he had.

Richardson indicated that he had learned from the police that phone calls made from Abbot's telephone were made to his friends and family.  At this point, Dimuro interjected that a

phone call had been made to Richardson's brother. Richardson stated that he had never been to 2400 Second Avenue before that day with Hall. The ADA then went over Richardson's statement from earlier that day, asking him if he was angry when the detectives told him about the DNA evidence. She also went over the physical confrontation in the kitchen. When the ADA began to question if he knew "Johnny," Dimuro took over the questioning, asking Richardson a series of questions about the altercation and several other topics. When the ADA resumed questioning Richardson, Dimuro again interjected, and continued to actively participate throughout the remainder of the questioning.

After the videotaped statement had concluded, Richardson was again briefly left in the interview room. Henriquez popped his head in and Richardson volunteered that the "phone belonged to the old lady." Henriquez asked him why he had not mentioned this in the interview and Richardson indicated that he would tell Henriquez now. At about 8:45 p.m., without being re-Mirandized, Richardson told Henriquez that he had called his brother and his fiancée from the phone. He otherwise repeated his videotaped statement. As Richardson spoke, Henriquez wrote the statement down and had Richardson sign it.

The Defense Motion to Suppress

Defense counsel filed a written motion, dated May 12, 2010, arguing in relevant part that the statements made on July 10th must be suppressed. Specifically, Dimuro failed to read Mr. Richardson his Miranda rights before he was first questioned on July 10, 2008. After Richardson invoked his right to remain silent, the police failed to scrupulously honor that right, appealing to him to make a second statement, that added details to his February 5th statement. Accordingly, the second statement be suppressed as well.Defense counsel, citing relevant Supreme Court cases, further argued that the videotaped statement and subsequent written statement to Henriquez were tainted by both the Miranda violation and the failure to scrupulously honor Richardson's invocation of his right to remain silent—a constitutional violation-- and were not attenuated and must be suppressed. Finally, defense counsel argued that aside from the Miranda violation, the videotaped statement and subsequent final statement to Henriquez were the fruits of a constitutional violation and must be suppressed.

The Trial Court's Decision

In a written decision, dated November 10, 2010, the court granted the defense motion to suppress in part, and denied it in part. The court suppressed the two statements—the pre-

Miranda statement and the first post-Miranda statement-- obtained by Dimuro on July 10, shortly after Richardson's arrest.

The court refused to suppress the subsequent videotaped and written statement, finding that Richardson was "no longer materially influenced by the Miranda violation" at the time of the videotaped statement.  In so finding, the court concluded that Richardson had been lawfully arrested on July 10, there was no flagrant police misconduct, Dimuro's two interview sessions with Richardson on July 10 were "relatively brief with an interval of approximately five hours between his last session with Richardson and the commencement of the video recorded statement," ADA O'Connell administered the Miranda warnings before the videotaped statement and ADA O'Connell did the "greater part of the questioning" with "Dimuro interjecting from time to time."  Finally, the court noted that Richardson did not appear "intimidated by the presence of the detectives."

The court concluded that the attenuation doctrine removed "the taint of the Miranda violation" from the portions of the video relating to Richardson's account of his actions on the day of Abbott's death as well as his discussion of his February 5th statement. However, the portions of the videotaped statement that referenced the earlier statements from July 10 obtained in violation of Miranda would be redacted. Finally, the court found Richardson's subsequent statement to Henriquez, after the videotape statement had concluded, about the "old lady's phone" admissible.  A re-reading of Miranda was unnecessary at that point.

Richardson renewed these arguments before the Appellate Division, First Department and sought leave to appeal to the New York State Court of Appeals on these same grounds.