

SUPREME COURT STATE OF NEW YORK

COUNTY OF NEW YORK : CRIMINAL TERM : PART  45
------------------------------------x
PEOPLE OF THE STATE OF NEW YORK,    Ind. No. 3534/08

           - against -

MARK RICHARDSON
------------------------------------x

                    111 Centre Street
                    New York, New York
                    September 8, 2011


FILED

JUN 2 5 2012

SUP COURT, APP. DIV
FIRST DEPT.

HONORABLE BRUCE ALLEN, Judge


A P P E A R A N C E S :


            NEW YORK COUNTY DISTRICT ATTORNEY
            CYRUS R. VANCE, JR.
             District Attorney, New York County
            BY: MATTHEW BOGDANOS, ESQ.



            LEGAL AID SOCIETY
            BY:  THOMAS KLEIN, ESQ.
            BY: SARAH LEGLER, ESQ.
            Attorney for defendant



            CLAUDINE Y. DAVIDSON
            SENIOR COURT REPORTER

2v

1          THE CLERK:  Recalling case on trial.

2    Mark Richardson.  All attorneys and defendant

3    present.  No jurors present at this time.

4          MR. BOGDANOS:  Matthew Bogdanos for the

5    People.

6          MR. KLEIN:  Legal Aid Society,

7    Thomas Klein.

8        Sarah Legler, L-E-G-L-E-R.

9          THE COURT:  Good morning, everyone.  We

10   have assembled a group of about 80 to 90 jurors and

11   I believe both sides have agreed that I will address

12   these folks as a group, and explain to them the

13   length of the trial and allow those who have what

14   they believe to be hardships to come in

15   individually, one at a time to express those

16   sentiments to us.

17     Once I speak to the individual jurors, I will

18   give both sides a chance to ask additional questions

19   concerning that particular juror.

20     Agreed?

21          MR. BOGDANOS:  Yes.

22          MR. KLEIN:  Fine.

23          THE COURT:  Before we bring them in, I want

24   to put the Sandoval ruling on the record.  If

25   Mr. Richardson takes the stand Mr. Bogdanos, you may

1   ask him the following question concerning his past

2   record:  Since 1985, have you been convicted of X

3   felonies and Y misdemeanors.  You cannot count the

4   youthful offender conviction.

5       And also, I believe that there were -- there was

6   at one -- on one occasion, he plead guilty to two

7   crimes on the same day and I believe under the law,

8   that counts as one conviction.  So, check on that?

9           MR. BOGDANOS:  Gotcha.

10          THE COURT:  And confer with Mr. Klein as to

11  the numbers.  If there is a disagreement on the

12  numbers, then I will take a look at the rap sheet.

13          MR. BOGDANOS:  I am sure there won't be.

14  Thank you, your Honor.

15          THE COURT:  Thank you.

16          THE COURT:  Are both sides ready for the

17  panel?

18          MR. KLEIN:  Yes.

19          THE COURT:  May we have the jurors please.

20          COURT OFFICER:  Jurors entering.

21      (Jury panel entering.)

22          THE CLERK:  Will the panel please rise and

23  raise your right hand.  Do you solemnly swear or

24  affirm that you will truly answer all questions put

25  to you touching upon your competency as an impartial

1    juror between the People of the State of New York

2    and Mark Richardson, the defendant at the bar?  Do

3    you so swear or affirm?

4            PROSPECTIVE JURORS:  I do.

5            THE COURT:  Good morning, ladies and

6    gentlemen.  I welcome all of you to part 45 as we

7    call this courtroom.  My name is Bruce Allen and I'm

8    going to be the presiding judge at the trial.  And

9    as you will hear, this is a criminal case.  To those

10   who are standing, I apologize but you won't be

11   standing for long and I will explain why in a few

12   minutes.  And I thank all of you for coming here.  I

13   know that some of you traveled from Thomas Street

14   and the others came from 60 Center.

15       Is that true?

16            PROSPECTIVE JURORS:  Yes.

17            THE COURT:  Usually, we get our jurors

18   right from this building itself but there were none

19   available.

20       In the typical trial, criminal trial in Supreme

21   Court, we bring down about 60 jurors and we usually

22   can pick the juror from that group of 60.  In this

23   case, we are not going to be able to do it that way

24   because the trial is going to take a little bit

25   longer than the typical criminal trial.

1      I have discussed this with the attorney and I am

2   going to tell you now that this trial is going to

3   take somewhere between two to three weeks.  We are

4   shooting or hoping to get the case to you for

5   deliberations approximately two weeks from today.

6   That would be the 22nd.  We might not make it and

7   you might not get this case until a few days later.

8   And indeed, if you are going to serve on the case,

9   you have to be prepared to come back that following

10   week beginning on the 26th.

11      I do not believe the trial will go beyond the

12   middle of that week.  That would be about the 28th.

13   But it is a longer than average trial.  And we

14   recognize that.  For some of you, this trial may

15   prove to be too much.  So what we are going to do is

16   give those folks who do have a scheduling concern or

17   a problem with this case a chance to come in

18   individually one by one and we are going to speak to

19   those folks this morning.

20      To be excused for a scheduling reason, the law

21   says that you have to show some sort of a hardship.

22   In other words, even though it's the luck of the

23   draw, you might get sent to a one week trial.  You

24   might get sent to a three month trial but the law is

25   the same in every case.  You can't be excused unless

1   there is some sort of a hardship.

2        So please bear that in mind.  I am not going to

3   tell you very much about the case itself.  It's

4   obviously a very important case, a very serious

5   case.  The top charge is murder in the second

6   degree.  I can also tell you that we have very fine

7   attorneys in this case on both sides.  They are

8   going to work very hard to make sure that we keep to

9   the schedule.  There will be no delay tactics.

10        For those who wind up serving on the case, I

11   think I can say to you this will truly be a once in

12   a lifetime experience, and to those who serve, it is

13   very likely that this will be the last time that you

14   have to serve on a case.  You won't even be asked to

15   come down here again for at least eight years.  They

16   give you that because of the length of the trial.

17        I should also mention that the workday itself

18   begins at about 9:45.  We try to get out of here

19   everyday by 4:30, although we might go beyond 4:30

20   occasionally.  There will be a couple of days off

21   during the course of the trial.  I have

22   institutional assignments on at least two days so we

23   won't be in session.  You will still get paid but we

24   won't be in session.  Those days will be Friday, the

25   ninth and also Friday the 16th.

1    Maybe I have said enough.  I see some grim faces out

2    there, and I understand.  We all understand.  It's not

3    easy coming down here to serve on any case much less a

4    case like this one.

5        So, we will be speaking now to the folks who would

6    like to speak to us concerning a possible hardship.

7    Before we do that, just give me a sneak preview.  How

8    many are thinking right now, I can do this or I might be

9    able to do this?

10       By the way, those who want to make calls to

11   employers, to make sure that it's okay with the folks at

12   work, you can do that now and let us know at 2:15 whether

13   or not it works and we -- you will have a second chance

14   at 2:15 if you think you have a hardship at that time.

15   But just right now, how many think they can do it

16   (indicating)?

17            THE COURT:  That's a tremendous response,

18       really it is and I thank all of you in advance and

19       for those who think they can do it, you don't have

20       to wait around while we speak to the other folks

21       because this is going to take awhile.  Those who are

22       thinking they can do it -- those folks are simply

23       going to be asked to come back at 2:15.

24           For everyone else who thinks they may have a

25       hardship, Sergeant Hut will take over and he will

1    send you in one at a time with your ballet and we'll

2    speak to you in the courtroom itself.

3        Yes, ma'am?

4        PROSPECTIVE JURORS:  Is there a chance of

5    being sequestered in this case?

6        THE COURT:  No.  You will not be

7    sequestered.  In fact, I thank you for that

8    question.  And anyone else who has any question at

9    all, I will be happy to try to answer that now

10    before we send everyone out.  Anyone else with any

11    question, anything that I said confuses you in any

12    way?  Thank you, ma'am.  Thank you, everyone.

13        Those who are coming back because they can do

14    it, 2:15 come directly here to this courtroom.

15    Everyone else, Sergeant Hut will send you in one at

16    a time but you are all free to leave the courtroom

17    now.

18        (Prospective jurors exit the courtroom at this

19    time.)

20        COURT OFFICER:  Jurors entering.  Christin

21    Goldmansour, G-O-L-D-M-A-N-S-O-U-R.

22        THE COURT:  I see you have got a medical

23    problem?

24        PROSPECTIVE JUROR:  Which wasn't the

25    original issue but when they said two weeks, I was

1    okay.  But first of all, I am self-employed and I do

2    consulting.  So to take two weeks off was okay but I

3    was pushing everything back.

4              THE COURT:  It's an economic concern?

5              PROSPECTIVE JUROR:  And also I will have to

6    get stitches out at a certain point.

7              THE COURT:  I am going to also ask you to

8    try to speak towards them.  Any questions from

9    counsel?

10             MR. BOGDANOS:  No, judge.

11             THE COURT:  You are excused, ma'am.  Thank

12   you very much.

13        (Prospective juror exits at this time.)

14             THE COURT:  Joseph Alhadeff,

15   A-L-H-A-D-E-F-F.

16             PROSPECTIVE JUROR:  I am a financial

17   advisor.  I work on commission only and I also have

18   a trip scheduled for the 28th of September.

19             THE COURT:  You lose money if you had to

20   serve?

21             PROSPECTIVE JUROR:  Yes.  I won't make it.

22             THE COURT:  I will excuse you.  Are there

23   any questions from counsel?

24             MR. BOGDANOS:  No.

25             MR. KLEIN:  No.

1          (Prospective juror exits at this time.)

2              COURT OFFICER:  Juror entering.

3              THE COURT:  Sona Lise, H-A-R-A-T-U-N-I-A-N.

4     Middle name L-I-S-E.  First name, S-O-N-A.

5              PROSPECTIVE JUROR:  I am part of a very

6     small three group, group team.  I am responsible for

7     putting together a national mid-October meeting.

8              THE COURT:  What kind of work do you do?

9              PROSPECTIVE JUROR:  Design training.  It's

10    for our top leaders at the firm.

11             THE COURT:  You think it would be worth

12    while to check with the folks at work?

13             PROSPECTIVE JUROR:  I spoke to them

14    yesterday just in case and put together a time line

15    and it so happens the dates that you talked about

16    are critical days I have to turn deliverable.

17             THE COURT:  You know it's not going to

18    work?

19             PROSPECTIVE JUROR:  It's going to be very

20    difficult because it's such a small group.  I don't

21    think anybody else from our team will be able to

22    take that on for three weeks.  It will be very

23    difficult.

24             THE COURT:  Anyone?

25             MR. BOGDANOS:  No.

1          MR. KLEIN:  No.

2          THE COURT:  You are excused.  Thank you

3    very much.

4          (Prospective juror exits at this time.)

5          THE COURT:  Good morning.  We just made it

6    by one minute.

7          Robyn Gottlieb, R-O-B-Y-N.  G-O-T-T-L-I-E-B.

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Did you have a problem?

10         PROSPECTIVE JUROR:  I served on many

11   juries.  When I was over at civil court, they said

12   this would go through next week and so I came over

13   but -- I have a 95 year old mother and this is

14   getting awfully close to the Jewish holidays and I

15   have a lot of preparation I have to do with her.

16         THE COURT:  You take care of your mom?

17         PROSPECTIVE JUROR:  I am her only child.  I

18   should also mention I work for the medical examiner.

19         THE COURT:  That won't disqualify you.

20         PROSPECTIVE JUROR:  I know.  I just wanted

21   to mention it.

22         THE COURT:  Anyone questions?

23         MR. BOGDANOS:  No.

24         MR. KLEIN:  No.

25         THE COURT:  I will excuse you,

1    Ms. Gottlieb.

2              PROSPECTIVE JUROR:  Thank you, so much.

3         (Prospective juror exits the courtroom.)

4              COURT OFFICER:  Step up.

5              THE COURT:  Good afternoon, sir.

6    This is -- first name Francisco Hernandez; usual

7    spelling.

8              PROSPECTIVE JUROR:  Well this is my first

9    time here.  I just wanted to say I think my guess it

10   will be a hardship.  I don't know exactly.

11             THE COURT:  What is the problem?

12             PROSPECTIVE JUROR:  The number of days the

13   company will cover.

14             THE COURT:  Who do you work for?

15             PROSPECTIVE JUROR:  Circle North America.

16             THE COURT:  What is that?

17             PROSPECTIVE JUROR:  What company?

18             THE COURT:  What do they do?

19             PROSPECTIVE JUROR:  It's an IT company.

20             THE COURT:  What did they tell you in terms

21   of how many?

22             PROSPECTIVE JUROR:  Actually, I just texted

23   them about a specific answer.  That's why I don't

24   have all the answers now.

25             THE COURT:  You might be able to serve?

1          PROSPECTIVE JUROR:  I might be able to
2     serve but definitely a limit in the number of days.
3          THE COURT:  I will ask you to come back at
4     2:15 with the other people here and we will bring
5     you in then and you can tell us if the situation
6     after you hear from them.
7          PROSPECTIVE JUROR:  Okay.
8          THE COURT:  Otherwise, you are willing to
9     do it?
10          PROSPECTIVE JUROR:  Yes.
11          COURT OFFICER:  Come back at 2:15.
12          THE COURT:  Goods afternoon, ma'am.  First
13     name Kaman, K-A-M-A-N.  Last name Lam, L-A-M.  What
14     is your concern?
15          PROSPECTIVE JUROR:  I am self-employed.  So
16     I am not sure.
17          THE COURT:  You are going to lose money if
18     you have to serve on a trial?
19          PROSPECTIVE JUROR:  I will be happy to if I
20     have to.
21          THE COURT:  What kind of work do you do?
22          PROSPECTIVE JUROR:  Free-lance make up
23     artist.
24          THE COURT:  In a--
25          MR. BOGDANOS:  I can't hear.

1          PROSPECTIVE JUROR:  Free-lance make up

2     artist.

3          MR. BOGDANOS:  Thank you.

4          THE COURT:  What do you think?  You could

5     do it or no?

6          PROSPECTIVE JUROR:  If I have to, I will.

7          THE COURT:  You are willing to do it?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Are you going to lose a lot of

10    money?

11         PROSPECTIVE JUROR:  It could be.

12         THE COURT:  Do you speak English well

13    enough to do this?

14         PROSPECTIVE JUROR:  That is part of my

15    concern as well.

16         THE COURT:  Have you been able to follow

17    me?

18         PROSPECTIVE JUROR:  Yes but maybe not like

19    very difficult subjects.  Normal conversation, I can

20    handle.

21         THE COURT:  Counsel, any questions?

22         MR. BOGDANOS:  Ma'am, you mentioned that

23    since you free-lance, you would be able to do some

24    of your -- some of the work after the court was done

25    for the day, right?

1          PROSPECTIVE JUROR:  Depends on the jobs

2     because it's like different jobs.  It's different

3     time everyday.

4          MR. BOGDANOS:  Thank you, so much.

5          MR. KLEIN:  You mentioned you said that

6     conversational talk, you have no problem.

7          PROSPECTIVE JUROR:  Like this, I have no

8     problem.

9          MR. KLEIN:  Okay.  And if there was

10    testimony from doctors or scientists about

11    scientific issues, do you think that would present

12    any problem or that would be okay?

13         PROSPECTIVE JUROR:  I want to understand

14    everything.  Do you have like a translator for

15    Chinese?

16         THE COURT:  No.  That we can't do.  Seems

17    like I would describe it as fluent--

18         PROSPECTIVE JUROR:  You think so?

19       Conversation, I think is perfect.

20         MR. KLEIN:  What is your concern about the

21    scientific discussion?

22         PROSPECTIVE JUROR:  I am very bad at

23    biology.

24         MR. KLEIN:  You don't have to be good at

25    any specific topic but are you afraid that you might

1    not follow everything or hear everything or

2    understand everything?  Just tell us.

3              PROSPECTIVE JUROR:  If it's like words of

4    chemicals, I don't understand.

5              MR. BOGDANOS:  You are not saying that's a

6    language issue.  That's just you are not good at

7    biology issues.

8              PROSPECTIVE JUROR:  Or maybe sometimes I

9    don't understand some difficult words.

10             THE COURT:  Ms. Lam, I don't understand

11   biology either.  I am going to ask you to come back.

12        (Prospective juror exits the courtroom at this

13   time.)

14             COURT OFFICER:  Juror entering.

15             THE COURT:  Good afternoon, sir.

16        First name M-A-D-H-A-V.  Last name

17   T-A-D-I-K-O-N-D-A.

18             THE COURT:  So you are worried about this

19   case?

20             PROSPECTIVE JUROR:  I am, yes.

21             THE COURT:  What is the problem?

22             PROSPECTIVE JUROR:  I am worried about the

23   length of time on it.  I am basically the primary

24   financial provider for our family and I have a

25   project that will start -- basically, meant to fly

1    to India a week from tomorrow.  I have been working

2    on it for three to four months.  It's around a bank

3    take over in India.  We have been doing all the

4    proprietary work.  It's starting in India the

5    following Monday.

6              THE COURT:  Does anyone have any questions?

7              MR. KLEIN:  No.

8              MR. BOGDANOS:  No.

9              THE COURT:  I am going to excuse you then.

10   Don't want you to miss that trip.

11             PROSPECTIVE JUROR:  Thank you.

12        (Prospective juror exits the courtroom.)

13             THE COURT:  Good afternoon, ma'am.

14        Crystal Blackson, B-L-A-C-K-S-O-N.

15             THE COURT:  How are you?

16             PROSPECTIVE JUROR:  So so.

17             THE COURT:  A little unhappy.  What is your

18   worry?

19             PROSPECTIVE JUROR:  I was in a car accident

20   so I go to therapy.

21             THE COURT:  How often?

22             PROSPECTIVE JUROR:  Three times a week.

23             THE COURT:  During this trial, you have

24   sessions three times a week?

25             PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Any questions?

2          MR. BOGDANOS:  No judge.

3          MR. KLEIN:  No.

4          THE COURT:  You are excused Ms. Blackson.

5     We are not--

6          (Prospective juror exits at this time.)

7          COURT OFFICER:  Juror entering.

8          THE COURT:  Good afternoon.  Your ballet

9     please.

10          THE COURT:  This is James Moyer, M-O-Y-E-R.

11    What's the problem?

12          PROSPECTIVE JUROR:  Well, I just got

13    started on a contract for my agency with Bank of

14    America, four month contract.  So it would cause a

15    hardship to the project to be gone just at the start

16    of it for a few weeks.

17          THE COURT:  Is it you and a lot of people

18    working with you or just you alone?

19          PROSPECTIVE JUROR:  No.  There is like --

20    in our group, we have like ten people.  We are not

21    all doing one thing, different types of things but I

22    don't know exactly which project.  I just literally

23    got hired for the job.

24          THE COURT:  What kind of work is it?

25          PROSPECTIVE JUROR:  Like a contract

1      software development for Bank of America.

2                 THE COURT:  Do you work for a company.

3                 PROSPECTIVE JUROR:   Through an agency that

4      placed me at Bank of America.

5                 THE COURT:  This will be an economic

6      opportunity that you would lose?

7                 PROSPECTIVE JUROR:  Yes.

8                 THE COURT:  Anyone?

9                 MR. BOGDANOS:  Just one question.  So, you

10     couldn't sit for any trial?

11                PROSPECTIVE JUROR:  If its short.

12                PROSPECTIVE JUROR:  A week long would be

13     hard.

14                MR. BOGDANOS:  Got it.  Thank you.

15                THE COURT:  Mr. Moyer, you are on your way.

16     You are excused.

17                PROSPECTIVE JUROR:  Thank you.

18                THE COURT:  Good afternoon.  This is Scott

19     Portnoy, P-O-R-T-N-O-Y.

20                THE COURT:  Go ahead.  What's the problem?

21                PROSPECTIVE JUROR:  The problem is the

22     length.  Two reasons, the length of the trial may

23     impede on Jewish holiday toward the ends of this

24     month as well as the fact that I have been recently

25     notified by my employer that my company will be

1    downsizing and I will be let go towards the end of

2    this year and given that I feel like my time would

3    be better served for my family and my own benefit to

4    be looking for a job as a full-time job.

5              THE COURT:  Well if I were to promise you

6    that you won't miss any religious occasions, would

7    that make a difference or is your concern more about

8    the job?

9              PROSPECTIVE JUROR:  Quite honestly, they

10   are both very important.

11             THE COURT:  Are you looking for work

12   already?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  What kind of work do you do?

15             PROSPECTIVE JUROR:  Commercial real estate

16   finances.  I was notified by my employer about two

17   weeks ago.

18             THE COURT:  Because your company is

19   shrinking?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  Were you given notice that you

22   will be in fact terminated?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Anyone?

25             MR. BOGDANOS:  No.

1        MR. KLEIN:  No.

2        THE COURT:  Then I will excuse you

3    Mr. Portnoy.  Good luck.

4        PROSPECTIVE JUROR:  Thank you.  I

5    appreciate it.

6        (Prospective juror exits at this time.)

7        COURT OFFICER:  Juror entering.

8        THE COURT:  Good afternoon, sir.

9    It's William Goldin, G-O-L-D-I-N.

10       PROSPECTIVE JUROR:  I am under an eviction

11   order and I am in the process of removing my

12   belongings from my apartment.

13       THE COURT:  Do you have a place to go?

14       PROSPECTIVE JUROR:  No.  This is why I am

15   saying I am -- I am not moving because I don't have

16   a place to go but I am removing my belongings.  I am

17   in the course of doing that.  I have couple of

18   extensions because I have lots of things and I do it

19   all by myself.  Renting a van and I rented some

20   storage rooms.

21       THE COURT:  Sounds like a lot.

22       THE COURT:  Any questions?

23       MR. BOGDANOS:  No.

24       MR. KLEIN:  No.

25       THE COURT:  Mr. Goldin, I am going to

1       excuse you.  I am not going to make you serve.

2              PROSPECTIVE JUROR:  Thank you very much.

3          (Prospective juror exits at this time.)

4              COURT OFFICER:  Juror entering.

5              THE COURT:  This is Bruce.  Last name

6       Bertrand, B-E-R-T-R-A-N-D.  Go ahead Mr. Bertrand.

7              PROSPECTIVE JUROR:  I have three potential

8       hardships.  One scheduling issue.  One of a

9       financial nature and one that's both the one that's

10      both is that I just two days ago finally confirmed

11      that I will eligible to purchase my first home and

12      legal paperwork has come in.  I have approximately

13      ten days to secure the financing for that.  The

14      reason that I am purchasing that new home is because

15      it's a limited equity co-op meaning that I will be

16      able to save a lot of money every month.

17          I can barely afford my current rent right now

18      which leads me to the truly financial hardship which

19      is after ten days, my employer will stop paying my

20      salary.  $40 a day will leave me in a position where

21      I cannot pay my rent at the end of this month and

22      the scheduling, purely scheduling hardship is that

23      my employer is a school.  We have just started a new

24      semester and I work as a system engineer for

25      learning department, technical department.

1        I am one of the only people who can provide the

2    technical services that they will need over the next

3    couple of weeks.

4            THE COURT:   Which school is this?

5            PROSPECTIVE JUROR:   Manhattan School of

6    Music.

7            THE COURT:   Anyone?

8            MR. BOGDANOS:   Yes, if I could.

9    Congratulations on the news about the mortgage.

10   That's great.   Since you work in a school of all

11   people, I don't need to tell you how crucially

12   important to our community, how important jury duty

13   is.   Knowing what you know about the fact that

14   without a jury, the system just stops working, do

15   you really believe -- tell us what you really

16   believe that you cannot serve even if the case may

17   go 12, 13 days instead of the ten for which you are

18   getting paid.   Is this still your position that you

19   would not be able to serve?

20           PROSPECTIVE JUROR:   From a financial

21   position, no.   From the possibility that many of the

22   events which are already scheduled at the school

23   will not be able to go on or will only go on at a

24   very limited level of functionally without the

25   technical assistance that I will provide, no.

1          MR. BOGDANOS:  Okay.  Thank you.

2          MR. KLEIN:  No.

3          THE COURT:  You are excused, Mr. Bertrand.

4      (Prospective juror exits the courtroom at this

5      time.)

6

7          COURT OFFICER:  Juror entering.

8          THE COURT:  Good afternoon, ma'am.  Amanda

9      Zammit, Z-A-M-M-I-T.

10         THE COURT:  Ms. Zammit, you have a concern?

11         PROSPECTIVE JUROR:  I am pregnant and I am

12     already thinking this case will be stressful on me.

13     I am new to the country.  I don't involve much, you

14     know.  My main concern is my pregnancy.

15         THE COURT:  We don't want to jeopardize the

16     health of you.

17         PROSPECTIVE JUROR:  I am already stressing.

18         THE COURT:  You seem a little tense.

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Anyone?

21         MR. KLEIN:  No.

22         MR. BOGDANOS:  No.

23         THE COURT:  You are on your way.  You are

24     excused.

25         PROSPECTIVE JUROR:  Thank you so much.

1    THE COURT:  Is it your first?

2    PROSPECTIVE JUROR:  Yes.

3    THE COURT:  Congratulations.

4    PROSPECTIVE JUROR:  Thank you.

5    (Prospective juror exits at this time.)

6    COURT OFFICER:  Juror entering.

7    THE COURT:  Step up.  Good afternoon,

8    ma'am.  I will take the ballet.  This is Marilyn

9    Korn, K-O-R-N.  M-A-R-I-L-Y-N.

10   PROSPECTIVE JUROR:  I am a sole proprietor

11   from my real estate.  The only help is my daughter

12   who comes in from Pennsylvania two days a week.

13   THE COURT:  It's a economic concern.

14   PROSPECTIVE JUROR:  Because I could do a

15   week but two weeks would be a hardship for me.

16   THE COURT:  Residential or commercial?

17   PROSPECTIVE JUROR:  Residential.

18   THE COURT:  Anyone?

19   MR. BOGDANOS:  No.

20   MR. KLEIN:  No.

21   THE COURT:  Ms. Korn, back to work.

22   You are excused from this case.

23   PROSPECTIVE JUROR:  Thank you.

24   (Prospective juror exits the courtroom at this

25   time.)

1        COURT OFFICER:  Step up.

2        THE COURT:  Sir, come on up.  Have a seat.

3   I will take the ballet.  This is Stephen Abreu,

4   S-T-E-P-H-E-N.  Last name A-B-R-E-U.

5        THE COURT:  You have a problem serving on

6   this kind of case?

7        PROSPECTIVE JUROR:  I currently work

8   full-time one hour shifts about three to four days a

9   week.  That could kind of intervene.  I got loans to

10  pay.

11       THE COURT:  Would your employer continue to

12  pay you or you would lose out?

13       PROSPECTIVE JUROR:  I would definitely lose

14  out.

15       THE COURT:  What kind of work?

16       PROSPECTIVE JUROR:  Barback, bartenders

17  assistant.

18       THE COURT:  There are many employees there?

19       PROSPECTIVE JUROR:  It's a small staff.

20  It's about four or five of us.  We have our own

21  dedicated shifts that we have to comply with.

22       THE COURT:  Your understanding is if you

23  are not there, you just don't get there?

24       PROSPECTIVE JUROR:  Definitely no.

25       THE COURT:  They won't reimburse you?

1          PROSPECTIVE JUROR:  No way.

2          THE COURT:  Counsel?

3          MR. BOGDANOS:  Sir, would it be possible --

4     have you spoken to your employer about the fact that

5     you have been called for jury duty?

6          PROSPECTIVE JUROR:  No, I have not.

7          MR. BOGDANOS:  I know you know this, so

8     forgive me for saying this, but you recognize that

9     jury duty is one of the most important duties you

10    can provide for your community and your society.

11    You agree with that, right?

12         PROSPECTIVE JUROR:  Of course.

13         MR. BOGDANOS:  Is it possible that your

14    employer might be able to change your shift?  I was

15    in the restaurant business.  Barback, you can move

16    shifts.  You can change them, so you would still be

17    able to make the same hours during the week but you

18    spread it out.  You could change shifts.  You could

19    do it.

20         PROSPECTIVE JUROR:  Is it Monday through

21    Friday?

22         MR. BOGDANOS:  Monday through Thursday.

23    You would still have Friday and Saturday, the real

24    money days.

25         PROSPECTIVE JUROR:  I could ask my manager.

1    There is no problem.

2         THE COURT:  Why don't you do that and tell

3    us -- let us know if you can at 2:15.  We don't want

4    to you lose money obviously.

5         PROSPECTIVE JUROR:  Okay.

6         THE COURT:  But if as the way Mr. Bogdanos

7    suggested to change shifts around and you are still

8    willing to do it?

9         PROSPECTIVE JUROR:  That's no problem.  I

10   will let you guys know.

11        MR. KLEIN:  Judge, we also don't want you

12   to get in a position where you are a juror here and

13   then you go off and work all night.

14        THE COURT:  We can't have that.

15        MR. KLEIN:  We can't have that either.

16        THE COURT:  We would not ask you to do

17   that.  That's too much.

18        MR. KLEIN:  You can't come in and say now I

19   can rest.  I will be a juror.

20        PROSPECTIVE JUROR:  I was--

21        MR. KLEIN:  Figure that out and let us

22   know.

23        PROSPECTIVE JUROR:  No problem.

24        THE COURT:  Come back this afternoon at

25   2:15.

1          PROSPECTIVE JUROR:  Not a problem.

2          (Prospective juror exits the courtroom at this

3     time.)

4          COURT OFFICER:  Juror entering.

5          THE COURT:  Mr. John Li, L-I.

6     How are you?

7          PROSPECTIVE JUROR:  Good.

8          THE COURT:  Nice and loud.

9          PROSPECTIVE JUROR:  So the reason I wanted

10    to speak to you your Honor is because I am not sure

11    if I can take an extended period of time off of my

12    current job my employer.  I know it's not a really

13    hardship.  That's why I wanted to get your expertise

14    or advice.  I am not sure if I could take two to

15    three weeks at a time because right now, my team

16    only has three teams.

17         One person is going on vacation.  It could kind

18    of disrupt the day-to-day activity if I were not

19    there for an extended period of time.

20         THE COURT:  What kind of work is it?

21         PROSPECTIVE JUROR:  Financial analyst at

22    Barclay's Capital.

23         THE COURT:  That's a big outfit?

24         PROSPECTIVE JUROR:  Yes.  And there is only

25    three people.

1              THE COURT:  Small group?

2              PROSPECTIVE JUROR:  My team that is three

3      people and one person goes on vacation for a month.

4              THE COURT:  This trial will be over then?

5              PROSPECTIVE JUROR:  I thought you said--

6              THE COURT:  I said the outside date would

7      be 27th, 26th, somewhere in there.

8              PROSPECTIVE JUROR:  There could be some

9      overlap.  I just -- I wasn't too sure.

10             THE COURT:  Why don't you do it this way?

11     Do you have a supervisor?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Call that person and let us

14     know if -- you can tell them the judge said, I can't

15     get out of this.  But I don't want to get you in

16     trouble at work?

17             PROSPECTIVE JUROR:  I mean--

18             THE COURT:  All we ask is that you come

19     back at 2:15 and tell us what you learned.

20             PROSPECTIVE JUROR:  Okay.

21        I will make that call.

22             THE COURT:  Fair enough, Mr. Li?

23             MR. BOGDANOS:  I do have one question.  I

24     am sorry.  Thank you so much because you are clearly

25     willing to serve.

1           PROSPECTIVE JUROR:  Yes.  I don't have a

2   problem.

3           MR. BOGDANOS:  We admire that.  Thank you.

4   You do understand and I think this is part of what

5   you are asking, that legally you can't be in any way

6   punished or penalized for serving as a juror by your

7   employer.  You know that, right?

8           PROSPECTIVE JUROR:  Okay.

9           MR. BOGDANOS:  Those are your rights.

10          PROSPECTIVE JUROR:  Sure.

11          MR. BOGDANOS:  You are here because you are

12  ordered by the Court to appear for jury duty.

13          PROSPECTIVE JUROR:  Sure.

14          MR. BOGDANOS:  And if in any way anyone

15  Barclays, that's a big company.  If anyone at

16  Barkclays in any way attempts to punish or penalize

17  you, you will come this afternoon and you will let

18  his Honor know right away.

19          PROSPECTIVE JUROR:  Okay.

20          MR. BOGDANOS:  Thank you, sir.

21      (Prospective juror exits the courtroom at this

22  time.)

23          COURT OFFICER:  Step up.

24          THE COURT:  Good afternoon, ma'am.  Did you

25  have your ballet?

1          THE COURT:  First name E-S-M-E-R-A-D-L-D-A.

2    McKormick, M-C-K-O-R-M-I-C-K.

3       Are you able to serve?

4          PROSPECTIVE JUROR:  Well, I would prefer

5    not to.

6          THE COURT:  Nice and loud.

7          PROSPECTIVE JUROR:  I don't mind serving on

8    a case that's two or three days.  Some people feel

9    that is going to be quick but something like this, I

10   really -- I need flexibility and this would keep me

11   sort of--

12          THE COURT:  What sort of work do you do?

13          PROSPECTIVE JUROR:  I have a full-time job

14   but I have credit card debt that doesn't seem to go

15   away.  So I do use vacation time from the job to do

16   part-time work.  But being a juror, I am not going

17   to have any flexibility.  So that's one of my

18   reasons.

19          THE COURT:  You do get paid?

20          PROSPECTIVE JUROR:  Yes.  My employer pays

21   me.

22          THE COURT:  We pay you too.

23       If your employer is paying you--

24          PROSPECTIVE JUROR:  Besides $40 is not

25   going to make it.

1          THE COURT:  So anyway, those are my

2    reasons.  You can decide.  I am sorry.  There is one

3    other reason.

4       My boss has already expressed to me that he

5    really hopes I don't get on a case.  It's a two

6    person office.  I know for him it will be very hard

7    for me to be out a long while.

8          THE COURT:  What sort of work is it?

9          PROSPECTIVE JUROR:  Dissertation.  We

10   finalize the PHD degrees for the graduate school for

11   graduate Arts and science at Columbia.

12         THE COURT:  How long have you been doing

13   that?

14         PROSPECTIVE JUROR:  Eighteen years.

15         THE COURT:  Anyone?

16         MR. BOGDANOS:  Yes, I do.  Ma'am, you do

17   know and if you don't, I am telling you, you do know

18   that no employer can punish or penalize you in any

19   way, shape or form for coming to jury duty.

20         PROSPECTIVE JUROR:  Yes; I know.

21         MR. BOGDANOS:  Since you went to work at my

22   old law school, I know that you know like the rest

23   of the academic community knows that there are few

24   things as important for the community as jury duty.

25         PROSPECTIVE JUROR:  Yes.

1   MR. BOGDANOS:  Without jurors, the system

2   just doesn't work.

3   PROSPECTIVE JUROR:  I understand.

4   MR. BOGDANOS:  Taking all that into account

5   and given the fact that you are working for a

6   university, a university that gives back to the

7   city, do you really think it's a hardship for you to

8   serve or do you think you could really do your duty

9   and serve in this case?

10   PROSPECTIVE JUROR:  I mean if you decide

11   that you think I can do it, then of course I am

12   going to do it you know but I am just saying, I

13   would prefer not to.

14   MR. KLEIN:  Really, it's a lot up to you.

15   It depends on what you tell us.  If you say to us,

16   listen, I would like to serve but I am just going to

17   go broke, you are going to get excused.  If you say

18   it's going to be hard but I will make it, then the

19   judge is going to ask you to stay.  It's up to you.

20   PROSPECTIVE JUROR:  Okay.  I mean I am not

21   going to lie.  I am not going to die you know but

22   the interest rates are going to just keep going up.

23   I guess I get stressed out just thinking about that.

24   THE COURT:  I do thank you for your candor

25   but I am going to ask you to come back.

1    PROSPECTIVE JUROR:  No problem.

2    THE COURT:  Thank you, very much.

3    (Prospective juror exits the courtroom at this

4    time.)

5    COURT OFFICER:  Juror entering.

6    THE COURT:  This is Melissa Miller,

7    M-I-L-L-E-R.  What was your concern?

8    PROSPECTIVE JUROR:  I only get paid on an

9    hourly basis.  I work at an office.  If I don't go,

10   I don't get paid.

11   THE COURT:  Small office.

12   PROSPECTIVE JUROR:  It's a small hedge fund

13   but they don't pay me if I don't work.  I can't pay

14   my rent.

15   THE COURT:  Did you discuss that with them?

16   PROSPECTIVE JUROR:  I did.

17   THE COURT:  I don't know what the rules are

18   but if an employer has a certain number of

19   employees, bylaw they are required to pay you but--

20   PROSPECTIVE JUROR:  I am only part-time so

21   I am not--

22   I work only 30 or less hours but I make enough

23   to live on but if I don't work those hours, then I

24   can't--

25   THE COURT:  They could probably do that,

1    not pay you?

2                PROSPECTIVE JUROR:  Yes and I don't get

3    vacation or sick days.

4                THE COURT:  Any questions?

5                MR. BOGDANOS:  No.

6                MR. KLEIN:  No.

7                THE COURT:  You are excused then.  We don't

8    want you to suffer economically.

9                PROSPECTIVE JUROR:  Thank you.

10          (Prospective juror exits the courtroom at this

11    time.)

12                COURT OFFICER:  Juror entering.

13                THE COURT:  Come on up, sir.  Do you have

14    your ballet?

15                PROSPECTIVE JUROR:  Yes, sir.

16                THE COURT:  This is Barry Fishman,

17    F-I-S-H-M-A-N.

18          Go ahead.

19                PROSPECTIVE JUROR:  I have a doctor's

20    appointment on the 19th.  Took me a month or two to

21    get it.

22                THE COURT:  The 19th.  I don't think we

23    will be in session that day?

24                PROSPECTIVE JUROR:  Before you mentioned

25    you would.  It's a Thursday.

1          THE COURT:  Do you know the time of the

2     appointment?

3          PROSPECTIVE JUROR:  It's an all day

4     appointment.  It's in New Jersey.  I have to take a

5     bus in the morning.

6          PROSPECTIVE JUROR:  The other court -- I

7     figured I had enough time.

8          THE COURT:  Any questions for Mr. Fishman?

9          MR. BOGDANOS:  No.

10         THE COURT:  You are excused.

11         PROSPECTIVE JUROR:  Thank you.

12      (Prospective juror excused at this time.)

13         THE COURT:  Come up.  If you have the

14    ballet, I can read it into the record.  Thank you.

15    First name Maysoun, M-A-Y-S-O-U-N.  Last name Freij,

16    F-R-E-I-J.

17      Go ahead.

18         PROSPECTIVE JUROR:  My excuse?

19         THE COURT:  Whatever you want to say.

20         MR. KLEIN:  We can start it like that.

21         PROSPECTIVE JUROR:  I just think it would

22    be very stressful and the time of two three weeks

23    and the stress of it.  I have just reached a point

24    where I am feeling well just in terms of like eating

25    every couple of hours and so forth.  I don't really

1    think it would be very good for my health and I have

2    a note from my doctor excusing me but I didn't want

3    to be called back every six months so I figured I

4    should try to.

5         THE COURT:  Let me just ask.

6         MR. BOGDANOS:  You are saying you could sit

7    on a shorter jury?

8         PROSPECTIVE JUROR:  If it weren't maybe

9    something so serious.  I feel like also I am anxious

10   to begin with.  The anxiety of such a serious trial

11   doesn't really seem to be in my interest at this

12   point.

13        THE COURT:  I will excuse you.

14        PROSPECTIVE JUROR:  I appreciate it.

15        THE COURT:  Good luck with the baby.

16        PROSPECTIVE JUROR:  Okay.  I appreciate it.

17      (Prospective juror excused at this time.)

18        COURT OFFICER:  Juror entering.

19        THE COURT:  Come on up.  Do you have your

20   ballet?

21      (Indicating)

22        THE COURT:  Christina, K-R-I-S-T-I-N-A.

23   Last name, Wildenstein, W-I-L-D-E-N-S-T-E-I-N.

24        PROSPECTIVE JUROR:  Yes.

25        THE COURT:  Your concern.

1    PROSPECTIVE JUROR:  My husband is in a law

2 school in France and I am going to have go with him.

3 He has already been heard once and he has to go back

4 again.  I don't know when it's going to be.  If it's

5 too long then I wouldn't be able to go.

6    THE COURT:  It can be anytime?

7    PROSPECTIVE JUROR:  It would be in the end

8 of September beginning of October.  I don't know.

9    THE COURT:  As I said, we will be finished

10 really I think by the 26th or 27th.

11    PROSPECTIVE JUROR:  I don't know.

12    THE COURT:  If I were to promise you that

13 you will be able to go to France with your husband,

14 are you then willing to serve?

15    PROSPECTIVE JUROR:  Yes.

16    THE COURT:  You have my promise.

17    PROSPECTIVE JUROR:  Okay.

18    THE COURT:  2:15.  We will keep the ballet.

19    PROSPECTIVE JUROR:  Okay.  But you are

20 free.

21   (The prospective juror exits the courtroom at

22 this time.)

23    COURT OFFICER:  Juror entering.

24    THE COURT:  It's first name L-A-I-L-A.

25 Last name Harchicha,  H-A-R-C-H-I-C-H-A.

1        THE COURT:  What is your concern?

2        PROSPECTIVE JUROR:  Sir you know I am just

3   a cook and I don't have this high education.  I am

4   working.  I just had this job for three months and

5   they can't offer the time to be absent.  I am going

6   to get fired.

7        THE COURT:  Where do you work?

8        PROSPECTIVE JUROR:  Small restaurant.  Like

9   Argentinian.

10        THE COURT:  You are fearful that if you get

11   stuck on a jury that you might get fired?

12        PROSPECTIVE JUROR:  Yes, because I just had

13   this job.  I am support willing myself.  I am just

14   single.

15        THE COURT:  Anyone?

16        MR. BOGDANOS:  No.

17        MR. KLEIN:  No.

18        THE COURT:  You are excused.

19      (Prospective juror excused at this time.)

20        COURT OFFICER:  Juror entering.

21        THE COURT:  Step up.  First name Susie,

22   S-U-S-I-E.  Last name Chin, C-H-I-N.  What would you

23   like to tell us?

24        PROSPECTIVE JUROR:  They hear it.

25        THE COURT:  In fact, I want to ask you to

speak loud.

PROSPECTIVE JUROR:  I thought I was going to speak to you alone.  I had a knife pulled on me years ago and I thought I was going to be killed. And another time, somebody--

THE COURT:  Are you saying you would have trouble being fair as a juror?

PROSPECTIVE JUROR:  Well, yes.  And another time, somebody was choking me and I couldn't breathe and they wanted to punch my face in.  I have been traumatized by that.  Very anxious.

I have two daughters.  I am worried about them.

THE COURT:  Heard enough?

MR. BOGDANOS:  We have heard enough.

MR. KLEIN:  Enough.

THE COURT:  Moving right along.

(Prospective juror is excused at this time.)

COURT OFFICER:  Juror entering.

THE COURT:  Cindy Hicks, H-I-C-K-S.

You look like you want to serve.

PROSPECTIVE JUROR:  I do but I can't because every other day, I have school.  Missing three weeks is automatic failure.

THE COURT:  You are in college.

PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Where do you go to school?

2          PROSPECTIVE JUROR:  Queens at York.

3          THE COURT:  Every other day?

4          PROSPECTIVE JUROR:  When I am not at

5     school, I work.

6          THE COURT:  Where do you work?

7          PROSPECTIVE JUROR:  Columbus Circle.

8          THE COURT:  What are you studying?

9          PROSPECTIVE JUROR:  Journalism.

10          THE COURT:  Any questions?

11          MR. BOGDANOS:  No judge.

12          MR. KLEIN:  No.

13          THE COURT:  I will excuse you.

14        (Prospective juror is excused at this time.)

15          COURT OFFICER:  Juror entering.

16          THE COURT:  Good afternoon, ma'am.  Come up

17     and have this seat right here (indicating).

18          PROSPECTIVE JUROR:  Good afternoon.

19          THE COURT:  Can I see the ballet.

20        Yolanda Rivero, R-I-V-E-R-O.

21          THE COURT:  How are you?

22          PROSPECTIVE JUROR:  I am good.

23          THE COURT:  Speak up so they can hear you.

24     Tell us whatever you want to tell us.

25          PROSPECTIVE JUROR:  I am also an attorney.

1    I work for a small plaintiff side employment

2    litigation firm and I am one of three.  My boss is

3    blind.  So he relies on my colleague and I to review

4    documents.  That's what we do.

5        Employment litigation involves like a lot of pay

6    stubs and things that can't be read by a computer

7    palm for my boss, as I said who was blind.  I also

8    have an issue with the 20th because my brother, his

9    own court case and I have to attend that.  So I am

10   just thinking that we have a pretty big case load

11   for a three lawyer firm and we have a couple of

12   motions that are due out.

13           MR. BOGDANOS:  Nothing.

14           MR. KLEIN:  No.

15           THE COURT:  All right.  You won your case

16   today.  You are excused.

17           PROSPECTIVE JUROR:  Thank you.

18       (Prospective juror excused at this time.)

19           COURT OFFICER:  Juror entering.

20           THE COURT:  If you would come on up.  I

21   will take the ballet.

22       (Indicating)

23           THE COURT:  This is Jill Romero,

24   R-O-M-E-R-O.

25       Ms. Romero nice and loud.

1          PROSPECTIVE JUROR:  I will try.  I have

2  laryngitis a little bit.

3          THE COURT:  What is the problem?

4          PROSPECTIVE JUROR:  My main concern is

5  about child care.  I have you know a baby-sitter for

6  these next two days but beyond that, I don't have

7  anything secured.  I am a single parent.  So, you

8  know I probably could make arrangements but I don't

9  know that for sure.

10         THE COURT:  Is it a financial issue or it's

11  just finding child care?

12         PROSPECTIVE JUROR:  It is also somewhat of

13  a financial issue but it's just whether I put my

14  daughter in an after-school program.  I just don't

15  know if she would be able to get in at this point.

16         THE COURT:  It's not something that you

17  could get an answer for us by 2:15?

18         PROSPECTIVE JUROR:  Unlikely.

19         THE COURT:  Would you like to try?

20         PROSPECTIVE JUROR:  I could try, yes.

21         THE COURT:  Is that agreeable?

22         MR. BOGDANOS:  Yes, and ma'am, thank you so

23  much.  Thank you for your question before.  You do

24  understand there will never be any sequestering so

25  that should resolve some of your issues if you won't

1    mind, trying to find out by 2:15.  I know how hard

2    child care issues are to resolve.  If you could, we

3    really admire you're trying to serve.

4            PROSPECTIVE JUROR:  Okay.

5        (Prospective juror exits the courtroom at this

6    time.)

7            COURT OFFICER:  Step up to the front

8    please.

9            THE COURT:  This is first name Yari,

10   Y-A-R-I.  Last name Reynoso, R-E-Y-N-O-S-O.

11       Swing around.  Everything you say, they have to

12   hear.

13           PROSPECTIVE JUROR:  Okay.

14           THE COURT:  Do you have a problem serving

15   on the case?

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  What is that problem and nice

18   and loud so they can hear.

19           PROSPECTIVE JUROR:  I got into a motor

20   vehicle accident two months ago and I have been out

21   of work for two months and I am due back

22   September 20th and I have a doctor's appointment for

23   a follow-up for a broken hand, September 15th.

24           THE COURT:  What sort of work do you do?

25           PROSPECTIVE JUROR:  I work as an assistant

1     for a real estate firm.

2              THE COURT:  How long have you been doing

3     that?

4              PROSPECTIVE JUROR:  Two years.

5              THE COURT:  If you told them, well, I won't

6     be able to come back to work until this trial will

7     be over, which is around the 26th--

8              PROSPECTIVE JUROR:  I can lose my job.

9              THE COURT:  You think that would happen?

10             PROSPECTIVE JUROR:  Yes, because I have

11    been out of work for two and a half months.

12             THE COURT:  They are already not happy.  Is

13    that what you are saying?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Anyone?

16             MR. BOGDANOS:  No.

17             MR. KLEIN:  No.

18             THE COURT:  All right, ma'am.  You are

19    excused.

20         (Prospective juror excused at this time.)

21             THE COURT:  Come on down.

22         This is John Emanuel, E-M-A-N-U-E-L.  What is

23    the problem?

24             PROSPECTIVE JUROR:  I got a commercial van

25    that I drive and if I don't work, I don't get paid.

```
 1          Right now, it's pretty slow.  So I even work on
 2     weekends and I even work Labor Day, trying to make
 3     ends meat.
 4                    THE COURT:  It's a financial--
 5                    PROSPECTIVE JUROR:  Yes.
 6                    THE COURT:  Financial concern.  Anyone?
 7                    MR. BOGDANOS:  No.
 8                    MR. KLEIN:  No.
 9                    THE COURT:  I will excuse you,
10     Mr. Emmanuel.
11            (Prospective juror excused at this time.)
12                    COURT OFFICER:  Juror entering.
13                    THE COURT:  It's Georgia Chan, C-H-A-N.  Go
14     ahead.  Nice and loud.
15                    PROSPECTIVE JUROR:  Can you take off me
16     because my English no good.
17                    THE COURT:  You don't speak English well?
18                    PROSPECTIVE JUROR:  I don't want to make
19     decision.
20                    THE COURT:  How many years have you lived
21     there?
22                    PROSPECTIVE JUROR:  Long time; simple
23     conversation, okay.
24                    THE COURT:  What sort of work do you do?
25                    PROSPECTIVE JUROR:  Security.
```

1              THE COURT:  Anyone?

2              MR. BOGDANOS:  No.

3              MR. KLEIN:  No.

4              THE COURT:  Mr. Chan, you are excused.

5              PROSPECTIVE JUROR:  Thank you, very much.

6         (Prospective juror exits the courtroom at this

7    time.)

8              THE COURT:  Step up to the front.

9         If I may have the ballet, please.  (indicating)

10             THE COURT:  This is Oliver.  Last name

11   G-A-B-B-A-Y.

12        Go ahead.

13             PROSPECTIVE JUROR:  I have a job starting

14   early next week.  I am a general contractor.  It's

15   our biggest job yet.  Just start the company a year

16   ago.

17             THE COURT:  You might lose out on the job

18   opportunity.

19             PROSPECTIVE JUROR:  Yes.  There is only two

20   of us.

21             THE COURT:  In fact, you won't be able to

22   go do the job?

23             PROSPECTIVE JUROR:  I  wouldn't be able to

24   do the job unless I am there.

25             THE COURT:  What kind of job?

1        PROSPECTIVE JUROR:  Renovations in an

2   apartment building.

3        MR. BOGDANOS:  That's fine.

4        THE COURT:  Anyone?

5        MR. KLEIN:  No.

6        THE COURT:  You are good to go.

7        PROSPECTIVE JUROR:  Thank you.

8   (Prospective juror excused at this time.)

9        COURT OFFICER:  Juror entering.

10        THE COURT:  This is Marc, M-A-R-C.  Last

11   name Iyeki, I-Y-E-K-I.

12        THE COURT:  What's your concern about

13   serving on this case?

14        PROSPECTIVE JUROR:  On August 31st, my

15   wife, she was feeling bad and she had dizziness and

16   numbness on her left side and so I went home.  We

17   went to the hospital by ambulance.  Called 911.

18   Medical people in my office told me to go home

19   immediately and she had a battery of tests that day.

20   She was -- eventually, she was discharged.  But they

21   said it can't be ruled out, that it's possible that

22   she had like a mini stroke and so, I plan to if

23   something happens and there is a heightened chance

24   of something happening, I am going to be -- I would

25   hope to be on the blackberry and things like that.

1    That's the main thing.  The other thing is that in

2    terms of business, my company -- and it's 9/11 time

3    and one of the companies will be coming visiting us

4    and they will be bringing over their top management

5    and they were the first company actually to list on

6    the company that I'm at after 9/11.  They didn't get

7    to -- they had this big banner.  They still have it

8    and they plan to put that up.  I am the connection

9    between that time and this company.

10        That's just one of the other things but it's

11   mostly--

12            THE COURT:  Anyone?

13            MR. BOGDANOS:  No.

14            MR. KLEIN:  No.

15            THE COURT:  I am going to excuse you, sir.

16       (Prospective juror excused at this time.)

17            COURT OFFICER:  Step up.

18            THE COURT:  This is first name Yajaira,

19   Y-A-J-A-I-R-A.  Last name Infante, I-N-F-A-N-T-E.

20            THE COURT:  Nice and loud.  They need to

21   hear what you have to say.  Go ahead.  The floor is

22   yours.

23            PROSPECTIVE JUROR:  Sorry.  Just don't

24   believe I could manage financially.  Three weeks.

25            THE COURT:  Your employer won't pay you?

1           PROSPECTIVE JUROR:  I am not certain what

2    the law demand but I don't know that he would pay me

3    for three weeks.

4           THE COURT:  What kind of work?

5           PROSPECTIVE JUROR:  For a moving company.

6           THE COURT:  Is it a big outfit?

7           PROSPECTIVE JUROR:  It is.  It is.

8           THE COURT:  How long have you been there?

9           PROSPECTIVE JUROR:  About 18 months.

10          THE COURT:  Did you speak to your boss

11   about coming down here today?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  You think it would do it any

14   good to speak to him over lunch and tell him the

15   judge said I am stuck or do you know he is going

16   blow up?

17          PROSPECTIVE JUROR:  I don't think that he

18   would have a problem with it.  I just don't know.

19          THE COURT:  Speak to your boss or anybody

20   whoever.

21          PROSPECTIVE JUROR:  Sure.

22          THE COURT:  And then you can let us know at

23   2:15 if there is a problem?

24          PROSPECTIVE JUROR:  Okay.

25          THE COURT:  Counsel?

1          MR. BOGDANOS:  No.

2          MR. KLEIN:  No.

3          THE COURT:  Come back at 2:15.

4      (Prospective juror exits the courtroom at this

5  time.)

6          COURT OFFICER:  Juror entering.  Could step

7  up to the front.

8          THE COURT:  Do you have your ballet?

9          PROSPECTIVE JUROR:  Yes.

10     (Indicating)

11         THE COURT:  This is first name Moise,

12  M-O-I-S-E-S.  Last name Coma, C-O-M-A.  Go ahead.

13  Speak in a loud voice so they can hear you.

14  Anything you want to say?

15         PROSPECTIVE JUROR:  I suffer from anxiety.

16  Right now, I am having a little anxiety.

17         THE COURT:  You think it would be difficult

18  to serve on a jury?

19         PROSPECTIVE JUROR:  Well basically I have

20  mixed feelings about my decision because my brother

21  was convicted of attempted murder of a police

22  officer.  And I am still emotionally in distress

23  about it.

24         THE COURT:  I think the parties would

25  agree.

1              MR. BOGDANOS:  Yes, Judge.

2              MR. KLEIN:  Fine.

3              THE COURT:  You are excused.

4         (Prospective juror excused at this time.)

5              COURT OFFICER:  Step up to the front.

6              THE COURT:  I will take the ballet.  This

7    is Harrel, H-A-R-R-E-L.  Last name Silverstein,

8    S-I-L-V-E-R-N-S-T-E-I-N, Silverstein.

9              PROSPECTIVE JUROR:  I work for a small

10   office of five people.  We are in the midst of

11   moving and kind of fighting for our survival.  I was

12   hoping that I wouldn't have to make a commitment for

13   two and a half, three weeks.

14             THE COURT:  What kind of work?

15             PROSPECTIVE JUROR:  Advertising marketing.

16             THE COURT:  It's a shaky time for the

17   company?

18             PROSPECTIVE JUROR:  Yes.  That's for sure.

19             THE COURT:  Anyone?

20             MR. BOGDANOS:  No.

21             MR. KLEIN:  No.

22             THE COURT:  I am going to excuse you.  We

23   don't want you to get--

24             PROSPECTIVE JUROR:  Okay.

25        (Prospective juror excused at this time.)

1              COURT OFFICER:  Step up.

2              THE COURT:  Have a seat.  This is

3    Wilson Gomez, G-O-M-E-Z.  Have a seat.  I am going

4    to ask you to speak in a loud voice so those folks

5    can hear you.  Go ahead.

6         What is your concern about serving on this case?

7              PROSPECTIVE JUROR:  I am a student from

8    Westchester community college.

9              THE COURT:  You are full-time?

10             PROSPECTIVE JUROR:  Yes.  I start my class

11   six o'clock over there.  So I take the public

12   transportation.  I don't think I have time to come

13   here and go there to my college.  I live in

14   Manhattan.  145th.

15             THE COURT:  You go everyday?

16             PROSPECTIVE JUROR:  Three days a week.

17             THE COURT:  From six to--

18             PROSPECTIVE JUROR:  Six to 9:30.  Six to

19   ten.

20             THE COURT:  You take a bus up there?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  From where, Port Authority?

23             PROSPECTIVE JUROR:  Yes.

24        I get the Metro North.

25             MR. BOGDANOS:  I don't care, judge.

```
 1                    THE COURT:  Sounds like a lot.  Because I
 2          take it even if he made you serve, you still try to
 3          get up there to school?
 4                    PROSPECTIVE JUROR:  Yes.
 5                    THE COURT:  I will excuse you.
 6                    PROSPECTIVE JUROR:  Thanks so much.
 7               (Prospective juror excused at this time.)
 8                    THE COURT:  We are doing pretty well.  We
 9          will pick it up at 2:15.
10     (LUNCHEON RECESS.)
11                    THE COURT:  Back on the record.  Are both
12          sides ready to continue with jury selection?
13                    MR. BOGDANOS:  Yes, Judge.
14                    THE COURT:  We will begin with the jurors
15          who were picking up additional information over the
16          lunch break.
17                    COURT OFFICER:  Juror entering.
18                    THE COURT:  Ms. Infante, good afternoon.
19          Ms. Infante.
20                    PROSPECTIVE JUROR:  Good afternoon.
21                    THE COURT:  Did you call someone over
22          lunch?  Nice and loud.
23                    PROSPECTIVE JUROR:  I do.  I called my
24          supervisor.  He says that he would prefer for me not
25          to stay out for that long.  He says two to three
```

1    weeks is much too long.

2            THE COURT:  How do you receive that?  Do

3    you think that your job is in jeopardy?

4            PROSPECTIVE JUROR:  I don't think that my

5    job would be in jeopardy.  If anything, he didn't

6    say no and he didn't say yes and I questioned him

7    about two to three times.  I said, does that mean

8    no, it's not possible?  He said, I am just telling

9    you I would prefer --

10           THE COURT:  Are you then willing to stay?

11           PROSPECTIVE JUROR:  Yes.

12           THE COURT:  Any questions from counsel?

13           MR. KLEIN:  No.

14           MR. BOGDANOS:  Thank you, ma'am.  No.

15           THE COURT:  We all thank you very much.

16    And we will be bringing everybody in in a few

17    minutes.

18       (Prospective juror excused at this time .)

19           COURT OFFICER:  Juror entering.

20           THE COURT:  Ms. Romero.

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Have a seat.  You were the

23    child care issue.  Any luck?

24           PROSPECTIVE JUROR:  Yes.  I spoke with my

25    daughter's school and they said that they could put

1        her into the afterschool program and I could pick

2        her up at the end of the day.

3                THE COURT:  So you are good to go?

4                PROSPECTIVE JUROR:  Yes.

5                THE COURT:  Thank you, very much,

6        Ms. Romero.

7                MR. BOGDANOS:  Thank you, ma'am.

8        (Prospective juror excused at this time .)

9                THE COURT:  Mr. Hernandez.

10               PROSPECTIVE JUROR:  Yes.

11               THE COURT:  Have a seat.  Any luck?

12               PROSPECTIVE JUROR:  Yes.  Actually I

13       verified with the company and they will pay all the

14       days.

15               THE COURT:  So you are good?

16               PROSPECTIVE JUROR:  Yes.

17               THE COURT:  Just rejoin the others.  We are

18       bringing a few folks in.

19               PROSPECTIVE JUROR:  Okay.

20               THE COURT:  Mr. Abreu.

21          Have a seat.  You are the barback.

22               THE COURT:  What happened?

23               PROSPECTIVE JUROR:  Yes.  I could switch my

24       schedule around.  It would be Monday through

25       Thursday, correct?

1          THE COURT:  Correct.

2          PROSPECTIVE JUROR:  I would work Friday

3     Saturday, Sunday but the thing is my issue is those

4     are -- Sunday is a very slow day and I think you

5     are, working now two shifts because they started

6     cutting guys because everything is slow.  It's a new

7     restaurant.  It's like I am still worried if I am

8     going to make my weekly budget to pay my loans, my

9     school loans and stuff so.  I don't know.

10          THE COURT:  You still have a concern.  Is

11    that what you are saying?

12          PROSPECTIVE JUROR:  Yes, definitely.

13          THE COURT:  Even though they are willing to

14    shift the hours a little bit?

15          PROSPECTIVE JUROR:  Yes.

16      If I can meet my weekly budget, I could do it

17    but right now, I don't know if I could.  I don't

18    know.  That's the only thing that's worrying me.

19          THE COURT:  You normally would have four

20    days?

21          PROSPECTIVE JUROR:  Two to three.

22          THE COURT:  So Friday, Saturday and Sunday?

23          PROSPECTIVE JUROR:  Really slow.

24          THE COURT:  Counsel, any questions?

25          MR. BOGDANOS:  Yes.  We really admire your

1    candor with us and we admire you coming down here.

2    We have -- you know how important this is.  Take it

3    all together.  Understanding how crucial it is for

4    people like you to come and sit on a jury but also

5    knowing that you have got a budget to worry about,

6    putting all that together, this is really a question

7    that you can answer better than anyone in the

8    courtroom.  Do you think you can give this case the

9    attention it deserves and do your duty, even if it

10   makes it -- might make it a little tough?

11             PROSPECTIVE JUROR:  I think it will be a

12   little bit tough for me honestly, definitely.

13             MR. BOGDANOS:  All right.

14             THE COURT:  All right.  Then I will excuse

15   you Mr. Abreu.  But thank you very much for trying.

16             PROSPECTIVE JUROR:  I would do it.

17        (Prospective juror excused at this time .)

18             THE COURT:  Back on the record.  Are both

19   sides ready for the panel?

20             MR. BOGDANOS:  Yes.

21             MR. KLEIN:  Yes.

22             THE COURT:  May we have the jurors please.

23             COURT OFFICER:  Jury entering.  Jurors

24   entering.

25             THE CLERK:  Case on trial continues.

1    People versus Mark Richardson.

2         THE COURT:  Thank you, very much.  Good

3    afternoon, ladies and gentlemen and welcome back.

4    And I want to thank all of all of you for

5    essentially volunteering your services for this

6    case.  We appreciate that very very much.  We did

7    not expect such a large number.  Believe me.

8         So what we are going to do is go right into the

9    jury selection itself.  Is there anyone doing this

10   for the first time?

11        (indicating.)

12        THE COURT:  In any event, as most of you

13   probably know, the purpose of the jury selection

14   process is simply to make sure that in the end, we

15   wind up with a fair and impartial jury.  Without

16   that, we can't have a fair trial.  When you are

17   talking about a criminal case, fairness can be

18   boiled down to two essential questions.  Can you be

19   fair to the prosecution and can you be fair to the

20   defense.

21        Those are the two sides here and each side is

22   entitled to a fair hearing from all of you.

23        The way it works is straightforward.  I will

24   begin the questioning by asking a series of general

25   procedural questions for all of you.  Some of you

screening questions really and some of you may be
excused during that portion of the questioning.
Those who remain will then be questioned
individually, first by me and then ultimately by the
attorneys.

Throughout all of this questioning, we are not
trying to embarrass anyone. We are not trying to
put you on the spot and there are no right or wrong
answers to any of the questions. Rather, this is a
chance for the attorneys to get to know you a little
bit and to try to figure out which of you happen to
be best suited for this particular case.

Now, some of the questions are somewhat personal
in nature. And that's true in every case. And it
may be as we go through this, that you will be asked
a question that you would rather not answer in front
of your fellow jurors. And if that happens to you,
just tell us at the time of the question. We will
then take your ballet. Put it on the side and bring
you in at the very end before the selections are
made so that you then have a chance to give your
answer to that particular question in a somewhat
more private setting. I say somewhat because the
answer is still given in open court. And indeed,
you should look upon this exercise as an open forum.

1    And by that, I mean we encourage you to speak out.

2        If you are selected, you will not be heard from

3    again until the very very end of the trial when you

4    render your verdict.

5        As some of you may know, there is a certain

6    amount of tradition to the jury selection process.

7    We've been picking juries this way in this basic

8    format now for way over a hundred years.  So it is

9    something that works but it can only work if each

10   and every one of you participates fully.  And I mean

11   by that is please give us your attention over the

12   next few hours.  Yes, it does take a little bit of

13   time and try to answer these questions as best you

14   can.

15       One special request for the folks seated toward

16   the back of the courtroom, please try to speak up in

17   I a loud voice.  I sometimes have trouble hearing

18   the folks in the back of the room.

19       If you want to stand up when giving a response,

20   that's fine.  Also, for everyone it helps us if you

21   identify yourself when giving a response.  That will

22   make for a much better record.

23       Now, speaking of identifying people, I am now

24   going to introduce the parties to you.  I'm going to

25   ask them turn to around and give you a good look and

1    the reason is I want to make sure -- well, I want to

2    find out if any of you happen to recognize any of

3    them.  I am going to start over here with our

4    prosecutor, Matthew Bogdanos.

5            MR. BOGDANOS:  Good afternoon all, and

6    thank you.

7            THE COURT:  Thank you and over here at the

8    defense table is Thomas Klein who is defense

9    counsel.  Sarah Legler also a defense counsel and

10   over here is Mark Richardson.

11      Mr. Richardson, will you also rise and face the

12   group.

13           THE DEFENDANT:  Hello.

14           THE COURT:  Do any of you think you might

15   recognize any of them?

16      (No response .)

17           THE COURT:  All right.  Fast start.  Let's

18   move on then.  I'm going to start out now by telling

19   you a little bit about the case how know it's a

20   criminal case.  I am going tell you the charges

21   involved and a brief description.  I am going to

22   give you a brief description of the People's theory

23   of the case but before I do any of that, I want to

24   emphasize that what I'm about to tell you is not

25   evidence.  And of course, you don't hear any

1   evidence during this part of the trial.  These are

2   merely allegations or contentions of the prosecution

3   as you will learn the prosecution bears the burden

4   in a criminal case and I'm going through it so that

5   you will be in a better position to answer some of

6   the questions that may come up.

7       As I said, the top count is murder in the second

8   degree.  There are actually two counts of murder in

9   the second degree.  There is a count of sexual

10  abuse.  There are two counts of robbery.  One is

11  robbery in the first degree and one is robbery in

12  the second degree.

13      But all of the counts arise out of the same

14  alleged incident.  It is the People's contention

15  that back on January 11, 2008, that this defendant

16  Mr. Richardson acting either alone or with at least

17  one other individual committed a robbery and a

18  sexual abuse of a woman named Helen Abbot.

19      It is further alleged that during the course of

20  the robbery and sexual abuse, that the defendant

21  again acting either alone or with at least one other

22  person murdered Ms. Abbot by stabbing her numerous

23  times and then strangling her with a chord.

24      Finally, it is alleged that this took place at

25  her apartment located in the Wagner Houses up on

1   124th Street and Second Avenue.

2       The defense denies these allegations.  But in

3   any event, based on what you've just heard the

4   charges and the people's theory of the case, is

5   there anyone for any reason would find it difficult

6   to serve on the case as a fair and impartial juror?

7   If so raise your hand and we will take the response.

8       (No response.)

9       THE COURT:  All right.  Now, I will move

10  on.  I'm going to read a list of names.  It's a long

11  list.  All of these people are potential witnesses

12  in the case.  I am not saying they are all going to

13  testify and we stick to the schedule that we gave

14  you earlier.  So don't be unnerved when you listen

15  to this list of names.  We want to find out if any

16  of you happen to know any of these people or if you

17  think you might know.

18      But it is a long list.  All right.  Amy Dorcy,

19  criminalist.  April Bailey who works at parole.

20  Detective Karen Eldridge.  Cindy Rodriguez, another

21  criminalist.  Two, Craig Hummer and Craig O'Connor.

22  Detective David Hernandez.  Sergeant Darwood Daniel.

23  Detective Donna Torres.  Sergeant Elvis Sierra.

24  Police officer Eric Caracato.  Sergeant

25  Frankenstein, no first name.  Detective Bernard

1    Demurro, Dr. Jason Graham.  Jean Alfred Frederick
2    with the ME's office.  Police officer Jessica Ramos
3    Sabalos, Officer Jose Rivera, Officer Louise Mehia,
4    Sergeant Margaret Gulliamelo Foster.
5        Detective Marc Worthington.  New York District
6    Attorney's office Michael Manion.  Neville Vanmainen
7    from the DA's office.  Norman Marron criminalist.
8    Sergeant Lance Camramenia.  Detective Regina Burgos.
9        EMT named Ron Lee.  Detective Rubin Enriquez.
10   Criminalist Sarah Phillips.  Officer Sean Amon.
11   Lieutenant Roman.
12       Detective Gary Signias.  ADA Assistant DA
13   Shirley Irick.  Siren Holly and.  Another EMT
14   civilians as follows.  Anthony Hall.  Desiree Allen.
15   Cheryl Abbot.  Christine DeDominico.  Christine
16   Ortiz.  Christopher Thel.  Daniella Keller, Debra
17   Sisky.  Frey Richardson, Marry Hope, Richard
18   Carbone, Richard Woitkowiaq, W-O-I-T-K-O-W-I-A-Q.
19       Thomas Theil.  Erica Gracetti.  Frank Ricata.
20   Henry Enright.  Justin Carol, Kendall Matthews,
21   Maria Duncan, William Dun, Sidney Gotler,
22   Patrick Green, Michael Key, Daryl King,
23   Matthew Lacks, Barbara Medina, Jose Melendez,
24   Derrick Richardson, Edwin Santiago, Javier Vega,
25   Terrell Whitaker, Gregory white head, is a PWRAOEPB

```
1    I can't bond, Tracy Braithwaite, Peter Richardson,

2    Esther Calli, Juan Perez, Marika Richardson.  Now we

3    are back to some of the police officers.  Sergeant

4    Thomas Verbrese, criminalist Troy Holder.  Detective

5    Jerry Rivera, Detective Ray Watts, Assistant DA

6    Kerry O'Connell, Detective Ray Brennan, Criminalist

7    Meredith Gitter, Detective Kevin Flynn, Detective

8    Kevin Sherlock, -- I am sorry.  Lieutenant Kevin

9    Sherlock and Detective Joseph Lifrenta.

10        Does anybody want me to read it again?  Did any

11   of you recognize any of those names.

12        (No response.)

13        THE COURT:  All right.  As I said, I'm not

14   suggesting that all of those people are going to

15   testify.  We have already given you the schedule.

16   There have been no changes obviously since this

17   morning.  If anyone however wants to raise a new

18   scheduling concern with us, we can take that now

19   before we move on to something else.  All right.

20        I gave you a location a few minutes ago.  Namely

21   124th Street and Second Avenue, an apartment in the

22   Wagner Houses.  In every criminal case, we have a

23   standing rule that the jury once selected is not

24   permitted to go out and visit any of the locations

25   that come up during the course of the trial.  So we
```

1    must ask all of you to give us an assurance that you

2    will stay away from those buildings, during the

3    course of this trial.

4         Is there anyone who would be unable to give us

5    such an assurance?  Yes, sir?

6              PROSPECTIVE JUROR:  That's the area around

7    where I live.

8              THE COURT:  That's fine.  Knowledge of the

9    neighborhood or living nearby does not preclude you

10   from serving unless you think that that would

11   somehow make it difficult for you to be fair?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  It would make it difficult?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  You are saying now that this is

16   not the right case for you?

17             PROSPECTIVE JUROR:  It's not the right case

18   for me.

19             THE COURT:  Your name?

20             PROSPECTIVE JUROR:  Maribelis Bennett.

21             THE COURT:  Mr. Bennett, we will find your

22   ballet.  We have already done so.  You are excused

23   and the officer will explain to you where to go.

24   Thank you very much?

25             PROSPECTIVE JUROR:  All right.

1    (Prospective juror excused at this time .)

2          THE COURT:  Is there anyone who does not

3    speak English well enough to do this?  Yes, ma'am?

4          PROSPECTIVE JUROR:  I am -- I speak

5    English.  I don't know.

6          THE COURT:  What is your name?

7          PROSPECTIVE JUROR:  Anna Maria Hernandez.

8          THE COURT:  Just one moment while we find

9    the ballet.

10     (Brief pause)

11          THE COURT:  You are excused ma'am.  Thank

12    you very much.

13     (Prospective juror exits the courtroom at this

14    time.)

15          THE COURT:  Is there anyone else on that

16    point?  Is there anyone with a health concern

17    something that might affect your ability to serve on

18    the case or simply a medical appointment come up for

19    example that might interfere with our trial

20    schedule?

21     (Indicating).

22          THE COURT:  A couple of people?

23          PROSPECTIVE JUROR:  I just want to say

24    something.  I consider myself to speak English but

25    sometimes when people have different accents or

 1          speak too fast, sometimes--

 2                    THE COURT:  Have you been able to follow me

 3          so far.

 4                    PROSPECTIVE JUROR:  Yes.

 5                    THE COURT:  A hundred percent?

 6                    PROSPECTIVE JUROR:  Yes until now, yes.

 7                    THE COURT:  Did I say something that you

 8          had trouble with?

 9                    PROSPECTIVE JUROR:  No.  At times I get

10          lost sometimes.  I am honest with myself.

11                    THE COURT:  Are you comfortable speaking in

12          English in the jury room when the jury is

13          deliberating?  Can you express your point of view in

14          English to the other jurors?

15                    PROSPECTIVE JUROR:  Yes.

16                    THE COURT:  No problem?

17                    PROSPECTIVE JUROR:  Yes.

18                    THE COURT:  Then you should stay.  Your

19          name just for the record.

20                    PROSPECTIVE JUROR:  Louise Danyagos

21          (phonetic).

22                    THE COURT:  Going back to health concern,

23          there was a gentleman.

24                    PROSPECTIVE JUROR:  Juan Baptista.  I have

25          an appointment later on this month, the 21st.  It's

1    been for quite awhile.

2            THE COURT:  Morning or afternoon?

3            PROSPECTIVE JUROR:  Give me one second.

4        1:40 p.m.

5            THE COURT:  If I said to you don't worry,

6    you will make that appointment you will be willing

7    to stay?

8            PROSPECTIVE JUROR:  No problem.

9            THE COURT:  We will take care of it.  Yes,

10   sir?

11           PROSPECTIVE JUROR:  Keith Dawson.  I also

12   have an appointment the 22nd of September.

13           THE COURT:  You have an appointment?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  In the morning or afternoon?

16           PROSPECTIVE JUROR:  In the morning.

17           THE COURT:  Is it something that can be

18   rescheduled easily or no?

19           PROSPECTIVE JUROR:  Don't think so.

20           THE COURT:  Again, how long do you think

21   that one will be?

22           PROSPECTIVE JUROR:  It's on the 22nd.

23           THE COURT:  The whole day or just an hour

24   or two?

25           PROSPECTIVE JUROR:  Couple of hours.

1          THE COURT:  What time does it start?

2          PROSPECTIVE JUROR:  Around 9:30.

3          THE COURT:  We will accommodate you as

4     well, sir.

5          (Indicating)

6          THE COURT:  Please state your name.

7          PROSPECTIVE JUROR:  Dawson.

8          THE COURT:  Anyone else with a health

9     concern?

10          (No response.)

11          THE COURT:  I have one more preliminary

12     question but it's a big one.  It's as follows:  If

13     you are selected as a juror in this case, first

14     thing that we will be asking you to do is to take an

15     oath.  And in that oath, you will be making a

16     promise to both sides that you will be a fair and

17     impartial juror.  So if you know right now that you

18     would hesitate to take that oath for any reason,

19     please say so.

20          (Indicating)

21          THE COURT:  Yes, ma'am.  In the middle?

22          PROSPECTIVE JUROR:  My name is Vancourt.  I

23     am sorry.  That's going to be hard to look up.  And

24     I would hesitate to -- given the particulars that I

25     know of the case, I would hesitate.

1      THE COURT:  Then I will excuse you right

2  now ma'am.  Thank you, very much.  We will find--

3      (Prospective juror excused at this time.)

4      THE COURT:  This is not the only time you

5  can say I would hesitate to take the oath.  As we go

6  through this, you might hear a question or you might

7  be -- you might be asked a question that prompts

8  something or triggers something and you can always

9  change your position.

10      I am not saying that no one else will ever be

11  excused from this jury but if you know there is

12  something about yourself that would make it

13  difficult to take the oath, you can tell us now.

14  Very very good.  All right.

15      What we are now going to do is our clerk over

16  here is going to take all of the remaining ballets.

17  Put them in the wheel on his desk and then draw 16

18  ballets at random.  We will ask those 16 to take

19  assigned seats over here in the jury box and the

20  questions will focus on that group of 16.

21      There will be many rounds.  If you are not in

22  part of the first round, don't go anywhere because

23  there will be a second and probably a third round as

24  well.  I am going to ask all of you folks, please

25  take a seat or stand out there for a moment until we

1    fill the box.

2              THE CLERK:   Prospective juror, number one.

3    I am sorry if I mispronounce anybody's name, Tracy

4    Chevel, C-H-E-V-E-L.

5         Prospective juror number two, Daniel Celio,

6    C-E-L-I-O.

7         Prospective juror number three, Christina

8    Wildenstein.

9         Michael Palumbo, P-A-L-U-M-B-O.

10        Laura Vincent.  V-I-N-C-E-N-T.

11        Number three is W-I-L-D-E-N-S-T-E-I-N.

12        Prospective juror number six is Shaniqua Austin,

13   A-U-S-T-I-N.

14        Prospective juror number seven, Yajaira,

15   Y-A-J-A-I-R-A.   Infante, I-N-F-A-N-T-E.

16        Prospective juror number eight, Paul Breza,

17   B-R-E-Z-A.

18        Prospective juror number nine, Sarah Clagett,

19   C-L-A-G-E-T-T.

20        Prospective juror number ten, Allison Wasserman,

21   W-A-S-S-E-R-M-A-N.

22        Prospective juror number 11, Paulina Blank,

23   B-L-A-N-K.

24        Prospective jurors number 12, Jose Minaya,

25   M-I-N-A-Y-A.

1      Prospective juror number 13,

2  Francisco Hernandez.

3      Prospective juror number 14, Stephen Sloan,

4  S-L-O-A-N.

5      Prospective juror number 15, Jill, J-I-L-L.

6  Romero, R-O-M-E-R-O.

7      Prospective juror number 16, Darcie,

8  D-A-R-C-I-E.  D' Augusta, D-A-U-G-U-S-T-A.

9      Number six is S-H-A-N-I-Q-U-A.  Last name

10  A-U-S-T-I-N.

11      Number four is P-A-L-U-M-B-O.

12      Number eight is B-R-E-Z-A.

13      THE COURT:  Ladies and gentlemen, I am

14  going to begin by going around and asking each of

15  you a series of questions about yourselves.  These

16  questions are designed to provide some personal

17  information about you to the parties.  So it's like

18  a thumbnail sketch of who you are.

19      The first category we call living arrangements.

20  By that we mean do you live alone or with someone

21  else.

22      Number two, category number two is occupation.

23  What do you do for a living.

24      Number three is neighborhood.  Which section of

25  Manhattan do you live in.  Number four is

1    educational background.   Highest level of education

2    will do.

3         Number five is called spare time activities.

4    What do you like to do outside of work.

5         Number six is organizations, that is, are you

6    involved with any organizations at this time,

7    professional organizations, religious, social,

8    political and so on.

9         And then finally, category number seven, current

10   events.   Do you keep up with current events and if

11   so, how do you do it.   We are going to go right down

12   the line starting with you Ms. Chevel.   You won the

13   lottery this afternoon.

14        So do you live alone or with someone else?

15             PROSPECTIVE JUROR:   I live with my

16   boyfriend.

17             THE COURT:   Which neighborhood is that?

18             PROSPECTIVE JUROR:   Upper westside.

19             THE COURT:   Are you employed?

20             PROSPECTIVE JUROR:   Yes.

21             THE COURT:   What do you do?

22             PROSPECTIVE JUROR:   I am an executive

23   assistant in finances investment banking.

24             THE COURT:   What is your highest degree?

25             PROSPECTIVE JUROR:   I have a bachelor

1   degree.

2           THE COURT:  What do you like to do in your

3   free time?

4           PROSPECTIVE JUROR:  Gym physical activity,

5   hiking.

6           THE COURT:  Are you active in any

7   organizations?

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  Do you keep up with current

10  events?

11          PROSPECTIVE JUROR:  Yes, I do.

12          THE COURT:  How do you do that?

13          PROSPECTIVE JUROR:  Read a couple of papers

14  on line everyday.

15          THE COURT:  Thank you, Ms. Chevel.

16          PROSPECTIVE JUROR:  You're welcome.

17          THE COURT:  Next is -- if I mispronounce a

18  name, please help me.

19      Mr. Celio, do you live alone or with someone

20  else?

21          PROSPECTIVE JUROR:  I live with my sister.

22          THE COURT:  Which neighborhood?

23          PROSPECTIVE JUROR:  East Village.

24          THE COURT:  Occupation?

25          PROSPECTIVE JUROR:  Programer.

1    Self-employed.

2              THE COURT:  Highest degree?

3              PROSPECTIVE JUROR:  Two years of college.

4              THE COURT:  Spare time activities.

5              PROSPECTIVE JUROR:  Drinking, traveling.

6              THE COURT:  Of course not during jury duty.

7    Organizations?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Do you keep up with current

10   events?

11             PROSPECTIVE JUROR:  Yes.

12             PROSPECTIVE JUROR:  Internet.  I read a lot

13   of New York Times, stuff like that.

14             THE COURT:  Would you say you check in

15   everyday?

16             PROSPECTIVE JUROR:  Yes.  Several times a

17   day.

18             THE COURT:  Thank you, sir.

19   Ms. Wildenstein?

20             PROSPECTIVE JUROR:  Married.

21             THE COURT:  Do you want to just volunteer?

22             PROSPECTIVE JUROR:  Neighborhood?

23             THE COURT:  Yes.

24             PROSPECTIVE JUROR:  Upper east side.

25             THE COURT:  Educational background?

1          PROSPECTIVE JUROR:  High school graduate.

2          THE COURT:  Interests hobbies?

3          PROSPECTIVE JUROR:  Physical sports,

4     crafts.

5          THE COURT:  Organizations?

6          PROSPECTIVE JUROR:  Pastor.

7          THE COURT:  Which is what?

8          PROSPECTIVE JUROR:  It's actually French

9     medical organization, Louis Paster (phonetic).

10         THE COURT:  Okay.  I have heard of him.

11    Current events?

12         PROSPECTIVE JUROR:  Yes.  Newspapers and

13    TV.

14         THE COURT:  Everyday?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Did I ask you your occupation

17    or did I forget?

18         PROSPECTIVE JUROR:  No occupation.

19         THE COURT:  Do you have work experience in

20    a particular field?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Okay.

23       Mr. Polumbo?

24         PROSPECTIVE JUROR:  Hi.

25         THE COURT:  You live alone?

1          PROSPECTIVE JUROR:  I live alone.

2          THE COURT:  Neighborhood?

3          PROSPECTIVE JUROR:  Gramercy Park avenue.

4          THE COURT:  Occupation?

5          PROSPECTIVE JUROR:  Office manager.

6          THE COURT:  Highest degree?

7          PROSPECTIVE JUROR:  Masters degree.

8          PROSPECTIVE JUROR:  Fine arts.

9          THE COURT:  Interests?

10         PROSPECTIVE JUROR:  Photography, reading,

11    drawing.

12         THE COURT:  Organizations?

13         PROSPECTIVE JUROR:  None.

14         THE COURT:  Current events?

15         PROSPECTIVE JUROR:  Yes.  Internet

16    newspaper, television.

17         THE COURT:  All the time?

18         PROSPECTIVE JUROR:  All the time.

19         THE COURT:  Thank you.

20       Ms. Vincent.

21         PROSPECTIVE JUROR:  Yes.  I live with my

22    boyfriend in the West Village.  I am in investment

23    banking.

24         THE COURT:  Highest degree?

25         PROSPECTIVE JUROR:  Four year college.

```
 1                    THE COURT:  Interests hobbies?
 2                    PROSPECTIVE JUROR:  Running traveling,
 3          reading.  I am obviously -- I watch Bloomberg all
 4          day.
 5                    THE COURT:  You keep up with what's going
 6          on?
 7                    PROSPECTIVE JUROR:  Yes.
 8                    THE COURT:  Are you involved with any
 9          organizations?
10                    PROSPECTIVE JUROR:  No.
11                    THE COURT:  Thank you, Ms. Vincent.
12          Ms. Austin?
13                    PROSPECTIVE JUROR:  Yes.
14                    THE COURT:  Do you live alone?  You look
15          awfully young to do that?
16                    PROSPECTIVE JUROR:  I have been on my own
17          but I live with my parents.
18                    THE COURT:  Neighborhood?
19                    PROSPECTIVE JUROR:  Upper westside.
20                    THE COURT:  Are you working or going to
21          school?
22                    PROSPECTIVE JUROR:  Going to school.
23                    THE COURT:  What year?
24                    PROSPECTIVE JUROR:  One year.
25                    THE COURT:  I am sorry?
```

1              PROSPECTIVE JUROR:  First year.

2              THE COURT:  Where do you go to school?

3              PROSPECTIVE JUROR:  I am going school at

4      BMCC.

5              THE COURT:  What do you like to do in your

6      free time?

7              PROSPECTIVE JUROR:  Singing, song writing.

8              THE COURT:  Do you belong to any

9      organizations?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Do you try to keep up with

12     current events?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  How do you do that?

15             PROSPECTIVE JUROR:  Newspaper.

16             THE COURT:  Everyday?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  All right.  Thank you ma'am.

19     Ms. Infante?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  Live alone?

22             PROSPECTIVE JUROR:  No.  I live with my

23     partner.  High Bridge section near Washington

24     Heights.

25             MR. BOGDANOS:  I am sorry.  I apologize

1        Ms. Infante, I couldn't hear that.

2                THE COURT:  A little louder.

3                PROSPECTIVE JUROR:  I live with my partner

4        in Washington near High Bridge.  I am a third year

5        undergrad student.  I am also a sales associate for

6        I a moving company.  Organization, I volunteer for

7        Learning Allie.

8                THE COURT:  Free time?

9                PROSPECTIVE JUROR:  Free time, I play

10       dominos, tennis.  I don't keep up with current

11       events much.

12               THE COURT:  What's that means once or twice

13       a week?

14               PROSPECTIVE JUROR:  Maybe once or twice a

15       week.

16               THE COURT:  Thank you, Ms. Infante.

17           Mr. Breza.

18               PROSPECTIVE JUROR:  I am single.  Live

19       alone upper westside.  I am a producer in corporate

20       events.

21               THE COURT:  Highest degree?

22               PROSPECTIVE JUROR:  Four years of college.

23       I don't have any interests outside of work.  I work

24       all the time.  No organizations.

25               THE COURT:  Current events?

1          PROSPECTIVE JUROR:  I am usually on line

2     all day and television at night.

3          THE COURT:  Thank you, Mr. Breza.

4     Ms. Clagett, you live alone?

5          PROSPECTIVE JUROR:  I am engaged; live on

6     the upper westside.

7          THE COURT:  Occupation.

8          PROSPECTIVE JUROR:  Television producer.

9          THE COURT:  Highest degree?

10         PROSPECTIVE JUROR:  Bachelors degree.

11         THE COURT:  Free time?

12         PROSPECTIVE JUROR:  I like to cook and

13    travel and play tennis.

14         THE COURT:  Partner over here,

15    organizations?

16         PROSPECTIVE JUROR:  I don't belong to any

17    outside organizations.

18         THE COURT:  Obviously you keep up with

19    current events?

20         PROSPECTIVE JUROR:  On a daily basis.  I do

21    that obviously for work.

22         THE COURT:  Right.  Thank you.

23    Ms. Wasserman?

24         PROSPECTIVE JUROR:  I live with my husband

25    in Tribeca.  I work for government sponsor health

1    insurance company.  I am a manager of analysts.

2    Free time, I like to travel and eat food.

3              THE COURT:  Highest degree?

4              PROSPECTIVE JUROR:  I have a bachelors of

5    science.

6              THE COURT:  Organizations?

7              PROSPECTIVE JUROR:  I belong to the

8    National Authentic Trainers Association.

9              THE COURT:  Current events?

10              PROSPECTIVE JUROR:  Daily news on line and

11    TV.

12              THE COURT:  Thank you.

13         Ms. Blank.

14              PROSPECTIVE JUROR:  I live alone on the

15    upper east side.  I have an associates degree in

16    culinary arts.  I am a pastry chef.  I belong to the

17    Association of Women's Chef restaurant and tours.  I

18    like to cook read and travel.  That was the last

19    one?

20              THE COURT:  Current events?

21              PROSPECTIVE JUROR:  I keep up.  I get the

22    New York Times everyday.

23              THE COURT:  Thank you.  Very good.

24         Mr. Minaya?

25              PROSPECTIVE JUROR:  Live with my mother and

1    my brother.

2              THE COURT:  Neighborhood?

3              PROSPECTIVE JUROR:  Spanish Harlem.

4              THE COURT:  Are you working or going to

5    school?

6              PROSPECTIVE JUROR:  None.

7              THE COURT:  Neither one.  Are you looking

8    for work in a particular field?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Do you have any kind of work

11   experience?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Then you have lots of free

14   time.  What do you like to do?

15             PROSPECTIVE JUROR:  Go on line, play

16   baseball.

17             THE COURT:  Do you belong to any

18   organizations?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  Do you keep up with current

21   event?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  Not at all?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Again, there are no right or

1     wrong answers.  We are just trying to get a little

2     information from you.  Thank you.

3         Mr. Hernandez, we know a little bit about you

4     but go ahead.

5              PROSPECTIVE JUROR:  Married.  Live uptown

6     Washington Heights.  Have a bachelor degree, read

7     the New York Times every morning.

8              THE COURT:  You work in IT?

9              PROSPECTIVE JUROR:  Yes.

10        Current events I read the New York Times every

11    morning.  Free time reading and travel.

12             THE COURT:  Did you mention organizations?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Thank you.

15        Mr. Sloan.

16             PROSPECTIVE JUROR:  Yes.  I live alone in

17    Chelsea.  I work for an investment bank as a project

18    manager.  I have an NBA.  No organizations.  I watch

19    the news everyday.

20             THE COURT:  In your free time?

21             PROSPECTIVE JUROR:  Theater, opera, ballet,

22    that kind of stuff.

23             THE COURT:  Thank you.

24        Ms. Romero?

25             PROSPECTIVE JUROR:  I am divorced.  I live

1    with my two children.  My son is 13 and my daughter

2    is nine.  I live in Morningside Heights Harlem.  I

3    am a licensed real estate sales person.

4        I try to keep up with current events styles.

5    It's difficult.  When I do, I read the free

6    newspapers and I listen to the local news.  And I

7    belong to Man R, which is a real estate board and

8    also two actors equity and screen actors Gill.

9        THE COURT:  Your highest level of

10   education?

11       PROSPECTIVE JUROR:  I have a masters in

12   fine arts.

13       THE COURT:  Thank you, ma'am.

14       Finally, Ms. D'Augusta?

15       PROSPECTIVE JUROR:  I live with my cousin

16   and my boyfriend in the upper westside.  I have a

17   masters degree in Economics and finances.  I work

18   right now at a bank as an analyst.  I keep up with

19   current events for work and--

20       THE COURT:  Your spare time?

21       PROSPECTIVE JUROR:  Spare time, read run,.

22       THE COURT:  Any organizations?

23       PROSPECTIVE JUROR:  No.

24       THE COURT:  Okay.  Thank you.  And now

25   ladies and gentlemen, I have a series of general

1    questions for all 16 of you.  Those who do answer

2    yes, can expect a few follow-up questions as well to

3    any of these questions.  The first one involves

4    prior jury experience.

5        That is have any of you had occasion to serve on

6    a criminal case in the past or civil or even the

7    Grand Jury, prior jury experience anyone?

8    (Indicating).

9            THE COURT:  God quite a few.  Mr. Breza,

10   trial or Grand Jury?

11           PROSPECTIVE JUROR:  Grand Jury.

12           THE COURT:  How many years ago was that?

13           PROSPECTIVE JUROR:  Just about eight years

14   ago.

15           THE COURT:  Did you hear all sorts of

16   different cases.

17           PROSPECTIVE JUROR:  No.  They were mostly

18   all drug cases.

19           THE COURT:  The narcotics, Grand Jury?

20           PROSPECTIVE JUROR:  Correct.

21           THE COURT:  That was here in Manhattan?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  Thank you.

24       Mr. Sloan?

25           PROSPECTIVE JUROR:  I have been on two jury

1    trials.

2           THE COURT:  Criminal or civil?

3           PROSPECTIVE JUROR:  One of each.

4           THE COURT:  All right.  Let's start with

5    the criminal case.  Without telling us what the

6    verdict in that case might have been, did you have a

7    chance to deliberate?

8           PROSPECTIVE JUROR:  I was an alternate.  I

9    was dismissed before they deliberated.

10          THE COURT:  How many years ago?

11          PROSPECTIVE JUROR:  About eight I would

12    say.

13          THE COURT:  Do you remember any of the

14    charges?

15          PROSPECTIVE JUROR:  Yes, armed robbery.

16          THE COURT:  A robbery case?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  You said there was a civil

19    matter?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Was that before the criminal

22    case?

23          PROSPECTIVE JUROR:  Yes.  I think so.  It

24    was around six or eight years ago too.

25          THE COURT:  Do you remember if you

1    deliberated in that one?

2              PROSPECTIVE JUROR:  We did.

3              THE COURT:  Did the jury come to a

4    decision?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Thank you.

7    There were others, Ms. Clagett?

8              PROSPECTIVE JUROR:  About six years ago, I

9    was an alternate on a criminal case.

10             THE COURT:  So again you did not

11   deliberate?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Do you remember any of the

14   charges?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  What kind of case it was?

17             PROSPECTIVE JUROR:  Not really.

18             THE COURT:  It's all right.  I forget them

19   too and I am right here.  Anyone else?  Mr. Polumbo?

20             PROSPECTIVE JUROR:  Criminal case.  It was

21   about eight or nine years ago and it was a drug

22   case.

23             PROSPECTIVE JUROR:  We deliberated.

24             THE COURT:  We don't need to know what the

25   verdict was but did you reach one?  Was the jury

1    able to do that?

2                PROSPECTIVE JUROR:  No.

3                THE COURT:  Ugly word, a hung jury?

4                PROSPECTIVE JUROR:  Hung jury.

5                THE COURT:  It happens.

6                THE COURT:  Anyone else on jury service?

7    (No response .)

8                THE COURT:  Next question, conflicts with

9    the law.  Have you or anyone close to you ever had a

10   conflict with the law?  By that, we mean some sort

11   of an arrest.

12     Ms. Infante?

13              PROSPECTIVE JUROR:  Yes.

14              THE COURT:  You or someone close to you?

15              PROSPECTIVE JUROR:  Someone close to me.

16              THE COURT:  Is the case still going on?

17              PROSPECTIVE JUROR:  Yes.

18              THE COURT:  Is it here in Manhattan?

19              PROSPECTIVE JUROR:  In the Bronx.

20             THE COURT:  Have you attended any of the

21   court proceedings?

22             PROSPECTIVE JUROR:  No.  That would have

23   been today.

24             THE COURT:  There was a first proceeding

25   today?

1          PROSPECTIVE JUROR:  I think so.

2          THE COURT:  Finally, is there anything

3      about that case that would somehow make it hard for

4      you to be fair and impartial in this case?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  So you can promise both sides

7      that you will be fair and true?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Thank you.

10        Mr. Breza?

11         PROSPECTIVE JUROR:  I don't mention this

12     much my brother-in-law.

13         THE COURT:  If there is something you want

14     to tell us about later on.

15         PROSPECTIVE JUROR:  It's all right.  I

16     don't often tell people but my brother-in-law was

17     convicted of murder about 15 years ago.

18         THE COURT:  Was there a trial in that case?

19         PROSPECTIVE JUROR:  There was a trial.

20         THE COURT:  Did you attend any of the

21     proceedings?

22         PROSPECTIVE JUROR:  I did not.

23         THE COURT:  Was it here in Manhattan?

24         PROSPECTIVE JUROR:  North eastern

25     Pennsylvania.

1          THE COURT:  Again, our only concern is it

2     whether something about that case would affect you

3     here.  Can you promise the parties that you will be

4     fair and that will not affect you?

5          PROSPECTIVE JUROR:  I would try to be very

6     very fair.  Yes.

7          THE COURT:  But do you hesitate in some way

8     to give them that promise?

9          PROSPECTIVE JUROR:  Yes, because I have

10    never --i haven't thought about this in so many

11    years.

12         THE COURT:  There is no right or wrong

13    answer?

14         PROSPECTIVE JUROR:  I would try my hardest.

15         THE COURT:  Keep thinking about it and I am

16    sure they will ask you follow-up questions about

17    that.

18       Anyone else on conflicts?

19       (No response.)

20         THE COURT:  Next question, law enforcement.

21    Do any of you happen to know anyone who works in law

22    enforcement?  Family members, friends or even a

23    acquaintances?  Mr. Breza?

24         PROSPECTIVE JUROR:  I have two cousins who

25    were policeman, retired now and an uncle who was a

1      policeman.

2              THE COURT:   Locally or somewhere else?

3              PROSPECTIVE JUROR:   In New Jersey.

4              THE COURT:   Thank you.

5          Ms. Infante.

6              PROSPECTIVE JUROR:   I have a friend who is

7      a police officer in Brooklyn.

8              THE COURT:   Thank you.

9          Mr. D'Augusta?

10             PROSPECTIVE JUROR:   I have a friend who is

11     a police officer in Brooklyn and an uncle who is a

12     state trooper in Massachusetts.

13             THE COURT:   Mr. Sloan?

14             PROSPECTIVE JUROR:   My God daughter is a

15     police cadet in Kansas.

16             THE COURT:   Thank you.

17         Ms. Wasserman?

18             PROSPECTIVE JUROR:   My brother is in

19     training to be a police officer in Pennsylvania.

20             THE COURT:   Ms. Wildenstein?

21             PROSPECTIVE JUROR:   My husband police -- is

22     an X policeman in his job.

23             THE COURT:   All right.   Thank you.

24         Anyone else law enforcement, last question,

25     victim of a crime.   Have you or anyone close to you

1    ever been the victim of a crime?  Mr. Breza?

2              PROSPECTIVE JUROR:  I was mugged a few

3    times actually.

4              THE COURT:  When was the last time?

5              PROSPECTIVE JUROR:  About 20 years ago.

6              THE COURT:  So sometime ago?

7              PROSPECTIVE JUROR:  It's been awhile.

8              THE COURT:  Did you report the matter?

9              PROSPECTIVE JUROR:  Yes.  I was

10   hospitalized for over a month.

11             THE COURT:  Did the police make any arrests

12   in these cases?

13             PROSPECTIVE JUROR:  Not to my knowledge,

14   no.

15             THE COURT:  Thank you.

16        Ms. Romero?

17             PROSPECTIVE JUROR:  I was sort -- I was

18   randomly attacked physically in Chinatown one time

19   but they did not catch the person.

20             THE COURT:  You did report it?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  How many years ago was that.

23        Approximately?

24             PROSPECTIVE JUROR:  Twenty.

25             THE COURT:  Going back a ways.  Thank you.

1    Others crime victims, Mr. Sloan?

2           PROSPECTIVE JUROR:  I was mugged about 20

3    years ago.

4           THE COURT:  In Manhattan?

5           PROSPECTIVE JUROR:  In New York City, yes.

6           THE COURT:  Reported?

7           PROSPECTIVE JUROR:  It was reported went to

8    jury, the whole thing.

9           THE COURT:  There was an arrest you

10   actually testified at a trial?

11          PROSPECTIVE JUROR:  Yes, at a Grand Jury.

12          THE COURT:  Is this anything about that

13   experience that would affect you here?  I know it's

14   a long time ago.

15          PROSPECTIVE JUROR:  No.  I don't think so.

16          THE COURT:  Thank you.  Anyone else?

17       (No response.)

18          THE COURT:  All right.  Then we will move

19   on to an entirely different topic.  I am going to go

20   over with you in summary fashion some of the

21   fundamental principles of criminal law.  If you are

22   selected, obviously there will be much more detailed

23   instructions about all of all of this later on

24   during the trial.

25   In this case ladies and gentlemen, as in every

1   criminal case, the accused or the defendant and here it's

2   Mr. Richardson must be presumed by you to be innocent.

3   He is here today because an indictment has been filed

4   against him but the indictment itself is not proof of

5   anything.  An indictment is simply by the means by which

6   a defendant is informed of the charges against him and is

7   then brought into court to face those charges.

8       But as he sits there now, he must be afforded the

9   presumption of innocence.  It is up to the People, that

10  is the DA's office to convince you beyond a reasonable

11  doubt that the defendant is guilty.

12      The burden in a criminal case is solely on the

13  prosecution.  The defense has no burden to do anything.

14  Is there anyone who has any difficulty accepting and

15  following these fundamental principals or any questions

16  about them?

17      (No response.)

18          THE COURT:  Here is another one also very

19      important:  Under our system, a defendant in a

20      criminal case is not obligated to take the witness

21      stand.  Thus, if Mr. Richardson does not testify at

22      this trial, you may not draw any inference

23      unfavorable to him from that fact.  If he doesn't

24      testify, you can't hold it against him.

25          Is there anyone who would have any difficulty

1    accepting and following this principle?

2        (no response .)

3            THE COURT:  Does anyone have anymore real

4    intellectual opinion or belief which might conflict

5    with any of these rules or which might somehow slant

6    your approach to the case?  Here we are looking for

7    moral or ethical concerns.  Anyone?

8        (No response .)

9            THE COURT:  All right.  Making rapid

10   progress at least as far as I am concerned.  Just a

11   few more questions.  One involves police testimony

12   and there will be a substantial amount of police

13   testimony at this trial at least that's my

14   understanding.

15       The question is this:  Will you be able to weigh

16   the testimony of a police officer in the same way

17   that you would weigh the testimony of a civilian

18   witness?  And that means essentially that no greater

19   or lesser weight is to be given to the testimony

20   simply because it is coming from a police officer.

21   Is there anyone who would be unable to follow such

22   an instruction?

23       (No response .)

24            THE COURT:  No one.

25   If after hearing all of the evidence in the case, you

1  are convinced that the defendant's guilt has been proved

2  beyond a reasonable doubt, would you hesitate for any

3  reason to vote guilty?

4      (No response .)

5          THE COURT:  And then the reverse, if you

6      find after hearing the evidence that you do have a

7      reasonable doubt, would you hesitate to vote not

8      guilty?

9      Those are the two verdicts, obviously, you will

10     be asked to consider at the end of the trial.

11     And finally, is there anything else anything you

12     want to raise concerning your qualifications to

13     serve on this case?  So any topic whatsoever anyone?

14     Mr. Celio.

15         PROSPECTIVE JUROR:  I was diagnosed with

16     ADHD.  I kind of trail off here and there but--

17         THE COURT:  Have you been able to

18     concentrate so far?

19         PROSPECTIVE JUROR:  Yes.  Sure, I guess.

20         THE COURT:  Jurors are allowed to take

21     notes.  Would that be of assistance to you?

22         PROSPECTIVE JUROR:  I guess.

23         THE COURT:  You have never done this before

24     I take it, so you are somewhat concerned?

25         PROSPECTIVE JUROR:  I hear three weeks and

1    I say, oh, man.  Just letting you guys know that.

2         THE COURT:  Thank you for telling us that.

3    I am not sure but they may ask you some additional

4    questions.

5         Anyone else before I get a chance to sit down?

6         (No response .)

7         THE COURT:  Then I thank you all very very

8    much.  The attorneys will now ask a few questions.

9    Since the People have the burden Mr. Bogdanos gets

10   to ask his questions first.

11        MR. BOGDANOS:  Thank you, your Honor.

12   Ladies and gentlemen, thank you.  Thank you.  Thank

13   you.  We bring you down out of your busy lives, ask

14   you to put your lives on hold so that the system

15   works because without jurors, we don't have a

16   criminal justice system so thank you.

17        To make matters worse in this particular case,

18   we bring you down for a murder.  We bring you down

19   here for a trial that may take two and a half to

20   perhaps as much as three weeks.  I truly want to

21   thank you all for that.

22        On the issue of coming down here, please

23   understand, every question I have for you and there

24   are several, as his Honor did indicate is designed

25   for a single purpose only, to insure a fair trial

1       for Mr. Richardson and a fair trial for the People.

2       That's it.  That's what these questions are designed

3       for.  So please forgive me if appear to probe.

4       Actually forgive me because I am going to probe.  I

5       just won't appear to do it.

6            Ma'am, if I could start with you.  How long have

7       you lived in New York?

8                 PROSPECTIVE JUROR:  My whole life.

9                 MR. BOGDANOS:  Like a native New Yorker

10      born and raised, may I assume like every New Yorker

11      I have ever met, you have an opinion about crime in

12      the city?

13                PROSPECTIVE JUROR:  Sure.

14                MR. BOGDANOS:  Don't tell me the opinion

15      but you have one.

16                PROSPECTIVE JUROR:  Of course.

17                MR. BOGDANOS:  You have an opinion about

18      the criminal justice system whatever the opinion is.

19                PROSPECTIVE JUROR:  Sure.

20                MR. BOGDANOS:  Sir, may I take it you have

21      an opinion as well?  I am not going to ask it

22      whatever the opinion is, you got it right?  A show

23      of hands who here has an opinion about crime in New

24      York City, raise your hand please, if you have an

25      opinion.  I am not going to ask if you don't have an

opinion.  You don't have an opinion just checking.
We are coming to TV later on.  Everyone has an
opinion about the criminal justice system, good, bad
too easy, too hard, what have.  Your opinion is we
have all got one.

Do you know, ma'am, I know you it do so forgive
me for saying this directly but you do understand
that opinions are not evidence, right?

PROSPECTIVE JUROR:  Agreed.

MR. BOGDANOS:  Anything you think about the
criminal justice system really has nothing to do
with the evidence in this case.  Is that fair?

PROSPECTIVE JUROR:  Yes.

MR. BOGDANOS:  Do you promise me that if
you are selected to sit on this jury that each and
everyday you walk into this courtroom, you will stop
at those doors right there and you will check your
opinion, your agenda, your bias, your hostility,
whatever it is, check it at the door like so much
baggage because that's really what it is.  And you
will bring into this courtroom your common sense,
your fundamental decency, your ability to perceive
observe and asses credibility.  You will bring that
into the courtroom but all that other stuff, you
will leave outside.  Will you do that?

1    PROSPECTIVE JUROR:  Yes.  It's the only

2    fair thing to do.

3        MR. BOGDANOS:  Will everyone do just that.

4    Mr. Breza, will you do that?  Will you leave -- and

5    I understand you have a slightly separate issue here

6    with your brother in laws conviction.  Do you

7    believe as you sit here now -- only you can tell us.

8    We take you at your word.  Can you assure us now

9    that you will leave anything -- any baggage that

10   remains from your brother in laws conviction?  I am

11   sorry to have to bring it up again.

12       PROSPECTIVE JUROR:  I would.

13       MR. BOGDANOS:  You will check it at the

14   door and judge this case on the evidence in this

15   case.  Will you do that?

16       PROSPECTIVE JUROR:  Yes, of course.

17       MR. BOGDANOS:  Everyone will, yes?

18   (Indicating).

19       MR. BOGDANOS:  Thank you.

20   Ma'am, do you understand every time I say do you

21   understand, he notes the answer.  The answer is yes.

22   It's getting to the question, that evidence is what

23   comes from for example, testimony from the witness

24   stand.  That's right where it is.  That's where the

25   witness is going to stand.  That's the microphone

1    and then whatever exhibits his Honor will allow into

2    evidence either from the defense or the People, you

3    understand that's evidence?

4             PROSPECTIVE JUROR:  Yes.

5             MR. BOGDANOS:  Do you understand that if

6    it's not evidence, you must not consider it.  You

7    must set aside all manner of irrelevancies that are

8    not based on the evidence and will you do that in

9    this case?

10            PROSPECTIVE JUROR:  I can try.

11            MR. BOGDANOS:  Everyone tries and I

12   understand that it's many times, it's just a way of

13   answering the question.  But you know you well, you

14   know yourself.  Do you think you are going to allow

15   extraneous material, irrelevancies to impact your

16   ability to be a fair juror in this case?

17            PROSPECTIVE JUROR:  No.

18            MR. BOGDANOS:  Okay.

19        Same question.  Will you set aside all matters

20   of irrelevancies not based on the evidence?

21            PROSPECTIVE JUROR:  Of course.

22            MR. BOGDANOS:  When I say that, there is a

23   whole host of things that are irrelevant but let me

24   address just a couple if I could please.  Each side,

25   the prosecution and the defense has attorneys whose

1   job it is to present evidence.  Or to question

2   evidence.  You understand that, right?

3       But you understand that the attorneys themselves

4   are not evidence, right?  It's what's coming from

5   the witness stand that's evidence.  No matter how

6   experience, clever witty, charming, intelligent

7   smart you find Mr. Klein, the lead defense counsel

8   or how much of the opposite you find me, do you

9   promise to put all of that aside and judge this case

10  solely on the evidence, not think about the

11  performance of the lawyers, who was better, you

12  promise to do that, ma'am?

13      I am going to ask you the same question if you

14  are selected as a juror, you will go into that

15  deliberation room in the back during every recess

16  and there may well come more than one time where you

17  are going to be in the back and say Klein got him

18  again or hey man, Klein is running circles around

19  him.

20      If you do it, do me a favor, please do it in the

21  back but do you assure me that however many times

22  you chuckle to yourself about that, you are not

23  going to allow that to impact and influence your

24  assessment of the evidence and your assessment of

25  the credibility of the witnesses who testify in this

1      case.  Will you assure me of that?

2                  PROSPECTIVE JUROR:  Yes.

3                  MR. BOGDANOS:  Will each and every one of

4      you do that exact same thing?

5                  PROSPECTIVE JURORS:  Yes.

6                  MR. BOGDANOS:  Do you promise me?  Thank

7      you.  If I could now Ms. Wasserman, you mentioned

8      that you are in the health insurance business.  Did

9      I hit that right?  Are you legally in the health

10     insurance business?

11                 PROSPECTIVE JUROR:  Yes.

12                 MR. BOGDANOS:  Absolutely sure you are in

13     the health insurance business?

14                 PROSPECTIVE JUROR:  Yes.

15                 MR. BOGDANOS:  Are you telling us that you

16     are in the health insurance business?

17                 PROSPECTIVE JUROR:  Yes.

18                 MR. BOGDANOS:  Did you hear how many times

19     I repeated the same question.  Is there any number

20     of times I can it, ask you that will change the fact

21     that you are in the health insurance business?

22                 PROSPECTIVE JUROR:  No.

23                 MR. BOGDANOS:  Is there any amount of

24     sarcasm I can put into my voice that will somehow

25     change the reality that you are in the health

1    insurance business?

2              PROSPECTIVE JUROR:  No.

3              MR. BOGDANOS:  You mean to tell me you

4    really want us to believe you are in the health

5    insurance business?

6              PROSPECTIVE JUROR:  Of course.

7              MR. BOGDANOS:  Do you believe her?

8              PROSPECTIVE JUROR:  I do.

9              MR. BOGDANOS:  But didn't you hear the

10   sarcasm in my voice.  I really--

11             PROSPECTIVE JUROR:  It was annoying.

12             MR. BOGDANOS:  That's the best I can do.

13   Did you hear it?

14             PROSPECTIVE JUROR:  I heard it.

15             MR. BOGDANOS:  You get the point.  The

16   truth is what the truth is, right, no matter how

17   many times I or I don't know any lawyer might ask a

18   question again and again and again doesn't change

19   your assessment of the answer, does it?

20             PROSPECTIVE JUROR:  No.

21             MR. BOGDANOS:  Ma'am, same question for

22   you, how about if I asked five more times if his

23   Honor lets me and he really wouldn't, how about I

24   got really sarcastic, would that somehow change your

25   assessment Of Ms. Wasserman's answer?

1           PROSPECTIVE JUROR:  No.

2           MR. BOGDANOS:  Will you bring that common

3   sense to bear if you are selected as a juror here?

4           PROSPECTIVE JUROR:  Yes.

5           MR. BOGDANOS:  You won't allow yourself to

6   be swayed by, I don't know, sarcasm or repetition or

7   anything like that but just listen to the answers

8   that are given questions coupled with the answers.

9   Will you do that?

10          PROSPECTIVE JUROR:  Yes.

11          MR. BOGDANOS:  Will each and every one of

12  you do just that?

13          (indicating).

14          MR. BOGDANOS:  Mr. Romero, forgive me for

15  causing you to relive it.  You mentioned you were

16  attacked in Chinatown a few years ago.

17          PROSPECTIVE JUROR:  Yes.

18          MR. BOGDANOS:  How many individuals were

19  involved?

20          PROSPECTIVE JUROR:  It was just one.

21          MR. BOGDANOS:  Mr. Sloan, same question.

22          PROSPECTIVE JUROR:  Yes.

23          MR. BOGDANOS:  There were three people and

24  I am not going to ask you to go into what each of

25  the three did.  There is no need to relive but do

1    you have in your mind a clear indication of what

2    they did or was it all a blur or did you only get

3    good look at one and not the others?

4           PROSPECTIVE JUROR:  It was pretty clear.

5           MR. BOGDANOS:  And I think there has also

6    been a juror before, have you, not in a criminal

7    trial?

8           PROSPECTIVE JUROR:  Yes.

9           MR. BOGDANOS:  So you do know that the law

10    understands that crimes are often committed by more

11    than one person, right?

12           PROSPECTIVE JUROR:  Yes.

13           MR. BOGDANOS:  In your case, the crime was

14    committed by three people, I am not in any way going

15    to instruct you on the law.  It's not my job.  His

16    honor won't allow me anyway.  But do you understand

17    in the law, there is a theory called acting in

18    concert?  His honor will give you plenty instruction

19    on it, but can you accept a proposition if his honor

20    instructing you that under the law, the law

21    recognizes that one person can do a crime -- two

22    people can do a crime, three people and they are

23    they are all in a sense, if they participate, they

24    are all equally guilty.

25        You understand that?

1              PROSPECTIVE JUROR:  Yes.

2              MR. BOGDANOS:  And you can accept that?

3              PROSPECTIVE JUROR:  Yes.

4              MR. BOGDANOS:  For example, if your case, I

5     am just going to make up some facts.  I rather you

6     not have to go through it but imagine, if you will,

7     that one person in your case was the lookout,

8     looking out to make sure there were no police, while

9     another grabbed you from behind, and a third went

10    through your pockets.

11        I hope I am not making you really relive it but

12    can you go with my hypothetical.  You got those

13    three people.  Do you understand?

14        And his honor will instruct you.  It's not my

15    province but you understand, under the law, all

16    three of those are equally guilty of the robbery,

17    the lookout, the person who choked you and the

18    person who grabs your money.  There are all three --

19    they even have different roles but they are all

20    three equally guilty.  If the crime was robbery in

21    the second degree as it would be under that

22    hypothetical, they all three would be guilty

23    regardless of their individual roles.

24        Do you understand that?

25              PROSPECTIVE JUROR:  Yes.

1        MR. BOGDANOS:  You accept as if his Honor
2   charges you on that, you accept that?  That's the
3   law.
4        PROSPECTIVE JUROR:  Yes.
5        MR. BOGDANOS:  Do you have any problem with
6   that law at all?
7        PROSPECTIVE JUROR:  No.
8        MR. BOGDANOS:  Sir, I will ask you the same
9   exact question.  Do you have any problem --
10       PROSPECTIVE JUROR:  You are telling me the
11  lookout is just as guilty as the guy who chokes him?
12       MR. BOGDANOS:  Yes.  That's the law.  Can
13  you accept that?
14       PROSPECTIVE JUROR:  Yes unless it was like
15  an emergency and he was drunk and he didn't know --
16  drugged.
17       MR. BOGDANOS:  Who was drugged?
18       PROSPECTIVE JUROR:  One of the guys.
19       MR. BOGDANOS:  You mean the lookout was
20  drugged?
21       PROSPECTIVE JUROR:  Maybe one guy was
22  drugged.
23       MR. BOGDANOS:  We will come back to
24  imagination in a little while.  Imagination is not
25  based on evidence.  We will come back to that.

1    Because you are actually not allowed to do that but

2    let me hold that thought.

3         Can you ma'am accept that what I just called

4    acting in concert, that theory under the law that if

5    each individual has a role in the crime each

6    individual is guilty of that crime?

7              PROSPECTIVE JUROR:  Yes.

8              MR. BOGDANOS:  Of course when it comes to

9    sentencing, the judge may or may not make a

10   different sentencing.  But you understand the

11   concept?

12             PROSPECTIVE JUROR:  Yes.

13             MR. BOGDANOS:  You accept it?

14             PROSPECTIVE JUROR:  Yes.

15             MR. BOGDANOS:  Ma'am, same thing.  Can you?

16             PROSPECTIVE JUROR:  Yes.

17             MR. BOGDANOS:  Can you?

18             PROSPECTIVE JUROR:  Yes.

19             MR. BOGDANOS:  Can you.

20             PROSPECTIVE JUROR:  Yes.

21             MR. BOGDANOS:  Anyone who can't accept that

22   who just doesn't think that ought to be the law or

23   can't follow it, if it is the law.  Anyone think

24   that at all?

25             (No response.).

1          MR. BOGDANOS:  Thank you.

2      Continuing on the theme of setting aside all

3      matters of irrelevancies that are not based on the

4      evidence, Ms. D'Augusta, you heard his Honor talk

5      about the fact that this is a murder trial.

6          PROSPECTIVE JUROR:  Yes.

7          MR. BOGDANOS:  And very briefly the

8      allegations.  I'm asking for your assurance in any

9      murder trial, it is common human nature to have a

10     whole host of emotions and they run the gamut from

11     sympathy for the victim, anger at the act that

12     occurred, all of the emotions.  I need to have your

13     assurance please if you can give it, that you will

14     put aside all such emotions.  You will check them at

15     the same door over there, anger, sympathy, all those

16     emotions, you will do that even though this is a

17     murder trial.  Will you do that?

18          PROSPECTIVE JUROR:  Do my best, yes.

19          MR. BOGDANOS:  You know you better than

20     anyone.  Again, we understand that it's a way of

21     speaking, I will try.  I will do my best.  I will do

22     the best I can.  Knowing you, do you think you will

23     succeed in -- sure, feel sympathy.  Sure, feel

24     anger.  Feel all those things but don't allow them

25     to influence your assessment of the evidence or your

1    verdict.  Will you do that.

2                PROSPECTIVE JUROR:  Yes.

3                MR. BOGDANOS:  Of course is the words you

4    said.

5                PROSPECTIVE JUROR:  Yes.

6                MR. BOGDANOS:  Ms. Romero, same question

7    for you.  Let me make the question a tiny bit harder

8    for you.  The allegations in this case are that

9    Helen Abbot, the woman that was sexually abused

10   robbed and murdered was 69 years old.  Her daughter

11   is going to testify in this trial.

12       It's common human emotion to feel sympathy for

13   the surviving daughter or the seven grandchildren or

14   the eight great grandchildren.  I need to know that

15   you are going to set that sympathy aside assuming

16   you feel it and judge this case only the evidence.

17   Will you do that?

18                PROSPECTIVE JUROR:  Yes.

19                MR. BOGDANOS:  Mr. Sloan continuing, you

20   will hear the allegations are that the 69 year old

21   woman was stabbed more than 22 times with a pair of

22   scissors and then her life was ended when an

23   electrical chord was pulled around her neck and she

24   was strangled to death.  Do you promise me that no

25   matter how horrific you might find what happened to

1      that 69 year old woman, you will not allow any anger

2      or sympathy to affect your verdict but rather, you

3      will judge this case solely on the evidence.

4           Will you do that?

5                PROSPECTIVE JUROR:  Yes.

6                MR. BOGDANOS:  Ma'am, I will ask you the

7      same question.  Will you do that?

8                PROSPECTIVE JUROR:  Yes.

9                MR. BOGDANOS:  Ms. Infante, will you do

10     that?

11               PROSPECTIVE JUROR:  I don't know that I

12     can.

13               MR. BOGDANOS:  Ma'am, thank you so much for

14     your honesty.

15          Anyone else having heard a tiny bit more about

16     the facts that you can't let me not do it, negative,

17     that's crazy.  Can each of you assure me that no

18     matter how horrific you find the crime, you'll

19     obviously listen to the evidence but you will not

20     allow the horror that you may feel at the crime

21     committed to affect your verdict.  Can you all

22     assure me you will do that?

23               PROSPECTIVE JUROR:  I cannot either.

24               MR. BOGDANOS:  More than one of exceeded my

25     memory of course.  It's on the record so Mr. Minaya,

1    you do not think you can set aside whatever

2    emotions?

3              PROSPECTIVE JUROR:  No.

4              MR. BOGDANOS:  Thank you sir.

5        Mr. Hernandez you do not and Ms. Infante.

6              PROSPECTIVE JUROR:  I would have trouble

7    too.

8              MR. BOGDANOS:  Let me just follow-up.

9    Trouble.  This is a troubling business.  It's a

10   troubling business to try to prosecute a homicide.

11   It's a troubling business to be a judge on a

12   homicide.  It's a troubling business to be a court

13   reporter on a homicide.

14        It's a troubling business to be a juror.  I got

15   it.  But knowing you, however troubling it is, you

16   have already spoken to us privately about your

17   appreciation for the duty of a juror, one of the

18   greatest things any citizen can do for its

19   community, military service and jury duty.

20        So we know how you feel about jury duty.  Can

21   you put those emotions, keep them.  They are yours.

22   You have them.  No one is expecting you to say, I am

23   a robot.  I have no emotion.  I am not going look at

24   those pictures and get ill.  I am not going to hear

25   the daughter and just want to cry.  No one is

1   expecting that.

2       What we are asking is okay but separate emotion

3   from fact.  Separate your reaction and simply do

4   what you do in everyday life and that is asses the

5   evidence just like you do in a normal -- any normal

6   significant event.  In your life, you asses what you

7   see.  Asses the credibility of people.

8       You asses the reliability of evidence and I am

9   asking you, can you do that in this case.  If you

10   can't, you can't.  If you can, please let us know.

11           PROSPECTIVE JUROR:  I can try but it's

12   difficult.

13           MR. BOGDANOS:  I am sorry.

14           PROSPECTIVE JUROR:  It's going to weigh--

15           MR. BOGDANOS:  The emotion will weigh.

16   Okay.  I got it.  Thank you, ma'am.  I appreciate

17   it.

18           MR. BOGDANOS:  All right.

19       Ms. Clagett, I promised to come back to you.

20   Don't get offended.  I don't have cable.  So, I

21   don't watch most of these shows although I have ones

22   that I have watched.  You check my netflix, you will

23   see NCIS and Law and Order but I know this every

24   other -- every other channel has CSI, CSI that Miami

25   Las Vegas, New York.  There is a whole host of crime

1  shows, law shows, criminal justice shows.  I am

2  picking you for the whole industry.  You got that?

3       PROSPECTIVE JUROR:  Yes.

4       MR. BOGDANOS:  You are okay with that?

5       PROSPECTIVE JUROR:  That's fine.

6       MR. BOGDANOS:  You understand what I am

7  getting at.  This you understand this isn't

8  television.  If this were television, let's be

9  honest, I would be six foot tall and good looking.

10  We are clear, right.  This ain't it.

11       For television, I call my assistant and I would

12  say, okay.  I want the DNA and I want it in 45

13  minutes.  Right.  That's how that works.  And I want

14  it now.  And I want that fiber.

15       I want to know what province in China that fiber

16  came from and what ship it came in on and through

17  what port, right.  If it were television, I would

18  get it right?

19       This may come as a shock to you, but we don't

20  get it.  That's not how that works.  You are okay

21  with that?

22       PROSPECTIVE JUROR:  Yes.  I work in news.

23       MR. BOGDANOS:  All right so.  You

24  understand that that's not how it really works but

25  the reality is because of your industry, it has

changed the way jurors look at cases and it has

changed the way jurors -- has changed jurors'

expectations.   In fact, it is so palpable, there is

a name.   It's called the CSI effect and there are

experts who write entire journals on the CSI effect.

Whatever this effect is, do you promise to hold

me to real life and not TV expectations?

PROSPECTIVE JUROR:   Yes, sir.

MR. BOGDANOS:   Same question.   I just --

I'm not going to move some satellite surveillance

and change it and backtrack it and find the license

plate of the getaway car -- there is no car in this

case.   I am not going do it.   Never done that.

Always wanted to.   Every time I see it, I think it's

really cool.

You understand that's not going to happen here?

PROSPECTIVE JUROR:   Yes.

MR. BOGDANOS:   And you are not going to

expect that?

PROSPECTIVE JUROR:   No.

MR. BOGDANOS:   Is anyone going to be so

disappointed by the lack of -- I have some really

cool charts but they are excel spreads sheets blown

up.   That's what you are getting here.   I am telling

you right now you are getting a couple of charts

that I glued and stapled and taped.  If that's going

to affect your ability to be a fair juror, I need to

know that now.  If you want flash, you are in the

wrong courtroom.  You are in the wrong universe but

you are in the wrong courtroom.

Any grand juror is going to expect that and hold

me to real life, honest, to good standards and not

TV standards.  I will leave Ms. Clagett alone now.

This is a yes or no answer, yes or no and I am not

going to ask for any details.  I give you my word

and my word is good:  I give you my word, no

details.

Has anyone here by a show of hands -- show of

hands -- has anyone here ever done anything bad in

your life?  Doesn't have to be criminal, just

something you wish you hadn't done?  Anybody?

(Indicating).

MR. BOGDANOS:  Really.  Were there hands

that did not go up?  I am talking about college too.

There is no statute of limitations.  We are all in

agreement.

Ms. Vincent, just whatever it is you have done

bad things, do not tell us.

PROSPECTIVE JUROR:  Okay.

MR. BOGDANOS:  You ever tell anyone about

1    them, close friend, family, anything?  Have you ever

2    told anyone, gee, I did it and I really wish I

3    hadn't?

4              PROSPECTIVE JUROR:  Of course.

5              MR. BOGDANOS:  Why?

6              PROSPECTIVE JUROR:  I guess I felt better

7    after I told someone about it.

8              MR. BOGDANOS:  Do you think you are the

9    only person in the world who has ever done something

10   bad and then talked about it -- told about it?

11             PROSPECTIVE JUROR:  No.

12             MR. BOGDANOS:  You think it's probably a

13   common human emotion.

14             PROSPECTIVE JUROR:  Yes.

15             MR. BOGDANOS:  In fact, aren't there entire

16   religions that are based on the cleansing value of

17   confession?

18             PROSPECTIVE JUROR:  Yes.

19             MR. BOGDANOS:  So, if you were to hear in

20   this case that the defendant confessed to some of

21   the crime, this wouldn't shock you?  You won't say,

22   oh, that's ridiculous?

23             PROSPECTIVE JUROR:  No, I would not.

24             MR. BOGDANOS:  Would that shock anybody at

25   all?

1    Does anyone not accept the concept that people

2    actually confess to crimes?  Anyone reject that?

3    How about you?  You will listen?  You accept that

4    that happens.  It's part of human nature.

5         PROSPECTIVE JUROR:  Yes.

6         MR. BOGDANOS:  Sometimes, you do a crime

7    and you tell about it?

8         PROSPECTIVE JUROR:  Yes.

9         MR. BOGDANOS:  You are being a good sport.

10   Ms. Vincent, let me come back to you.  On the

11   occasions when you have heard told, have you always

12   told like everything you did or did you minimize or

13   spin it a little bit?

14        PROSPECTIVE JUROR:  I think I have spun it

15   a little.

16        MR. BOGDANOS:  Do you think you are the

17   only person in the world that's ever done that?

18        PROSPECTIVE JUROR:  No.

19        MR. BOGDANOS:  Ms. Blank, you were looking

20   at her sympathetically so I take it you fall in the

21   same category.  There are times in your life you

22   done something you wish you hadn't done and you told

23   people about it?

24        PROSPECTIVE JUROR:  Yes.

25        MR. BOGDANOS:  But you spun it a little.

1    Maybe you put yourself in a little better light?

2          PROSPECTIVE JUROR:  Yes.

3          MR. BOGDANOS:  Maybe you didn't quite say

4    everything you did, but just enough.

5          PROSPECTIVE JUROR:  Yes.

6          MR. BOGDANOS:  And you don't think the two

7    of you are the only two people in the whole world

8    that have ever done that, do you?

9          PROSPECTIVE JUROR:  No.

10          MR. BOGDANOS:  You think maybe there might

11    be other people throughout this courtroom that have

12    done the exact same thing?  I will raise my hand

13    (indicating).

14          PROSPECTIVE JUROR:  Yes.

15          MR. BOGDANOS:  Maybe on that side of the

16    courtroom as well.

17          PROSPECTIVE JUROR:  Yes.

18          MR. BOGDANOS:  You will keep an open mind.

19          PROSPECTIVE JUROR:  Yes.

20          MR. BOGDANOS:  And you will listen to hear

21    whether or not that took place here?

22          PROSPECTIVE JUROR:  Yes.

23          MR. BOGDANOS:  Will everyone do that?

24       (Indicating).

25          MR. BOGDANOS:  I'm just about done so thank

1    you for yours patience with me.

2        Mr. Minaya and Mr. Hernandez forgive me for

3    skipping over you.  You already told us you can't be

4    here so I don't want to put you through anything.

5    Same thing for you, Ms. Infante.

6        You said you don't think you are going to be

7    fair.  You will not be sitting on this jury and I

8    don't want to put you through this whole questions.

9    Forgive me for keep walking past you.  No

10   favoritism.  It's just that you are not going to be

11   on this jury.

12       Bear with me one moment, please.  Anyone here

13   take psychology in college?

14       (Indicating).

15           MR. BOGDANOS:  Okay.  See that will teach

16   you to raise your hand.  In psychology, why you did

17   it, why anyone does something, that's certainly the

18   essence of the science of the art, right.  I mean,

19   that's part of the center of what psychology is

20   about, the why, right, from what you remember?

21           PROSPECTIVE JUROR:  Okay.

22           MR. BOGDANOS:  I am asking.

23           PROSPECTIVE JUROR:  Abnormal psychology.

24           MR. BOGDANOS:  Let's do it this way.  The

25   why is a relevant question.

1          PROSPECTIVE JUROR:  Okay.

2          MR. BOGDANOS:  I am asking.

3          PROSPECTIVE JUROR:  Yes.

4          MR. BOGDANOS:  You understand that it's a

5     valuable question.  It's an important question, why

6     does anyone do anything?  That's a really -- it's an

7     interesting question.

8          PROSPECTIVE JUROR:  Yes.

9          MR. BOGDANOS:  But do you understand in

10    this courtroom of all the things I am charged with

11    proving, in order to meet my burden as his Honor has

12    said of, all the things if I am to meet my burden of

13    proof and for to find this man guilty of murder in

14    the second degree, I have to prove a whole host of

15    things.  I have to prove he either committed or

16    participated in a robbery or a sex abuse and that

17    during the course of that robbery and sex abuse, he

18    and others with him murdered that woman.  I have to

19    prove all of that beyond a reasonable doubt by

20    competent evidence.  But what I don't have to prove

21    is why.

22       Can you accept that?

23          PROSPECTIVE JUROR:  Yes.

24          MR. BOGDANOS:  Is it fair to say that if

25    you are seated as a juror one of the things you are

1   going to want to know is why, why would any anybody

2   stab a 69 year old woman more than 22 times with a

3   pair of scissors.   I mean it's a fair question,

4   right?

5           PROSPECTIVE JUROR:   Yes.

6           MR. BOGDANOS:   During the recess, you will

7   go out in the hallway and you may very well say

8   internally, why?   It's fair, right?

9           PROSPECTIVE JUROR:   Yes.

10          MR. BOGDANOS:   Why would someone cut the

11  electrical chord to a lamp and take that electrical

12  chord and put it around her neck and strangle her to

13  death.   My goodness.   Why?   Fair question.

14          PROSPECTIVE JUROR:   Yes.

15          MR. BOGDANOS:   If selected as a juror here,

16  do you understand that you may never get an answer

17  to that question?

18          PROSPECTIVE JUROR:   Oh, yes.

19          MR. BOGDANOS:   Thomas Landis is right.

20  Some questions just don't have answers.   Can you

21  accept that?

22          PROSPECTIVE JUROR:   Yes.

23          MR. BOGDANOS:   Sir, can you accept that you

24  might never find out why to your satisfaction?

25          PROSPECTIVE JUROR:   Sure.

1          MR. BOGDANOS:  Would the fact that you

2    could never fully grasp why, would that impact your

3    ability to render a fair verdict here?

4          PROSPECTIVE JUROR:  No.

5          MR. BOGDANOS:  Ma'am.

6          PROSPECTIVE JUROR:  No.

7          MR. BOGDANOS:  Do you understand?

8    You would certainly want to know why, won't you?

9          PROSPECTIVE JUROR:  Yes, definitely.

10         MR. BOGDANOS:  But can you accept that you

11   might never find out why?

12         PROSPECTIVE JUROR:  I can, yes.

13         MR. BOGDANOS:  And still render a fair

14   verdict yes?

15         PROSPECTIVE JUROR:  Yes.

16         MR. BOGDANOS:  Does anyone have a problem

17   accepting that, that no -- and people have said in

18   the past, I got to know why.  You want me to find

19   someone guilty of murder.  You better show me why.

20    Is anyone thinking that?

21    (No response .)

22         MR. BOGDANOS:  Thank you.

23    Any readers of mystery novels?  No one.

24    (indicating).

25         MR. BOGDANOS:  Thank you.  Most good

1      mystery novels certainly -- I read them by the end

2      of the book, you find out pretty much everything

3      that happens.

4                PROSPECTIVE JUROR:  Correct.

5                MR. BOGDANOS:  For the most part.  I mean

6      there are some you never -- there is a couple.

7      Edgar Allen Poe that you really never figure out

8      wait a second.  By the end of the book for the most

9      part, you found out everything.

10          You know the color of the curtains in the room

11     right during the murder.  You know how much sunlight

12     was coming in and you know everything.  You know the

13     exact moment of death.  The exact -- all those

14     things you know all that.  Can you accept that as

15     much as we would like that, that's not how real life

16     works?

17                PROSPECTIVE JUROR:  Absolutely.

18                MR. BOGDANOS:  And that in any case, this

19     case, case Mr. Sloan was on before, any case other

20     jurors was on as jurors.  You don't get all the

21     answers.  The burden is to prove -- to give you

22     enough answers to prove that the defendant murdered

23     Ellen Abbot but not to tell you in minute detail,

24     every single action that took place in the exact

25     sequence action stack number.  One was in the left

1   jugular.   Stab number two was in the aorta.   Stab

2   number three punctured the liver.   Four, five and

3   six went in through the lungs and then the seven

4   ribs were fractured and then she was placed in a

5   chokehold.

6       Is that the kind of expectation you have, that

7   somehow I am going to be able to prove to you

8   exactly in what sequence all these injuries took

9   place?

10          PROSPECTIVE JUROR:   No; seems irrelevant.

11          MR. BOGDANOS:   But you will still hold me

12   to my burden?

13          PROSPECTIVE JUROR:   Yes.

14          MR. BOGDANOS:   Okay.   Because this isn't,

15   where is my ballet fan?This is real life in an

16   apartment, where the only person left is dead.   So,

17   there is going to be questions about how exactly,

18   exactly when, but as long as the people meet their

19   burden, are you okay with that?

20          PROSPECTIVE JUROR:   Yes.

21          MR. BOGDANOS:   Anyone who hasn't already

22   told me you can't, anyone have a problem with the

23   concept that not only you are not going tell me why

24   but wait a second, you are not going to prove to me

25   exactly how.   Anyone have a problem because now is

1    the time to say.

2        (No response .)

3        MR. BOGDANOS:   Thank you.

4      Finally, the judge mentioned in his brief

5    instructions and as he indicated, he is going to

6    give very thorough clear instructions both before

7    the case and then after on all the legal consents --

8    I am not going into any legal concepts at all in any

9    detail.  Not my job.  But the one thing his Honor

10    talked about was proof beyond a reasonable doubt.

11    That is my burden as a representative of the People

12    of the State of New York, to prove it beyond a

13    reasonable doubt if I can by competent evidence.

14      Do each of you promise to hold me to my burden?

15    Don't let me off the hook.  Not one iota, each of

16    you promise to hold me to that burden beyond a

17    reasonable doubt?  You hear the operative word in

18    that phrase, reasonable, not beyond all doubt or I

19    have heard it on movies, beyond a shadow of a doubt.

20    I don't even know what beyond the shadow of a doubt

21    means.  I know it's not the standard but you will

22    all hold me just to that standard.

23      Ma'am, you would do that, just that standard an

24    none other.

25      Ms. Wasserman, right?

1          PROSPECTIVE JUROR:  Yes.

2          MR. BOGDANOS:  You are not mad at me for

3     the repetitive questions from before, are you?

4          PROSPECTIVE JUROR:  No.

5          MR. BOGDANOS:  Maybe this will do it.  When

6     you came into the courtroom when his Honor called

7     everyone in at 2:15, you came through those doors,

8     right?

9          PROSPECTIVE JUROR:  Yes.

10          MR. BOGDANOS:  When you came in through

11     those doors, were there any wild dogs out in the

12     hallway?

13          PROSPECTIVE JUROR:  No.

14          MR. BOGDANOS:  See any wild dogs?

15          PROSPECTIVE JUROR:  No.

16          MR. BOGDANOS:  See that woman right by the

17     door, my assistant Ms. Pat, very competent.  It is

18     entirely possible that I texted her a few minutes

19     ago and said get the wild dogs and put them in the

20     hallway and do it now.  She works for me and she is

21     competent.

22          I am telling you right now, if there is a way to

23     do it, she could do it.  Do you think there are any

24     wild dogs out in the hallway?

25          PROSPECTIVE JUROR:  No.

1        MR. BOGDANOS:  You agree with me in the

2    universe of possibilities, it is possible?

3        PROSPECTIVE JUROR:  Yes.

4        MR. BOGDANOS:  So at the end his Honor when

5    we break and gives us a recess, are you going to

6    stay here for the possibility that there are rabbit

7    dogs or are you going to just walk out those doors?

8        PROSPECTIVE JUROR:  I am going walk out.

9        MR. BOGDANOS:  Because it's not a

10   reasonable possibility, is it?

11       PROSPECTIVE JUROR:  Correct.

12       MR. BOGDANOS:  Will you bring that exact

13   common sense to bear in this case, base any verdict

14   you have in this case on proof beyond a reasonable

15   doubt?

16       PROSPECTIVE JUROR:  Yes.

17       MR. BOGDANOS:  Will you do that?  Will each

18   and every one of you do the exact same thing and

19   please, I am going to ask for an audible yes, if

20   that's the case.

21       PROSPECTIVE JURORS:  Yes.

22       MR. BOGDANOS:  Again, I thank you for your

23   service, your time and your patience.  Thank you,

24   your Honor.

25       THE COURT:  Thank you, Mr. Bogdanos.

1   Mr. Klein.

2          MR. KLEIN:  Thank you, judge.  I guess you

3   know the sole purpose here is to see if this the

4   right case for you.  Are you the right jurors for

5   this case.  I assume Ms. Blank it doesn't take a lot

6   to convince you that nobody should be bludgeoned,

7   stabbed strangled and left in a pool of their own

8   blood, right?  Nobody should have their life end

9   that way, whether they are young or old, right?

10         MR. KLEIN:  In fact, whether someone has

11  lead an exemplary life or not has a good pattern or

12  not, is a drug user or not, is a lawyer or someone

13  who lives on public assistance, no one should be

14  killed and murdered in that way, right?

15         PROSPECTIVE JUROR:  No.

16         MR. KLEIN:  When you hear that, that that's

17  what happens to someone obviously whoever they are

18  in some fashion your heart goes out to that

19  individual, yes?

20         PROSPECTIVE JUROR:  Yes.

21         MR. KLEIN:  Ms. Wasserman, I assume -- I

22  don't know if you have a mother but I assume it

23  won't take a lot to convince you that no adult

24  daughter should ever walk into a house can looking

25  for their mother because they have lost contact with

1     her and find her bludgeoned, stabbed and strangled

2     and left half naked on the floor, right?  That

3     should never happen to any daughter, any son, any

4     child whether they are young or old, yes?

5            PROSPECTIVE JUROR:  Yes.

6            MR. KLEIN:  Just hearing about that raises

7     a certain kind of horror, maybe even fear in some

8     people and disgust, yes?

9            PROSPECTIVE JUROR:  Yes.

10            MR. KLEIN:  Knowing that's what happened to

11    someone, that's what happened to a mother and that's

12    what a daughter then did discover.  And I would also

13    assume Ms. Clagett that just hearing about that, it

14    would raise some kind of anger of anyone who is even

15    suspected of being involved in creating that kind of

16    tragic event, right?

17           PROSPECTIVE JUROR:  Yes.

18           MR. KLEIN:  I bring it up because that's

19    what this case is about.  That's what you are going

20    to hear about.  And whether you think the emotions

21    are strong now just hearing about it, wait until yo

22    see the evidence of it because people are going come

23    in and talk about it.  You are going to see terribly

24    graphic pictures.  You are going to hear medical

25    people describe it.  You are going see photographs.

You are going to hear a daughter talk about it and you also know that Mark Richardson, he is the person who is accused of creating that kind of horror, okay.

And I guess, I just need all of you to grapple with it now and decide over the weekend or decide, now.  That's okay.  I understand it had and it's going to be painful but I can deal with it.  You know I am going to feel terrible about it but in some sense, I will be able to put it all aside and decide in this case what's proven.

Ms. Chevel, you can do that?

PROSPECTIVE JUROR:  Yes.

MR. KLEIN:  I also bring it up because you can't decide the case based on any kind of anger, thinking he is the guy who is accused of it.  He is the guy sitting there and we have to find someone answerable for this problem.  Since he is the one who is accused of it, maybe he is the guy who did it.  You can't decide a case in that fashion, okay.

PROSPECTIVE JUROR:  Okay.

MR. KLEIN:  Can everyone here, except for the people who said they would have a problem.  Mr. Polumbo, let me ask you, can you assure me as you think about the facts of the case and already

what you know.  Those are facts that aren't in
dispute.  This really terrible thing happened and a
daughter came in and discovered her mother.  And
worse, her mother was killed in this terribly brutal
fashion.  Can you assure us, assure the judge and
assure my client that you won't use in any sense the
anger and disgust and the fear and the horror that
creates any kind of proof in the case?

PROSPECTIVE JUROR:  Yes.

MR. KLEIN:  You won't say well, I know this
is a really horrible thing.  This is the worst thing
I ever heard about.  About maybe it is.  It's going
to be and you won't say someone has to pay for this.

It's not fair that someone ends this way and
someone, a daughter comes in and discovers her
mother in this way and another daughter comes in.
Someone has to pay for it, you know, which is a fine
thing to feel but you can't assume in any way, well,
he is the guy over there.  He is the guy accused so
he is the guy that's going to have to pay for it.
You can't do that.

Is that fair?

PROSPECTIVE JUROR:  Yes.

MR. KLEIN:  You won't say to yourself,
well, he is the one accused.  He is the one on trial

1    and you know, we can't let this daughter go away

2    feeling that you know, someone wasn't found guilty.

3    Even if we are not convinced, we are going to

4    convict that guy of the crime even if you are not

5    really certain that he is the person who committed

6    it.  You won't do that, will you?

7               PROSPECTIVE JUROR:  No.

8               MR. KLEIN:  All right.

9               MR. KLEIN:  Ms. Vincent same thing.  I

10   would ask you, this is a terribly terribly serious

11   accusation.  The accusation is murder in the second

12   degree.  This is a murder that's really horrendous.

13   All the circumstances surround it are horrendous and

14   you heard that the government, you know, has taken a

15   position that he is the guy who is responsible for

16   doing it.  You have to consider the evidence in the

17   case.  You have to consider the horror in everything

18   but can you assure me that you won't think in any

19   way that because the government has decided to

20   accuse him in some way, he must be the guy who is

21   responsible for this crime?

22               PROSPECTIVE JUROR:  Yes.

23               MR. KLEIN:  You won't do that, right?

24               MR. KLEIN:  No.  I mean yes, the government

25   has lodged an accusation against him, but the

1   government can be wrong about the person that they

2   are accusing, right?  And they can be wrong about

3   something that's even so serious, yes?

4           PROSPECTIVE JUROR:  Yes.

5           MR. KLEIN:  Ms. Austin, you know you are

6   going to hear -- obviously, there is a professional

7   prosecutor and there are going to be professional

8   witnesses.  By that, I mean a professional police

9   force, New York City police force Medical

10  Examiner's.

11      The prosecutor is going to try to convince you

12  he is the guy.  He is the guy who is responsible.

13  Got to listen to it.  I want to make sure you agree

14  with that just because they have taken a position

15  thinking that it's him, that he is the guy who is

16  responsible doesn't mean that they are right in that

17  position.

18      Is that okay?  You can do that?

19          PROSPECTIVE JUROR:  Yes.

20          MR. KLEIN:  Mr. Breza, any problem with

21  that?

22          PROSPECTIVE JUROR:  No.

23          MR. KLEIN:  Okay.  Ms. D'Augusta.

24          PROSPECTIVE JUROR:  No.

25          MR. KLEIN:  The fact that he is accused of

1    the crime in no no way means he is the killer,

2    right?  Is that right?

3              PROSPECTIVE JUROR:  Yes.  That's right.

4              MR. KLEIN:  The fact that he is accused of

5    a crime that's really horrendous, you will hear its

6    about three and a half years ago.  We are talking

7    about January 11, 2008.  We are in 2011.  You can't

8    think oh, my God.  If they are bringing him to trial

9    it's a long investigation.  It's obviously they got

10   the right guy.  If you decide that, fine but if it's

11   not proven, you won't assume that because he is the

12   one that sits there.  He must be the one that's

13   responsible for it.

14       Can you do that?

15             PROSPECTIVE JUROR:  Yes.

16             MR. KLEIN:  Okay.

17       Mr. Sloan, the judge instructed you and

18   everybody else on the presumption of innocence.  He

19   said that's one of the fundamental cornerstones you

20   have to apply not just in every criminal case.  I

21   don't care about every criminal case.  I care about

22   this one.

23       You will apply it here to Mark Richardson?

24             PROSPECTIVE JUROR:  Yes.

25             MR. KLEIN:  And you look over, you know,

1    what he is accused of doing.  He is the guy who

2    participated in stabbing somebody all these times

3    and sexually abusing them and robbing them, you will

4    still presume that man over there Mark Richardson

5    not guilty of these criminal events, right?

6              PROSPECTIVE JUROR:  Yes.

7         MR. KLEIN:  And you have no problem doing

8    that, right?

9              PROSPECTIVE JUROR:  Yes.

10         MR. KLEIN:  Okay.

11    Ms. Blank, let me tell you something about the

12    case.  Make it even a little more difficult because

13    one of the things you are going to hear throughout

14    the case is regardless of the presumption of

15    innocence of the criminal charges, one thing you are

16    definitely going to decide is Mark Richardson is no

17    innocent kid, all right.

18    You are not going think that's an angelic kid

19    who has never been involved in his own problems.  In

20    fact, one of the things you will hear about is he

21    has been involved in his own criminal activities at

22    times, okay.

23              PROSPECTIVE JUROR:  Okay.

24         MR. KLEIN:  And knowing that, knowing that

25    Mark Richardson, this big guy sitting over here, he

1    is not an angel.  He is not an innocent guy.  The

2    way we consider our newborn children innocence, you

3    will still apply the presumption of innocence in

4    this case to him, right?

5         PROSPECTIVE JUROR:  Yes.

6         MR. KLEIN:  I can't instruct you on the

7    law.  I am not allowed to and the judge does that,

8    but the presumption of innocence means, you presume

9    the individual innocent of the charges, right?

10        PROSPECTIVE JUROR:  Yes.

11        MR. KLEIN:  Doesn't mean that the

12   individual has to be a perfect innocent man in order

13   to have the presumption of innocence apply to him,

14   okay.

15        PROSPECTIVE JUROR:  Yes.

16        MR. KLEIN:  So Mr. Polumbo if during the

17   facts of the case, during the case, you eventually

18   come to decide you know, I am not sure that guy did

19   what he is accused of but that guy over there

20   Mark Richardson, I don't really like him much.  I

21   wouldn't won't want him to be my friend.  I wouldn't

22   invite him over to dinner at my house.

23        You put all that aside and still presume him

24   innocent of this charge and if this charge isn't

25   proven against him, you will acquit him of this

case, yes?

PROSPECTIVE JUROR:  Yes.

MR. KLEIN:  Okay.

Ms. Romero, same question to you.  Knowing that
one of the things you are going to hear in this case
is you are going to say, you know, I see why they
charged him.  I see why they are going after him you
know.  You don't like him.  You end up deciding you
don't trust him.  You don't trust anything he has
ever had to say.  You think he has been up to his
own criminal activity but you still apply the
presumption of innocence to him.

PROSPECTIVE JUROR:  Absolutely.

MR. KLEIN:  You won't in any way say, look,
even if his lawyer, the lawyer, the guy who is
defending him, that's not the world's greatest over
there, mark Richardson.  You won't use that as
evidence against him and say, I guess he must be
guilty of this crime.  You won't do that.

PROSPECTIVE JUROR:  No.

MR. KLEIN:  Anyone going to do that?
(Indicating.)

MR. KLEIN:  Sometimes Mr. Celio in some
cases, some cases you know you have like a young
person, 19 year old in college.  He is accused

1   crimes and that kid you find out about him that he

2   is in college.  He has a really bright future.  His

3   parents are here.

4        You hear he has never done anything wrong in his

5   life and you are asked to judge him and obviously

6   you say wow, I mean that's like a really innocent

7   person and I sure don't want to convict him of a

8   crime unless it's really proven to me that he

9   actually did the crime, right?

10            PROSPECTIVE JUROR:  Sure.

11            MR. KLEIN:  Okay.  And in that case, you

12   can say it would be pretty easy to follow the judges

13   instructions and presume him innocent, not convict

14   him unless it's proven.  But how about here in this

15   case?  I have already told you some of the things

16   you are going to hear that are going to make you

17   dislike that man, Mark Richardson who sits over

18   there.

19        Can you still assure me in spite of that, in

20   spite of knowing that, you will still give him those

21   same protections that the law provides anyone

22   accused of a crime just like you would to that 19

23   year old kid?

24            PROSPECTIVE JUROR:  Yes.

25            MR. KLEIN:  Just like you would to your

1    brother if you have one?

2            PROSPECTIVE JUROR:  Yes.

3        MR. KLEIN:  Okay.

4        I would make it harder Ms. Chevel because among

5    the things you are going to hear that you dislike

6    about him is that he lies during a police

7    investigation, okay.  He doesn't help the police.

8    In fact, he lies to the police.

9        Obviously, that's a bad thing to do and you can

10   use it against him in any way you want.  You can

11   think of what the lies are.  You can think what they

12   mean to you but you can't in any way say, well

13   because he is a liar, I am going to assume he must

14   be guilty of the crimes or someone would lie during

15   the police investigation, no.  No.  That person is

16   so terrible, that I am going in some way assume he

17   must be guilty.  You won't do that?

18           PROSPECTIVE JUROR:  Of course not.

19       MR. KLEIN:  Okay.

20       So regardless of the fact that throughout the

21   case and as the case goes on, you decide you don't

22   like Mark Richardson.  I don't want to ever be near

23   him.  He is a liar and he is a bum.  I don't like

24   anything I have heard about him, unless this

25   specific charge is proven, you won't find him

1    guilty, would you?

2             PROSPECTIVE JUROR:  Correct.

3             MR. KLEIN:  It's not like if at the end of

4    the case, you say, I don't really know if he did

5    this.  Bad as he may be, I don't really know if he

6    did this, then you won't hesitate to vote not

7    guilty, right?

8             PROSPECTIVE JUROR:  Correct.

9             MR. KLEIN:  It's not like you are giving

10   him an award saying, we think you are the greatest.

11   You are just saying -- you are saying I am not sure.

12   You would do that?

13            PROSPECTIVE JUROR:  Yes.

14            MR. KLEIN:  Okay.

15      Mr. Sloan, you heard an enormous list of the

16   witnesses, right?

17            PROSPECTIVE JUROR:  Yes.

18            MR. KLEIN:  A lot of them I believe are

19   police officers, people that work with the police

20   and they are going to testify.  I don't think there

21   is going to be much issue about what they have to

22   say.  I don't know.  I haven't heard them all but

23   you know I think you heard a long list of civilians,

24   right?

25            PROSPECTIVE JUROR:  Yes.

1          MR. KLEIN:  And I don't know what they are

2     going to say either but I have an inkling and there

3     is a possibility that someone is going to come in

4     and say, you know, that guy he said all sorts of

5     things to me.  You know, he admitted I did it.  He

6     said he was the killer or something like that, okay.

7     Someone is going to take the witness stand maybe and

8     say that.  You are going to evaluate that person's

9     credibility, right.

10          PROSPECTIVE JUROR:  Yes.

11          MR. KLEIN:  You decide for yourself whether

12    you think that person is telling the truth, right?

13          PROSPECTIVE JUROR:  Yes.

14          MR. KLEIN:  You won't assume simply because

15    the prosecution has put him on the witness stand, he

16    must be telling the truth, right?

17          PROSPECTIVE JUROR:  No.

18          MR. KLEIN:  And even if that person before

19    they testify gets up and says, you know, I swear --

20    I swear to tell the truth, the whole truth and

21    nothing but the truth so help me God, do you

22    understand that's not any kind of assurance that in

23    fact, they must be telling the truth, right?

24          PROSPECTIVE JUROR:  Right.

25          MR. KLEIN:  Can you also assure me that

before you believe or credit a witness who comes in and testifies and says whatever he says, I saw him do it or I heard he did it or whatever, you'll make the prosecution prove to you, that you should believe that witness, okay?

PROSPECTIVE JUROR:  Yes.

MR. KLEIN:  And is anyone, anyone here going to say that no, if the government is putting a witness on the stand, then this guy must have already been tested in some way.  I mean obviously he must have passed some test and obviously be telling the truth.  You are the ones who are going to decide, okay Ms. Wasserman?

PROSPECTIVE JUROR:  Yes.

MR. KLEIN:  If someone gets up and testifies and sounds okay, but at the end you say, I don't really know if I should believe that testimony, then you won't hesitate to reject it, right?

PROSPECTIVE JUROR:  No.

MR. KLEIN:  And I assume you know, all of us that have lied and told fibs about things in our daily life.  We all have, yes?

PROSPECTIVE JUROR:  Yes.

MR. KLEIN:  Assume also about really

1    serious matters, we generally tell the truth, right?

2            PROSPECTIVE JUROR:  Yes.

3            MR. KLEIN:  Okay.

4        And you accept there are people who are so

5    unscrupulous that they would even lie about

6    something really really serious like when they are

7    giving testimony in a murder trial.

8            PROSPECTIVE JUROR:  Yes.

9            MR. KLEIN:  Does anyone have a problem with

10    that?

11        (No response .)

12            MR. KLEIN:  One of the things the judge

13    said near the end of the judge's instructions

14    Ms. Austin, let me direct this to you, he said you

15    know in a trial, a defendant doesn't have to

16    testify.  You heard that?

17        (Indicating).

18            MR. KLEIN:  And the judge said not only

19    does the defendant not have to testify but if he

20    doesn't testify, you can't in any way hold it

21    against him, right.  Can you follow that

22    instruction?

23            PROSPECTIVE JUROR:  Yes.

24            MR. KLEIN:  So let's say you are back in

25    the jury room.  The case is gone on and at the end

you say.  I don't know.  I don't like him.  But boy

you know, I don't know if he committed this murder.

I am confused and another juror says to you, give me

a break.  Come on.  He must have done it because if

he didn't do it, he would have gotten up on the

witness stand and denied he did it.

I mean, who wouldn't get up on the witness stand

and deny he did it if he didn't do it, right?

Someone who could say that.

PROSPECTIVE JUROR:  Yes.

MR. KLEIN:  Someone says that to you.

Would you tell that other person, hey, wait a

second.  That's not fair.  You all agreed that you

wouldn't hold it against someone who is accused of a

crime if he doesn't take the witness stand.  Will

you do that?

(indicating).

MR. KLEIN:  Knowing right now, any of you

knowing right now, I am telling you there is a great

possibility, a great probability, you are never

going to hear Mark Richardson's open his mouth in

the courtroom.  Can you all assure me in no way in

no way Mr. Breza, Ms. D'Augusta Ms. Romero in no way

would you hold that against him?  Oh, he must have

something to hide if he doesn't get up and talk to

you.

How about if I don't prove a lot in this case.
Ms. Romero, the judge said the burden is on the
prosecution to prove guilt beyond a reasonable doubt
right?

PROSPECTIVE JUROR:  Yes.

MR. KLEIN:  Obviously one of the things
that means a lawyer doesn't have to prove his
clients innocence, right.  So if at the end of the
case, you say, I don't know, you know Klein, he
didn't do that much.  I mean the DA said he was
going to be all sarcastic and all this stuff but
really, he didn't do that much during the trial.
You won't think in some way he must have given up on
the case or his client must be guilty or it's all
hopeless.  Just understand that we follow certain
rules in here and you have to agree to follow them
if you are going to be on the jury.

PROSPECTIVE JUROR:  Okay.

MR. KLEIN:  You won't assume in any way by
my silence that it must mean that Mark Richardson
must have committed this crime, right?

PROSPECTIVE JUROR:  Right.

MR. KLEIN:  And you would hold the DA to
the burden of proof, yes.

```
1                    PROSPECTIVE JUROR:  Yes.
2               MR. KLEIN:  If he proves the case fine, but
3          if at the end of the case, you have a reasonable
4          doubt and you say no, I am not sure if he did this,
5          you won't hesitate to acquit him, right?
6                    PROSPECTIVE JUROR:  That's right.
7               MR. KLEIN:  Regardless of whether I have
8          done something or not spoken a lot, asked a lot of
9          questions or not asked a lot of questionless, right?
10                   PROSPECTIVE JUROR:  Yes.
11              THE COURT:  Mr. Klein, I am sorry to
12         interrupt.
13              MR. KLEIN:  Judge, I know.  We have the
14         4:30 rule and I am really just about done.
15              THE COURT:  Keep going.
16              MR. KLEIN:  I was aware.
17              THE COURT:  I don't want to cut you off.
18         We can finish on Monday.
19              MR. KLEIN:  It's really just one more
20         point.
21              THE COURT:  Okay.
22              MR. KLEIN:  Just who else hasn't already
23         eliminated themselves in some way?  Mr. Sloan, I am
24         sorry a lot of people said already they couldn't be
25         fair.  One of the things that I think Mr. Bogdanos
```

1    dwelled on was the use of common sense, right?

2           PROSPECTIVE JUROR:  Yes.

3           MR. KLEIN:  He talked about you have to use

4    your common sense and when you come in here, you

5    don't leave your common sense outside.  You leave

6    your prejudices and biases outside but you bring

7    your common sense in, right?

8           PROSPECTIVE JUROR:  Yes.

9           MR. KLEIN:  And you will use that in this

10   case, right?

11          PROSPECTIVE JUROR:  Yes.

12          MR. KLEIN:  Of course you know sometimes we

13   use our common sense when we are like in the grocery

14   store.  We have to decide what am I going to but for

15   dinner.  Use your common sense.  Your wife hates

16   meat.  You don't buy meat.  You are going to go to a

17   movie.  Use your common sense because you know what

18   kind of movie your girlfriend or boyfriend likes,

19   right and that's common sense, right?

20          PROSPECTIVE JUROR:  Yes.

21          MR. KLEIN:  Sometimes in life you are

22   called upon to make decisions like what kind of

23   medical care should I get for a child or what kind

24   of nursing home should I put my mother in, right,

25   and you use your common sense in those decisions

1   also, yes?

2          PROSPECTIVE JUROR:  Yes.

3          MR. KLEIN:  But of course you use the kinds

4   of common sense when you are using all the powers

5   that you have to make sure you are making a right

6   decision, right?

7          PROSPECTIVE JUROR:  Yes.

8          MR. KLEIN:  So can you assure

9   Mr. Richardson that you will use that kind of common

10  sense if you are on this jury and evaluating the

11  facts of this case?

12         PROSPECTIVE JUROR:  Yes.

13         MR. KLEIN:  Thank you.

14         THE COURT:  Thank you, Mr. Klein.  Ladies

15  and gentlemen as indicated, that will do it for

16  today.  The selections are next.  However, you are

17  not going to find out until Monday morning.

18      As I said, we are not going to be in session

19  tomorrow and there is not enough time today for the

20  attorneys to make their selections and to give you

21  the results.  I am sorry but that's the way things

22  work around here now.  We will have the results for

23  you first thing Monday morning.  I ask all of you

24  and all of you out there to come in directly here to

25  our courtroom at about 9:45 on Monday morning.  We

1    will get you into the courtroom as soon as we can.

2    And one more reminder a very important one, please

3    do not discuss this case with anyone between now and

4    then.

5        Monday 9:45.  You don't have to come in for jury

6    duty tomorrow.  You have the day off but you do come

7    back here on Monday.  All right.  If you have

8    questions, the officers there will take them outside

9    and we will bring you in if necessary.

10       (Prospective jurors exit the courtroom at this

11   time.)

12           MR. BOGDANOS:  We don't even get to do our

13   selections?

14           THE COURT:  We have to shutdown the

15   courtroom.

16       Time-out.  We have one quick juror who wants to

17   come in with a question.

18           COURT OFFICER:  Juror entering.

19           THE COURT:  Mr. Li?

20           PROSPECTIVE JUROR:  After hearing some of

21   the allegations some of the things that were brought

22   up, I don't think I could stay unbiased.  I just got

23   back from China and I visit my grandmother.

24           THE COURT:  We accept you at your word but

25   for legal reasons, you still have to come back on

1    Monday.

2              PROSPECTIVE JUROR:   To tell you the same

3    thing?

4              THE COURT:   Let me ask you, do both sides--

5              MR. BOGDANOS:   Consent.

6              MR. KLEIN:   I consent.

7              THE COURT:   We will find your ballet.   You

8    come back tomorrow and maybe jury duty will be over

9    tomorrow.

10             PROSPECTIVE JUROR:   All right.   Same room

11   right here?

12        I came from Thomas Street.

13             COURT OFFICER:   Come tomorrow, third floor.

14             THE COURT:   Thank you, very much, Mr. Li.

15        (Prospective juror exits the courtroom at this

16   time.)

17             THE COURT:   That's it.   You can take

18   Mr. Richardson down.   Bring him back Monday.

19   (Whereupon the case is adjourned to September 12,

20   2011.)

21             *          *          *

22   CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT.

23

24                    CLAUDINE Y. DAVIDSON
                        SENIOR COURT REPORTER
25

```
 1   SUPREME COURT        NEW YORK COUNTY
     TRIAL TERM           PART 45
 2   ------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK : INDICTMENT #
 3                                       : 3534/08
                                         :
 4           AGAINST                     : CHARGE
 5                                       : MURD 2
     MARK RICHARDSON,                    :
 6                Defendant.             :
     ------------------------------------x TRIAL/VOIR DIRE
 7

 8                   111 Centre Street
                   New York, New York 10013
 9                   September 12, 2011

10

11   B E F O R E:

12           HONORABLE BRUCE ALLEN
                JUSTICE OF THE SUPREME COURT
13

14   APPEARANCES:
15

16   For the People:          CYRUS VANCE, ESQ.,
                       New York County District Attorney
17                          One Hogan Place
                          New York, New York 10013
18                     BY:    MATTHEW BOGDANOS, ESQ.
                       Assistant District Attorney
19
     For the Defendant:    THE LEGAL AID SOCIETY
20                          49 Thomas Street
                       New York, New York 10013
21                     BY:   THOMAS KLEIN, ESQ.
                             Of counsel
22

23

24                      Penelope Messina,
                         Senior Court Reporter
25
```

<u>Proceedings</u>                                        2

1            (Continuation of Voir Dire from

2   September 8, 2011.)

3            THE COURT CLERK:  Case on trial, your Honor.

4            THE COURT:  Good morning, Mr. Richardson.

5            THE DEFENDANT:  Good morning Mr. --

6            THE COURT CLERK:  Case on trial continued.  People

7   of the State of New York against Mark Richardson.  The

8   defendant, his attorney, and the assistant district attorney

9   are present.  The jury is not present at this time.

10           MR. BOGDANOS:  Matthew Bogdanos for the People.

11   Good morning.

12           MR. KLEIN:  Legal Aid Society, Thomas Klein.

13           MS. LEGLER:  Sarah Legler, L-E-G-L-E-R.  Good

14   morning.

15           THE COURT:  Before we start with your selections

16   one of the jurors, No. 16, Ms. Daugusta indicated to one of

17   the officers that she had something she wanted to tell us.

18   I propose we bring her in first and then hear what she has

19   to say.  Agreed?

20           MR. KLEIN:  Yes.

21           THE COURT:  Mr. Bogdanos?

22           MR. BOGDANOS:  Yes.  Yes.

23           THE COURT:  This is off the record the record.

24           (Off-the-record discussion.)

25           THE COURT OFFICER:  Juror entering.

<u>Proceedings</u>                                              3

1          (Prospective juror entered the courtroom.)

2          THE COURT:  Ms. DeGusta, good morning to you.

3    Welcome back.  Is there something you want to say?

4          PROSPECTIVE JUROR:  Yes, I wanted to confirm the

5    time length for the trial.  I found out on Friday I am going

6    to be transitioning into another position in work starting

7    the first week of October; and I wanted to see if that would

8    conflict.

9          THE COURT:  You are worried we won't be finished

10   before the first of October?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Have no fears.

13         PROSPECTIVE JUROR:  Okay.  All right then, I am

14   fine.

15         THE COURT:  The schedule given last week still is

16   in play.  All right?

17         PROSPECTIVE JUROR:  Yeah.

18         THE COURT:  Thank you very much.

19         (Prospective juror exited the courtroom.)

20         THE COURT OFFICER:  Your Honor, one moment.

21         THE COURT:  Back on the record.  Now Mr. -- No. 4

22   Mr. Palumbo has also indicated he would like to have a word

23   with us.  Please bring in Mr. Palumbo.

24         THE COURT OFFICER:  Juror entering.

25         (Prospective Juror entered the courtroom.)

<u>Proceedings</u>                                      4

1  |  THE COURT:  Good morning, Mr. Palumbo.  What did
2  |  you want to say?
3  |  PROSPECTIVE JUROR:  Huh?
4  |  THE COURT:  Or tell us.
5  |  PROSPECTIVE JUROR:  I wasn't clear on the start
6  |  date and so I have a referral form from my doctor to see a
7  |  heart specialist.  I have it with me to see him and I wasn't
8  |  sure of the start date of the trial; so when you were
9  |  talking about it I thought it was starting maybe in a week
10 |  or two; and so I thought I didn't know if I should go to the
11 |  doctor or if I should wait.
12 |  THE COURT:  When is your appointment?  You haven't
13 |  made it yet?
14 |  THE DEFENDANT:  I haven't made it.  I have the
15 |  referral form and I would make it this week if I can; and if
16 |  I can't, I just need to know the start date basically.
17 |  THE COURT:  We are on trial now.  I mean there is
18 |  no delay here.  We are going forward everyday this week.
19 |  PROSPECTIVE JUROR:  So my question was I didn't
20 |  realize that.
21 |  THE COURT:  But I do.
22 |  PROSPECTIVE JUROR:  There are other jurors.  I
23 |  asked other jurors.  They weren't clear as to when the start
24 |  date was either so.
25 |  THE COURT:  Well, let me ask you.  I think we will

<u>Proceedings</u>                                                    5

1    be down this Friday.  If you want if it is possible to

2    schedule it for this Friday?

3              PROSPECTIVE JUROR:  It is.  I could try that.

4              THE COURT:  But every other day we expect to be on

5    trial?

6              PROSPECTIVE JUROR:  Every other Friday?

7              THE COURT:  No, every other Monday, Tuesday,

8    Wednesday, Thursday.

9              PROSPECTIVE JUROR:  But every Friday it's possible

10   to schedule the appointment on any Friday?

11             THE COURT:  Well, the twenty-third we may be in

12   session so I wouldn't -- I wouldn't schedule it for that day

13   necessarily; but again we don't want to cause any health

14   problems for you; so if the doctor says I could only do it

15   on a certain day, then that's the day you do it.  We don't

16   want you to put it off and jeopardize your health.

17             PROSPECTIVE JUROR:  I will have to call him.

18             THE COURT:  Best would be early in the morning so

19   then you could still come here?

20             PROSPECTIVE JUROR:  What time does the trial start

21   in the morning?

22             THE COURT:  Usually 9:45.

23             MR. BOGDANOS:  There was one issue with regard to

24   tomorrow.  Mr. Klein was about to mention to your Honor and

25   I think due to -- had nothing to do with this case, I think

1    we were planning starting at 11:00 tomorrow; so if

2    Mr. Palumbo would be able to get a doctor's appointment,

3    finish eleven tomorrow or anytime Friday, that would

4    solve --

5                    THE COURT:  That's another --

6                    PROSPECTIVE JUROR:  Okay, I will try.

7                    THE COURT:  That's another possibility.  Thank

8    you, Mr. Palumbo; but, Mr. Palumbo, whatever you get, we

9    will work around.  That's my message.

10                   PROSPECTIVE JUROR:  Okay, thank you.

11                   THE COURT:  You are welcome.

12                   MR. BOGDANOS:  That's what he was about to ask you

13   if we could start tomorrow at 11:00.  I have no problem with

14   that.

15                   THE COURT:  All right.

16                   MR. BOGDANOS:  With the timing and the fact we

17   only have the defendant for a certain period of time, I

18   didn't get things on the record.  I got them on Thursday

19   because we went right to 4:29.  I got to put them on the

20   record please, 60 seconds.

21                   THE COURT:  Go ahead.

22                   MR. BOGDANOS:  Thank you, Judge.  First, the

23   People had intended on referring to Mr. Richardson on any

24   videotape as the tall black male approximately six foot five

25   wearing a green army jacket and blue jeans.  That's how he

<u>Colloquy</u>                                              7

1   appears on the video; both counsel.

2        Mr. Klein and I are well aware of <u>People versus</u>

3   <u>Coleman</u>; but since there isn't any issue at all with

4   Mr. Richardson on the video, Mr. Klein has informed me that

5   it is just too cumbersome and makes no sense so we are going

6   to refer to Mr. Richardson on the video so we don't want

7   your Honor to think we are not aware of <u>People versus</u>

8   <u>Coleman.</u>  We are.  We recognize it is not an issue in this

9   case.

10        Secondly, I have turned over to Mr. Klein this

11   morning some additional Rosario material.  The interns of

12   the law schools I had watching the video took notes on, you

13   know, they typed up notes on the various video sections they

14   watched.  I turned those over to Mr. Klein.  He has the --

15   he had last week the final compiled list, but he didn't have

16   all the drafts; so I have given him that this morning.

17        Also, there are two additional charges I mentioned

18   to your Honor and Mr. Klein last week concerning DNA.

19   Rather than have the DNA expert list each piece of

20   evidence -- and there were dozens and dozens -- I have

21   created summary charts that I promised your Honor and

22   Mr. Klein would shorten -- simplify shorten, make the trial

23   more efficient.

24        I emailed those to the DNA people, the Office of

25   Chief Medical Examiner.  They emailed me back.  Said it

1    looks good.  Change this.  Change that.  I have given those

2    emails to Mr. Klein this morning.

3              In Mr. Klein's motion on third party guilt,

4    he had -- that was filed on the eighth.  He had indicated

5    that he has never received anything concerning the criminal

6    history of Desiree Allen.  I know he prepared that on the

7    sixth, on the 6th of September.  I turned over, even though

8    we are not calling Desiree Allen, you know my feeling on

9    discovery.  If I have it, you can have it.  I turned over

10   all Ms. Allen's prior criminal history even though we are

11   not calling her; her arrest reports, her criminal history

12   sheet.

13             With regard to the informant there is no

14   cooperation agreement in place yet.  It's, you know, a

15   stepped process.  Until there is a cooperation agreement, I

16   can't put them in protective custody.  Until I put them in

17   protective custody, I can't release the name to Mr. Klein

18   and all the material -- and give him all the material.

19             I expect that to happen by Friday.  I want to be

20   abundantly clear I am doing exactly what Mr. Klein asked.  I

21   am printing everything.  We have complaints, DA data sheets

22   on all his New York County cases; and I am getting arrest

23   reports and Certificates of Conviction on all of the New

24   York County cases; so he is going to have everything from

25   the DA's Office, everything that exists; and finally with

1    regard to Matthew Lacks, Mr. Klein and I have spoken off the

2    record extensively but the record should be clear in his

3    moving papers, he indicates that the original Assistant

4    District Attorney Ms. O'Connell had originally said that

5    there was a profile, an exemplar of Mr. Lacks given to the

6    ME's Office and, in fact, there was not an exemplar.

7           Mr. Lacks is just another, you know, potential

8    third party person.  There was not an exemplar but I didn't

9    want to miss -- that's true, we never got an exemplar from

10   Mr. Lacks.  He never consented.  Never enough to get a Court

11   order.  No one ever got an exemplar but his profile is in

12   the state DNA data bank.

13          I did provide that last week to Mr. Klein; and so

14   just so we are clear for the record we all know he is --

15   Mr. Lacks is in the data bank.  It's just that an exemplar

16   wasn't provided from him, so I think without that the record

17   might have been a little fuzzy.  That's all I have.  Thank

18   you.

19          THE COURT:  Thank you.  Mr. Klein.

20          MR. KLEIN:  I don't have any answers to two quick

21   things.  We will be requesting the Court to issue a decision

22   on the Brady motion and on our position that the information

23   about Mr. Gotler should be put before the jury; that that be

24   done before opening statements because it can impact on

25   opening statements; and the other thing is I just want to

<u>Colloquy</u>                                            10

1   explain about tomorrow why I am requesting the eleven

2   o'clock call.

3            What happened is the list of potential witnesses

4   was given over I think on Thursday, and Thursday I saw the

5   ME who -- the other district attorney I believe who had the

6   case planned to call wasn't being called.  I contacted the

7   ADA.  He told me that person was retired.  He is using

8   Dr. Graham.

9            I assume Mr. Bogdanos had thought it was

10  communicated to me but it never was.  I had spoken

11  extensively with the previous medical examiner who I

12  expected to be the witness; and now I immediately contacted

13  Dr. Graham.  I said I need to come talk to you because I

14  can't do openings without speaking to you.  Can you meet me

15  on Friday?  Unfortunately, he wasn't in on Thursday with the

16  message.  He got back and said he couldn't meet on Friday.

17  I said the case is going on early the morning either Monday

18  or Tuesday.

19           Since we already had the jury come in 9:30

20  tomorrow, I said I could do it as early as you can be

21  Tuesday morning.  He said he would meet with me before Court

22  opened; so I think it will make me an hour and a half, two

23  hours.  We are meeting eight o'clock in the morning.  Eleven

24  would be a safe time.

25           THE COURT:  That's fine.

1       MR. KLEIN:  I am sorry, I always talk to the ME in

2   advance of trial.  I didn't know there was a change.

3       MR. BOGDANOS:  No objection whatsoever.  I did not

4   know he had not been informed Dr. Taranchida had been

5   retired.

6       THE COURT:  Do you wish to respond in writing to

7   the Brady motion?

8       MR. BOGDANOS:  Not in writing, Judge, but I do

9   have very detailed --

10      THE COURT:  You already --

11      MR. BOGDANOS:  By line response prepared and the

12  reason I say not in writing because I actually think some of

13  the material that Mr. Klein has -- listen, it is not

14  intentional but some of it is just wrong and in fairness to

15  Mr. Klein I see why some of -- he makes some of the

16  arguments he does based on the reading of the material.

17      I, obviously, have the benefit that Mr. Klein

18  doesn't have, actually spoken to the people who wrote the

19  material upon Mr. Klein basing his argument; so there is no

20  way to put all of that in writing.

21      The easier way I am happy to go explain to

22  Mr. Klein exactly what -- where some of the things he thinks

23  happened didn't actually happen; and some follow-ups I did

24  that were not recorded; so I actually think on the motion

25  itself at the end of the day there may not -- there will be

 1      some things left to rule on; but not as much as the motion
 2      itself would otherwise indicate; so I am ready to do that
 3      when your Honor wants.  Not now.  We have a jury sitting
 4      outside.  Whatever you want, I am ready to do that.
 5               THE COURT:  We will try to get to that later
 6      today.
 7               MR. KLEIN:  Just so the Court knows regarding the
 8      first twelve people in the box there are agreements on three
 9      challenges for cause between the district attorney and
10      myself, which I could put on the record now.
11               THE COURT:  Thank you very much.
12               MR. KLEIN:  There is also actually a forth we
13      agree on but that's not in the first twelve.  We agree that
14      No. 3 --
15               THE COURT:  Wildenstein.
16               MR. KLEIN:  And No. 7.
17               MS. LEGLER:  Infante, and that No. 12, Mr. Minaya
18      all have to be challenged for cause.
19               THE COURT:  Yes, I have little x's by the names
20      but I don't recall the reasons why.
21               THE COURT OFFICER:  No. 2 is still missing.  You
22      will have the board in five seconds.
23               THE COURT:  Mr. --
24               MR. KLEIN:  Judge, I should say though there is I
25      believe probably no agreement about another one, which is

1   No. 2, the individual Mr. Celio who said --

2            THE COURT:  We didn't get to it.  We didn't get to

3   challenges yet.

4            MR. KLEIN:  I know.  I am just saying Celio.  We

5   haven't resolved the whole issue.

6            MR. BOGDANOS:  He is not even here.  You want me

7   to challenge him for cause?  If you are challenging for

8   cause, I will consent.

9            MR. KLEIN:  Okay.

10           MR. BOGDANOS:  I was going to ask to have him come

11  in.  Did you follow the day's proceedings?  He is the one

12  who told us he is spacing out.

13           THE COURT:  I remember ADD.  Both sides agree to

14  excuse, Mr. Celio?

15           MR. KLEIN:  Yes.

16           MR. BOGDANOS:  Yes.

17           THE COURT:  You have the board now.

18           THE COURT CLERK:  Who has been challenged for

19  cause?

20           THE COURT:  Parties have excused two, three, seven

21  and twelve; Celio, Wildenstein Infante and Minaya.  As to

22  the remaining jurors, do you have any challenges for cause,

23  Mr. Bogdanos?

24           MR. BOGDANOS:  Yes, Mr. Hernandez.  Same reasons

25  as the others.

1        THE COURT:  No. 13?

2        MR. BOGDANOS:  Yes.

3        MR. KLEIN:  Agreed.

4        THE COURT:  Mr. Hernandez is excused.  Anyone else

5   for cause, Mr. Bogdanos?

6        MR. BOGDANOS:  No, your Honor.

7        THE COURT:  Any cause challenges, Mr. Klein?

8        MR. KLEIN:  No.

9        THE COURT:  Peremptory challenges, Mr. Bogdanos?

10        MR. BOGDANOS:  Yes, your Honor, No. 6, Ms. Austin;

11   and No. 8, Mr. Breza, and that's it.

12        THE COURT:  Mr. Klein, peremptories?  Take your

13   time.

14        (Defense Attorney Klein conferred with defendant.)

15        THE COURT:  All right, Mr. Klein.

16        MR. KLEIN:  No. 1, Chevel; No. 5, Ms. Vincent;

17   No. 9, Ms. Clagett; and No. 10, Ms. Wasserman.

18        THE COURT:  The other jurors are acceptable?

19        MR. BOGDANOS:  Yes.

20        THE COURT:  Mr. Palumbo is seated Juror No. 1,

21   Ms. Blank --

22        MR. KLEIN:  Judge, by the way I assume we just did

23   twelve?

24        THE COURT:  No, I said everyone because we only

25   had twelve left.

1        MR. KLEIN:  Okay.

2        THE COURT:  You have more peremptories.  The

3 district attorney had done the whole board his perempts.

4        MR. BOGDANOS:  Yes.

5        MR. KLEIN:  Okay.

6        (Defense Attorney Klein conferred with defendant.)

7        MR. KLEIN:  So No. 14, Mr. Sloan.

8        THE COURT:  Fifteen and sixteen are acceptable?

9        MR. KLEIN:  Yes.

10       THE COURT:  So 15, Romero becomes seat No. 3;

11 Daugusta, Juror No. 4.

12       MR. BOGDANOS:  Judge, I have an application.  I am

13 so sorry to do this.  In the process -- but I am

14 particularly sorry to do this because of my respect for

15 Mr. Klein -- unless I am mistaken, Mr. Klein had four white

16 females available and challenged all four; so four for four.

17 We are clear that that raises the specter of Batson; so I am

18 asking for a facially -- a neutral reason for those four

19 challenges.

20       MR. KLEIN:  Judge, I don't think that raises the

21 specter of anything and I don't think I should be required

22 because I challenged four women and one man that, that

23 raises the initial specter of anything or satisfies his

24 initial first burden.

25       MR. BOGDANOS:  Well, okay, I am sorry.

1       MR. KLEIN:  I am saying there is 11 -- Ms. Blank,
2   she is a white female.  I assume she is there.
3       MR. BOGDANOS:  Actually, the Court is precise as
4   of that particular challenge.  Once you get to
5   Mr. Wasserman -- Ms. Wasserman there were four white females
6   available to the defense.  All four were challenged.  I
7   don't think there is a question as to whether or not that's
8   a Level I showing.  I mean that's not even an argument.  If
9   I did that, I would stand up and say here are my reasons
10  because it's obvious four out of four.

11      You can't get better than four out of four.  We
12  know two out of three is enough.  We know three out four is
13  enough; so the Court of Appeals rules four out of four is
14  clearly -- and I am making this abundantly clear -- I am not
15  in anyway suggesting Mr. Klein in anyway is inappropriate.
16  I am just saying his burden at this point, I made a Level I
17  showing.  It's his burden to explain the reasons that are
18  not based on race or gender.

19      MR. KLEIN:  Judge, I understand that's what he
20  said, but I didn't do a Level I.  I don't think you do it by
21  the first two.  You do it by what's on the board.
22  Ms. Blank, Ms. Daugusta are two white people on the jury I
23  didn't ask to get off so I don't think he went forward to
24  making a burden one showing.

25      (Defense Attorney Klein conferred with defendant.)

1    THE COURT:  The application is denied.  I don't

2 believe -- I don't believe a prima facie case or Level I

3 challenge has been made.

4    MR. BOGDANOS:  Just so I am clear cause we have a

5 future round, four out of four in this courtroom, four

6 available, four challenges not a prima facie showing?

7    THE COURT:  No.  I think you look at the entire

8 group of sixteen and then you make your --

9    MR. BOGDANOS:  Fine.

10    THE COURT:  Your --

11    MR. BOGDANOS:  Okay.  So again, Judge, I am just

12 being clear for the record so if it's not four out of four,

13 the only other white female is Ms. Daugusta so four out of

14 five.  I don't accept your Honor's version of the law.  I

15 think it's as of that last selection, but I will accept it.

16 Four out of five is not enough.

17    THE COURT:  I believe there is one more,

18 Mr. Bogdanos, No. 11, Ms. Blank.  I have her down as a white

19 woman.

20    MR. BOGDANOS:  So four -- I am sure you are right

21 so four out of six is not sufficient in this courtroom?

22    THE COURT:  No.  You show me a case that's

23 otherwise.  I will certainly read it.

24    MR. BOGDANOS:  That's a deal.  That's a deal.  I

25 want to make sure when it's the other way around, four for

1    six is not enough.  Got it.

2              THE COURT:  Dealing with white woman.

3              MR. BOGDANOS:  Or actually any black males, black

4    woman, Asian females it doesn't matter.  The standard is the

5    same.  Can I at least get the Court we agree the standard is

6    the same regardless of race and gender?

7              THE COURT:  This is the most slippery -- slippery

8    area of the law known to man.

9              MR. BOGDANOS:  Agreed.

10             THE COURT:  And women.  So any case you have --

11             MR. BOGDANOS:  Agreed.

12             THE COURT:  -- I will be happy to look at.  Now

13   off the record for a second.

14             (Off-the-record discussion.)

15             THE COURT:  Are both sides ready for the jury?

16             MR. BOGDANOS:  Yes, Judge.

17             MR. KLEIN:  (Nod head affirmatively up and down.)

18             THE COURT:  Before we do that, we have a couple of

19   quick adjournments.  Jeanette, two adjournments, please.

20             (Pause in the proceedings.)

21             THE COURT:  All right, now we are ready for the

22   panel.  Thank you.

23             THE COURT OFFICER:  Jurors entering.

24             (Jury entered the courtroom.)

25             THE COURT CLERK:  Case on trial continued.  The

1 │ People of the State of New York against Mark Richardson.

2 │ The defendant, his attorneys, and the assistant district

3 │ attorney are present.  All jurors are present.

4 │        THE COURT:  Well most of them.

5 │        THE COURT CLERK:  Most jurors are present.

6 │        THE COURT:  Close enough.  Ladies and gentlemen,

7 │ first of all an apology to everyone.  I know you have been

8 │ waiting a long time to come into the courtroom.  The parties

9 │ have been waiting too.  I was stuck in traffic this morning.

10 │ I think it's sort of a hold over from yesterday; but there

11 │ were numerous check points, whatever they call them, and

12 │ literally took me two hours to drive in, so it was my fault;

13 │ and I want you all to know that because I don't want you to

14 │ be speculating or to assess blame against one side or the

15 │ other.  They are not at fault.  In fact, they have made

16 │ their selections.

17 │        I should also add it doesn't affect the trial

18 │ schedule one bit.  They have made their selections and in a

19 │ moment our clerk will announce the results; however, four of

20 │ you were selected and twelve were not.  To the twelve who

21 │ were not, especially anyone who may be doing this for the

22 │ first time just a couple of words, there should be no hard

23 │ feelings about any of this.  No one should feel insulted or

24 │ slighted; and certainly just because you were not selected

25 │ for this case does not mean you won't be selected for some

1   other case down the line.

2              The truth is that the law does give the attorneys

3   a little bit of a discretion when they are making these

4   selections and that scrutiny or discretion is always at its

5   greatest once the first group comes up for consideration; so

6   a lot of this jury selection process really does depend on

7   the luck of the draw when your ballot comes out of the

8   wheel.  Everyone, all sixteen of you -- well, we are missing

9   one -- he participated too.  Everyone participated during

10  the questioning, and I thank you for doing that.

11             That's what makes our system so special and the

12  good news if you were not selected, the odds are very much

13  in your favor that you will be excused when you get back to

14  the jury room.  All right, Jeanette, the results, please.

15             THE COURT CLERK:  Will the following jurors please

16  remain seated Michael Palumbo, Helena Blank, Jill Romero,

17  and Darcie Daugusta.  The rest of you may report back to the

18  central jury room.

19             (Prospective jurors exited the courtroom.)

20             THE COURT:  Are the remaining jurors satisfactory

21  to the People?

22             MR. BOGDANOS:  They are to the People.  Thank you,

23  your Honor.

24             THE COURT:  To the defendant?

25             MR. KLEIN:  Yes.

 1        THE COURT CLERK:  Jurors, stand to be sworn or
 2   affirmed.
 3        (Jurors were duly sworn and/or affirmed.)
 4        JURORS:  Yes.
 5        THE COURT:  Thank you.  You may be seated.  I have
 6   a very brief announcement for the four of you.  I have
 7   discussed this with the attorneys; and we do believe that we
 8   are going to have to spend the rest of the day picking the
 9   other jurors, so we do not need you to be here physically
10   while we do this.  In fact, I am going to let all of you go
11   now with the understanding that you will be back here
12   tomorrow morning.
13        We are going to start a little bit later for
14   scheduling reasons at eleven o'clock tomorrow so please come
15   back at 11:00 tomorrow.  Wait right outside.  The other
16   jurors should be there as well.  On your way out one of the
17   other officers needs to get questions answered; contact
18   information.  That won't take long.  See you tomorrow
19   morning.  Please do not discuss the case with anyone between
20   now and then.
21        All right, any questions for me before you leave?
22   Great.  See you tomorrow morning.
23        (Jurors exited the courtroom.)
24        THE COURT:  I could start the preliminary.  We are
25   going to ask eighteen to come forward this time.  We call it

1     round two.  The ballots are in the wheel so it will be one

2     through nine and ten through eighteen in the back row.

3     Before we go to the wheel, all of you have had quite a bit

4     of time to think about the case, to think about whether it's

5     the right case for you.  You have heard the questions that

6     were asked of the first group and the answers given.  If

7     anyone -- and you have seen the four take the oath.  If any

8     of you would hesitate to take that oath for any reason, you

9     may tell us now.  Yes, sir, your name?

10          PROSPECTIVE JUROR:  John Li.  You actually excused

11    me on Thursday and told me to come back today to get my

12    ballot.

13          THE COURT:  That's true.  That's still good.

14          THE COURT OFFICER:  All right.

15          THE COURT:  Mr. Li, we will find it.  John Li.

16    It's L-I.  Again there are way more than eighteen.  If you

17    were not part of the second round please stay around here

18    because I think there will probably be a third round as

19    well.

20          Mr. Li, we don't have it so we think it was sent

21    already.  We will check for you.

22          PROSPECTIVE JUROR:  Okay.

23          (Pause in the proceedings.)

24          THE COURT:  Now we are going to go to the wheel,

25    eighteen.

1      THE COURT CLERK:  Seat No. 1 in the jury box

2  please Lucy Armstrong, A-R-M-S-T-R-O-N-G; seat No. 2, James

3  Hedges, H-E-D-G-E-S; seat No. 3, Michael Peters,

4  P-E-T-E-R-S; seat No. 4 --

5      THE COURT:  I am sorry I didn't catch that name?

6      THE COURT CLERK:  Michael Peters.  Isadoro

7  Guzman,G-U-Z-M-A-N, seat No. 4; Berlin Ando, A-N-D-O.

8  Ms. Ando.

9      THE COURT:  No response.

10      THE COURT CLERK:  Kenneth Rose, R-O-S-E, seat No.

11  5; Victor Huang, H-U-A-N-G, seat No. 6; John Weiner,

12  W-E-I-N-E-R, seat No. 7; Keyia Brown, B-R-O-W-N, seat No. 8;

13  Che Ling, L-I-N-G, seat No. 9; Adam Schuster,

14  S-C-H-U-S-T-E-R, seat No. 10; seat No. 11, Lourdine Haney,

15  H-A-N-E-Y, L-O-U-R-D-I-N-E; seat No. 12, Esmeralda

16  McCormick, M-C-C-O-R-M-I-C-K; seat No. 13, Kaman Lam, L-A-M,

17  seat No. 13, K-A-M-A-N, first name; Luis Gallegos,

18  G-A-L-L-E-G-O-S, seat No. 14; Yan Lee, L-E-E, seat No. 15;

19  Benjamin Warheit, W-A-R-H-E-I-T; Jason Lanzetta, I am sorry

20  L-A-N-Z-E-T-T-A, seat No. 17; Shanequa McIntosh,

21  M-C-I-N-T-O-S-H, S H A N E Q U A, seat No. 18.

22      THE COURT:  Good morning again, ladies and

23  gentlemen.  I am going to ask the same questions that I

24  asked of the first group.  Starting out once again with the

25  questions about yourselves.  I guess it will get you talking

1     a little bit and the attorneys will find out something about

2     you.  The categories are as follows.  Number one, living

3     arrangements; No. two, occupation; No. three is

4     neighborhood; No. four, educational background; number five

5     is spare time activities; number six, organizations and,

6     finally, number seven, current events.  If you want to

7     volunteer the information, you can take them in any order or

8     I could just run through it question and answer but no

9     matter what, we are going to start with you, Ms. Armstrong.

10    Good morning.

11                 PROSPECTIVE JUROR:  Hi.

12                 THE COURT:  Do you live alone or with some one

13    else?

14                 PROSPECTIVE JUROR:  I live with two roommates.

15                 THE COURT:  Which neighborhood?

16                 PROSPECTIVE JUROR:  East Village.

17                 THE COURT:  Occupation?

18                 PROSPECTIVE JUROR:  Fashion stylist.

19                 THE COURT:  Highest degree?

20                 PROSPECTIVE JUROR:  Bachelor of Fine Arts.

21                 THE COURT:  Spare time activities?

22                 PROSPECTIVE JUROR:  Travel.  I do a lot of

23    free-lance work because I work a lot.  Tennis.  Walk

24    outside.

25                 THE COURT:  Any organizations?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Do you keep up with current events?

3          PROSPECTIVE JUROR:  Maybe like a couple times a

4     week.  I don't have a television so I just look at it

5     on-line.  It is not too much.

6          THE COURT:  You read the papers too?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Thank you, Ms. Armstrong.  Mr. Hedges,

9     do you live alone or with someone else?

10         PROSPECTIVE JUROR:  I live with my grandmother.

11         THE COURT:  Which neighborhood?

12         PROSPECTIVE JUROR:  Kips Bay.

13         THE COURT:  What's your occupation?

14         PROSPECTIVE JUROR:  Loss prevention for Best Buy.

15         THE COURT:  Highest degree?

16         PROSPECTIVE JUROR:  High school.

17         THE COURT:  Interest?

18         PROSPECTIVE JUROR:  Activities?

19         THE COURT:  Yes.

20         PROSPECTIVE JUROR:  Biking.

21         THE COURT:  Organizations?

22         PROSPECTIVE JUROR:  I belong to the auxiliary

23    police program and NYPD Explorers.

24         THE COURT:  Do you try to keep up with current

25    events?

1              PROSPECTIVE JUROR:  Yes.  I read the news every

2     morning.

3              THE COURT:  I am sorry.

4              PROSPECTIVE JUROR:  I read it on my phone every

5     morning.

6              THE COURT:  Very good.  Thank you.  Mr. Peters.

7              PROSPECTIVE JUROR:  Good morning.

8              THE COURT:  Good morning.

9              PROSPECTIVE JUROR:  I live with my wife.  Sutton

10    Place, neighborhood midtown east.  Technology entrepreneur.

11    I have a Master's Degree.

12             THE COURT:  Free time?

13             PROSPECTIVE JUROR:  Travel and athletics.

14    Organizations, I am on the Alumni Board of Governors for the

15    University of Chicago; and I am Board of Directors for Delta

16    Kapa Epsalan (phonetic).

17             THE COURT:  You keep up with current events?

18             PROSPECTIVE JUROR:  I read the Economist, Times

19    Wall Street Journal daily.

20             THE COURT:  Thank you, Mr. Peters.  Mr. Guzman.

21             PROSPECTIVE JUROR:  I live with my wife,

22    Washington Heights.  Occupation is parking attendant.  Free

23    time is watching TV, baseball.

24             THE COURT:  Your highest degree?

25             PROSPECTIVE JUROR:  Eighth grade.

1       THE COURT:  And do you -- are you active in any
2   organizations?
3       PROSPECTIVE JUROR:  No.  No organizations.
4       THE COURT:  Do you keep up with current events?
5       PROSPECTIVE JUROR:  No.
6       THE COURT:  Not at all?
7       PROSPECTIVE JUROR:  (Nod ead negatively back and
8   forth.)
9       THE COURT:  You read the sports pages?  You could
10  flip it over to the front page, no?  Do you do that a little
11  bit?
12      PROSPECTIVE JUROR:  A little bit.
13      THE COURT:  All right.  Thank you.  Ms. --
14  Mr. Rose?
15      PROSPECTIVE JUROR:  Yes.  I live in Harlem.
16  Highest grade I went to was two years of college taking up
17  computer science.  I live alone.  I like sports.  My
18  occupation, I am unemployed right now, and I do read current
19  events daily and --
20      THE COURT:  You belong to any organizations?
21      PROSPECTIVE JUROR:  No organizations.
22      THE COURT:  What kind of work did you do or are
23  you looking for?
24      PROSPECTIVE JUROR:  I use to work for the Parks
25  Department.

1          THE COURT:  Thank you.  Mr. Huang?

2          PROSPECTIVE JUROR:  Okay, I live --

3          THE COURT:  Nice and loud so they could hear you.

4    Where do you live?

5          PROSPECTIVE JUROR:  I live in Chinatown, yeah,

6    with my wife and my children.

7          THE COURT:  How many kids?

8          PROSPECTIVE JUROR:  Three.  It's sometimes we are

9    talking too much.

10         THE COURT:  Its hard to hear you.

11         MR. KLEIN:  I can't understand.

12         THE COURT:  Have you been able to follow so far --

13         PROSPECTIVE JUROR:  Yeah, sometime.

14         THE COURT:  -- English?  May I ask you this, do

15   you think your English is strong enough to be deliberating

16   in English with your fellow jurors or you think it might be

17   a problem for you?

18         PROSPECTIVE JUROR:  Right.

19         THE COURT:  Which, a problem?

20         PROSPECTIVE JUROR:  Yes, it's a problem.

21         THE COURT:  All right both sides?

22         MR. BOGDANOS:  Consent.

23         MR. KLEIN:  Yes.

24         THE COURT:  You are excused, Mr. Huang.  Thank you

25   very much.

```
1                    MR. BOGDANOS:  Judge, may we ask that we fill the
2        seat.
3                    THE COURT:  Yes, we are going to go to the wheel.
4                    MR. BOGDANOS:  Thank you, Judge.
5                    (Prospective juror exited the courtroom.)
6                    THE COURT CLERK:  Wing Ma, W-I-N-G, M-A.
7                    THE COURT:  Mr. Ma, come on up.  How are you?  All
8        right, Mr. Ma, you are in the hot seat.  Are you ready?
9                    PROSPECTIVE JUROR:  Yes.
10                   THE COURT:  Go ahead.  You live alone or with
11       someone else?
12                   PROSPECTIVE JUROR:  I am living in Chinatown with
13       my mother, my wife, and three children.
14                   THE COURT:  Are you working?
15                   PROSPECTIVE JUROR:  Yes.
16                   THE COURT:  What do you do?
17                   PROSPECTIVE JUROR:  An editor in a Chinese news
18       room.
19                   THE COURT:  What is your highest level of
20       education?
21                   PROSPECTIVE JUROR:  Bachelor Degree.
22                   THE COURT:  What do you like to do when you are
23       not at work?
24                   PROSPECTIVE JUROR:  Having a good time with my
25       children.
```

```
 1            THE COURT:  Do you belong to any organizations?
 2            PROSPECTIVE JUROR:  No.
 3            THE COURT:  Do you -- you do keep up with current
 4       events I would imagine?
 5            PROSPECTIVE JUROR:  Yes, because I am working for
 6       news room.  I must read newspaper.
 7            THE COURT:  Everyday?
 8            PROSPECTIVE JUROR:  Yeah, everyday.
 9            THE COURT:  All right, thank you, sir.
10       Mr. Weiner?
11            PROSPECTIVE JUROR:  Yes, I live on the east side,
12       midtown with my girlfriend.  I am an attorney, a tax
13       attorney.  Highest level of education is LLM.  In my spare
14       time I like sports, culture and travel; and organizations
15       would be New York City Bar and American Bar Association.
16            THE COURT:  You keep up with --
17            PROSPECTIVE JUROR:  I keep up with current events
18       constantly.
19            THE COURT:  In your legal career any litigation
20       matters, civil or criminal?
21            PROSPECTIVE JUROR:  Civil, yes.
22            THE COURT:  Criminal?
23            PROSPECTIVE JUROR:  No.
24            THE COURT:  All right, thank you.  Ms. Brown?
25            PROSPECTIVE JUROR:  Good morning.  I live in
```

1   Harlem with my two children.  I completed two years of

2   college.  I am self-employed.  I braid hair.  My free time I

3   like to take my children to play things; and I read the

4   paper.

5                   THE COURT:  Daily?

6                   PROSPECTIVE JUROR:  Yes.

7                   THE COURT:  Do you have any organizations?

8                   PROSPECTIVE JUROR:  No.

9                   THE COURT:  Thank you, Ms. Brown.

10                  MR. BOGDANOS:  I couldn't hear after

11  self-employed?

12                  PROSPECTIVE JUROR:  I am self-employed.  I braid

13  hair?

14                  MR. BOGDANOS:  What else?

15                  THE COURT:  No, that's it.  You hit them all.

16                  MR. BOGDANOS:  Thank you.

17                  THE COURT:  No. 9, Mr. Ling?

18                  PROSPECTIVE JUROR:  Good morning.  I live on West

19  42nd Street with my wife and one son, two years old.  I got

20  Associate Degree.  No organization.  Free time; Internet,

21  bowling; and current events, I never read papers but I read

22  from the Internet.  Only the big events like 911, hurricane.

23  Something like that.

24                  THE COURT:  Where do you work?

25                  PROSPECTIVE JUROR:  I am bookkeeper in

1  construction company.

2           THE COURT:  Thank you.  Back row, Mr. Schuster?

3           PROSPECTIVE JUROR:  Good morning, your Honor.

4           THE COURT:  Good morning.

5           PROSPECTIVE JUROR:  I live with my wife on the

6  upper east side.  I am an attorney who has a Legal Aid

7  Society job not profit in East Harlem.  Highest degree Juris

8  Doctorate.  Hobbies, I play golf regularly, poorly.  Avid

9  reader of history novels.  Association, New York State Bar

10 Association.

11          THE COURT:  Current events?

12          PROSPECTIVE JUROR:  Thank you.  I keep up with the

13 news pretty regular.  Internet, television, books,

14 newspapers.

15          THE COURT:  Again in your legal career, any

16 criminal law matters?

17          PROSPECTIVE JUROR:  No, not criminal.

18          THE COURT:  But litigation?

19          PROSPECTIVE JUROR:  Not -- when I was in law

20 school, I spent the summer working in Nassau County on 1983

21 matters.

22          THE COURT:  All right, thank you very much.

23 Ms. Haney?

24          PROSPECTIVE JUROR:  Good morning.

25          THE COURT:  Nice and loud now.  This is where I

1      struggle.

2                 PROSPECTIVE JUROR:  I work in a hospital.  I live

3      in Harlem with my three children.  I play basketball,

4      sports, and I read the newspaper.

5                 THE COURT:  Your highest degree?

6                 PROSPECTIVE JUROR:  11th grade.

7                 THE COURT:  Do you read the paper everyday?

8                 PROSPECTIVE JUROR:  No, not everyday.  I have two

9      jobs.

10                THE COURT:  A couple of times a week?

11                PROSPECTIVE JUROR:  Maybe a couple times a week,

12     yes.

13                THE COURT:  Did you mention, are there any

14     organizations?

15                PROSPECTIVE JUROR:  Eastern Star Organization.

16                THE COURT:  Eastern Star?

17                PROSPECTIVE JUROR:  Yeah.

18                THE COURT:  All right, thank you, ma'am.

19     Ms. McCormick, good morning.

20                PROSPECTIVE JUROR:  Oh.

21                THE COURT:  Nice and loud, do you live alone or

22     with someone else?

23                PROSPECTIVE JUROR:  I am married.

24                THE COURT:  Any children?

25                PROSPECTIVE JUROR:  No.

```
 1              THE COURT:  You told us your work.  Was it
 2    Columbia?
 3              PROSPECTIVE JUROR:  Yes.
 4              THE COURT:  Say it again for the record?
 5              PROSPECTIVE JUROR:  Columbia University,
 6    secretary.  I read the newspaper.  I don't know, once or two
 7    twice a week.  Actually, I almost read the newspaper
 8    everyday the free one; and Wall Street Journal once a week;
 9    and I do try to follow news on the Internet whenever I have
10    a moment.  What else?
11              THE COURT:  Free time.
12              PROSPECTIVE JUROR:  Reading, exercising, checking
13    out new neighborhoods.  Basically that's it.
14              THE COURT:  Your highest degree is what?
15              PROSPECTIVE JUROR:  Bachelors.
16              THE COURT:  Did you mention which neighborhood you
17    live in now?
18              PROSPECTIVE JUROR:  Inwood.
19              THE COURT:  Inwood.  You did tell us.  Thank you,
20    ma'am.  Ms. Lam, I know you have a very soft voice because
21    we spoke before so, so project.  Give it all you got.  Do
22    you live alone or with someone else?
23              PROSPECTIVE JUROR:  I live with my husband.
24              THE COURT:  Which neighborhood is that?
25              PROSPECTIVE JUROR:  Midtown east.
```

1        THE COURT:  And what is your occupation?

2        PROSPECTIVE JUROR:  I am a makeup artist.

3        THE COURT:  Highest degree?

4        PROSPECTIVE JUROR:  I have an Associates Degree in

5    Computer Science.

6        THE COURT:  What do you like to do in your spare

7    time?

8        PROSPECTIVE JUROR:  Watch movies.  I am mostly

9    home.

10        THE COURT:  Do you belong to any organizations?

11        PROSPECTIVE JUROR:  No.

12        THE COURT:  Do you try to keep up with current

13    events?

14        PROSPECTIVE JUROR:  Once a week.

15        THE COURT:  A newspaper or TV?

16        PROSPECTIVE JUROR:  On-line.

17        THE COURT:  On-line.  All right.  Thank you,

18    Ms. Lam.  Gallegos, do you live alone?

19        PROSPECTIVE JUROR:  I live in the Bronx with my

20    wife and two kids.

21        THE COURT:  Woo, woo, woo.  In the Bronx?

22        PROSPECTIVE JUROR:  Yes.

23        THE COURT:  Which part of the Bronx?

24        PROSPECTIVE JUROR:  South Bronx.

25        THE COURT:  Is it the part that's really in

<u>Voir Dire - Selection</u>                                    36

1   Manhattan?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  There is one little -- what's the

4   neighborhood?

5              PROSPECTIVE JUROR:  I know it as the South Bronx.

6              THE COURT:  How did you get here if I may ask?

7              PROSPECTIVE JUROR:  I took the No. 2 train from my

8   home.

9              THE COURT:  No, no.  You are suppose to be called

10  for jury duty in the county where you reside.  This is New

11  York County.  The Bronx has its own court house and the

12  Bronx is a separate county.

13             PROSPECTIVE JUROR:  Yeah.

14             THE COURT:  Jury duty for you should be in the

15  Bronx, not in Manhattan.

16             PROSPECTIVE JUROR:  Okay.

17             THE COURT:  Did you use to live in Manhattan?

18             PROSPECTIVE JUROR:  Yeah, I was separated those

19  days.

20             THE COURT:  But you are a winner here because we

21  have to let you go.  You cannot serve on this jury and live

22  in the Bronx, okay, and you tell the jury people that when

23  you go back to the room.  I take it both sides agree?

24             MR. BOGDANOS:  Yes, your Honor.

25             (Prospective Juror exited the courtroom.)

1          THE COURT:  Back to the wheel.

2          THE COURT CLERK:  Meredith Sulser, S-U-L-S-E-R,

3     seat No. 14.

4          THE COURT:  All right, so it's Ms. Sulser.  The

5     floor is yours.  Go ahead.

6          PROSPECTIVE JUROR:  I live on the upper east side

7     alone.  I work in a bank.  Part of my job is reading the

8     news so I read the news daily.  Hobbies, running traveling,

9     being with my family.  No association.

10          THE COURT:  Neighborhood?  Did you give us that?

11          PROSPECTIVE JUROR:  Bachelors of Arts, upper east

12     side.

13          THE COURT:  Thank you, ma'am.  Mr. Lee?

14          PROSPECTIVE JUROR:  Good morning.  I live with my

15     wife and my son in Tudor City.  Have an engineering degree.

16     I have been retired almost five years.  Currently not

17     working.  Not currently active in any organization.  In my

18     spare time, free time I travel; exercise.

19          THE COURT:  What about current events?  Do you

20     keep up?

21          PROSPECTIVE JUROR:  I do not read the paper.  I

22     get news on-line pretty daily.

23          THE COURT:  On a regular basis?

24          PROSPECTIVE JUROR:  Daily.

25          THE COURT:  Thank you, Mr. Lee.  Mr. Warheit?

1              PROSPECTIVE JUROR:  Yes, I live in Harlem in the

2      Morningside area with one roommate.  I am unemployed.  I am

3      a free-lance cartoonist and illustrator and comedy writer.

4      Highest degree I ever learned was Bachelors in Neuroscience;

5      and for hobbies I sing in a band and I do improv stand-up

6      comedy and -- was there more?  News, often times I have

7      New York 1 on as background noise.

8              THE COURT:  And what about organizations?

9              PROSPECTIVE JUROR:  Organizations, nothing that I

10     can think of.

11             THE COURT:  Thank you Mr. Warheit.  Mr. Lanzetta?

12             PROSPECTIVE JUROR:  Married.  Two children.  Live

13     in Chelsea.  Bachelor's Degree.  Trade equities investment

14     banker.  Read news all day long.  No association.  Free

15     time.  I have kids so I have two kids.  Spend time with my

16     children.

17             THE COURT:  You are in a hurry?

18             PROSPECTIVE JUROR:  No, not really.

19             THE COURT:  It sounds like you are in a hurry

20     right now.  Relax.  You did cover it all.  Ms. McIntosh?

21             PROSPECTIVE JUROR:  So I live in Harlem with my

22     boyfriend and my 19 month old daughter; and I am a

23     psychologist.  My highest degree earned a PhD. but I am ABD,

24     all but dissertation.  I like to read.  I like to cook, and

25     I don't belong to any organizations.

1   THE COURT:  Current events, you keep up with

2   current events?

3   PROSPECTIVE JUROR:  Yes, I do, I would say almost

4   daily but my daughter keeps me pretty busy.  I have a New

5   York Times on-line subscription.

6   THE COURT:  Thank you, ma'am.  Now, ladies and

7   gentlemen, the next set of general questions now starting

8   with prior jury experience so again the question is have any

9   of you had occasion to serve on a criminal case in the past

10  or a civil case or possibly the grand jury?  Any one of

11  those three.  Ms. McCormick?

12  PROSPECTIVE JUROR:  Grand jury.

13  THE COURT:  When was that approximately?

14  PROSPECTIVE JUROR:  2002.

15  THE COURT:  Did you hear all sorts of different

16  cases?

17  PROSPECTIVE JUROR:  Yes.

18  THE COURT:  Thank you.  No one else?  Number two,

19  conflicts with the law, have you or anyone close to you ever

20  had a conflict with the law and by that we mean an arrest of

21  some sort?  Ms. McIntosh?

22  PROSPECTIVE JUROR:  Yes, my brother and sister

23  both have had some conflicts with the law.

24  THE COURT:  Were those conflicts here in

25  Manhattan?

1    PROSPECTIVE JUROR:  Nope.

2    THE COURT:  Somewhere out --

3    PROSPECTIVE JUROR:  Upstate but in New York.

4    THE COURT:  Did you attend any court proceedings?

5    PROSPECTIVE JUROR:  I did.

6    THE COURT:  Were there any trials involved?

7    PROSPECTIVE JUROR:  No trial.

8    THE COURT:  When was the last time that you went

9    to one of those proceedings approximately?

10   PROSPECTIVE JUROR:  I think it was around 2009.

11   THE COURT:  And is there anything about those

12   cases that would somehow make it hard for you to be fair in

13   this one?

14   PROSPECTIVE JUROR:  No.

15   THE COURT:  Thank you, Mr. Lee?

16   PROSPECTIVE JUROR:  By youngest sister was

17   murdered 17 years ago and unfortunately her eldest son was

18   the one that did it so I went through the whole court

19   proceeding.

20   THE COURT:  Was that here in Manhattan?

21   PROSPECTIVE JUROR:  No, that's in New Jersey.

22   THE COURT:  New Jersey.  So was there a trial?

23   PROSPECTIVE JUROR:  Yes.

24   THE COURT:  Again is there anything about that

25   whole experience that would come into play in this case and

1    make it hard for you to be fair?

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  Thank you.  Mr. Rose?

4            PROSPECTIVE JUROR:  I was convicted of a drug

5    charge in '93.

6            THE COURT:  You were?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Was there a trial?

9            PROSPECTIVE JUROR:  No.

10            THE COURT:  Was the arrest here in Manhattan?

11            PROSPECTIVE JUROR:  Yes.

12            THE COURT:  It goes back away but do you think any

13    of that would affect you in terms of being fair?

14            PROSPECTIVE JUROR:  No, not at all.

15            THE COURT:  You could promise both sides including

16    the DA because that's the same office after all?

17            PROSPECTIVE JUROR:  Sure.

18            THE COURT:  You could promise him you could be

19    fair?

20            PROSPECTIVE JUROR:  Yes, sir.

21            THE COURT:  Thank you.  Anyone else with a

22    conflict?

23            Law enforcement, do any of you happen to know

24    anyone who works in law enforcement?  Well, Mr. Hedges, you

25    know lots of people.  Any family members?

<u>Voir Dire - Selection</u>                                    42

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  I am sorry, Ms. Brown?

3          PROSPECTIVE JUROR:  Like a Correction officer

4    would be law enforcement?  My niece is a Correction officer.

5          THE COURT:  Yes.

6          PROSPECTIVE JUROR:  Right, my knees.

7          THE COURT:  Where is she located?

8          PROSPECTIVE JUROR:  Riker's.

9          THE COURT:  Riker's.  Thank you.  Mr. Peters.

10          PROSPECTIVE JUROR:  My step-father, two uncles and

11    cousin are all police officers.

12          THE COURT:  In New York City?

13          PROSPECTIVE JUROR:  No in Cleveland.

14          THE COURT:  Cleveland.  Very good.  Anyone else?

15    Ms. McCormick?

16          PROSPECTIVE JUROR:  I have two cousins that work

17    in Texas, second cousins actually, are police officers.  I

18    have a good friend former coworker, who is a police officer,

19    but I haven't been in touch with him for quite awhile.  I

20    think that's it.

21          THE COURT:  Here in Manhattan or New York City?

22          PROSPECTIVE JUROR:  I honestly don't know.  I

23    haven't been in touch.

24          THE COURT:  Thank you.  One more victim of a

25    crime, have you or anyone close to you ever been the victim

1      of a crime?  Mr. Weiner?

2                    PROSPECTIVE JUROR:  I have been mugged several

3      times and assaulted by a family member.

4                    THE COURT:  When was the last incident?  How many

5      years ago?

6                    PROSPECTIVE JUROR:  Over twenty years ago.

7                    THE COURT:  We are going pretty far back.  Did you

8      report most of these, or were these matters mostly reported

9      to your knowledge?

10                    PROSPECTIVE JUROR:  One or two were reported and

11     one or two were not reported.

12                    THE COURT:  Were there any arrests in these cases?

13     No?

14                    PROSPECTIVE JUROR:  I don't think so.  I am not

15     sure.

16                    THE COURT:  You didn't have any further

17     involvement in terms of prosecution?

18                    PROSPECTIVE JUROR:  No.

19                    THE COURT:  Did any of them occur in Manhattan?

20                    PROSPECTIVE JUROR:  Yes.

21                    THE COURT:  Most?

22                    PROSPECTIVE JUROR:  Two in Manhattan and two in

23     the Bronx.

24                    THE COURT:  Thank you.  Other crime victims in

25     this area, Ms. Brown?

1      PROSPECTIVE JUROR:  My brother.

2      THE COURT:  Mother?

3      PROSPECTIVE JUROR:  Brother was shot and left him

4  paralyzed by his girl friend.

5      THE COURT:  When did that happen?

6      PROSPECTIVE JUROR:  Maybe late '97.

7      THE COURT:  Was there an arrest and a trial?

8      PROSPECTIVE JUROR:  There was an arrest, yes.

9      THE COURT:  Did you attend any of those

10 proceedings?

11     PROSPECTIVE JUROR:  No.

12     THE COURT:  Is there anything about that case that

13 would come into play and make it difficult for you to be

14 fair?

15     PROSPECTIVE JUROR:  No.

16     THE COURT:  Did that one occur in Manhattan too?

17     PROSPECTIVE JUROR:  No.

18     THE COURT:  Thank you.  Anyone else crime victim?

19 Mr. Peters?

20     PROSPECTIVE JUROR:  In 2009 I was mugged in

21 Moscow.

22     THE COURT:  That must have been unpleasant.  Did

23 you report it to the local authorities?

24     PROSPECTIVE JUROR:  I did not because one of them,

25 the muggers was posing as a police officer.  I didn't know

1    if he was or not.

2              THE COURT:  Thank you.  Mr. McCormick?

3              PROSPECTIVE JUROR:  My grandfather was mugged many

4    years ago and my cousin was stabbed entering the lobby of a

5    building.

6              THE COURT:  Entering?

7              PROSPECTIVE JUROR:  The lobby of a building.

8              THE COURT:  And if you know, were any arrests made

9    in those cases?

10             PROSPECTIVE JUROR:  I don't believe so.

11             THE COURT:  All right.  Thank you.  No one else.

12   All right then, we will move along and once again I am going

13   to go over with you what I referred to earlier some of the

14   fundamental principles of criminal law.  In this case,

15   ladies and gentlemen, as in every criminal case the accused

16   or the defendant -- here it's Mr. Richardson -- must be

17   presumed by you to be innocent.

18             He is here today because an indictment has been

19   filed against him but the indictment itself is not proof of

20   anything.  An indictment is simply the means by which a

21   defendant is informed of the charges against him and is then

22   brought into court to face those charges; therefore, as he

23   sits there now, he must be afforded the presumption of

24   innocence.

25             It is up to the People, DA's Office to convince

1   you beyond a reasonable doubt that the defendant is guilty.

2   The burden in a criminal case is solely on the prosecution.

3   The defense has no burden to do anything.  Is there anyone

4   who has any difficulty accepting and following these

5   fundamental principles?

6           All right, under our system a defendant in a

7   criminal case is not obligated to take the witness stand;

8   though, if Mr. Richardson does not testify you may not draw

9   any inference unfavorable to him from that fact.  Is there

10  anyone who would have any difficulty accepting and following

11  this principle?

12          Does anyone have any moral, intellectual, or

13  religious opinion or belief which might conflict with any of

14  these rules or which might some how slant your approach to

15  the case?  So moral or ethical concerns?  No one.

16          Police testimony, will everyone be able to weigh

17  the testimony of a police officer in the same way that you

18  would weigh the testimony of a civilian witness?  And again

19  that means that no greater or lesser weight is to be given

20  to the testimony simply because it is coming from a police

21  officer.  Is there anyone who would be unable to follow such

22  instruction?

23          All right, making good -- rapid progress I should

24  say.  If after hearing all the evidence in the case you are

25  convinced that the defendant's guilt has been proved beyond

1    a reasonable doubt, would you hesitate to vote guilty?  All

2    right, and then the flip side if you find after hearing the

3    evidence that you do have a reasonable doubt, would you

4    hesitate to vote not guilty?

5           Finally anything -- is there anything else,

6    anything you would like to tell us about your qualifications

7    to serve on this case?  All right, and I thank you all very

8    much.  Once again that concludes my portion of the

9    questioning so the attorneys will now take over.

10   Mr. Bogdanos will go first.

11          MR. BOGDANOS:  Thank you, your Honor.  Ladies and

12   gentlemen, good morning and thank you again.  Thank you so

13   much all of you for taking the time out of your lives to

14   make sure the system works.  May I just with a show of hands

15   each and everyone of you was in the courtroom Thursday

16   during the first panel?  Just a show of hands everyone.

17          A whole lot of people have soft voices like

18   Ms. Lam; but I don't have that problem.  You probably

19   figured that out.  Did everyone hear me during the first

20   panel where you were seated?  Did anyone have any difficulty

21   at all?  You are going to hear it is going to be much of the

22   same questions I had.  It's the same case but presumably

23   that means we will be able to do it much faster.

24          Ms. Armstrong, ma'am, I think you were right in

25   this very seat.  I asked the exact same question do you have

1   an opinion about crime in New York City, Criminal Justice

2   System, cops, lawyers, prosecutors, defense attorneys,

3   judges?  Don't tell me the opinion.  I don't think I could

4   take it but you have an opinion?

5                PROSPECTIVE JUROR:  Yeah.

6                MR. BOGDANOS:  Does everyone have an opinion?

7   Does anyone not have an opinion about crime in New York

8   City?  Whatever that opinion is good, bad, indifferent

9   courts are too hard, courts are too easy, whatever that

10  opinion is do you promise to leave that opinion outside and

11  judge this case solely on the evidence?

12               PROSPECTIVE JUROR:  Yes.

13               MR. BOGDANOS:  Will you do the exact same thing,

14  sir?

15               PROSPECTIVE JUROR:  Yes.

16               MR. BOGDANOS:  Ma'am, would you do the exact same

17  thing?

18               PROSPECTIVE JUROR:  Yeah.

19               MR. BOGDANOS:  Not on the evidence, not what you

20  read in newspapers, not what you see in crime programs, not

21  what you see in the neighborhood, not what you see in the

22  hospital.  Would you judge it purely what you see in this

23  case?

24               PROSPECTIVE JUROR:  Yes.

25               MR. BOGDANOS:  Mr. Hedges, because of your

1  connection with the New York City Police Department you will
2  put that aside, will you not, and judge this case fairly?
3            PROSPECTIVE JUROR:  Yes.
4            MR. BOGDANOS:  You will do that, won't you?  You
5  won't allow your relationship good or bad with any other,
6  either fellow auxiliary police officers or New York City
7  police officers to affect your judgment here, will you?
8            PROSPECTIVE JUROR:  No.
9            MR. BOGDANOS:  Can we agree that police officers
10 like any other profession have good ones, not so good ones,
11 and bad ones; yes?
12           PROSPECTIVE JUROR:  Yes.
13           MR. BOGDANOS:  Like doctors, lawyers, accountants,
14 and all, you will put any personal relationships aside and
15 judge this case solely on what you hear from this witness
16 stand?
17           PROSPECTIVE JUROR:  Yes.
18           MR. BOGDANOS:  Detective, police officers testify
19 you will use all your powers of observation that you would
20 with any witness to assess their credibility, reliability,
21 and accuracy?
22           PROSPECTIVE JUROR:  Yes.
23           MR. BOGDANOS:  You wouldn't treat police officers
24 any differently?
25           PROSPECTIVE JUROR:  No.

1          MR. BOGDANOS:  Mr. Weiner, I believe.  Am I saying
2     it right?
3          PROSPECTIVE JUROR:  Yes.
4          MR. BOGDANOS:  You are an attorney?
5          PROSPECTIVE JUROR:  Yes.
6          MR. BOGDANOS:  This may come as a shock to you.
7     During the course of my career I have prosecuted attorneys
8     for crimes.  Not a shock, right?
9          PROSPECTIVE JUROR:  No.
10          MR. BOGDANOS:  Good attorneys, bad attorneys?
11          PROSPECTIVE JUROR:  Yes.
12          MR. BOGDANOS:  Right?  Good accountants, bad
13     accountants?
14          PROSPECTIVE JUROR:  (Nod head affirmatively up and
15     down.)
16          MR. BOGDANOS:  I have told you, ma'am, that I have
17     prosecuted attorneys for committing crimes and attorneys who
18     were actually convicted of committing crimes; so you
19     understand that there are attorneys in the world who have --
20     who are criminals; right?
21          PROSPECTIVE JUROR:  Right.
22          MR. BOGDANOS:  Doesn't shock you?
23          PROSPECTIVE JUROR:  No.
24          MR. BOGDANOS:  Do you think it's fair to judge
25     Mr. Weiner based on some other attorney that I prosecuted

1   and convicted?  You think it's fair to look at him and say,

2   oh, he is an attorney; he must, you know, be a criminal?

3   Forgive me.  Do you think that's fair?

4            PROSPECTIVE JUROR:  No.  No.

5            MR. BOGDANOS:  I had an investment banker someone.

6            THE COURT:  Mr. Lanzetta.

7            MR. BOGDANOS:  Mr. Lanzetta, I have prosecuted

8   investment bankers in my career?  Shocker?

9            PROSPECTIVE JUROR:  No.

10           MR. BOGDANOS:  They were convicted so you conclude

11  good investor bankers, bad?

12           PROSPECTIVE JUROR:  Yes.

13           MR. BOGDANOS:  You think it is fair to judge

14  Mr. Lanzetta based on the action of other investment

15  bankers?

16           PROSPECTIVE JUROR:  No, I don't.

17           MR. BOGDANOS:  Judge Mr. Weiner based on what he

18  does; not other lawyers?  Do all jurors promise to do that

19  in this case particularly when it comes to police officers?

20           PROSPECTIVE JUROR:  Yes.

21           MR. BOGDANOS:  Anyone thinks it's fair to read

22  page 14 of The Post and say, oh, this police officer did

23  this?  Well, every police officer must be bad or dirty or

24  whatever.  Anyone thinks that's fair?  Anyone thinks that's

25  unfair?  Show hands who thinks it's unfair.  Got it.

1          Thank you.  Mr. Schuster, another attorney you say

2    with a non-profit?

3          PROSPECTIVE JUROR:  Yes.

4          MR. BOGDANOS:  In East Harlem?  What is the

5    chapter?

6          PROSPECTIVE JUROR:  Youth Development Organization

7    that uses sports to build on teamwork.

8          MR. BOGDANOS:  That's great.  Thank you.  Thank

9    you for your service.

10          You understand -- and I am picking on a lawyer --

11    but you do understand that whatever lawyers do in the

12    courtroom, that's not evidence, right?  Is it?

13          PROSPECTIVE JUROR:  I understand.

14          MR. BOGDANOS:  And you understand that evidence is

15    the witness stand and any exhibits that his Honor or

16    evidence his Honor allows to come in.  That's evidence,

17    right?

18          PROSPECTIVE JUROR:  Yes.

19          MR. BOGDANOS:  I need you to promise me --

20    Mr. Klein, is very good; very experienced.  I need you to

21    promise me at no point when you are trying -- when you are

22    comparing --

23          MR. KLEIN:  Judge, I think we have to approach for

24    a second about this.

25          THE COURT:  Well, he will move on.

1              MR. KLEIN:  Okay.

2              MR. BOGDANOS:  Okay.  You will limit yourself to

3     the evidence and not anything lawyers do?

4              PROSPECTIVE JUROR:  Yes.

5              MR. BOGDANOS:  Fair.  Will everyone do just that?

6              PROSPECTIVE JUROR:  Yes.

7              MR. BOGDANOS:  I am looking at -- thank you,

8     ma'am.

9              Mr. Lee, were you able to hear when you were out

10    there when I was talking to the other jurors about the law

11    recognizes that sometimes crimes are committed by more than

12    one person.  Could you hear that?  I am not instructing you

13    on the law in any way.  That's not my job.  That's what his

14    Honor does, but do you understand why the law recognizes

15    that sometimes crimes are committed by one person; sometimes

16    by two; sometimes by three?  For there is actually no limits

17    whatever the number is, right?  You could accept that?

18             PROSPECTIVE JUROR:  Sure.

19             MR. BOGDANOS:  Can you accept the fact that if

20    there were -- let's pick a robbery -- four people involved

21    in a robbery and one has the gun, one is the lookout, one

22    drives the getaway car, and one cleans out the safe.  Let's

23    say it is a restaurant robbery.  Do you understand under the

24    law all four of them are guilty of robbery?

25             PROSPECTIVE JUROR:  Yes.

1    MR. BOGDANOS:  Does that offend you in any way the

2  getaway driver, the guy who is outside sharing in the intent

3  to commit the robbery but he never goes inside, he is just

4  as guilty under the law as the person holding the gun?  Can

5  you accept that?  If his Honor so instructs you, can you

6  accept that?

7            PROSPECTIVE JUROR:  Yes.

8            MR. BOGDANOS:  Ma'am, same question to you, can

9  you accept that law?

10           PROSPECTIVE JUROR:  Yes.

11           MR. BOGDANOS:  Does that offend you in anyway at

12  all?

13           PROSPECTIVE JUROR:  No.

14           MR. BOGDANOS:  Sir, does that bother you in any

15  way the law recognizes that more than one person can commit

16  a single crime?

17           PROSPECTIVE JUROR:  No problem.

18           MR. BOGDANOS:  Does anyone have any problem with

19  that concept commonly called acting in concert as his Honor

20  will instruct?  Any one having any difficulty?  Thank you.

21           Ms. Henry, you mentioned you work in a hospital

22  but if you said what you do in the hospital, I couldn't hear

23  so I apologize if I am making you repeat it.  What do you

24  do?

25           PROSPECTIVE JUROR:  Medicine technician.

1            MR. BOGDANOS:  Ma'am, this is just going to be --
2       and let me move to Ms. McCormick.  It is a yes or no answer.
3       Yes or no.  Please no details.  Have you ever done anything
4       bad in your life?
5            PROSPECTIVE JUROR:  Yes.
6            MR. BOGDANOS:  Did you ever tell anyone about it?
7            PROSPECTIVE JUROR:  Yes.
8            MR. BOGDANOS:  Anything unusual about that?
9            PROSPECTIVE JUROR:  No.
10            MR. BOGDANOS:  Why did you do that?  Why did you
11       tell someone else about what you had done bad?
12            PROSPECTIVE JUROR:  For kind of a release,
13       tension.  Holding it inside.
14            MR. BOGDANOS:  You think you are the only person
15       in the world who does that?
16            PROSPECTIVE JUROR:  No, of course not.
17            MR. BOGDANOS:  Mr. Peters, yes or no.  Don't -- no
18       details.  Did you ever do anything bad in your life?
19            PROSPECTIVE JUROR:  Yes.
20            MR. BOGDANOS:  Tell anyone about it?
21            PROSPECTIVE JUROR:  Of course.
22            MR. BOGDANOS:  Anything surprising about that?
23       That you would actually tell someone about something bad you
24       did?
25            PROSPECTIVE JUROR:  (Nod head negatively back and

1    forth.)

2                    MR. BOGDANOS:  So if you were to hear in this

3    courtroom that in this case the defendant -- allegations

4    only -- defendant confessed to some of his participation in

5    this crime, you will keep an open mind, will you not?

6                    PROSPECTIVE JUROR:  Yes.

7                    MR. BOGDANOS:  You won't say, well, that's crazy.

8    No one's ever going to confess to a crime, right?  You won't

9    do that?  Will anyone do that?  Does anyone think that's not

10   possible?  Can everyone accept that and could I get nodding

11   of the heads?

12                   PROSPECTIVE JUROR NO.12:  Excuse me, could you

13   repeat that please.

14                   MR. BOGDANOS:  Sure.  Do you think that's

15   impossible that an individual who has committed a crime will

16   confess to having committed that crime?

17                   PROSPECTIVE JUROR:  No.

18                   MR. BOGDANOS:  I probably made that sentence too

19   long.  You have no problem with that at all?

20                   PROSPECTIVE JUROR:  No.

21                   MR. BOGDANOS:  You understand the concept and you

22   understand the reality of it?  Forget about it.  It is nice

23   in theory.  You work in Columbia.  My Alma Mater.  It works

24   in practice, right?  In real life?  People really do commit

25   crimes and confess.  Nothing surprising to you about that?

```
 1              PROSPECTIVE JUROR:  No.
 2              MR. BOGDANOS:  Ms. Sulser, yes, same question,
 3    ever do anything bad?
 4              PROSPECTIVE JUROR:  (Nod head affirmatively up and
 5    down.)
 6              MR. BOGDANOS:  No details.  Did you tell anyone?
 7              PROSPECTIVE JUROR:  (Nod head affirmatively up and
 8    down.)
 9              MR. BOGDANOS:  Now, you only did one bad thing in
10    your life or more than one?
11              PROSPECTIVE JUROR:  I am sure a few.
12              MR. BOGDANOS:  Tell people more than once?
13              PROSPECTIVE JUROR:  Yeah.
14              MR. BOGDANOS:  Did you ever have an occasion you
15    ever said, told someone what you did but maybe you put a
16    little bit of a spin on it; maybe you minimized what you
17    did, your involvement maybe?  You didn't tell everything?
18    Did you ever do that?
19              PROSPECTIVE JUROR:  (Nod head affirmatively up and
20    down.)
21              MR. BOGDANOS:  Why?
22              PROSPECTIVE JUROR:  Because you feel better and
23    get it out there.
24              MR. BOGDANOS:  Would it surprise you if anyone
25    else did such a thing; that is, not told what they did but
```

1    then minimized it or altered or shaped or -- I don't know --

2    common parlance, put a spine on it?

3             PROSPECTIVE JUROR:   (Nod head affirmatively up and

4    down.)

5             MR. BOGDANOS:   I think the example I used last

6    Thursday four people do a robbery and all four confess.

7    Sometimes all four say they were the getaway driver.

8    Nothing about that surprises you?

9             PROSPECTIVE JUROR:   No.

10            MR. BOGDANOS:   You could accept that and if that's

11   the kind of --

12            PROSPECTIVE JUROR:   (Nod head affirmatively up and

13   down.)

14            MR. BOGDANOS:   What you hear in this courtroom,

15   you will use your common sense and your knowledge of the

16   world to assess what it is you hear?

17            PROSPECTIVE JUROR:   (Nod head affirmatively up and

18   down.)

19            MR. BOGDANOS:   In that regard will everyone do

20   just that?  Sir, I will ask you.  Will you use your common

21   sense and knowledge of the world and your fairness and

22   impartiality in assessing such evidence?  Yes?  I am sorry,

23   Ms. Messina has to get your answer?

24            THE COURT:   Out loud.

25            MR. BOGDANOS:   Could you do that?

1          THE COURT:  As opposed to nodding, say the word.

2          PROSPECTIVE JUROR:  I know what we are talking

3    about, yes.

4          MR. BOGDANOS:  Thank you.  I know you are nodding

5    for us and we all see that but just the record has to

6    indicate what you are saying.

7          Mr. Lanzetta, do you ever walk by Macy's window?

8          PROSPECTIVE JUROR:  Sure.

9          MR. BOGDANOS:  Do you ever see a crime actually

10   being committed in Macy's window while you are walking by?

11         PROSPECTIVE JUROR:  Right.

12         MR. BOGDANOS:  Do you get the point that the idea

13   behind crime is to try to commit it with not witness -- with

14   witnesses who are not -- I am not saying this as well at

15   all.

16         PROSPECTIVE JUROR:  I understand.

17         MR. BOGDANOS:  I have to say it for the record.

18   That the idea is to commit it without witnesses if possible?

19         PROSPECTIVE JUROR:  Right.

20         MR. BOGDANOS:  You get that?  Anyone shocked at

21   that concept?  Anyone shocked at the concept sometimes

22   crimes are committed without any witnesses at all?

23         If your Honor instructs you, could you accept the

24   proposition, legal proposition that there is no requirement

25   under the law for there to be an actual person who witnesses

 1   a crime in order for you to find the defendant guilty?  Can
 2   you accept that?
 3               PROSPECTIVE JUROR No. 1:  Yes.
 4               MR. BOGDANOS:  You still have -- it still has to
 5   be proven beyond a reasonable doubt by admissible evidence,
 6   right?  We can agree on that?
 7               PROSPECTIVE JUROR:  Yes.
 8               MR. BOGDANOS:  We can certainly agree on that, you
 9   got to hold the People to their burden of proof; but is
10   anyone sitting here now -- and I am going to do this more
11   directly start going back to you, as you are sitting here
12   now saying, well, I have to have a person who saw the crime.
13   I don't care how much other stuff you have, Mr. DA.  I need
14   a real person who is going to say, wait, I saw him do what
15   you are claiming he did.  Are you going to require that?
16               PROSPECTIVE JUROR:  No.
17               MR. BOGDANOS:  Are you --
18               PROSPECTIVE JUROR:  No.
19               MR. BOGDANOS:  Are you going to require that, sir?
20               PROSPECTIVE JUROR:  No.
21               MR. BOGDANOS:  Can you accept whatever the other
22   evidence is, whether it's DNA, whether it's fingerprints,
23   whatever it is -- I am not going to go through the evidence.
24   Jury selection is not the right place for you, but I am
25   telling you now you are not going to hear from a live

1    witness who actually saw -- is going to say they saw the

2    defendant do any of these actions he is charged with.  Can

3    you accept that?

4                PROSPECTIVE JUROR:  Yes.

5                MR. BOGDANOS:  Sir, can you accept that same

6    thing?

7                PROSPECTIVE JUROR:  Yes.

8                MR. BOGDANOS:  Do you have any problem with that

9    at all?

10               PROSPECTIVE JUROR:  No problem.

11               MR. BOGDANOS:  Anything at all?

12               PROSPECTIVE JUROR:  No.

13               MR. BOGDANOS:  Mr. Warheit?

14               PROSPECTIVE JUROR:  Yes.

15               MR. BOGDANOS:  Do you accept that and, in fact,

16   the defendant, the person who commits the crime -- not this

17   one, I am talking in general terms -- a defendant who

18   chooses when and where to commit the crime, right?  You

19   understand that?

20               PROSPECTIVE JUROR:  Right.

21               MR. BOGDANOS:  So if I want to commit crime in an

22   elevator, that's my choice to commit the crime in the

23   elevator?  Yes?

24               PROSPECTIVE JUROR:  Yes.

25               MR. BOGDANOS:  You can accept then if that's the

1    case that it necessarily follows that it's the -- the

2    defendant -- again I am talking in general terms -- who

3    chooses whether or not there are witnesses to a crime;

4    right?

5                PROSPECTIVE JUROR:  Okay, yeah.

6                MR. BOGDANOS:  You accept that?

7                PROSPECTIVE JUROR:  Ah-huh.

8                MR. BOGDANOS:  So the same question you are not

9    going to hold -- you are not going to say, okay, Mr. DA you

10   better put a witness on that stand.  You are not going to do

11   that because the law doesn't require an actual live

12   eyewitness.  You accept that?

13               PROSPECTIVE JUROR:  Yes.

14               MR. BOGDANOS:  I know you got this in law school

15   but I am going to ask you now.

16               PROSPECTIVE JUROR:  I am sorry.  I am distracted

17   by --

18               MR. BOGDANOS:  The phone.  Why don't we wait to

19   get that off.

20               (Pause in the proceedings.)

21               MR. BOGDANOS:  Sorry, Mr. Rose.

22               PROSPECTIVE JUROR:  Very sorry.

23               THE COURT:  It is all too common occurrence these

24   days.  It's off.

25               MR. BOGDANOS:  Thank you very much.  I was trying

1    to pretend it wasn't happening.  I didn't want to embarrass
2    him -- can you accept -- I know you got this in law school;
3    no requirement of an actual live witness but could you
4    accept in reality and in practice this is not just in
5    theory?
6                PROSPECTIVE JUROR:  Yes.
7                MR. BOGDANOS:  Does anyone have any difficulty at
8    all?
9                PROSPECTIVE JUROR:  No.
10               MR. BOGDANOS:  Do you, sir?
11               PROSPECTIVE JUROR:  No.
12               MR. BOGDANOS:  Ma'am?
13               PROSPECTIVE JUROR:  No.
14               MR. BOGDANOS:  Thank you.
15               Ms. McIntosh, psychologist on your way to Ph.D.
16   all you need is a dissertation.  You are writing your
17   dissertation with a nineteen month old.  Good luck with
18   that.  Do you understand that of the many questions that the
19   People are required to prove in order for you to find the
20   defendant guilty of murder, People have to prove a whole
21   series of things and his Honor will instruct you.  I am not
22   allowed to.  Go through the list of elements.  Have to prove
23   this.  Have to prove that.  His Honor will instruct you at
24   the appropriate time and of all those things -- it is a long
25   list -- of all those things no where on there is why, why

1   did the defendant rob 69 year old Helen Abbott; why did he

2   and others stab her; why did he and others strangle her to

3   death.

4           I am telling you now if you are seated as a juror

5   in this case you may never hear the answer to that question,

6   the question of why did he do it.  Can you accept that?

7           PROSPECTIVE JUROR:  I can accept it.

8           MR. BOGDANOS:  Can you still -- can you agree it's

9   something you would like to know?

10          PROSPECTIVE JUROR:  Yeah, I would like to know.

11          MR. BOGDANOS:  Interesting piece of information?

12          PROSPECTIVE JUROR:  Not necessarily, yeah.

13          MR. BOGDANOS:  Thank you.  But not necessary and

14  you won't -- you will be able to assess the evidence; and if

15  someone in the back in the deliberation room says I've got

16  to know why he did -- come on, why did he do this, will you

17  stop and say that's nice but this isn't the appropriate

18  forum for why.  Will you do that?

19          PROSPECTIVE JUROR:  (Nod head affirmatively up and

20  down.)

21          MR. BOGDANOS:  Does anyone have any difficulty

22  whatsoever with the fact you may never hear why this was

23  done?  Why he did it; why he and the others did it; just

24  that it was done?  Does anyone have a problem at all?

25          Ms. Lam, I think you said you have an associate

1    degree in computer science.  Science is what?  Science

2    is lots of zeros and one's and its exact and it's precise

3    and formula in, formula out?  There is a real beauty and a

4    symmetry to the science, right?  We agree with that?

5         Can you accept the fact that murder isn't like

6    that?  You may never find out all of the facts in this case.

7    Can you accept that proposition going in?  I am telling you

8    right now if you are a juror on this case, I am never going

9    to stand up and in front of you and tell you which stab

10   wounds came first.  The one in the jugular; the one in the

11   aorta; the one in the lungs; whether the seven fractured

12   ribs happened before or after she was stabbed twenty-two

13   (22) times.  Never going to tell you that.

14        But can you still listen to the evidence and even

15   if you don't get that kind of precision, will you still be

16   able to fairly and impartially judge the evidence in order

17   to determine whether the People had proven that that man

18   Mark Richardson murdered Helen Abbott?  Will you do that?

19        PROSPECTIVE JUROR:  Yes.

20        MR. BOGDANOS:  Even if there are unanswered

21   questions?  Yes?

22        PROSPECTIVE JUROR:  (Nod head affirmatively up and

23   down.)

24        MR. BOGDANOS:  Provided that the evidence still

25   convinces you beyond a reasonable doubt as his Honor has

1   instructed you; you will do that?

2          PROSPECTIVE JUROR:  (Nod head affirmatively up and

3   down.)

4          MR. BOGDANOS:  Mr. Guzman, you will do that as

5   well?

6          PROSPECTIVE JUROR:  (Nod head affirmatively up and

7   down.)

8          MR. BOGDANOS:  Judge it fairly and impartially?

9   Yes?

10          PROSPECTIVE JUROR:  Yes.

11          MR. BOGDANOS:  Mr. Guzman, really important.  You

12   said you are a baseball fan.  Mets or Yankees?  I am sorry,

13   I want the answer.  Which one?

14          PROSPECTIVE JUROR:  Mets.

15          MR. BOGDANOS:  Bad answer.  Where is my history

16   novice?  Same set of questions I did with Ms. Lam.  History

17   novel, historical fiction?

18          PROSPECTIVE JUROR:  Actually primarily historical

19   fact biography.

20          MR. BOGDANOS:  More John Kegan (phonetic) than

21   like Steven Presfield (phonetic)?

22          PROSPECTIVE JUROR:  (Nod head affirmatively up and

23   down.)

24          MR. BOGDANOS:  You recognize this is an easily

25   answered -- you recognize that in historical nonfiction, you

1    don't get to fill in the blanks, right?

2              PROSPECTIVE JUROR:  Correct.

3              MR. BOGDANOS:  But you do get to use your common

4    sense and your knowledge of the world to reach reasonable

5    conclusions based on the facts at hand, right?

6              PROSPECTIVE JUROR:  (Nod head affirmatively up and

7    down.)

8              MR. BOGDANOS:  That's exactly what you will do if

9    you are chosen as a juror in this case?

10             PROSPECTIVE JUROR:  Yes.

11             MR. BOGDANOS:  Will everyone do just that?  Show

12   of hands please if I could.  Thank you.

13             Finally there is someone here who doesn't have a

14   TV.  Was that Ms. Armstrong?  And you don't either?  It's

15   fine.  I don't have cable; but I get that there are -- there

16   is a proliferation of crime dramas, CSI, Law & Order.  I

17   like them.  I do the -- when I get to watch them I do but is

18   anyone here going to hold me to that standard?  Tell me now

19   cause it ain't happening.

20             Are you going to hold me to the standard that you

21   see on television?  Whether it's CSI, where you know, quick

22   get that fingerprint and lift it and tell me where that

23   finger print came from and how long it's been there and put

24   it up on the plasma screen and wait a second.

25             There is a little spec of dirt that can only come

1    from one preserve in Kenya; and if you are expecting that to

2    happen in this case because, man, are you going to be

3    disappointed if that's what you think we can do.  Are you

4    going to accept that?

5              PROSPECTIVE JUROR:  (Nod head affirmatively up and

6    down.)

7              MR. BOGDANOS:  Now, it is the same thing before --

8    I am sorry, I know you are shaking your head, no, but could

9    you say it out loud for the record.

10             THE COURT:  Actually the answer to that question

11   was yes.

12             MR. BOGDANOS:  Real loud.

13             THE COURT:  State it out loud.

14             MR. BOGDANOS:  Thank you, Judge.  You are not

15   going to hold me to that standard at all; right?  Anyone

16   going to do that?  You have to tell me now please.

17             Anyone going to expect DNA in 45 minutes or you

18   know any kind of fiber analysis in the trunk of a car that

19   will trace back to the sneaker of Mr. Richardson?  Is anyone

20   going to hold me to that standard?  You are going to hold me

21   to the real world standard?  Yes, sir?

22             PROSPECTIVE JUROR:  No.

23             MR. BOGDANOS:  So ultimately the question is

24   really simple.  Before you hold me to the burden of proof

25   beyond a reasonable doubt will each of you do that and if,

1        in fact, the People cannot prove beyond a reasonable doubt

2        that the defendant committed this murder, robbery; sex abuse

3        and murder with others, then you will find him not guilty,

4        right?  We are all in agreement, yes?

5                PROSPECTIVE JUROR:  Yes.

6                MR. BOGDANOS:  But if the People prove that this

7        man here Mark Richardson acting with others robbed and

8        murdered Helen Abbott or during the course of the robbery

9        Helen Abbott was murdered, what would your verdict be?

10               PROSPECTIVE JUROR:  If proved beyond a reasonable

11       doubt, my verdict will be guilty.

12               MR. BOGDANOS:  Your verdict?

13               PROSPECTIVE JUROR:  Guilty.

14               MR. BOGDANOS:  Your verdict if it's proven beyond

15       a reasonable doubt?

16               PROSPECTIVE JUROR:  Guilty.

17               MR. BOGDANOS:  Your verdict?

18               PROSPECTIVE JUROR:  Yes.

19               MR. BOGDANOS:  It is hard to hear.

20               PROSPECTIVE JUROR:  Guilty.

21               MR. BOGDANOS:  Your verdict if it is proven beyond

22       a reasonable doubt?

23               PROSPECTIVE JUROR:  Guilty.

24               MR. BOGDANOS:  Your verdict?

25               PROSPECTIVE JUROR:  Guilty.

1            MR. BOGDANOS:  It is hard to hear?

2            PROSPECTIVE JUROR:  Guilty.

3            MR. BOGDANOS:  Your verdict?

4            PROSPECTIVE JUROR:  Yeah.

5            MR. BOGDANOS:  Ma'am, your verdict if it is proven

6    beyond a reasonable doubt that this man -- the one in court

7    before you today -- committed a robbery of Ms. Abbott;

8    during the course of the robbery, she was murdered, what

9    will your verdict be?

10           PROSPECTIVE JUROR:  Guilty.

11           MR. BOGDANOS:  Your verdict?

12           PROSPECTIVE JUROR:  Guilty.

13           MR. BOGDANOS:  Your verdict?

14           PROSPECTIVE JUROR:  Guilty.

15           MR. BOGDANOS:  Your verdict?

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  Your verdict?

18           PROSPECTIVE JUROR:  Yes.

19           MR. BOGDANOS:  If we prove it beyond a reasonable

20   doubt and only then, what will it be.

21           PROSPECTIVE JUROR:  Guilty.

22           MR. BOGDANOS:  What would your verdict be?

23           PROSPECTIVE JUROR:  Guilty.

24           MR. BOGDANOS:  Even if we don't produce a live

25   witness but prove it with other evidence beyond a reasonable

1    doubt, what would your verdict be?

2              PROSPECTIVE JUROR:  Guilty.

3              MR. BOGDANOS:  And you, ma'am?

4              PROSPECTIVE JUROR:  Guilty.

5              MR. BOGDANOS:  Thank you, ladies and gentlemen.

6              THE COURT:  Mr. Klein, you have ten minutes or so.

7    We have to break early.  Then you can finish in the

8    afternoon.

9              MR. KLEIN:  That's fine.

10             Good afternoon.  Mr. Hedges, I don't know if you

11   heard one of the things Mr. Bogdanos said.  He was talking

12   about the role of attorneys in the courtroom.  He said one

13   of the things you are going to hear or you might find is

14   that me, Mr. Klein, that I was a very experienced attorney.

15   You heard him say that?

16             PROSPECTIVE JUROR NO.2:  Yes.

17             MR. KLEIN:  Well, obviously, you will decide on

18   your own if you think I am experienced or not; but you know

19   this is a murder prosecution, right?

20             PROSPECTIVE JUROR:  Yes.

21             MR. KLEIN:  This is a prosecution for the most

22   serious crime that we have in New York State, okay.  This is

23   a prosecution where someone is accused of taking a life of

24   another human being, right; so obviously these crimes are

25   taken the most seriously in courtrooms in New York.  It

1     doesn't surprise you, right?

2          PROSPECTIVE JUROR:  No.

3          MR. KLEIN:  It doesn't surprise you then that

4     obviously these crimes are prosecuted with great

5     seriousness, right?

6          PROSPECTIVE JUROR:  Nod head affirmatively up and

7     down.)

8          MR. KLEIN:  That these crimes in seriousness of

9     the prosecution of experienced people are assigned to deal

10    with them?  That wouldn't surprise you; right?

11         PROSPECTIVE JUROR:  (Nod head affirmatively up and

12    down.)

13         MR. KLEIN:  Obviously, when some one else's life

14    is taken and someone is accused of a crime, a very

15    experienced prosecutor will be assigned to the case; right?

16         PROSPECTIVE JUROR:  Right.

17         MR. KLEIN:  That wouldn't surprise you?  It

18    wouldn't surprise you that very experienced police

19    investigators, homicide investigators with years of

20    experience that they would also be assigned to the case;

21    right?

22         PROSPECTIVE JUROR:  (Nod head affirmatively up and

23    down.)

24         MR. KLEIN:  And I assume then it wouldn't surprise

25    you in any way to hear that also an experienced defense

1    lawyer was assigned to Mr. Richardson, okay?  Doesn't

2    surprise you?  It's what you would expect, yes?

3              PROSPECTIVE JUROR:  (Nod head affirmatively up and

4    down.)

5              MR. KLEIN:  And, Mr. Peters, same true for you.

6    You assume that when the charge is something like murder, it

7    is not shoplifting, maybe a first year lawyer could handle?

8    That most experienced people come in and present the cases

9    to you, all right; and, Mr. Weiner, you are an attorney

10   yourself?

11             PROSPECTIVE JUROR:  Yes.

12             MR. KLEIN:  You know some issues can be dealt with

13   first year associates I assume you worked with and as issues

14   get more complicated, more intricate, then more experienced

15   attorneys deal with them, yes?

16             PROSPECTIVE JUROR:  Yes.

17             MR. KLEIN:  And you all accept -- and,

18   Ms. McCormick, let me ask you.  One of the reasons why

19   experienced people are assigned to cases of this nature you

20   want to make sure that no stones are left unturned, right?

21             PROSPECTIVE JUROR:  (Nod head affirmatively up and

22   down.)

23             MR. KLEIN:  And one of the reasons why experienced

24   people are assigned like to someone accused of a crime,

25   accused of murder, is because the system wants to make sure

1  that that person's only convicted of the crime if in fact he

2  really did it and the attorney is experienced because they

3  want to make sure his rights are uphold.  We don't spout

4  about it in a courtroom but we really apply it.

5          PROSPECTIVE JUROR:  Right.

6          MR. KLEIN:  And he has someone despite how

7  terrible it sounds, despite the fact you are going to hear

8  all this evidence, oh, it must have been him, he must have

9  did it.  To make sure there is someone on his side and to

10 make sure that the case is really proven against him before

11 we condemn him for anything; so can you assure me and more,

12 assure Mr. Richardson that you won't like hold it against

13 him?  Decide -- and I don't know what you will decide.  You

14 may decide I am a bum.  I don't know.  You will decide that;

15 but at the end of the case you say Mr. Richardson, he seemed

16 like a pretty competent attorney, an attorney who knew how

17 to ask a question, knew how to cross-examine a witness, who

18 knew how to keep his mouth shut, whatever you feel about me,

19 you won't hold it against him in any way because he has me

20 as his lawyer, right?

21          And you won't make any kind of assumption you

22 know?  People, you know, they hate lawyers and I don't

23 know -- some people really late criminal defense lawyers

24 because they think criminal defense lawyers what they do is,

25 they just get up there and they try to pull the wool over

1    everyone's eyes; they know their guy did it; they are trying

2    to be smart, click, and that if you think that about it,

3    that's fine; but if at the end of the case you say, okay,

4    now, the lawyer was just doing his job and you are not

5    convinced of the facts here, that's a not guilty.  You don't

6    hesitate to acquit him, right?  You won't say now this is

7    just this experienced lawyer knew how to get him off or

8    something like that?

9           Okay.  You understand Ms. Sulser I have no job

10   here.  I haven't been assigned here to pull the wool over

11   anyone's eyes about anything, okay.  I have just been

12   assigned to make sure that this individual, Mr. Richardson,

13   gets a fair trial, okay; and if it's proven that he is

14   guilty so be it.  Can't do anything about it.  But there is

15   a lot at steak here obviously for everybody and a lot of

16   complicated issues to deal with and there may be a lot of

17   emotion in the case.

18          Someone may want to say to themselves someone got

19   to pay for this.  That guy's got to pay because he is in

20   that seat.  Part of my job is let's concentrate what's

21   really proven here and not proven, and then you will make

22   your decision.

23          All right, does anyone have a problem at all?

24   Mr. Warheit, Mr. Lanzetta, Ms. McIntosh that, that's the way

25   the system works?  We assign people, defense lawyers, and I

1   have been assigned to represent him and I am going to do my

2   job.  You wouldn't expect anything else, Mr. Warheit?

3                   PROSPECTIVE JUROR:  No.

4                   MR. BOGDANOS:  Mr. Lanzetta, would you hold it

5   against him that I represent him?

6                   PROSPECTIVE JUROR:  No.

7                   MR. BOGDANOS:  Ms. McIntosh, that's okay with you

8   also?

9                   PROSPECTIVE JUROR:  I won't hold it.

10                  MR. KLEIN:  If at the end of the case they say it

11  is proven; if at the end of the case, I don't know; Judge

12  gives me instructions; I have to make sure it is proven

13  beyond a reasonable doubt; but if it's not, I don't want to

14  condemn the wrong guy for something he may have done because

15  then you will just acquit him, right?  Fair enough.

16                  Ms. Brown, I don't know.  I am sure you paid

17  attention what I was talking about last time.  One of the

18  things I talked about I guess Thursday awhile ago I said a

19  little bit about what we understand the facts of the case

20  are going to be about, you know, really horrific murder.

21                  Obviously, that has been made clear to you.  A

22  woman who is found largely unclothed, she has been stabbed.

23  She has been strangled.  She has been beaten perhaps and

24  left dead and then a daughter who comes in and finds her;

25  and you know like I said to the jury last week, obviously

```
 1    when you hear that and I heard someone groan -- maybe that
 2    was you -- and we all groan when we hear it.  We are human
 3    beings.  When we hear that, it makes you groan in some way
 4    if you are in the courtroom; and obviously it makes you
 5    feel, you know, if someone can do that, you know they are
 6    going to be held accountable, right.
 7                 They should be held accountable, right, but we --
 8    can't -- every one of the things we do in the courtroom, we
 9    make sure that the wrong people or persons are not held
10    accountable, okay.  That's also one of your jobs if you are
11    on this jury.  All right, yes?
12                 PROSPECTIVE JUROR:  Right.
13                 MR. KLEIN:  So if you are here and you say after
14    hearing the evidence you say to yourself this is really bad;
15    someone has to pay; some group of people have to pay,
16    someone did this; but you are in the jury room and you say
17    you know, but I don't know that this was really proven.  I
18    don't know if it was really proven to me he was one of them.
19                 Can you promise me and more importantly can you
20    promise Mr. Richardson that if you just feel in the pit of
21    your stomach how awful this crime is, you will never use
22    that as proof of anything against him?
23                 PROSPECTIVE JUROR:  Okay.
24                 MR. KLEIN:  Promise me that?
25                 PROSPECTIVE JUROR:  Yes.
```

1     MR. KLEIN:  Mr. Ling, the same question to you.
2  Even if you know you are going to hear -- and you are going
3  to hear medical examiners, who are going to come in and talk
4  about this death; you are going to hear crime scene
5  officers, who are going to come in and describe what they
6  found there, right?  You are going to hear the daughter who
7  does that.  You are going to see pictures.  Can you promise
8  me at the end of the case -- look, this was a really
9  terrible, terrible scene.  This was one of the worse crimes
10 you will ever hear about in your whole life because it's
11 going to be played out in front of you.

12     At the end of the case -- look, I understand he is
13 being accused of them but you know it's not proven to me.
14 You won't use your disgust, your horror in the pit of your
15 stomach in anyway that we've got to find him guilty?  You
16 won't do that, right?

17     PROSPECTIVE JUROR:  Yep.

18     MR. KLEIN:  One of the things about a horrendous
19 crime is you want to make sure that the right people are
20 held accountable, right, and the wrong person is never
21 convicted for such a horrendous crime if they didn't do it,
22 right?

23     PROSPECTIVE JUROR:  Yes.

24     THE COURT:  Mr. Klein.

25     MR. KLEIN:  I understand, Judge.

1        THE COURT:  Sorry to interrupt but we do have one

2    more case from the calendar that we want to take care of

3    before lunch so we are going to break now.  I ask everyone

4    to come back at 2:15.  We will continue the questioning at

5    that time.  Please do not discuss the case with anyone

6    between now and then.  Thank you very much.

7        (Prospective jurors exited the courtroom.)

8        THE COURT OFFICER:  The rest of you jurors are to

9    come back at 2:15.

10        (Court officer conferred with the Court off the

11    record.)

12        MR. KLEIN:  Are we waiting for someone to come in?

13        THE COURT:  He is just waiting.  There is a juror

14    here who has an issue.  All right, we have the three

15    defendants.

16        MR. KLEIN:  What time did you say?

17        THE COURT:  2:15 approximately.

18        (Luncheon recess.)

19        A F T E R N O O N   S E S S I O N

20        THE COURT:  Both sides ready?

21        MR. KLEIN:  Yes, Judge.  There is something I

22    would like to bring to the Court's attention.  As the Court

23    knows I objected by asking to approach on a comment made by

24    the district attorney about my experience; and I did it in

25    the context of also comments being made last time at the

1   voir dire of the district attorney had gone on.

2          Last time there were more extensive comments made

3   by the district attorney about how the defense lawyer,

4   Mr. Klein, could be -- is very good, very experienced, very

5   articulate.  I don't know if the word clever was used, a

6   comment like that; and the reason I approached is, I think

7   especially the First Department frowns on this kind of

8   comment.

9          I actually tried a case in 1992 in front of Judge

10  Levitan, <u>People v. Randall Jones</u>, and among the problems the

11  First Department found that the case was a summation

12  argument; again the attorney was to argue that defense

13  counsel was a very good lawyer.  That case, they went on to

14  state with discrepancies out of proposition and asked the

15  jury not to be fooled; and I just think that we have to be

16  very careful with the jury not saying that what defense

17  counsel does if he appears to be experienced is in anyway to

18  pull the wool over people's eyes and that's why I objected

19  over the comment.

20         It obviously puts the defense counsel in a

21  difficult posture, of course, because Mr. Bogdanos says,

22  "And my opponent is a very good lawyer."  It is very awkward

23  to get up and say I object and everyone could say you don't

24  think you are a good lawyer; but kind of what the First

25  Department said, I believe what the law is, those kinds of

1    comments are frowned upon because of the danger that it

2    holds for the exercise of the 6th Amendment right of

3    counsel, and I ask it not to occur in this case.

4         MR. BOGDANOS:  Actually what Mr. Klein has done is

5    taken something I did, turned it into something I didn't do.

6    Find a case on point with something I didn't do and then

7    complain.  First, I never in any way, shape, or form

8    indicated in the slightest manner that Mr. Klein is

9    attempting to fool the jury at all.  What I simply -- if the

10   Court recalls the context within which I made the comments

11   Thursday entirely appropriate; like appropriately I submit

12   is that just because an attorney -- either side engages in

13   behavior whether it's repetitive questioning or whether it's

14   altering the question, whether it's raising a voice -- any

15   of those things, I asked for an assurance from the jurors

16   that, that was not -- they understood that was not evidence

17   to both sides.

18        It is exactly what I said.  I stand by the record.

19   It is what I started doing today.  Your Honor suggested I

20   move on.  I moved on but at no point did I ever indicate

21   that Mr. Klein was doing anything inappropriate indeed.  We

22   could count the number of times when I suggested Mr. Klein

23   was actually behaving appropriately in front of the jury and

24   my respect for Mr. Klein in front of the jury; so putting

25   that aside, that isn't what I did, but consider the second

Proceedings

82

1    half of the argument.

2        Mr. Klein got up and spent at least ten minutes

3    talking about how experience is appropriate in a homicide

4    case.  In other words, echoing my very theme that experience

5    in this case is not unusual; but it is also not evidence,

6    not evidence that the jury can use and that's all I did.

7    That's all I will continue to do.

8        I don't happen -- I am not planning on saying

9    anything like that at all in any other rounds; but if

10   Mr. Klein is trying by this to chill my opportunity on

11   summation to say just because the defense says something

12   doesn't make it; so well then I have every intention of

13   doing that on summation.  I have every intention of saying

14   what we do in this well is not evidence.  That's evidence up

15   on the witness stand and all the voice in the world or the

16   repetition of the world or the sarcasm in the world if it

17   plays out in this courtroom is not evidence.

18       That is the entire and exclusive use of what I

19   intend to do with regard to that so, your Honor, on this

20   issue I completely disagree with Mr. Klein.

21       THE COURT:  Thank you both.  I eagerly await the

22   summations from both sides.  May we have the jury, please.

23       (Prospective jurors entered the courtroom.)

24       THE COURT CLERK:  Case on trial --

25       THE COURT:  We are missing Mr. Rose.

1          (Court Officer exited the courtroom.)

2          THE COURT CLERK:  Case on trial continued.  People

3     of the State of New York versus Mark Richardson.

4     Appearances, please.

5          MR. BOGDANOS:  Matthew Bogdanos for the People.

6     Good afternoon, your Honor, and jurors.

7          THE COURT:  If you like.

8          MR. KLEIN:  Thomas Klein for the defendant.

9          THE COURT:  All right, good afternoon, everyone.

10    Mr. Klein will now continue without Mr. Rose, when he indeed

11    shows up, will continue.

12         MR. KLEIN:  Ms. Sulser, one of the things that the

13    district attorney spoke about earlier I believe was how when

14    you come into a courtroom even though everyone has opinions

15    about the Criminal Justice System, you have to leave your

16    opinions outside; right?  And we all agree that, that we

17    could do that, though maybe it would be more accurate to say

18    we all agree we will try to do it, right?

19         Cause I assume you go into a restaurant at some

20    point and there was a cloak room and, you know, leave your

21    jacket there at the cloak room and you don't bring your

22    cloak, that's an object you could take off and not have with

23    you; but your opinions even if there is a cloak room for

24    opinions and the way you think, the way you view the world

25    that is harder to discard; right?

1          PROSPECTIVE JUROR:   (Nod head affirmatively up and

2     down.)

3          MR. KLEIN:  Maybe you would agree not simple even

4     though we want to assure both sides we will leave our

5     opinions outside, maybe we can do it, maybe we can't.

6          Okay.  So often, you know, people think that, you

7     know, New York City police officers are okay.  Some of them

8     may be bad apples but you know bad apples in everything.

9     Most of them are probably pretty good and people tend to

10    think someone gets arrested, then they are probably guilty

11    of the crime for which they have been arrested, okay.

12          Okay, it's an opinion and it's actually a fair

13    opinion, right?  And it might be an opinion that you have.

14    It is not bad to have it.  You are allowed to have it.

15    Okay, it's just one of the things we are trying to do when

16    we try to pick a jury is, we try to figure out what do you

17    do about that; like what do you ask jurors to do because the

18    Judge says that you have to presume the individual's

19    innocent, who is sitting over there at that chair; and you

20    have to look over at him and say to yourself even though I

21    know he has been arrested by the New York City Police

22    Department, even though I know he was charged with a crime,

23    I could really follow that presumption of innocence that the

24    Judge gives and even though I generally share that opinion

25    and I know it's going to be in there working on me in some

1    ways, I am going to make an attempt to put that aside and

2    presume him innocent.  So can you assure us that you will

3    make that attempt?

4              PROSPECTIVE JUROR:  Yes, I will try to.

5              MR. KLEIN:  Okay, and you could look over to

6    Mark Richardson knowing all you heard today or yesterday.

7    You don't have to ignore any of it and knowing the opinions

8    that you have and you could look over to him and say to all

9    us of us here, the fact that he sits there in my mind

10   doesn't make it likely or probable that he's the killer even

11   though I know that he has been arrested and charged with the

12   crime.  Can you do that?

13             PROSPECTIVE JUROR:  Yes.

14             MR. KLEIN:  Ms. Lam, the same question to you even

15   though he is sitting over there, can you assure us that

16   knowing he has been arrested doesn't make it probable or

17   likely in any way that he's the killer in this case?  Can

18   you do that?

19             PROSPECTIVE JUROR:  Yes.

20             MR. KLEIN:  Yes.  Mr. Peters, similar question to

21   you, when you come in obviously everybody they look over

22   there and they see the guy sitting over at that chair.  We

23   are all human beings.  Here's the guy.  He is arrested.

24   What is he charged with?  Murder.  It is a big thing.  The

25   judge says it is an important case, and there is a tendency

1    to say if he is there, then he probably did it; otherwise,

2    he wouldn't be sitting there and then you come in and the

3    Judge says you really can't think that way in the courtroom.

4    That's not the way our system works and in here we presume

5    people innocent regardless of the fact they are sitting over

6    there; regardless of the fact, obviously, they have been

7    arrested; and we have a system where you decide not any

8    presumption of guilt, whether or not you decide you do it

9    presuming an individual is innocent.

10             PROSPECTIVE JUROR:  It is a challenge.

11             MR. KLEIN:  Listen, one thing about jury service

12   it is well-known especially here where the charge is so

13   serious, it is a challenge; and you have to then decide --

14   and it's not a moral judgment on you or anyone else -- if

15   anyone says, you know, listen it's a challenge and I'm up to

16   it and I don't mean as a sporting event.  It is much more

17   serious than that, but it is a challenge but it is one I

18   want to take on and I can take on.

19             You are going to have to tell us you can if you

20   feel like because of past experiences, past opinions, your

21   whole life everything you read and what you thought about

22   the Criminal Justice System and everything else, you would

23   say it's a challenge; and, you know, I just don't know if I

24   am right for this case, then you and anyone else has to say

25   that to us, all right.

1          So can you look over at Mark Richardson and say I

2    know, Mr. Richardson, you have been arrested and you are

3    charged with the most serious crime in New York; but you

4    know, I could really put opinions aside and I could presume

5    you are innocent of this charge.  Can you do that?

6          PROSPECTIVE JUROR NO.3:  I think I have the

7    ability to do that.

8          MR. KLEIN:  Is there anyone in any way -- Mr. Ma,

9    let me ask you a similar question, can you take on that

10   challenge in a very difficult situation and say even though

11   I know he has been arrested, I am going to presume him

12   innocent of the charges for which he has been accused?  Will

13   you do that?

14         PROSPECTIVE JUROR:  I will try to do that.

15         MR. KLEIN:  A little doubt?

16         PROSPECTIVE JUROR:  No, but I try to.  I try my

17   best.

18         MR. KLEIN:  Try your best?

19         PROSPECTIVE JUROR:  Yeah.

20         MR. KLEIN:  You know here's the thing, this is

21   when we make that decision right now.  You can't like once

22   you start hearing evidence like come in and say to the

23   Judge, Hay, maybe I should have said something earlier.  I

24   am not sure I can really follow the laws in this case; so in

25   a sense all we can ask is that you try your best.

 1              Can you give us the assurance that, you know, I

 2    can do that?  I can presume innocence, not guilty who sits

 3    over there.  I could follow the instructions on that.  I

 4    will hold the district attorney to the burden of proof.  If

 5    the proof isn't there, I will acquit the individual.

 6              PROSPECTIVE JUROR:  I can presume he's innocent

 7    before the trial.

 8              MR. KLEIN:  You can?

 9              PROSPECTIVE JUROR:  Yes.

10              MR. KLEIN:  Okay.  Anybody here?  Ms. Armstrong,

11    any opinion on that at all?

12              PROSPECTIVE JUROR:  No.

13              MR. KLEIN:  Does it sound difficult or like a

14    challenge in any way; something that kind of you new before

15    you came in and you are happy?

16              PROSPECTIVE JUROR:  No, it's fair.  He deserves

17    the right of innocence before we come in with a judgment.

18              MR. KLEIN:  You could put aside the fact,

19    obviously, someone must think he is guilty otherwise he

20    wouldn't be sitting here arrested, being accused.  Grand

21    jury wouldn't have voted an indictment against him.  You

22    could put all of that aside and say here we start as a clean

23    slate?  As a matter of fact I presume him innocent of the

24    charges.  Can you do that?

25              PROSPECTIVE JUROR:  Yes, I don't know him so...

1          MR. KLEIN:  Ms. McCormick, I brought this up last

2     time.  I said, you know, one of the things about the

3     presumption of innocence is it has to do with the charges

4     that have been brought against him.  You are to presume him

5     innocent of murder, innocent of sexual abuse, and innocent

6     of robbery, right?  And it just applies to that, right?

7          PROSPECTIVE JUROR:  Right.

8          MR. KLEIN:  Like you don't have to sit there and

9     say to yourself, well, if I hear things about him that I

10    don't like, you know, like he doesn't seem like an innocent

11    person in general to me, right, you might think that, right?

12    Okay, I mean you might hear, no, he has been up to his own

13    stuff.  I don't like anything about him.  I don't think he

14    is a very appealing individual.

15          Maybe he has been involved in his own criminal

16    activity.  You may find that, all right.  If that happens,

17    though, can you assure the Court that you won't then say,

18    well, since he is not a total innocent, I am going to take

19    the presumption of innocence away from him?  You could still

20    apply it, right?

21          PROSPECTIVE JUROR:  I will still apply it, yes.

22          MR. KLEIN:  Because we are not here to judge his

23    character.  So even if you hear evidence you don't like, his

24    character, personality, you don't like the things he has

25    done, you don't like the fact he has been involved in his

1    own criminal activity, you won't then lesson the presumption

2    of innocence in this case about these charges, right?

3              PROSPECTIVE JUROR:  Yeah.

4              MR. KLEIN:  Ms. Haney, a similar question to you,

5    is that all right what I said?

6              PROSPECTIVE JUROR:  Yes.

7              MR. KLEIN:  So I think I raised this on Thursday.

8    I said sometimes it's easy to give someone a fair trial

9    because, well, we are not allowed to judge like you know

10   people we love like family members but -- for obvious

11   reasons -- but sometimes you know someone is on trial and

12   you hear a lot about them, that's really good.

13             They are an exemplar figure in the community and

14   in that situation it might be easy to say, well, yeah I am

15   going to give that person the presumption of innocence.  It

16   is a 19 year old kid.  Doesn't seem like he has done

17   anything wrong in his life.  I don't want to convict him

18   unless it is really proven that he did it, right?

19             Well, you could say that's a case where it is easy

20   to assure someone the presumption of innocence, the right to

21   a trial.  How do you do it in this case where I am telling

22   you, you know, as the trial goes on, you are going to look

23   over to him and say I don't like him.  I don't like

24   Mark Richardson.  I don't want him in my house.  I don't

25   want him to be friends with people I know.  I don't like

1    anything I hear about him.

2              I don't like his character.  Can you still assure

3    the Court that in that situation you will still accord him

4    the presumption of innocence of the specific charges that

5    have been brought against him?

6              PROSPECTIVE JUROR:  Yes.

7              MR. KLEIN:  Okay.  Mr. Guzman, same thing to you,

8    okay, you won't say if I don't like the guy, if I don't like

9    him then the heck with him and let's just convict him and

10   get out of here.  You won't do that, right?

11             PROSPECTIVE JUROR:  I won't.

12             MR. KLEIN:  Okay.  Ms. McIntosh, one of the things

13   I said I thought, jurors who were selected were going to

14   eventually hear specific reasons to dislike my client, okay.

15   One of them being that he lies to the police during a murder

16   investigation.  Okay, all right.  You are probably going to

17   hear that.  I am pretty sure you are going to hear that.

18             Now you have a right to use that in your case,

19   obviously, however you want.  If you think that's evidence,

20   you could is use it against him, right?  But people would

21   say if someone lies during a police investigation of a

22   murder, that's such a terrible thing to do that I can no

23   longer be neutral about that individual.

24             As a matter of fact, I dislike the concept so much

25   that I couldn't give someone who does that a fair trial, all

1   right; and what I need from you is an assurance that, yeah,

2   if you hear that he lies, obviously, you will consider what

3   does he lie about.  Is it important?  Is it not what he is

4   trying to hide; all of that stuff you will think about?  And

5   could you also look over at him and assure him and say it

6   doesn't matter, Mr. Richardson?  I may hear you are a liar;

7   no good.  You didn't help the cops.

8           As a matter of fact you tried to not help the

9   cops, all of that stuff; and use it however you think is

10  appropriate but could you still give him a fair trial?  Make

11  sure it is not just proven he is a liar or a big mouth; but

12  that he is guilty of this crime, right?

13          PROSPECTIVE JUROR:  Yes.

14          MR. KLEIN:  Mr. Ling, a similar question to you,

15  if you find out that Mr. Richardson lied during this police

16  investigation, okay, things he said about his own activities

17  and what he knew, what he did, they are not true; all right?

18          PROSPECTIVE JUROR:  (Nod head affirmatively up and

19  down.)

20          MR. KLEIN:  You could obviously use that as

21  evidence against him if you think it's appropriate, right?

22          PROSPECTIVE JUROR:  (Nod head affirmatively up and

23  down.)

24          MR. KLEIN:  Could you assure us if he did that, he

25  is so bad that he must be guilty of the crime; you won't do

1    that, will you?

2              PROSPECTIVE JUROR:  No.

3              MR. KLEIN:  Okay.  Mr. Warheit?

4              PROSPECTIVE JUROR:  Warheit.

5              MR. KLEIN:  One of the things the judge instructed

6    you on, the defendant doesn't have to testify at trial;

7    right?

8              PROSPECTIVE JUROR:  Ah-huh.

9              MR. KLEIN:  You knew that already when you came

10   in?

11             PROSPECTIVE JUROR:  Yes.

12             MR. KLEIN:  About that, right, everyone has heard

13   it, the right to remain silent and all of that; right?

14             PROSPECTIVE JUROR:  Ah-huh.

15             MR. KLEIN:  The other part that the judge said is

16   actually maybe in many ways a more important part he said;

17   and if someone doesn't testify at their own trial, you can't

18   use it as any kind of evidence against him, right?

19             PROSPECTIVE JUROR:  Ah-huh.

20             MR. KLEIN:  You can't use it as any kind of

21   evidence of guilt?  Is that okay?

22             PROSPECTIVE JUROR:  Yep.

23             MR. KLEIN:  Some people would say that, you know,

24   the guy is not going to take the witness stand and he is not

25   getting up to testify, he must be hiding his guilt.  If he

1   got up there and the truth must be he did it; otherwise,

2   that's why he is staying off the witness stand.  Right?

3         Other people say all sorts of things why people

4   don't take the witness stand.  I need your assurance if you

5   are on the jury, you would follow the Judge's instruction

6   and say, no, that's the system we use here and I am not in

7   any way at all holding it against him if he doesn't testify.

8   Could you do that?

9         PROSPECTIVE JUROR:  Yep.

10         MR. KLEIN:  Mr. Lanzetta, same question to you, if

11   he doesn't testify?

12         PROSPECTIVE JUROR:  Be a nonissue.

13         MR. KLEIN:  Be a nonissue.  Just a nonissue, okay.

14   Didn't some people say you have kids?  Anyone have kids?

15   You came home one day and you if your child -- how old is

16   your child?

17         PROSPECTIVE JUROR:  Twenty-one.

18         MR. KLEIN:  Twenty-one years old.  You say to a

19   twenty-one year old, you, know some of my money is missing

20   like whatever your child's name is; did you take it and they

21   say, mom, I got nothing to say.  I have the right to remain

22   silent.  You might think I know who did it, right?  That's

23   the way we think outside the courtroom, right; but in a

24   courtroom, we have totally different rules.  Yes?

25         PROSPECTIVE JUROR:  Yes.

1          MR. KLEIN:  You say if a guy is accused of a

2     crime, he could just sit there and it is a nonissue.  If you

3     are on the jury and the defendant does not testify, it is a

4     nonissue.

5          How about if as the trial goes on, you hear me,

6     witnesses testify and I don't do all that much, okay.  I

7     don't get up and I don't try to show that a cop, you know,

8     all these people aren't telling the truth or something; and

9     you say at the end, boy, it doesn't sound like Mr. Klein

10    really tried to prove that his client is innocent.  You

11    might decide that at the end of the case.

12         You might think when does the defense lawyer try

13    to prove that his client didn't do it, right?  And you might

14    say it never happened here.  I thought that happened in the

15    courtroom, okay; but the Judge said, you know, the defendant

16    doesn't have to prove his innocence, right?  It is not our

17    job to get up and convince you that he didn't do the crime,

18    right?  It is really the prosecution and only the

19    prosecution that has the burden to prove something, right?

20         If he proves it, so be it.  If he doesn't prove

21    it, you can't look over at me and say I am not going to

22    acquit him because you didn't prove that he was innocent,

23    all right?  So let's say you are in the jury room.  The case

24    is ended and you are arguing back and forth talking as you

25    are suppose to amongst yourself, and someone says he was

1   proven.  Someone else says, no, I don't really think it was

2   proven.

3            I mean you wouldn't then say, well, he is probably

4   guilty because Mr. Klein didn't prove he was innocent,

5   right?  I mean I am not going to try to prove anything to

6   you, right?  I am not going to try to prove his innocence,

7   okay.  It is not my burden to, all right, and you can't hold

8   it against me or hold it against my client or assume he must

9   be guilty just because I don't try to do something; that

10  there is no expectation that it be done in a courtroom, all

11  right?

12           Okay.  Anybody have a problem like that?  Anyone

13  think I don't like it, well, you know you could have

14  whatever opinion you want.  You could say I don't think

15  that's a good system.  I think if he didn't do a crime, you

16  should have to prove you weren't there.  You should have to

17  prove your innocence, I think; whatever you want; but you've

18  got to assure us you won't use a rule like that in this

19  courtroom.  Okay?  Ms. Brown, all right?

20           PROSPECTIVE JUROR:  (Nod head affirmatively up and

21  down.)

22           MR. KLEIN:  Mr. Ling?  People have from all sorts

23  of things, they read TV and everything else.  Ideas about

24  evidence, scientific evidence, DNA, what can be done, and

25  what can't be done.  Yes, we have all seen this and,

1    Ms. Sulser, you saw this stuff on TV?  You read about it and

2    one thing that was said earlier was even if all that stuff

3    exists, you know, you never are going to get all the answers

4    to something that you'd like to get all the answers to; and

5    I assume you've been in positions like that before where you

6    had to make decisions, right?

7            And sometimes you say, okay you know what, I have

8    been told a lot.  I know a lot but I have been told enough.

9    I have enough and I could come up with the answer and

10   sometimes you have to make a decision; and you said, I don't

11   know if I've got enough to really make a decision.  There is

12   something missing here; and I am not really convinced that I

13   know enough yet to make a real decision, right?

14           Okay, when you are in this courtroom one thing the

15   Judge is going to tell you he is going to say, you know,

16   when you are considering the case you have to consider the

17   evidence and the lack of evidence, right?  What's proven to

18   you and what's not proven to you, all right?  And then you

19   make a decision based on what the judge tells you; whether

20   you have enough to make a confident decision, all right?

21           I mean no one is telling you and no one will ever

22   tell you don't ignore the lack of evidence.  Don't ignore

23   things that you don't know.  Just evaluate them.  Think

24   about them.  Decide if they are important or not important.

25   Decide if you can make a good decision or not.  All right.

1          (Juror Rose entered the courtroom at 2:55 p.m.)

2          MR. KLEIN:  Anyone else?

3          THE COURT:  He was fixing his phone.

4          PROSPECTIVE JUROR:  Thank you.

5          THE COURT:  Thank you, Mr. Klein.  Ladies and

6   gentlemen, the attorneys are now going to make their

7   selections from this group.  I ask everyone to wait outside

8   for a few minutes while they do this.  Please do not discuss

9   the case.  Thank you.

10          (Prospective Jurors exiting the courtroom.)

11          THE COURT:  Mr. Schuster?

12          PROSPECTIVE JUROR:  I apologize.  I should have

13  brought it up earlier.  I remember last week you had

14  mentioned the trial should end early on the week of

15  twenty-sixth.  Right now I am scheduled to be out of the

16  state on Friday, September 30th at a wedding.  I don't know

17  if that's within the timeline.

18          THE COURT:  No.  I could assure you, you will be

19  able to attend the wedding.

20          PROSPECTIVE JUROR:  My wife would kill me.

21          THE COURT:  She will kill me maybe but she won't

22  kill you.

23          PROSPECTIVE JUROR:  Thank you very much.

24          (Prospective Juror Schuster exited the courtroom.)

25          THE COURT:  Take a look at all of them and let me

1    know when you are ready.

2              MR. BOGDANOS:  Ready.

3              THE COURT:  Before you get too far into it,

4    Mr. Rose, did not appear until the very last minute or two

5    of your questioning, Mr. Klein.  If you want to bring him in

6    to ask additional questions or if really either side wants

7    to bring him in, that's fine.

8              MR. KLEIN:  I would like to bring him in

9    actually.

10             MR. BOGDANOS:  Is your Honor not going to -- your

11   Honor is not going to entertain a challenge for cause

12   against him?  That would be, Mr. Klein --

13             THE COURT:  I would not entertain it just for his

14   late appearance.

15             MR. BOGDANOS:  Fair enough.  I am going to

16   challenge him peremptorily anyway.  I don't want to waste

17   anytime on him.

18             MR. KLEIN:  Okay.

19             MR. BOGDANOS:  I don't mind telling you up front I

20   am going to do that.

21             THE COURT:  It's appreciated.  Thank you.  Off the

22   record.

23             (Off-the-record discussion.)

24             MR. BOGDANOS:  I am sorry, Judge, I am ready.  I

25   didn't realize.

```
 1              THE COURT:  You are ready too?

 2              MR. KLEIN:  Yes.

 3              THE COURT:  Are you ready, Jeanette?

 4              THE COURT CLERK:  Yes, your Honor.

 5              THE COURT:  Let's start out by agreeing on the

 6     number of peremptories used.  So far I have the People are

 7     using two and the defense using five.

 8              MR. BOGDANOS:  Correct.

 9              THE COURT CLERK:  Correct, that's what I have,

10     your Honor.

11              THE COURT:  Agreed?

12              MR. KLEIN:  Yes.

13              THE COURT:  All right, we have four selected

14     jurors so we will start with the first eight, Armstrong

15     through Brown, any challenges for cause in that group,

16     Mr. Bogdanos?

17              MR. BOGDANOS:  No, your Honor.

18              THE COURT:  None?

19              MR. BOGDANOS:  No, your Honor.

20              THE COURT:  Mr. Klein, for cause?

21              MR. KLEIN:  Yes, I would challenge Mr. Ma.  There

22     were two points during the district attorney's voir dire

23     where it did not appear that he understood what was going

24     on.  One of them when he answered the question in the wrong

25     manner.  By wrong manner I just mean showing incomprehension
```

1   and another where the district attorney asked everybody
2   raise their hand.  Everybody did, except he didn't because
3   he obviously didn't comprehend the instruction that had been
4   given.  Although I appreciate that he is an editor of a
5   journal, I am not confident that his English rises to the
6   level that's required here.
7            MR. BOGDANOS:  On the question that was posed by
8   me, actually I misunderstood my own question because your
9   Honor actually interrupted with the correct -- what ought to
10  have been the correct answer; so I don't think my awful
11  question ought to be something that Mr. Ma is penalized for;
12  and you know it's interesting, Mr. Ma is the one who
13  actually said the words you can presume him innocent.
14            I don't think there is any language issue
15  whatsoever with Mr. Ma.  I think he understood completely
16  throughout the course of the jury selection.  We both --
17  Mr. Klein and I, all attorneys on occasion ask questions
18  that are simply too long to be answered in simple yes or no
19  or hand raising and that's on us, not on them, so I think
20  the totality of the circumstances indicates that he well
21  understood what was going on.
22            THE COURT:  Well, let's bring him in.  We will ask
23  a few more questions.  His body language did leave something
24  to be desired.
25            THE COURT OFFICER:  What is his name?

1           THE COURT:  Mr. Ma.

2           (Prospective juror Ma entered the courtroom.)

3           THE COURT OFFICER:  Juror entering.

4           THE COURT:  Mr. Ma, if you would step up please at

5      the rail.  We would like to ask you a few additional

6      questions.  English language?

7           PROSPECTIVE JUROR:  English.

8           THE COURT:  English?

9           PROSPECTIVE JUROR:  Huh?  I am not sure.

10          THE COURT:  Listen to me.

11          PROSPECTIVE JUROR:  I am not sure.

12          THE COURT:  First question, have you been able to

13     understand everything that has been said so far?

14          PROSPECTIVE JUROR:  So far I understand but in the

15     real trial, I am not sure, real trial.

16          THE COURT:  So you have doubts about being able to

17     follow the testimony?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Do you have doubts about going back

20     into the jury room and being able to discuss the case with

21     your fellow jurors in English?

22          PROSPECTIVE JUROR:  So far I really -- not sure.

23     Really not sure because I never have been to a courtroom;

24     and I am afraid some terms, you know, medical terms, the

25     legal terms I could get confused.

1     THE COURT:  How many years have you been speaking
2     English?
3           PROSPECTIVE JUROR:  Since very little; since I am
4     a boy but I don't speak very often.
5           THE COURT:  Well, going back to your comprehension
6     is there anything that I said that you did not understand?
7           PROSPECTIVE JUROR:  So far, no.
8           THE COURT:  How about the attorneys, did you
9     understand everything that they said?
10          PROSPECTIVE JUROR:  I understand.
11          THE COURT:  All right, any questions from counsel?
12          MR. KLEIN:  What are you nervous about happening?
13    Not being able to participate in the discussion or not being
14    able to express all your own ideas?
15          PROSPECTIVE JUROR:  In fact, I have confidence but
16    you know sometimes I maybe misunderstood something.  May
17    misunderstood.  Then there will lead to a very terrible
18    result.
19          THE COURT:  That's it.
20          MR. KLEIN:  (Nod head affirmatively up and down.)
21          THE COURT:  Thank you, Mr. Ma.
22          PROSPECTIVE JUROR:  Okay, thank you.
23          THE COURT:  Please rejoin the others.
24          MR. BOGDANOS:  Judge, I don't know how that rises
25    to the level of challenge for cause.  He is concerned with

1   medical terms and legal terms.  That's everybody's concern

2   here who is not a lawyer or a doctor is concerned about

3   medical and legal terms.  They will be explained.

4           He even said in response to Mr. Klein's question

5   he has confidence that he will be able to express himself.

6   Sure, his English isn't perfect; but I don't see how that

7   distinguishes him from a specific percentage of the veneer

8   that we see on a daily basis.

9           THE COURT:  Mr. Klein?

10          MR. KLEIN:  I thought his last comment really

11  summed it up.  He would like to but he understands that he

12  might misunderstand some things and that could lead to a

13  tragic result.  I think he expressed the reason why he needs

14  to be challenged for cause.

15          THE COURT:  Thank you both.  Mr. Ma is excused.

16  Anyone else for cause?

17          MR. KLEIN:  No, Judge.

18          THE COURT:  Peremptories, Mr. Bogdanos?

19          MR. BOGDANOS:  Yes, No. 5, Mr. Rose and No. 8,

20  Ms. Brown and that's it.

21          THE COURT:  Mr. Klein?

22          MR. KLEIN:  Judge, I think a record has to be

23  made.  In the eight people there were two African American

24  people; one man, one woman.  Both of them have been stricken

25  by the district attorney.  Not raising the level one

1    challenge but I think the record should reflect it.

2          MR. BOGDANOS:  And the record should also reflect

3    we know two for two is not sufficient; but No. 5, Mr. Rose,

4    has a prior drug conviction and his last job was in the

5    Parks Department.  The defendant when he committed this

6    murder was working in the Parks Department.  Okay.

7          THE COURT:  He has not raised the challenge.

8          MR. BOGDANOS:  I got it but your Honor has pointed

9    out the record are records and with regard to Ms. Brown,

10   whose niece is a Corrections officer, I believe that we will

11   have an inmate from Riker's Island testifying in this case.

12   I don't want anyone having any connections to Corrections

13   officers.

14          I have no idea whether her niece comes home and

15   tells her about the inmates good, bad, indifferent.  I am

16   not taking the chance so her niece is a Corrections officer.

17   She is off.

18          MR. KLEIN:  Yes.  No. 2, No. 3, No. 7.

19          THE COURT CLERK:  Names?

20          MR. KLEIN:  Sorry, No. 2, Hedges; No. 3, Peters;

21   No. 7 is Weiner.

22          THE COURT:  That leaves Ms. Armstrong to be juror

23   No. 5 and Mr. Guzman to be No. 6; is that correct?

24          MR. BOGDANOS:  Yes, your Honor.

25          MR. KLEIN:  Yes.

1          THE COURT:  You got that?

2          THE COURT CLERK:  Five and six.

3          THE COURT:  The next six Ling through Sulser,

4    challenges for cause, Mr. Bogdanos?

5          MR. BOGDANOS:  None.

6          THE COURT:  Mr. Klein?

7          MR. KLEIN:  None.

8          THE COURT:  Peremptories?

9          MR. BOGDANOS:  None.

10          THE COURT:  Mr. Klein?

11          (Defense Attorney Klein conferred with defendant.)

12          MR. KLEIN:  Thirteen and fourteen.

13          THE COURT CLERK:  Lam and Sulser?

14          THE COURT:  Yes, so that means that Mr. Ling, will

15    be Juror 7; Mr. Schuster, Juror 8, Ms. Haney, nine, and

16    Ms. McCormick, ten.  Next two Lee and Warheit, challenge for

17    cause?

18          MR. BOGDANOS:  No.

19          MR. KLEIN:  No.

20          THE COURT:  Peremptories?

21          MR. BOGDANOS:  No.

22          MR. KLEIN:  Mr. Lee.

23          THE COURT:  So Mr. Warheit becomes Juror 11.

24    Lanzetta for the last spot, challenges for cause?

25          MR. BOGDANOS:  No.

1           MR. KLEIN:  No.

2           THE COURT:  Peremptories?

3           MR. BOGDANOS:  No.

4           MR. KLEIN:  Yes.

5           THE COURT:  McIntosh, challenges for cause?

6           MR. BOGDANOS:  No.

7           MR. KLEIN:  No.

8           THE COURT:  Peremptories?

9           MR. BOGDANOS:  Yes.

10          THE COURT:  How many do we have in the wheel?  Off

11     the record.

12               (Off-the-record discussion.)

13          THE COURT CLERK:  Fourteen, your Honor.

14          THE COURT:  Both sides agree to put everybody who

15     is left in the box?

16          MR. KLEIN:  Yes.

17          MR. BOGDANOS:  Yes.

18          THE COURT:  Both sides ready for the jurors?

19          MR. BOGDANOS:  Yes, Judge.

20          MR. KLEIN:  Yes.

21          THE COURT:  Thank you.

22               (Prospective jurors entered the courtroom.)

23          THE COURT:  Jeanette.

24          THE COURT CLERK:  Case on trial continued.  People

25     of the State of New York against Mark Richardson.  Both

1     sides stipulate all jurors are present?

2               MR. BOGDANOS:  Yes.

3               MR. KLEIN:  Yes.

4               THE COURT:  Ladies and gentlemen, this time around

5     seven of you have been selected.  We are making great

6     progress.  You heard what I said to the first group.  I

7     won't repeat all those remarks; but everyone should

8     understand that this is just one case and if you were not

9     selected for this one, that doesn't mean you won't be

10    selected the next time around.  To the contrary, everyone,

11    all of you participated fully; put up with us over,

12    unfortunately, for an extended period of time and answered

13    all these questions and we -- this is really what makes the

14    system what it is; and we really appreciate it very, very

15    much and again the consolation prize is if you are excused

16    from this case, I do believe you will be sent walking when

17    you get back upstairs and your tour of duty will be over.

18    All right, Jeanette, if you would announce the results,

19    please.

20              THE COURT CLERK:  Would the following jurors

21    please remain seated.  Lucy Armstrong, Isadoro Guzman,

22    Che Ling, Adam Schuster, Lourdine Haney, Esmerelda

23    McCormick, Benjamin Warheit.  The rest of you may report

24    back to the central jury room.

25              (Prospective Jurors exited the courtroom.)

 1              THE COURT:  We are missing somebody.  Hold on.
 2    Mr. Guzman, come right back here.  Not so fast.
 3              (So done.)
 4              THE COURT:  We are good.
 5              THE COURT CLERK:  Both sides stipulate that all
 6    jurors are present and properly seated?
 7              MR. BOGDANOS:  Yes.
 8              THE COURT CLERK:  I am sorry.
 9              THE COURT:  Are the remaining jurors satisfactory
10    to the People?
11              MR. BOGDANOS:  Yes.
12              THE COURT CLERK:  To the defendant?
13              MR. KLEIN:  Yes.
14              THE COURT CLERK:  Jurors, please stand.
15              (Jury was duly sworn and/or affirmed.)
16              THE COURT:  You may be seated.  Same announcement
17    that I gave the first group.  We are going to ask all of you
18    to come back eleven o'clock tomorrow morning.  We now have
19    eleven jurors so we are in good shape.  We have some time
20    left this afternoon and hopefully will be able to finish the
21    job and move onto the next phase of the trial tomorrow
22    morning.
23              On your way out one of the officers needs to ask
24    you a couple of questions.  That's it.  Tomorrow morning.
25    Please do not discuss the case.

1          (Sworn jurors exited the courtroom.)

2          THE COURT:  All right, folks, all of you will be

3    considered together as round three.  Once again if anyone

4    has had a change of position about anything, or question

5    about something, you may raise it now before we go to the

6    wheel.  Anyone?

7          All right, we will put nine in the front row and

8    the rest will be in the back.

9          THE COURT CLERK:  Richard Kirkland, Jr.,

10   K-I-R-K-L-A-N-D, seat No. 1; Kelly Pasterick,

11   P-A-S-T-E-R-I-C-K, seat No. 2; Rachel Rios Rodriguez,

12   R-I-O-S, R-O-D-R-I-G-U-E-Z, seat No. 3; Rosemary Romero,

13   R-O-M-E-R-O, seat No. 4; Vanessa Rodriguez,

14   R-O-D-R-I-G-U-E-Z, seat No. 5; Lana Kim, seat No. 6; Juan

15   Batista, B-A-T-I-S-T-A, seat No. 7; Neal Hay, H-A-Y, seat

16   No. 8; Shirley Schwartz, S-C-H-W-A-R-T-Z; seat No. 9;

17   Charles Apostolou, A-P-O-S-T-O-L-O-U, seat No. 10; Keith

18   Dawson, D-A-W-S-O-N, seat No. 11; Judith Lieb, L-I-E-B, seat

19   No. 12; Kenneth Witters, W-I-T-T-E-R-S; seat No. 13.

20         THE COURT OFFICER:  No response.

21         THE COURT CLERK:  Martin Hermens, M-A-R-T-I-N,

22   H-E-R-M-E-N-S, seat No. 13.

23         THE COURT:  That's it?

24         THE COURT CLERK:  That's it.

25         THE COURT:  Thank you.  May I have the board.

1      (Handing.)

2      THE COURT:  All right, are you ready?  This will

3  be the lightning round.  We will do this as fast as we can

4  meaning no disrespect because of you.  We are up against the

5  clock and also you heard everything -- you really have --

6  and we should be able to get through this quickly; but we

7  are going to start out with the personal questions going

8  right down the line.  Mr. Kirkland, good afternoon, sir.  I

9  will do question and answer for a few and if you want to

10  start volunteering, that's fine.  Do you live alone or with

11  someone else?

12      PROSPECTIVE JUROR:  I live with my wife.  Upper

13  West Side.

14      THE COURT:  What is your occupation, sir?

15      PROSPECTIVE JUROR:  I was a magazine editor for

16  many years.  I am editorial director in a large consulting

17  firm.

18      THE COURT:  Highest degree?

19      PROSPECTIVE JUROR:  MA.

20      THE COURT:  Free time activities?

21      PROSPECTIVE JUROR:  Gardening, reading, exercise,

22  playing.

23      THE COURT:  Organizations?

24      PROSPECTIVE JUROR:  Juvenile Diabetes Research

25  Foundation Board.  Very active.  Duke University Board of

1    Governors and the National Center For Journalists.

2              THE COURT:  Current events?

3              PROSPECTIVE JUROR:  News junky.  I read

4    newspapers, magazines, on-line, TV.

5              THE COURT:  Thank you, sir.  Ms. Pastara (sic).  I

6    must have written it down wrong.

7              PROSPECTIVE JUROR:  Pasterick.

8              THE COURT:  Pasterick.  I am sorry.  I did write

9    it down right.  Do you live alone or with someone else?

10             PROSPECTIVE JUROR:  I live alone in midtown east.

11             THE COURT:  What is your occupation, please?

12             PROSPECTIVE JUROR:  I am a director of a corporate

13   treasury for a large Fortune 500 company.

14             THE COURT:  What is your highest education?

15             PROSPECTIVE JUROR:  MBA and CPA as well.

16             THE COURT:  Free time activities?

17             PROSPECTIVE JUROR:  Exercise, travel.

18             THE COURT:  Organizations?

19             PROSPECTIVE JUROR:  American Institute of CPA's

20   and Pennsylvania Institute of P.C.A.'s.

21             THE COURT:  Professional?

22             PROSPECTIVE JUROR:  (Nod head affirmatively up and

23   down.)

24             THE COURT:  Current events?

25             PROSPECTIVE JUROR:  Wall Street Journal and

 1   Bloomberg everyday.

 2              THE COURT:  Thank you, Mr. Pasterick.

 3   Ms. Rodriguez No. 1, do you live alone or with someone else?

 4              PROSPECTIVE JUROR:  My husband.  I am married.

 5              THE COURT:  Which neighborhood?

 6              PROSPECTIVE JUROR:  Inwood, Washington Heights.

 7              THE COURT:  Are you working?

 8              PROSPECTIVE JUROR:  I am unemployed.  I have a

 9   Bachelor of Arts in Sociology.  Case aide.

10              THE COURT:  Bachelors of Arts in Sociology.

11              MR. BOGDANOS:  I couldn't hear you before.

12              PROSPECTIVE JUROR:  I am unemployed.  Looking for

13   a job.

14              MR. BOGDANOS:  Before that you said?

15              PROSPECTIVE JUROR:  I was a case aide.

16              MR. BOGDANOS:  Case aide.  Sorry.

17              THE COURT:  What do you like to do in your free

18   time?

19              PROSPECTIVE JUROR:  I read and TV.

20              THE COURT:  Belong to any organizations?

21              PROSPECTIVE JUROR:  I go to church.  That's about

22   it.

23              THE COURT:  Do you try to keep up with current

24   events?

25              PROSPECTIVE JUROR:  Yeah, the news.

1           THE COURT:  Everyday?

2           PROSPECTIVE JUROR:  Yeah.

3           THE COURT:  Thank you.  Ms. Romero?

4           PROSPECTIVE JUROR:  I live in Inwood with my

5    parents.  I work in the Compliance Department for a

6    financial company.  I am a member of a couple of

7    professional organizations.  One is the Association For

8    Certified and Money Laundering Specialist; and in my free

9    time I read.  Spend time with my family and I guess I have a

10   BA in Psychology.

11          THE COURT:  You also keep up with current events?

12          PROSPECTIVE JUROR:  Yes, daily.

13          THE COURT:  Thank you, Ms. Romero.  Ms. Rodriguez

14   No. 2.

15          PROSPECTIVE JUROR:  I live alone.  I live in

16   Tribeca.  I work for the Board of Ed.  I also teach after

17   school baking class.  Current events, sometimes Internet but

18   the newspaper mostly.  I like to exercise and go out

19   socially with friends and just...

20          THE COURT:  Are you active in any organizations?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Your highest degree?

23          PROSPECTIVE JUROR:  High school.

24          THE COURT:  High school?

25          PROSPECTIVE JUROR:  (Nod head affirmatively up and

1   down.)

2                  THE COURT:  Thank you.  Ms. Kim?

3                  PROSPECTIVE JUROR:  Hi.  I live in Harlem with my

4   sister.  I work for the city in construction and building

5   management.  My highest degree is a masters.  Free time, I

6   like to eat out and watch football.  Organizations, I am on

7   the board for a mentoring program in Washington Heights and

8   a member of a church; and I keep up with current events

9   daily.

10                  THE COURT:  Thank you, Ms. Kim.  Mr. Batista?

11                  PROSPECTIVE JUROR:  Yes.  Single.  I have a

12   roommate.  I have an Associates.  I live in

13   Morningside Heights.  I watch news on TV and the internet

14   and no organizations.

15                  THE COURT:  Your highest degree?

16                  PROSPECTIVE JUROR:  Associates.

17                  THE COURT:  I am sorry, you said that.  Where do

18   you work?

19                  PROSPECTIVE JUROR:  I am unemployed.  I was an

20   officer manager before.

21                  THE COURT:  Thank you.  Mr. Hay?

22                  PROSPECTIVE JUROR:  I am married.  I live on the

23   upper east side.  I am the head of structural and plumbing

24   for a large UK bank.  My highest degree is BA.  In my spare

25   time I undertake triathlons, baseball.

1          THE COURT:  Organizations?

2          PROSPECTIVE JUROR:  Some sports organization.  I

3    am a member of USA Triathlon New York Road Runners and

4    member of an Episcopal church.

5          THE COURT:  Are you keeping up with the current

6    events?

7          PROSPECTIVE JUROR:  I am an Internet junkie.

8          THE COURT:  Ms. Schwartz?

9          PROSPECTIVE JUROR:  I live up in Washington

10   Heights.  I live with my four dogs.  I am also a teacher and

11   a Fiasion (sic) Columbia graduate.  I speak a couple of

12   other languages.  My hobbies, I run, love music, cook.  I

13   read a lot and I have friends.  Entertain.

14         THE COURT:  Are you active in any organizations?

15         PROSPECTIVE JUROR:  UFT, Federation of Teachers

16   and also New York Society in Brooklyn, families and friends.

17         THE COURT:  All right, thank you.  The back row,

18   Mr. Apostolou?

19         PROSPECTIVE JUROR:  Hello, Judge.

20         THE COURT:  Hello.

21         PROSPECTIVE JUROR:  I am retired.  Living alone.

22   Upper West Side.  I have a Masters in Business.  Hobbies

23   travel, photography.  Do not belong to any associations.

24         THE COURT:  Current events, keep up?

25         PROSPECTIVE JUROR:  Almost exclusively on-line,

1 | BBC, CNN, New York Times, Washington Post.

2 |         THE COURT:  I think you hit them all.  Thank you.

3 | Mr. Dawson is next.

4 |         PROSPECTIVE JUROR:  Good afternoon, Judge.

5 |         THE COURT:  Good afternoon.

6 |         PROSPECTIVE JUROR:  Highest degree.  Associates,

7 | Telecommunication.  I live with my wife currently down south

8 | with my mother-in-law with cancer.  I live up in Harlem.

9 |         THE COURT:  Free time?

10 |         PROSPECTIVE JUROR:  Free time I volunteer

11 | Veteran's Hospital.

12 |         THE COURT:  Do you keep up with current events?

13 |         PROSPECTIVE JUROR:  Yes, I do.  On-line, Time

14 | magazine.

15 |         THE COURT:  Did you mention where you work?

16 |         PROSPECTIVE JUROR:  Excuse me, I am up in Harlem.

17 |         THE COURT:  What do you do?

18 |         PROSPECTIVE JUROR:  I am retired.

19 |         THE COURT:  What sort of work did you do?

20 |         PROSPECTIVE JUROR:  Telecommunications.

21 |         THE COURT:  Thank you.  Ms. Lieb?

22 |         PROSPECTIVE JUROR:  Hi, how are you?

23 |         THE COURT:  Good.  Good.

24 |         PROSPECTIVE JUROR:  I live upper West Side with my

25 | daughter.  I have a JED degree.  I am a Judge.  I sit in

1   Supreme Court in Bronx Criminal Division.  I belong to

2   professional associations.  I read the New York Times

3   everyday and I like photography, reading, bridge.

4                THE COURT:  And before you became a Judge, did you

5   practice law on the criminal side?

6                PROSPECTIVE JUROR:  Yes, I handled one murder case

7   as a defense attorney and then I was a prosecutor at the

8   Eastern District, US Attorney's Office for eight years.

9                THE COURT:  You don't have any -- we will get to

10  that.  Thank you very much, Judge Lieb.  Finally,

11  Mr. Hermens?

12               PROSPECTIVE JUROR:  I live upper west side with my

13  fiance.  I have a bachelor's degree.  I work as an analyst

14  with a bank.  Free time I enjoy banking, running, travel;

15  and I keep up with the news consistently.  Internet,

16  newspaper.

17               THE COURT:  Thank you, sir.  And now the next set

18  of questions beginning with prior jury experience, have any

19  of you had occasion to serve on a criminal case in the past

20  or civil case or even the grand jury.  Ms. Romero?

21               PROSPECTIVE JUROR:  I was in 2001 on a civil case.

22  It settled.

23               THE COURT:  So no deliberations in that case or

24  did you deliberate?

25               PROSPECTIVE JUROR:  No, settled after almost a

1    month and a half.

2                THE COURT:  Too bad.  Or maybe you were happy

3    about that.  Ms. Rodriguez?

4                PROSPECTIVE JUROR NO.3:  I served I think it was

5    ten years ago.  It was a civil case and we got to deliberate

6    and --

7                THE COURT:  You reached a decision?

8                PROSPECTIVE JUROR:  We reached a decision.

9                THE COURT:  Very good.  Very good.  Ms. Pasterick?

10               PROSPECTIVE JUROR:  Assault case in the '90's.

11               THE COURT:  Deliberations?

12               PROSPECTIVE JUROR:  Yes.

13               THE COURT:  Verdict?

14               PROSPECTIVE JUROR:  Yes.

15               THE COURT:  Was that trial here in Manhattan?

16               PROSPECTIVE JUROR:  No, it was in Pennsylvania.

17               THE COURT:  Thank you.  No one else?

18   Ms. Schwartz, you served on a case?

19               PROSPECTIVE JUROR:  Yes, it was narcotics, THC,

20   criminal cocaine; but they decided they wanted the case

21   was --

22               THE COURT:  Did you go back and deliberate?

23               PROSPECTIVE JUROR:  Yes, we did.

24               THE COURT:  You reached a verdict?  You don't have

25   to tell us what the verdict was but did you come to a

1     decision?

2               PROSPECTIVE JUROR:  We came to a decision.

3               THE COURT:  And -- and was that case in Manhattan?

4               PROSPECTIVE JUROR:  It was in Manhattan.

5               THE COURT:  Can you approximate how many years

6     ago?

7               PROSPECTIVE JUROR:  Approximately seven years.

8     Seven.

9               THE COURT:  Seven?  All right, anyone else?  Now,

10    conflicts with the law, have you or anyone close to you ever

11    had a conflict with the law?  Again an arrest of some sort.

12    Mr. Batista?

13              PROSPECTIVE JUROR:  Menacing charge.  It was

14    dismissed.

15              THE COURT:  This happened to you?

16              PROSPECTIVE JUROR:  Yeah, It was put against me.

17              THE COURT:  How many years ago was that?

18              PROSPECTIVE JUROR:  2003.

19              THE COURT:  Where was it?  Did it happen here in

20    Manhattan?

21              PROSPECTIVE JUROR:  Yeah.

22              THE COURT:  And you say it was dismissed?

23              PROSPECTIVE JUROR:  Yeah.

24              THE COURT:  So but still it was in Manhattan and

25    this case is in Manhattan too.  Is there any question in

1      your mind as to whether or not you could be a fair and

2      impartial juror because of that incident?

3                  PROSPECTIVE JUROR:  No, it wasn't a problem to me.

4                  THE COURT:  So you could make the promise to both

5      sides you will be fair and impartial?

6                  PROSPECTIVE JUROR:  Sure.

7                  THE COURT:  Anyone else?  Ms. Pasterick?

8                  PROSPECTIVE JUROR:  I have a brother who was

9      arrested for drunk driving.

10                 THE COURT:  This case is still going on or over?

11                 PROSPECTIVE JUROR:  It actually is still going on

12     outside of Manhattan in Pennsylvania.

13                 THE COURT:  Did you attend any of those sessions?

14                 PROSPECTIVE JUROR:  No.

15                 THE COURT:  Anything about that case that would

16     affect you hear?

17                 PROSPECTIVE JUROR:  No.  No.

18                 THE COURT:  Thank you.  No one else?

19                 Law enforcement, do any of you know anyone, happen

20     to know anyone who works in law enforcement?  Ms. Romero?

21                 PROSPECTIVE JUROR:  My brother is a police

22     officer.  I didn't recognize anyone on the witness list, but

23     I believe my brother's precinct is near the area.  I am not

24     sure it is the same precinct.  I might know people.

25                 THE COURT:  Which precinct is your brother in?

1          PROSPECTIVE JUROR:  The 33rd.

2          THE COURT:  33rd.  Mr. Batista?

3          PROSPECTIVE JUROR:  Brother is Teaneck, PD in

4    New Jersey and a friend in the Terrorism in New York.

5          THE COURT:  Not far away at all.  Mr. Hay?

6          PROSPECTIVE JUROR:  I grew up with a lot of my

7    family trying to be a police officer.  Obviously in the UK;

8    not here in Manhattan.  I have a friend who works in the

9    District Attorney's Office but in Brooklyn.

10          THE COURT:  Brooklyn?  Okay.  Mr. Hermens?

11          PROSPECTIVE JUROR:  Yeah, my father is a retired

12    prosecutor.

13          THE COURT:  From?

14          PROSPECTIVE JUROR:  In Oregon.

15          THE COURT:  Thank you, and Judge Lieb?

16          PROSPECTIVE JUROR:  Just I was a prosecutor and

17    some friends from --

18          THE COURT:  This is the question I had for you.

19    Do you know anyone who works in the Manhattan DA's Office?

20          PROSPECTIVE JUROR:  Do I know anyone who works

21    there?

22          THE COURT:  Any friends?

23          PROSPECTIVE JUROR:  I know people but not friends.

24    I know friends who were in the office.

25          THE COURT:  I mean now?

1           PROSPECTIVE JUROR:  No, not really.

2           THE COURT:  Thank you.  Mr. Dawson?

3           PROSPECTIVE JUROR:  Yes, I have a cousin who is a

4    U.S. marshal and a niece who is a New York City police

5    officer.

6           THE COURT:  Thank you.  Anyone else?

7           Victim of a crime, have you or anyone close to you

8    ever been the victim of a crime?  Mr. Kirkland?

9           PROSPECTIVE JUROR:  My wife was assaulted some

10   months ago.  Jewelry ripped off.

11          THE COURT:  In Manhattan?

12          PROSPECTIVE JUROR:  In Manhattan.

13          THE COURT:  Was reported?

14          PROSPECTIVE JUROR:  There were a lot of incidents

15   that night.  We did not report it.

16          THE COURT:  Anyone else in the front?

17   Mr. Batista?

18          PROSPECTIVE JUROR:  I was robbed at gunpoint in

19   Washington, DC and I had an uncle that was murdered.

20          THE COURT:  Robbery in DC, when was that?

21          PROSPECTIVE JUROR:  '97.

22          THE COURT:  And did you call -- notify the police

23   in some way?

24          PROSPECTIVE JUROR:  No.  I was happy to get out of

25   town.  It was a bus ride through, yeah.  It was when -- the

1   height of the DA's murder rate.  I just wanted to get out of

2   there.

3                THE COURT:  The other case you mentioned, it was

4   prosecuted?

5                PROSPECTIVE JUROR:  No, it's unsolved.

6                THE COURT:  Unsolved.  Mr. Hay?

7                PROSPECTIVE JUROR:  My wife was the subject of two

8   armed robberies in the mid 1990's.  Both in the United

9   kingdom; not here.  One was solved.  One wasn't.  I didn't

10  go to court.

11               THE COURT:  Was there a trial?

12               PROSPECTIVE JUROR:  There was.

13               THE COURT:  She sort of testified?

14               PROSPECTIVE JUROR:  Yes.

15               THE COURT:  You discussed that with her?

16               PROSPECTIVE JUROR:  Yes.

17               THE COURT:  That would come into play here?

18               PROSPECTIVE JUROR:  I don't believe so.

19               THE COURT:  You could promise both sides that you

20  would be fair?

21               PROSPECTIVE JUROR:  Absolutely.  Absolutely.

22               THE COURT:  Thank you.  Mr. Hermens?

23               PROSPECTIVE JUROR:  My brother was a victim of

24  attempted murder in Oregon.  The case went to trial.

25               THE COURT:  You don't have to tell us what

1   happened but when did the trial occur?

2           PROSPECTIVE JUROR:  This was 2007.

3           THE COURT:  Did your brother testify?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  Did you watch the trial?

6           PROSPECTIVE JUROR:  No, I did not.

7           THE COURT:  Anything about that trial that would

8   affect you here?

9           PROSPECTIVE JUROR:  Absolutely not.

10           THE COURT:  All right.  Thank you.  Judge Lieb?

11           PROSPECTIVE JUROR:  Just had a wallet stolen a

12   long time ago.  I didn't report it and you know it was fine.

13           THE COURT:  Thank you.  Mr. Apostolou?

14           PROSPECTIVE JUROR:  I was mugged fourteen years

15   ago and my mother was mugged about thirty years ago.

16           THE COURT:  Did you -- the mugging that happened

17   to you, did you report it?

18           PROSPECTIVE JUROR:  Well, it was in Florence,

19   Italy; and there was a language barrier so what I got was a

20   lot of shrugs.

21           THE COURT:  The other one?

22           PROSPECTIVE JUROR:  With my mother it was late at

23   night and she came up and she was bruised and she couldn't

24   describe what happened except it was in the neighborhood.

25           THE COURT:  When you say the neighborhood was it

1    in Manhattan?

2              THE WITNESS:  Yes.

3              THE COURT:  Thank you.  Let's move on.  Once again

4    I will give you the language concerning the fundamental

5    principles of criminal law although I think you could

6    probably recite it to me at this point rather than me give

7    it to you; but obviously all of these principles are very,

8    very important and sometimes when you hear them said than

9    something -- this trigger goes off; so in this case as in

10   every criminal case the defendant -- and again it's

11   Mr. Richardson in this case -- must be presumed by you to be

12   innocent.

13             Yes, he is here today because an indictment has

14   been filed against him but the indictment itself is not

15   proof of anything.  An indictment is simply the means by

16   which a defendant is informed of the charges against him and

17   then brought into court to face those charges; so as he sits

18   there now he must be afforded the presumption of innocence.

19             It is up to the People, the District Attorney's

20   Office to convince all of you beyond a reasonable doubt that

21   the defendant is guilty.  The burden in a criminal case is

22   solely on the prosecution.  The defense has no burden to do

23   anything.  Is there anyone who has any difficulty accepting

24   and following these fundamental principles?  All right, no

25   one.

1          Under our system a defendant in a criminal case is

2     not obligated to take the witness stand; therefore, if

3     Mr. Richardson does not testify you may not draw any

4     inference unfavorable to him from that fact.  Is there

5     anyone who would have any difficulty accepting or following

6     this principle?

7          Does anyone have any moral, intellectual, or

8     religious opinion or belief which might conflict with any of

9     these rules which might somehow slant your approach to the

10    case?  No one.

11         Will everyone be able to weigh the testimony of a

12    police officer in the same way that you would weigh the

13    testimony of a civilian witness?  And again no greater or

14    lesser weight can be given to the testimony simply because

15    it is coming from a police officer.  You are all comfortable

16    with that instruction?  Yes?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  All right, if after hearing all the

19    evidence in the case you find that you are convinced beyond

20    a reasonable doubt of the defendant's guilt, would you then

21    hesitate to vote guilty for any reason?

22         All right, then going the other way if you find

23    you do have a reasonable doubt after hearing the evidence,

24    would you hesitate for some reason to vote not guilty?

25         And my favorite question, is there anything else

1  anything that you would like to raise concerning your

2  qualification to serve on this case?  All right, then I

3  thank all of you very much.  Mr. Bogdanos.

4            MR. BOGDANOS:  Thank you, your Honor.

5            Good afternoon all.  May I take it that each of

6  you could hear both me and Mr. Klein throughout the course

7  of Thursday and Friday?  I will try real hard not to repeat

8  anything, Mr. Kirkland, and let me start with you.  Is there

9  anything about what you have heard from either me or

10  Mr. Klein that causes you to believe that you cannot be a

11  fair and impartial juror here?

12            PROSPECTIVE JUROR:  No.

13            MR. BOGDANOS:  So you believe as you sit here now

14  that you can listen to the evidence fairly, dispassionately,

15  assess that evidence, and determine whether or not beyond a

16  reasonable doubt this man's guilt right here of murder in

17  the second degree?  Do you believe you could do that?

18            PROSPECTIVE JUROR:  I do.

19            MR. BOGDANOS:  Ma'am, you mentioned it's your

20  brother, brother-in-law?

21            PROSPECTIVE JUROR NO.2:  Brother.

22            MR. BOGDANOS:  Brother currently has an open case?

23            PROSPECTIVE JUROR:  (Nod head affirmatively up and

24  down.)

25            MR. BOGDANOS:  Sorry for that.  Without going

1  into -- please don't go into the details or the facts of the

2  case.  Do you have any sense from having talked to your

3  brother or other family members whether your brother is

4  being treated fairly, unfairly by either the prosecutor or

5  the judge or the defense attorney in his case?

6          PROSPECTIVE JUROR:  I believe he is being treated

7  fairly.

8          MR. BOGDANOS:  By all sides?

9          PROSPECTIVE JUROR:  Correct.

10          MR. BOGDANOS:  So he is being prosecuted by

11  someone who has my job somewhere else?

12          PROSPECTIVE JUROR:  Yes.

13          MR. BOGDANOS:  You are not going to hold that

14  against me?

15          PROSPECTIVE JUROR:  No.

16          MR. BOGDANOS:  He is being defended by someone who

17  has Mr. Klein's job?  Also you are not going to hold that

18  against him.

19          PROSPECTIVE JUROR:  No.

20          MR. BOGDANOS:  The same thing with regard to his

21  honor, it is a separate case and fairly and dispassionately

22  judge this case?

23          PROSPECTIVE JUROR:  Yes.

24          MR. BOGDANOS:  Ms. Rodriguez, you mentioned you

25  are a case aide -- you were a case aide in what field?

1       PROSPECTIVE JUROR:  I was working with people,
2   individuals who live with HIV, public assistant case
3   manager.

4       MR. BOGDANOS:  Thank you very much.  Ms. Romero,
5   you mentioned your brother is in the 33rd Precinct.  If you
6   hear this took place within the 25th precinct, you will be
7   okay with that?  I won't think that would overlap at all
8   with your brother's precinct.  It is nearby upper Manhattan
9   but it is pretty far apart.  You haven't heard any names
10   that you recognized?

11       PROSPECTIVE JUROR:  I didn't.  Only concern is I
12   do know people in a few of the places.  I don't think the 25
13   but I just don't know.

14       MR. BOGDANOS:  Ma'am, I take it that you already
15   told us that you heard both Mr. Klein and I and his Honor
16   throughout the course of the last day and a half, one of the
17   things I would ask you, do you understand that you are not
18   as a juror being asked to judge an individual, right?  You
19   understand that?  You are not being asked to judge
20   Mr. Richardson's character or personality or in the words of
21   Mr. Klein any other criminal activity and you understand
22   that?

23       PROSPECTIVE JUROR:  Yes.

24       MR. BOGDANOS:  Thank you.  But you are being asked
25   to judge the evidence and you can do that?

1           PROSPECTIVE JUROR:  Yeah.

2           MR. BOGDANOS:  Ms. Rodriguez, No. 5, you mentioned

3      you work for the Board of Ed; but I didn't hear what you

4      said you did for the Board of Ed.  I apologize.

5           PROSPECTIVE JUROR:  I am a cook.

6           MR. BOGDANOS:  At a school?

7           PROSPECTIVE JUROR:  Yes.

8           MR. BOGDANOS:  In Tribeca?

9           PROSPECTIVE JUROR:  No.

10          MR. BOGDANOS:  That's where you live.  Got it.  Do

11     you understand you heard Mr. Klein talk about how being a

12     juror is a challenging, difficult thing to do and you agree

13     with that?

14          PROSPECTIVE JUROR:  Yes.

15          MR. BOGDANOS:  And I take it you also understand

16     that your comfort level -- forgive me for being this candid;

17     this is what I do; this is how I am -- your comfort level

18     isn't an issue here?  I never am going to ask you if you are

19     comfortable sitting as a juror?  You could accept that?

20          PROSPECTIVE JUROR:  Yes.

21          MR. BOGDANOS:  You not going to ask me if I am

22     comfortable doing this job; right?  It is your job and this

23     is my job?

24          PROSPECTIVE JUROR:  Yes.

25          MR. BOGDANOS:  You understand if you are

1   eventually seated as a juror, you are going to be asked a

2   question and the question is do you find Mark Richardson

3   guilty of the murder of a 69 year old woman?  No where in

4   that question is it going to be asked do you find that easy

5   or hard or whether you are comfortable making that decision.

6   You understand those are the words of one of your other

7   fellow veneer persons?  A nonissue, right?  And you can

8   accept that?

9           PROSPECTIVE JUROR:  Yes.

10          MR. BOGDANOS:  You may well be uncomfortable.  It

11   may be disagreeable because if selected as a juror, ma'am, I

12   am going to come back here in the name of the People of the

13   State of New York and also ask you to say the word guilty of

14   murder in the second degree; and I need to know that if the

15   evidence convinces you beyond a reasonable doubt, that you

16   will be able to discharge that duty.  You will be able to do

17   just that?  Is that okay, ma'am?

18          PROSPECTIVE JUROR:  Yes.

19          MR. BOGDANOS:  Ms. Kim, same question with a

20   twist.  I assume you have in you're life made difficult or

21   weighty decisions; and you've seen people make difficult and

22   weighty decisions.  You probably had bosses who have made

23   difficult and weighty decisions; have you not?

24          PROSPECTIVE JUROR:  Yes.

25          MR. BOGDANOS:  Have you also seen people who

1 || avoided making difficult or have decisions?

2 ||         PROSPECTIVE JUROR:  (Nod head affirmatively up and

3 || down.)

4 ||         MR. BOGDANOS:  Have you seen bosses who avoid

5 || making difficult and Nod decisions?

6 ||         PROSPECTIVE JUROR:  (Nod head affirmatively up and

7 || down.)

8 ||         MR. BOGDANOS:  Have you seen people behind their

9 || lack of comfort or come up with all excuses for failing to

10 || make weighty decision?

11 ||         PROSPECTIVE JUROR:  Yes.

12 ||         MR. BOGDANOS:  You have seen that?

13 ||         PROSPECTIVE JUROR:  Yes.

14 ||         MR. BOGDANOS:  I won't ask you what you think

15 || about those people.  It is probably the same thing I think

16 || of those people; but do you understand that's not something

17 || you can do here.  In fact, if you are seated as a juror

18 || during his honor's instructions, not my job -- two people

19 || that doubtless do it well -- one of the instructions you may

20 || hear is you may not find someone not guilty simply because

21 || it's a disagreeable thing or uncomfortable thing to do; but

22 || rather because the evidence has not proven to you beyond a

23 || reasonable doubt that he is guilty; so I am asking you

24 || directly will you discharge your duty?  Will you do your

25 || duty, whatever it is, based on the evidence not based on

1    your comfort level?

2              PROSPECTIVE JUROR:  Yes.

3              MR. BOGDANOS:  Yes, you will do that?

4              PROSPECTIVE JUROR:  Yes.

5              MR. BOGDANOS:  Everyone will do the exact same

6    thing?

7              PROSPECTIVE JUROR:  Yes.

8              MR. BOGDANOS:  I promise sitting as a juror in a

9    murder trial, it's disagreeable.  I promise you.  It's

10   uncomfortable; but will everyone put that discomfort aside

11   and judge this case on the evidence.  Can each of you do

12   that?

13             PROSPECTIVE JUROR:  Yes.

14             MR. BOGDANOS:  Mr. Batista, please forgive me.

15   Two hard questions.  I am so sorry for your loss for your

16   uncle, unsolved.

17             PROSPECTIVE JUROR:  (Nod head affirmatively up and

18   down.)

19             MR. BOGDANOS:  Meaning the police didn't catch the

20   guy and the prosecutor didn't prosecute the guy.  You are

21   going to put that aside?

22             PROSPECTIVE JUROR:  Yeah.

23             MR. BOGDANOS:  And not hold it against anyone in

24   this case?

25             PROSPECTIVE JUROR:  Yes.

1      MR. BOGDANOS:  Not hold it against the people for
2   having failed to solve that case but also not hold it
3   against Mr. Richardson because he is charged with murder?
4   You will put that aside and give both sides a fair trial.
5   Will you do that?
6      PROSPECTIVE JUROR:  It is no burden.
7      MR. BOGDANOS:  Second disagreeable charge -- I
8   have to ask it -- you had a menacing charge against you.  It
9   was dismissed?
10      PROSPECTIVE JUROR:  Yes.
11      MR. BOGDANOS:  Do you think you were treated
12   fairly or unfairly -- withdrawn.  Was there an arrest
13   involved?
14      PROSPECTIVE JUROR:  No, it was proven it was
15   fabricated.
16      MR. BOGDANOS:  So you never had to be arrested?
17      PROSPECTIVE JUROR:  No.
18      MR. BOGDANOS:  And it was proven fabricated I take
19   it then fairly quickly?
20      PROSPECTIVE JUROR:  Yeah.
21      MR. BOGDANOS:  Were you treated fairly or unfairly
22   by the system, the entire system?
23      PROSPECTIVE JUROR:  Yes.
24      MR. BOGDANOS:  Which one fairly or unfairly?
25      PROSPECTIVE JUROR:  Fairly.

1          MR. BOGDANOS:  Thank you.  You won't hold that

2     against anyone in this case?

3          PROSPECTIVE JUROR:  No.

4          MR. BOGDANOS:  Mr. Hay -- it is Hay?

5          PROSPECTIVE JUROR:  Yes.

6          MR. BOGDANOS:  Mr. Hay, how long have you lived in

7     New York?

8          PROSPECTIVE JUROR:  Eight years.

9          MR. BOGDANOS:  If you said it, I pardon.

10         PROSPECTIVE JUROR:  No problem.  I have been here

11    eight years.

12         MR. BOGDANOS:  I am terrible with accents.  Is it

13    Scottish?

14         PROSPECTIVE JUROR:  Good guess.

15         MR. BOGDANOS:  I know you know this but let me say

16    you recognize we have a different system here than in

17    Scotland?

18         PROSPECTIVE JUROR:  I do.

19         MR. BOGDANOS:  A whole different legal system?

20    You still have three verdicts in Scotland?

21         PROSPECTIVE JUROR:  We do.

22         MR. BOGDANOS:  We don't have that here.

23         PROSPECTIVE JUROR:  I appreciate that.

24         MR. BOGDANOS:  The question is simply going to be

25    guilty as in not is he a bad person, not that did he do

1    other criminal activity, not are you going to take him home

2    with you, not any of those things.  The question is have the

3    People proven through the evidence beyond a reasonable doubt

4    as the term will be defined for you that the defendant is

5    guilty.  That's the question?

6             PROSPECTIVE JUROR:  Yep.

7             MR. BOGDANOS:  Given another way of saying proven

8    or not, you can accept that?

9             PROSPECTIVE JUROR:  Yes.

10            MR. BOGDANOS:  Can everyone do just that?  Any

11   challenging issues?  Ms. Schwartz, it is so hard to hear in

12   this courtroom.  Did you say you are a physician?

13            PROSPECTIVE JUROR:  I also I have BS in Science

14   and went to Columbia University.

15            MR. BOGDANOS:  Ma'am, there is going to be medical

16   testimony in this case from the Office of the Chief Medical

17   Examiner.  It is my burden to prove cause of death amongst

18   other things through a pathologist, through a medical

19   doctor.  I take it you will not allow your background as a

20   doctor to carry extra weight in the jury deliberation room?

21   You are just another juror, one of twelve, because you can

22   imagine how your fellow jurors might turn to you and say,

23   wait, what do you think about that.  Give us your expert

24   opinion about the DNA or about the doctor or about this stab

25   wound, or about that strangulation or about the hyoid bone?

1      PROSPECTIVE JUROR:  H-Y-O-I-D.

2      MR. BOGDANOS:  I knew you would know.  You won't

3  do that?  Bring your experience, your education, your

4  knowledge of the world into the deliberation room but you

5  will be just another juror?

6      PROSPECTIVE JUROR:  Exactly.

7      MR. BOGDANOS:  Thank you.  Mr. Apostolou, you said

8  there were two instances in which you or a family member had

9  been mugged?

10      PROSPECTIVE JUROR:  Yes.

11      MR. BOGDANOS:  You in Florence?

12      PROSPECTIVE JUROR:  Right.

13      MR. BOGDANOS:  And then your mother about 30 years

14  ago?

15      PROSPECTIVE JUROR:  Correct.

16      MR. BOGDANOS:  Obviously, I mean it is very easy

17  to tell from your whole body language and the way you

18  described it, you recognize it has nothing to do with this

19  case?

20      PROSPECTIVE JUROR:  That's correct.

21      MR. BOGDANOS:  People say mugging.  A mugging is a

22  robbery.  It's the common way of saying robbery; but that's

23  what the crime is, robbery?

24      PROSPECTIVE JUROR:  Right.

25      MR. BOGDANOS:  And your mother came home bruised?

1        PROSPECTIVE JUROR:  Right.

2            MR. BOGDANOS:  You understand that one of the

3    charges in this case -- two of the charges in this case that

4    the defendant faces is robbery charges and indeed the murder

5    is a murder committed during the course of a robbery.  Those

6    are the allegations.  You will put that, your prior

7    experience with robbery aside and give this defendant a fair

8    trial?

9            THE DEFENDANT:  Defendant yes.

10            MR. BOGDANOS:  By the way, the People a fair

11    trial?

12        PROSPECTIVE JUROR:  Right.

13            MR. BOGDANOS:  Thank you.  Mr. Dawson, I am so

14    sorry for your mother-in-law's current condition.  Is

15    this -- is her -- and forgive me for following up on this --

16    is this something that you might be needed to be called away

17    in the next three weeks or is it something your wife, I

18    mean, has a hand on and only you can answer it?

19        PROSPECTIVE JUROR:  It has been ongoing.  She is

20    in remission.

21            MR. BOGDANOS:  Our prays are with you.

22            Judge, you could probably come over here and do

23    this and doubtless do it better but you are -- this is so

24    weird -- if seated on this panel, you are a juror?

25        PROSPECTIVE JUROR:  Yes, I am.

1    MR. BOGDANOS:  You don't get to say, you know, the

2    DA he violated People versus Washington -- I made that up; I

3    am sure there is a People versus Washington -- and he

4    shouldn't have done that.  I don't know why Judge Allen let

5    him get away with that.  You are not going to do that?

6          PROSPECTIVE JUROR:  I will not do that.

7          MR. BOGDANOS:  Regardless of what you think and I

8    know you know all these things, knowing what you know about

9    the Criminal Justice System, knowing what you know about

10   everything taken together, do you believe you could be a

11   fair and impartial juror in this case?

12         PROSPECTIVE JUROR:  Yes, I do.

13         MR. BOGDANOS:  Thank you, Judge.  You have someone

14   covering your calendar so there are no issues?

15         PROSPECTIVE JUROR:  Well, um, actually I heard the

16   judge is not sitting this Friday.  Friday is my calendar day

17   but we will handle it.

18         MR. BOGDANOS:  Thank you, Judge.  And Mr. Hermens,

19   finally, your dad is a retired prosecutor?

20         PROSPECTIVE JUROR:  Yeah.

21         MR. BOGDANOS:  He did it for a career?

22         PROSPECTIVE JUROR:  Correct.

23         MR. BOGDANOS:  Mr. Hermens, you must have heard

24   some war stories over the years?

25         PROSPECTIVE JUROR:  A little bit.

1    MR. BOGDANOS:  You would put all of that aside?

2    PROSPECTIVE JUROR:  Absolutely.

3    MR. BOGDANOS:  It is not in New York?

4    PROSPECTIVE JUROR:  No in Eugene, Oregon.

5    MR. BOGDANOS:  And so sorry about your brother's

6    case.  Again you will put that aside and thank goodness it

7    was an attempted murder?

8    PROSPECTIVE JUROR:  Absolutely.

9    MR. BOGDANOS:  You understand the concern the

10   defense might legitimately have.  This is a murder and your

11   brother was a victim of an attempted murder.  You will put

12   it aside and you will promise both sides that you will --

13   and the Court -- that you will fairly and dispassionately

14   assess the evidence and the reliability of the witnesses and

15   credibility of all of the evidence in determining the

16   appropriate verdict?  You will do that?

17   PROSPECTIVE JUROR:  It will be no issue.

18   MR. BOGDANOS:  Finally, ladies and gentlemen, you

19   have heard me say to the prior two panels you are not going

20   to ever hear in this case an eyewitness.  No one is ever

21   going to come up in this courtroom and take that stand and

22   say I saw what happened.  The law doesn't require it, but I

23   am asking you whether any of you think for a moment -- it is

24   a difficult concept -- think about it, are any of you going

25   it say oh, no, I don't care.  You could have all the DNA, I

1    want fingerprints.  You could have all the other stuff --

2    whatever the stuff is -- you could have all that other

3    stuff, I need an eyewitness.  Does anyone think that because

4    now is the time to tell us, both sides?

5              PROSPECTIVE JUROR:  No.

6              MR. BOGDANOS:  Ladies and gentlemen, I thank you

7    all for your patience.

8              THE COURT:  Thank you, Mr. Bogdanos.  Mr. Klein.

9              MR. KLEIN:  Thanks, Judge.  Ms. Kim, you work for

10   the City of New York Building Management?

11             PROSPECTIVE JUROR:  Construction and building

12   management.

13             MR. KLEIN:  What does that mean?  What do you

14   actually do?

15             PROSPECTIVE JUROR:  I manage projects for building

16   renovations and also the other side is managing the

17   buildings so your HTHC systems and plumbing.

18             MR. KLEIN:  That's what you do?

19             PROSPECTIVE JUROR:  (Nod head affirmatively up and

20   down.)

21             MR. KLEIN:  You heard the district attorney

22   mention in this case there is no eyewitness; but you are

23   going to hear DNA evidence and you are going to hear

24   fingerprint evidence.  That makes you feel one way or the

25   other, there is no I.D. witness there is DNA there is

1  fingerprint; this is a strange case, weak case, anything

2  case?

3          PROSPECTIVE JUROR:  No.

4          MR. KLEIN:  You are going to hear about DNA,

5  fingerprint.  Just say, okay, I will hear about it.

6          PROSPECTIVE JUROR:  Okay.

7          MR. KLEIN:  This is an eyewitness, no eyewitness

8  case.  May be proven or not proven?

9          PROSPECTIVE JUROR:  Yes.

10          MR. KLEIN:  Doesn't change your opinion at all?

11          PROSPECTIVE JUROR:  Not at all.

12          MR. KLEIN:  The fact I have been talking about --

13  you are going to find out as the trial goes on he is an

14  unlikable guy.  My client lied to the police.  He lied a lot

15  as the investigation was going on.  You know the case is

16  proven, you find him guilty?

17          PROSPECTIVE JUROR:  Yes.

18          MR. KLEIN:  Mr. Batista, in your case you

19  mentioned how actually they were able to prove -- you

20  thought you were going to be arrested maybe but they were

21  able to prove that the accusation was false, okay.  I guess

22  somebody got up some way and proved your innocence; right?

23          PROSPECTIVE JUROR:  Yes.

24          MR. KLEIN:  Ms. Rodriguez No. 5, here one of the

25  things I keep telling the jury how in this case it is

1   unlikely I am going to get up and prove to you that my

2   client didn't do the crime, right?  I am not going to put

3   him on the witness stand and call witnesses that prove to

4   you it's impossible he couldn't have done it; but you could

5   accept that it is not my burden to do that in the case;

6   right?

7              PROSPECTIVE JUROR:  Yes.

8              MR. KLEIN:  You are in the jury room and you say,

9   listen, the lawyer doesn't prove his client innocent.

10  That's not really what we have to do here.  The question is

11  did the district attorney prove guilt?

12             PROSPECTIVE JUROR:  Yes.

13             MR. KLEIN:  If he doesn't prove beyond a

14  reasonable doubt, then you will vote not guilty; right?

15             PROSPECTIVE JUROR:  Yes.

16             MR. KLEIN:  Could you just tell me, you are a cook

17  for the Board of Education.  That's what you do in a school?

18             PROSPECTIVE JUROR:  (Nod head affirmatively up and

19  down.)

20             MR. KLEIN:  Yes?  Ms. Rodriguez, No. 3, you are a

21  case aide.  What does that mean?  Maybe I should know but I

22  don't.

23             PROSPECTIVE JUROR:  I was working for a nonprofit

24  organization work on people HIV, just general data.  Getting

25  Social Services helping them out.  I was an assistant to a

```
 1        case manager.  Now I am unemployment.

 2                    MR. KLEIN:  Perhaps --

 3                    PROSPECTIVE JUROR:  I lost my employment.  I have

 4        been looking.

 5                    MR. KLEIN:  Any problems with any of the concepts

 6        that have when brought up?

 7                    PROSPECTIVE JUROR:  No.

 8                    MR. KLEIN:  If you are on the jury, you will give

 9        the other jurors your own opinion, right?

10                    PROSPECTIVE JUROR:  My opinion.

11                    MR. KLEIN:  Your own opinion right, just yours?

12                    PROSPECTIVE JUROR:  Yes.

13                    MR. KLEIN:  You will listen to all the evidence,

14        right?

15                    PROSPECTIVE JUROR:  Based on the evidence.

16                    MR. KLEIN:  And talk to your fellow jurors?

17                    PROSPECTIVE JUROR:  Yeah.

18                    MR. KLEIN:  And then decide the way you think

19        about the case?

20                    PROSPECTIVE JUROR:  Yes.

21                    MR. KLEIN:  Ms. Romero, no problem that in this

22        case it is very unlikely that the defendant is going to take

23        the witness stand?

24                    PROSPECTIVE JUROR:  No.

25                    MR. KLEIN:  Some people say no problem because do
```

1    I want -- I don't want to hear him; he is a murderer, who

2    knows; who wants to hear from a murderer.  You could think

3    whatever you want.  You have to tell us if that's the way

4    you think.  You have to tell us, the judge, no, if you know

5    the guy doesn't testify, the lawyer doesn't put him on the

6    witness stand; like the guy said, nonissue; right?  You

7    won't think in any way, no, he must have done it; otherwise,

8    he would testify, right?

9                PROSPECTIVE JUROR:  No.

10               MR. KLEIN:  Have you ever been accused of

11   something?  You said your peace and you said, hey, I didn't

12   do it.

13               PROSPECTIVE JUROR:  (Nod head affirmatively up and

14   down.)

15               MR. KLEIN:  In a courtroom it doesn't really work.

16   The defendant has obviously plead not guilty.  His position

17   is he didn't do it, right; but the fact he doesn't get up on

18   the witness stand and say to all of you, hey, it wasn't me;

19   I know they are accusing me but it is not me; that's

20   irrelevant, okay?  You won't hold it against him in any way?

21               PROSPECTIVE JUROR:  No.

22               MR. KLEIN:  All right.  Ms. Pasterick, same

23   question to you at the end of the case you go in the jury

24   room and you say a lot of stuff was answered.  I got the

25   answers to a lot of questions, and I've seen DNA evidence,

1    and I have seen fingerprints, and I heard what people have

2    to say but I have some fundamental doubts about whether or

3    not the defendant is guilty.  I have reasonable doubts about

4    it.  Would you acquit him?

5            PROSPECTIVE JUROR:  (Nod head affirmatively up and

6    down.)

7            MR. KLEIN:  Okay, regardless of your feeling at

8    that point, I don't know if the defense lawyer didn't prove

9    he is innocent then maybe we are letting a guy go who may

10   have done the crime; right?  Would you still vote not guilty

11   in that situation?

12           PROSPECTIVE JUROR:  If I didn't believe beyond a

13   reasonable doubt that he was guilty, I would not vote

14   guilty.

15           MR. KLEIN:  Regardless of the fact that you might

16   still think to yourself I don't know; maybe he did do it.

17   Still vote for not guilty; right?

18           PROSPECTIVE JUROR:  It would be difficult but yes.

19           MR. KLEIN:  You would do it?  Mr. Kirkland, the

20   same question to you?

21           PROSPECTIVE JUROR:  Okay.  I can do that.

22           MR. KLEIN:  At the end of the case you say I don't

23   know.  I heard a bunch of evidence.  I understand why he is

24   arrested.  I understand why he is sitting there regardless

25   of presumption of innocence.  Oh, yeah there is some

1  evidence that points to him, but at the end of the case you

2  say you know, I am not sure.  According to the Judge's

3  instructions you say it is not proven to me beyond a

4  reasonable doubt, you know I am not going to convict the guy

5  unless I am sure; right?  Can you follow that?

6              PROSPECTIVE JUROR:  I have never heard the beyond

7  a reasonable doubt.  I assume based on the instruction, I

8  could follow the instructions and make a decision.

9              MR. KLEIN:  You never sat as a juror?

10             PROSPECTIVE JUROR:  I never sat as a juror.  You

11 asked a hypothetical.  It is an interesting thought.

12             MR. KLEIN:  Well, it's one, you know -- I raise it

13 because it is one that very likely is going to happen here.

14 I told you I am not -- at the end of the prosecution's case

15 I am not going to prove the defendant couldn't have done it;

16 right?

17             PROSPECTIVE JUROR:  Right.

18             MR. KLEIN:  The question you are really going to

19 have to ponder as the gentleman from Scotland said is it

20 proven or not proven.  Are we convinced beyond a reasonable

21 doubt or not?  You can do that; right?

22             PROSPECTIVE JUROR:  Right.

23             MR. KLEIN:  You could hesitate as Ms. Pasterick

24 said?  You could hesitate and say I don't want to vote not

25 guilty, you know, unless I really know he didn't do it, but

1  that's the situation you may find yourself in it?  You will

2  deal with it?

3              PROSPECTIVE JUROR:  Yes.

4              MR. KLEIN:  Mr. Apostolou, any problem with that?

5              PROSPECTIVE JUROR:  No, not at all.

6              MR. KLEIN:  In case you decide, I have seen the

7  DNA; I have seen the fingerprints; telephone records

8  anything you get in the case you say, okay, I see it's

9  possible.  He could have done it.  That stuff all convinces

10  you.  You say he could have done it.  It could be him.  He

11  could be one of the guys; but you say I am the not sure;

12  convinced beyond a reasonable doubt he is really one of

13  them, the appropriate people to convict and then you

14  wouldn't hesitate to acquit him, right?

15              PROSPECTIVE JUROR:  Right.

16              MR. KLEIN:  You understand there is no way if you

17  acquit someone, you are not like giving them a pat on the

18  back and saying you are the greatest guy; you are innocent;

19  I love you.  You are saying this is not a case where you are

20  not sure.  Okay.  Thank you.

21              THE COURT:  Thank you, Mr. Klein.  The time has

22  come for the attorneys to make some selections.  I ask all

23  of you to wait outside before they do this.  Please do not

24  discuss the case.  We will get you back in here by 4:25.

25              (Prospective Jurors exited the courtroom.)

1          (Short recess.)

2          THE COURT:  All right, folks.  Are we ready to go?

3          MR. BOGDANOS:  Yes, Judge.

4          MR. KLEIN:  Yeah.

5          THE COURT:  Are you ready, Jeanette?

6          THE COURT CLERK:  Yes, your Honor.

7          THE COURT:  Back on the record, we have eleven

8   selected jurors so we will do these jurors one at a time

9   starting with Mr. Kirkland.  Challenges for cause?

10         MR. BOGDANOS:  No.

11         MR. KLEIN:  No.

12         THE COURT:  Peremptories?

13         MR. BOGDANOS:  No.

14         MR. KLEIN:  Yes.

15         THE COURT:  Pasterick, challenge for cause?

16         MR. BOGDANOS:  No.

17         MR. KLEIN:  No.

18         THE COURT:  Peremptories?

19         MR. BOGDANOS:  No.

20         MR. KLEIN:  Yes.

21         THE COURT:  Rodriguez No. 3, challenges for cause?

22         MR. BOGDANOS:  No.

23         MR. KLEIN:  No.

24         THE COURT:  Peremptories?

25         MR. BOGDANOS:  Yes.

1          THE COURT:  Romero, challenges for cause?

2          MR. BOGDANOS:  No.

3          MR. KLEIN:  No.

4          THE COURT:  Peremptories?

5          MR. BOGDANOS:  No.

6          MR. KLEIN:  Yes.

7          THE COURT:  Rodriguez No. 2, challenges for cause?

8          MR. BOGDANOS:  No.

9          MR. KLEIN:  No.

10         THE COURT:  Peremptories?

11         MR. BOGDANOS:  Yes.

12         THE COURT:  Ms. Kim, challenges for cause?

13         MR. BOGDANOS:  No.

14         MR. KLEIN:  No.

15         THE COURT:  Peremptories?

16         MR. BOGDANOS:  No.

17         MR. KLEIN:  No peremptories.

18         THE COURT:  Thank you.  Ms. Kim becomes juror

19    No. 12.  You know with the alternate seats each side has two

20    peremptories, Mr. Batista, to be alternate No. 1 challenges

21    for cause?

22         MR. BOGDANOS:  No.

23         MR. KLEIN:  No.

24         THE COURT:  Peremptories?

25         MR. BOGDANOS:  Yes.

1            THE COURT:  Mr. Hay, challenges for cause?

2            MR. BOGDANOS:  No.

3            MR. KLEIN:  No.

4            THE COURT:  Peremptories?

5            MR. BOGDANOS:  No.

6            MR. KLEIN:  Yes.

7            THE COURT:  Ms. --

8            MR. KLEIN:  Yes.

9            THE COURT:  Ms. Schwartz, challenges for cause?

10           MR. BOGDANOS:  No.

11           MR. KLEIN:  No.

12           THE COURT:  Peremptories?

13           MR. BOGDANOS:  Yes.

14           THE COURT:  Mr. Apostolou, challenges for cause?

15           MR. BOGDANOS:  No.

16           MR. KLEIN:  No.

17           THE COURT:  Do you have a peremptory, Mr. Klein?

18           MR. KLEIN:  No.

19           THE COURT:  Mr. Dawson for alternate seat No. 2,

20      challenges for cause?

21           MR. BOGDANOS:  No.

22           MR. KLEIN:  No.

23           THE COURT:  Peremptories?

24           MR. BOGDANOS:  No.

25           MR. KLEIN:  No peremptory.

1          THE COURT:  Thank you.  Mr. Dawson becomes the
2     alternate No. 2.  Judge Lieb for alternate seat No. 3,
3     challenges for cause.
4          MR. BOGDANOS:  No.
5          MR. KLEIN:  No.
6          THE COURT:  Now I promise I will never divulge the
7     result of the next question.  Peremptories challenges for
8     Judge Lieb?
9          MR. BOGDANOS:  No.
10          MR. KLEIN:  Yes.
11          THE COURT:  Mr. Hermens, No. 13, he is our last
12     juror in this group.  Challenges for cause?
13          MR. BOGDANOS:  No.
14          MR. KLEIN:  No.
15          THE COURT:  Peremptories?
16          MR. BOGDANOS:  No.
17          MR. KLEIN:  Yes.
18          THE COURT:  Does either side want to volunteer
19     somebody to become alternate No. 3?  I will go with the two;
20     but I think we would be better off with three.  You can
21     discuss this among yourself if you want and save the record.
22          (Off-the-record discussion.)
23          THE COURT:  Back on the record, both sides ready
24     for this group?
25          MR. KLEIN:  Yes.

1       THE COURT:  May we have all the jurors, please.

2           (Juror entered the courtroom.)

3       THE COURT CLERK:  Case on trial continued.  The

4  People of the State of New York against Mark Richardson.

5  Both sides stipulate that all jurors are present?

6       MR. KLEIN:  Yes.

7       MR. BOGDANOS:  Yes.

8       THE COURT:  Ladies and gentlemen, this time three

9  of you have been selected.  As you know going in, there were

10 not that many places available so no one should feel

11 disappointed whatsoever.  Again everyone participated fully

12 and we do appreciate that.  We thank you very much for doing

13 so.  I will leave it at that.

14      I should also add that we have this new rule.  We

15 have to get out of here by 4:30 so we just barely made it

16 under the buzzer, and you were a part of that; so thank you

17 very much and now for the results please, Jeanette.

18      THE COURT CLERK:  Would the following jurors

19 please remain seated, Lana Kim, Charles Apostolou, and

20 Keith Dawson.  The rest of you are excused with the thanks

21 of the Court.  You know you may return back to the jury room

22 tomorrow morning.  I think they are going home.  I am sure

23 you are going home actually.

24          (Prospective jurors exited the courtroom.)

25      THE COURT:  Are the remaining jurors satisfactory

1     to the People?

2                MR. BOGDANOS:  Yes.

3                THE COURT:  To the defendant.

4                MR. KLEIN:  Yes.

5                THE COURT CLERK:  Jurors, please stand and raise

6     your right hands.

7                (Jurors were duly sworn and/or affirmed.)

8                JURORS:  I do.

9                THE COURT:  Thank you.  You may be seated.  Again

10    we are going to ask all of you to come back tomorrow morning

11    at the same time 11:00 a.m.  We now have completed the jury

12    selection process.  I always love to say that so we could

13    move on to the next phase of the trial.  We will start at

14    11:00 tomorrow morning; so please do not discuss the case

15    with anyone between now and then; and one of the officers

16    will ask you a couple of questions on your way out.  Thank

17    you very much.

18                (Jurors exited the courtroom.)

19                MR. BOGDANOS:  What are we doing on Mr. Klein's

20    motion?  This is still outstanding.

21                THE COURT:  Unfortunately --

22                MR. BOGDANOS:  I get it.

23                THE COURT:  We are out of time.

24                MR. BOGDANOS:  I got it.

25                THE COURT:  We are working on it.  We will hear

1   from you in the morning; but we are also working on it.

2          MR. BOGDANOS:  Judge, I want to be clear.  You

3   can't work on it.  Listen, I got this Thursday.  We have

4   been on trial.  You can't work on it until I explain what I

5   believe to be unintentional but certainly factual

6   inaccuracies in the motion.  I mean there are issues here

7   that I think only will resolve themselves.

8          THE COURT:  Be assured I have not rendered -- I

9   have not reached any sort of decision.

10          MR. BOGDANOS:  Not even leaning.

11          THE COURT:  I am not even leaning.  Not even

12   working.

13          MR. BOGDANOS:  That's fine.

14          (Trial adjourned to September 13, 2011.)

15                  oOo

16
I hereby certify the foregoing to be a true and
17   accurate transcript of the original stenographic record
in the    above proceedings.
18
19          Penelope Messina
            Senior Court Reporter
20

21

22

23

24

25

1   SUPREME COURT OF THE STATE OF NEW YORK.

2   COUNTY OF NEW YORK: CRIMINAL TERM: PART 45

3   ----------------------------------------x

4   THE PEOPLE OF THE STATE OF NEW YORK    : Indictment

5                                          :    3534/08

6        -against-                         : Charge:

7   MARK RICHARDSON,                       :   MURD 2

8                    Defendant.            :   TRIAL

9   ----------------------------------------x

10
                      111 Centre Street
11                    New York, New York
                      September 13, 2011,
12
    B E F O R E :
13
        HONORABLE BRUCE ALLEN, Justice
14

15  A P P E A R A N C E S :

16  For the People:

17      CYRUS VANCE, ESQ.
        Assistant District Attorney
18      New York County
        BY:      MATTHEW BOGDANOS, ESQ.
19               Assistant District Attorney

20  For the Defendant:

21      LEGAL AID SOCIETY
        THOMAS KLEIN, ESQ.
22      and SARAH, LEGLER, ESQ. For Defendant Richardson

23

24                    PENELOPE MESSINA, RPR
                      Senior Court Reporter
25

1          THE COURT CLERK:  Case on trial continued.  The

2     People of the State of New York against Mark Richardson.

3     The defendant, his attorney, and the assistant district

4     attorney are present.  The jury is not present at this time.

5          THE COURT:  Thank you.  Mr. Bogdanos.

6          MR. BOGDANOS:  Yes, your Honor, we can move right

7     into the motion.

8          THE COURT:  Any preliminary matters that you would

9     like to raise at this time.

10          MR. BOGDANOS:  Yes, Mr. Klein had yesterday asked

11     the Court to rule prior to the opening on the outstanding

12     motion and so what I would like to do, your Honor, is I

13     mentioned yesterday is -- and it would be helpful.  I don't

14     know if your Honor has a copy.  I want to go paragraph by

15     paragraph because I actually believe that some of the items

16     that Mr. Klein is requesting are actually based on in some

17     occasions misunderstandings of what did and did not take

18     place and in some case speculation about what is and is not

19     possible, what we do and do not have; so I would like to

20     walk through that.

21          And finally, your Honor, in many cases throughout

22     the course of the defense motion, the defense says the

23     witness says such and such without saying the rest of the

24     statement and without looking at the context of many of

25     these statements.  It's impossible for your Honor to rule

1    fairly, so on each occasion where the defense complains

2    about late disclosure of a D.D.5, a police report, I am

3    going to ask the Court to actually receive the D.D.5 in

4    Evidence for the purposes of this discussion, and I have

5    already notified Mr. Klein of the numbers of each D.D.5

6    number I am going to be so requesting of your Honor; so if

7    we could turn to the defense, the first claim in the

8    defense.  It's in paragraph nine and I also want to be

9    abundantly clear -- I am in no way as I walk through the

10   motion when I highlight what I believe are inaccuracies or

11   incompleteness -- I am no way disparaging the motion or the

12   defense in any, way, shape or form.  I am simply stating

13   facts as they really are on many occasions.

14            Paragraph nine through fourteen the defense makes

15   a single claim.  The claim is that they did not receive a

16   D.D.5 of Anthony Hall and that's numbered D.D.5 I call it

17   32A because it falls between 32 and 33, in which

18   Anthony Hall during his first interview claims that he was

19   -- had run into an individual named Sylvester on Saturday;

20   and Sylvester said that he had seen Helen Abbott earlier

21   that day.

22            The point of the argument on behalf of the defense

23   is that means Helen Abbott is still alive on Saturday.  If

24   Helen Abbott is still alive on Saturday so, therefore,

25   Mr. Richardson already left the building on Friday.

1    Couldn't have done it.  The problem with that argument is
2    first it selects out a single sentence in an entire D.D.5;
3    and I am going to offer that to your Honor in a second in a
4    moment, but more damaging it omits all of Anthony Hall who
5    the People do believe is -- is probably the other person in
6    the apartment with the defendant during the murder.

7         There isn't enough evidence at this point to
8    arrest him but it omits all the other statements of
9    Anthony Hall in which he admits that he lied in the earlier
10   statement.  In D.D.5 121 and in D.D.5 218 Mr. Hall admits
11   when he was talking about Saturday, it wasn't really
12   Saturday.  First he changes it to Friday.  Then he changes
13   it to Thursday; so, in fact, if you would just to rule on
14   the defense motion and nothing else, your Honor would be
15   unintentionally I am sure misled into thinking Anthony Hall
16   said something that he didn't; and for that I am going to
17   offer to the Court those three D.D.5's in their entirety;
18   that is, what we are calling 32A -- what I am calling 32A,
19   121, and 218 in which your Honor can see that Anthony Hall
20   completely repudiates his earlier statement about having
21   anything to do with Saturday.  In fact, it's all about
22   Thursday and Friday.

23        I don't know how your Honor wants to move.  Shall
24   I --

25        MR. KLEIN:  Why don't we address this point?  Why

1   don't we address this point because if it's going to go on

2   in this tenure, then we should be clear about something.

3            THE COURT:  Point by point.

4            MR. BOGDANOS:  Okay.

5            MR. KLEIN:  This is the exact point that was

6   raised by the prior district attorney on a similar point,

7   which is the information that they didn't disclose to the

8   defense while in itself is perhaps Brady material really

9   isn't valuable Brady material because it was shown to be

10  unreliable because in other D.D.5's Anthony Hall says what I

11  was saying before was gobbledygook and what I am saying now

12  is true; and what I am saying now isn't true and it's the

13  prosecution's position -- though I am not sure it is the

14  position of the New York County District Attorney's Office

15  in general -- that if they can show that material,

16  exculpatory material is unreliable in some fashion in their

17  view, then there wasn't a necessity to turn it over at the

18  time that it was created so that the defense could do its

19  own investigation.

20           MR. BOGDANOS:  That's absolutely not the argument.

21  I am sorry.  If Mr. Klein had allowed me to --

22           THE COURT:  Mr. Bogdanos.

23           MR. BOGDANOS:  -- had allowed to me to finish my

24  argument.

25           THE COURT:  Let him finish.  You could get back.

1          MR. BOGDANOS:  In other words, I could finish my

2     argument after he interrupts.  You got it.

3          THE COURT:  Go ahead.

4          MR. KLEIN:  And I think that's not what the Brady

5     case law -- if a witness says something that is helpful to

6     the defense especially on a critical point such as there is

7     another witness who you all should talk to because it

8     supports the theory that the defendant couldn't have killed

9     the individual because the person was alive on the twelfth

10    and seen on the twelfth, then it has to be turned over.

11         The District Attorney's Office may at some later

12    occasion talk to the individual himself Mr. Sylvester and

13    get Mr. Sylvester to say what Anthony Hall is saying isn't

14    true or the district attorney may at this later point may

15    speak to Anthony Hall and Anthony Hall may repudiate the

16    information that he gave.  The point of Brady is though when

17    that information came into the possession of the police

18    and/or the District Attorney's Office at that point it had

19    to be given to us so that we can do our own investigation.

20         For example, speak to Sylvester at that time back

21    then when the information came in and ask him hey,

22    Sylvester -- wherever you are -- where we weren't able to

23    find him at that point and say did you see the individual on

24    the twelfth.  It doesn't matter that Mr. Hall later says

25    everything I said was a lie.  It's that it was an

1    investigative lead that would have been helpful to the
2    defense that wasn't provided to us.
3            MR. BOGDANOS:  That actually wasn't my argument.
4    What I tried to say before your Honor allowed the
5    interruption is it is not the People's position that we can
6    pick and choose based on the relevance of the material.
7    That is not -- and it's not the position, well, this must
8    not be -- first of all it is the People's position this
9    isn't Brady.  I am going to explain why it isn't Brady but
10   it is not the People's position -- and not being put to
11   saying something I did not -- it is not the People's
12   position this is not Brady because Mr. Hall later repudiated
13   it.  This is the People's position.  It is not Brady for two
14   other reasons; not the reasons that the defense would like
15   me to argue.
16           First, Mr. Hall indicated he wasn't talking about
17   Saturday.  He was talking about Friday and it was a mistake,
18   and that's what the D.D.5 -- if you see there is crossed out
19   in the D.D.5 with regard to the date.
20           Second when the detective actually went to find a
21   Sylvester when this took place and there was none that they
22   could find, so that for these reasons it's the People's
23   position that when a witness makes something up and there is
24   no good faith basis whatsoever it has no basis in reality or
25   fact.

1          Not only is it not Brady but even assuming that it
2    is there is no remedy for it in this particular case so come
3    back to the original position it's not Brady.  It is not
4    Brady for these reasons; however, had the defense gotten
5    that earlier, they would have found out the same thing
6    Mr. Hall changed the dates inadvertently.  He was drunk.
7    Whatever his reasons are, they are listed in his interviews.
8    There is no Sylvester, at least no Sylvester the detectives
9    could find.
10          I would like to move onto the second --
11          MR. KLEIN:  Could I?
12          MR. BOGDANOS:  I am done on that argument on
13   Mr. Hall and Sylvester.
14          THE COURT:  Mr. Klein.
15          MR. KLEIN:  First of all I would say as soon as we
16   got that -- and I think we wrote this in our motion; if we
17   didn't I will tell you -- as soon as we got this, we sent
18   investigators up to the building to speak to grounds people.
19   It appeared there is a Sylvester who works there although it
20   appears in some very casual manner we were unable to verify
21   he was actually employed there.  Was he a subcontractor like
22   someone who works on the grounds, employs him to do some
23   work there?  That's as far as we could get but that there is
24   no such person as a Sylvester.  We found out contradictory
25   information when we got this, of course, some three years

1  too late.

2           As for it's not Brady because he was talking about

3  Friday, that's their position.  That's the Prosecution's

4  position that he was talking about Friday.  It's our

5  position that, in fact, he was talking about Saturday

6  because the D.D.5 itself has a cross out by Dt. Dimuro,

7  which indicates that it wasn't Friday that was being talked

8  about but it was Saturday that was being talked about; and

9  that's why we think it's Brady material that had to be given

10 to us.

11          We think that the defendant was damaged in this

12 manner and we are asking as a remedy -- you know, we are

13 asking that the information be put in front of the jury,

14 that the jury be told that Hall stated that there was an

15 individual named Sylvester who indicated that he had seen

16 the victim alive on Saturday.

17          MR. BOGDANOS:  But without -- so in other words

18 one sentence in pages and pages of interviews so you are

19 saying the defense is suggesting that one selective out of a

20 context statement --

21          THE COURT:  Go on to the next item.

22          MR. BOGDANOS:  We could go with dueling D.D.5's if

23 that's what the defense wants.  I will put in three D.D.5's

24 of Mr. Hall's statement if Mr. Richardson was in the

25 apartment.  We will move on next.

1            The next argument is with regard to Michael Key

2    and that's paragraph fifteen and sixteen.  The argument is

3    Michael Key was a jailhouse informant who had contacted

4    through his attorney -- it is not the argument these are the

5    facts -- had contacted the District Attorney's Office;

6    indicated that he had information about the homicide.  The

7    defense claims in the -- on page five of their motion that

8    Key told detectives that Hall had confessed to another

9    individual that Hall went to Abbott's apartment.

10           Actually that's not true.  That's -- again it's a

11   select -- selection actually of a partial sentence.  What

12   Mr. Key really said is Mr. Key heard -- I am going to quote

13   street talk about the murder from Wagner residents because

14   Mr. Key was incarcerated and this talk indicates that

15   Helen's assailant took her from her kitchen into the back;

16   and then Mr. Key goes on to say that according to Steve and

17   his friend Stanley Rowson R-O-W-S-O-N; Desiree and

18   Anthony Hall set up Helen to be robbed and that the robbery

19   had gone bad.

20           Apparently Hall had gone with someone to Helen's

21   apartment to rob her but when things got out of hand,

22   Anthony ran out.  That's actually exactly the People's

23   theory of the case by the way that Mark Richardson and

24   Anthony Hall left Desire's Allen apartment.  Decided at one

25   point to rob Helen Abbott and Anthony Hall ran out while

1    Mark Richardson finished the job.

2         So if you didn't have -- and I am going to ask

3    that the Court have for the record D.D.5 212 -- if I could

4    hand that up, Judge.

5         D.D.5 215 if you didn't have the entire statement

6    of Michael Key you might otherwise believe that some was

7    somehow exculpatory.  In fact it is both by my count

8    quadruple hearsay, right?  Key says he heard from Steve and

9    Stanley who heard word on the street who heard that Desiree

10   and Anthony Hall set up a robbery that Hall did with someone

11   else.

12        I think that's four layers of hearsay but, in

13   fact, on closer inspection the statement is consistent with

14   the People's position not in anyway exculpatory to the

15   defense.  Then paragraph 17 still on Michael Key so we are

16   not -- once I finish Michael Key, I will indicate and then

17   Mr. Klein can respond.  Paragraph 17, the defense motion

18   says, defense learned for the first time of several other

19   individuals connected to this case, Frog, Red Man and

20   Matt Helm who Key had discussed; and then the defense argues

21   that had they been -- that material been turned over sooner,

22   they could have -- let me quote it, "As a direct result of

23   the prosecution's belated disclosure of the very existence

24   of Key they were not able to find the witnesses."

25        Well actually as your Honor can see from D.D.5 212

1   Mr. Key's entire interview -- at the time Mr. Key gave that
2   interview one of them was already dead.  Had been dead for
3   years so he was already dead but yet the defense is claiming
4   if they had the information, they could have found him.
5   Really?
6          Once again not having all the facts makes it
7   difficult if not impossible for this Court to rule fairly.
8   It was Red who had died two years before the interview.
9   Again if you read the entire interview you will see that it
10  is multiple layers of hearsay just like earlier and if
11  Mr. -- if Mr. Klein, the defense is suggesting they would
12  like that entire D.D.5 to come in, then there are other
13  D.D.5's that indicate Anthony Hall did, in fact, go -- the
14  street talk was that Anthony Hall did, in fact, go with
15  another older black male.  That's the other street talk
16  that's indicated in Michael Key's D.D.5; and others.
17         It should also be pointed out and defense I
18  believe -- well, I do know -- knows this because it is
19  actually in the notes -- the two individuals -- it's in the
20  detective notes that were turned over to the defense.  The
21  two individuals that are mentioned by Michael Key is
22  actually having been the source of the street talk, were
23  both reached by the detectives; and on both occasions both
24  of them denied any knowledge of the murder or having told
25  Michael Key anything.  I understand that isn't dispositive.

1    I am just putting all of that on the record so the record is
2    clear about the lack of exculpatory value of this particular
3    evidence; and that's it with regard to the argument with
4    Mr. Key.
5                THE COURT:  Thank you.
6                MR. KLEIN:  Judge, since Mr. Bogdanos thinks it's
7    important to put everything in context and that we at some
8    point perhaps inadvertently only put in one line and then
9    didn't put in other lines that would perhaps put it in
10   context, then I assume it was just inadvertent slip by the
11   district attorney when he was just reading this to your
12   Honor that he stopped when he said -- and if you read the
13   entire D.D.5, you see it says apparently Hall had gone out
14   with someone to Helen's apartment to rob her; but when
15   things got out of hand, Anthony ran out and then he said
16   that is exactly their position on the case; but the next
17   lines are actually the lines we thought and I believe we
18   spoke Judge Carruthers about how critical we thought they
19   were when Ms. Irick was on the case, that is the lines he
20   adds that it is Hall and Desire's MO to set people up to rob
21   them; and I think that was the part that we felt, it was a
22   helpful lead for us.
23               Mr. Bogdanos seems to -- well he does whatever he
24   does -- but there is an argument made by the District
25   Attorney's Office here that this is four levels of hearsay

1    and, therefore, wouldn't be admissible in court, but we are

2    not talking about when we deal with Brady litigation about

3    whether the information that was in the report is in itself

4    admissible.  We are talking about whether or not

5    investigative leads were given to the defendant that may

6    have led to admissible evidence.  That's the problem.

7            That's the quandary and the difficulty that the

8    Court is putting in that.  We are aware of that.  The Court

9    has to sit there and say, okay, these other individuals said

10   that Key was full of gobbledygook but it appears Key knew

11   something about what was going on there and it would have

12   been helpful for the single minded defense lawyer to have

13   this information and be able to speak to Key and find out

14   what -- why he was saying, for example, that it was this

15   other guy Hall and Desiree, this girl who you know, her name

16   kind of drifts around the case -- why they had this MO to

17   set people up and rob them.  That's my argument with regard

18   to that.

19           THE COURT:  Thank you.

20           MR. BOGDANOS:  Moving onto paragraphs 20 and 21,

21   there is an argument by the defense about a Barbara -- I am

22   sorry I skipped 18 and 19 because it summarizes then -- each

23   of those individuals are summarized and covered later -- 20

24   and 21 defense argues that there is an individual named

25   Barbara who spoke to a CI, CI Edwin Santiago and this is

1  D.D.5 53.  It's in the Defense 58.  It is just a typo.  It

2  is 53 so I will offer 53 to the Court at this time as well.

3          (Handing.)

4          MR. BOGDANOS:  Sidney Gotler is an individual,

5  your Honor, who had had a prior association with Ms. Abbott

6  and who is dead.  Who has died unrelated to this case.

7  Unrelated to anything.  Just natural causes so -- and so

8  Mr. Gotler is gone; so the argument appears to be that

9  Edwin Santiago told the police that Barbara told him that

10  Sidney Gotler had lied about being in the apartment on

11  Saturday night.

12          In fact, it's slightly more involved than that.

13  What Sidney -- what this CI said Barbara said Santiago -- I

14  am sorry -- that Gotler said -- and I am sorry; I am still

15  counting four layers of hearsay -- is that he had lied to

16  the police and didn't look around the apartment and left

17  after he smoked.  That's a quote.  That's what he said in

18  the D.D.5 and I would urge, your Honor, to go through the

19  entire D.D.5 and you will see that there is nothing in that

20  statement that is in anyway exculpatory.

21          I should also put on the record that Mr. Santiago

22  refused to tell the detectives who this Barbara was whether

23  that was her real name or her street name or just a name he

24  made up; and now the police or the district attorney know

25  who this Barbara is or ever knew who this Barbara was; so I

1    am not sure -- with regard to this complaint, I am not sure

2    what the remedy would be other than dueling D.D.5's of a

3    dead person who may or may not have been in the apartment

4    after she was murdered and may or may not have smoked crack

5    and may or may not have looked around the apartment.

6         I do know what that does other than distract the

7    jury with irrelevant matters and I don't even know how it

8    gets into Evidence other than through the vehicle of dueling

9    D.D.5's, particularly where we don't even know the

10   individual who reported this Barbara -- let's pretend that's

11   her real name.  We don't know who that person is so I am not

12   exactly sure how that does anything for the defense or for

13   the trial.  That's it.

14        THE COURT:  I take it he died before this document

15   was turned over?

16        MR. BOGDANOS:  Did you have this before I gave it

17   to you?  I don't --

18        THE COURT:  They say the 19.  They got this on

19   April 21, 2011.

20        MR. BOGDANOS:  Before they got this particular

21   document -- yeah, I think -- yes, the answer they got the --

22   defense, just to be more precise, the defense got this

23   document after he died but they got plenty of other

24   documents identifying Sidney Gotler and interviews and DNA

25   long before.  Sidney Gotler was not a surprise.  They knew

1    his name, who he was and what his involvement in the case
2    was before he died.
3              THE COURT:  Thank you.  Mr. Klein.
4              MR. KLEIN:  Just I think actually dueling D.D.5's
5    here as it is called by the district attorney would not be
6    an inappropriate remedy.  I should say it's always been the
7    district attorney's position in this matter.  It certainly
8    was the detectives' position that Sidney Gotler -- he wasn't
9    lying about having gone to the apartment on the evening of
10   the twelfth in the morning of the thirteenth.
11             In fact there is great corroboration about that.
12   He is identified on the video by the family of the victim,
13   by the detectives.  He is clearly seen leaving also the
14   early morning hours of the eleventh.  He is there for about
15   forty-five minutes.  What it appears he lies about is his
16   activities in there.  It is not that he says in one, yeah, I
17   did go to Barbara and then says, no, I didn't go.  It
18   appears that he says police had me in for an interview.
19   They think I killed her.  I told them what I was doing in
20   there.  That's not really true.  I did other things.  I told
21   them I didn't know about them being dead.  I didn't know
22   about her being dead; so it's important not only because he
23   may, in fact, be the individual who killed the victim.  It
24   also goes to obviously to the integrity of the crime scene
25   itself as to whether other people were there in between the

1   time that the district attorney deposes the defendant and

2   others killed her on the eleventh and when she is actually

3   discovered by family members on the afternoon of the

4   thirteenth.

5            THE COURT:  Thank you.

6            MR. BOGDANOS:  Moving to paragraph 22, your Honor,

7   that's concerning Tyrell Whittaker.  Tyrell Whittaker is a

8   street name of Smiley is a drug dealer.  Now it appeared to

9   have been Helen Abbott's drug dealer.  Anthony Hall's drug

10  dealer.  Desiree Allen and Mark Richradson's.  Defense

11  argues that Mr. Whittaker was present in the apartment

12  Friday night to deliver drugs.  That may or may not be true

13  but that's not borne out by any evidence in the case.

14           What D.D.5 218 which is the source of this

15  information indicates is that after Anthony -- it's an

16  Anthony Hall interview -- after Anthony Hall and Richardson

17  went to Helen Abbott's apartment they used some of

18  Anthony Hall's money to purchase drugs from Smiley assuming

19  this Smiley is Tyrell Whittaker, which appears likely that's

20  all there is.  There is no indication that Tyrell Whittaker

21  ever went into the apartment.

22           Now the defense claims that they don't have the

23  ability to search for him in the videotape, and that's a

24  complaint that alludes me.  I gave them a photograph of

25  Tyrell Whittaker on September 2nd.  It's eleven days ago;

1    and -- right, eleven days ago?  And they had that video of

2    the entire building long before I came on the case, and I

3    gave them a complete new copy of the entire video so I am

4    not sure what is preventing anyone from looking at the video

5    in the intervening eleven days to see whether or not an

6    individual who looks like that photograph appeared in

7    entering the building; but I am just not sure what exactly

8    the argument is here to interview a drug dealer to get him

9    to admit he sold drugs; and to what?

10            This I one I am lost on, Judge.  I don't

11   understand what's being requested so it's hard to respond.

12   I am done on Mr. Whittaker.

13            MR. KLEIN:  Over the past three years there has

14   been much back and forth about the third individual.  There

15   is an individual who is sometimes called Johnny, who the

16   police actually asked my client about a lot; and when they

17   finally arrested the defendant, they immediately go to

18   Mr. Hall's house and ask him who is Johnny because there is

19   a dispute as to whether or not this Johnny, this third

20   person was a friend of the defendant's and lived with the

21   defendant and aided the defendant during this with

22   Ms. Abbott or whether Johnny, in fact, is a friend of

23   Mr. Hall's and went with Mr. Hall.  Could be a friend of

24   Mr. Hall.  Whatever happened in there, this individual went

25   with hall.

1          It is very unclear.  It is hard to know, of
2    course, who to believe in terms of this Richardson telling
3    the truth.  Hall went there in front of his confederates.
4    Is hall telling the truth that Richardson went there with
5    one of his own confederates?
6          It is also alluded to in the videotape that is
7    actually going to be shown to the jury there is some
8    fourteen (14) minutes that Judge Carruthers ruled is
9    admissible; and Richardson says in that part of the
10   videotape that this guy and this so called Johnny and Hall
11   seem to be acting together, right?
12         Of course, it's the prosecution's position that
13   they were all acting together.  It is our position the jury
14   is going to accept that it was Hall and this other
15   individual who were acting together on their own.  Whittaker
16   apparently is a drug seller, who is called that evening and
17   comes over and delivers crack, and it's our position that
18   obviously since he came over and apparently came to the
19   apartment Hall says that, that he'd be able to tell us this,
20   we'd know who he was, what his role was, and how to find
21   him; not whether or not he sold crack there.  That wouldn't
22   interest us.
23         What interested us obviously was to know what he
24   could tell us about the relationships among the parties;
25   that is, this Johnny like who did it appear to you he was

1    with, who knew him, who did he know, who knew his name, who

2    did he share money with and all of those things to try and

3    display the notion whether this person, in fact, was really

4    a confederate of Hall as the defendant had been saying as he

5    said in the videotaped statement so that's why it is

6    important.

7                    (Transcript continued on the next page.)

PROCEEDINGS/MOTIONS

1   T-2 - Peo. V March Richardson, Ind.#3534/08

2   September 13, 2011:

3               MR. BOGDANOS:  The one problem with that

4   argument is, in the videotaped statement that Mr. Klein alludes

5   to, the defendant actually talks about Johnny and says that

6   he's Hall's friend.  And, in fact, they greet each other

7   downstairs on the lobby and say:  I'll catch you at Ma Ma's in

8   a minute.  Ma Ma being Helen Abbott.

9               Well, you actually see what Mr. Richardson has

10  described exactly on the video, you actually see him greeting

11  some person at the door as the defendant and someone, Hall and

12  someone else come in.

13              So you actually see all of that.  So the defendant's

14  statement in that regard is corroborated by the video.  The

15  problem with that argument is you then see that individual

16  leave the building before Helen Abbott does while she's still

17  alive.

18              You also, by the way, see the other person who came

19  in with the defendant leave with the defendant while Helen

20  Abbott is still alive because you see her on the video some

21  time later.  So at the moment the last -- and then the

22  defendant comes back alone.

23              So at the moment Helen Abbott is last seen alive

24  those two people, the people that defendant describes in the

25  video, the person of Hall, they're gone.  They don't come back

Glenn J. Merola, Sr. Court Reporter

1  in the building.  It's only Hall and Richardson who are in the

2  building.

3        So I come back to the same problem.  One, I still

4  don't see how this comes in.  I'm not sure how anybody cross

5  examines third and fourth party hearsay.  But I don't see the

6  relevance of it.  I just wanted to add that particular point to

7  it and I will move on.

8        The second set of paragraphs is, discusses four

9  women, paragraphs 23 to 27, a Jackie Jacino, Maritza Rivera, a

10 Jeannette Anderson and Alicia Spriel and Evon.  So it's five

11 all together.  Without -- I don't want to belabor any of this

12 but Rivera said, in DD5 160, that she didn't know anything

13 about the murder.  She heard from Jackie who told her that

14 Whitey and Green Eyes had done the murder.

15       By the way, it should be clear, these two women,

16 Rivera and Jacino, are actually incarcerated when they are

17 having this conversation.  So, in DD5 160, which I am going to

18 offer Your Honor, Rivera says its told to her Whitey and Green

19 Eyes had done the murder.  And in DD5 140 when detectives

20 interview Jackie Jacino, she says she never heard of the

21 murder.

22       So I'm not sure what it is -- and here's 160 and 140

23 for the Court -- I'm not sure what Jackie Jacino is going to

24 say since she denies anything of the murder.  Could you imagine

25 in that if that is Brady material that every single witness who

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1   identifies the murder becomes Brady material.  Really.

2           With regard to Jeannette Anderson.  So your Honor

3   gets it.  Rivera sources Jacino, Jacino says it didn't happen,

4   so I'm not sure what that leaves with Rivera and Jacino says

5   she has no knowledge.  Jeannette Anderson is, actually,

6   honestly, I really do assume this was just an error, Jeannette

7   Anderson, it's DD5 Number 28, says that she heard the same

8   thing.  It's rumors.  Three talking words on the street.

9           Jeannette Anderson says she heard that Green Eyes did

10  the murder.  Green Eyes did the murder.  Here's DD5 28.  I

11  don't want to misread.  Then she identifies the photo of Green

12  eyes.  His name is Barna Medina.  Barna Medina was incarcerated

13  in December of 2007, and I don't have the exact dates, I think

14  it was April of 2008 when he got out.  Incarcerated six weeks

15  before the murder and for most after.  The person that she's

16  saying did it is incarcerated.

17          Kind of shows you what street talk and words and

18  rumor is worth and dueling DD-5s is worth.  The defense knows

19  this, I given them his incarceration history, so they know that

20  he's actually incarcerated so that, one, frankly, I'm assuming

21  that's a word processor issue, that name should have been

22  deleted from a list of names.

23          Then the defense argues, same paragraph, that Evon

24  must have information, at page ate, that they have no

25  additional contact information for someone named Evon.  Because

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1    in DD5 97 an informant, turns out to be Patrick Green, says

2    Evon told him that she had information that Tony Hall and

3    Whitey, and perhaps some other people, and I'm not going to

4    read it because I don't want to be accused of reading it out of

5    context, had killed Ms. Abbott.  So I am going to ask that 97

6    be handed to the Court.

7          Well, the problem is, once again, beside the fact

8    that you have someone saying someone else said something about

9    someone who, Anthony Hall and Whitey and other people did it

10   but, putting that aside, we don't know who Evon is.  We don't

11   know if Evon, in fact, it specifically says in the DD5 that's

12   the name he's using for her, there is no indication whatsoever

13   that's a real name.  In fact, it's almost certainly not.

14         And New York City Police Department, DA's Office, do

15   not know who that person is.  Frankly, if that person exists.

16   And have never known who that person is or if that person even

17   exists.

18         So, again, even if there were some vehicle for which

19   this came in we could be talking about a fictitious person and

20   I don't understand what the good faith basis for that to come

21   before the jury would be.  I am not arguing good faith base on

22   the part of the defense, they're fine, I am talking about in

23   front of the jury.

24         Now that I am telling the Court and I assume Mr.

25   Klein, as the Court takes my word, we don't know who that

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1   person is and the informant refused to say the name and that's
2   going to be a recurring theme in a moment.
3          And then, finally, with regard to this list of women,
4   you have Alicia Spriel.  Alicia Spriel had indicated that she
5   had information about the murder.  Again, it was in her words,
6   street buzz.
7          It turns out that she didn't have information it was
8   her husband who had information but she refused when detectives
9   went to visit her house some woman there said Alicia doesn't
10  live there anymore but shortly there after Alicia called the
11  25th Precinct said I will put my husband on the phone but I am
12  not telling you his name and the Detective then spoke to the
13  man who, again, did not indicate he had any firsthand knowledge
14  whatsoever about the homicide but just indicated that he had
15  the same information I just repeated Your Honor about all the
16  other street buzz.
17         The thing that had -- and this is DD5 -- no, it's
18  not.  The thing that had concerned the defense -- it is DD5
19  120.  I'm sorry.  The thing that had concerned the defense is
20  the note at the bottom of DD5 120 in which, Detective Dimuro's
21  handwriting, it indicates, pointing to the husband, an arrow to
22  the husband, says CI for Kevin Flynn.
23         In fact, that's a question and one of the other
24  detectives had told Detective Dimuro when he was typing up --
25  reviewing the DD5, check to see if he's the informant that

PROCEEDINGS/MOTIONS

1   calls sometimes for Detective Flynn.  It turns out not to be

2   him.  But in fairness to Mr. Klein, the defense, they didn't

3   know that until now.  I confirmed it with Detective Dimuro and

4   represented to Detective Flynn, who's actually retired.

5        So let me offer 120 for the Court's consideration

6   here.  So the bottom line on that is we don't know who that

7   person is and never knew who that person is and he's not a CI

8   for Detective Flynn or to our knowledge any other detective.

9   And that's it on those women.  Yeah, it is on those women.

10  That's it.

11       MR. KLEIN:  Let me just respond.  The Court has

12  the Fives, the Court can read them, it's just that with regard

13  to the information from Jacino, Rivera, to the individuals

14  first mentioned by the district attorney, she then says, you

15  have to put this together with the information from Evon about

16  this Green Eyes they were talking about a Green Eyes who had

17  done the murder and how ridiculous that was because everyone

18  knows and she, Evon, identifies the Green Eyes as being Barna

19  Medina and detectives early figure out that Barna Medina is

20  dead.

21       MR. BOGDANOS:  Incarcerated.

22       MR. KLEIN:  I'm sorry.  That Barna Medina is

23  incarcerated at the time of the murder and can't have done it

24  and we all agree with it.  Then the detective goes on to say,

25  the great surprise in the case, another Green Eyes appears, a

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

 1   Green Eyes named Mr. Vega, who is also one of suspect in the

 2   case and then the detectives realize there's a relationship

 3   between Vega and Lax.  Lax being Whitey.

 4         Much of the street talk that these women talked about

 5   is that either Hall does it with Lax or with Whitey, or that

 6   Vega is involved, not the defendant, and that's the Green Eyes

 7   who it appears that they are talking to, Jacino and Rivera, one

 8   of them is actually supposedly doing tricks for Lax who had

 9   lived in the building, one of them is a step sister, I believe,

10   of Vega.

11         So it's not that this was a far fetched thing where

12   everyone was off in the ozone looking at a Green Eyes because

13   Detective Dimuro himself notes in his case files this great

14   surprise that there is actually a different Green Eyes who

15   maybe related to the case.

16         So we felt that it was important, obviously, for us

17   to be able to actually speak to Alicia Spriel, find out who was

18   her informant, if it was her husband, then actually to speak to

19   the husband to get information about that and, obviously, to

20   speak to these two women at the time the information came into

21   the District Attorney's Office and then we'd be able to

22   determine whether or not it was the buzz whether they really

23   knew anything or not.

24         But it was certainly a good investigative lead they

25   were giving the detectives and we felt we should have been

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1  given that other people not the defendant were responsible for

2  the crime.

3          MR. BOGDANOS:  The one final point on all those

4  women is we see the problem with using DD5s to prove anything.

5          Based on the DD5s the Green Eyes was Barna Medina.  A

6  photo of Barna Medina was actually identified.  It's in the

7  Fives.  That's who was identified as the Green Eyes.

8          Could you imagine if we put that DD5 into evidence

9  and we didn't have the ability to cross examine that person the

10  jury would be left in a position of thinking that Green Eyes

11  must have done it and so I'd have to bring in hearsay to

12  disprove double hearsay.

13          What point does that slippery slope stop?  The answer

14  is never if Your Honor were to open that door.  We're just

15  about done.  Four more points.  And I think these are quicker.

16          Number -- paragraph 28.  Kathy.  Defendant has asked

17  for Kathy.  Who's Kathy?  Turns out that after Helen Abbott is

18  murdered her apartment is no longer used, it's a crime scene,

19  it's sealed, it's no longer used for crack smoking so there's a

20  new apartment and this apparently is someone who may be named

21  Kathy.

22          This is according to an informant and that's DD5

23  Number 32.  Informant, someone named Edwin Santiago, who

24  provided information and the information is elicited in there.

25          The bottom line on that is he refused to give Kathy's

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1   real name.  He refused to give Kathy's location.  He refused to

2   give anything whatsoever about Kathy.  Presumably because it's

3   his new crack spot as well and he doesn't want to give it up.

4           So the defense is asking for something we don't have

5   and never had.  So I don't think there is no Brady issue.  We

6   never had that information about who this Kathy is if that's

7   her real name or what the spot is.

8           Then the next point is paragraph 29 and it's Matthew

9   Lax.  Just so the record is clear because I think there may

10  have been a bit of understandable misunderstandings on the part

11  of the defense.  I think I have been able to clear it up but

12  let me do so for the record.

13          We have never received a DNA sample from Matthew

14  Lax.  He refused, didn't give us one.  But there was none the

15  less a profile in the state DNA data bank that for Matthew Lax

16  and that -- I provided all this to the defendant -- and that

17  actually indicated that Matthew Lax DNA appeared in the

18  apartment on a duvay cover.  Not surprising Matthew Lax used to

19  live in the apartment before he left with his girlfriend.

20          I have heard, depending on whom you believe in the

21  dueling DD5 interviews, he left because Helen threw him out.

22  Or, he left because he wanted to and he didn't want to stay

23  there anymore.  Or, he left because he was having his

24  girlfriend turn tricks there who actually was the half sister

25  of another person who used to smoke there and it created an

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1    uncomfortable situation.  Or, pick all of the above, because

2    every single one of those are in the DD5s.

3              This is the kind of slippery slope we're talking

4    about.  This is the kind of information that is going to come

5    in if any of this comes in I submit.  So the defense argument

6    is, if I'm misstating I apologize, I don't do it intentionally,

7    that they never had a photograph of Matthew Lax up until

8    recently and, therefore, couldn't engage in their investigative

9    lead that a photograph might have offered them.

10             Well, here's the problem with that.  Matthew Lax has

11   been arrested six times in New York County in the last ten

12   years.  I looked it up.  Five of the six have arrest

13   photographs.  There's nothing preventing the defense from

14   having done a simple name search and gotten that and then

15   gotten the arrest photographs.  And the defense knows the name

16   Matthew Lax and has known his real name for I think years.

17   Certainly long before I did.

18             And, in fact, they know his NYSID number because it

19   was listed in a DNA report in February 15, 2011, with his NYSID

20   number, they could have gotten arrest photo.  So I don't

21   understand.  It's one of these, I don't know how to respond to,

22   maybe it's just being thrown out there, maybe they didn't give

23   us a photo.

24             Well, there is nothing preventing the defense from

25   getting a photo on his own.  Isn't that what CPL 240.00 says

                    Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1    that the People aren't required to turn over photo that they

2    could have obtained via subpoena duces tacum themselves.

3           Clearly an arrest of an individual whose NYSID number

4    they known since at least February 15, 2011, has to fall into

5    that category.  Anyway, I don't know the remedy, I don't know

6    what's being requested with Mr. Lax just like I don't know

7    what's being requested with Kathy.

8           Turning now to 30 and 31.  Patrick Green.  And I am

9    not stopping just because these are all cut from the same

10   cloth.  Patrick Green, the defense clearly indicates they all

11   know the name but they didn't know the significance, they

12   didn't realize that Patrick Green was someone who was required

13   to as a CI or a source and their concern is apparently that he

14   had looked at a video on Saturday afternoon and he had said

15   that, fifty-fifty, thinking he may have seen Matthew Lax in the

16   building on Saturday afternoon.

17          Well, the detectives actually looked and they doubted

18   it but it's not their position to doubt either they have to

19   back it up.  So they actually had Anthony Hall look at that

20   exact same clip.  Anthony Hall grew up with Matthew Lax.

21   Anthony Hall looked at that same clip and Anthony Hall told

22   them it was actually not Matthew Lax in the photograph.

23          Also, with Matthew Lax and Kathy, I don't know what

24   the defense is asking for because whatever they are asking for

25   doesn't exist.

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1           And then, finally, Desiree Allen.  The complaint was

2    they never had information about her prior arrest.  They

3    actually did.  I turned it over on the 6th.  But Desiree Allen

4    is not a People's witness.  Desiree Allen is the defendant's

5    girlfriend.  Desiree Allen is the actual person who initially

6    put the detective on to Mark Richardson.

7           She initially made anonymous phone call, DD5, 61, and

8    then she's saying you should look at Mark Richardson.  Then she

9    came to the 25th Precinct on a pretext, some other matter on a

10   friend of hers, while she was there she said I would like to

11   talk to the Detective.  Then a detective came down and the

12   detective said what is it.  I think you should look at Mark

13   Richardson.  DD5 40.  Then she identified a photo of Mark

14   Richardson DD5 70.

15          And, ultimately, Desiree Allen is what enabled the

16   police to connect the person who kept coming in and out of the

17   video in the building with Mark Richardson because she's the

18   one who said Mark Richardson is the one you should be looking

19   at because we had a fight shortly after the murder and he was

20   mad at me, He said don't let what happened to the old lady

21   happen to you.  And Desiree Allen was in fear for her safety

22   and that's when she made the anonymous phone call.

23          So I don't understand what the name Desiree Allen is

24   doing in a Brady motion because Desiree Allen is actually the

25   person who inculpates Mr. Richardson.  So these last four I am

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1   just at a loss.  Thank you.

2           MR. KLEIN:  Well, Judge, I will start on the

3   last one.  Because when we spoke to the district attorney in

4   his office and explained that we thought there was possibility

5   that Desiree Allen was actually going to be called as a

6   prosecution witness but we had DD5s that seemed to indicate she

7   was known to the police as a liar because she had, for example,

8   made a rape complaint about, seemed to involve Mark Richardson

9   but it also seemed that the police had information saying that

10  she had just made up this rape complaint because as it turned

11  out she didn't want to go to work that day.

12          So we thought it was appropriate if she was going to

13  be called as prosecution witness in the case that we be given

14  that kind of material about her that showed her fundamental

15  unreliability.  So that's why we asked for such information.

16          But going back to the other point about Patrick Green

17  and the photograph of Matthew Lax, I guess that's true, we

18  could have found the photograph of Matthew Lax, we could have

19  done that.  The problem is not having the information about

20  Patrick Green and not knowing that Patrick Green was a CI, he

21  was the person giving the information.

22          Actually, he was an individual that we should have

23  spoken to.  We didn't know this was someone that actually said

24  it was apparently Lax who was seen exiting the building with

25  Mr. Hall and apparently Patrick Green, CI, was giving the

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1  police information about the fact that it may have been Hall

2  and Lax who had done the crime and not the defendant.

3       The district attorney then says but that doesn't

4  really fly because Hall looked at the videotape, Hall who the

5  district attorney says is the other perpetrator here with Mark

6  Richardson and of course has his own reasons to lie, Hall

7  looked at the video tape with the police and said, no, it's

8  definitely not Lax.

9       Of course we all know Hall has very good motive to

10  not give the information to the police who may have been with

11  Mr. Lax because then the police would obviously speak to Mr.

12  Lax who would get Lax to implicate Mr. Hall.

13       So the fact that he identified the individual on the

14  tape being Lax is really irrelevant to whether or not we should

15  have been given access to Patrick Green who had information

16  leading to believe that it was Lax and Hall who had done the

17  crime and not the defendant.

18       And then I think, you know, the district attorney has

19  actually convinced me of something now with regard to this

20  application then, you know, he said, part of the absurdity of

21  what we done is we asked for remedies and what remedies could

22  there possibly be.  So I guess he, in a funny way, is actually

23  joining with my client because when my client read this motion

24  he said I don't understand why you're not asking for dismissal

25  of the case here and I guess I thought because I didn't want to

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1   be outlandish and ask for something that I didn't think was

2   appropriate but now the district attorney has convinced me that

3   I was wrong if there aren't remedies that could be given for

4   these obvious Brady violations that have gone on for years with

5   four different district attorneys, not implicating Mr.

6   Bogdanos, if there is no remedy to be fashioned then I ask for

7   the case to be dismissed.

8             MR. BOGDANOS:  One minor correction.  If I was

9   in artful I apologize.  Mr. Klein just said that the clip that

10  Patrick Green may have seen Matthew Lax in was him with Anthony

11  Hall leaving the building.  If I led him to say that, that's

12  inaccurate.  The clip that Patrick Green said might have been

13  Lax was Saturday entering the building with some woman named

14  Virginia, crack head, street name Virginia.

15            So there is no indication whatsoever anywhere in the

16  record, anywhere in any DD5 or interview or video that has

17  Matthew Lax with Anthony Hall in the building.  So I just want

18  to correct that.

19            And in response to Mr. Klein's newest motion, the

20  People remain, the People's position remains the same, that

21  there is no Brady violation here.  I simply was entertaining

22  each request so Your Honor could actually see that there was no

23  Brady violation when it was viewed in its entirety and in

24  context.  That's a separate argument from the vehicle through

25  which the defendant was, at least as of when they filed the

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1    motion, attempting to enter it.

2           So I don't want to confuse two separate threads of

3    the argument.  There is no Brady violation.  I am not going to

4    repeat why but there's also the remedies that they are asking

5    for are well beyond any remedy that is appropriate in this case

6    and it actually serves to distract the jury.

7           Thank you, Judge.

8           MR. KLEIN:  Judge, I don't know how you want to

9    do this, I do have another motion, not a Brady motion.

10          THE COURT:  All right.  Why don't you proceed.

11          MR. KLEIN:  Sure.

12          THE COURT:  I want to get the jury in here at

13   some point.

14          MR. KLEIN:  As we do.

15          The district attorneys office indicated that they

16   believe there was an informant who was probably going to

17   testify who was going to talk about jailhouse informant, about

18   statements made by the defendant, I assume are inculpatory.

19          The district attorney last week brought this up and

20   indicated it might be asking for a protective order with regard

21   to this individual because the person couldn't be moved until

22   Monday, Monday being yesterday, because although Mr. Richardson

23   is at Manhattan house now having been moved about two weeks ago

24   for unknown reasons, apparently this informant is still at

25   Rikers Island.

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1          So until he can be moved, which would have been

2     Monday, it wouldn't be appropriate to give the defense

3     information about his name and I was, understood, I had no

4     problem with that.  However, Mr. Bogdanos has informed me that

5     discussions have continued with this individual about something

6     to the effect there is no final agreement, cooperation

7     agreement and as a matter of office policy, I believe, he can't

8     get approval to have the individual moved until there's

9     actually a cooperation agreement signed.

10          That may happen or it may never happen and until that

11     happens, that is the cooperation agreement is signed and the

12     individual is moved, then the individual remains in jeopardy if

13     the defense is given information about him.

14          But I don't think that's now a valid reason.  I

15     accepted we couldn't do it until Monday until yesterday but I

16     think this is an office policy issue that can't trump

17     defendant's discovery rights.

18          The district attorney's office moves people gets

19     separation orders against people and whether or not there's a

20     cooperation agreement in place doesn't stop them from having an

21     individual moved.  They could ask for a court order.  They

22     could ask for a court order ex-parte.  They could say, Judge,

23     order this individual moved.

24          But now we're before opening statements which is the

25     time that the district attorney's office is required to give

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1   material about anyone, you know, who is going to testify and I

2   think that material has to be given to us now before opening

3   statements, criminal history, the other individual that Mr.

4   Bogdanos says had DD5s, we have write-ups, 61s, before we

5   proceed to opening statements and to say that there is an issue

6   of office policy can't trump that.

7         MR. BOGDANOS:  It's not -- this may just be

8   another misunderstanding.  If it's my fault I apologize.

9         This is nothing to do with office policy here at

10  all.  This is not office policy trumping anything.  It is

11  simple reality.

12        An individual informed the district attorney's office

13  that he had information about Mark Richardson.  He was

14  produced.  I interviewed him.  I have to in good faith as an

15  officer of the court investigate to determine -- I don't decide

16  when the defendant confesses to people he's incarcerated with.

17  I don't decide when they come forward.  Once they do come

18  forward as an officer of the court I have an obligation to

19  investigate to ensure that it's credible.  Not just housing

20  arrangements but the individuals prior criminal history, none

21  of which can be done overnight.

22        This isn't office policy.  This is reality.  And so

23  until there's a cooperation -- and there is no cooperation

24  agreement in place.  There is none.  A cooperation agreement,

25  as Mr. Klein and this Court well knows, has to be approved by

PROCEEDINGS/MOTIONS

1  the defendant, by the individual's attorney, and by the Court

2  before whom that individual has an open case.  Hence, he's in

3  jail with the defendant so that hasn't happened.  Until that

4  happens there is no cooperation agreement.

5          And there's not going to be one until the People

6  investigate sufficiently and get the Court's approval, get a

7  cooperation agreement signed, and then get -- put the

8  individual into protective custody an turn over the material to

9  the defense.

10          Now, there's two things and Mr. Klein had already

11  said these, but the record should be clear.  Number one, I have

12  made it abundantly clear to him, on the record and privately, I

13  am getting him everything I get.  I am talking about VDFs, I

14  am treating it as if it's Rosario, all his cases, closed cases,

15  open cases, cases from all over the counties, he's getting

16  everything, he's getting exactly what I have, DA data sheets,

17  Criminal Court complaints, indictments, VDFs, whatever it is,

18  he's getting it, I'm compiling that.

19          But the second issue with regard to the protective

20  order is there have been threats against this individual in

21  jail.  I said this last time.  I'm prepared to go on the record

22  in-camera, out of the presence of the defendant, to the give

23  the Court the precise detail of the threats that appear to have

24  been made -- well, certainly appeared to have been made on

25  behalf of Mr. Richardson with Mr. Richardson's name being

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1   used.

2            I made it clear last time, I am repeating, I am not

3   ascribing the threats to Mr. Richardson, I am not saying he put

4   the word out to make sure there are no snitches but I'm saying

5   that this individual has been approached in prison and that

6   individual who approached him used the name Mark Richardson.

7            I am not going to say more then that because I am not

8   in any way going to give the defendant any clue as to who this

9   individual might be.  But I said that last week, I will stand

10  by it, I am prepared to make in-camera record as to exactly why

11  a protective order is required here.

12           Judge, I will keep Mr. Klein, the defense informed as

13  to the status.  It will not go beyond this Friday, I guarantee

14  that, that the latest he will have everything is Friday.  But

15  it's not office policy.  Its simple reality of all the moving

16  parts that need to get into place before I can ensure that

17  witnesses safety.

18           MR. KLEIN:  Judge, just, can I respond briefly.

19  We all want to start the trial.  We all want to start it.  Mr.

20  Richardson especially.  But the district attorney comes to a

21  point where it says it's investigation is complete enough that

22  they answered ready for trial, to start the trial, cognizant

23  that there are certain things that once they say that have to

24  be turned over to the defense.

25           So, I don't think it's adequate for them to say we

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/MOTIONS

1   haven't been able to finish our investigation about this

2   individual in part and that's why the material can't be given

3   over.   They are either ready or they are not.

4              THE COURT:   Is it your position that you are in

5   compliance with the CPL.

6              MR. BOGDANOS:   Yes, Your Honor.   Absolutely.

7              THE COURT:   All right, next issue.

8              MR. BOGDANOS:   I have none.

9              MR. KLEIN:   None.

10             THE COURT:   Okay.   One moment.

11         (Short pause in the proceedings.)

12             MR. KLEIN:   Have we told the jury anything

13   about --

14             THE COURT:   They are all waiting.   They are all

15   here.

16         (Short pause in the proceedings).

17         (Continued on next page.)

18

19

20

21

22

23

24

25

                Glenn J. Merola, Sr. Court Reporter

1            THE COURT:  Back on the trial.  With regard to the

2   motion for an order in limine regarding certain alleged

3   Brady violations, the motion to dismiss is denied; and the

4   motion to grant certain trial remedies such as admitting

5   D.D.5's, et cetera, is also denied.

6            As to the second motion regarding the late

7   turnover of certain Rosario material, if it occurs the

8   defense will be given additional time to prepare for the

9   cross-examination of that witness; but that will not stop

10   the trial from going forward.  In fact, I am now ready to

11   give my preliminary instructions to the jury if both sides

12   are ready.

13            MR. BOGDANOS:  Yes, your Honor.

14            MR. KLEIN:  Yes.

15            THE COURT:  Thank you.  May we have the jury

16   please, Greg.

17            (Off-the-record discussion.)

18            THE COURT OFFICER:  Jury entering.

19            (Jury entered the courtroom.)

20            (Jury roll call.)

21            THE SERGEANT:  Your Honor, properly seated jury.

22            THE COURT:  Jeanette.

23            THE COURT CLERK:  Case on trial continued.  The

24   People of the State of New York against Mark Richardson.

25   The defendant, his attorney, and the District Attorney are

1   present.  Would both sides stipulate the jury is present and

2   properly seated?

3               MR. BOGDANOS:  Yes.

4               MR. KLEIN:  Yes.

5               THE COURT:  Thank you and good afternoon, ladies

6   and gentlemen.  I do apologize to all of you for the long

7   delay this morning.  The parties have been in the courtroom.

8   We have been working on some legal issues that, that came

9   up.  Unfortunately that may happen again during the course

10  of the trial; that is, some legal issue that may have to be

11  addressed with the jury outside.  We will do our best to

12  keep those at a minimum and ironically some of the stuff --

13  some of the things that we were talking about this morning

14  might actually save time in the long hall; but that I just

15  throw that out as an aside.  I know it is difficult when you

16  are waiting and wondering outside the courtroom.

17               Believe me, we have all been working hard and in

18  terms of the overall trial schedule that has not changed one

19  bit and certainly should there be a change one way or the

20  other, I will pass that information on to you as soon as I

21  can.

22               What we are going to do before we break for lunch

23  is as follows:  I am going to give you some preliminary

24  instructions designed to assist you from this point forward

25  and then both attorneys are going to address you with their

1  opening statements.  It's -- we are going to go past the one
2  o'clock hour which is our normal time to break for lunch;
3  but we want to get all of this before you and then we will
4  take an extended lunch, so there will be a normal lunch
5  period on the other side and we will start up a little bit
6  later this afternoon; and you will begin to hear the actual
7  testimony later on this afternoon so I do apologize if any
8  of you are getting hungry but this helps us in terms of the
9  schedule.

10      All right, I will now start out with the
11  preliminary instructions.  So what is a jury trial?  It is
12  sometimes said usually by appellate judges that a trial is a
13  search for the truth.  Actually as many of you have figured
14  out already a trial is simply an adversarial proceeding
15  meaning one side against the other in which both sides
16  playing by well established rules and principles submit to
17  your ultimate decision and that's why we spend so much time
18  during the jury selection process.

19      We want to be sure that each and everyone of you
20  will be a fair and impartial juror and I do believe we have
21  accomplished that.  If we are lucky at the end of the trial,
22  we will be able to say that justice with a small "j" has
23  been achieved and that truly is our goal; and speaking of
24  the rules, I remind you again that Mr. Richardson is in
25  court today because an indictment has been filed against

1   him.  Once again, the indictment itself is not evidence of

2   anything and it cannot be taken by you to be evidence of

3   anything.  The indictment informed Mr. Richardson of the

4   various charges against him and it now brings him into Court

5   to face those charges.  As he sits there now he carries with

6   him the presumption of innocence.

7           There is no burden on him or his attorneys to do

8   anything, to prove anything or to say anything at anytime

9   during the course of the trial.  To the contrary, it is the

10  People who have brought these charges against

11  Mr. Richardson; and it is, therefore, the People's burden

12  and responsibility to prove him guilty beyond a reasonable

13  doubt of one or more of the respective charges submitted for

14  your consideration.

15          If the People have proved the defendant's guilt

16  beyond a reasonable doubt as to a particular charge, it will

17  then be your responsibility to return a verdict of guilty on

18  that charge.  On the other hand if the People have not

19  proved the defendant's guilt beyond a reasonable doubt as to

20  a charge, then it will be your responsibility to return a

21  verdict of not guilty on that charge.

22          You, the jury, are the sole and exclusive judges

23  of the facts.  It will be your responsibility and your

24  responsibility alone to determine what the facts are in this

25  case.  You will determine the facts based upon the evidence

1    that you hear and see during the course of the trial, and

2    there are three basic kind of evidence.

3            First there is testimonial evidence.  That is what

4    the witnesses say to you in court.  Second, there is

5    physical evidence and that's simply a reference to the

6    various exhibits that will be introduced during the course

7    of the trial.

8            Third, there is something called a stipulation.

9    Stipulations are simply agreements between the parties as to

10   what -- as to what certain testimony or facts are.

11           In addition, the evidence also includes any

12   reasonable inferences that can be drawn from the testimony,

13   the exhibits, and the stipulations.  I am the judge of the

14   law and you must accept the law as I give it to you whether

15   or not you agree with it.  You will take the facts as you

16   find them and then apply them to the law in order to reach

17   your verdict.

18           Now, Mr. Palumbo, you happen to be the first juror

19   selected in this case.  We have designated you to be the

20   foreperson of the jury.  It is largely a ceremonial role.

21   Certainly everyone who goes into the jury room has an equal

22   vote and an equal voice; but we will ask you to perform

23   certain administrative details while the jury deliberates;

24   and then we will call upon you to announce in court whatever

25   verdict it is that the jury ultimately reaches.  If you have

1    any concerns about the role, just let us know and other

2    arrangements can be made.

3            Mr. Apostolou and Mr. Dawson, you happen to be the

4    last two jurors selected in this case so you have been

5    designated the alternate jurors.  Now the role of an

6    alternate juror is also very important because if anything

7    should happen to one or two of the twelve, then obviously

8    one or both of you will be asked to step in and take over.

9    I ask all, everyone, all fourteen of you to pay particular

10   attention to everything that transpires in the courtroom;

11   and as we go along, ladies and gentlemen, you must always

12   keep in mind the following rules which apply at all criminal

13   trials.

14           Number one, you must not discuss the case amongst

15   yourselves or anyone else.  Number two, you must not form or

16   express any opinion about the case as we go along.  Number

17   three, you must not visit or view any location that is

18   mentioned during the course of the trial.  Number four, you

19   must avoid any depiction of the case in the media if there

20   should happen to be any.  Number five, very important, you

21   are not permitted to gain additional information about the

22   law or the case or the parties from any source whatsoever

23   including the Internet; and finally, number six, if anyone

24   should attempt to approach you and to discuss the case with

25   you, you are of course to avoid any such discussion and then

1    you must bring the matter to my attention as soon as
2    possible.
3            It is possible because of the way in which the
4    courthouse has been constructed that you might actually see
5    someone outside the courtroom who is connected with this
6    case.  It might be one of the parties.  It might be a
7    witness.  It it might be a member of the public who just
8    happens to be interested in this particular case, but if
9    that should happen; that is, if you have such a face-to-face
10   encounter with that person, please do not even say so much
11   as good morning or good afternoon.  No conversations
12   whatsoever are permitted and, of course, the parties have
13   been given similar warnings.
14           The reason for all of this is obvious.  Your
15   verdict, whatever verdict it might be must be based solely
16   upon what happens here inside the courtroom and upon nothing
17   else.
18           Now, every criminal case proceeds in the same
19   orderly fashion.  As I said in a few minutes when I complete
20   these preliminary instructions I am going to turn to the
21   parties, the attorneys, and ask them to deliver their
22   opening statements.  By law, the People must deliver an
23   opening statement in a criminal case.  That opening
24   statement itself, however, is not evidence.  Rather
25   Mr. Bogdanos will set forth in -- it will be a preview by

1   which he will set forth in an overview what he expects to
2   establish through the evidence during the course of the
3   trial.

4          As I said when he is finished, Mr. Klein will
5   deliver an opening statement on behalf of Mr. Richardson.
6   Again that's -- that also is not evidence and simply will
7   serve the same purpose from the defense perspective as the
8   People's opening serves from theirs.

9          After the opening statements you will begin to
10   hear the evidence in the case.  The People will present
11   their case first.  The People must present evidence in order
12   to establish the charges that they have brought.  The People
13   will present evidence by calling witnesses who will testify
14   first in response to questions from Mr. Bogdanos.  That is
15   called direct examination.  When he is finished asking
16   questions of a particular witness, one of the defense
17   attorneys may also ask questions of that same witness.  As
18   you probably know that is called cross-examination.

19          The process of direct and cross will actually
20   continue until there are no relevant, probative questions
21   for that witness.  The witness will then be excused.
22   Another witness will be called and the process will repeat
23   itself.  When the People have concluded the presentation of
24   the evidence on their case, Mr. Bogdanos will rest.  The
25   defense may then if it wishes present it's case, but again

1    the defense is under no obligation to do this.

2            If the defense does present evidence, it will do

3    so in the same fashion; that is, defense counsel will call

4    the witness.   One of them will ask the questions first and

5    then Mr. Bogdanos will have an opportunity to cross-examine.

6            When you have heard all of the evidence in the

7    case the parties will rest and then you will hear the

8    summations.   The summations like the opening statements are

9    not evidence.   Rather they are attempts by the attorneys to

10   convince you that the evidence you have heard supports their

11   respective positions; so you are free to accept or to reject

12   the arguments that you hear in summation based upon your

13   determination of what the facts are in the case.

14           After the summations, I will charge you on the law

15   and then finally you will retire to deliberate.   As I said

16   all of that is coming up in the not too distant future

17   hopefully; and as we go along I will try to give you

18   periodic updates but as I said so far so good we are on

19   track.

20           Ladies and gentlemen those are my preliminary

21   instructions.   As I said I am now going to turn to the

22   attorneys beginning with Mr. Bogdanos and ask them to

23   deliver their opening statements.

24           THE COURT:  Mr. Bogdanos.

25           MR. BOGDANOS:  Helen Abbott was 69 years old.  As

1    fate would have it, she was born September 3rd, so last
2    Saturday she would have turned 73.  Helen Abbott lived at
3    2400 Second Avenue, the Wagner houses on 124th Street and
4    Second Avenue.  She lived on the twelfth floor, Apartment
5    12-E.  She had four children, Renee, Cheryl, Joseph, and
6    Norman.  She had seven grandchildren.  She had eight great
7    grandchildren.  She was five foot three and one hundred
8    twenty pounds; and the reason the evidence will show you
9    that she didn't reach her 73rd birthday is six foot five
10   inch 290 pound Mark Richardson.
11        The evidence will show you that that man acting
12   with others ended that woman's life on January 11, of 2008.
13   You will learn a lot about Helen Abbott.  You will learn
14   that midway through her life's journey she lost her way.
15   Unlike Dante she didn't have a Beatrice or a Virgil to bring
16   her back so she began using alcohol and drugs.  Started with
17   weed, marijuana.  Moved onto crack cocaine; and you will
18   learn that perhaps the last 20 years of her life was spent
19   facing those demons.  Making life choices that I strongly
20   suspect no one in this jury or courtroom would make; and
21   that was Helen Abbott.  I told you one of her daughters
22   Cheryl, nonjudging Cheryl.  Cheryl maintained contact with
23   her mother on a daily basis usually by phone.
24        Cheryl is a talent manager so frequently would
25   have to travel to Los Angeles, but would always talk to her

1  mother and indeed the need for the two of them to talk was

2  so strong that Cheryl actually put her mom on her cell phone

3  plan and got her mom a phone; so that they could talk on an

4  almost daily basis and indeed the phone itself broke in

5  early January of 2008 and Cheryl immediately got her a new

6  phone.

7       You can't imagine how happy Helen was when she got

8  her new phone little realizing she had days to live.  The

9  last time Cheryl talked to her 69 year old mother was

10 Thursday night, January 9th, at about 5:54 in the evening.

11 Cheryl noticed that her mom was a little shorter.  A little

12 more curt than usual on the phone.  It was a short

13 conversation unlike the other longer ones they had; but

14 Cheryl always gave her mother space.  Didn't pry and didn't

15 question the life-style that she had chosen and then Friday

16 came around and no phone calls.

17      Cheryl called but there was no answer, and then

18 Saturday also no phone calls.  Cheryl called.  There was no

19 answer and Sunday still no contact.  Unusual for that mother

20 and daughter to not have spoken for three days so Cheryl who

21 grew up in those Wagner houses from a small child -- Helen

22 had been there almost fifty years -- Cheryl on that Sunday

23 afternoon January 13th at about 3:15 in the afternoon went

24 to the 2400 building of Wagner houses.  Took the elevator up

25 to the twelfth floor.  Got to 12-E, her mother's apartment.

 1   The door was closed but unlocked.  Unusual Cheryl thought to
 2   herself and she opened the door and she went into that dark
 3   hot apartment.  She noticed that her burner was on in the
 4   kitchen.  That was odd and walked looking for her mother.
 5   She walked past the kitchen on the right-hand side.

 6          She walked down the hallway.  She walked into the
 7   living room, past the living room.  There was silence.  She
 8   walked down a long hallway.  Bathroom on the right.  There
 9   is a bedroom -- sorry -- bathroom on the left, bedroom on
10   the right and still silence and still she walked down that
11   hallway until she came to the last bedroom on the left-hand
12   side and saw what no one should ever see, her mother; and
13   when she entered that room, her mother on the side of the
14   bed on her right side, her practically naked.  Her pants
15   pulled down below her knees.  Her shirt pulled up, up to her
16   shoulders.  Her body exposed and there was a cord, an
17   electrical cord around her neck; and she was lying
18   motionless.  Her hands out to the left lying on her right
19   side; and the right face lying in a pool of her own dried up
20   blood.

21          Not processing what she saw Cheryl continued to
22   walk forward hoping maybe her mother had just fallen; maybe
23   it was the shadows playing tricks with her eyes; maybe her
24   mother wasn't dead and naked in her bedroom but she was.
25   She touched the side of her face with the back of her hand

1    and what happened next is really a blur for Cheryl.  She

2    immediately called her sister; and one of the first things

3    you will hear she thought about was please I don't want

4    anyone to see my mother like this.  It's my mother.  Naked

5    like this.  Who knows what they did to her before or after

6    they killed her; and so she tries to call her sister.  Can't

7    get her and she leaves Wagner houses.

8            She goes to get her sister.  Renee brings her back

9    20 minutes later and gets the police.  There are police in

10   the viper building.  Viper is a video surveillance system,

11   that is set up in the housing projects throughout the city

12   and she gets the police officers and the police officers go

13   up to what is now a crime scene; and they find sure enough

14   that the cord is around Helen Abbott's neck.

15           It is a cord that was cut off of a lamp that was

16   in the living room, and the crime scene detectives arrive.

17   They take photographs.  You will see those photographs in

18   court.  I warn you now murder is not social work and these

19   will be disturbing; but this will be the evidence before

20   you, before you were even told, and you will see the

21   photographs of Ms. Abbott but you will hear other things

22   about the crime scene and about the body.  You will hear --

23   the evidence will show you that the cause of death was

24   ligature strangulation; ligature, the electrical cord that

25   had been cut from the lamp in the living room; and you will

1    hear that it was the cord that ended her life wrapped around

2    her neck so tight that it fractured the hyoid bone on the

3    left side and created a deep burrow in her neck; but that is

4    not the only injuries you will hear because in addition to

5    that, you will hear that there are other injuries in the

6    neck consistent with Helen Abbott being put in a choke hold

7    in which someone's arm is placed around her neck; and the

8    radial bone of the forearm placed against the left side

9    because it created additional trauma on the left side of her

10   neck but there is more.

11          She was stabbed 22 times at least 22 times with

12   what appear to be a pair of scissors that were never

13   recovered.  You will hear why.  Of those twenty-two wounds

14   seven of them would have been fatal had they been given the

15   chance, but she was strangled too fast and the heart beat

16   just a few more times after one of those stab wounds went

17   into her left jugular and then another stab wound into the

18   left aorta and two more in her chest cavity and another into

19   her liver and kidneys again and again and again 22 wounds on

20   the -- mostly all except three on the left front side.

21          But there is more.  She was also beaten at least

22   three separate blows to the left side of her face.  She had

23   abrasions on the right side that appear to have come from

24   the fall when she was either thrown to the ground or fell.

25   She had seven fractured ribs -- six fractured ribs but one

1    is broken in two places.

2          Four -- two of those appear or three altogether

3    appear to have come from the fall on the right side; but

4    there are four more on the left indicating a real beating.

5          You will also hear from the crime scene analysis

6    that at least one of the blunt forced trauma -- blunt force

7    not sharp, hard like a fist -- at least one blunt force

8    trauma took place while she was already on the ground.  An

9    expert will tell you, you can actually see the blood spatter

10   that circled her body in a radial pattern never going higher

11   than 18 inches indicating to the expert you will hear from

12   she was stabbed in the front; so she has already been

13   stabbed and she is faced down and she is on the right side;

14   and you will hear that someone hit her again after she was

15   down into a pool of blood and caused the blood to spatter

16   and make as I said to a height of eighteen (18) inches to

17   around her body.

18         You will also hear because the evidence will show

19   you she didn't fight back.  No wounds on her hands -- what

20   are called defensive wounds on her hands, on those frail

21   arthritic 69 year old hands.  Not on the back.  Not on the

22   front.  Nothing.  Never fought back.

23         You will hear because the evidence will show you

24   that all of these wounds, everything the stabbings, the

25   choking, the punching had to have occurred in a very

1    short -- and fractured rib -- had to occur in a very short

2    period of time.  Too much for one person to have done

3    everything.

4              You will also learn because the evidence will show

5    you that the time of death of the victim is consistent.  No

6    one is going to give you an exact time, but it is consistent

7    with having died Friday afternoon, at least 48 hours before;

8    and all of you will hear all the reasons about lividity.  It

9    is because the blood pools gravity closer to the ground and

10   causes a purpling of the skin.

11             You will hear how rigor mortis had passed by the

12   time of autopsy.  Rigor mortis is when your body starts to

13   freeze up after death passes.  Usually about 48 hours.  You

14   will find you will hear it already passed indicating she had

15   been dead for more than 48 hours.  You will also hear -- and

16   you need to hear these things because one of the elements

17   the People have to prove is the time of death, approximate

18   time of death for Friday afternoon of Ms. Helen Abbott.

19             The skin had already started to change color, and

20   there had been skin slippage, all decompositional factors

21   that take place after a body has been dead for a period of

22   time.

23             And you will learn that the Wagner houses as I

24   mentioned has a very robust video system.  You will see this

25   chart.  The person who prepared it will come in to

1    testify.  I am sorry.  I am not going to go into any detail
2    now but what you will learn of relevance to you in this case
3    is that it is impossible to enter or leave the 2400 building
4    without being seen on camera.  Impossible.  Can't be done.
5    Cameras cover every angle; and while you don't have to
6    memorize them in any way, you will find that there is a
7    camera -- here is the lobby.  Here is the front door; and --
8    forgive my back, your Honor -- Camera 1A as it's called,
9    it's in the front of the building looking in the front door.
10          Camera 1B as it's called is inside looking out.
11   Between those two cameras they cover every entrance and exit
12   that will matter as you will see in just a moment.  There
13   are only two ways to get in and out of that building.  The
14   front door or the side door both of which are visible on
15   both those cameras.  You will also learn there is a camera
16   in the lobby, and then in each elevator as well as next to
17   the mini police station on the lobby floor.
18          You will see Helen Abbott walking out of her
19   apartment taking the -- you won't see her coming out of the
20   apartment.  There are no cameras in the hallways, but you
21   will see her taking the elevator Friday morning at about
22   3:30 and you will see that is the last time she is ever seen
23   alive.  She leaves her apartment at about 3:30 Friday
24   morning and goes and takes the elevator.  Goes to the lobby.
25   Goes to the front door.  You will see her.

1      She wore a wig and has a slight little arthritis
2   so she drags her right leg just a little bit but pretty good
3   for 69, and you will see her leave to go to the store and
4   then you will see her come back with a little bag.  You will
5   see all this video.  That is about 3:30 a.m. on Friday
6   morning January 11th of 2008; and then you will never see
7   her again until you see her dead body as Cheryl had found it
8   on Sunday afternoon.
9      You will also see the defendant.  This man right
10   here Mark Richardson lives in Queens but has business in
11   Manhattan, and you will see that the defendant enters -- you
12   don't need to memorize any of this; all of this is going to
13   be in Evidence -- but you will see that the defendant
14   indicated here as male, that the defendant enters the
15   building four times on Friday.  Comes in at about 12:50
16   a.m.; so just past midnight Friday morning goes up to the
17   12th floor with three other people and leaves the building
18   at 3:10.
19      Shortly after he leaves.  Helen Abbott leaves and
20   that's the last time you ever see her alive.  Then she comes
21   back in at 3:29.  That's the exact last time she is ever
22   seen alive; but then the defendant comes back and he comes
23   back as you will see at 11:24 in the morning.  You will see
24   him.  He stays for about a half hour.  Takes the elevator to
25   twelve and then gets on the elevator at eleven when he

1   leaves a half hour later.

2          He comes in a third time that day at 12:18 and

3   goes up to twelve and then later on takes the elevator down

4   and leaves and he comes in a fourth time at about 2:14.  You

5   will see it here, 2:15.  Gets off at twelve.  Fourth trip of

6   the day to the twelfth floor and stays for about two hours

7   and thirty-six minutes and he finally leaves at 4:50; so

8   there are four different times that the defendant goes into

9   the building on Friday -- and gets off Helen Abbott's floor

10  on Friday afternoon, January 11th.

11         Well, the detectives see that too and so

12  immediately you will learn because the evidence will show

13  you -- track down that individual, turns out to be

14  Mark Richardson -- to interview him.  This guy was there

15  four times on the day of the murder.  He might be a witness.

16  Let's talk to him so the detectives do talk to him; and the

17  defendant tells them that on January 11th of 2008 the day of

18  the murder he has an alibi.  He has an alibi.

19         His alibi he was working at the Parks Department

20  that day and he doesn't just say he has an alibi but after

21  meeting with the detectives, he goes to his supervisor, a

22  counselor at the Parks Department.  He gets her to write him

23  a letter saying that he was at work all day on January 11,

24  2008, the day of the murder; so there you go.  It's over.

25  Can't have done the murder.  He's got an alibi.

1      Well, of course, he doesn't because he is on
2  video; so you will learn because the evidence will show the
3  defendant's not here because he lied to the police.  The
4  defendant is not here because he presented a false alibi.
5  The defendant is not here because he did any of those
6  things.  The defendant is here because the evidence will
7  show you he committed a murder; and in order to not be found
8  guilty of the murder or even arrested for the murder, he
9  presented a false alibi; and you will hear those witnesses
10 come before you so the question that the evidence will pose
11 to you is, well, if he is on the video all day long, coming
12 in and out, why would he lie?

13      It will become abundantly clear to you why he
14 lied.  The evidence will show you why he lied because you
15 will see right next to the victim Helen Abbott when her body
16 was found, she was found on the floor right next to a bed,
17 and right next to that bed is a broom.  This broom, it is on
18 the bed.  The bed is made.  A couple of feet away from --
19 you will see the broom.  It will be in court -- a couple of
20 feet away from the victim.

21      What's a -- what's a broom doing on the bed?  But
22 you will learn that the defendant's right palm print is on
23 that broom found on the bed feet away from Helen Abbott but
24 there is more.  Helen Abbott as I told you was on the floor
25 face down practically strip naked.  You will learn because

1   the evidence will show you that there are no holes what are

2   called defects in the clothing.  In other words the clothing

3   was pulled up and down before she was stabbed.  She was

4   naked when she -- half naked when she was stabbed.  You will

5   learn because the evidence will show you that turned out to

6   be a mistake for the defendant because he left a witness on

7   her left breast, amylase.  Human amylase has two sources.

8   Saliva or sweat.  You can't determine which of the two it is

9   but it is one of the two, saliva or sweat.

10        You will learn because the evidence will show you

11   that the defendant left his sweat or saliva on her left

12   breast.  You will learn from a DNA expert who will tell you

13   exactly how it is known that it is the defendant's saliva or

14   sweat; and you will learn that the chances of it being

15   someone else in the population is one in eighteen billion,

16   B, billion; one in eighteen billion.  What's that?  Three

17   planet earths?  So you will learn that stripping her left a

18   witness but there is more.

19        I told you that the defendant was in the building

20   getting off of her floor that afternoon from about 2:14 to

21   about 4:50.  Forgive my back and clumsiness.  Well, at

22   exactly 3:02 remember that phone Cheryl got for her mom, the

23   phone that was broken but she got it fixed.  The phone that

24   is on Cheryl's plan you, will learn that at 3:02 that

25   telephone starts making a series of calls, 22 calls

1     altogether.  Helen Abbott's phone makes 22 phone calls

2     between 3:02 and 4:59, and again no memorization for this.

3     It will all be in evidence; and the phone calls that are

4     made while the defendant's in the building leaves his saliva

5     or sweat on this breast leaving his palm print on the broom

6     next to the body, the defendant -- that phone is being used

7     to call the defendant's family.

8            Twenty-two phone calls.  You will hear that Sprint

9     didn't capture the number on two of them.  They just can't

10    tell what number was dialed so take those two out.  You got

11    twenty.  Out of the twenty, nineteen are the defendant's

12    family.  Two to his brother.  Look at the length of time

13    they talk on someone else's phone while he is in the

14    building leaving his DNA and his palm print on this dead

15    body.

16           Nineteen phone calls to his brother, daughter,

17    stepsister, father, sister, wife's work, wife and cell

18    phone.  You will have all the phone records for this.

19           (Transcript continued on the next page.)

20

21

22

23

24

25

OPENING/PEOPLE/BOGDANOS

1   T-4 - Peo. V Mark Richardson, Ind.#3534/08

2   September 13, 2011:

3           MR. BOGDANOS:  And so you are beginning to see

4   how the evidence will show everything converges, converges on

5   the defendant.

6           And so the defendant makes another statement.  You

7   will see that statement.  It videotapes the defendant.  The

8   defendant who the evidence will show used her phone after she

9   was dead.  The defendant who the evidence will show was in the

10  building on the 12th floor with others.  The defendant which

11  the evidence will show leaves his DNA and palm print.

12          The defendant made a statement, it's videotaped, you

13  will see it, it's 14 minutes long, in which he admits that he

14  was in the apartment and his words, as you will see, are that:

15  Yeah, Anthony was there.

16          Anthony Hall, a man who lives on the 11th floor.

17  Remember the defendant always gets off on 12 always gets on at

18  11.  A guy named Anthony Hall lives on the 11th floor was there

19  with him and a guy named Johnny.  Sorry, can't tell you the

20  rest of his name, don't know him, but Johnny was there and it

21  seems, according to the defendant, that Anthony Hall owed the

22  defendant twenty-eight dollars or thirty dollars and Helen

23  Abbott, according to the defendant, owed Anthony Hall thirty

24  dollars.

25          Therefore, in their logic, Helen Abbott owed the

Glenn J. Merola, Sr. Court Reporter

OPENING/PEOPLE/BOGDANOS

1    money to Mark Richardson.  And so sure enough Mark Richardson

2    goes with Anthony Hall up to the apartment.  This is what he

3    admits.  Goes up to the apartment to get his money, excuse the

4    quotes, his money from Helen Abbott.

5           Because, according to the defendant, Anthony Hall and

6    Ms. Abbott start arguing.  I am not sure how you argue with a

7    five foot three inch 69 year old woman.  It starts to get

8    violent and physical and while Ms. Abbott is being bounced

9    against the refrigerator, according to the defendant, he sees,

10   just so happens, exactly thirty dollars in her sweater, shirt,

11   blouse, I think it's blouse is the word.

12          You will hear from Cheryl that Helen Abbott was known

13   to keep her money in her bra or in her blouse.  It was kind of

14   a common joke whenever she went to the corner bodega to get

15   something, pay for it, she would turn around, put her hand down

16   her shirt, pull her money out.

17          Listen, we're all entitled to our little

18   idiosyncracies, this was hers.  She took the money out, put it

19   back in the bra, in her heart, and make Mark Richardson says he

20   sees that money, grabs it, six foot five inch two hundred

21   twenty pound man grabs the money from her shirt.

22          Helen Abbott doesn't want to give it up so apparently

23   she grabs his shirt and now the other two individuals, Johnny,

24   Anthony Hall, defend him.  They defend him.  Against Helen

25   Abbott.  Right?  Because they got to defend him.

Glenn J. Merola, Sr. Court Reporter

1         So, Johnny puts Helen Abbott in a choke hold and

2    Anthony Hall, according to the defendant, repeatedly stabs her,

3    punches her in the chest, but he sees something silver in

4    Anthony Hall's hand and sees blood on her front on her blouse

5    and clearly indicating that she's being stabbed.

6         Mark Richardson, immediately runs out and leaves the

7    building and you will see him leave at about 4:50 that

8    afternoon and says that he saw uniformed police officers at the

9    door as he was leaving as Helen Abbott was dying bleeding to

10   death up in her apartment.

11        And, in fact, you will see on video there are police

12   officers who happen to be arriving at this time on unrelated

13   matter and he opens the door and lets them in.

14        That will be the evidence before you.  I warn you

15   now, as I did during jury selection, some of it will be long

16   and cumbersome.  There is no way to make telephone records

17   interesting.  You are going to hear a lot of testimony about

18   DNA, and alleles, and losis, and more than you could possibly

19   want to know and you will hear from the Medical Examiner about

20   wound tracks and transeeking aorta and bones.

21        Again, more than you could possibly want to know.

22   And in some respects I will beg your indulgence, some witnesses

23   will be called out of order for their own personal scheduling

24   reasons so please bear with me in that regard.

25        But when all of the evidence is in, putting it all

OPENING/PEOPLE/BOGDANOS

1   together, you will see because the evidence will prove to you

2   that in the entire universe, actually, in three different

3   universes, there is only one possible person who could have

4   done this and the man who did that is before you today and you

5   will learn because the evidence will show that whether it was

6   those hands that used the scissors, or maybe those hands used

7   the electrical cord, or maybe those hands did the choke, or

8   maybe those hands fractured the ribs, or maybe those hands

9   battered her face, or maybe those hands stripped her naked, or

10  maybe those hands took the money, whatever his part in this, of

11  one thing you will be sure, that it's those hands that ended

12  her life, the life of Helen Abbott, and so I will return to

13  this spot a week and a half, two weeks from now, and I will ask

14  you to return a verdict of guilty as to Mark Richardson.

15          Guilty of Murder in the Second Degree.  Guilty of

16  Robbery in the First Degree.  Guilty of Robbery in the Second

17  Degree.  Guilty of Sexual Abuse in the First Degree.  And I

18  will ask you to do that for one reason, and one reason alone,

19  because he is.  Thank you.

20          THE COURT:  Thank you, Mr. Bogdanos.  Mr. Klein.

21          MR. KLEIN:  Thank you, Judge.

22          Good afternoon.  Much of what the district attorney

23  says is certainly true and much of the evidence, the real

24  evidence, the factual evidence, the hard evidence, will and

25  should be accepted by this jury.  Much of what he will present

Glenn J. Merola, Sr. Court Reporter

OPENING/DEFENSE/KLEIN

1  will be uncontroverted, unchallenged and acknowledged as true.

2  Much of it will speak for itself and should not be ignored.

3         Nor is there a need, given what really is at stake

4  here, be diminished in any significant way.  It's not now not

5  unknown and not unexpected.  In fact, much of it's been sitting

6  in files waiting to be brought into court for months if not

7  years.  It has not ripened, gave power with the passage of

8  time, nor has it weakened, collapsed with the passage of

9  years.

10        The evidence here just is what it is and is what it

11  was and much of it is evidence that points a powerful finger of

12  dark suspicion at Mark Richardson who sits in that chair.

13  There is, of course, today, one critical new factor entered

14  into the equation after this long period of intense

15  anticipation, that's the group of you that sits in this spot.

16        That's all of you and each of you, neutral and

17  independent women and men, not prosecutors, nor defense

18  lawyers, that finally must examine this slowly collected mass

19  of facts and now must exercise independent thought and

20  judgement because only you can and must now determine, okay,

21  all that stuff.

22        What precisely does it mean in the context of what

23  has to be decided?  The mountain of proof can't be ignored.  It

24  obviously provides an accusatory pointer of dark suspicion

25  pointed at that man.  If it didn't we all wouldn't be here and

OPENING/DEFENSE/KLEIN

1    no jury would sit in judgement.

2              But how does it make you confident that that man is

3    one of the men responsible for this God awful murder.   You

4    decide.   If it all shows a suspicion of guilt, a shadow of

5    guilt, a possibility of guilt, an odor of guilt, while powerful

6    and disturbing in itself, is yet nothing more than that and

7    cannot be taken as compelling evidence of actual guilt of this

8    horrendous crime.

9              Finally, an independent jury, that's all of you,

10   chosen because you have no ax to grind and no biased interest

11   in the outcome of this case, gets to scrutinize that very

12   evidence and decide what is proven and what's merely

13   suggested.

14             You do the critical job which none of us are entitled

15   to do and decide once and for all what's proven beyond a

16   reasonable doubt aware of all the dangers that can lurk when it

17   looks bad and appears bad and portrays a defendant in an

18   apparently terrible light, you been chosen to provide us with

19   the answer to the critical issue in a context in which so much

20   is at stake when it might become easy to want to condemn an

21   unappealing man when suspicion surrounds him concerning a

22   horrible crime, only a jury is intrusted to decide what the

23   proof actually shows.

24             When the charge is now murder, the taking of life, we

25   decided that only a jury is capable and responsible for giving

Glenn J. Merola, Sr. Court Reporter

OPENING/DEFENSE/KLEIN

1  us the critical answers.  Only you get to decide is he guilty

2  of murder and robbery as the prosecutor proclaims.  You will

3  hear of a dramatic death scene and a terrible family

4  discovery.

5        You will see physical evidence that appears to

6  squarely place Mark Richardson in physical contact with Helen

7  Abbott the victim.  His own saliva or sweat on a dead womans

8  breast.  You will hear of specially peculiar series of phone

9  calls he makes with the victims cell phone.  A broom that he

10  touches that's found in a compromising position.  A wallet that

11  someone has gone throw and flipped on a bed.

12        And in that apartment building up on the relevant

13  floor Mark Richardson is there and leaves and goes back again

14  and again and again.  You will hear him making statements

15  attempting to explain away his presence and video that

16  controverts his paultry attempt at denial.

17        Sure you will hear of lies that he tells from his

18  very first involvement in the case including a clumsy attempt

19  to construct an airtight alibi, oh no, it couldn't have been

20  me, I was really at work.

21        Phone calls he makes, flatly unconvincingly, denies

22  his matter of being, talking actually will make you disbelieve

23  all he says.  Every word out of his mouth appears to be uttered

24  with blatant disregard for the truth.

25        You will see every way he tries to turn to explain

OPENING/DEFENSE/KLEIN

1   his own action, only ties himself up more in a deeper web of

2   impossible contradiction.  He gradually digs his own grave and

3   gets himself put in that chair as he awkwardly tries to deflect

4   suspicion away from himself.

5        Yet, who killed Helen Abbott?  This evidence I submit

6   will never answer that question to your satisfaction.  Who

7   really created the chain of events that leads to her death?

8   Who was in her house when she dies?  Who actually attacked her

9   and thus leaves her on that floor?  I believe you will still be

10   asking that question at the end of this case.

11        When is she killed and whose responsible for the

12   homicidal action?  That is evidence that will never come close

13   to resolving.  Sure, some things will be proven beyond a

14   reasonable doubt here.

15        That he's a liar, a bolster, a disreputable big

16   mouth, having convincingly proven and proven beyond a shadow of

17   doubt that he deserved to be in that chair and accused.  That

18   will be powerfully demonstrated and cannot be denied that he's

19   guilty of terrible judgement, of being a fool, and damningly

20   himself with his own attempted to reflect blame will be vividly

21   placed down before you.

22        All that will be proven beyond a reasonable doubt.

23   You will see he obviously panics as he really sees that he's

24   suspected by experienced cops of a murder that he may in fact

25   have never committed.  Yet, to which he believes he has no

OPENING/DEFENSE/KLEIN

1  viable defense because he knows he was there in her apartment

2  on the 10th, the 11th, and obviously involved in his own

3  criminal behavior, he was there, he's caught, and what

4  eventually becomes a scene of the crime and if you who go up to

5  that house are simply partaking in lawful and legitimate acts,

6  better to concoct a defense he says so they'll think I didn't

7  do the murder.

8       Little does he know that his obvious lies only make

9  the police suspicion grow stronger.  He's unable to see that

10 just telling the unvarnished truth to inquisitorial cops maybe

11 that would work and be enough to dispel a cloud of suspicion.

12 Yet that thought, the truth, apparently never entered into his

13 grey matter up here.

14      Yet the evidence will never answer the question that

15 you are called upon to ponder because none of this will provide

16 the convincing evidence that he's in fact guilty of robbery or

17 sex abuse, nor felony murder.

18      Sure they'll say it's not this piece alone, that

19 piece alone, you need to put it all together, and if you put it

20 all together it's a lot of stuff yet no totality of evidence

21 heard during this trial will draw you to what we submit would

22 be a reckless decision.

23      The prosecution may simply lack a convincing basis in

24 proof.  You will be urged to convict when the fact may not bear

25 out inescapable conclusion that it must be Mark Richardson who

Glenn J. Merola, Sr. Court Reporter

OPENING/DEFENSE/KLEIN

1  committed these crimes.

2          In closing there is, however, one more point I would

3  like you all to consider because I submit to you that the

4  evidence presented in this case will do more than raise doubt

5  in your mind about who should be found guilty, it will convince

6  you of something critical and enormous if you listen with care

7  and dispassion, it will make you believe and understand that

8  your role is essential, that each of you has a critical job and

9  that's why you been chosen because only you can ensure when the

10 evidence just leaves us all in doubt that no man, no matter how

11 unappealing and unbelievable, is ever convicted of a heinous

12 crime for which he may in fact not be guilty.  Thank you.

13          THE COURT:  And thank you Mr. Klein.

14          Ladies and gentlemen, as I said, we'll take a normal

15 lunch hour which around here means an hour fifteen minutes.  I

16 ask all of you to return at 2:45.  Please wait outside we'll

17 bring you in together.  Please do not discuss the case with

18 anyone between now and then.  All right, 2:45.

19          (The jury exits the courtroom for a luncheon recess.)

20          (Trial was adjourned for a luncheon recess.)

21    A F T E R N O O N          S E S S I O N

22          THE COURT CLERK: Case on trial continued.

23 The defendant, his attorney and the DA are present, the jury is

24 not present at this time.

25          THE COURT:  All right, both sides ready to

Glenn J. Merola, Sr. Court Reporter

DIRECT/C.ABBOTT/PEOPLE

```
 1    proceed?
 2                    MR. BOGDANOS:  Yes, Your Honor.
 3                    THE COURT:  May we have the jury, please.
 4                 THE COURT OFFICER: Jury entering!
 5                 (The jury enters the courtroom.)
 6                    THE COURT CLERK:  Will both sides stipulate that
 7    all jurors are present and properly seated.
 8                    MR. BOGDANOS:  Yes.
 9                    MR. KLEIN:  Yes.
10                    THE COURT:  Thank you.  Good afternoon, ladies
11    and gentlemen.  Mr. Bogdanos, please call your first witness.
12                    MR. BOGDANOS:  Yes.  The People first call to
13    the stand, Your Honor, Ms. Cheryl Abbott.
14                    (The witness, Cheryl Abbott, enters the
15            courtroom, takes the witness stand, is duly
16            sworn/affirmed in by the Clerk of the Court, responds to
17            the oath and testifies as follows:)
18                    THE COURT CLERK:  Do you solemnly swear or
19            affirm the testimony you are about to give shall be the
20            truth, the whole truth, and nothing but the truth, so
21            help you God?
22                    THE WITNESS:  Yes.
23                    THE COURT OFFICER:  Have a seat, please.  State
24            your name for the record and spell your last name.
25                    THE WITNESS:  Cheryl Abbott.  A-b-b-o-t-t.
```

Glenn J. Merola, Sr. Court Reporter

DIRECT/C.ABBOTT/PEOPLE

1              MR. BOGDANOS:  May in inquire?

2    DIRECT EXAMINATION

3    BY MR. BOGDANOS:

4         Q.   Good afternoon, Ms. Abbott.  I know you have a soft

5    voice to begin with and under the best of circumstances, to the

6    extent possible, please try and focus on keeping your voice up

7    so the very last juror can hear you.  Okay?

8         A.   Yes.

9         Q.   And secondly, if whenever you answer yes if you nod

10   your head, if you would just indicate yes or no rather than

11   just nod your head.  I know it's human reaction but, again, if

12   you can just focus on that it would be a lot easier.  Okay?

13        A.   Yes.

14        Q.   Ma'am, tell us the county you live in?

15        A.   Queens County.

16        Q.   Without telling us your current address would you

17   tell us how long you lived at your current address?

18        A.   Fifteen years.

19        Q.   And before that where did you live?

20        A.   In Wagner Houses.

21        Q.   How long did you live in Wagner Houses all together?

22        A.   Twenty-five years.

23        Q.   And what building, what apartment?

24        A.   2400 Second Avenue, apartment 12E.

25        Q.   And when you lived at Wagner Houses who did you live

DIRECT/C.ABBOTT/PEOPLE

1   with?

2         A.    My mother, my sister, my brother.

3         Q.    Would you please give us everyones full names and

4   ages, please?

5         A.    My older sister Rene Abbott Rolian.  She's 55 years

6   old.  As of today.  Well, my brother Norman Abbott, and he's

7   54.  Myself, Cheryl Abbott, 53.

8         Q.    I was going to tell you not to tell use your age but,

9   go ahead , and your other brother?

10        A.    My other brother Joseph Abbott and he's 42.

11        Q.    And your Mom?

12        A.    Helen Abbott.

13        Q.    When was she born?

14        A.    September 3, 1938.

15        Q.    And what about your father?

16        A.    Norman Abbott Senior.  And he was -- what do you need

17   to know?

18        Q.    Did he pass away?

19        A.    Yes, he passed away.

20        Q.    When did he pass away?

21        A.    He passed away 1990.

22        Q.    And what had he done for a living before he passed

23   away?

24        A.    He was Air Force -- he was in the Air Force and he

25   was in the Air Force for over 28 to 30 years.

Glenn J. Merola, Sr. Court Reporter

DIRECT/C.ABBOTT/PEOPLE

1    Q.    And then he retired?

2    A.    Then he retired.

3    Q.    Do you remember when he retired from the Air Force?

4    A.    He retired in 19 -- I would say 1987.

5    Q.    And Ms. Abbott, what is your level of education?

6    A.    Some college.

7    Q.    What did you study in college?

8    A.    Liberal arts.  I'm sorry.

9    Q.    And at any point -- there is nothing to apologize

10   for -- at any point you need a break all you have do is ask.

11   A.    Okay.

12   Q.    I am trying to ask easy questions first to get you

13   comfortable.  I am obviously not doing a good job.  I'm sorry.

14   A.    Okay.

15   Q.    What do you do for a living?

16   A.    I am a talent manager.

17   Q.    What does that mean?

18   A.    That means I represent a few celebrity entertainer.

19   Q.    How long have you been doing that?

20   A.    About fifteen years.

21   Q.    And where does that take you?

22   A.    It allows me to travel to different states, different

23   countries around the world.

24   Q.    And before your mother passed away could you just

25   describe, very briefly, please, your relationship with your

DIRECT/C.ABBOTT/PEOPLE

1  mother?

2      A.   It was wonderful relationship.  That was my friend,

3  my sister, my role model.  We had a wonderful relationship.  I

4  called her all the time and she just made me laugh, you know.

5  Whenever I was feeling down she made me laugh.

6      Q.   And before your dad passed away what did your mother

7  do for a living?

8      A.   She was a hostess at different restaurants.  She was

9  a model -- first she was a model, traveling a little bit around

10 the world and she became a hostess working.

11     Q.   And after your father passed away did you notice a

12 change in your mother and in her life-style?

13     A.   Yes, I noticed a change.

14     Q.   Would you please explain that to us, please.

15     A.   She was diagnosed with high blood pressure and the

16 doctor told her that she shouldn't work anymore, she should

17 retire and just relax, because the pressure was very high.

18          So she ended up just becoming a stay at home mom

19 receiving child support and so by her staying home it allowed

20 her to become a little bit more familiar with the neighborhood,

21 the community, and so, you know, she just started -- just being

22 at home she just started spending a little more time having

23 more fun I would say.

24     Q.   Did there come a time when you noticed that your

25 mother began using drugs?

Glenn J. Merola, Sr. Court Reporter

DIRECT/C.ABBOTT/PEOPLE

1    A.   Yes.

2    Q.   Would you explain that to us, briefly please?

3    A.   I would say in the late '80s when drugs, crack,

4  started coming into the Harlem community and because my mother

5  didn't have a problem smoking cigarettes and, you know, I

6  believe she smoked marijuana but she never done any of that in

7  front of the children whenever she would smoke that was just a

8  smoking situation.

9       But when crack came into the neighborhood, again, she

10  never did that in front of me, I guess it was a feel of

11  smoking, she didn't know how dangerous it was, she started

12  doing because people brought it to her and she smoked.

13    Q.   And how did it come to your attention that she in

14  fact had developed a crack habit?

15    A.   When I just started noticing more company coming into

16  the household and just different activities.

17    Q.   Did you ever confront your Mom about this?

18    A.   Yes, plenty of times.

19    Q.   Would you, again, very briefly, just explain that?

20    A.   I just asked her what she was doing, you know, I was

21  aware of what was going on and she denied it.  I said if you

22  need any help, please, I'm willing to get you the type of help

23  that you need.  So I would call different agencies and they

24  told me there is nothing I can do until she wanted to change

25  her life-style and I couldn't force her.

Glenn J. Merola, Sr. Court Reporter

DIRECT/C.ABBOTT/PEOPLE

1    Q.   And so after that you didn't push her?

2    A.   I did.  I did.  But I didn't want to push her where

3  we would become estranged so I tried to figure out the best

4  method but my mother she wasn't ready.

5    Q.   Ms. Abbott, I am going to need to show you a

6  photograph of your mother, okay?  With the Court's permission

7  may I ask the Court Officer to hand what's briefly been marked

8  as -- that I request be deemed marked for the time being as

9  People's 1.

10              (Handing photo, People's 1 to the witness.)

11    A.   Yes.  This is my mother, Helen Abbott.

12    Q.   And is that a fair and accurate photograph of how she

13  appeared shortly before her death?

14    A.   Yes.  I would say, yes.

15              MR. BOGDANOS:  A copy has previously been

16  furnished to the defense.  I would offer this into evidence as

17  People's 1.

18              MR. KLEIN:  Okay.

19              THE COURT:  People's 1 admitted.  We'll mark it

20  later.

21              (People's Exhibit 1 was received in evidence.)

22  BY MR. BOGDANOS:

23    Q.   Ms. Abbott, moving to December, 2007, January, 2008,

24  do you recall that time frame?

25    A.   Yes.

Glenn J. Merola, Sr. Court Reporter

DIRECT/C.ABBOTT/PEOPLE

1    Q.   And how would you describe the level of contact

2    between you and your mother at that time?

3    A.   It was -- oh, we were still communicating regularly.

4    Q.   What's regularly mean?

5    A.   Daily.  Everyday.

6    Q.   How?

7    A.   By cell phone.

8    Q.   Did your Mom have a cell phone?

9    A.   Yes, she did.

10    Q.   Could you explain that to us, please?

11    A.   I purchased her a cell phone because I was traveling

12    a lot.  She really didn't want a phone in the house.  She said

13    that because she was living alone, her children all lived

14    somewhere else, if she got a phone in the house, a land line,

15    we would never come to visit her.  So she said the only way to

16    get you guys to the house because I know everybody lives in

17    different states, you would have to come visit me quite often.

18        So I started traveling, I was visiting her a lot and

19    then I started traveling a lot more so it allowed me not to see

20    her so I wanted to get in touch with her I couldn't so I decide

21    to buy her a cell phone and she was the happiest person.  She

22    was, oh my God, she loved it because she didn't have to stay in

23    the house she could go out be on the phone.

24    Q.   And you mentioned her other children moved away.

25    Could you -- would you please tell us what they did for a

DIRECT/C.ABBOTT/PEOPLE

1    living and where they moved to?

2              MR. KLEIN:  Judge, objection.

3              THE COURT:  Overruled.

4    Q.    Please.

5    A.    Norman Abbott, he lives in Richmond, Virginia.  And

6    his occupation?

7    Q.    Yes.

8    A.    He's a retired Correction Officer and so he's living

9    in Richmond, Virginia.  He's living there about five years.

10              Joseph Abbott lives in Columbia, Maryland, and he's

11   been living there for, I will say ten years and he's our

12   delivery driver.  And my sister Rene, she was living in the

13   same community and housing development but two buildings away

14   and she's a security guard.

15   Q.    So you got your mother this phone?

16   A.    Yes.

17   Q.    And that's in 2007?

18   A.    I would say 2007 -- 8, 9, 10 --  yes, 2007.

19   Q.    Well, fast forward, did there come a time when the

20   phone broke in the beginning of January?

21   A.    Yes.

22   Q.    Again, very briefly, just describe that for us?

23   A.    The phone, what happened the phone was, she was

24   getting a lot of drop calls, every time I called her there was

25   a bad signal, I guess the towers weren't working, every time

Glenn J. Merola, Sr. Court Reporter

DIRECT/C.ABBOTT/PEOPLE

1   she called the call dropped and then she had her phone on, it

2   was just that, mainly that, so the calls were dropped.

3          And then the call -- the phone was also on auto

4   answer so whenever I called her the phone would automatically,

5   the microphone would come on, the speaker would come on, I

6   could hear her she couldn't hear me.

7          I would say, hi Mom, the speaker is on, and I called,

8   finally got through to her, I said the speaker is on, I said

9   this is not cool because you don't want your house to be an

10  intercom so I said let me come by and correct that and the fact

11  that the calls kept dropping.  So I came by the house and  I

12  picked up the phone to get it serviced.

13     Q.   And when did you bring it back to her?

14     A.   I brought it back on a Tuesday.  I picked it up on a

15  Sunday and brought it back on a Tuesday.

16     Q.   And just so we're clear on the days and dates, and I

17  know I am more guilty than most in getting all these things

18  wrong, you have the 13th is a Sunday, so the 11th was a Friday?

19     A.   Right.

20     Q.   So you brought her back the phone that week?

21     A.   Yes, on that Tuesday.

22     Q.   Tuesday.  So, someone help me out, 10, 9, is that the

23  8th?

24     A.   The 8th, right.

25     Q.   The 8th is a Tuesday?

Glenn J. Merola, Sr. Court Reporter

DIRECT/C.ABBOTT/PEOPLE

1    A.   Eight, 9, 10, 11, yeah.

2    Q.   And you brought her the phone?

3    A.   I brought her the phone, yup.

4    Q.   And do you remember talking to her that week?

5    A.   Yes.  Several times that week after I brought the

6    phone back, yes.  Yes, I spoke to her when I dropped the phone

7    off I gave it to her.

8         She met me downstairs in the lobby, well, not the

9    lobby in front of the building, I gave her the phone and she

10   was so happy, she was like, oh my phone, oh my God you got it.

11        And she was sitting on a car, she was waiting for me,

12   it was kind of a nice day, sitting on the hood of someones car,

13   just on the side and when I walked up she was crossing her

14   legs, moving her legs, and when I walked up to her I said, my

15   God, you look like somebody's daughter sitting on the car.

16        She said you have my on phone?  I said here it is.

17   Oh my God, I love my phone, she started kissing it.  I said,

18   Mom, you can't say you love your none stop that.  So we talked

19   for a few minutes and then I left.

20   Q.   Is that the last time you saw her?

21   A.   Saw her, yes.

22   Q.   That's the last testimony you saw her?

23   A.   Yes.

24   Q.   When is the last time you spoke to her?

25   A.   That Thursday.

Glenn J. Merola, Sr. Court Reporter

DIRECT/C.ABBOTT/PEOPLE

1    Q.    Do you remember roughly what time?

2    A.    No.  Thursday maybe nineish.  Maybe.

3    Q.    Would looking at your telephone records help you

4    remember when it was you last spoke to her on that Thursday?

5              MR. BOGDANOS:  I will ask the court officer to

6    hand you what I will deem be marked People's 2 for

7    identification.

8    BY MR. BOGDANOS:

9    Q.    Just take a look at those documents, please, and tell

10   the Court if you recognize them?

11   A.    Yes, I do recognize the documents.

12   Q.    What do you recognize those to be?

13   A.    My cell phone records.

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

1  DIRECT EXAMINATION CONT'D.:

2      *Q*    And, in fact, did you actually get Sprint to produce

3  those for you and then provided them to the District Attorney's

4  Office?

5      *A*    Yes, I did.

6      *Q*    Do they go all the way back to August, 2007, up until

7  January, 2008?

8      *A*    Yes, they do.

9      *Q*    You had an opportunity to look at them previously?

10     *A*    Yes, I did.

11     *Q*    If I can invite your attention -- just to speed it up a

12  little bit, if I could invite your attention to your January

13  phone bill.  It should be at the very back and in particular on

14  page -- I am sorry, bear with me your Honor -- on page eight of

15  eighteen.

16     *A*    Page eight of eighteen.

17     *Q*    So the January bill right at the back it would be A 8

18  of 18 and the record should reflect a copy of the phone records

19  have been provided to the defense.

20     *A*    Yes, I have it.

21     *Q*    If I can invite your attention to the left column and

22  maybe four from the bottom.

23     *A*    Yes.

24     *Q*    Just look at that to yourself.  Do you see -- you see

25  your mother's telephone number?

1    **A**   Yes, I do.

2    **Q**   On -- does that refresh your recollection as to the

3 last time you spoke to her on the time you spoke to her on that

4 Thursday?

5    **A**   Yes, at 5:54 p.m.

6    **Q**   You can put those down now.  Thank you.

7    **A**   Very well.

8    **Q**   Did you ever -- did you ever speak to your mom after

9 that Thursday night at 5:54 p.m.?

10    **A**   No, I did not.

11    **Q**   Did your mother have any habits with regard to the

12 telephone where she kept it; how she kept it; whether she lent

13 it out; anything like that; any habits concerning the telephone?

14    **A**   She kept her cell phone in her case on her belt; and

15 she kept it with her all the time when she was out.  When she

16 was in the house she would put it -- she would put it down; but

17 mainly she kept it because she wanted to see if I was calling or

18 one of the family members so she pretty much kept it on her

19 waist.

20    **Q**   And did your mother have any habits with regard to

21 where and how she kept her money?

22    **A**   Yes.  Her money always she kept it in her bra.

23    **Q**   For how long has she been doing that?

24    **A**   Since I was a child.  I would say at least since I was

25 ten years old.

1  **Q**    Would you explain to us in a little more detail about

2  that habit of where she kept her money.

3  **A**    Oh, yes, my mother was -- she was afraid that maybe she

4  would get robbed.  Most people would mostly carry the money in

5  their purse or in a pocket, but she always said they wouldn't

6  think to look inside her bra; so she would always -- some kind

7  of way she was pretty hefty.  There was times she would put her

8  money -- well, all the time she would put her money without a

9  wallet just like with cash in her bra; and it would be pretty

10 much in her position.

11 **Q**    And what would she do when she was buying something in

12 the store?

13 **A**    She would actually go into the store, purchase the

14 item, and in front of the clerk she would actually turn around

15 but they didn't know what she was doing.  She would turn around,

16 act like she was doing something, get her money out, and come

17 back around and then pay for her merchandise.

18 **Q**    Now, you were saying they didn't know what she was

19 doing.  She had done this for --

20 **A**    Yeah.

21 **Q**    -- more than 40 years?

22 **A**    Yeah, so if you are in a community by this time

23 everybody already knew.  It wasn't you know --

24 **Q**    It wasn't much of a secret?

25 **A**    It wasn't much a secret anymore.

1     *Q*   Did you speak to your mom at all on Friday the
2  eleventh?  You told us about Thursday night.  Now we are into
3  Friday the eleventh.  Did you speak to her on Friday?
4     *A*   No, not at all.
5     *Q*   Are you sure?
6     *A*   Positive.
7     *Q*   How can you be so sure?
8     *A*   Because I knew first I was busy.  I was busy Friday.
9  When I woke up, I had work to do.  I had deals to close and then
10  I realized I hadn't spoken to my mother; so it was around eleven
11  o'clock and I said, oh, I didn't speak to mom today so I called
12  her on the phone and she never answered.
13     *Q*   Was that usual or unusual for you to call her that
14  late?
15     *A*   It was usual.  Anytime of the day.
16     *Q*   Did you talk to her -- what happened when you called?
17     *A*   Phone went straight to voice mail.
18     *Q*   Did you and that's -- that's Friday night you are
19  saying?
20     *A*   Friday night, yes.
21     *Q*   Did you talk to her on Saturday?
22     *A*   No, I did not.
23     *Q*   Did you try?
24     *A*   Several times.
25     *Q*   Explain that.

1       A       Since I didn't hear from her Friday I figured let me

2    call her Saturday.  I called several times.  She didn't answer;

3    so I thought maybe I just got the phone fixed so maybe it's a

4    problem again and I said, hmmm, you know, if the phone is not

5    working mom would've called me.  She would have went downstairs

6    to a pay phone and said, Cheryl, my phone is not working again.

7    She didn't do that.

8             Maybe she is not aware that the phone is off so I

9    didn't -- I just said, hmmm, it was -- I tried to several times;

10   so I was like, hmmm, this just didn't seem like so I just didn't

11   do anything.

12      Q       Are you absolutely certain you never spoke to her on

13   Saturday?

14      A       Absolutely certain.

15      Q       Did you speak to her on Sunday?

16      A       No, I did not.

17      Q       Did you try?

18      A       Yes, I did.

19      Q       Explain.

20      A       On my way to church, before I went to church on Sunday

21   I called her and she didn't answer so as I was going -- I was

22   driving.  I had my head set on.  I tried a couple more times.

23   She didn't answer so after church service, which was over I

24   would say about two o'clock, I then just said I got to go

25   straight to her house and this was Sunday.

1  *Q*   And do you recall approximately what time you arrived?

2  *A*   I got there about 3:00, maybe 3:10ish.

3  *Q*   And what did you do when you arrived?

4  *A*   Well, I don't have a key to the lobby so I just waited

5  for someone to let me in the building; but it seemed like it

6  took some time; so someone finally came to the building and I

7  went to the elevator and upstairs to the 12th floor, which is

8  the floor she lived on.

9  *Q*   You have a key to her apartment?

10  *A*   No, I do not.

11  *Q*   So what did you do when you got to her apartment, to

12  your mom's apartment door?

13  *A*   Okay, when I got to the apartment door I was a little

14  nervous but not thinking nothing.  I did never thought the

15  worse.  I was just saying she hadn't talked to me and so I went

16  to the door and she always had a television that I purchased for

17  her on her kitchen table; and the TV stayed on 24 hours a day.

18  Well, the TV wasn't -- I didn't hear any noise coming outside

19  the door; and the TV, no voices, nothing; so I was like, hmmm,

20  it was quiet but, all right, so I listened.  Didn't hear

21  anything so I tried the knob and I didn't knock.  I just tried

22  the knob and the door was unlocked.

23  *Q*   And when you entered the apartment, did you notice

24  anything.

25  *A*   Nothing out of the ordinary first but I did notice that

1   there was a pair of latex gloves that was hanging from the top

2   broom closet.  There is two closet doors, broom closet, and then

3   a little small shelf on the top; and I noticed there was some

4   latex gloves just hanging out and dangling.  That's the only

5   thing I saw unusual.  If I opened the door, if she was in the

6   kitchen where she was always hang out, she would say who is

7   that.  She didn't say nothing, so I continued to walk into the

8   apartment.

9        *Q*     Now, when you were talking about gloves, your mom would

10   use for cleaning?

11       *A*     What someone used for cleaning but she -- no.

12       *Q*     I am sorry, I should have phrased that better.  That's

13   the kind of gloves you are talking about, used --

14       *A*     No, these looked more like doctor surgical gloves, the

15   clear ones type.

16       *Q*     So when you see that, you walk past the kitchen?

17       *A*     I walk to the kitchen.

18       *Q*     Did you notice anything in the kitchen?

19       *A*     I noticed that the TV was off and I noticed that the

20   cable cord that she used as an antennae -- she didn't have cable

21   TV and the cord you could see to the antennae part; and she used

22   the cord.  That was cut and I noticed that was cut and left on

23   the table and I thought, hmmm, still nothing, anything.

24           So as I walked a few more feet and I looked to the

25   right, further into the right I noticed that there was the

1  draw -- the utility draw and there was a lot of wires like

2  extensions cords all jumbled and pulled out dangling.  Never saw

3  that before; and then I saw the pilot light -- not the pilot --

4  the flame on the stove was on.  That was a little unusual too.

5      *Q*    So it is a gas stove so you could actually see the

6  flame?

7      *A*    Yes.

8      *Q*    Please continue.

9      *A*    So the -- so I didn't see her there and the only two

10 places my mother really spent time in her apartment was in the

11 kitchen and in the living room.  She slept on the sofa.  She

12 said it was close to the kitchen.  She could get her food.

13 Bathroom right there and this is her world.

14          So when I didn't see her in the kitchen, I kept walking

15 which is two more feet and I am entering the living room; and I

16 look to the left where the sofa that she slept on thinking maybe

17 she was asleep.  She wasn't on the sofa; so at this time as I am

18 concerned she is not in the apartment because she is not in the

19 kitchen or in the living room.

20     *Q*    So where do you go?

21     *A*    So I then start going down the hall so I am thinking

22 maybe she is in the bathroom but she still could hear me walking

23 in.  I'd open the door.  I closed the door, but nobody came out;

24 so as I walked into the -- walked by the bathroom -- well, I

25 walked in towards the bathroom, I notice in the hallway there

1  was a blanket, like a comfort -- just a blanket she would
2  probably use to sleep on; and I noticed that was on the floor in
3  the hallway, which that was unusual so, hmmm, why is that
4  blanket there; so I kept walking in.

5          Now I am thinking somebody was in the house maybe, who
6  knows who.  Maybe my mother might have been in the bathroom, but
7  I kept walking and I looked into the first bedroom on the right
8  and I didn't see anybody in there; and then her bedroom -- that
9  was her master bedroom, that door was closed because she put her
10 storage stuff in there; and then as I was walking to pass the
11 bathroom, nobody was in the bathroom; and I continued and as I
12 was coming down the hall, I noticed that the back bedroom door
13 was wide open.

14         It's just opened, whatever; and I noticed that there was
15 a broom on the bed on top of the comforter and there was --
16 looked like a wallet that was turned upside down, like all the
17 contents was scattered so that brought me to, well, what is this
18 about; so as I decided to walk closer to look to see what was on
19 the bed -- if I didn't go any further, I wouldn't have known --
20 but anyway I kept walking and I got close to the bed and to the
21 left that's when I saw my mother in a pool of blood dead,
22 swelled, pants down to her ankles, shirt pulled up full of
23 blood.

24         It was a white T-shirt, white sweat shirt full of blood.
25 She wore a wig.  The wig was underneath her, and as I was

1   looking, I noticed there was a cord.  I could see a cord

2   sticking out.  I went -- no, before then I get closer to her

3   after I saw her there.  I screamed and I said -- woo, woo, woo.

4   I screamed.  Well then, I am thinking maybe she is alive.  Maybe

5   she fell.  Maybe she is -- so I went over to her but I noticed

6   that the blood had already been thick and red dark purple; and I

7   am going maybe she is alive and I went over to her and I've

8   watched TV.  Don't touch the palms with your fingers; so I

9   turned the hand and I touched her with the back of my hand.  I

10  felt her face.  It was frozen hard, and I was in complete shock;

11  and that's when I noticed the cord sticking out passed the sweat

12  shirt; and I was going she was strangled.  Her pants are down.

13  She -- what happened?

14          So I looked at her.  I went over.  That's my mother and

15  I love her so I was concerned.  Was she raped?  What happened?

16  So I went over to her body and I looked to see if there was any

17  intrusion from this broom that was on the bed.  See if somebody

18  rammed it, but I didn't see any blood.  I was like thank God she

19  wasn't raped too.

20          So by that time I'm devastated, so I said calm down.  Be

21  strong.  Figure this out.  Don't scream.  I can't scream.  I

22  don't want to tell the neighbors.  I don't want anyone to see my

23  mother like that.  She had so much dignity and respect and that

24  was my hero; and I didn't want her to be exposed this way, so

25  the first thing I do is I called my sister and I couldn't get

1   her on the phone.  I called two numbers.  I couldn't get her on
2   the phone.
3           Then I am thinking get out of the house.  You don't know
4   if this monster is still in the house hiding in the closet or
5   something, and I just dashed out the building.  Dashed out of
6   the apartment.
7       *Q*     Is it fair to say that from that moment on the rest of
8   the evening is kind of a blur?
9       *A*     I would say yes.
10      *Q*     But you remember doing certain things but not others;
11  is that fair?
12      *A*     Oh, yes, yes.
13      *Q*     So you -- you run out?  Do you remember how you got
14  downstairs from the twelfth floor?
15      *A*     I know I wouldn't wait for the elevator so I believe I
16  took the stairs down.
17      *Q*     And once -- once you got downstairs do you remember
18  where you went?
19      *A*     I went straight to my sister's house.
20      *Q*     Did you find your sister?
21      *A*     No, I didn't.  So you want me to finish?
22      *Q*     Please?
23      *A*     So I went straight to her building which is two
24  buildings away, and I had to go into the lobby.  She also had a
25  building where you have to use a key to get in.  Some tenants

1  were going in the building so I went straight up to her

2  apartment on the second floor, and I banged on the door.  She

3  didn't answer; so I then decided to call.  She had three numbers

4  and so I decided to try the last number and I got her.  She was

5  at work, which was about two blocks -- about ten blocks away;

6  and the first thing I said Renee -- and I hadn't talked to my

7  sister maybe six months.  She was a little upset with the family

8  about some stuff.

9       So I called her up and I said Renee, I said, mommy's

10  dead.  She was what.  Like she was who is this.  Cheryl.

11  Cheryl.  What are you talking about because she hadn't talked to

12  me.  What do you mean mommy -- I said mommy is dead.  I left the

13  apartment.  She is dead.

14       Where are you?  I am in your building.  She said come

15  and get me.  She screams at the top of her lungs in her office.

16  My mother is dead.  My mother is dead.  Don't say.  Be quiet.

17       So next thing I know, I had to go back towards my

18  mother's building because my car was parked.  I drove down.  My

19  car was parked and I jumped in the car, and I went directly to

20  her job and when we saw each other --

21  Q    Did you pick your sister up and bring her back --

22  A    Yes.

23  Q    -- to the building?

24  A    Yes, I did.

25  Q    When you got back to 2400 Second Avenue, what did you

1    do?

2         **A**    We had to wait because the door was still locked.  It

3    seemed like it took forever for a tenant to come and open the

4    door; but not just one tenant came to the door with no key.  Ten

5    tenants it seemed like they came and I am going nobody has a key

6    because I am now trying -- I told my -- well, I told my sister

7    there was a police officer which is called a Viper room.

8              I didn't know you called it Viper.  We use to call it

9    Housing cop, and it was a Viper room; so when I spoke to her I

10   said -- she said, did you call the cops.  I said no.  I needed

11   to talk to you first.  I needed family before I reported this

12   because I wasn't sure they were going to have me -- whatever --

13   so I said let's go back to the Housing cop.

14             She said, okay, yes, and then we will let them know what

15   happened; so as we waited in the lobby, outside the lobby it

16   looks like ten people came.  Nobody had a key until someone

17   finally opened the door and let us in.  We went to the Housing

18   cop, Housing Office that was on the left lobby.

19             MR. BOGDANOS:  And if I can ask that the witness

20        be handed if we can put it up to the TV, I request be deemed

21        marked People's 3 for Identification.

22             (Handing.)

23        **Q**    And if you would just take a look, you have seen this

24   before?

25        **A**    No.

1  *Q*   Can you take a look at it.

2         THE COURT:  You can stand up if you want.

3  *Q*   Do you recognize this to be the lobby of 2400?

4  *A*   Yes, I do.

5  *Q*   And you see the elevators A and B, is that where they

6  belong?

7  *A*   Yes, they do.

8  *Q*   Is that where you see --

9         MR. BOGDANOS:  Approach it with the Court's

10 permission.

11        THE COURT:  Yes.

12        MR. BOGDANOS:  Thank you.

13 *Q*   You see the door here.  Is that where the front door

14 belongs?

15 *A*   Yes.

16 *Q*   And I am not asking you if it purports to be to scale,

17 but I am not going to ask you that.  I will call the person who

18 prepared it.  Don't worry.  Does it appear to you to fairly and

19 accurately --

20 *A*   Yeah.

21 *Q*   Let me finish, Cheryl, sorry.  Does this appear to you

22 fairly and accurately represent the lobby area of 2400 Second

23 Avenue?

24 *A*   Yes, it is.

25        MR. BOGDANOS:  I will offer this into Evidence

 1        subject to connection.  I will, of course, call the engineer
 2        who prepared it.
 3                  THE COURT:  All right People's 3 is so admitted.
 4        **Q**     And the Viper office that you had indicated is -- if I
 5        could see E.  You see door No. E?
 6        **A**     Yes, I do.
 7        **Q**     You knew there were police officers?  You didn't know
 8        they were called Viper?
 9        **A**     Right.
10        **Q**     You know it now?
11        **A**     Yes, I do.
12        **Q**     You use to think they were Housing -- well, they are
13        Housing cops?
14        **A**     Yeah.
15        **Q**     That's E where the Viper office is?
16        **A**     Yes, it is.
17        **Q**     So tell us what you did?
18        **A**     As we went into the lobby we went straight to the Viper
19        room, and we knocked on the door; and there were people that
20        came in the lobby and I told my sister again don't say nothing,
21        you know.  I didn't want the neighbors to know.  I had to figure
22        this out.  I was in shock.  I said don't say nothing.  Let's go
23        straight to Housing; and as soon as we got into the lobby and we
24        went to the Viper room, we knocked on the door.  The door opens.
25                  There is still ten's of people in the lobby.  They open

<u>Abbott - Direct - People</u>                    102

1  the door.  My sister screamed, "My mother is dead.  My mother is

2  murdered."  She said, "My mother is dead;" and that's when the

3  whole thing started and we go straight in.

4      *Q*   And without going into the details of -- of what

5  happened next, did you explain to the police officers in there

6  what had happened?

7      *A*   Yes.

8      *Q*   Do you remember one police officer in particular?

9      *A*   Yes.

10     *Q*   What do you remember male, female?

11     *A*   Female.  She was a black woman and she was pregnant.

12     *Q*   And do you remember -- did you know that she was a

13 sergeant or?

14     *A*   No, I didn't.

15     *Q*   Do you remember if she was in uniform or plainclothes?

16     *A*   She was in plainclothes.

17     *Q*   And did you -- withdrawn.

18         You told her what happened.  Then what did you do with

19 her?

20     *A*   We were -- she asked me a bunch of questions, and I

21 explained to her what I saw; and she says I got to call the city

22 police; and then I'm thinking -- right then we went up to my

23 mother's apartment.

24     *Q*   And do you remember getting on the elevator or is this

25 one of the things that's a blur?

1     *A*     I do remember getting on the elevator.

2     *Q*     Did you get on with the female officer you just

3   described?

4     *A*     Yes, I did.

5     *Q*     And with anyone else that you remember?

6     *A*     I think it was a male officer but in plainclothes and I

7   don't remember.

8     *Q*     Do you remember getting on the elevator with E.M.S.,

9   with -- with Emergency Services with a gurney?  If you don't

10  remember, say you don't.

11    *A*     I don't remember.

12    *Q*     But you wind up going back upstairs?

13    *A*     Yes, I do.

14    *Q*     With the officers?

15    *A*     Yes.

16    *Q*     Is it fair to say for the rest of the day you are

17  talking with family and police officers and detectives?

18    *A*     Yes, that's correct.

19    *Q*     Pretty much nonstop?

20    *A*     Nonstop.

21    *Q*     For hours and hours?

22    *A*     Hours and hours.

23    *Q*     Family comes over?

24    *A*     Family comes over, yes.

25    *Q*     Have you had occasion -- you do know at least now that

<u>Abbott - Direct - People</u>                                    104

1    the building itself has -- had and has video cameras that record

2    events?  Yes?

3       *A*    I knew we had cameras.  They had cameras but I didn't

4    know that they worked.  I wasn't aware of that.

5       *Q*    You know that now?

6       *A*    Yes, I do.

7       *Q*    And, in fact, at my request have you -- have I asked

8    you to look at some of the video footage of your mother?

9       *A*    Yes, you did.

10              MR. BOGDANOS:  With the Court's permission if we

11      can take that down and, your Honor, if I can have Ms. Pal

12      (sic) come up so she can work the laptop.

13              THE COURT:  Is it possible to swivel that around a

14      little bit so she has a better --

15              MR. BOGDANOS:  Sure, whatever the officer wants to

16      do.

17      *Q*    Ms. Abbott, while it is getting set up -- and does this

18   need to be on?

19              THE COURT:  That's perfect.

20      *Q*    Ms. Abbott, you've had an opportunity to look as I have

21   asked for the clips.

22              MR. BOGDANOS:  Does the monitor need to be on?

23              MS. PAL:  It should be on.

24              (Pause in the proceedings.)

25      *Q*    Ms. Abbott, you know that there are

1  different cameras -- you know now that there are different

2  cameras throughout the building?

3      *A*    Yes, I do.

4      *Q*    And just to fast forward there is a camera in the front

5  of the door?  There is a camera in the lobby?  There is a camera

6  at the elevator, and there is a camera showing inside the

7  elevators?

8      *A*    Yes.

9      *Q*    And I have asked you to look for your mom coming in and

10  out of the building?

11      *A*    Yes, you did.

12      *Q*    And you found her?

13      *A*    Yes, I did.

14      *Q*    And before we look to that, I could stall for another

15  30 seconds.  The clips that you saw of your mom were they -- did

16  they fairly and accurately depict your mother as you knew her?

17      *A*    Oh, yes.

18      *Q*    Of her at that time in January?

19      *A*    Yes, in January.

20      *Q*    The clips that you looked at do they fairly and

21  accurately depict the front of the building if the camera's in

22  the front?  The lobby in the camera was the lobby?  The

23  elevator, if the camera was in the elevator?

24      *A*    Yes.

25      *Q*    It did?

1   *A*   Ah-huh.

2            MR. BOGDANOS:  So for the record if you could go

3   to clip No. 24, camera 1B clip entitled 325.  Go to

4   expanded, please; and if you would go to 18 minutes and 54

5   seconds into the clip.

6   *Q*   What view are we looking at, Ms. Abbott, please?

7   *A*   That's in the lobby.

8   *Q*   Looking in or out?

9   *A*   Out.

10  *Q*   The lobby looking out the front door?

11  *A*   Leaving the elevator.  Getting off the elevator.  I am

12  sorry, you are getting off the elevator and you are heading out

13  the front lobby doors.

14           MR. BOGDANOS:  Go to 18 54, please.

15  *Q*   Do you recognize that person?

16  *A*   Yes, that's my mother Helen Abbott.  That was my

17  mother.

18           MR. BOGDANOS:  Can we please go to the next clip

19  25.  That's camera 1A.  Clip named 338.  Please expand it.

20  Nine minutes and thirty-two seconds into the clip, please.

21  *Q*   Who is -- could you tell us who you just saw.

22  *A*   That was my mother Helen Abbott.

23  *Q*   She appeared to be favoring her right leg?

24  *A*   Yeah, she had a little arthritis on the right side.

25  *Q*   She is wearing her wig?

1      *A*     Yes, sir, she is wearing her wig.

2      *Q*     She was swearing sun glasses?

3      *A*     Eye glasses.

4      *Q*     They are dark?

5      *A*     They are tinted, yes.

6              MR. BOGDANOS:  If you would go now please to the

7      next clip 26 coming back.

8      *Q*     Was there a bodega or store nearby where your mom went

9      to?

10     *A*     Yes, there was a 24 hour bodega that was right across

11     the street two minute walk, three minute walk.

12             MR. BOGDANOS:  Play it, please.

13     *Q*     And that person, Ms. Abbott?

14     *A*     My mother Helen Abbott.

15     *Q*     That's her coming back in?

16     *A*     Coming back in, yeah.

17     *Q*     If we can go just three more clippings and you are

18     done.

19             MR. BOGDANOS:  Go to 1B please clip No. 27.

20             (Witness crying.)

21             MR. BOGDANOS:  Eleven minutes and twenty seconds

22     in and please hit play.  I am sorry, five minutes and

23     thirty-seven seconds, please, clip 347.

24     *Q*     Ms. Abbott, same question, who was that person?

25     *A*     That was my mother Helen Abbott.

1   *Q*   She is coming back?

2   *A*   She is coming back in the building.

3   *Q*   You saw she had some kind of a bag in her hand?

4   *A*   Yes, she might have went to the store.

5          MR. BOGDANOS:  Last clip, please, if we can go to

6   elevator B so that's camera 4 clip No. 29.  That will be 29

7   minutes and 20 seconds into.

8   *Q*   Do you recognize this elevator?

9   *A*   Yes, I do.

10  *Q*   Is that one of the elevators in that apartment

11  building?

12  *A*   Yes, it is.

13  *Q*   Who is that woman in that picture?

14  *A*   That was my mother Helen Abbott.

15  *Q*   Getting off that elevator?

16  *A*   Getting off the elevator, yes.

17         MR. BOGDANOS:  Thank you.  I have nothing further

18  on the video.

19  *Q*   Ms. Abbott, I have no further questions, thank you.

20         THE COURT:  Mr. Klein.

21  CROSS-EXAMINATION

22  BY MR. KLEIN:

23  *Q*   Good afternoon, Ms. Abbott.  Ms. Abbott, you indicated

24  that you went to the apartment; and you found a couple of things

25  that appeared to be out of the ordinary, right?

 1   *A*    Yes.

 2   *Q*    A box of surgical gloves, right?

 3   *A*    Yes.

 4   *Q*    And a cable cord that appeared to be cut to a TV in the

 5   kitchen, right?

 6   *A*    Yes.

 7   *Q*    And the utility draw appeared to be opened in a way

 8   that you hadn't normally seen it?

 9   *A*    Yes.

10   *Q*    And the extension cords appeared to be jangled up,

11   right?

12   *A*    Yes.

13   *Q*    And the pilot light was on?

14   *A*    Yes.

15   *Q*    Other than that, did the general condition of the

16   kitchen appear to you to be the way it generally was when you

17   had seen it?

18   *A*    Yes.

19   *Q*    The same -- not the exact same articles but more or

20   less the same stuff in the kitchen area; is that right?

21   *A*    Yes.

22   *Q*    And then when you walked into the apartment, walked

23   down you eventually came to a living room?

24   *A*    Yes.

25   *Q*    Okay.  Did the living room appear to you to be

1   generally in the same condition that it was other times you have
2   been there?
3       *A*    Yes.
4       *Q*    And is there the same amount of stuff there?
5       *A*    Yes.
6       *Q*    Then as you walk down and if you recall the bedroom off
7   to the right, bedroom No. 1, okay, you looked in there; right?
8       *A*    Yes.
9       *Q*    And did that also appear the way you generally saw it?
10      *A*    Yes.
11      *Q*    With the same amount of --
12      *A*    Yes.  Yes.
13      *Q*    Then you indicated there is another bedroom, call that
14  bedroom No. 2, further down and also on the right?  Is that
15  okay?
16      *A*    Yes.
17      *Q*    And would it be accurate to say that that room also
18  appeared to be the same way it was when you had generally seen
19  it?
20      *A*    Yes.
21      *Q*    And that was used as a storeroom, right?
22      *A*    Yes.
23      *Q*    It was generally filled with a lot of stuff, right?
24      *A*    Yes.
25      *Q*    The way it appeared on the day in question was the way

1  it was when you generally saw it?

2      *A*    Yes.

3      *Q*    Okay.  Now, you also indicated that you gradually

4  became aware of your mother's drug activities; right?

5      *A*    Yes.

6      *Q*    You became aware that she actually had a crack habit,

7  right?

8      *A*    Aware but never -- it was never introduced to me.  I

9  never saw her do it.

10     *Q*    All right, and you became aware there was gradually

11  more company in the house?  I think those were your words.

12     *A*    Right.  That's correct.

13     *Q*    Then sometimes you would confront her about her

14  activities; is that right?

15     *A*    That's correct.

16     *Q*    You didn't want to push too hard?

17     *A*    That's correct.

18     *Q*    You wanted to maintain a relationship with her?

19     *A*    Correct.

20     *Q*    But you would ask her about what was going on in the

21  apartment, right?

22     *A*    I did, yes.

23     *Q*    As a matter of fact would it be accurate to say that a

24  few months before all this happened back in October, you had

25  been over there and an individual had come out of the back

1   bedroom?

2       *A*    Yes.

3       *Q*    When I say the back bedroom I mean the bedroom that

4   actually you thought was your mom's bedroom; is that right?

5       *A*    No.  Can I --

6       *Q*    I am sorry.  Was that bedroom No. 3 what I am talking

7   about?

8       *A*    He didn't come out of the back bedroom.  He came out

9   from the back of the apartment.

10      *Q*    Back of the apartment?  You weren't sure exactly where

11  they came out of?

12      *A*    Right.

13      *Q*    Would it be accurate to say you asked your mom who the

14  guy was, right?

15      *A*    (Nod head affirmatively up and down.)

16      *Q*    You knew it was a guy who had some kind of drug

17  connections in the building; is that right?

18      *A*    Probably, yes.

19      *Q*    And you asked your mom who it was she had living there

20  at that time, right?  You asked your mom, "I didn't know you had

21  anyone living here," right?

22      *A*    That's correct.

23      *Q*    And your mom said words to the effect I could have

24  whoever I want; I live here; it is none of your business; its

25  mine?

1    *A*    Well, it's my --

2    *Q*    Not those exact words?

3    *A*    Right.

4    *Q*    Words to that effect?

5    *A*    To that effect.

6    *Q*    Okay.  And now would it be accurate to say that one of

7    the things that you did was you spoke to your mom about how she

8    was supporting her crack habit?

9    *A*    No.

10   *Q*    Did you ever ask her about that?

11   *A*    No.

12   *Q*    And did you ever see your mom out in front of 240?

13   There is a bus stop across the street, right?

14   *A*    Yes.

15   *Q*    That's where 124th and Second Avenue is, right?

16   *A*    Yes.

17   *Q*    That's the M35 bus?

18   *A*    Yes.

19   *Q*    And that's a bus that actually takes people back and

20   forth to Wards Island to the shelter there, right?

21   *A*    I am familiar with that bus, yes.

22   *Q*    And did you ever become aware of the fact that your mom

23   was waiting there and asking people who were on the bus if they

24   wanted to pay her ten dollars ($10) so that they could use the

25   apartment to smoke crack in?

1       *A*     No, I wasn't aware of that.  No.

2       *Q*     And did you ever become aware of the fact that your mom

3    would sometimes wait there and charge people ten dollars so that

4    if they wanted, they could use the back bedroom, bedroom No. 3,

5    to have sex in?  Did you become aware of that?

6       *A*     No, I wasn't aware of that.

7       *Q*     And did you become aware that your mother was also

8    charging people ten dollars if they wanted to use the house to

9    store their crack in?

10      *A*     No, I wasn't aware of that either.

11      *Q*     Or to smoke their crack in?

12      *A*     No, I wasn't aware of that.

13      *Q*     Or to sell crack in?

14      *A*     No, I wasn't aware of that.

15      *Q*     And you -- the last time you'd actually seen your mom

16   was on that Tuesday, right?

17      *A*     Yes.

18      *Q*     That Tuesday she met you downstairs; right?

19      *A*     Yes, she did.

20      *Q*     You didn't go up into the house?

21      *A*     No, I didn't.

22      *Q*     Right?  So at that point like on that Tuesday you

23   didn't know how many people were staying in the house; right?

24      *A*     No, I didn't.

25      *Q*     Or using the house to smoke crack in, right?

```
 1        A    No, I didn't.

 2        Q    How many people were storing drugs in the house at that

 3   time?

 4                  MR. BOGDANOS:  Objection as to form.  If any.

 5                  THE COURT:  Sustained.

 6                  MR. BOGDANOS:  Just as to form.  Only as to form.

 7        Q    If any?

 8        A    No.

 9                  MR. KLEIN:  Thank you.

10                  THE COURT:  Anything further?

11                  MR. BOGDANOS:  No, your Honor.

12                  THE COURT:  Ma'am, that completes your testimony.

13   Thank you very much.

14                  MR. BOGDANOS:  Your Honor, the People next call to

15   the stand Daniel-Bey.

16                  THE COURT:  Before the next witness starts will

17   the attorneys step up, please.

18                  (Off-the-record bench conference.)

19                  THE COURT:  Ladies and gentlemen before the next

20   witness starts, it has come to my attention that one of you

21   may be taking notes.  It's fine because note taking is

22   allowed but he have to read an instruction to you about

23   that.  In fact, other people may wish to take notes as well;

24   and if they would like to do so, we do have notebooks

25   available.
```

1          There is a certain protocol that goes with all of

2     this.  All right, where is it?

3          Note taking, for those of you who wish to take

4     notes during the trial I must advise you that notes are not

5     a substitute for the official record or for your own

6     independent recollection; that is, your notes may only be

7     used to refresh your recollection.  That means of course if

8     you read something in your notes which you cannot actually

9     remember seeing or hearing, you should not rely on the notes

10    but rather you should request a read back of the official

11    transcript.

12         In addition your notes are solely for your

13    personal use and no other juror should use or rely on your

14    notes in any way.  The way we do it is for those who were

15    going to take notes, we do pass out the books.  We collect

16    them at the end of the day.  We put them in a secure area;

17    and at the end of trial, the notes are shredded so no one

18    will ever have a chance to look at your notes; so with all

19    of that, are there any note takers out there?

20         THE COURT SERGEANT:  Raise your hand.

21         THE COURT:  Looks like about three or four.  The

22    sergeant will explain to you how you write on your book and

23    so on.

24         (Transcript continued on the next page.)

25

DIRECT/SGT.DANIEL-BEY/PEOPLE

1  T-6 - Peo. V Mark Richardson, Ind.#3534/08

2  September 13, 2011:

3                 THE COURT:  And the name of the witness --?

4                 MR. BOGDANOS:  Sergeant Daniel-Bey.  And there

5  is more video with this witness so may Ms. Powell come up

6  because she did great last time.

7                 (The witness, Sergeant Dawud Daniel-Bey, enters

8          the courtroom, takes the witness stand, is duly

9          sworn/affirmed in by the Clerk of the Court, responds to

10         the oath and testifies as follows:)

11                THE COURT CLERK:  Do you solemnly swear or

12         affirm the testimony you are about to give shall be the

13         truth, the whole truth, and nothing but the truth, so

14         help you God?

15                THE WITNESS:  Yes, I do affirm.

16                THE COURT OFFICER: In a loud clear voice, please

17         state your name, spelling your last name, your shield

18         number and command.

19                THE WITNESS:  My name is Sergeant Daniel-Bey.

20         Last name is D-a-n-i-e-l, hyphen, d-e-y.  Shield number

21         2122.  My command is the 32nd Precinct.

22  DIRECT EXAMINATION

23  BY MR. BOGDANOS:

24    Q.    Sergeant, good afternoon.  Thank you for your

25  patience today.  Would you tell us how long you have been on

DIRECT/SGT.DANIEL-BEY/PEOPLE

1  the New York City Police Department all together, how long you

2  have been at the 32nd precinct, and how long you have been a

3  sergeant?

4      A.   I have been on the job for 16 and a half years.  I

5  have been at the 32nd Precinct since 2005 but I had left there

6  for about a year and a half in between and I was assigned to

7  VIPER command for about a year and a half.

8      Q.   How long have you been a sergeant?

9      A.   Since 2005.

10     Q.   And, very generally, what is your assignment now?

11     A.   Now, well, what they call Impact Training Supervisor,

12  which is the field training supervisor for the rookies just

13  coming out of the academy.

14     Q.   And could you tell us where the 32nd Precinct is

15  located?

16     A.   32nd precinct is located on 135th Street between 7th

17  and 8th Avenue.

18     Q.   Now, if I could invite your attention back to January

19  of 2008.  Did you have a different assignment than you do now?

20     A.   Yes, I did.

21     Q.   Where were you assigned?

22     A.   I was assigned to VIPER 12.

23     Q.   And what does VIPER actually stand for?

24     A.   It stands for Video Interactive Patrol Enforcement,

25  the R is, I think it's, I'm not sure what the R is.

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1      Q.    Does Response sound right?

2      A.    Yes, right.

3      Q.    So Video Interactive Patrol Enhance Response?

4      A.    Right.

5      Q.    And what is that exactly?

6      A.    It's -- we monitor the activity that goes on within

7    the area concerned and report back to the dispatcher so the

8    uniformed police officer can take actions against crimes that

9    are currently occurring.

10      Q.    In housing projects?

11      A.    Right.

12      Q.    So the enhance response portion it's video cameras

13   setup throughout housing projects?

14      A.    Correct.

15      Q.    And you were assigned to VIPER 12.  Where was that

16   located?

17      A.    2400 Second Avenue.

18      Q.    That's the building?

19      A.    Yes.

20      Q.    And that's in the Wagner Houses?

21      A.    Right.

22      Q.    Are the Wagner Houses the only housing project in the

23   city that has the VIPER Program?

24      A.    No, it's not.

25      Q.    It's throughout the city?

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1     A.    Right.

2     Q.    When you arrived there what was your assignment?

3     A.    My assignment was the video patrol supervisor for the

4  four to twelve and midnight.  I had two different shifts.

5     Q.    Whatever shift you had you were the supervisor?

6     A.    Right.

7     Q.    And just so we're clear, the police department

8  generally works on eight hour shifts?

9     A.    Correct.

10    Q.    Midnight to eight, roughly eight to four, four to

11 twelve?

12    A.    Correct.

13    Q.    You will explain in a minute, the shifts overlap so

14 there's not this time period when there's no cop on the street,

15 correct?  Right?

16    A.    Correct.

17    Q.    So it's generally for three eight hour shifts?

18    A.    Yes, eight hours twenty-three minutes to be exact.

19    Q.    Right.  And that extra 23 minutes is so --

20          MR. KLEIN:  Judge, I think he has to testify not

21 Mr. Bogdanos.

22          MR. BOGDANOS:  I'm just trying to get past

23 foundational stuff.

24          THE COURT:  Go ahead.

25 BY MR. BOGDANOS:

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1    Q.    And specifically VIPER 12, what -- you were

2  supervising the people, what was the VIPER system, explain that

3  to us in the building, in your office?

4    A.    Oh there's 267 cameras throughout the projects which

5  we have, I think it's like forty something monitors which you

6  actually monitor and they switch between the different cameras

7  located throughout the projects.

8    Q.    And the monitor themselves are where?

9    A.    They are inside the office where we sit at.

10   Q.    And the monitors, since there's more cameras than

11  monitors, explain how that works?

12   A.    Those monitors which are not fixed on one camera they

13  switch between the different cameras throughout the projects

14  but they still record.

15   Q.    And are part of your duties to both watch those

16  monitors and ensure that the monitors and the cameras and the

17  recorders are working properly?

18   A.    That's correct.

19   Q.    What are you supposed to do if they are not?

20   A.    You are supposed to make notification.  Actually

21  notification consists of doing incident report and calling

22  different people to come out fix the cameras and see if they

23  work actually make sure they don't work.

24   Q.    And, in fact, when you come on duty the beginning of

25  a shift do you have any responsibility with regard to the

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1   cameras and the video?

2       A.   Yes.   I am responsible for making sure all the

3   cameras are working properly and are recording as well.

4       Q.   And do you do that then periodically throughout your

5   shift?

6       A.   Yes, I do.

7       Q.   Were you working on January 11th of -- oh, before I

8   get to the cameras, just to short circuit all the other

9   questions.   Did you have any knowledge of any homicide

10  committed in Wagner -- in the 2400 building on January 11th?

11      A.   Yes, I did.

12      Q.   After the fact?

13      A.   After.   Yes, it was after.

14      Q.   Did you have any knowledge at the time?

15      A.   No, I didn't.

16      Q.   So whatever you learned you learned later on?

17      A.   Right, that's correct.

18      Q.   So now let's go back to January 11th of 2008.   Were

19  you on duty on that date?

20      A.   Yes, I was.

21      Q.   Were you on duty on January 12th?

22      A.   Yes, I was.

23      Q.   And were you on duty on January 13th?

24      A.   Yes, I was.

25      Q.   Same tour all three days?

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1      A.    Yes, I was.

2      Q.    Exactly what was your tour?

3      A.    Midnight to 7:23.  Eleven o'clock midnight which is

4  the midnight tour to 7:23 in the morning.

5      Q.    All right.  I know you know what you mean but you

6  just said 11 o'clock midnight so let's do that again.  I know

7  you call it the midnight tour so let's do it again.

8      A.    We call it the midnight tour but it actually starts

9  at 11 o'clock.  It's called the midnight tour but it goes from

10 11 o'clock at night to 7:23 in the morning.

11     Q.    And so we're clear, when I say the 11th, did you work

12 the Thursday into Friday and then Friday into Saturday and

13 Saturday into Sunday?

14     A.    Correct.

15     Q.    So those three?

16     A.    Correct.

17     Q.    You started the night before but those three

18 mornings?

19     A.    Right.

20     Q.    So it was actually the 10th, 11 o'clock at night for

21 the 11th and the 11th would have been for the 12th and the 12th

22 for the 13th.  And was -- were the VIPER cameras working during

23 all three of your tours of duty on the 10th into the 11th, 11th

24 into the 12th and 12th into the 13th?

25     A.    Yes.  Were all the cameras working?

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1    Q.    Good point.  Were any of the cameras not working?

2    A.    There were probably some cameras that weren't

3    working.  Once they are not working they are documented in our

4    command log.

5    Q.    Were all the cameras in the 2400 building working in

6    those three tours?

7    A.    Without seeing the command log I couldn't tell you.

8    Q.    Would looking at the command log from that date

9    refresh your recollection as to whether they were working?

10   A.    Yes, it will.

11         MR. BOGDANOS:  I would ask that this be deemed

12   marked People's 5 for identification and handed to the

13   sergeant.  For the record, copies of the command log from

14   January through February of 2008, copy of which previously has

15   been given to the defense.

16   A.    You are saying on the 11th?

17   Q.    Your three tours, all three.  Let's do them all at

18   once.  Were the cameras in the 2400 building working?

19   A.    Do you have the camera numbers for the 2400

20   building?

21   Q.    Okay.  Have you -- let's put that down for a minute.

22   Sergeant, have you had opportunity to look at the cameras for

23   2400?

24   A.    Yes, I did.

25   Q.    Okay.  And did I specifically ask you to look at

DIRECT/SGT.DANIEL-BEY/PEOPLE

1   those cameras and to actually find yourself on each of the

2   cameras on all three of your tours of duty?

3        A.   Yes, you did.

4        Q.   If you would look to the right.  Your left.  Sorry.

5   Please, do you see the files that are indicated on the monitor

6   that appear to be a hard drive content, if you will?

7        A.   Yes, I do.

8        Q.   Have you seen those before?

9        A.   Yes, I have.

10        Q.   Are those the actual cameras I asked you to review

11   before?

12        A.   Yes.

13        Q.   And did you review those cameras?

14        A.   Yes, I did.

15        Q.   Looking at those camera numbers do they refresh your

16   recollection as to which camera numbers were in 2400?

17        A.   Yes.

18        Q.   So I come back to my first question and that is:

19   Were all the cameras in 2400 working on all three tours?

20        A.   Yes, they were.

21        Q.   You are absolutely certain?

22        A.   Yes.

23        Q.   You couldn't be mistaken?

24        A.   No.

25        Q.   In addition to you being certain that the cameras

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1   were working at the time, did I also ask you to confirm three

2   half years later that they were working back then?

3       A.   Yes, you did.

4       Q.   How did you do that?

5       A.   What I did I went back to the times when I supposedly

6   signed in, I saw myself entering the building and the times

7   that I was supposedly signed out, and I saw myself leaving the

8   building as well.

9       Q.   And did you see yourself at exactly the time on the

10  clips that you actually had signed yourself in on the log?

11      A.   Yes, I did.

12      Q.   And leaving?

13      A.   Yes I did.

14      Q.   All three tours?

15      A.   All three tours.

16      Q.   And did you record that information as you watched

17  it?

18      A.   Yes, I did.

19      Q.   And did you do that fairly and accurately?

20      A.   Yes, I did.

21           MR. BOGDANOS:  I would ask that the witness now

22  be handed People's, what I request be deemed marked People's 6

23  for identification.

24           For the record, Sergeant Daniel-Bey recorded times on

25  video a copy of which has previously been given to the

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1  defense.

2  BY MR. BOGDANOS:

3      Q.   Do you see this document prepared there before you?

4      A.   Yes, I do.

5      Q.   Who prepared that document?

6      A.   I did.

7      Q.   And how did you prepare that document?

8      A.   I went through each video clip at the time and I

9  recorded the times that I entered the building and the times

10  that I saw myself leaving the building on each of the cameras

11  that was supposed to pick me up going into the building in an

12  out of the building.

13      Q.   And did you actually record those times as you were

14  actually looking at the video?

15      A.   Yes, I did.

16      Q.   Simultaneously?

17      A.   Yes.

18      Q.   And did you confirm that you did it accurately?

19      A.   Yes, I did.

20      Q.   And if you were to put that down would you be able to

21  testify as to each and every time you saw yourself in the

22  building without looking at it?  I mean if you were not looking

23  at it could you tell this jury exactly what film -- what

24  clip -- start again.

25           If you were not -- and I apologize -- if you were not

DIRECT/SGT.DANIEL-BEY/PEOPLE

1  looking at that -- put it down, turn it over right now,

2  please -- could you tell this jury which camera you were on,

3  which film clip you were on, the number you were on and where

4  exactly in that clip you were without looking at that could you

5  possibly do that?

6       A.   Yes.

7       Q.   Wait.  You could actually -- you could direct us to a

8  place on the clip without looking at that?

9       A.   No, I need the clip name so I can go back to the

10  time.

11       Q.   So you would need to use that document that you

12  prepared?

13       A.   So I can refer back to the time.

14       Q.   That's the reason you prepared it?

15       A.   Yes.

16            MR. BOGDANOS:  I will offer this into evidence

17  as past recollection recorded as People's Exhibit Number 6.

18            MR. KLEIN:  Okay.

19            THE COURT:  Thank you.  People's 6 is admitted.

20            (People's Exhibit 6 was received in evidence)

21  BY MR. BOGDANOS:

22       Q.   Now you can turn it over.  And I'm certainly not

23  going to ask you to go through every single one of those but I

24  am going to ask you to go through one just so you can explain

25  to the jury the actual nomenclature and taxomity of the film

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

 1   clips themselves.

 2          So if I could ask you to start with --

 3              MR. BOGDANOS:  And I'm sorry.  I actually need

 4   to approach with the Court's permission.

 5              THE COURT:  Yes.

 6              MR. BOGDANOS:  And if I could have that for one

 7   moment.  I'm just going to indicate the one that's

 8   highlighted.  For the record it's January 11th camera 1B, at 11

 9   o'clock.

10   BY MR. BOGDANOS:

11      Q.   And here's what I'm going to ask you.  Sergeant, the

12   camera, the -- go back to the content, please, the names of the

13   cameras.  Camera 1A.  Can you tell the jury which camera that

14   is or what the viewed is of camera 1A?

15      A.   Camera 1A is the front door outside.  That is when

16   you approach the door that's when you if anybody is seen before

17   they get into the lobby.

18      Q.   So that's the camera that looks in?

19      A.   That's the camera that looks out.

20      Q.   Okay.  I'm sorry.  1A, you are indicating is the

21   camera that looks outside or inside?

22      A.   It should be outside.  It's outside.

23      Q.   It's outside looking in the door is what I am

24   asking.  I think we're saying the same thing but we're saying

25   it backwards.

                    Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1      A.   Right.

2      Q.   I am asking?

3      A.   Well, that's the first camera that would be seen from

4  anybody coming into the door.

5      Q.   Okay.  Let me show you what has previously been

6  received in evidence subject to connection as two --

7           THE COURT:  Three.

8           MR. BOGDANOS:  Yes, Judge.  Thank you.

9      Q.   People's 3.  Do you see this diagram?

10     A.   Yes, I do.

11     Q.   Do you recognize this diagram?

12     A.   Yes, I do.

13     Q.   What do you recognize it to be?

14     A.   It's the front door of the front entrance door in the

15  hallway of 2400 Second Avenue.

16     Q.   Do you see this red orange dot right here?

17     A.   Yes.

18     Q.   Do you know what's there?

19     A.   That should be a camera.

20     Q.   Would that be camera 1A?

21     A.   Yes.

22     Q.   Okay.  So here's the front door?

23     A.   Right.

24     Q.   So it's the camera that's outside the front door?

25     A.   Right, outside.

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1    Q.    So we were saying the same thing and forgive me if I

2    misunderstood.   Pointing to the next orange dot that appears to

3    be near the letter A, for the record, what is that cameras?

4    A.    That's another camera right by the elevator looking

5    outside.

6    Q.    What camera number is that, do you remember or do you

7    need to look at --

8    A.    I need to look at where they are labeled at.   That

9    should be 1B.

10   Q.    Okay.   Is this one right here the one you indicated

11   as 1A?

12   A.    Yes, it is.

13   Q.    I am going to write 1A on this and I am pointing to

14   what you indicated 1B.

15   A.    Yes, it is.

16   Q.    So I am going to write 1B.   Okay.   The camera where

17   there's another dot in front of the elevators, do you know what

18   camera number that is?   You need to look?

19   A.    That should be 2 lobby elevator.

20   Q.    Okay.   I'm going to write a 2 there.   And there's a

21   dot right here?

22   A.    That is right outside our office.

23   Q.    Right outside the VIPER office?

24   A.    Yes.

25   Q.    What number is that?

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1      A.    That should be 10.

2      Q.    And while I am writing that what camera is indicated

3   in elevator A?

4      A.    Elevator A should be 3.

5      Q.    And elevator B?

6      A.    Four.

7      Q.    Have I written everything in here fairly accurately

8   as you told me to do?

9      A.    Yes, you did.

10     Q.    Okay.  Thank you.  All right.  So, now, let's go --

11  well, actually that has to come down.  Let's go to the entry I

12  showed you before.  Would you explain to this jury how to find

13  you on that one entry and we're not going to do all the entries

14  we're just doing one but we need you to walk us through that.

15     A.    What is 1B?

16     Q.    Sure.  Tell us exactly what to do.

17     A.    So go to 1B.

18     Q.    You have to tell us.

19     A.    Open up 1B.  The clip name is 7:34.  1/11 7:34.  Then

20  you have to go to 7:17 -- 8 minutes, 45 seconds into the clip.

21  And I should be walking in the door at that time.  Walking out,

22  actually.

23     Q.    Is that you?

24     A.    Yes, it is.

25     Q.    Pause, please.  Does that fairly accurately represent

DIRECT/SGT.DANIEL-BEY/PEOPLE

1    how you looked?

2        A.   Yes, it was.

3        Q.   How you looked on that day?

4        A.   Yes, it is.

5        Q.   It's your backpack?

6        A.   Right.

7        Q.   Your jacket?

8        A.   Yes, it is.

9        Q.   I am not going to ask you to do it in front of the

10   jury but you did that, I don't know, couple dozen times?

11       A.   Yes, I did.

12       Q.   Would you please reduce that and explain to us

13   exactly how we can figure out what time that is?

14       A.   Okay.  If you go to the previous clip.

15       Q.   Well, first, let's do it this way, Sergeant -- I'm

16   sorry.  I should have broken it up.  The name of the clip

17   itself, what does that indicate?

18       A.   That indicates the ending time of the previous clip.

19       Q.   So if a clip is named 7:34, for example, that means

20   that clip ends at 7:34?

21       A.   Right.

22       Q.   So how can you tell the actual time, since we don't

23   see a time stamp when we open it up, how can you tell the

24   actual time that you recall seeing on that video?

25       A.   You go back to the previous clip which is labeled

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1   7:17.

2        Q.    Okay.  And then what will -- so now we're at 7:17.

3   Now what?

4        A.    No.  Actually 7:34.  7:17 is where that clip ended

5   and 7:34 is where the other one begins.

6        Q.    Let me back up for a second because I may be asking

7   this badly.  The clip and information -- forgive my back if I

8   am blocking anyones view.  Please raise your hand.

9             So there's a clip named 7:34 and before that there's

10  a clip that's named 7:17, correct?

11       A.    Correct.

12       Q.    You just told us that?

13       A.    Correct.

14       Q.    Now, no where on here does there appear to be a time,

15  right?

16       A.    Correct.

17       Q.    So because there's no time and you have told us at

18  7:34 is the end of this clip.  What's the beginning of the

19  clip?

20       A.    7:17.

21       Q.    So the way to get the beginning of the clip is to

22  look at --

23       A.    Right.  Go to the beginning of that clip.

24       Q.    So you determine the time of the beginning of the

25  clip by looking at the end of the last clip?

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.DANIEL-BEY/PEOPLE

1      A.    Correct.

2      Q.    And then you just add the running time, in other

3   words, the time on the counter?

4      A.    Right.

5      Q.    And -- I'm sorry.  It's terrible complicated and

6   thank you for your patience.  And is that how you get the

7   actual time?

8      A.    Yes.

9      Q.    On all of them?

10     A.    Yes.

11     Q.    Having gone through all of this, did you notice

12   whether or not camera 1B is on the same time as all of the

13   other twelve cameras?

14     A.    1B it's maybe about two or three minutes off.

15     Q.    With the other cameras?

16     A.    Right, correct.

17     Q.    And all the sort cameras are synchronized?

18     A.    Yes, they are.

19           MR. BOGDANOS:  Got it.  Thank you.  Nothing

20   further.

21           THE COURT:  That completes your testimony,

22   Sergeant.  Thank you.

23           (The witness was excused and exits the courtroom.)

24           THE COURT:  You have twelve minutes you want to

25   start another witness?

                Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.SUREO/PEOPLE

1            MR. BOGDANOS:  Sure.  It will be Sergeant

2   Suero.  But I warn everyone it's the exact same purpose.  The

3   video.

4            (The witness, Sergeant Elvis Suero, enters the

5        courtroom, takes the witness stand, is duly

6        sworn/affirmed in by the Clerk of the Court, responds to

7        the oath and testifies as follows:)

8            THE COURT CLERK:  Do you solemnly swear or

9        affirm the testimony you are about to give shall be the

10       truth, the whole truth, and nothing but the truth, so

11       help you God?

12           THE WITNESS:  I do.

13           THE COURT OFFICER: You may have a seat

14   Sergeant.  Sergeant, can you state your complete name for

15       the record, spelling your last.

16           THE WITNESS:  Elvis Suero, S-u-e-r-o.

17           THE COURT OFFICER:  Shield and command.

18           THE WITNESS:  Shield is 4780.  I work in

19       Brooklyn North Narcotics.

20   DIRECT EXAMINATION

21   BY MR. BOGDANOS:

22       Q.   Good afternoon, Sergeant.  Thank you for your

23   patience today.  Would you please tell us how long you have

24   been on the New York City Police Department, how long you have

25   been in Brooklyn Narcotics and how long you have been a

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.SUREO/PEOPLE

1  sergeant?

2       A.    I have been on the job eleven years.  I have been in

3  Brooklyn North Narcotics about a month now.  And I am about to

4  have four years as a sergeant in March.

5       Q.    And was there a time when you were assigned to the

6  VIPER office of 2400 Second Avenue?

7       A.    Yes.

8       Q.    We have already heard all about VIPER so you don't

9  need to tell us how many monitors or cameras or what VIPER is.

10  When you were in VIPER were you a sergeant?

11       A.    No, I wasn't.

12       Q.    So you weren't a supervisor at the time?

13       A.    No, I wasn't.

14       Q.    Did you have responsibility for the proper working of

15  the cameras and monitors of the VIPER office?

16       A.    Yes, I did.

17       Q.    And did you discharge those duties?

18       A.    Yes, I did.

19       Q.    Moving to the 11th and 12th of January of 2008, were

20  your on duty on those two dates?

21       A.    Yes, I was.

22       Q.    What hours were you working both dates?

23       A.    I was working 0700 by 1523.  3:23.

24       Q.    Seven in the morning to 3:23 in the afternoon?

25       A.    Yes.

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.SUREO/PEOPLE

1     Q.   Friday and Saturday?

2     A.   Yes.

3     Q.   But you were off Sunday?

4     A.   Yes.

5     Q.   And were the cameras and monitors in the VIPER office

6   for the 2400 building working properly throughout both of your

7   tours?

8     A.   They were.  If they were not then there would have

9   been paperwork on them.

10    Q.   So were they?

11    A.   Yes.

12    Q.   And that's part of your job?

13    A.   Yes.

14    Q.   To monitor those?

15    A.   Yes.

16    Q.   In addition to telling us that you knew then they

17   were working did I ask you to take steps now three and a half

18   years later to make sure that they were properly working three

19   and a half years ago?

20    A.   Yes.

21    Q.   What did you do?

22    A.   I went back and looked at the monitors and saw when I

23   did came in and when I left the building.

24    Q.   And did you do that each -- for each of the cameras

25   that I asked you to look at?

Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.SUREO/PEOPLE

1       A.   Yes, I did.

2       Q.   And did you write down the times that you saw

3   yourself?

4       A.   Yes, I did.

5       Q.   And did the times that you saw yourself on the video,

6   were they the same times that you had actually logged in and

7   out for both of those tours?

8       A.   Yes, they were.

9       Q.   And did you record all that information?

10      A.   I did.

11      Q.   Did you do it as you were watching the video?

12      A.   I did.

13      Q.   Did you do that accurately?

14      A.   Yes, I did.

15      Q.   Are you sure?

16      A.   Yes.

17           MR. BOGDANOS:  I will ask the sergeant be handed

18   People's, what I request he be deemed marked People's 7 for

19   identification.  Please take a look at that.

20           For the record, Sergeant Suero's time sheets have

21   previously been provided to the defense.

22   BY MR. BOGDANOS:

23      Q.   Do you recognize that document?

24      A.   I do.

25      Q.   What do you recognize it to be?

                    Glenn J. Merola, Sr. Court Reporter

DIRECT/SGT.SUREO/PEOPLE

1       A.   The times that I entered and left the building on

2  those dates.

3       Q.   Who wrote that down?

4       A.   I did.

5       Q.   And did you do it accurately?

6       A.   Yes, I did.

7       Q.   Did you do it as you were actually looking at the

8  video?

9       A.   Yes, I did.

10       Q.   And one final question on that.  Were all those times

11  that you have recorded did the video recording of the VIPER

12  video fairly and accurately record those times and records you

13  as you looked on that date?  On those dates?

14       A.   Yes, it did.

15            MR. BOGDANOS:  I will offer People's 7 into

16  evidence.  I have no further questions.

17            THE COURT:  People's 7 is admitted.  I see no

18  objection.

19            MR. KLEIN:  No questions.

20            THE COURT:  Thank you, Sergeant, you're done.

21       (The witness was excused and exits the courtroom.) (.

22            MR. BOGDANOS:  I can do one more.

23            THE COURT:  You're on a roll.  Go ahead.

24            MR. BOGDANOS:  The People call Officer Eric

25  Carricato.


                   Glenn J. Merola, Sr. Court Reporter

DIRECT/PO CARRICATO/PEOPLE

1          (The witness, P.O. Eric Carricato, enters the

2      courtroom, takes the witness stand, is duly

3      sworn/affirmed in by the Clerk of the Court, responds to

4      the oath and testifies as follows:)

5          THE COURT CLERK:  Do you solemnly swear or

6      affirm the testimony you are about to give shall be the

7      truth, the whole truth, and nothing but the truth, so

8      help you God?

9          THE WITNESS:  I do.

10          THE COURT OFFICER:  Have a seat.  In a loud

11      clear voice please state your name, spelling your last

12      name, shield and command.

13          THE WITNESS:  Police Officer Eric Carricato.

14      C-a-r-r-i-c-a-t-o.  Shield number 29933.

15  DIRECT EXAMINATION

16  BY MR. BOGDANOS:

17      Q.   Officer Carricato, would you please tell us how long

18  you have been on the New York City Police Department and how

19  long you have been at the 23rd Precinct.

20      A.   It's five years two months and I have been at the

21  23rd Precinct for about eight months.

22      Q.   Was there a time period when you were assigned to the

23  VIPER office of the 2400 building in Wagner Houses?

24      A.   Yes, I was.

25      Q.   Were you working there in January of 2008?

Glenn J. Merola, Sr. Court Reporter

DIRECT/PO CARRICATO/PEOPLE

1     A.   Yes, I was.

2     Q.   The jury has already heard about all the monitors and

3 all the cameras so you don't need to go through any of that.

4 What were your duties within the VIPER office?

5     A.   To monitor video.

6     Q.   And did you do that accurately?

7     A.   I did.

8     Q.   And did you have a procedure to follow if any of the

9 monitors or cameras were not working?

10    A.   Yes, we did.

11    Q.   I invite  your attention now to January 12th of 2008,

12 and January 13th of 2008, were you working on both days?

13    A.   I was.

14    Q.   Do you remember the tour you were working?

15    A.   Working 1500 shift by 2323 hours.

16    Q.   Okay, so 3 o'clock in the afternoon until 11:23

17 p.m.?

18    A.   That's correct.

19    Q.   And were all of the cameras and monitors and the

20 recorders in the 2400 building working properly throughout your

21 tour on both those days?

22    A.   Yes, they were.

23    Q.   You are absolutely certain?

24    A.   I am positive.

25    Q.   Did I, even though you knew they were working at the

Glenn J. Merola, Sr. Court Reporter

DIRECT/PO CARRICATO/PEOPLE

1   time, did I ask you none the less to confirm three and a half

2   years later that they were working back then?

3        A.   That's correct.

4        Q.   What did I ask you to do and what did you do?

5        A.   To go back in the video and see when I saw myself

6   coming into work and leaving work.

7        Q.   Did you do that?

8        A.   I did.

9        Q.   Did you do it fairly and accurately?

10       A.   I did.

11       Q.   And did you record the results?

12       A.   I wrote them down on a piece of white paper.

13            MR. BOGDANOS:  I would hand this to the officer,

14   People's 8 for identification, Police Officer Carricato's time

15   record previously given to the defendant.

16       Q.   Do you recognize the document I just handed to you or

17   the Court Officer?

18       A.   Yes.  This is my handwriting.

19       Q.   Are those the recorded times as you went through the

20   cameras from January 12th and 13th of 2008?

21       A.   Yes, they are.

22       Q.   Did you record them accurately?

23       A.   I did.

24       Q.   And, in fact, looking back when I asked you to view

25   the cameras and you did, looking at the cameras did they fairly

Glenn J. Merola, Sr. Court Reporter

DIRECT/PO CARRICATO/PEOPLE

1   and accurately record both the events that were taking place

2   and the times that they took place?

3       A.   Yes, they do.

4               MR. BOGDANOS:  Thank you.  Nothing further.  I

5   will offer that into evidence as People's 8 and no further

6   questions.

7               THE COURT:  People's 8 is admitted.  No

8   objection.

9               MR. KLEIN:  No.

10              THE COURT:  No cross.

11              MR. KLEIN:  No.

12              THE COURT:  Officer Carricato, thank you very

13  much.

14              MR. BOGDANOS: The next witness is long.

15              THE COURT:  Ladies and gentlemen, that will do

16  it's for today.  We are at the 4:30 hour.  See you tomorrow

17  morning 9:45 the trial will resume.  Please be here on time.

18  Please do not discuss the case.  Those with notebooks may leave

19  them on their chairs and we'll pick them up.

20              Thank you very much, we'll see you tomorrow morning.

21              (The jury is excused and exits the courtroom.)

22              THE COURT:  Any application?

23              MR. BOGDANOS:  No.

24              MR. KLEIN:  No.

25              THE COURT:  Okay.  9:45.  Thank you all.

Glenn J. Merola, Sr. Court Reporter