Colloquy

```
 1   SUPREME COURT          NEW YORK COUNTY
     TRIAL TERM             PART 45
 2   ------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK  x  IND#
 3                                        x  3534/08
                                          x
 4      -against-                         x
                                          x  CHARGE:
 5   MARK RICHARDSON,                     x  MURD. 2
                                          x
 6                      Defendant.        x
     ------------------------------------x
 7   JURY TRIAL CONTINUING

 8                          111 Centre Street
                            New York, N.Y. 10013
 9                          September 19, 2011

10

11   B E F O R E:

12              HONORABLE BRUCE ALLEN,
                 JUSTICE OF THE SUPREME COURT
13

14

15   A P P E A R A N C E S;  (Same as previously noted)

16   ----------------------------------------------------

17              THE COURT:  Case on trial continued.  Everyone

18   is here.  Yes.

19              MR. BOGDANOS:  Good morning, Your Honor.

20              MR. KLEIN:  Good morning.  Judge, we would just

21   agree that there should be a change in the record on page 389

22   there's a question to Doctor Graham from Mr. Bogdanos:

23         "Did he have a routine practice that he observed with

24   regard to swabbing the breast?"

25         "Answer:  Yes.  His routine practice was to swab the
```

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1  nipple area as well as the outlining, I-N-G, area with -- the

2  area of the breast."

3        We believe that was outlying, L-Y-I-N-G, area of the

4  breast.  So we just ask that the record be changed in that

5  manner.

6        MR. BOGDANOS:  I didn't hear it but I take Mr.

7  Klein's word so I will consent to that change.

8        THE COURT:  Thank you.  Consider it changed.

9        MR. BOGDANOS:  Couple other matters, Your

10  Honor.  There had been much discussion about the potential use

11  of what I call, jailhouse informant, the People will not be

12  using such an individual.

13        I do need to place a couple of things with regard to

14  that on the record should my good faith basis in the future,

15  perhaps on cross examination, be questioned.

16        The individual, whom I am prepared to name on a

17  sealed record not in front of the defendant, had informed me

18  directly when I produced him from jail that he had several

19  conversations with the defendant in which the defendant told

20  him that he actually did the stabbing himself and explained why

21  he did it.

22        I am not going to go into the details of that

23  particular portion because there was no one else present for

24  that particular portion.  My concern is that if I give you the

25  specific details of the why the defendant will know whom I am

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   talking about.

2          In addition to that portion, the jailhouse informant

3   also stated that the defendant told him that he screwed up

4   because he didn't realize there was video and that was a big

5   screw up on his part.  But the DA has screwed up also.  The DA

6   has time of death wrong.  In Mr. Richardson's words, wrong by a

7   couple of hours.

8          And so for those three areas the People were planning

9   on calling this particular individual.  The reason we're not

10  calling him is this individual has a record that rivals the

11  defendant's.  That is the reason.

12         This individual was questioned hard and scrutinized

13  very carefully.  His story about what the defendant told him

14  stood up throughout every single, and I say hard, I mean hard

15  cross examination, in my office, by myself, and by seasoned

16  detectives.  The story never wavered.  It stood up under the

17  closest of scrutiny.

18         That's not the reason he's not being called.  He's

19  not being called because his record is as bad as the defendant

20  and it is the decision of, my decision and the decision of

21  District Attorney's Office, not to call him because of what can

22  only be characterized as horrific prior record himself and we

23  don't want to put someone like that on the stand in this case.

24         That's the only reason that he's not being called and

25  Mr. Klein and I we had this conversation as I promised on

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   Friday.  I let him know that.  But I just want to make the

2   record clear should that ever come up on cross examination my

3   good faith basis for cross examination.

4          Second, I have provided this morning Mr. Klein

5   photographs of the scissors, you know substituted into the

6   record of trial.

7          Three other small matters, two small, one perhaps

8   larger.  Mr. Klein and I had previously agreed that the

9   propriety, the lawfulness, the legalness of the arrest would

10  not be at issue here and as a result of that I didn't introduce

11  the defendant's other arrest from which they got a cigarette

12  from which the original DNA hit was made, which was the basis

13  for the arrest that Judge Carruthers found lawful.

14         I just want to be clear.  So I am not calling

15  Detective Cornetta or any of the officers that arrested Mr.

16  Richardson on the unrelated drug charge that we got the DNA,

17  just going right to the DNA buccal swab, as Your Honor knows.

18         The second is, and this is really more as, for the

19  defenses benefit, the defendant is initially identified, I know

20  Your Honor knows this, is initially identified by name by

21  Desiree Allen.  She's the person who first puts the detectives

22  on to Mark Richardson.

23         They see the call person on the video coming in and

24  out, coming in and out, but they don't know who it is.  It's

25  Desiree Allen who says, take a look at Mark Richardson, because

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   he tried to choke me and said don't let happen to you what

2   happened to the old lady, and then she identifies a photo.

3            And, obviously, not putting in Desiree Allen's

4   statement through the detectives of what the defendant did but

5   I just want to be clear that that's what the basis for focusing

6   on Mark Richardson is.

7            So if, and I don't expect it's going to happen, in

8   any way, shape or form, particularly in light of counsel's

9   opening, I don't think he's going to attack the detective for

10  focusing on Mark Richardson but, just so we're clear, that door

11  could be opened, I don't expect it to be, but that's what's out

12  there if for some reason the detectives are impugned in

13  anyway:  Why did you focus on Mark Richardson?   Well, it's

14  because someone told us, his girlfriend.

15           And, finally, we have the February 5th statement.  As

16  Your Honor knows, my initial intention had been not to

17  introduce the February 5th statement by Mark Richardson.  It

18  is, you know, there are certainly good reasons for putting it

19  in, it's inconsistent with July 10th, I can show the jury how

20  his story changes.  But my decision was not to.

21           Mr. Klein convinced me that there's a fair reason for

22  the defense to put it in.  Notwithstanding, the fact that it's

23  hearsay when the defense tries, and that is he wants to show, I

24  believe, as he said, and we had discussions about this, that

25  the detectives gave Mr. Richardson certain information on that

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   date.

2           And, in particular -- and if I am wrong, please, Mr.

3   Klein, correct me -- what he wants to do is have the

4   photographs that the detectives showed Mr. Richardson on

5   February 5th.  He wants those photographs in.  I think that's

6   fair.  I don't have any objection to it.  Here's the reason I

7   am raising it this morning.

8           That's not the only thing the detectives did.  The

9   detectives, during that conversation with the defendant,

10  remember, he walked out at the end of it, they don't have

11  enough to arrest him, and he just -- they drive him home and he

12  goes home for the next four months.  Five months.

13          But, in addition to confronting him with the

14  photographs to get a statement, they confront him with Desiree

15  Allen's statement.  We have your girlfriend telling us this.

16  And he says she's a liar.  I think his words were, "she's a

17  filthy liar."  And they ask him for DNA and he refuses DNA.

18  Then they confront him with being on video.

19          If the statement's coming in, the statement's coming

20  in, and all of that is coming in.  So I am going to bring that

21  out on direct examination of my detective, of the detectives

22  who were present for February 5th.

23          And I just want the record to be clear because that's

24  what -- when at the hearing Detective Dimuro was asked by

25  Justice Carruthers, what eventually got the defendant off the

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1    dime, and it was all of that, the totality, the Desiree Allen

2    statement, the photographs, the fact that he's on video.

3              And, so, the People's position is, if that's coming

4    in, it's all coming in.  You can't parse one in and the other

5    out and, of course, his refusal of DNA.  He chose to speak.  I

6    mean he didn't invoke any right to counsel, didn't invoke a

7    right to remain silent.

8              So, I don't see anything, any suppressible component

9    to him refusing DNA.  So, I just wanted the record to be clear,

10   I am just memorializing what Mr. Klein and I spoke about on

11   Friday in this regard.

12             THE COURT:  Thank you.  Mr. Klein.

13             MR. KLEIN:  Yes.  Judge, the district attorney

14   has indicated that he has no plan to bring in the February 5th

15   statement and I want to explain why we believe that we do have

16   a need to bring it in.

17             In part, well, there are various reasons why, one has

18   to do with the District Attorney's Office planning to introduce

19   evidence on February 6th, the day after the statement, the

20   defendant goes to his job and he fabricates am alibi.

21             And we believe our right to bring in the statement

22   concerns our right to present a defense and right to confront

23   evidence under both the Federal and New York Constitution.

24             With regard to the creation of an alibi.  If you

25   create an alibi you do it for, I believe, one of two reasons.

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1  One, because your guilty, or a false alibi, or you create one

2  because you're accused of the crime and that is because you are

3  being accused and you're afraid and you create an alibi and you

4  may or may not be guilty in doing it.

5          Although, you would have attempted to create may be a

6  real alibi, false alibi here, it's going to be on shown to be a

7  false alibi, if there is no context to it at all and the

8  district attorney is able to elicit on February 6th if he

9  doesn't create an alibi the nature, inference, is, well, he had

10  killed someone, he needs to create an alibi.

11          If the circumstances of February 5th are brought out

12  in some fashion, then, of course, it gives a reasonable

13  argument for the district attorney to say, he did it for the

14  reasons he to say, and for me to say, because he had been

15  accused in some fashion or realized that he was suspected of

16  committing a murder the day before.

17          We also need to bring out the circumstances for two

18  other reasons.  One, as Mr. Bogdanos has indicated, there were

19  a series of pictures that were shown to the defendant during

20  the February 5th questioning, and he's actually provided the

21  pictures to me now, and which is great, of course, I tried to

22  get them from Ms. Irick for about two years but she could never

23  figure it out, apparently these are pictures that had been

24  taken, this is Mr. Bogdanos' understanding of it, that these

25  were pictures taken by Detectives Henriquez at the scene of the

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   crime and were shown to the defendant.

2          They show, you know, the bloodied scene.  They are

3   very similar to the crime scene photographs that were brought

4   in.  And, actually, I will ask that these be made, maybe they

5   are going to come in some sort fashion, but I ask that these be

6   made a court exhibit, these four photographs, and we can put it

7   in the record so later just so if there is appellate review

8   they know what we're talking about.

9          These are photographs that were shown to the

10  defendant and one of the questions is:  Where did the

11  defendant's knowledge of the crime come from?  Because they

12  either came from him having seen the crime and being part of

13  committing the crime or, there's a reasonable argument for us

14  to make that, in fact, his knowledge of the crime comes from

15  having been shown these photographs about the crime.

16         All right.  Of course, something I can't do unless I

17  am allowed to elicit from the detective:  Didn't you show him

18  photographs that actually show what's portrayed in this court

19  exhibit.  In addition, I need to show that the police said

20  certain things to him because it shows why he gave, what we

21  contend or what it's reasonable to argue, was a false

22  confession.

23         Because people confess falsely when they give an

24  exculpatory explanation, which is something that the defendant

25  does during the February 5th incident and they are told that

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   this explanation is not believable, that it's not even

2   convincing.  And, in fact, that's what occurs during the

3   February 5th incident.  He says that he had been there and that

4   he left before anything happened at all.

5        I think you seen this from reading the papers

6   themselves. But, in fact, just so the Court understands what

7   occurs is, he says, I don't know anything about that.  Then

8   he's shown the pictures, he sits there with the pictures for a

9   few minutes.

10        Then they tell the defendant there's video, there's

11  video of the building, there's a record of people coming in and

12  out of the apartment.  They tell him that even though he denies

13  knowing Helen that someone is telling him, someone is telling

14  the police, that he does no Helen.  They say that someone who

15  they spoken to is saying that he, that is the defendant, cracks

16  up in Helen's apartment.  And by crack up, they are telling him

17  it's a place that he uses as a place to use crack.

18        As a matter of fact on page 834 of the hearing

19  transcript Detective Dimuro says that's actually what moves him

20  to start admitting that he knows Helen at all.  The defendant

21  says I went to work on Friday, all right, and then he must

22  realize he has to create an alibi for that day after that.

23        Detective says it doesn't ring true what he's saying

24  so they tell him there are numerous times that you are in and

25  out of the apartment on the 11th.  The defendant has denied he

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1  went in and out.  As a matter of fact, the Detective says, I

2  mean that he went into the whole thing, basically he wanted to

3  lock him into any kind of statement.

4        As a matter of fact, Dimuro says, Detective Dimuro

5  says, maybe he'd be able to lock him into an alibi.  He told,

6  the detective, that he thought he'd been up there a few more

7  times then the defendant had said.  He had told him words to

8  the effect of -- this is directly from the hearing --"listen,

9  Richardson, doesn't look good for you when you tell us you

10  haven't been there much and we know that you have been there

11  more than you are telling us.

12        They told him about DNA.  And at the end they said,

13  we want to make it clear to you, that we believe you saw more

14  than you been telling us.  One area of the questioning went on

15  extensively what he had seen Anthony do to Helen.  They don't

16  just ask one question but they go over this many times.  They

17  say:  Isn't it true that you actually saw more, maybe you

18  didn't leave so quickly?

19        Dimuro says see bluntly told him that he thought,

20  that is Dimuro thought, that the defendant saw Anthony do a lot

21  more then he was actually saying.  He says that he made it

22  clear that he thought the defendant had done more then he was

23  saying.  He basically, intrinsically, intentiveley thought that

24  the defendant saw what happened to the woman and he had told

25  the defendant that, he told him what he thought.

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1            He told him that he thought that Richardson didn't
2    want to interject himself into the situation because he was on
3    parole.  He told him you want to have it both ways.  Like you
4    are acting like you want to cooperate but then you are saying
5    you didn't really see anything.  And then he told him you're in
6    for a penny you're in for a pound.  You're in it.  You're in it
7    now.

8            In addition, during that questioning, he also did go
9    over the statements that the police said they had information
10   from Desiree Allen.  Let me just -- give me one second, Judge.

11           They tell him about Desiree Allen.  We tell him we
12   spoken to his girlfriend.  We tell him that she's been
13   providing information.  Like they told him there were reasons
14   why we're speaking to you and not to somebody else.

15           Desiree Allen had spoken about him.  She said you had
16   a violent temper.  She said that the defendant had argued with
17   her and had tried to choke her around the time of the
18   incident.  But she had said that the defendant knew Helen
19   mother than he was saying.  And he told him that the defendant
20   had tried to choke her.

21           He doesn't remember all the words he used but I am
22   not saying that Mr. Bogdanos is wrong to say were the detective
23   to testify that he might also say, yeah, I told him that she
24   had said Mark had tried to choke her and that he had also said
25   to her that she shouldn't let what happened to the old woman

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1    happen to her.

2             So the question is, what do we do about that?

3    Because it's clear that if that comes in I can't go into the

4    statement at all.  I mean, I think it would be kind of

5    malpractice on my part because I don't know how, even if there

6    was an instruction given by the Court, that this jury would

7    ignore that.

8             They say, basically, the defendant had confessed to

9    his girlfriend.  But I think the statement, because I need to

10   be able to argue that it was a false confession, the district

11   attorney says, well, if the statement comes in then it all

12   comes in, I can't have part come in.

13            He says, I guess he doesn't really give a compelling

14   reason, except to say, that's part of it.  And I agree it is

15   part of it.  And then the argument is everything has to come in

16   you can't parse things out.  But I then say, obviously, but

17   it's more prejudicial than probative.

18            With regard to its probative nature, actually, it

19   would be more probative for me because it would give the

20   defendant even more an incentive to come up with a false

21   confession that he's been confronted in this manner.  He's even

22   told that his girlfriend said he did it.

23            The district attorney can respond to that, say, no,

24   he thinks it's probative for him that it happens so why would

25   he give a real confession.  Which kind of means it can be

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1    argued either way the statements about Desiree Allen but the

2    damage, the prejudice, obviously, we know would be awesome.

3              Basically, if you rule that it comes in, then I will

4    not bring the statement in and cannot make the argument.  Or, I

5    mean, I will still make the argument but I am lacking much of

6    the foundation to make the argument that is a false confession

7    he made because of the way he was confronted with the February

8    5th statement.

9              With regard to the District Attorney's Office, that

10   if part comes in that it all has to come in, that we need

11   completeness, you know, we often redact statements because

12   we're afraid, like during confessions the defendant makes a

13   statement and in the middle of a statement he talks about other

14   crimes he's also guilty of, and those are redacted, and even

15   though that detracts from the completeness we redact it because

16   it's more prejudicial than probative.

17             Completeness is not a very compelling reason.  So I

18   believe that the Court should allow the circumstances of the

19   February 5th statement to go in its entirety except for any

20   discussion of confronting the defendant about what the

21   detectives said Desiree Allen said.

22             I am not saying they didn't have a good faith basis

23   to say it, anything like this, but just so, for the reasons

24   that I elicited.

25             So, that's my position, to not let the defendant do

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1    that would be a violation of the defendant's right to present a

2    defense and to confront the evidence against him under the

3    Federal and State Constitution.

4           So that's my position.  Now, although I think that's

5    the only appropriate thing to do, were the Court to rule

6    against me, then I would argue that the following should be

7    permitted.  For it to be brought out that the defendant was

8    brought down to the precinct on February 5th, questions in fact

9    is here in the videotape that's been shown to the jury, right,

10   there's already in there that discussion he went out, these

11   guys came, they asked him to go down, I just don't think it's

12   clear the date and it is important that the date come out

13   because it's February 5th, it's the date before he creates what

14   the district attorney will argue is a false alibi.

15          So, I think it's important that I be allowed to bring

16   out the date, that on February 5th he was brought down to a

17   precinct and that he was released and to be allowed to say that

18   he was shown things, four pictures, which we made a court

19   exhibit, that at least I be allowed to do that.

20          Although, I think the Court should actually rule

21   against the district attorney, knowing that if I go into the

22   statement, the complete confrontation has to come out.

23              THE COURT:  Thank you.  Mr. Bogdanos.

24              MR. BOGDANOS:  Please, Your Honor.  I do.

25          As Mr. Klein so aptly noted previously, virtually

PROCEEDINGS

1   every piece of evidence in this case is a double edge sword, it

2   has both prejudice and prejudicial value to both sides, maybe

3   that's the way many cases are.

4          But the compromise that Mr. Klein is actually

5   suggesting is, in order of magnitude, more unfair to the

6   People, to the system, and to the jury, than his original

7   suggestion.

8          So, all the stuff that's good for the defense, that

9   should come in.  Let's just say he was picked up, shown the

10  photos and then he crafts a skillful false confession defense.

11         Well, how is that anything other than misleading the

12  jury?  So, that compromise is, honestly, is not a compromise at

13  all.  Actually, very clever, but it's the worse of all possible

14  worlds with no fairness attached.

15         But now let's look at Mr. Klein's fuller argument.

16  He has a better argument in that regard.  As I said,

17  repeatedly, he convinced me the February 5th statement has

18  relevance to this jury.  Apart from the words that the

19  defendants said, he wants redaction, pointing out that, you

20  know, we redact all the time, like when the defendant talks

21  about other crimes.

22         Absolutely true.  The defendant isn't talking about

23  other crimes.  He's talking about this crime and this case.

24  There is nothing, in either the confrontation by the Detective

25  or the words of the defendant, that talk about other crimes.

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1    It's this case.  And this isn't just the normal case where a

2    prior confession is offered to show the jury -- by the People

3    to show the jury that it's a statement against penal interest

4    and, therefore, the defendant must be guilty.

5              That's not what this is.  The defense is using the

6    February 5th involved with the detectives as a sword.  They

7    want to use it as a sword but all the other components to that

8    they want out.  And I don't understand how that comes in.

9              Here's what they want.  They want to show the jury

10   that the defendant was confronted by detectives on February 5th

11   and because of that confrontation two things ensued.  One, is a

12   false exculpatory statement on February 6th and a false

13   confession.  But they want to pick and chose what he's

14   confronted with.  How does that work?  I don't in get it.  I

15   don't understand that.

16             If he's confronted he's confronted with four

17   different thing.  Well, that's what the jury ought to be

18   presented.  Here are the four things he's confronted with.  And

19   Mr. Klein is absolutely right, the whole Desiree Allen

20   strangling thing actually may well give him more incentive to

21   provide a false confession.  But, my concern here is that if we

22   pick and chose the aspects of that confrontation between the

23   detective and the defendant, the jury will be mislead and one

24   side or the other is going to be unfairly prejudiced.

25             So the People's position, as it was before this trial

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1  began, is the defense wants it they have a reasonable argument,

2  then the entire confrontation comes in.

3          THE COURT:  Have we aired it's sufficiently?

4          MR. KLEIN:  I think so.

5          MR. BOGDANOS:  Yes, Judge.

6          THE COURT:  Very briefly.  My ruling is that the

7  door would be open Mr. Klein and so I believe everything would

8  come out.  I would be prepared to give some sort of limiting

9  instruction concerning the statement made by Desiree Allen.

10  So, that's about it.

11          MR. KLEIN:  I understand.  And I'll be guided by

12  your ruling.

13          Just, we had agreed that, Mr. Bogdanos and I did in a

14  phone conversation Friday, that I can't be in a position of

15  sandbagging him and bringing it out on cross where he didn't go

16  into it on direct, right, so let me make clear that, given your

17  ruling, I believe there's going to be no discussion of the

18  February 5th statement, okay?  I am not planning to go into it

19  on cross examination.

20          And I assume that you also ruled that the compromise

21  I put forward is unacceptable?

22          THE COURT:  Correct.

23          MR. KLEIN:  Okay.  However, Judge, there's no

24  prejudice to anybody to say that on February -- something --

25  the District Attorney's Office brought out by putting the

PROCEEDINGS

1   statement in the fold, they decided to put in, they didn't ask

2   for any redaction of the ten minutes or sixteen minute portion

3   that came in and there is a discussion in there of the

4   defendant being brought down to the police station, they go

5   into the February 5th discussion with the defendant between

6   Kerry O'Connell and the defendant, right, they talk about it,

7   he came out, there was these guys, they asked would you come,

8   he said okay, he went with him.

9           I just want to bring out the date that happened that

10  was February 5th.  That's all.

11          MR. BOGDANOS:  Not problem.  That's fair.  I

12  will, consequently I will bring it out on direct, but in that

13  limited fashion.  No problem.

14          THE COURT:  Then we're set to go.

15          (Short pause in the proceedings.)

16          (Continued on next page.)

17

18

19

20

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

<u>Proceedings</u>                                        535

```
 1  TK2      THE COURT:  Both sides ready?
 2              MR. BOGDANOS:  Yes, your Honor.
 3              MR. KLEIN:  Yes.
 4              THE COURT:  May we have the jury, please.
 5              (Jury entered the courtroom.)
 6              THE COURT:  Case on trial continued.  People of
 7      the State of New York against Mark Richardson.  The
 8      defendant, his attorney, and the assistant district attorney
 9      are present.  Would both sides stipulate all jurors are
10      present and properly seated?
11              MR. KLEIN:  Yes.
12              MR. BOGDANOS:  Yes.
13              THE COURT:  Thank you.  Good morning, ladies and
14      gentlemen.  Welcome back.  I apologize for the delayed
15      start.  We have been working in the courtroom.  There were
16      some once again legal issues that that arose; and we are now
17      going to proceed and I will ask Mr. Bogdanos to call his
18      next witness.
19              MR. BOGDANOS:  We are still on cross of
20      Ms. Philipps.
21              THE COURT:  I am sorry.  We are still on cross of
22      Ms. Philipps.  How can I forget?
23              (Witness entered the courtroom.)
24              THE COURT:  Good morning, Ms. Philipps.  You are
25      still under oath.
```

```
 1   CROSS-EXAMINATION CONT'D.:
 2        Q    Good morning, Ms. Philipps.
 3        A    Good morning.
 4        Q    Now generally in a case evidence is presented to you
 5   for analysis, yes?
 6        A    Okay.
 7        Q    And then you analyze the evidence that you believe is
 8   appropriate to analyze given what you have been given; is that
 9   right?
10        A    When evidence is received in our laboratory it is up to
11   the Criminalist Level IV or evidence exam person to sign in
12   evidence according to information that we have in the case file.
13   They will select items that they consider relevant, and future
14   testing can always come into account when we receive more
15   information in regards to the case.
16        Q    Okay, so areas are analyzed that there is a belief are
17   appropriate to analyze; is that right?
18        A    Correct.
19        Q    And then your reports are written, right?
20        A    Yes.
21        Q    Okay.  And once your reports are written, you are
22   always open to going back and analyzing stuff again; right?
23        A    What do you mean by analyzing again?
24        Q    Okay, you write your reports, right?
25        A    Correct.
```

1    *Q*    Your reports are then scrutinized by supervisors, yes?

2    *A*    After a report is written it goes to a supervisor for

3    review, yes.

4    *Q*    And then finally a report is put out, right?

5    *A*    That's correct.

6    *Q*    Now, if additional requests are made for you to analyze

7    additional material, you will consider those requests, right?

8    *A*    That's correct.

9    *Q*    For example, if an additional request is made by the

10   district attorney for you to analyze additional material and if

11   your office determines that the request is appropriate, you will

12   do additional analysis?  Is that right?

13   *A*    Yes, we will do additional testing from requests from

14   district attorneys and defense attorneys as well.

15                MR. KLEIN:  Judge, I just -- can we come up for

16        one second?

17                THE COURT:  Yes.

18                (Off-the-record bench conference.)

19   *Q*    To backtrack, Ms. Philipps, you said that your work is

20   evaluated, yes?

21   *A*    Correct.

22   *Q*    And reports are evaluated before they are finally

23   published, yes?

24   *A*    Correct.

25   *Q*    In other words, they are reviewed before they actually

1  come out; is that right?

2      *A*    That's right.

3      *Q*    That's to make sure the raw data supports the

4  conclusions in the report, yes?

5      *A*    Correct.

6      *Q*    To make sure any, for example, any allele calls that

7  you made then support the conclusions that the report has,

8  right?

9      *A*    Correct.

10     *Q*    Okay.  And working somewhat backwards PM2C2 was

11 according to the information that you were given, it was

12 recovered from Ms. Abbott's left breast, right?

13     *A*    Correct.

14     *Q*    Okay, and a mixture of DNA was found on PM2C2, yes?

15     *A*    Yes.

16     *Q*    Meaning that more than two alleles were found at given

17 loci, yes?

18     *A*    Correct, a mixture would indicate more than one

19 individual contributed their DNA.

20     *Q*    Many of the alleles were foreign to the victim,

21 Ms. Abbott, correct?

22     *A*    That's correct.

23     *Q*    Thus couldn't have come from her?

24     *A*    Correct.

25     *Q*    These alleles all came from a male donor, right?

1      *A*      That's correct.

2      *Q*      Who you referred to as Male Donor A, yes?

3      *A*      Yes.

4      *Q*      Okay, and based on the DNA results the most likely

5      profile from Male Donor A was then established?

6      *A*      That's correct.

7      *Q*      Okay, and Thursday thus we have the conclusion that we

8      would need at least the population of at least three earths

9      before we would expect to find another individual with the

10     alleles of the Male Donor A, who is connected to this case;

11     right?

12     *A*      That is correct.

13     *Q*      Okay, and as you noted in a report dated December 4,

14     2008, the DNA alleles from Mark Richardson are the same as the

15     DNA alleles of Male Donor A connected to this case, yes?

16     *A*      That's correct.

17     *Q*      Now, I think on Thursday I began to discuss with you

18     some of the different swabs, yes?

19     *A*      Yes.

20     *Q*      All right, and just to be clear when they came in each

21     was labeled, right?

22     *A*      Yes.

23     *Q*      And they came from the Sex Offense Evidence Collection

24     Kit, right?

25     *A*      That's correct.

1    *Q*    And your office does the inventory, right?

2    *A*    Yes, when we receive CPM kits, we will inventory the

3    items that are received within that kit.

4    *Q*    And you had two swabs from the left breast, right?

5    *A*    Yes.

6    *Q*    PM2C2 and PM2C1, correct?

7    *A*    Correct.

8    *Q*    And two from the right breast, PM2C3 and PM2C4, right?

9    *A*    That's correct.

10   *Q*    So you had four swabs, right?

11   *A*    Yes.

12   *Q*    Three showed presumptive blood on the KM tests, right?

13   *A*    Correct.

14   *Q*    But not PM2C2, right?

15   *A*    That is correct.

16   *Q*    That was the only one that did not?

17   *A*    Correct.

18   *Q*    All right, and then I began to ask you I think about

19   the swab PM2C4, okay.

20   *A*    Yes.

21   *Q*    Because on PM2C1 and PM2C3 you really were able to

22   obtain no valuable DNA results?  Is that fair to say?

23   *A*    For PM2C1 and PM2C3 they did not go through for DNA

24   testing so there are no DNA results for them.

25   *Q*    Okay, now going back to PM2C3,4 they did give DNA

1    results, yes.

2        *A*    That's correct.  It was a mixture of DNA.

3        *Q*    Now, just if we look at this chart No. 70 in

4    Evidence -- by the way this chart, this chart wasn't prepared by

5    you, right?

6        *A*    That's correct.

7        *Q*    It wasn't prepared by the Office of Chief Medical

8    Examiner, right?

9        *A*    That is correct.

10       *Q*    And these charts were prepared by the District

11   Attorney's Office, yes?

12       *A*    Correct.

13       *Q*    Okay, and PM2C2 on the chart shows -- for PM2C2 shows

14   Helen Abbott and Mark Richardson, yes?

15       *A*    Yes, it does.

16       *Q*    Helen Abbott, Mark Richardson, Male A, okay.

17             Now, with regard to PM2C4, your results did not simply

18   state that the results on PM2C4 were consistent with the DNA of

19   Helen Abbott, did they?

20       *A*    The DNA on PM2C4 is consistent with Helen Abbott and a

21   minor contributor; but there wasn't enough information from the

22   minor contributor to make a comparison as to who could have

23   contributed that DNA.

24       *Q*    So would it be accurate to say that your results

25   actually showed more than the PM2C4 had DNA consistent with

1    Helen Abbott?  Is that true?

2         *A*    The results do have DNA that is consistent with

3    Helen Abbott; but we would not be able to make a comparison with

4    any other individual in order to make any further DNA results to

5    add to that chart.

6         *Q*    My question is, though, as follows:  Would it be

7    accurate to say that with regard to PM2C4 your results did not

8    simply state that the results on PM2C4 are consistent with the

9    DNA of Helen Abbott but it also showed that there was a mixture?

10   Is that right?

11        *A*    That's correct.  It showed that there was a mixture but

12   it was a mixture with Helen Abbott and a minor contributor, and

13   we could not make a comparison to the minor contributor.

14        *Q*    Your result did show that Helen Abbott's DNA is

15   consistent with the DNA found on PM2C4, right?

16        *A*    Yes, Helen Abbott is consistent with donating DNA to

17   that sample.

18        *Q*    It's just that your results also showed that there was

19   a mixture of DNA?  Is that true?

20        *A*    Yes.  There was a mixture of DNA of Helen Abbott and

21   another individual, but there was not enough information present

22   in this mixture in order for us to make a comparison or try to

23   determine who the other contributor was.

24        *Q*    Okay.  Now just to back up a little, by the time you

25   are writing your report on PM2C4, you already had and most

1    likely a profile for the Male A, yes?

2        *A*    Yes, that Male A was included in the same report.

3        *Q*    Okay, that you've been able to deduce from the mixture

4    on the other breast, right?

5        *A*    That's correct.

6        *Q*    Okay, and you had also been able to deduce another Male

7    Donor B, right?

8            MR. BOGDANOS:  Objection just as to form.  Are we

9        still talking about on the secretion or any time?

10       *Q*    At the time of the report you were writing the report?

11           THE COURT:  You may answer.

12       *A*    Male Donor B was found on a crime scene sample N-3, and

13   that was a clean profile meaning it wasn't a mixture and that

14   profile did not need to be deduced out.

15       *Q*    Male Donor B we know where his DNA came from at least

16   with regard to the information you were given, right?

17       *A*    Male Donor B was on sample N-3, yes.

18       *Q*    And sample N-3 was found in a semen stain which was

19   according to the information you'd been given recovered from the

20   floor of bedroom 3; right?

21       *A*    That is correct.

22       *Q*    Is it accurate to say that Male Donor B is never

23   identified as having the same alleles as a known individual,

24   right?

25       *A*    That's correct.  We never had a known sample from an

1  individual match up to the DNA alleles of Male Donor B.

2     *Q*   Now, in other words, tell me if this makes sense.  You

3  were able to connect Male A with Mark Richardson, right?

4     *A*   Yes.

5     *Q*   Because you were given an exemplar, which you were

6  informed, came from Mark Richardson; right?

7     *A*   That's correct.

8     *Q*   But you were never given information concerning whose

9  DNA profile matches that of Male B, right?

10    *A*   That's correct.  We never received a known sample that

11  matched to Male Donor B's DNA profile.

12    *Q*   However you were certain that you had a profile of a

13  Male B, right?

14    *A*   Yes.

15    *Q*   That's a real person, right?

16    *A*   Correct.

17    *Q*   Just an unidentified person?

18    *A*   Yes.

19    *Q*   Now, when you do the -- I want to go back to PM2C4,

20  okay.

21    *A*   Okay.

22    *Q*   When you -- you did the analysis of PM2C.4, you see

23  that at certain locations there are more than two alleles,

24  right?

25    *A*   That's correct.

1    **Q**    Okay, and given that you can only get one allele from
2    mom and one from dad, if you find more than two you have to have
3    more than one contributor to the DNA sample if that's what you
4    find in any given likeness; is that right?

5    **A**    Correct.

6    **Q**    If you have more than two it means you have a mixture,
7    right?

8    **A**    Yes.

9    **Q**    Of at least two people, right?

10   **A**    Yes.

11   **Q**    Two real people?

12   **A**    Correct.

13   **Q**    Okay.  I mean whether you can get a complete profile of
14   each of the people is irrelevant to the real factual existence
15   of at least two people's DNA in the sample, right?

16   **A**    The number of the alleles present will indicate if it's
17   a mixture; but we also need a certain number in order to make a
18   comparison to the minor contributor.

19   **Q**    Okay.  Whether you can get a complete profile of each
20   of the people is irrelevant to the fact, there are at least two
21   real contributors to the mixture; right?

22   **A**    Right, we can make a distinction that a sample is a
23   mixture; and then depending on what is present, you can either
24   make comparisons or deductions.

25   **Q**    Okay.  If you have four alleles at any given place, you

1  also know you have a mixture, right?

2      *A*    Correct.

3      *Q*    All right, again here too you have a minimum of two

4  contributors if you have four alleles at any one place; right?

5      *A*    That is correct.

6      *Q*    And that's all you can say about the possible number,

7  right?  That it's a minimum of two?

8      *A*    That's correct.

9      *Q*    And if you get five alleles then using math since you

10 can only get a maximum of two from each person, if you have five

11 alleles then we know we have a minimum of three people?  Is that

12 right?

13     *A*    That's correct.

14     *Q*    Okay.  By the way, here with regard to PM2C4, the most

15 you've found was four, is that right, at any given loci?

16     *A*    At location B3 there were four alleles and there were

17 other locations that had three alleles.

18     *Q*    Okay, so would it be accurate to say that with regard

19 to PM2C4, the most you found at any location was four?

20     *A*    Yes.

21     *Q*    Four alleles?

22     *A*    Correct.

23     *Q*    Which would lead you to say that the minimum, a minimum

24 of two folks must have contributed, right?

25     *A*    Based on those numbers you would say a minimum of two

1   people; but with mixtures there is also the possibility of

2   what's known as allele sharing; meaning individuals may have the

3   same number at a location so depending on what the graphical

4   representation of the sample looks like, you can determine if

5   there is possible allele sharing, so you can make a conclusion

6   that there could be three people.

7       *Q*    As a matter of fact in this report you wrote a

8   conclusion about the minimum number of people you thought that

9   were at PM2C4, right?

10      *A*    Yes.

11      *Q*    The minimum number of people that were placed in the

12  report was?

13      *A*    A minimum of three (3) people.

14      *Q*    Okay.  Now as you examined your data to PM2C4, you

15  notice you had four alleles at some point and three at others

16  and I believe the --

17      *A*    Correct.

18      *Q*    And with regard to the locus that test for the sex

19  gene, right?

20      *A*    Amelogenin determines the sex of the sample, yes.

21      *Q*    You did note there was an X, right?

22      *A*    Yes.

23      *Q*    You stated you did detect additional peeks which did

24  not meet laboratory criteria for a allele identification, right?

25      *A*    That is correct.

1     *Q*     However something did appear to you, yes?

2     *A*     Yes.

3     *Q*     But your protocols did not permit you to call that

4     allele, right?

5     *A*     That is correct.

6     *Q*     To name that allele, right?

7     *A*     Yes.

8     *Q*     Of course, with regard to genes if it's not and X then

9     it's a Y, right?

10    *A*     For the sex determining gene, yes.

11    *Q*     Now, you did draw a result concerning this mixture,

12    right?

13    *A*     Yes.

14    *Q*     You noted that the mixture was consistent with a

15    mixture of DNA from Helen Abbott and a minor contributor, right?

16    *A*     That's correct.

17    *Q*     Now you already had the most likely profile formally

18    Donor A, right?

19    *A*     Yes.

20    *Q*     Now at times with regard to a mixture when you already

21    have a known profile, you are able to obtain results with regard

22    to a comparison between the known profile and the mixture;

23    right?

24    *A*     That's correct.

25    *Q*     For example, if you look at with regard to page two of

1   the November 8th report -- is that okay -- with regard to the

2   sample N-3 on page 2 I believe you were able to say that you had

3   found a mixture of DNA and that the results are consistent with

4   a mixture of DNA from Male Donor B and a minor source, right?

5       *A*    Which sample were you referring to.

6       *Q*    N-3, I think it's written up on page two of the

7   November 8th report.

8              THE COURT:  Do you see it?

9       *Q*    Do you have the November 21st report?

10      *A*    Are you referring to sample N-3 sperm fraction or

11  sample N-3 epithelial.

12      *Q*    Epithelial?

13      *A*    I found the section you are referring to.

14             MR. BOGDANOS:  I am sorry, just can we correct

15      that for the record.  I believe it is November 21st, not

16      November 8th.  I just want to make that --

17             MR. KLEIN:  I did get that wrong.  I am sorry.

18      *Q*    Did that mislead you, Ms. Philipps?

19      *A*    No.

20      *Q*    Okay.  There is no November 8th report?  Just the

21  November 21, 2008, report, yes?

22      *A*    Correct.

23      *Q*    All right, and in that on N-3 epithelial fraction you

24  are able to say a mixture of DNA was found.  The results are

25  consistent with a mixture of DNA from Male Donor B and a minor

1  source, yes?

2      **A**    That's correct.

3      **Q**    And also that no conclusions can be made regarding the

4  minor contributor, right?

5      **A**    Correct.

6      **Q**    Okay.  Here with regard to PM2C4 you are not able to

7  say with regard to -- you are not able to say that with regard

8  to Male Donor A and the mixture from the right breast, right?

9      **A**    For sample PM2C4, as I stated previously we can only

10 detect Helen Abbott's DNA profile in there.  The minor

11 contributor was too minor to make a comparison.

12     **Q**    Right, your report does not state, right, that the

13 results are consistent with a mixture of DNA from Male Donor A,

14 Helen Abbott, and a minor source, right?  It doesn't say that,

15 does it?

16     **A**    No, the report says no conclusion can be made regarding

17 the minor contributor.

18     **Q**    Your report states the results are consistent with a

19 mixture of DNA from Helen Abbott and a minor DNA source, right?

20     **A**    Correct.

21     **Q**    Now, when you get a swab you get an indication of where

22 the swab is from, right?

23     **A**    Generally you do get an indication of where the swab is

24 from, yes.

25     **Q**    So, for example, you've gotten swabs that indicate they

1  came, for example, from the blade of a knife; right?

2     *A*   Yes.

3     *Q*   Or you have had occasion to actually swab the blade of

4  a knife yourself; right?

5     *A*   That's correct.

6     *Q*   All right, you might get a four-inch section of a blade

7  of a knife?  You then swab with a swab, right?

8     *A*   Yes, we use cotton swabs for testing.

9     *Q*   You might swab the four-inch blade of the knife from an

10 area near the hilt up to near the point, right?

11    *A*   That's possible.  It would depend on what the item

12 looks like, what stains you are visually seeing; so it would

13 depend on what the actual item looks like.

14    *Q*   So if you swab an area of a knife, for example, from an

15 area near the hilt up towards the tilt -- up towards the tip

16 with one swab, okay, it would be accurate to say you have no way

17 of knowing precisely where the area was swabbed, the DNA was

18 located if you do recover some DNA from that swab; right?

19    *A*   That's correct.  If you do a general swabbing of the

20 item, there would be no way to pinpoint where the DNA came from.

21    *Q*   You can't pinpoint that it came near the point, near

22 the handle?  If you do it in that way, right?

23    *A*   Correct.

24    *Q*   You simply knew it came from somewhere within the

25 confines of the area that you actually swabbed, right?

1    *A*    That is correct.

2    *Q*    More precision than that, you can't give?

3    *A*    That's correct.

4    *Q*    We know -- assume that we know that, that the swabs
5 here are from the breasts, all from the breasts of Helen Abbott;
6 right?

7    *A*    According to the box, they indicated they were either
8 from the left or right breast.

9    *Q*    And assume that a swab is used to swab the breasts, the
10 outlying areas of the breasts and also covers the nipple, okay.

11    *A*    Okay.

12    *Q*    Okay, and assume that DNA is recovered from that swab
13 eventually; all right?

14    *A*    Okay.

15    *Q*    It would be accurate to state -- well, it would be
16 accurate to state you could assume that the DNA comes from the
17 area that the swab covered; right?

18    *A*    Yes.

19    *Q*    And that the individual who did the swabbing did cover
20 the area as they described it in the information given to you,
21 right?

22    *A*    Since I wasn't there at the time of the swabbing I
23 cannot accurately say but we base our information on what is
24 written on the boxes when we receive them.

25    *Q*    Okay.  Assuming that the swabbing, the swab that was

553

```
 1   used was done to cover both -- was used to do the breast, the
 2   outlying area of the breast and also covered the nipple; and
 3   assume that you have found DNA on that swab, it would be
 4   accurate to say that you cannot tell us with any reasonable
 5   degree of scientific certainty that the DNA came from the
 6   nipple, right?
 7        A    That would be correct.
 8        Q    And only from that area, right?
 9        A    If the general swabbing was done again from all the
10   various areas, there would be no way for us to pinpoint the
11   specific area the DNA is coming from.  We just know there is DNA
12   present on that sample.
13        Q    You wouldn't be able to say with any degree of
14   scientific certainty that any of the DNA came from the nipple of
15   that breast, right?
16        A    Again if it's a general swabbing, we would not be able
17   to make that determination; and we just base our sample names on
18   what was provided to us in the boxes that the samples are
19   collected in.
20        Q    Therefore, I want you to assume the following:  That as
21   we know the alleles of Male A were recovered from swab PM2C2,
22   right?
23        A    Yes.
24        Q    Okay, and assume that the swab that is actually the
25   sample PM2C2, did swab the outlying area of the breast and the
```

1  nipple area as well, okay, just assume that, all right?

2     *A*    Okay.

3     *Q*    Is it accurate to say you cannot tell us with any

4  degree of scientific certainty if that Male A's DNA came from

5  the nipple or from an outlying area of the breast, right?

6     *A*    There would be no way for us to determine that.

7     *Q*    Now, you told us on Thursday, I believe, that you

8  cannot tell when the DNA found in PM2C2 was deposited on the

9  woman's breast, right?

10    *A*    That's correct.

11    *Q*    When it was deposited in relationship to other

12 biological material, that you did find on her breast, right?

13    *A*    That's correct.

14    *Q*    When it was positive in relationship to the blood that

15 you did find on her breast, right?

16    *A*    The presumptive blood that was found.

17    *Q*    The presumptive blood?

18    *A*    Correct.

19    *Q*    You also can't give any temporal finding, you can't

20 tell us when temporally the DNA that was deposited on PM2C2 when

21 that was deposited in relationship to the minor contributor DNA

22 that was found on the other breast, right?

23    *A*    I can't determine the time when samples are deposited.

24    *Q*    Now, you indicated that you got an indication of a

25 minor donor from the right breast, yes?

1      **A**    That is correct.

2      **Q**    And I believe you told us that you weren't able to

3    deduce a profile of that minor donor, right?

4      **A**    Yes, that minor donor you cannot make a deduction and

5    it was not suitable for comparison.

6      **Q**    Okay, and on the other breast you got a full profile of

7    Male A, right?

8           You know what, I am going to withdraw the question.

9           On the other breast you were able to deduce a profile, a

10   likely profile of a Male A; is that right?

11     **A**    That's correct.

12     **Q**    All right, you weren't able to deduce a minor profile

13   from the other breast, right?

14     **A**    From PM2C4, correct.

15     **Q**    So it could be accurate to say that you got more

16   alleles for the minor contributor on the left breast than you

17   were able -- you weren't able to actually deduce any for the

18   minor contributor on the right breast, right?

19     **A**    That's correct.

20     **Q**    Okay.  Now, there are many reasons why you may get

21   fewer alleles from one location than you get from another,

22   right?

23     **A**    Correct.

24     **Q**    As you indicated before amylase can come from sweat,

25   right?

1    **A**    Yes.

2    **Q**    Sweat contains skin cells, right?

3    **A**    Correct.

4    **Q**    You find DNA in skin cells, right?

5    **A**    Yes.

6    **Q**    The amount of skin cells that you get this sample is

7    one of the determinants of whether you will be able to get a

8    complete or full profile, right?

9    **A**    That's correct.

10   **Q**    Or be able to deduce the profile of a probable

11   minor/contributor, right?

12   **A**    Right, depending on how much DNA that would have

13   contributed to a sample.

14   **Q**    If you collect more skin cells from one sample, you

15   might be able to get a fuller profile, right?

16   **A**    That is possible, yes.

17   **Q**    If you get fewer skin sells from another sample you may

18   only be able to get a few alleles from DNA or only an indication

19   there is a minor contributor, right?

20   **A**    Yes, that's possible.

21   **Q**    Also it is fair to say some people shed a lot of skin

22   cells, right?

23   **A**    Yes, there is -- there have been studies done that show

24   people have differing amounts of skin cells they will shed on

25   surfaces.

1    *Q*    It's fair to say some shed allot and some shed few?
2    Yes?

3    *A*    Yes.

4    *Q*    Even under the same conditions, right?

5    *A*    Yes.

6    *Q*    Some are known colloquially in your office as good
7    shedders and some are known as poor shedders; is that right?

8    *A*    That's correct.

9    *Q*    And are you working on that, how to categorize if it
10   will ever be possible shedding rates of individuals is at a
11   somewhat rudimentary stage in your office?  Is that right?

12   *A*    The shedding would be done or work with possible
13   shedders is done in the High Sensitivity Group.  For my testing
14   I am dealing with biological fluids that have a lot of DNA
15   present, so I do not know much information in regards to high
16   sensitivity testing and shedding abilities of individuals.

17   *Q*    Okay.  But you do know some people are good and some
18   are poor shedders; right?

19   *A*    Correct.

20   *Q*    Some people shed a lot and some people shed fewer;
21   right?

22   *A*    Correct.

23   *Q*    Yes?  And you are only able to get to deduce a partial
24   profile or simply an indication of a minor donor from one
25   sample; is thus, not in any way a reliable indication that the

1  minor donor had more or less contact with the individual on whom

2  DNA was left than a person who left a more complete profile?  Is

3  that fair to say?

4      *A*    When DNA is transferred there is a contact that needs

5  to occur; so if I were to touch this case file, I am going to be

6  leaving my DNA behind.

7          With these mixtures from PMC-2 from the left breast we

8  were able to get a minor male profile that was deducible; so

9  that means that a male left enough DNA in that sample for us to

10 make a deduction.

11         For PM2C4 there was a minor contributor but there wasn't

12 enough DNA present for us to make a deduction.  As for how this

13 happened, I would not be able to tell you that one male shedded

14 more or less.  It's just the science that we have in these

15 samples.

16     *Q*    Your expertise doesn't extend to the area of trying to

17 understand why one may have left more, why one may have left

18 less, right?  You don't put that in your report, right?

19     *A*    That's correct.

20     *Q*    Because that's beyond the level of the expertise; is

21 that fair to say?

22     *A*    That would be beyond the scope of these reports.

23     *Q*    Okay.  Now with regard to the cord, you told us that

24 the cord came in, right?

25     *A*    Yes, we received a cord.

1   *Q*   And there was no swab attached to the cord, right?

2   *A*   Correct.

3   *Q*   And I think I asked you on Thursday some questions
4   about swabbing, right?  If you get an item that may have already
5   been swabbed, do you remember I asked you some question about
6   that?

7   *A*   Yes.

8   *Q*   All right, and you said that, yes, at times you do get
9   an item that's already been swabbed by another agency, right?

10   *A*   That's correct.

11   *Q*   And sometimes you also get an item that's already been
12   swabbed, which you then swab again, right?

13   *A*   There are instances where we will receive a swab of an
14   item and sometimes that swab will not have enough DNA present on
15   it; and we can go back and sample the actual item as well.

16   *Q*   Okay.  Well, if you find yourself in a position where
17   you've been given an item with a swab, you don't ignore the
18   first swab, right?

19   *A*   Correct.

20   *Q*   You don't discard the first swab, right?

21   *A*   If an item is received with a swab, the swab will
22   remain with the item; and depending on how the evidence
23   supervisor deems the examination, they may sign that in for
24   examination or they may not.  It will depend on the case.

25   *Q*   That may be examined, right, that swab?

1     **A**     It's possible that it can be examined, yes.

2     **Q**     And then a swab you do of the same item may also be

3     examined, right?

4     **A**     Correct.

5     **Q**     Okay.  You indicated that -- that first swab may have

6     gotten an insufficient amount of DNA on it, right?

7     **A**     That's possible, yes.

8     **Q**     It's also possible the first swab actually got a

9     sufficient amount of DNA for an examination, right?

10    **A**     That's also possible.

11    **Q**     And that the second swab you do may get an insufficient

12    amount, right?

13    **A**     The second swab meaning?

14    **Q**     The same area that you do could get an insufficient

15    amount right?

16    **A**     Yes, it's always possible.

17    **Q**     It is because the first swab collected the DNA that

18    isn't there for the second swab to get, right?

19    **A**     Correct.

20    **Q**     The cord was examined, right?

21    **A**     Yes, it was.

22    **Q**     Is it accurate to say the cord didn't come in at the

23    same time as the postmortem kit, right?

24    **A**     The office received the electrical cord on March 9,

25    2008, and the Sexual Assault Kit was received on January 15,

1    2008.

2    **Q**    Okay, so that material in the postmortem kit was

3    brought from the medical examiners to your office on January

4    15th; right?

5    **A**    Correct.

6    **Q**    And the Medical Examiner's Office is actually a part of

7    OCME, right?

8    **A**    Yes.

9    **Q**    As you are apart of OCME?

10   **A**    Yes.

11   **Q**    Okay.  And then it would be accurate to say that your

12   office was asked in March about whether or not there had been

13   any analysis done of the cord?

14   **A**    Yes, there was a request to examine the electrical

15   cord.

16   **Q**    Well, it turned out that your office hadn't received

17   the cord as part of the postmortem evidence; right?

18   **A**    That's correct.  They came in separately.

19   **Q**    And then an effort was made to track it down, right?

20   **A**    Yes.

21   **Q**    In fact, a message was sent to Dr. Tranchita who

22   actually had done the autopsy concerning the cord, right?

23   **A**    Yes, there was communication to Dr. Tranchita in

24   regards to the electrical cord.

25   **Q**    And your office indicated you were going to work to try

<u>Philipps - Cross - Defense</u>                    562

1   to track it down internally, right?

2       **A**    Yes.

3       **Q**    The police then informed OCME that a detective was

4   going to go to the Medical Examiner's Office to try to track it

5   down as well, right?

6       **A**    Yes.

7       **Q**    So that it could be brought to your office for an

8   examination, right?

9       **A**    That's correct.

10      **Q**    Okay.  Your office was informed around that time that

11  the cord may have been used to strangle the victim, right?

12      **A**    Yes.

13      **Q**    Okay.  That the District Attorney's Office considered

14  it a potentially significant piece of evidence in the case?

15  That's what your office was informed, right?

16      **A**    Yes.

17      **Q**    Okay.  Now, it's obviously true as I think you said

18  many times on direct examination that people who touch an object

19  may not leave skin cells on the object, right?

20      **A**    That's possible, yes.

21      **Q**    Or they may, right?

22      **A**    Correct.

23      **Q**    That's one of the reasons why you do an analysis of an

24  object such as a cord, right?

25      **A**    Correct.

1    **Q**    Additionally, if a person -- a victim bleeds a lot and
2    you observe their blood and the DNA in their blood may overwhelm
3    the DNA, if any, of a person who grabbed the cord; right?

4    **A**    That's correct.

5    **Q**    And thus you may not be able to deduce out a minor
6    contributor to a mixture; and you may not even find that there
7    is a mixture, right?

8    **A**    That's correct.

9    **Q**    But you do the analysis, right?

10    **A**    Yes.

11    **Q**    You do the best you can, right?

12    **A**    The cord was analyzed and there was blood found on it;
13    and when it went for DNA typing, the DNA was consistent with
14    Helen Abbott and there was a minor source; but again there
15    wasn't enough information for further comparison.

16    **Q**    Okay, the actual work on that piece of evidence was
17    done not by you, right?

18    **A**    Another analyst in the laboratory examined the
19    electrical cord.

20    **Q**    You know who that was right?

21    **A**    Yes.

22    **Q**    A Mr.?

23    **A**    Cindy Rodriguez.

24    **Q**    I am sorry, Cindy Rodriguez.  That was the analyst who
25    actually worked with the cord, right?

<u>Philipps - Cross - Defense</u>                        564

1      *A*     They did the physical examination of the cord.

2      *Q*     They did the physical examination on March 8th of 2008,

3  right?

4      *A*     The examination of the cord was started on March 11,

5  2008.

6      *Q*     I am sorry.  It got there on March 8th.  I am sorry.

7  It was examined on March 11th of 2008, yes?

8      *A*     Correct.

9      *Q*     And what she actually did, we can understand from

10  looking at her notes, right?  Is that -- is that true?  We can

11  understand what she did from looking at her notes, yes?

12      *A*     The notes in here describes how she examined --

13      *Q*     Without telling us what she did, would it be accurate

14  to say that we can understand what she did or try to understand

15  what she did by looking at her notes?

16      *A*     The notes in here indicate how she tested the cord and

17  how she sent on the samples for DNA testing.

18      *Q*     Ms. Philipps, could you tell me this, is the answer to

19  my question yes?

20      *A*     Yes.

21      *Q*     Okay.  Thank you.

22          We can understand what she did from looking at her

23  notes?  Yes?

24              MR. BOGDANOS:  Objection.  Asked and answered word

25      for word.

1        THE COURT:  Sustained.

2    *Q*    It took me about -- to get it -- there is nothing

3    unusual about that, right, that we try to understand what

4    someone else did in your office by looking at the notes that

5    they have and left, right?

6    *A*    We are required to take notes during examination and

7    that's what this analyst did and she described her testing, yes.

8    *Q*    And there is nothing unusual about you telling us what

9    your understanding is of what she did, right?

10   *A*    Correct.

11   *Q*    Each of the ends of the cord were swabbed, right?

12   *A*    Yes, she used two swabs for each of the ends of the

13   cords (sic) for a total of four swabs.

14   *Q*    Were the ends of the cord swabbed yes or no?

15   *A*    Yes.

16   *Q*    Thank you.  She used two swabs for each end of the

17   cord; is that true?

18   *A*    Yes.

19   *Q*    And would it be accurate to say that the swabs for the

20   ends were then combined?  Is that true?

21   *A*    Yes, she combined the four swabs into one sample.

22   *Q*    Okay, and then would it also be true that she took a

23   sample nineteen (19) inches from the plug, yes or no?  Did she

24   do that?

25   *A*    According to the notes, yes, she did.

1    *Q*    Well, we are going to rely on her notes, okay?

2    *A*    Okay.

3    *Q*    Because we have you here and not her, right?

4    *A*    Yes, but I am a custodian of this case file and I

5    reviewed the notes; and I can read what she did and I trust her

6    as an analyst.

7    *Q*    And there is no reason we shouldn't trust you to tell

8    the jury what it is precisely what she did?

9    *A*    Correct.

10   *Q*    Okay.  So it would be accurate to say she took a sample

11   19 inches from the plug, right?

12   *A*    Correct.

13   *Q*    And she said -- would it be accurate to say that she

14   noted down why she had done this?  Yes or no?

15   *A*    Yes, it's indicated in the notes.

16   *Q*    It's a yes or no question.  It's indicated in the

17   notes, is it not?  Yes?

18   *A*    Yes.

19   *Q*    Thank you.

20        It would be accurate to say that she said that it

21   appeared that the area she selected -- she selected because it

22   appeared to have less residue compared to the rest of the cord,

23   right?

24   *A*    Correct.

25   *Q*    That's what she saw at the time, right?

1     **A**    Yes.

2     **Q**    Okay.  She didn't write in the report that this was the

3  only area of the cord that had little residue, did she?  Did she

4  write that, what I just asked?

5         Did she write in the report this was the only area with

6  little residue?  Did she write that?

7     **A**    She did not write a report in relation to this case.

8     **Q**    No -- you are reading from her notes, right?

9     **A**    Right, these are examination notes.  They are separate

10 from our report, which is the overall summary of the results

11 from the case.

12    **Q**    But I am now asking you about examination notes, right?

13    **A**    I am sorry, I was confused.  You had said report so...

14 I just wanted to clarify.

15    **Q**    Would it be accurate to say she does not write down in

16 the examination notes that this was the only area with little

17 residue, right?  Did she write that, yes or no?

18    **A**    She said that it was the area that had less residue

19 compared to the rest of the cord.

20    **Q**    No, no, I am just asking you the following did she

21 write --

22         MR. BOGDANOS:  Objection, your Honor.

23    **Q**    This is the only area with little residue?  Did she

24 write that down on the report?

25         MR. BOGDANOS:  Objection.

1          THE COURT:  You could ask for a yes or no but she

2     is --

3     *Q*    Yes or no?

4          THE COURT:  She is entitled to answer it as best

5     she can, Mr. Klein.

6     *Q*    Just tell me did she write the following in the notes:

7     This is the only area that I saw with little residue?  Yes or

8     no?  You can -- you don't have to repeat to us what she already

9     did, right?  We know that my question is another one, did she

10    write the following words in the report?

11         THE COURT:  From the notes.

12    *Q*    This is the only area in the notes -- the notes become

13    part of the report, right?  They are in the same file?

14    *A*    They are in the same file but the report is a separate

15    entity.

16    *Q*    In the notes did she write this was the only area with

17    little residue yes or no?

18    *A*    She did not use the word only, no.

19    *Q*    She didn't write in the report -- did she write not in

20    the report in the notes -- that this is the only area on the

21    cord that might yield relevant results?  Did she write that in

22    the notes?

23    *A*    No.

24    *Q*    Okay.  Did she write in the report that besides the

25    area that she swabbed, there was no other area that might yield

1    relevant results?

2                MR. BOGDANOS:  Objection, to this entire line of

3        inquiry.  The list of things she did not include in a single

4        paragraph of not is infinite; and I would about fields where

5        we are on this questioning.

6                THE COURT:  I will sustain -- you don't have to

7        make a long record.  I will sustain it.

8        *Q*    She indicated much of the cord appeared to be heavily

9    residued, right?

10       *A*    Yes.

11       *Q*    Which you understood to mean saturated with blood of

12   the victim, right?

13       *A*    At the time of the examination took place she would not

14   be able to determine who the blood came from but the majority of

15   the cord had reddish brown residue.

16       *Q*    It seemed -- would it be accurate to say that in

17   looking at her notes it seems that she swabbed the area that she

18   felt had the best chance of giving a swab that was not simply

19   overwhelmed with the blood of the victim, but might also give

20   results indicating who else, if anyone, had touched the cord?

21       *A*    Based on how she tested this cord, she took the item --

22   a sample that, yes, she believed had less residue so there was

23   the potential that you might see another individual then who

24   contributed the possible blood to it.

25                (Transcript continued on the next page.)

CROSS/PHILIPPS/DEFENSE

1   T-3 - Peo. V Mark Richardson, Ind.#3534/08

2   September 19, 2011:

3   CONTINUED CROSS EXAMINATION

4   BY MR. KLEIN:

5       Q.    So would you agree with the following:

6             It seems that given what she's written that she

7   swabbed the one area that she felt had the best chance of

8   giving a swab that was not simply overwhelmed with the blood of

9   the victim and thus might give result indicating who else, if

10  anyone, touched the cord.

11            MR. BOGDANOS:  Objection asked and answered.

12  It's the exact question.

13            THE COURT:  Overruled.  You may answer again.

14  BY MR. KLEIN:

15      Q.    Is that true?

16      A.    Yes, that is true.

17      Q.    Thank you.  Now, any given area of the cord may have

18  little blood from the victim but also if you -- or no skin

19  cells of a person who grabbed the cord, right?

20      A.    That's possible.

21      Q.    Or no skin cells of the person who grabbed the cord

22  because the person may not have grabbed in the area with little

23  blood, right?

24      A.    That's possible as well.

25      Q.    Or a second area of the cord may have a little more

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1    blood from the victim then the first area but more skin cells

2    of the perpetrator because the second area may be the precise

3    area where a perpetrator did grab the cord, is that also

4    possible?

5         A.    That would be possible, yes.

6         Q.    And it was, in fact, the skin cells of someone other

7    than Helen Abbott that you were interested in locating, not you

8    but Ms. Rodriguez was interested in locating in this

9    examination, yes?

10        A.    The examination, yes, was to determine if there was a

11   possible other DNA contributor to the cord.

12        Q.    Other then Helen Abbott?

13        A.    Correct.

14        Q.    So she swabbed the area of the cord center, yes?

15        A.    Yes.

16        Q.    And she didn't do it with just one swab but with two,

17   right?

18        A.    Yes, she used two swabs.

19        Q.    And the two swabs were combined, yes?

20        A.    Yes.

21        Q.    And then is it true that there was a thought that

22   this should be sent for high sensitivity training?

23              Yes or no.

24        A.    At the time, yes, there was the thought that it

25   should be sent to high sensitivity.

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1      Q.   However, given the amount of blood that it appeared
2  there was on the cord swabs, a decision was made not to do high
3  sensitivity testing at that time, is that right?
4      A.   For samples that are positive for possible blood they
5  won't go on for high sensitivity testing due to the fact that
6  there's a biological fluid present that will have possibly a
7  lot of DNA so the high testing sensitivity would not make sense
8  with those samples.
9      Q.   Okay.   Now, once that happened the cord wasn't thrown
10  away, right?
11      A.   We don't throw away evidence.
12      Q.   So this wasn't thrown away, yes?
13      A.   Correct.
14      Q.   It was retained, right?
15      A.   The cord was packaged back in the evidence packaging
16  that it was received in.
17      Q.   So it was needed, right?
18      A.   Correct.
19      Q.   For court, right?
20      A.   Correct.
21      Q.   Or for any additional testing that was determined to
22  be appropriate, right?
23      A.   Correct.
24      Q.   Now, the cord ends in the DNA examination, all that
25  was obtained were DNA consistent with Helen Abbott, right?

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1      A.    Correct.   The DNA is consistent with Helen Abbott.

2      Q.    There was no sign of more than two alleles at any one

3  locis, right?

4      A.    No, the sample was from a single course.

5      Q.    Therefore, no sign of a mixture, right?

6      A.    Correct.

7      Q.    So, therefore, you are able to tell the jury that it

8  all came from a single source, right?

9      A.    That's correct.

10     Q.    The cord center was also analyzed, right?

11     A.    That's correct.

12     Q.    Because we're dealing with a different areas of the

13  cord, two different areas of the cord that were analyzed?

14     A.    Right.   There are two separate samples.

15     Q.    The cord end is one and the center is another, right?

16     A.    That's correct.

17     Q.    Now, your results for the cord center didn't simply

18  say, homicide ligature, Helen Abbott, right?

19     A.    No.   The item --

20     Q.    Let's try it this way, okay, and I don't mean to

21  disturb you.   Would it be accurate to say that your results did

22  not simply state that the cord, that the homicide ligature

23  showed Helen Abbott's DNA or that it showed something more; did

24  it show more?

25     A.    The item was called cord center for the testing and

CROSS/PHILIPPS/DEFENSE

1  in the cord center we were able to develop a DNA profile that

2  was consistent with Helen Abbott but there was also a possible

3  minor contributor and there wasn't enough information in order

4  for us to make a DNA comparison to the possible minor

5  contributor.

6      Q.   You wrote a report, right?  Yes?

7      A.   Correct.

8      Q.   Not examination notes now, the report, right?

9      A.   Correct.

10     Q.   In your report you noted, with regard to the cord

11  center, a person can have a maximum of two DNA alleles at a

12  given locis, right?

13     A.   That's correct.

14     Q.   Then you wrote, since more than two DNA alleles were

15  seen at D7, a mixture of DNA is present in the cord center,

16  right?

17     A.   Correct.

18     Q.   You then wrote a minimum of two people must have

19  contributed to this sample, right?

20     A.   Correct.

21     Q.   Okay.  No further conclusions could be made regarding

22  the sources of the DNA, right?

23     A.   Regarding the minor contributor which we're able to

24  make a comparison with Helen Abbott and she was consistent were

25  being the major contributor.

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1       Q.   But you couldn't tell us anything more about the

2   minor contributor, right?

3       A.   That's correct.  There wasn't sufficient information

4   process.

5       Q.   Just there was a mixture there?

6       A.   Right.

7       Q.   At the cord center?

8       A.   That is correct.

9       Q.   Did you have any information concerning how this

10  ligature was found other then it was in fact around the

11  victim's neck?

12      A.   According to the laboratory request for the

13  electrical cord the information says it was looped around Helen

14  Abbott's neck.

15      Q.   Beyond that you didn't have any information, right?

16      A.   No.

17      Q.   Whether the cord center had been around the neck or

18  not you didn't know, right?

19      A.   That's correct.

20      Q.   Or whether the cord center was around -- which may

21  have been touched by the perpetrator you didn't know, right?

22      A.   Correct.

23      Q.   Your results were then reported, right?

24      A.   Yes.

25      Q.   And there was no additional work done on the cord,

CROSS/PHILIPPS/DEFENSE

1    was there?

2         A.   No.

3         Q.   Okay.  Now, you also indicated that, on Thursday,

4    there was a Crime Scene Swab 1, and Crime Scene Swab 1 and 3,

5    remember that?

6         A.   Yes.

7         Q.   It's actually here on Number 7 introduced by the

8    People, right?  Yes?

9         A.   Yes.

10        Q.   Can you see it at the bottom?  I'm sorry.

11             Ms. Philipps, Crime Scene Swab Semen 1, and indicates

12   could be, included Helen Abbott, Mark Richardson, or Male A,

13   Male B, right?

14        A.   Correct.

15        Q.   And then Crime Scene Swab Semen B, Male 3, right?

16        A.   That's correct.

17        Q.   Is consistent with the profile of Male B, correct?

18        A.   Yes.

19        Q.   His profile is considered being in the mixture?

20        A.   For sample of sperm extraction single source DNA

21   profile.  It wasn't a mixture and it wasn't consistent with a

22   male individual so we designated him Male B.

23        Q.   Not a mixture.  Actually single source profile?

24        A.   Correct.

25        Q.   Sorry.  Now, these crime scene swabs, they came into

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1    your laboratory, right?

2        A.    Correct.

3        Q.    They came in or were examined around January 30th of

4    '08, is that right?

5        A.    We received them in our laboratory on January 28,

6    2008 and examination started on January 30, 2008.

7        Q.    And, by the way, were you the actual annalist who did

8    the initial evidence examination or was that someone else?

9        A.    I did the examination on these items.

10       Q.    And just to be clear, when I say the examination, I

11   mean the evidence examination that then is written in the

12   examination notes, right; you did that, right?

13       A.    Yes.

14       Q.    Okay.  Then you wrote the general report, right?

15       A.    Correct.

16       Q.    All right.  Now, you -- when you get this material,

17   you look to see where it from, right?

18       A.    Meaning --

19       Q.    Meaning like who sent it to you, where did it come

20   from?

21       A.    We receive this item as a voucher from the New York

22   Police Department.

23       Q.    Okay.  And didn't it, the material that you then

24   examine, the material, didn't you see that it came from a

25   collection that had been done by something called SIU?

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1      A.    SIU is the special --

2      Q.    Just listen.  Listen to my question.  Would it be

3   accurate to say that you got an indication that, which had been

4   collected by SIU, did you get that?

5      A.    Yes.  And the SIU --

6      Q.    Now --

7            MR. BOGDANOS:  Judge, could the witness finish

8   her answer.

9            THE COURT:  You have to let her finish her

10  answer.

11     Q.    The SIU is the Special Investigation Unit?

12     A.    Correct.  That's what I was about to say.

13     Q.    Okay.  And that's what I was about to ask.  Special

14  Investigation Unit not of the Police Department, right?

15     A.    No.  That's the group within our laboratory.

16     Q.    It's part of the Office of Chief Medical Examiner,

17  right?

18     A.    Correct.

19     Q.    Okay.  And the report -- the packaging indicated that

20  there were possible semen stains from floor of bedroom three,

21  right?

22     A.    Yes.  That was written on the envelopes that these

23  items were received in.

24     Q.    And so then you wrote that down?

25     A.    Correct.

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1      Q.    And they were differentiated as N1, 2 and 3?

2      A.    And N4.

3      Q.    And N4, right?

4      A.    Correct.

5      Q.    And you indicated that N3 gave you a result that was

6   consistent with Male B, yes?

7      A.    The sperm cell fraction of that sample, yes.

8      Q.    The sperm cell fraction, right?

9      A.    Correct.

10     Q.    Consistent with Male B, yes?

11     A.    Yes.

12     Q.    All right.  And N1 you indicated that Helen Abbott,

13   Mark Richardson or Male A or Male B, could be included.  Did

14   you note that?  Yes or no?

15     A.    Yes, that was the mixture.

16     Q.    All right.  And you indicated that, I believe you

17   said this on Thursday, that you do P30 testing of an allege

18   semen stain, right?

19     A.    Right.  That's our testing to confirm whether or not

20   semen is present on an item.

21     Q.    So you did that in this case, right?

22     A.    On these items, yes.

23     Q.    And these two items, right?

24     A.    On the four items.

25     Q.    I'm sorry.  On the four items?

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1      A.   Correct.

2      Q.   And were you able the confirm the presence of semen

3  on N1 and N3, is that right?

4      A.   That's right.  And then no semen was fond on N2 or

5  N4.

6      Q.   Would it be accurate to say that semen has two

7  components in it?

8      A.   Yes.

9      Q.   Has seminal plasma and sperm, right?

10     A.   Yes, it would have the seminal fluid in the sperm.

11     Q.   And to analyze samples which potentially contain a

12 mixture of semen and other bodily fluids is a technique is

13 employed by the Office of Chief Medical Examiner, yes?

14     A.   Yes.  We have an extraction method called the

15 differential extraction for semen stains.

16     Q.   It has a specific definition, right?

17     A.   It is the type of extraction method that will

18 separate semen stains into three separate components.

19     Q.   Let's just do it slowly.

20          MR. BOGDANOS:  Judge, objection.  I object.

21 BY MR. KLEIN:

22     Q.   There is a technique --

23          MR. KLEIN:  I can ask a question like that.

24          MR. BOGDANOS:  You have to let her finish.

25          MR. KLEIN:  She doesn't have to give a special

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1  answer in front of the injury.  I just wanted an answer to the

2  question.

3              MR. BOGDANOS:  And I am objecting.  She wasn't

4  finished with her answer.  An answer is an answer even if it's

5  more full then you want to --

6              MR. KLEIN:  Judge, just ask her to answer my

7  questions, okay.

8              THE COURT:  All right.  Try to answer the

9  question as posed.

10  BY MR. KLEIN:

11     Q.   Ms. Philipps, you have explained a lot of this to me

12  already, right?

13     A.   Yes.

14     Q.   Okay.  But you understand that the jury, a lot of

15  them probably never heard this before, okay?

16     A.   Correct.

17     Q.   Okay.  So I just want to go slow, all right.  That's

18  all.  Okay?

19     A.   Okay.

20     Q.   You have a specifics technique, right, when you get

21  such a sample, right?

22     A.   Yes, it's called differential extraction.

23     Q.   All right.  And it's a technique that's been designed

24  to physically separate the DNA in the epithelia cells from the

25  DNA in the sperm cells, right?

CROSS/PHILIPPS/DEFENSE

1      A.    That's correct.  It will have --

2      Q.    Let's just stop there for a second.

3            MR. BOGDANOS:  Judge, she has to be allowed to

4  answer the question.

5            THE COURT:  Mr. Klein, you must let her finish

6  the answer.

7            MR. KLEIN:  Judge, I am not hiding anything.  I

8  am trying to bring it out.  I am just trying to do it slowly.

9            THE COURT:  No one is accusing you of doing

10  anything wrong but you are not allowing her to finish her

11  answer

12  BY MR. KLEIN:

13      Q.    I'm sorry.  Good ahead.

14      A.    The differential extraction will separate samples

15  into three separate fractions.  So you will have a sperm

16  epithelia process skin fraction and then what's called the

17  substrate remains, which is whatever the substrate was

18  collected on, in case of samples N1 and 4, those were swabs.

19      Q.    Okay.  So you get a sperm cell fraction right, you

20  try to?

21      A.    Correct.

22      Q.    To determine who is, in fact, the semen donor, right?

23      A.    That's correct.

24      Q.    Because that determines whether or not you can say

25  who the semen donor is, right?

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1       A.    Right.  You make the attempt to get a DNA profile

2  from the semen extraction.

3       Q.    And then you also get epithelia cell fraction, right?

4       A.    Correct.  And that will contain skin cells.

5       Q.    And sometimes you can do a complete separation

6  sometimes you can't, is that true?

7       A.    That's correct.  You can get single source or

8  sometimes you get mixtures of DNA in the fractions.

9       Q.    Okay.  And you indicated that sometimes after you do

10 this attempt of doing this differential extraction you have DNA

11 that may persist on a sample that you then analyze as a

12 fraction called swab remains or substrate remain fractions,

13 yes?

14      A.    Yes.  It's possible that during the differential

15 extraction you might not be able to separate the sperm cells

16 into the sperm fraction so you have the swab remains as sample

17 to test.

18      Q.    And the precise source of the substrate remains is

19 often not clear, right?

20      A.    Meaning --?

21      Q.    Well, you don't know precisely what biological fluid

22 gave rise to the DNA that you find in the substrate remains, is

23 that true?

24      A.    Well, the substrate remains would contain sperm cells

25 and possible skin cells.  So often times it is a mixture of

Glenn J. Merola, Sr. Court Reporter

1   DNA.

2        Q.   Okay.  And you know where you can say scientifically

3   where the sperm cell fraction comes from, right?

4        A.   Correct, it would be from the sperm.

5        Q.   And then you get epithelia cells, right?

6        A.   Correct.

7        Q.   And it's accurate to say that you can't tell with a

8   biological -- I'm sorry -- with any degree of scientific

9   certainty where, what is the biological source of the epithelia

10  cells, is that true?

11       A.   You would be able to determine that they are skin

12  cells but you can't specifically say from where on the body the

13  skin cells came from.

14       Q.   All right.  That's fine.  Now, with N3 you could

15  isolate a sperm fraction, right?

16       A.   Correct.  And that was the Male Donor B.

17       Q.   That was Male Donor B, right?

18       A.   Yes.

19       Q.   Therefore, it was clear that Male Donor B's sperm was

20  on the floor, right?

21       A.   Yes.  For sample N3 the sperm fraction was for Male

22  Donor B.

23       Q.   For N1 you were not able to get a DNA result from the

24  sperm fraction, right?

25       A.   For sample N1 there was not enough DNA present in the

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1    sperm fractions or the epithelia fractions so the substrate

2    remains fraction was sent on for DNA testing.

3        Q.   So is it accurate to say that you could not get a DNA

4    result for the sperm fraction?

5        A.   Of N1, yes.

6        Q.   Okay.  And you found that in the DNA that you finally

7    found that Helen Abbott, Male A, Male B, could be included,

8    right?

9        A.   For the substrate remains of sample N1, yes.

10       Q.   But only in the substrate remains, right?

11       A.   Correct.

12       Q.   You were not able to detect Male Donor A as DNA in

13   that sperm fraction, right?

14       A.   For this sperm fraction there was insufficient DNA so

15   it didn't go on for further testing at all.

16       Q.   So you don't write in your report at Male Donor A was

17   in the male fraction, right?

18            MR. BOGDANOS:  Objection.  Asked and answered.

19            THE COURT:  Sustained.

20   BY MR. KLEIN:

21       Q.   You indicated in the substrate remains you did have

22   DNA, right?

23       A.   Yes.  Mixture of DNA was found.

24       Q.   You had a mixture, right?

25       A.   Correct.

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1      Q.    Can't say any of that DNA came from sperm, right?

2      A.    For this substrate remains fraction the DNA present

3    most likely came from sperm or epithelia cells because this is

4    a semen positive sample.  It's just that there was not enough

5    DNA present in the sperm cell fraction for a DNA profile.

6      Q.    So you can say it came from sperm or epithelia cells,

7    right?

8      A.    That's correct.

9      Q.    It's clear that three people may have contributed to

10   this stain, right?

11     A.    Yes.

12     Q.    But you cannot say with any degree of scientific

13   certainty what is the biological source for any of this DNA

14   other then that it came from skin cells, right?

15     A.    Or sperm cells.

16     Q.    Skin cells or sperm cells, right?

17     A.    Correct.

18     Q.    Or sperm cells or skin cells, right?

19     A.    That's correct.

20            MR. KLEIN:  How about a break?  You want me to

21   keep going?  Whatever you want.

22            THE COURT:  No.  Somewhere in here I would like

23   to take one.

24            MR. KLEIN:  All right.

25            THE COURT:  This is a good place?

              Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1              MR. KLEIN:  Sure.

2              THE COURT:  Thank you, Mr. Klein.  Ladies and

3    gentlemen, step outside for a few minutes, take a break.

4    Please do not discuss the case.

5              (The jury is excused and exits the courtroom.)

6              (Short break taken.)

7              THE COURT CLERK:  Case on trial continued.

8              THE COURT:  Are both sides ready?

9              MR. BOGDANOS:  Yes.

10             THE COURT:  Okay.  The jury, please.

11             (The jury enters the courtroom.)

12             THE COURT CLERK:  Case on trial continued.  The

13   People of the State of New York against Mark Richardson.  The

14   defendant, his attorneys, and the assistant district attorney

15   are present.  Will both sides stipulate all the jurors are

16   present and properly seated.

17             MR. BOGDANOS:  Yes.

18             MR. KLEIN:  Yes.

19             THE COURT:  Thank you.  May we have the witness,

20   please.

21             (The witness, Sarah Philipps, resumes the witness

22   stand.

23   CONTINUED CROSS EXAMINATION

24   BY MR. KLEIN:

25        Q.   So, Ms. Phillips, I believe that all the work that we

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1    discussed up to now, all that work was completed in 2008, is

2    that fair to say?

3         A.    That's correct.

4         Q.    Now, there was material that you had received in 2008

5    but was not examined in 2008, right?  And by examined I mean

6    there weren't any DNA tests done on it?

7         A.    Which items are you referring to?

8         Q.    Well, I am just asking you a general question.  It

9    goes like this:  Would it be accurate to say that in 2008 you

10   had received other material but as of the end of 2008 there was

11   no forensic examinations done on them by your office?

12              You don't have to list them all for us if you agree

13   with me you can just say yes you can just say no.

14        A.    For the items that were received in 2008 we conducted

15   DNA testing.  We did receive additional items in 2011.

16        Q.    In 2008 you did forensic examinations in everything

17   that you got in 2008?  Let me just do it like this.

18              Like in 2008 you got the post-mortem kit, right?

19        A.    Correct.

20        Q.    And that had fingernail scrapings and clippings in

21   them, right?

22        A.    Yes.

23        Q.    And you got that in 2008, right?

24        A.    Correct.

25        Q.    All right.  That was there in your office, right?

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1   A.   Yes.

2   Q.   When did you do the examinations on that?

3   A.   For the fingernail scrapings and clippings that

4   examination was done in 2011.  For fingernails we have to

5   receive a request in order to do the examination.  We don't

6   traditionally do examination.

7   Q.   So without going into all that yet, I will ask you a

8   question.  I said in 2008, had you received material that you

9   didn't examine in 2008, what's the answer to that?

10   A.   Yes.  According to our protocol like the fingernail

11   scrapings would not be examined without a request so, yes, we

12   did have them in the office but we didn't do testing on them in

13   2008.

14   Q.   Whether it's according to protocol or not, you

15   requested or not, all I am asking is did you get some stuff in

16   2008 that you didn't examine in 2008?

17                MR. BOGDANOS:  Objection.  Asked and answered.

18                THE COURT:  Sustained.  Asked and answered.

19   BY MR. KLEIN:

20   Q.   Okay.  You got fingernail scrapings in 2008?

21   A.   Yes.  They were contained in the post-mortem kit.

22   Q.   They weren't examined in 2008, right?

23   A.   Correct.

24   Q.   You got a broom in 2008?

25   A.   No.

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1    Q.    You didn't get the broom?

2    A.    Not in 2008.

3    Q.    Okay.  How about bedding?

4    A.    We did not receive bedding in 2008 either.

5    Q.    You got none of that?

6    A.    I'm correcting that.  On voucher P 033656, we did

7  receive a sheet but that was the only bedding that we received

8  in 2008.

9    Q.    Okay.  Now, eventually you did receive a request that

10  you do an examination of the broom, right?

11    A.    We received the broom in March 25, 2011.

12    Q.    Okay.  And he so you got it there in your lab, right?

13    A.    Correct.

14    Q.    And you got a request that you do an examination of

15  the broom, right?

16    A.    Yes.

17    Q.    And that was done, right?

18    A.    Correct.

19    Q.    It was tested by an analyzed in your office, right?

20    A.    Correct.

21    Q.    It was tested for blood, right?

22    A.    Yes, it was looked at for the presence of possible

23  blood.

24    Q.    And none was found, is that right?

25    A.    That's correct.

Glenn J. Merola, Sr. Court Reporter

CROSS/PHILIPPS/DEFENSE

1       Q.      You also received a request -- a request to test

2   various objects of bedding, is that right?

3       A.      Yes.  We received a voucher N 986472, on March 25,

4   2011, that contained bedding items.

5       Q.      And you actually got the bedding items themselves,

6   right?

7       A.      Correct.

8       Q.      And certain articles of clothing also came in, right?

9       A.      We received grey hat on that voucher as well.

10      Q.      Okay.  And a hat and articles of clothing, right?

11      A.      Yes.

12      Q.      And you also received a request that you do

13  fingernail examinations, right?

14      A.      Yes.

15      Q.      There was a request to look at the fingernails that

16  had been contained in the post-mortem kit?

17      A.      Okay.

18      Q.      So that work was done, right?

19      A.      Yes.

20      Q.      All right.

21              With regards to the articles of bedding you tested

22  them for the presence of semen, right?

23      A.      Correct.

24      Q.      You tested DH1 which was a white cream blanket?  And

25  when I say you I mean your office, okay?

CROSS/PHILIPPS/DEFENSE

1      A.   Correct.

2      Q.   I am not insinuating that you did this.  I mean DH1

3   was white cream blanket, right?

4      A.   Yes.

5      Q.   It came packaged and sealed, right?

6      A.   Yes.

7      Q.   Came with a voucher indicating what it was, right?

8      A.   Correct.

9      Q.   And analyzed, looked at the blanket, right?

10      A.   Correct.

11      Q.   And made certain notes on the evidence examination

12   sheet notes, right?

13      A.   Yes, she kept notes.

14           (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

1   CROSS-EXAMINATION CONT'D.:

2       *Q*      She looked at it under ALS, alternative light source;

3   right?

4       *A*      Correct.

5       *Q*      Several areas fluoresced, right?

6       *A*      Yes.

7       *Q*      Giving a sign there may be semen there, yes?

8       *A*      That's correct.

9       *Q*      Semen was, in fact, found on the blanket because its

10  presence was confirmed by a P30 test, correct?

11      *A*      Correct.

12      *Q*      Analysis was done to try to determine whose semen this

13  was, right?

14      *A*      Yes.

15      *Q*      Your office came up a with a Male D?

16      *A*      Male D was found in stain 1F sperm cell fraction from

17  that blanket.

18      *Q*      That was -- when you say Male D, it's an unidentified

19  person, right?

20      *A*      That's correct.

21      *Q*      But it is a real person?

22      *A*      Yes.

23      *Q*      All right, and DH3, you remember what that was -- would

24  you actually say it was a blue blanket?

25      *A*      DH3 was a blanket that had a UHaul pattern on it.

594

1      *Q*      Yes, okay, and would it be accurate to say a woman's

2   DNA was found on that?

3      *A*      Yes, and she was assigned as Female Donor A.

4      *Q*      Because she wasn't Helen Abbott, right?

5      *A*      Correct.

6      *Q*      They was another person, right?

7      *A*      Correct.

8      *Q*      On DH3 there was also an indication that semen was

9   found, right?

10     *A*      Yes.

11     *Q*      And I think -- correct me if I am wrong -- on that

12   semen your office wasn't able to figure out whose semen that

13   was; is that right?

14     *A*      For DH3 that's correct.  We were only able to develop a

15   DNA profile from Female Donor A.

16     *Q*      And DH4 that was a tan flat sheet, right?

17     *A*      Yes.

18     *Q*      And semen was also found on that, right?

19     *A*      Correct.

20     *Q*      And you were able to get enough of a profile off of

21   this semen to actually develop a profile of an individual,

22   right?

23     *A*      For DH4 we found a mixture of DNA.

24     *Q*      Yeah, and were you able to develop a profile, a male

25   profile off of it?

1          *A*     We used stain 4D to make comparisons to the known

2     profiles we had in the case.

3          *Q*     Okay.  Did you come up with a Male E?

4          *A*     Male E was found on duvet cover DH8.

5          *Q*     I am sorry, excuse me, right, DH8 that was the duvet

6     cover, right?

7          *A*     Right.

8          *Q*     Found semen on that, right?

9          *A*     Yes.

10         *Q*     And on that you came up with another male donor called

11    Male Donor E, right?

12         *A*     Correct.

13         *Q*     When you say it is Male Donor E, what you are saying

14    is -- it's -- you have a different profile than the ones you

15    have come across before, right?

16         *A*     Right, so it would be a different DNA profile formally

17    Donor A, B, and D.

18         *Q*     C, we didn't have yet, right?

19         *A*     C is from a different report in the high sensitivity

20    group.

21         *Q*     So we will leave that alone but you already had what

22    you call the suspect files?  We used that word last week, right?

23         *A*     Correct.

24         *Q*     You had a bunch of DNA profiles from those individuals,

25    right?

1    **A**    Correct.

2    **Q**    And Male Donor E was none of them either, right?

3    **A**    That's correct.

4    **Q**    Okay, in D10 that was again another floral pattern flat

5    sheet; is that right?

6    **A**    Correct.

7    **Q**    And on that you also found semen, right?

8    **A**    Yes.

9    **Q**    As a matter of fact you found six separate semen stains

10   on them, right?

11   **A**    Yes.

12   **Q**    You found a semen stain that had DNA consistent with an

13   individual known as Anthony Hall, right?

14   **A**    DNA from Anthony Hall was found on the sheet DH10,

15   stain 9F sperm cell fraction.

16   **Q**    And you had Anthony Hall's DNA profile from one of the

17   suspect files, right?

18   **A**    That's correct.

19   **Q**    And you got this -- this semen stain, that appeared to

20   come from this Male F, right?

21   **A**    That's correct.

22   **Q**    And then you said Male F, Anthony Hall, they appear to

23   be -- I am sorry.  I am not using your language -- but one in

24   the same?

25   **A**    They had the same DNA profile.

1       *Q*      The same DNA profile, okay, and you also found a stain

2   on this item consistent with another individual who had also

3   been in the suspect files, right?

4              I will make it easy.  You got a Male G, who turned out

5   to be Edwin Santiago?

6       *A*      That's correct.  There was a Male Donor G on the flat

7   sheet DH10, and for Edwin Santiago we received a bottle; so the

8   DNA profile that was on DH10 stain 9E was consistent with the

9   bottle that was used by Edwin Santiago.

10      *Q*      And you then also here -- got DNA consistent with --

11  contributed by the Male D you had found previously; right?

12             I believe Male D, his DNA was found in Stain G and Stain

13  H on that same white flat bed sheet with the orange green

14  flowers; is that right?

15      *A*      That's correct.

16      *Q*      Okay, and you also found on that same sheet the DNA

17  that appeared to come from another female donor who was not

18  Female A or Helen Abbott; is that right also?  I think a Female

19  B?

20      *A*      Right, on Stain 9D epithelial cell fraction from sheet

21  DH10, there was a Female Donor B.

22      *Q*      Okay.  You also did an examination of that one article

23  of clothing that you had been given, right?

24      *A*      The gray hat, yes.

25      *Q*      The gray hat, yes.

1          And you did this by someone at your lab by scraping the
2   inside of the hat, yes?

3       *A*    Correct.  So you would do scraping with the idea that
4   skin cells will be transferred into the scraping, so you could
5   attempt to find the wearer of an item of clothing.

6       *Q*    This is actually a different way of collecting the
7   evidence that you do with such an item as opposed to the way you
8   try to collect evidence from like a semen stain on a bed, right?

9       *A*    Right for semen stain you would make a small cutting of
10  the stain to go on for testing.

11      *Q*    Here instead you scrape the entire inside or as much as
12  is indicated in the evidence notes that was scraped, right?

13      *A*    That's correct.

14      *Q*    And you were able to get a mixture of DNA from this
15  hat, right?

16      *A*    Yes, it had at least three people in this mixture of
17  DNA.

18      *Q*    And you were able to deduce out some further results on
19  the hat, right?

20      *A*    There were no deductions possible since it was a three
21  person mixture; but we could compare the known DNA on profiles
22  that we had in the case, so the DNA profile of Helen Abbott and
23  Male Donor D cannot be excluded as possible donors; but Male
24  Donors A, B, E, F, and G and Female Donors A and B are excluded
25  as possible contributors to the mixture.

1      *Q*     Okay.  You've indicated that routinely -- I am going to

2    phrase it the other way -- would it be accurate to say in this

3    case when the fingernail scrapings first came in the -- in the

4    postmortem kit you did not do forensic examinations of them?

5    Yes or no?

6      *A*     That's correct.  We need to receive a request in order

7    to examine fingernails.

8      *Q*     Back then you had no request, right?

9      *A*     In 2008, right.

10     *Q*     Then you got a request, right?

11     *A*     In 2011, yes, so testing was done.

12     *Q*     Okay, and there was a scraping done of the different

13   fingernails, right?

14     *A*     We received from the postmortem kit, there was

15   scrapings from both the right and left fingernails.

16     *Q*     Now with regard to the left fingernails, I just want to

17   concentrate on them for a moment, okay?  Yes?

18     *A*     Yes.

19     *Q*     Those were examined, right?

20     *A*     Correct.

21     *Q*     And your -- your branch, okay, of the DNA -- I am

22   sorry -- your branch of forensic biology at the Office of Chief

23   Medical Examiner you are not the high sensitivity branch, right?

24     *A*     That's correct.

25     *Q*     That's a different branch, right?

1    *A*    Correct.

2    *Q*    But you got these fingernail scrapings first, right?

3    *A*    Yes.

4    *Q*    All right, and you did -- by you again your office --

5    did some initial work on the left fingernail scrapings, right?

6    *A*    That is correct.

7    *Q*    You determined that there was a mixture of two people,

8    right?

9    *A*    Yes, there is a mixture of at least two people in the

10   left fingernail scrapings.

11   *Q*    Individual contributors to the mixture could not be

12   determined by your specific office?

13   *A*    Correct.  I am sorry by my specific group?

14   *Q*    Unit, your group?  I am sorry.  Your group which is

15   different from the high sensitivity group?

16   *A*    That's correct.

17   *Q*    However the results were -- that you came up with were

18   suitable for comparison, right?

19   *A*    That's correct.

20   *Q*    And Mark Richardson was excluded as a possible

21   contributor, right?

22   *A*    Yes.

23   *Q*    Okay, now a decision was then made to continue to

24   examine the left fingernail scrapings, right?

25   *A*    A decision was made to forward the sample to the high

1    sensitivity group, yes.

2       *Q*    Okay.  Not all material which you examine and for which

3    you find a mixture but are unable to deduce the individual

4    contributors is sent onto the high sensitivity group, right?

5       *A*    That's correct.  It depends on the sample whether or

6    not it will go forward for high sensitivity testing.

7       *Q*    But this was a decision that was made that this stuff

8    would be sent forward for high sensitivity evaluation?  Yes?

9       *A*    Yes.

10      *Q*    Okay, just in the postmortem kit what are one of the

11   things -- would it be fair to say in general -- and I will ask

12   you one of the things that comes in a postmortem kit is the

13   underpants or panties of the victim?  Is that right?

14      *A*    Yes, kits can receive -- come with clothing from the

15   victim such as underwear.

16      *Q*    And, in fact, in this specific case those were received

17   by your office; is that right?

18      *A*    There was underwear in the Sexual Assault Kit.

19      *Q*    It was taken out and examined, right?

20      *A*    Correct.

21      *Q*    It was shown some areas were covered by blood, some

22   areas didn't have blood on them?  Is that fair to say?

23      *A*    There were stains on the underwear that did test

24   positive for possible blood.

25      *Q*    Okay, and also I believe possible semen; is that right?

1   **A**   There was no semen.

2   **Q**   Testing was done, not that semen was found, but testing

3   was done?

4   **A**   Right, there was testing for possible semen but it was

5   negative.

6   **Q**   Okay, and then at that point like with all the evidence

7   you get, the underwear wasn't discarded; right?

8   **A**   That's correct, we don't discard evidence.

9   **Q**   It was preserved, right?

10   **A**   Yes.

11   **Q**   Finally, Ms. Philipps, I just want to ask you a few

12   questions about sweat glands, okay.  Is that all right?

13   **A**   Okay.

14   **Q**   You're a forensic biologist, right?

15   **A**   Yes.

16   **Q**   All right, you have some knowledge biology and

17   chemistry of the human body, right?

18   **A**   Correct.

19   **Q**   Okay, I just want to talk to you about sweat glands for

20   a moment.  Okay?

21   **A**   Okay.

22   **Q**   You have some rudimentary knowledge about them that you

23   received through your education and your work, right?

24   **A**   Correct.

25   **Q**   Would it be accurate to say that there are about two or

1    four million sweat glands found across the human body?

2        *A*    I have knowledge in sweat as it relates to our DNA

3    testing.  For example, you can get -- the reason you get a DNA

4    profile is because there is epithelial cells in sweat; but as to

5    how many sweat glands are in the entire body, I do not know the

6    answer.

7        *Q*    That's all right.  Is it fair to say you learned in

8    college, graduate school there are a lot?

9        *A*    That wasn't the scope of my graduate training.

10       *Q*    Okay.  Could it be accurate to say that you learned

11   that sweat glands have a wide distribution across the body?

12       *A*    Again, I was not trained in sweat glands but, yes,

13   there are sweat glands across your body.

14       *Q*    Okay.  In your forehead, right?

15       *A*    Correct.

16       *Q*    In your feet, right?

17       *A*    Correct.

18       *Q*    And in your hands, right?

19       *A*    Yes.

20               MR. KLEIN:  Thank you very much, Ms. Philipps.

21               THE COURT:  Thank you, Mr. Klein.  Mr. Bogdanos.

22               MR. BOGDANOS:  Yes.  Quite brief if I may, your

23   Honor.

24   REDIRECT EXAMINATION

25   BY MR. BOGDANOS:

1    **Q**    Ms. Philipps, you were asked by Mr. Klein about
2  receiving in particular the electrical cord and the broom after
3  receiving the postmortem kit; correct?
4    **A**    Yes.
5    **Q**    Whatever date -- don't look up, March 9th, April 11th,
6  whatever date it was when you received -- when your lab received
7  those items, were they sealed?
8    **A**    Yes, they were received sealed with evidence tape.
9    **Q**    So wherever the electrical cord was in the ME's Office,
10  you know, your other half of your office, wherever it was when
11  you got it, it was sealed?
12    **A**    Correct.
13    **Q**    You were asked about the chart you see before you
14  People's 70 in Evidence and you were asked by Mr. Klein whether
15  or not the Office of Chief Medical Examiner prepared that?  You
16  did not?
17    **A**    That's correct.
18    **Q**    The District Attorney's Office prepared it?
19    **A**    Correct.
20    **Q**    And did you have an opportunity -- in fact did I send
21  you --
22              MR. KLEIN:  Objection.
23              MR. BOGDANOS:  He raised this issue.
24              MR. KLEIN:  Yes.
25              MR. BOGDANOS:  I sent it.  He raised it.

<u>Philipps - Redirect - People</u>                              605

1                  MR. KLEIN:  Please no one should yell at me.

2                  THE COURT:  Relax.  Overruled.  You may continue.

3       *Q*     Did I, in fact, send you a smaller version of this

4    before it was blown up?

5       *A*     Yes.

6       *Q*     And I asked you to review it?

7       *A*     Correct.

8       *Q*     Did you do that?

9       *A*     Yes.

10      *Q*     And, in fact, does this chart accurately summarize your

11   reports?

12      *A*     Yes, it is a summary of the results.

13      *Q*     And the headings, in fact, are your language; the

14   language that you use?

15      *A*     Yes.

16      *Q*     The excluded -- cannot be excluded, could be included,

17   or the is consistent language that's your language?

18      *A*     Yes.

19      *Q*     Your findings or Mr. O'Connor's findings from High

20   Sensitivity?

21      *A*     Correct.

22      *Q*     You were asked by Mr. Klein about PM2C4, the swab from

23   Helen Abbott's right breast and in fact on PM2C4 --

24                  MR. BOGDANOS:  May I just put it up for a moment,

25      Judge?

```
 1                THE COURT:  Yeah.
 2                MR. BOGDANOS:  Thank you.
 3     Q    PM2C4 you can't exclude --
 4                MR. KLEIN:  Judge, this is redirect.  Let's do
 5     direct, please.
 6                THE COURT:  Would you swivel it around so she
 7     could see.
 8     Q    On PM2C4, the swab from the right breast, you can't
 9     make any conclusions as to the profile of the minor contributor?
10     A    That's right.
11     Q    Now with regard to PM2C2 --
12                MR. BOGDANOS:  You can leave it up for a moment.
13     A    Yes, the minor contributor was able to be deduced out.
14     Q    It's Mark Richardson, Male Donor A?
15     A    Correct.
16                MR. BOGDANOS:  And so I would ask you should be
17     shown People's 69 in Evidence.
18     Q    If you look at D7 --
19                MR. BOGDANOS:  May I approach, Judge?  My eyes are
20     really -- I can't see from there.  Thank you.
21                THE COURT:  Go ahead.
22     Q    If you look at D7, you see the dried secretion at D7 as
23     alleles 8 and 10 yet Mr. Richardson at D7 as alleles 11 and 12.
24     How can that be Mr. Richardson in -- how can Mr. Richardson had
25     contributed to that mixture?
```

1      **A**    For this mixture it was a sample taken from the
2    victim's left breast; so it's not surprising that she would be
3    the major contributor or the person that would donate most DNA
4    to the sample.  There was a minor contributor present that was
5    able to be deduced out; but since they are minor, it is not
6    surprising that at some locations you can't make the
7    determination of their DNA profile because there is either not
8    enough DNA present or, for example, a location like D7, we have
9    locations that are a larger amount of DNA; so with the sample
10   like that it is not surprising to see drop outs or you're only
11   going to get a partial profile of an individual; but for the
12   male donor that we were able to deduce out, you can give the
13   statistics of one in approximately eighteen billion people and
14   when you make that comparison to Mark Richardson, the deduction
15   that was able to be made Male Donor A is matching up at all the
16   locations to Mark Richardson where he is deduced.
17     **Q**    And with regard to D18, there again at D18 for the
18   secretion there is only three alleles, correct?
19     **A**    Correct.
20     **Q**    That -- three alleles that you could find or call as
21   you say?
22     **A**    Right.
23     **Q**    It doesn't mean that's the only alleles at that
24   location?
25     **A**    Correct.

1  *Q*   And would your answer then be the same as it was D7,

2  there is 18 at that location for Mark Richardson that you

3  couldn't call in the secretion?

4  *A*   Yes, so for the same reasons it is not unlikely to have

5  a partial profile from a minor contributor in a sample that is

6  intimate to the victim, so it's at times you can't make a full

7  deduction.

8  *Q*   Got it.

9        And the secretion PM2C2 on the left breast, you already

10 told us -- but and I am not asking you to repeat it -- that this

11 is male amylase.  How long would the male amylase would have

12 stayed on Helen Abbott's left breast?

13                MR. KLEIN:  Judge, I believe it's -- well --

14                MR. BOGDANOS:  I am sorry.

15                THE COURT:  Is that an objection?

16                MR. KLEIN:  No.

17                THE COURT:  All right.  Can you answer that one?

18 *A*   Well for amylase it is known to degrade or breakdown

19 over time.  I can't give a specific time frame of how long you

20 would expect it to remain on the body; but again it will

21 breakdown with time and if the environment isn't conducive to

22 saving it, if it's raining or it's very warm, then it's less

23 likely that you will find amylase on an item.

24 *Q*   Would it have remained through a shower?

25 *A*   Highly unlikely.

1    *Q*    So certainly can you say then it would not have -- it
2    would not have remained beyond the last -- Helen Abbott's last
3    shower?

4    *A*    It's possible but again that's highly unlikely it would
5    remain.

6    *Q*    Would a time frame of approximately two days be --
7    sound right within your science as to amylase staying on
8    Helen Abbott's left breast?

9    *A*    That sounds like a legitimate time frame but again I
10   can't pinpoint an exact date.

11                   MR. BOGDANOS:  Thank you.  Nothing further.

12                   MR. KLEIN:  Nothing.

13                   THE COURT:  Ms. Philipps, that completes your
14        testimony.

15                   THE WITNESS:  Thank you.

16                   (Witness exited the courtroom.)

17                   THE COURT:  Mr. Bogdanos.

18                   MR. BOGDANOS:  Yes, the People next call to the
19        stand Mr. Craig O'Connor.

20                   THE COURT:  Thank you.

21                   (Witness enter the courtroom.)

22   C R A I G   O' C O N N O R , called as a witness by and on behalf
23        of the People, having been first duly sworn and/or affirmed,
24        testified as follows:

25                   THE WITNESS:  I do.

```
 1              THE COURT OFFICER:  If you could just have a seat,
 2      please.  Just pull your chair a little bit up to the
 3      microphone.  State your name for the record and spell your
 4      last name.
 5              THE WITNESS:  Craig O'Connor, O apostrophe
 6      C-O-N-N-O-R.
 7              MR. BOGDANOS:  May I inquire, your Honor?
 8              THE COURT:  Yes, you may.
 9  DIRECT EXAMINATION
10  BY MR. BOGDANOS:
11      Q    Good afternoon, Mr. O'Connor.
12      A    Good afternoon.
13      Q    Sir, where do you work?
14      A    At the Office of Chief Medical Examiner in New York
15  City in the Department of Forensic Biology.
16      Q    And how long have you worked for the Office of Chief
17  Medical Examiner altogether?
18      A    A little over three (3) years.
19      Q    And what are your specific responsibilities within the
20  office?
21      A    My current title is Criminalist Level II.  I am
22  responsible for the day-to-day examination of crime scene
23  evidence, evidence from crimes such as homicides, sexual
24  assaults, assaults and property crimes; processing of that
25  evidence, looking for the presence of DNA, and DNA testing,
```

1   writing reports, and testifying in court.

2       *Q*      And do you work within a specific group or unit within

3   the -- within Forensic Biology?

4       *A*      Yes, depending on the case type, we have different

5   groups that are responsible for doing different types of cases.

6   At the laboratory I'm currently what is known as the High

7   Sensitivity Group.

8       *Q*      Would you tell the jury please your educational

9   background that qualifies you for your current position.

10      *A*      I have a Bachelors of Science in Physiology and

11  Neurobiology; a Masters of Science in Genetics and a PhD. in

12  Genetics from the University of Connecticut.

13      *Q*      And would you also tell the jury any training you've

14  had in addition to your education that qualifies you for your

15  current position?

16      *A*      Each analyst that's hired by the Department of Forensic

17  Biology has to go through a training process, which includes a

18  number of training lectures, a number of written questions, an

19  oral examination, and also a series of competency tests.  These

20  are basically tests that we have to do for each procedure that

21  we do in a laboratory.

22          We are given a set of samples which we don't know the

23  answers to, which we have to process as if they are case work

24  samples.  Then our supervisor will review the results; make sure

25  that we pass.  We are responsible for passing each competency

1    test before we are allowed to perform those experiments and

2    procedures on case load samples.

3        *Q*    Did you take and pass all of those?

4        *A*    Yes, I have.

5        *Q*    And can you tell the jury approximately how many -- how

6    many different times you have conducted evidence examination in

7    the Office of the Chief Medical Examiner?

8        *A*    At this point hundreds.

9        *Q*    Can you tell the jury approximately how many times you

10   have either developed or supervised or assisted in the

11   development of DNA profiles?

12       *A*    Again hundreds.

13       *Q*    Have you ever testified as an expert in DNA profiles,

14   DNA analyses, and DNA examination and comparison?

15       *A*    Yes, I have.  This is my fifteenth time.

16       *Q*    And in what courts?

17       *A*    I have testified in grand juries and Supreme Courts in

18   all five boroughs of New York City including Nassau County, in

19   Long Island, and also Tolland County, Connecticut.

20              MR. BOGDANOS:  Your Honor, I will offer

21       Mr. O'Connor as an expert in the field of forensic biology

22       specifically.

23              MR. KLEIN:  Yes.

24              MR. BOGDANOS:  All the DNA analysis, comparison,

25       evaluation, and examination.

1          MR. KLEIN:  Yes.

2          THE COURT:  Thank you.  The application is

3    granted.

4     *Q*    Do you work in the same office as Ms. Sarah Philipps?

5     *A*    Yes, I do.

6     *Q*    And in the same Forensic Biology Department?

7     *A*    Yes, we are actually in different groups though.

8     *Q*    Okay, you are in High Sensitivity?

9     *A*    Correct.

10    *Q*    The jury has heard much -- and I hope you won't be

11   offended but we are going to skip forensic, the definitions of

12   forensic science, forensic biology, DNA alleles, loci.  You are

13   okay with skipping all of that?

14    *A*    That's fine.

15    *Q*    We will go right to High Sensitivity.  Can you explain

16   to the jury what that means and why it's different from what

17   Ms. Philipps does.

18    *A*    Well, High Sensitivity DNA testing as the name implies

19   is a more sensitive way of doing your traditional DNA testing;

20   and we would perform High Sensitivity testing on items that we

21   receive which we expect to have more amounts of DNA so when you

22   get in something that has body fluids such as a blood stain or

23   semen stain or a saliva stain there is a lot of cells that are

24   in there; and, therefore, you expect to question a lot of DNA;

25   but when items come in that don't have body fluids, that you

1    would only expect to find a limited number of skin cells as

2    if -- such as a cup or a pen or the knife or a handle, this is

3    going to have much less levels of DNA; therefore, we would send

4    it for High Sensitivity testing in order to try to recover as

5    much DNA as possible.

6          The procedures and experiments that we perform are

7    exactly the same as you would perform on -- with your regular

8    testing on the body fluids except we increase the sensitivity to

9    try and get as much DNA as possible.

10   *Q*    Apart from that increased sensitivity that you are

11   talking about, the safeguards are the same; protocols are the

12   same; the level of review -- peer review and administrative

13   review are exactly the same?

14   *A*    Yes, everything is the same.  It's just that there is a

15   couple of steps in the process that are modified in order to

16   increase the sensitivity and again recover as much DNA as we

17   can.

18   *Q*    You indicated a moment ago that when you have bodily

19   fluid such as blood or semen, you wouldn't send that item for

20   High Sensitivity testing?

21   *A*    No, because again you'd -- there is a lot of cells that

22   even in a very, very small spec of blood or very small spec of

23   semen or saliva, there is going to be a lot of cells that are in

24   there; and in turn get a lot of DNA recovered so, therefore, we

25   would send that along, the regular processing in order to do

1    testing.

2        *Q*    Now, when you are in High Sensitivity, are you subject

3    to the same requirements of record keeping as the rest of the

4    Forensic Biology Department?

5        *A*    Yes, we are.

6        *Q*    And are you required to document every single step of

7    the process?

8        *A*    Yes, we are.

9        *Q*    And to record those results?

10       *A*    Yes, we are.

11       *Q*    And are you or anyone in High Sensitivity required to

12   record those results at or near the time of the testing or the

13   events themselves?

14       *A*    Yes.

15       *Q*    Are you required to do that accurately?

16       *A*    Yes, we are.

17       *Q*    As a part of your official duties?

18       *A*    Yes.

19       *Q*    Are you required then to maintain those records and

20   charts as part of your official duties as a member of the Office

21   of the Chief Medical Examiner for New York City?

22       *A*    Yes.

23              MR. BOGDANOS:   I would ask that this file be

24       handed and marked 72 for Identification and handed to

25       Mr. O'Connor.  For the record DNA file 418 labeled LCN.

1              (Handing.)

2      *Q*    Please take a look at that file.

3              MR. KLEIN:  No objection to being admitted.

4              THE COURT:  Thank you.

5      *Q*    Are those -- are those the files pertaining to this

6      case produced, prepared, and maintained by the High Sensitivity

7      Unit of the Forensic Biology Department of the Office of the

8      Chief Medical Examiner?

9      *A*    Yes, this is a certified copy of the files that were

10     maintained by the group.

11     *Q*    If at any point you need to refer to -- withdrawn.

12             Are you aware of other testing that was done in this

13     case outside of the High Sensitivity Unit?

14     *A*    Yes.

15     *Q*    So if you are asked any question that requires either

16     the records prepared by High Sensitivity or records prepared by

17     the rest of the office, just ask for a particular file.  They

18     are all in Evidence.  Okay?

19             THE COURT:  Yes, and 72 is in Evidence now too.

20             MR. BOGDANOS:  Thank you, Judge.

21     *Q*    And, in fact, did you -- I suppose I should have asked

22     you this first.  Sorry.  Did you receive an assignment of

23     relevance to this case and this jury?

24     *A*    Yes.

25     *Q*    And that is the homicide of Helen Abbott?

*Penelope Messina, RPR*
*Senior Court Reporter*

1   **A**    Yes.

2   **Q**    If I could jump right to People's 70, what has to be

3   placed up there 70 in Evidence.

4            MR. BOGDANOS:  Didn't we have a way of doing it

5   Thursday.

6            THE COURT OFFICER:  We could use the easel if you

7   want.

8            MR. BOGDANOS:  Perhaps, the easel will be best.

9   Thank you.

10  **Q**    Mr. O'Connor, taking a look at People's 70 you have

11  seen that before?

12  **A**    Yes, I have.

13  **Q**    And you haven't prepared that, right?

14  **A**    No, I did hot.

15  **Q**    That's prepared by the District Attorney's Office?

16  **A**    Yes, it was.

17  **Q**    Was it prepared based on reports written by the Office

18  of the Chief Medical Examiner?

19  **A**    Yes, it was.

20  **Q**    And, in fact, the headings are your headings, headings

21  that you said were the four findings with regard to DNA?

22  **A**    Yes.

23  **Q**    Do you need any additional time to examine this chart?

24  **A**    No, I do not.

25  **Q**    And does this chart fairly and accurately -- and we are

1   just going to limit your -- what you did or what your unit

2   did -- does it fairly and accurately summarize all of the items

3   your unit tested and the findings your unit determined within

4   these four headings?

5       **A**   Yes, it does.

6       **Q**   If you could start then with that chart, start right at

7   the top and tell us which items are yours for lack of a better

8   way of saying it, which items your unit tested?

9       **A**   The items that were sent to the High Sensitivity group

10  for testing include the fourth row down, the clear glass lamp

11  and broken cord.  Then down at the bottom about six rows up the

12  left fingernail scrapings, and then the very last row the brown

13  wallet and swab.

14      **Q**   So if --

15          MR. BOGDANOS:  With the Court's permission, may I

16  approach, Judge?

17          THE COURT:  Yes.

18      **Q**   What I will do, I will write out HS for High

19  Sensitivity in the left column indicating the ones you just

20  said.  So you said the lamp?

21          THE COURT:  Careful now.

22          MR. BOGDANOS:  Yeah, I know where this is going.

23      **Q**   Lamp?

24      **A**   Correct.

25      **Q**   I will write HS on the lamp as well.

1    *A*    Correct.

2    *Q*    Fingernail scrapings yes?

3    *A*    The left fingernail scrapings, yes.

4    *Q*    What about fingernail clippings?

5    *A*    No.

6    *Q*    What's the difference between fingernail clippings and

7    fingernail scrapings?

8    *A*    It depends on how they are taken from the -- either the

9    medical examiner in a homicide or if it's a nurse or somebody

10   that would take it at a hospital.  Usually the clippings would

11   be clippings of the nails themselves whereas a scraping

12   typically it's a little wooden stick with a point at the end

13   that is used to scrape underneath the fingernail.

14   *Q*    And the brown wallet and swab?

15   *A*    Correct.

16   *Q*    Anything else on this sheet from you -- on this chart

17   from you?

18   *A*    No.

19   *Q*    Got it.

20          MR. BOGDANOS:  If we could leave that up there,

21   please.

22   *Q*    Going to the clear glass lamp with the broken cord and

23   the swab, can you please tell us your findings.

24   *A*    Yes.  Well, we received the lamp itself; and the lamp

25   also had a cord on it that was at the base of the lamp on the

1   bottom; and along with that we received two swabs from NYPD of

2   locations on that lamp as well; so if we start with the lamp,

3   which was sampled by our group, examined by our group, samples

4   were taken from the neck of the lamp, from the body of the lamp,

5   and then also from the base of the lamp down at the bottom; so

6   from the neck of the lamp, there was a mixture of DNA that was

7   found from at least two individuals so we know it was more than

8   one person.

9           The actual contributors to that sample could not be

10  determined.  There just wasn't enough information for us to pull

11  out a one single DNA profile but it was used for direct

12  comparison only.  We compared the DNA profile of Helen Abbott to

13  that mixture, and she could not be excluded as a contributor to

14  that mixture.

15      *Q*   And what could you stay about the minor contributor?

16      *A*   Again we weren't able to pull out any source of

17  contributors so we weren't able to say what if a DNA profile was

18  there from a minor contributor as well.

19      *Q*   Okay, please, that's the neck?

20      *A*   Correct.

21      *Q*   So go to the body.

22      *A*   Then the body of the lamp again was examined by our

23  group.  There was again a mixture of DNA.  That was found at

24  this time from at least three (3) people.  Again similar to the

25  neck, the body, the individual contributors to this mixture

1   cannot be determined; so we weren't able to actually pull out a

2   single DNA profile; but we did use it for comparison purposes.

3          In this instance Helen Abbott could be a contributor to

4   this mixture based on the DNA that we saw from her profile we

5   were seeing at every location in the mixture as well so she

6   could be a contributor.

7   **Q**    So if she is a contributor, there are at least how many

8   minor contributors in that mixture?

9   **A**    If she could be a contributor to this mixture and it is

10  a mixture of at least three individuals, you could say that

11  there was at least two other individuals in this mixture.

12  **Q**    And then the base, please.

13  **A**    The sample that was taken from the base of the lamp

14  High Sensitivity testing was done on that sample; however, there

15  were no conclusions that could be made.  There just wasn't

16  enough information there for us to make any conclusions about

17  that sample.

18  **Q**    And what about the swab?

19  **A**    There were two swabs that were taken from the lamp --

20  excuse me -- there were two swabs that were sent to us from the

21  NYPD that were taken from the lamp.  One was from -- was called

22  swab S1 from B/I/S on base.  No DNA was found on that sample so

23  there are no conclusions or anything that could be done because

24  no DNA was found.

25         The other swab S2 from the last tier by base, there was

1  a mixture of DNA on that sample.  This time from at least two

2  individuals again similar to the other samples from the lamp.

3  The individual contributors could not be determined; so we

4  weren't able to pull out any single DNA profile but again we did

5  do a direct comparison to that sample.  In this instance

6  Helen Abbott could be a contributor to that mixture as well.

7      *Q*    If you were not able to determine any additional

8  profiles how is it you were able to exclude from the lamp and

9  swab Mark Richardson, Sidney Gotler, and Male B?

10     *A*    Well, although we weren't able to pull out a single DNA

11  profile, we can still do direct comparison to that mixture; so

12  what we do is we take any comparison samples that we have.  As I

13  said we did that for Helen Abbott.  We also did that for other

14  individuals Mark Richardson, Sidney Gotler, and the profile of

15  Male Donor B and did a direct comparison to the mixture to see

16  if their DNA profiles or their alleles were seen in that

17  mixture; so in this instance since most of their alleles were

18  not seen in the mixture, we can exclude them as contributors to

19  that mixture.

20     *Q*    Despite the fact there is not enough for a profile,

21  there is enough to exclude?

22     *A*    Correct.

23              THE COURT:  Mr. Bogdanos.

24              MR. BOGDANOS:  Moving to --

25              THE COURT:  This might be a good place.  It is one

1    clock.  Sorry to cut you off.

2                 MR. BOGDANOS:  Yes, Judge.

3                 THE COURT:  Ladies and gentlemen, we do have one

4    more calendar case we have to attend to and we will resume

5    the trial at 2:30.  You may all step out side.  Please do

6    not discuss the case.  Come back at 2:30, please.

7    Mr. O'Connor, you are excused.

8                 THE WITNESS:  Thank you.

9                 (Jury exited the courtroom.)

10                (Witness exited the courtroom.)

11                (Luncheon recess.)

12                (Transcript continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

DIRECT/O'CONNOR/PEOPLE

1  T-5 - Peo. V Mark Richardson, Ind. #3534/08

2  September 19, 2011:

3                THE COURT:  Are we ready.

4                MR. BOGDANOS:  Yes, Judge.

5                THE COURT:  Mr. Klein, ready?

6                MR. KLEIN:  Yes.

7                THE COURT:  Okay.  Let's check on the jury, see

8  if they are all there.

9                (The jury enters the courtroom.)

10                THE COURT CLERK:  Case on trial continued.  The

11  people of the State of New York against Mark Richardson.  The

12  defendant, his attorneys, and the assistant district attorney

13  are present.  Both sides stipulate that all jurors are present

14  and properly seated.

15                MR. BOGDANOS:  Yes.

16                MR. KLEIN:  Yes.

17                THE COURT:  Thank you.  And good afternoon,

18  ladies and gentlemen.  We will now continue with the testimony

19  of Mr. O'Connor.

20                MR. BOGDANOS:  Thank you, Judge

21  CONTINUED DIRECT EXAMINATION

22  BY MR. BOGDANOS:

23     Q.    I think we were up to the fingernail scrapings on

24  People's 7.  Could you put that back up on the easel.  Thank

25  you.  So, Mr. O'Connor, good afternoon.

Glenn J. Merola, Sr. Court Reporter

DIRECT/O'CONNOR/PEOPLE

1      A.    Good afternoon.

2      Q.    When we broke you had just finished talking about the

3   lamp and you were about to start with the fingernail

4   scrapings.  If you could, please tell us the findings on the

5   left fingernail scrapings, please?

6      A.    The sample from the left fingernail scrapings that

7   were done through the High Sensitivity Group yielded a

8   mixture.  Again, that's DNA of more than one individual.  And

9   in this instance it was a mixture of at least two people.

10  Helen Abbott was included in that mixture.  And so assuming

11  that she was a contributor to that mixture she was included.

12         We were able to pull out second profile, this being

13  of a male individual, which we call Mailed Donor C, it was a

14  partial profile that we were able to pull out but we did see

15  Helen Abbott was included in this mixture as one other

16  contributor and also Male Donor C was in this mixture.

17     Q.    And so we're clear, the left fingernail scrapings,

18  they are the left fingernail scrapings of Helen Abbott?

19     A.    Correct.

20     Q.    So you would expect to see her?

21           MR. KLEIN:  Objection.

22     Q.    Would you expect to see her?

23           THE COURT:  Overruled.  You may answer?

24     A.    Yes.  This is a sample coming from her body you would

25  expect to see her in that mixture.

Glenn J. Merola, Sr. Court Reporter

DIRECT/O'CONNOR/PEOPLE

1    Q.    And is this Male C a major or minor contributor?

2    A.    Umm --

3    Q.    If you can say.

4    A.    In this instance we were unable to say who was the

5    major and who was the minor based on the amount of DNA that was

6    seen in the sample.  So, in circumstances like this, because it

7    is a sample from an individual we call this an intimate

8    sample.

9          Since it's from the fingernails of Helen Abbott, we

10   are able to say that, since it's a sample from her, and we can

11   include her in the mixture, we assume that she's in this, and

12   from then, from there we're able to determine the second

13   profile from there.

14   Q.    And turning to the excluded section, even though you

15   weren't able to determine major, minor, and you had to assume

16   that Helen Abbott was a contributor, were you still able to

17   exclude all of the people that are listed here in this box that

18   I am pointing to under the excluded section?

19   A.    Yes.  From the profile, the DNA result from the

20   mixture, we were able to do comparisons of samples that we had

21   from other individuals, Mark Richardson, Sidney Gotler, Anthony

22   Hall, Edmond Santiago, Javier Vega, the two police officers,

23   and then also the other profiles that we had developed, we did

24   compare that to the mixture from the left fingernail scrapings

25   and they all can be excluded as contributors to that mixture.

Glenn J. Merola, Sr. Court Reporter

DIRECT/O'CONNOR/PEOPLE

1    Q.   But we're talking about the left fingernail

2   scrapings.  What were you able to determine from the right

3   fingernail scrapings?

4    A.   Those were not done.  High Sensitivity testing was

5   not done on that sample.

6    Q.   And then moving to the clippings -- withdrawn.  You

7   didn't do the clippings.  Go right to the brown wallet, if you

8   would, please, and the swab, and tell us the tests that were

9   done and then conclusions thereon?

10    A.   We received a brown wallet which we examined through

11   the High Sensitivity Group.  We also received a swab from the

12   NYPD of that wallet.  Both the swab that was received from the

13   NYPD and the brown wallet itself yielded mixture of DNA for

14   each one of the samples, for both of them, it was a mixture of

15   at least two people.

16        So the sample that was taken from wallet itself and

17   also the swab was a mixture of two individuals for both

18   samples.  The major contributor, the person whose DNA was there

19   the most, was Helen Abbott, and the minor contributor could not

20   be determined.

21    Q.   Now, assume, if you will, that this jury has heard

22   evidence that -- withdrawn.  I'm sorry.

23        MR. BOGDANOS:  May I approach again, Judge?  I'm

24   sorry to keep doing this.

25    Q.   Again, let's go to the exclusion box.  And you see in

Glenn J. Merola, Sr. Court Reporter

DIRECT/O'CONNOR/PEOPLE

1   the exclusion box one of the individuals is then Police Officer

2   Fabrizi, and  he's excluded from -- his DNA is excluded from

3   the wallet, right?

4       A.    Correct.   DNA profile from Police Officer Fabrizi was

5   compared to the mixture on the wallet and he can be excluded as

6   contributor.

7       Q.    Assume for purposes of this question, that this jury

8   has heard testimony from Police Officer Fabrizi himself, that

9   he actually, as a rookie, picked up that wallet from a bed with

10  his bare hands, went through the wallet, looking through

11  papers, and then put it down again, yet his DNA is not on

12  there.  Can you explain that?

13      A.    Well, the amount of DNA that is left on an object and

14  also the ability of us to detect that DNA, there's several

15  circumstances that will affect whether or not we will be able

16  to take the DNA and whether or not it will be left on the

17  surface.

18            Depends on the type of surface, whether it's a smooth

19  surface, a rough surface, is going to affect the amount of DNA

20  left.  The amount of skin cells that a person may sluff off

21  their hand that may be left on the item itself may be a big

22  determination.

23            If somebody washed their hands prior to touching it

24  that's going to affect the amount left on it.  How rough or how

25  easily the item was handled.  Was it grasped really hard or

Glenn J. Merola, Sr. Court Reporter

DIRECT/O'CONNOR/PEOPLE

1   only touched lightly.  That would affect the amount DNA that's

2   left.

3          What happened to the item after they touched it?  Was

4   it wiped off?  Was it wet?  How long did it stay there?  All of

5   that is going to affect the amount of DNA that will be

6   transferred on to that item and then also, in turn, affect our

7   ability to detect DNA off that item.

8          So just because somebody touched an item does not

9   mean they well will leave DNA on it.  And even if they do

10  doesn't necessarily mean we will detect it.

11  Q.   So going, specifically now, just the excluded column

12  right down that chart, when you say someone is being excluded

13  from a DNA swab, or a sample, are you telling us that person?

14          MR. KLEIN:  Objection.  He should just say what

15  it means not the district attorney.

16          THE COURT:  Overruled.  You may phrase it as you

17  wish.

18  Q.   Are you telling us that that person in the excluded

19  column didn't touch that item?

20  A.   No.  I have no way of knowing that.  All excluded

21  means is that we were unable to detect that person's DNA in the

22  mixture.  Or on the sample.  Excuse me.

23  Q.   And that's not just in this case that's any case?

24  A.   Yes.

25  Q.   You see on this chart that there is something called

Glenn J. Merola, Sr. Court Reporter

DIRECT/O'CONNOR/PEOPLE

1    a homicide ligature?  Assume for purposes of this question

2    that's an electrical cord.  Are you aware there was an

3    electrical cord that was received by your office in connection

4    with this case?

5         A.    Yes.

6         Q.    Was that electrical cord tested within the High

7    Sensitivity Group?

8         A.    The cord itself when it was first sent for testing

9    was examined by somebody in the High Sensitivity Group.  Again,

10   the way that's determined is based on whether or not we expect

11   there to be a low amount of DNA on the item.

12            Something such as electrical cord would taken skin

13   cells which has lower amount of DNA so that would have been

14   slated to go to High Sensitivity Group.  But once it was

15   examined it was noticed that there was a lot of reddish brown

16   staining which would be indicative, one indication, that

17   possible blood may be on the item so, therefore, it didn't

18   continue along the high sensitivity path it actually went

19   through normal DNA testing.

20        Q.    Well, why not -- this particular electrical cord, why

21   not send it for high sensitivity testing anyway even if it's

22   got a brown reddish stain on it?

23        A.    Body fluid, such as blood in this instance, reddish

24   brown staining, indicates blood on the item.  Again, contains a

25   lot of DNA.  There are a lot of cells in blood and, therefore,

DIRECT/O'CONNOR/PEOPLE

1    would contain a lot of DNA, tremendous amounts more than you

2    would expect from a few skin cells that might be on the cord.

3          So even if it was sent for high sensitivity testing

4    it would be expected that the DNA from the blood would

5    overwhelm any DNA that would have come from the few skin cells

6    that may or may not be on the cord itself.

7    Q.   The jury has also received in evidence People's 71.

8    If I could have that put on the easel.  Thank you.

9          And you seen this chart before as well or at least

10   the form that made the chart before coming to court?

11   A.   Yes, I have.

12   Q.   And were any of these items on this particular chart

13   items that came to you for high sensitivity test or came to

14   your unit for high sensitivity testing?

15   A.   Yes.  The first item there or, excuse me, the second

16   item, swab base of lamp, marked as one, came the our group for

17   testing and no DNA was found on that sample.

18   Q.   And is that it on that?

19   A.   Yes.

20          MR. BOGDANOS:  Thank you.  Nothing further, Mr.

21   O'Connor.

22          THE COURT:  Thank you.  Mr. Klein.

23   CROSS EXAMINATION

24   BY MR. KLEIN:

25   Q.   Good afternoon, Mr. O'Connor.

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

```
 1      A.    Good afternoon.

 2      Q.    You and I spoke before?

 3      A.    Yes, we have.

 4      Q.    About this case?

 5      A.    Yes, we have.

 6      Q.    All right.  General forensic objectives when you are

 7  doing testing is to see if you can identify DNA contributors to

 8  biological samples, right?

 9      A.    Yes.  The objectives are to know or find or, excuse

10  me, identify any biological substances and then eventually

11  attempt to find out who those belong to.

12      Q.    Some samples are considered appropriate for high

13  sensitivity testing, right?

14      A.    Correct.

15      Q.    Or what's called low copy number?

16      A.    Yes.  That's another name.  It goes by low copy

17  number or high sensitivity templet or low templet testing.

18      Q.    All of those?

19      A.    Correct.

20      Q.    High sensitivity low copy number, low templet, yes?

21      A.    Yes.

22      Q.    Be accurate to say that, in general, a human cell

23  contains about six picograms of DNA, is that about right?

24      A.    Yes, on average.

25      Q.    And if you have less than a hundred picograms of DNA,
```

CROSS/O'CONNOR/DEFENSE

1  then the sample is probably more likely to give results with

2  low templet than with normal DCR/DNA testing, would you agree

3  with that?

4      A.   Well, it depends on the laboratory and type of

5  testing.  In our laboratory for high sensitivity testing it's

6  more a process, the entire process as it goes along, would

7  determine whether or not it goes to the high sensitivity group

8  and in the end the amount of DNA that is recovered will

9  determine whether or not it continues along that high

10  sensitivity testing.

11         So, if we do have a sample, which would, after the

12  quantitative stage, which is find how much DNA we have, would

13  yield less than a hundred picograms, in the next step,

14  amplification, then, yes, it would continue along the high

15  sensitivity path.

16      Q.   You use the same methodology that you use by the

17  normal group that Ms. Philipps works with but it's increased

18  for higher sensitivity, yes?

19      A.   Correct.  The process and substances that we use are

20  exactly the same.  It's just that a number or couple of the

21  procedures are modified to increase the sensitivity.

22      Q.   And by increase sensitivity we mean the ability to

23  get results from a smaller sample of DNA that might be possible

24  with the routine testing done by Ms. Philipps group, is that

25  right?

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

1       A.    Correct.

2       Q.    Okay.  But the work you do, is at least as reliable

3  as the work that she does, right?

4       A.    It's exactly the same reliability.

5       Q.    In fact, many of the techniques of low templet or low

6  copy DNA, have actually been developed by the Office of Chief

7  Medical Examiner where you work, right?

8       A.    The techniques, again, are the same techniques that

9  are used in traditional testing, it's just that they are

10 modified to increase sensitivity.

11      Q.    No, I understand.  It's the same, it's just increased

12 sensitivity, right?

13      A.    Correct.

14      Q.    And you do this in your lab, right?

15      A.    Correct.

16      Q.    And the work that you do on loud copy number DNA is

17 some of the most advanced work that's actually done in this

18 country, is that fair to say?

19      A.    Yes.

20      Q.    In fact, many of the techniques that you have been

21 able to develop while you use them in your lab hasn't yet been

22 used in many other labs in the country, is that correct?

23      A.    Correct.  Currently we're the only forensic lab that

24 does high sensitivity testing.

25      Q.    Correct.  You have more advanced technology than

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

1    actually even the FBI does in D.C.?

2       A.    I wouldn't say necessarily more advanced but we do

3    this type of testing where as the FBI doesn't do it.  This type

4    of testing has been done overseas in a number of countries as

5    well.

6       Q.    It's not used with every piece of crime scene

7    evidence that's recovered in New York, right?

8       A.    Correct, it's not.

9       Q.    But it's will be used in homicide cases, for example,

10   if there's a belief that the work may yield relevant results,

11   right?

12      A.    Yes.  Depends on the item that's received and

13   circumstances.  But if we expect there to be a low amount of

14   DNA on that evidence then it would come to our group.

15      Q.    For example, low templet or slow copy number DNA is

16   believed to be appropriate to use when, for example, you may

17   have an object that no biological fluids were left on it but

18   someone may have simply touched the object, is that fair to

19   say?

20      A.    Correct.

21      Q.    Okay.  Where you maybe looking for just skin cells,

22   epithelia cells and not blood, semen, saliva, something like

23   that, right?

24      A.    Correct.

25      Q.    Where skin cells may have been deposited on the item

Glenn J. Merola, Sr. Court Reporter

1  by the mere touching of the item?

2       A.    That is one way skins cells may have gotten on to

3  that item by touching it.

4       Q.    It's accurate to say that method is used in your lab

5  by various touch items, right?

6       A.    Yes.

7       Q.    Such as weapons, right?

8       A.    Yes.

9       Q.    Or staplers and drawer handles, right?

10      A.    Yes.  We had variety of evidence that has been sent

11 to our laboratory for testing and examination which we would

12 expect to have low amount of DNA.

13      Q.    In fact, in your lab even clothing has been examined

14 by your lab to see who may have touched the clothing, correct?

15      A.    Yes, that's is correct.  Depending on the

16 circumstances we have been able to develop profiles from outer

17 clothing that may have been touched by somebody.

18      Q.    Now, with regard to clothing, would it be accurate

19 the say that prior to the advent of low templet DNA that you

20 developed in your lab, your lab could generally only determine

21 whether a given individual was the wearer of clothes, is that

22 right?

23      A.    Well, it would depend on the circumstances.  But for

24 the most part most of the clothing that has been examined prior

25 to the sensitivity testing was looking for bodily fluids or the

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

1   wearer of that item.

2       Q.   All right.  But now with the development of low copy

3   number, low templet testing, you can now at times determine not

4   only the wearer of the clothing but who else may have simply

5   touched the clothing, is that a fair statement?

6       A.   It depends on the area that we're looking at, the

7   information that we have received regarding that item, and the

8   locations that may or may not have been touched.  But, yes, we

9   have been able to develop profiles of somebody that may have

10  touched an article of clothing.

11      Q.   Okay.  In fact, in your division, in the last five

12  years, would it be accurate to say that you been able to obtain

13  the DNA from people who may have touched clothing through the

14  examination of shirts, sweatshirts, and the examination of

15  underpants or panties?

16      A.   Yes.  There have been number of types of clothing

17  that we have done examinations on looking for touched DNA.

18      Q.   By the way, I just want to talk a minute about the

19  swabs that you used in the high sensitivity area of your lab,

20  all right?  Is that okay?

21      A.   Yes.

22      Q.   Your lab has actually developed that certain kind of

23  swab to use for high sensitivity training, is that right?  High

24  sensitivity examination, is that right?

25      A.   Yes.  We have patent pending on the swabs that

CROSS/O'CONNOR/DEFENSE

1    actually -- that are sort of material that are used in -- they

2    are different than the typical swabs that may be used by high

3    templet testing or other laboratories.

4           The swabs that we're using, and that has patent

5    pending, we developed that.  It collects and able to collect

6    more DNA and also the ability to release that DNA increase,

7    therefore, it gives us the ability to detect more DNA and make

8    it more sensitive.

9    Q.   Because you may be dealing with a swab that's

10   collecting from a touch item or somebody may have just left a

11   couple of skin cells, right?

12   A.   Yes. Mostly items that are looked at and that we use

13   that swab are on items that we expect to have low amounts of

14   DNA from a couple of skin cells.

15   Q.   And you want the best possible swab for the maximum

16   absorption of DNA because you know you may be only able to get

17   a couple of cells off a touched item, correct?

18   A.   We want the swab to collect as much DNA possible.

19   Q.   And you want to have the maximum ability to release

20   the DNA from the swab itself?

21   A.   Yes.  Once the swab is used to collect a sample then

22   it goes into a tube and various chemical are added to it in

23   order to break up the cells and release the DNA.

24   Q.   Okay.  Now, with regard to any item that you are

25   going to examine, eventually comes into your lab, right?

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

1      A.    Yes.

2      Q.    And you hope to receive it in the same condition in

3  which it was recovered at the crime scene, is that right?

4      A.    Well, the condition that the item is received in we

5  really don't know what the condition was at the crime scene.

6  It's just the condition when we receive it is the condition

7  that it's in.

8      Q.    And then you have an item that you are going to

9  examine for touched DNA you then make a determination as to

10  what areas of the item may have been touched by someone who

11  touched it, is that fair to say?

12      A.    Yes.

13      Q.    It's kind of common sense?

14      A.    Yeah.  Depending on the items we look at it and look

15  to see where an individual may have touched that item or the

16  best location to look at for somebody that may have touched

17  it.

18            So, for instance, we have a coffee mug, you go after

19  the handle, more likely that somebody would grab from the

20  handle then the very bottom of the cup.

21      Q.    All right.  So you didn't do the -- the actual

22  examination of the lamp in question, you didn't do, right?

23      A.    I myself did not do it.  It was done by another

24  annalist at the laboratory at that time.  She no longer works

25  at the laboratory.

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

1      Q.    But you know who she is?

2      A.    Yes.

3      Q.    And we can rely on her examination notes to

4  understand what she did, right?

5      A.    Correct.  She was annalist at the time.  She went

6  through all the same training and tests that every annalist has

7  to go through in order to do examination on crime scene

8  evidence.

9      Q.    By the way, one of the things she also does is, she

10  would have taken a photograph of the object as it appeared when

11  it was first received in your lab, right?

12      A.    Yes.  During the examination process it's routine

13  that routinely items are photographed during examination.

14      Q.    And you actually have that picture here?

15      A.    Yes.  It's in the case file.

16      Q.    And it's a picture of the way it came in, wrapped up,

17  right?

18      A.    Yes.  If you look on page two of the DNA case file

19  there is a picture of the lamp itself as it was received

20  packaged.

21      Q.    And then there's also a picture how it's received

22  once it's unpackaged by the DNA annalist, right?

23      A.    Correct.

24      Q.    Okay.  And be accurate to say that the object itself

25  came in March of '08, is that right?

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

1       A.      The lamp itself?

2       Q.      Yeah.  Not when it was first analyzed.

3       A.      Was received.  Excuse me.  The lamp itself was

4   received by the High Sensitivity Group on September 26th of

5   '08.

6       Q.      I'm sorry.  When it first came into the forensic

7   biology in general?

8       A.      Actually, I would have to refer to the other case

9   file.

10              MR. BOGDANOS:  Yeah, he needs the other case

11  file.

12      Q.      You know, you don't have to tell us.  That's okay.

13  The examination was then done by this annalist, right?

14      A.      Correct.

15      Q.      And the date which she actually unpackaged it, began

16  to do the examination, is noted down on her notes, yes?

17      A.      Yes.  That was September 30th of 2008.

18      Q.      That's when she did the actual examination?

19      A.      Correct.

20      Q.      All right.  Now, she noted that there was a lamp,

21  yes?

22      A.      Yes.

23      Q.      And there was also -- she noted there was broken

24  glass, right?

25      A.      Yes. There are ten pieces of broken glass.

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

1      Q.    And a plastic piece, yes?

2      A.    Yes.

3      Q.    And she also noted then that there was an envelope

4  that was marked AD slash and then two swabs from the NYPD

5  police lab, is that right?

6      A.    Yes.  S1 and S2.

7      Q.    And then that became, at least for her, for the lab,

8  1A became the lamp, right?

9      A.    Yes.

10     Q.    Or at least what section of the lamp made it into

11 your lab, right?

12     A.    Yes.  The lamp that we received was then given the

13 item -- or, excuse me, itemized as item 1A.

14     Q.    And then 1B were ten pieces of broken glass, right?

15     A.    Yes.

16     Q.    And then 1C was a plastic piece, right?

17     A.    That's correct.

18     Q.    Now, and then the swabs, the two different swabs that

19 came in from the NYPD lab, they became 1D and 1E, right?

20     A.    Yes.  Each item that's received we itemize them so we

21 can tell them apart.

22     Q.    Now, you indicated that the lamp itself came wrapped

23 up, right?

24     A.    Correct.

25     Q.    And it came wrapped in evidence packaging that was

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

1   then circled with evidence tape, right?

2        A.   Yes.   From the photograph it looks like there was

3   brown paper that was wrapped around the lamp and then evidence

4   tape which is tape that has evidence written on it was then

5   wrapped around the brown paper in order to keep it wrapped

6   around the lamp itself.

7        Q.   Okay.   Now, with regard to the broken pieces, as far

8   as you know, no one in your office broke the lamp, did they?

9        A.   As far as I know, no.

10       Q.   As a matter of fact, as far as you know, your

11  particular office examined it in the same condition in which it

12  arrived at forensic biology, right?

13       A.   Correct.   The condition that is noted is the

14  condition that it was when the packaging was opened.

15       Q.   By the way, if someone at OCME forensic biology did

16  damage a piece of evidence, if like it fell and broke into

17  parts of pieces, that would be indicated on internal report,

18  right?

19       A.   Not necessarily a report per se but there would be

20  some documentation that the item was damaged either at the time

21  or when it was opened.

22       Q.   That's what I mean.   There would be some kind of

23  documentation.   I'm not saying an official report.   Right?

24       A.   Correct.

25       Q.   That would be done, A, so that in part whoever broke

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

1  it could be spoken to in whatever way they would be spoken to,

2  right?

3      A.    Well, we obviously need to know the condition of the

4  evidence once it's in sour possession so that would be one way

5  of tracking the evidence and what happened to it.

6      Q.    Okay.  Because you do want to know the relevant

7  condition of the item of evidence that you are going to

8  examine, right?

9      A.    Yes.

10      Q.    Okay.  Now, the annalist who actually did this was

11  Scott Hodgson, is that right?

12      A.    Did what?

13      Q.    The evidence examination, is that right?

14      A.    No, that is incorrect.

15      Q.    Who did the actual evidence examination?

16      A.    The annalist is Lauren Liberman.

17      Q.    I'm sorry.  She did the examination of the lamp

18  itself?

19      A.    Correct.

20      Q.    Okay.  And would it be accurate to say that before

21  the lamp was finally analyzed in September there was some

22  discussion with, inside the office of Chief Medical Examiner's

23  forensic biology unit about what to do with the lamp and why it

24  should be tested?

25      A.    Yes.  Once items are received and requested for

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

```
 1   testing, then a supervisor or a scientist personally would then
 2   review the case notes, speak to any detectives or district
 3   attorneys or attorneys, period, if the case determines that
 4   that's necessary in order to determine if an item will be
 5   examined and then how it will be examined.
 6        Q.    And that's actually reflected in the notes that you
 7   have in front of you, right, that discussion?
 8        A.    I'm not sure what you mean.
 9        Q.    If there was a discussion between the detectives, the
10   District Attorney's Office, and the supervisor, about what to
11   do with the lamp or the item of evidence and why it's could be
12   relevant to the case, that's actually, that is documented in
13   the case file, right?
14        A.    If there is a discussion that takes place, a phone
15   call that's made between the NYPD or attorneys are guarding
16   the case and case contact is what we call it, are kept and
17   documented to show that there was a discussion that took place.
18        Q.    And would it's be accurate to say there was a
19   discussion, the lab was informed that the lamp maybe probative
20   because there was a thought that the cord used to strangle the
21   victim probably came from the lamp itself?
22        A.    I am just referring to the case contacts.  Excuse me.
23        Q.    Right.  Looking around September.
24        A.    Yes.  There's a case contact, September 22, 2008,
25   that a discussion was done between one of our supervisors and
```

Glenn J. Merola, Sr. Court Reporter

CROSS/O'CONNOR/DEFENSE

1  an individual from the Manhattan District Attorney's Office.

2      Q.   Right.  Now, there was a discussion that the lab was

3  informed that the lamp could be very probative because it seems

4  that the cord used to strangle the victim probably came from

5  the lamp, that was the supposition, right?

6      A.   Yes.  From the case contacts that's what the

7  conversation was.

8      Q.   It would be accurate to say that it also had appeared

9  that the cord may have been cut and not yanked out of the lamp

10  itself, right?

11      A.   No.  There is nothing in the case contacts that would

12  indicate that.

13      Q.   There isn't --

14      A.   Yes.  I apologize.  I do see that there is a case

15  contact for September 24th of 2008, that does say that another

16  discussion by a supervisor with an individual from the

17  Manhattan District Attorney's Office that says that.

18          (Continued on next page.)

19

20

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

1  CROSS-EXAMINATION CONT'D.:

2      *Q*    Just keep your finger there for a second.  Would it be

3  accurate to say that a supervisor then said that your office

4  would test the lamp in areas where we would think that someone

5  would have held the lamp while cutting the cord?

6      *A*    Yes, it does say that.

7      *Q*    All right.  Cause that's what you then want to do?  You

8  swab the areas that someone may have held that -- it, right?

9      *A*    Yes, we would then examine that item and sample the

10  areas where we would expect someone would have touched it.

11     *Q*    You did -- not you -- the analyst then swabbed the base

12  area, right?

13     *A*    Correct.

14     *Q*    The area around the base, right?

15     *A*    Correct.

16     *Q*    The body of the lamp, right?

17     *A*    Yes.

18     *Q*    And the neck, right?

19     *A*    Yes.

20     *Q*    Those are the areas that appeared likely someone may

21  have been in contact with it, right?

22     *A*    Yes, those were areas that were determined at the time

23  had been possible for somebody to touch it.

24     *Q*    Now, you see on page 3 -- is that page 3 where you

25  actually have the photograph of the lamp?

O'Connor - Cross - Defense                    648

1    **A**    Yes, it is.

2    **Q**    That's a photograph of the lamp as it appeared in your

3    office, right?

4    **A**    Yes, it's a photograph of the lamp -- two photographs.

5    One actually one of the base of the lamp, the underside of the

6    base of the lamp, and one a side view of the lamp once it had

7    been unpackaged.

8    **Q**    The lamp appears to sit right on its base, right?

9    **A**    Correct.

10   **Q**    Now just -- I ask that you -- I am just going to ask

11   you take a look at what's been admitted into Evidence as exhibit

12   28, People's exhibit 28.

13           (Handing.)

14   **Q**    Can you compare that to the photograph that you have.

15   **A**    Okay.

16   **Q**    It's clear there is a difference, right?

17   **A**    Yes.

18   **Q**    It's clear that the bottom glass part of the lamp as it

19   appeared at the crime scene -- assuming the crime scene

20   photographs are accurate -- is no longer there tacked on the

21   lamp once you are examining it -- not you -- but forensic

22   biology is examining it in the lab; right?

23   **A**    Right, that bottom glass part is not in this picture of

24   the item that was taken by the analyst when they examined it.

25   **Q**    As far as you know -- can I have that back -- you have

1  no record of the analyst ever having been given the actual crime
2  scene photograph itself, right?

3      **A**   No, typically we don't get to see crime scene
4  photographs.

5      **Q**   So as far as you know the analyst who was examining
6  this would have no way to know exactly what was the area closest
7  to the base of the lamp when it was at the crime scene -- when
8  the lamp was at the crime scene, right?

9      **A**   Correct, the analyst who had examined it would only
10  know what it looks like once they open up the packaging.

11      **Q**   Now, the analyst did examine the area of the glass that
12  was closest to the base, at least, as it appeared in -- in the
13  photograph that you have on page 3; right?

14      **A**   Yes, that sample was taken from the larger surface area
15  of that lamp and that was what was called the base of the lamp,
16  that sample or excuse me, the body of the lamp.  That was the
17  sample.

18      **Q**   Those were the pieces of glass, the area of the lamp
19  closest to the cord, right?

20      **A**   That was -- the body of the lamp was the -- the largest
21  surface area of the lamp itself, so the glass part that was
22  towards the bottom of the lamp.

23      **Q**   That actually goes to where it hits the base, right?

24      **A**   Correct, the bottom part that would have finally hit
25  the base.

1    *Q*    Okay.

2    *A*    That was included in the sample.

3    *Q*    Four swabs were actually collected from around the body

4  of the lamp, right?

5    *A*    Yes, four swabs were used to sample the body of the

6  lamp and those four were then combined and put into a tube, and

7  that was the one sample from the body of the lamp.

8    *Q*    Two were then collected from the neck of the lamp,

9  right?

10   *A*    Yes, two swabs were used to sample the neck portion,

11  what was determined to be the neck portion of that lamp; and

12  again those two were combined into one sample, which was called

13  the sample from the neck of the lamp.

14   *Q*    And then also the lamp base was swabbed including the

15  area with the broken off cord itself, right?

16   *A*    Yes, three swabs were used to sample the base of the

17  lamp.  Those three were then combined into a sample and there

18  was one swab that was used to swab the cord that was underneath

19  the base, and that was also combined with the samples from the

20  base into one sample that was called swab from base of lamp.

21   *Q*    So you actually had three swabbed groupings to say it

22  colloquially fair enough?

23   *A*    Three samples.

24   *Q*    Three samples?

25   *A*    Three final samples, yes.

O'Connor - Cross - Defense                    651

1    *Q*    You had the lamp neck, right?

2    *A*    Correct.

3    *Q*    You had the lamp base, right?

4    *A*    Correct.

5    *Q*    And then you had the lamp body, right?

6    *A*    Yes.

7    *Q*    Of course, the lamp body was only samples from the body

8    as it had been presented to you in the photograph, right?

9    *A*    The lamp body as it was in the photograph here on page

10   4 was how it was sampled.

11   *Q*    Okay.  In fact if -- if that photograph is -- is

12   accurate the one you have in there, right, and if the crime

13   scene photograph is accurate, okay, then the actual area of the

14   lamp that was closest to the base at the time when it was

15   recovered at the crime scene was contained in the pieces of

16   glass that were provided to your office?  Is that fair to say?

17   *A*    I don't know if I could answer that question.

18   *Q*    Well, take a look at the picture of the pieces of glass

19   that you have there?

20   *A*    The photograph in the case file is accurate as it

21   depicts the item when it was received, and as it was examined.

22   That was the body of the lamp and the part that was closest to

23   the base, that's what was --

24   *Q*    Fair enough but no problem, the ten pieces of glass of

25   loose glass they were also photographed too, right?

1      **A**    Correct, they were.

2      **Q**    Take a look at that, right?  Those appear to be pieces

3   of the lamp also, right?

4      **A**    Yes, they appear to be similar to the glass in the

5   lamp; but since it wasn't on the lamp when we received it there

6   is no way of us to know where those pieces came from.

7      **Q**    Right, and especially since you weren't given a crime

8   scene photograph, right?

9      **A**    Correct.

10     **Q**    Okay, so the pieces of lamp were just looked at and

11  then put into an envelope, right?

12     **A**    Yes, it was determined that they weren't going to be

13  sampled; and then they were retained with the evidence.

14     **Q**    In fact, your office or the analyst who was examining

15  it had no reason to think in any way that those objects should

16  be sampled; did she?

17     **A**    At the time when the item was received it was

18  determined that they wouldn't be sampled.

19     **Q**    There was no -- if you had been given this stuff,

20  right, say you had been given it and you were given a picture of

21  the lamp, right, you wouldn't have sampled the individual broken

22  pieces of glass either, would you have?

23              MR. BOGDANOS:  Objection.  Can he answer it?

24              THE COURT:  He is an expert.

25              MR. KLEIN:  If he can answer it.

```
 1              THE COURT:  Overruled.
 2              MR. BOGDANOS:  Sure.
 3      A   I really don't understand the question.  If I was given
 4   the --
 5      Q   I am sorry, I will try to rephrase it.  Let's say you
 6   were given a lamp that you opened up and you examined it and
 7   that it appeared to be in the condition it is shown in the
 8   picture on page 3, right?
 9      A   Okay.
10      Q   Right?
11      A   Uh-huh.
12      Q   And you are trying to figure out who may have touched
13   the lamp, right?
14      A   Yes.
15      Q   Okay, and then you are also given a bag that has some
16   broken pieces of glass, right?
17      A   (Nod head affirmatively up and down.)
18      Q   Yes?
19      A   Yes.
20      Q   You know that the broken pieces of lamp -- of glass
21   weren't swabbed, right?
22      A   Correct, they weren't.
23      Q   And there was no reason for them to be swabbed, right?
24      A   As the lamp was received and the condition that it was
25   in, it was determined that the lamp itself would be sampled and
```

1    the pieces of broken glass weren't.

2       *Q*    Okay.  Given the information that the analyst had at

3    the time with regard to the condition of the glass, would it be

4    accurate to say they didn't do her job in any sloppy manner in

5    not examining any of the broken pieces of glass; correct?

6       *A*    Correct, it was at that time determined it wouldn't be

7    sampled.

8       *Q*    Okay.  Now in November of 2008 with regard to the lamp

9    you were able to make some DNA determinations, right?

10      *A*    Correct.

11      *Q*    With regard to the body of the lamp you were able to

12   determine that there was a mixture, right?

13      *A*    Yes, from the DNA report, the sample from the body of

14   the lamp was a mixture of DNA from at least three people.

15      *Q*    And you were able to say that Helen Abbott -- if

16   Helen Abbott was one of the contributors assuming she, that

17   Helen was one of the contributors, Male Donor A he was excluded

18   from that area; right?

19      *A*    It was determined that Helen Abbott could be a

20   contributor to that mixture; and then we also compared the

21   profile that was generated for Male Donor A to that sample; and

22   Male Donor A could be excluded as a contributor.

23      *Q*    Okay, now with regard to the neck of the lamp, you came

24   up with a mixture of at least two people, right?

25      *A*    Yes.

1   *Q*   And with regard to that one Helen Abbott couldn't be

2   excluded as a contributor but Male Donor A and Male Donor B was

3   excluded, right?

4   *A*   Yes, Helen Abbott cannot be excluded as a contributor

5   to this mixture.  Male Donor A and Male Donor B were both

6   excluded as contributors.

7   *Q*   Now I want you to just look at for a minute the report

8   that was created on November 28th of 2008, okay.

9   *A*   Excuse me, was this the DNA report of the evidence or

10  the DNA report of from Mark Richardson?

11  *Q*   DNA report of the evidence.

12  *A*   What was the date on that?  I am sorry.

13          MR. BOGDANOS:  November 28th.

14          MR. KLEIN:  I will look but I will try.

15  11/28/ 2008.  Mr. Bogdanos assures us I am right.

16          MR. BOGDANOS:  It's Miss Lieberman's.

17  *Q*   You have that?

18  *A*   Yes.

19  *Q*   Turn to page two of that report.  All right?

20  *A*   Yes.

21  *Q*   Now, it also -- the report comes out on 11/28/08,

22  right?  That's the date of the report?

23  *A*   Yes, that's the date of the report.

24  *Q*   Okay, and would it be accurate to say that it reads as

25  follows:  It discusses swab S2, right?

1      A    Yes, that was one of the samples in the report.

2      Q    And that was S2 from last tier by base.  This was one

3  of the swabs that you actually got from the NYPD, right?

4      A    Yes, it is.

5      Q    All right.  And would it be accurate to say it

6  indicates High Sensitive PCR DNA typing performed on swab S2 in

7  last tier of base.  Indication mixture of at least two DNA; two

8  people?  It says that?

9      A    Yes.

10     Q    It says DNA profiles contributors to this mixture

11  cannot be determined; however, this mixture is suitable for

12  direct comparison; right?

13     A    Yes.

14     Q    It goes onto say Helen Abbott could be one contributor

15  to this mixture, right?

16     A    Yes.

17     Q    And then it goes on to say Male Donor A from reports

18  dated April 8, 2008, and November 21, 2008, cannot be excluded

19  as a contributor to this mixture of DNA, right?

20     A    Yes.

21     Q    And it goes on to say Male Donor B from report dated

22  April 8, 2008, can be excluded as a contributor to this mixture,

23  right?

24     A    Yes, that's correct.

25     Q    But when this report came out in November 28th at least

1   with regard to Male Donor A, it indicated that he couldn't be

2   excluded as a contributor to the mixture on swab S2, which came

3   from the last tier by base?

4   **A**   Yes, DNA profile that was determined from Male Donor A

5   and it the was compared to this mixture, and it was determined

6   that Male Donor A or is concluded -- excuse me -- that Male

7   Donor A cannot be excluded as a contributor to the mixture.

8   **Q**   Cannot be excluded as a contributor to the mixture as a

9   meaning in OCME Forensic Biology, right?

10  **A**   Yes, when we are looking at mixtures and doing

11  comparisons, there are a number of conclusions that we come up

12  with.  If there is just not enough information to make any

13  conclusion we say no conclusions could be determined.  If all of

14  the DNA alleles -- the markers from an individual are seen in

15  this mixture, then they are said to be included and could be a

16  contributor.

17         If most of the alleles is not seen, then that person is

18  excluded as a contributor to the mixture; but if most of the

19  alleles from that individual are seen but not all, one or two or

20  three of them are missing, then they would be said to be cannot

21  be excluded because since not all of them are seen, we can't say

22  that they are included but since most of them are seen, we are

23  not going to say it is excluded.

24  **Q**   Right.  Now, bear with me for a second.  Just I know I

25  am slowing us down but you deal with these concepts all the

1   time; right?

2       **A**   Yes.

3       **Q**   Okay, some of us first time we ever heard of them, all

4   right.  I am just going back over to something I think you just

5   said.  Is that all right?

6       **A**   Yes.

7       **Q**   When you say that Male Donor A cannot be excluded as a

8   contributor to this mixture of DNA, you're not saying no

9   conclusions can be drawn, right?  You are not saying that?

10      **A**   Correct.

11      **Q**   You are saying the conclusions can be drawn, right?

12      **A**   The conclusion that was drawn was that Male Donor A

13  could not be excluded as a contributor.

14      **Q**   That was the conclusion that you came up with at -- not

15  you -- by your office came up with that -- came up with at that

16  time, right?

17      **A**   Yes, in this report that was dated November 20, 2008,

18  (sic) that was the conclusion.

19      **Q**   Okay, given the data you then had available, right?

20      **A**   Correct.

21      **Q**   Now 2011, your office was requested to do additional

22  work, right?

23      **A**   Yes.

24      **Q**   You were asked by the High Copy Number Team; that is,

25  the Ms. Philipps group to examine the fingernail scrapings;

1  right?

2       **A**     Well, the fingernail scrapings were examined by that

3  group and then we were asked to perform high sensitivity testing

4  on that sample.

5       **Q**     Really on the left fingernail scrapings, right?

6       **A**     Correct, the left fingernail scrapings.

7       **Q**     And then you did that evaluation, right?

8       **A**     Yes.

9       **Q**     And you got a mixture of at least two people, right?

10      **A**     Yes.

11      **Q**     One was Helen Abbott, right?

12      **A**     Yes, Helen Abbott was a contributor to the mixture.

13      **Q**     And then you were able to deduce out a partial profile

14  of another individual, right?

15      **A**     Yes, based on assuming that Helen Abbott was a

16  contributor to that mixture, we were able to pull out a second

17  DNA profile of Male Donor C and, yes, it was partial.

18      **Q**     You were able to deduce out the -- the -- the gender of

19  the individual, right?

20      **A**     Yes.

21      **Q**     That it was a male, right?

22      **A**     Yes.

23      **Q**     A male you called Male Donor C, right?

24      **A**     Correct.

25      **Q**     Now, sometimes when you do an analysis of a mixture you

1   can't deduce out a minor contributor, right?

2       *A*    Yes.

3       *Q*    You can't tell us what you believe is the profile of a

4   minor contributor, right?

5       *A*    Yes, that's common with mixtures.

6       *Q*    Because sometimes you just don't have enough data,

7   right?

8       *A*    Most times there are just not enough information for us

9   to pull out a distinct DNA profile of a minor contributor; and

10  sometimes even a major contributor.  Sometimes we are unable to

11  pull out any profile.

12      *Q*    All right, but here you were actually able to deduce

13  from the mixture a number of alleles and able to create a

14  partial profile of the most likely male donor, right?

15      *A*    Correct.

16      *Q*    And you were able to deduce or call or name as part of

17  his profile approximately ten different alleles, right?

18      *A*    Bear with me for one moment.  Yes, referring to page

19  133 of the case file there were ten alleles that we were able to

20  determine that belonged to Male Donor C.

21      *Q*    And you were also able to do work to give a frequency

22  estimate for how frequent that partial profile might be found in

23  the general population, right?

24      *A*    Yes, there was a statistic that was generated based on

25  that profile.

1    *Q*    Tell them, please.

2    *A*    The most likely DNA profile of Male Donor C in this

3    case is expected to be found in approximately 701 -- excuse

4    me -- one (1) in seven hundred eighty-seven thousand (787,000)

5    people.

6    *Q*    All right, Male Donor C never gets identified, right,

7    as far as you know?

8    *A*    Correct.

9    *Q*    Okay.  Now, I just want to talk a minute about the

10   wallet, okay.  You did do an examination of a wallet, right?

11   *A*    Yes.

12   *Q*    And the swab, that appears to have been taken of the

13   wallet before you did your examination of the wallet?

14   *A*    The swab, that was sent to us by the NYPD.

15   *Q*    Okay.  And is it fair to say when you are dealing with

16   touch DNA the more times an item is handled, the less likely you

17   are to get the DNA of any specific person?  Is that fair to say

18   who may have touched it?

19   *A*    Not necessarily.

20   *Q*    You may still get it, right?

21   *A*    Yes, you may.  It's possible to get DNA from whoever

22   touched that item.

23   *Q*    I am not saying it is not possible, but if someone

24   touches an item and then five other people then touch the same

25   item, that can interfere with your ability to get DNA from the

1   first person who touched the item?  Is that fair to say?

2      **A**   Yes, the number of individuals that do touch an item

3   can affect the ability to get DNA from a single individual.

4      **Q**   Okay.  Now, when you were asked to do the new

5   examinations in 2011, okay, were you ever provided with a bra of

6   the victim in this case?

7      **A**   No.

8      **Q**   So it would be accurate to say you were never asked to

9   see if you could find out besides the wearer who may have

10  touched it?  Is that fair to say?

11     **A**   A bra was never examined in this case.

12     **Q**   And when you were asked to do a new examination, were

13  you provided with a belt that had been worn by the victim?

14     **A**   No.

15     **Q**   So it's accurate to say you were never requested to see

16  if you could find out who besides the wearer of the belt may

17  have touched it?  Is that fair to say?

18     **A**   Belt was never examined in this case.

19     **Q**   Okay, and when you were asked to do the new

20  examinations in 2011, were you provided with a pair of

21  underpants collected in the postmortem kit?

22     **A**   No.

23     **Q**   So the high sensitivity group was never requested to

24  see who besides the wearer may have touched those underpants?

25  Is that right?

1       **A**     The underpants were not examined by us.

2       **Q**     But you did do newer examinations in this case, right?

3  Yes?

4       **A**     Correct.  We did the -- excuse me -- we examined the

5  wallet and then also the swab from the wallet.

6       **Q**     You did examinations on the fingerprints, right -- I am

7  sorry not the fingerprints.  You did examination on the

8  fingernail scrapings, right?

9       **A**     The left fingernail scrapings, yes.

10      **Q**     The fingernail scrapings that have actually been in the

11 OCME's possession for years?

12      **A**     That is correct.  They weren't examined prior until

13 2011.

14      **Q**     I mean you did a new examination of old evidence?  Is

15 that fair to say?

16      **A**     I guess it determines on what you call old.  Yes.

17      **Q**     A couple of --

18      **A**     Yes.

19      **Q**     -- a years an old?  You have done this before?

20      **A**     Yes.

21      **Q**     It is not unusual, right?

22      **A**     Nothing.

23      **Q**     In fact, all your work at OCME you are always open to

24 amending, correcting, or updating or doing more if you are

25 requested?  Is that right?

1     **A**    Depending on the circumstances and what we are -- the
2   case information we are given, that is something that does
3   happen.

4     **Q**    All right, and amending, correcting, updating or new
5   testing can always potentially -- potentially provide new
6   insights in the material that you have?  Is that right?

7     **A**    Depending on what is done, we can gain more information
8   than we previously had; and then that information is collected
9   and reviewed; and from there we can do more testing, more
10  additional reports depending on the circumstance.

11    **Q**    Back in -- remember I asked you that, back in November
12  of 2008, I asked you was it true that November, 2008, your
13  report High Sensitive PCR DNA typing performed on swab S2 didn't
14  indicate that Male Donor A cannot be excluded as a contributor
15  to this mixture, right?  Page two of the November report.

16    **A**    That is correct.

17    **Q**    Okay, the DNA profile of Male Donor A that was
18  determined at the time it was compared to the mixture; and it
19  was concluded that he cannot be excluded as a contributor to the
20  mixture?  That was back in November, right?

21    **A**    Correct.

22    **Q**    But then additional work was -- was done on this case,
23  right?

24    **A**    Yes.

25    **Q**    Okay, in fact, a real sample of Mark Richardson was

1    obtained, right?

2        **A**    Yes, it was sent to the laboratory.

3        **Q**    On December 28, 2008, a report came out from your lab

4    that indicated that -- do you have it, the Richardson suspect

5    file, December 28, 2008?

6                    MR. BOGDANOS:  It is 448.

7                    THE WITNESS:  I have it.

8                    MR. BOGDANOS:  Okay.

9        **A**    December 28th of 2008?

10       **Q**    You got it?

11       **A**    Yes.

12       **Q**    Thanks a lot.  Would it be accurate to say November 28,

13   2008, a report came out that indicated the DNA profile of the

14   suspect Mark Richardson was determined and now said

15   Mark Richardson can be excluded as contributor to the mixture of

16   DNA detected on the neck and body of the lamp, right?

17       **A**    Yes.

18       **Q**    And now it also said that he could also be excluded on

19   swab S2 from last tier by base, right?

20       **A**    Yes the DNA profile of Mark Richardson was determined

21   and that profile was compared to those samples and this mixtures

22   and, yes, he was excluded as a contributor.

23       **Q**    Is it accurate to say the continued work that was done

24   created a more specific result than you would have had before,

25   right?

1    *A*    Well, it's -- it was dependent on the full profile of

2    Mark Richardson that we received from his sample; and we

3    compared it to the mixture and he was excluded.

4    *Q*    Okay.

5              MR. KLEIN:  Thank you very much.

6              THE COURT:  Thank you, Mr. Klein.  Mr. Bogdanos.

7              MR. BOGDANOS:  Very brief if I may, Judge.

8    REDIRECT EXAMINATION

9    BY MR. BOGDANOS:

10   *Q*    Mr. O'Connor, you were asked by Mr. Klein about testing

11   clothing and that is certainly something that High Sensitivity

12   can do, right?

13   *A*    Yes, it is.

14   *Q*    How about if that clothing is covered in blood?  Is it

15   still something High Sensitivity can do?

16   *A*    It is something that we can do depending on the

17   circumstances of the case and of the evidence itself, and what

18   we would be looking for.  If it was an item of clothing that we

19   would be looking for touch DNA meaning very small number of skin

20   cells and we received clothing that is covered in blood that

21   would be something that most likely would be determined to be

22   unsuitable for sampling; but again it would depend on the

23   circumstances and what the item looked like once it was

24   examined.

25              MR. BOGDANOS:  I would ask that the witness now be

1    handed People's 31 in Evidence for the record.  Mr. Klein?

2              MR. KLEIN:  That's fine.

3              MR. BOGDANOS:  When she is turned over.

4    **Q**    Just take a look at that photo.  Assume if you will

5    that photograph is a photograph of Helen Abbott taken after her

6    body has been turned over at the crime scene; assume further if

7    you will that there is evidence that she had been on the floor

8    face down for two days; assume if you will further that there is

9    evidence before this jury that she suffered twenty-two (22)

10   separate stab wounds, one in the jugular, one in the aorta and

11   bled; assume if you will that what you see, the red that you

12   seen in that photograph -- you can see it?

13   **A**    Yes.

14   **Q**    Assume that's blood; assume that her bra is up toward

15   her shoulders right next to the jugular where it was struck;

16   assume -- can you see up by her head what appears to be dried

17   substance -- assume that's dried blood where she bled out for

18   two days.  Is that the kind of clothing that would be suitable

19   for High Sensitivity DNA testing?

20   **A**    Again it would depend on what areas we would be looking

21   to sample; but if it were anywhere near this reddish brown

22   staining which most likely is blood, no, that would most likely

23   not be suitable for testing.  Again it would depend on the

24   circumstances and what we were told --

25   **Q**    Of course.

1    *A*    -- while we had the sample.

2    *Q*    And everything I just asked you is assumed.  Those

3   circumstances, do you.  It is not depending on -- assume the

4   circumstances that I just gave you, assume that that's all

5   blood, would that be -- would that clothing be suitable for high

6   sensitivity testing?

7    *A*    Again probably not but depending on where we were

8   looking.

9    *Q*    Got you.

10          MR. BOGDANOS:  Nothing further on the photo.

11   *Q*    Now you were asked also by Mr. Klein about the lamp

12  being broken and it's clear to you from looking at the

13  photographs at some point in its travels between labs the

14  lamp -- the glass was broken; right?

15          MR. KLEIN:  Objection.

16          THE COURT:  Sustained.

17   *Q*    Is it clear --

18          THE COURT:  Sustained.  Sustained.

19          MR. BOGDANOS:  Sure.  We can do it the longer way.

20   *Q*    Please take People's 28.  You were asked by Mr. Klein

21  to look at that photograph.

22          (Handing.)

23   *A*    Yes.

24   *Q*    And take a -- let's take a look at page 2.  It is clear

25  to you that at some point -- assuming that's the same lamp --

1  and at some point that lamp is broken, the glass in the lamp is

2  broken; correct?

3        *A*    If the picture is the same as --

4        *Q*    Every time I say assume --

5            MR. KLEIN:  Judge, I ask he be allowed to answer

6        the question.

7            MR. BOGDANOS:  I apologize.

8        *Q*    Every time I say you could assume it, you could assume

9  it as a fact.  Assume that's the lamp; assume it's the same lamp

10  as you see in the photograph before you.  At some point the

11  glass in the lamp got broken?

12       *A*    It appears so, yes.

13       *Q*    Now, the -- would the fact that the lamp was -- the

14  glass was broken would that in any way detract from developing

15  getting DNA on a swab of the broken glass?  Is it a bad

16  question?  You didn't get it?  You want me to rephrase it?

17       *A*    Can you rephrase it, please.

18       *Q*    I can do that.  I can do that.  You have an intact

19  glass lamp.  You can take a swab of that, right?

20       *A*    Correct.

21       *Q*    You have broken pieces from that exact same lamp?  You

22  could still take a swab, correct?

23       *A*    Correct, you could take a swab from pieces.

24       *Q*    Is the fact it is broken change the ability to develop
a DNA profile if you can from the lamp?
25       *A*    For the most, no.
                 (Transcript continued on the next page.)

REDIRECT/O'CONNOR/PEOPLE

1  T-7 - Peo. V Mark Richardson, Ind.#3534/08

2  September 19, 2011:

3  REDIRECT EXAMINATION

4  BY MR. BOGDANOS:

5      Q.   Now, you were also asked about continuing testing,

6  for lack of a better word of putting it, from what Mr. Klein

7  was talking about, items that are in the lab, what is YSTR

8  typing,?

9      A.   YSTR typing is similar to your traditional DNA typing

10 except you are looking at markers that are specifically on the

11 Y chromosome.  So when it comes to DNA, the DNA is packaged in

12 what we call chromosomes, it actually looks like Xes under the

13 microscope.  Females have an X and X chromosome, two X

14 chromosomes where as male has Y and X chromosome.

15          Therefore, it's called second determining chromosome

16 because that is how it's determined whether or not an

17 individual is male or female.

18          So YSTR testing is specifically tested on the Y

19 chromosome itself, therefore, it would be only applicable to

20 samples from males.

21     Q.   And how does that differ from DCR/DNA typing?

22     A.   Really the only difference is the markers that are

23 looked at.  So instead of looking at the entire DNA, DNA

24 markers from all 23 chromosomes that humans have, we're only

25 specifically looking at markers on the Y chromosome.

REDIRECT/O'CONNOR/PEOPLE

1      Q.   And you may need -- do you have file 418, not LCN but

2  the regular file.  You don't.  So let me hand you 418 and

3  there's another half of that.  There it is.

4           If you could go to the report dated July 29th of

5  2008, please, in 418.  Just the first page.

6           (Pause)

7               MR. BOGDANOS:  If there is no objection, it

8  would save time, I can show him my copy or do you want to wait

9  for him to find it?

10              MR. KLEIN:  That's okay, you can show him and

11  then just bring it over to me for a second.

12     A.   July 29th.

13     Q.   You got it?

14     A.   Yes.  Sorry.

15     Q.   Yes.  Please.  Just the first page of that, where it

16  says, just make sure we have the same thing, YSTR typing was

17  attempted on the following --

18     A.   Yes.

19     Q.   That's it.  You got it?

20     A.   Yes.

21     Q.   That report indicates that for YSTR typing no alleles

22  were detected from PM2C2?

23     A.   Yes.

24     Q.   But, I'm sorry to do this to you, now if you can go

25  to December 4th.  Hold that spot, don't lose July 29th.

Glenn J. Merola, Sr. Court Reporter

```
 1      A.   December 4th of --

 2      Q.   2008.

 3      A.   Of 418?

 4      Q.   I'm sorry, Mr. O'Connor, of 448.  File 448.  I'm

 5 sorry.

 6      A.   December 28th?

 7      Q.   December 4th Of 448.

 8      A.   December 4th, yes.

 9      Q.   You got it?

10      A.   Yes.

11      Q.   And that indicates that, in fact, that profile

12 developed from PM2C2 has the same alleles as Mark Richardson.

13           The question is, how do you square that -- how is it

14 possible that the YSTR typing came up with no alleles but

15 DCR/DNA testing came up with Mark Richardson's alleles, could

16 you explain that, please?

17      A.   Well, the YSTR testing, like I said, is specifically

18 targeting the alleles or the DNA that is on the Y chromosome

19 itself are, as your regular testing is looking at all of the

20 chromosomes that are there including the DNA from the female

21 contributor of that mixture.

22           So when you are looking at the YSTR testing it's a

23 specifically trying to target alleles that are on the Y

24 chromosome.  So given this type of mixture and the fact that

25 Helen Abbott was the major contributor to that sample, most of
```

REDIRECT/O'CONNOR/PEOPLE

1   the DNA that is in that sample would be her DNA, female DNA,

2   so, therefore, it would be a little bit more difficult to kind

3   of find the Y chromosome only DNA within that mixture and it

4   was probably overwhelmed by the amount of DNA that was there

5   from Helen Abbott.

6       Q.   Does the fact that Mark Richardson's DNA could not be

7   found in the secretion, based on YSTR typing, does that in any

8   way undermine the results of the DCR/DNA typing that in fact

9   found Mark Richardson's alleles in that secretion?

10      A.   No, it doesn't.

11      Q.   Explain?

12      A.   Again, because the fact that the it was a mixture

13  with a female DNA being a major component, it's not unusual

14  that you wouldn't get the YSTR result.  But because the regular

15  chromosome typing chromosome meaning the other chromosomes that

16  are done, or profiles, it's looking at all the DNA and taking

17  all the DNA when it's doing that determination.

18           So, therefore, getting a profile from the regular

19  testing is just as good or maybe even better than just the YSTR

20  testing.

21      Q.   And then, finally, you were asked by Mr. Klein about

22  the fact that on November 28th Mr. Richardson could not be

23  excluded from the lamp but on December 28th he was able to be

24  excluded from the lamp?

25      A.   Well, Male Donor A in the first report, November 28th

Glenn J. Merola, Sr. Court Reporter

REDIRECT/O'CONNOR/PEOPLE

1    report, could not be excluded from that mixture and then when

2    we received a sample from Mark Richardson, typed that sample

3    and compared it to the mixture, it was determined or concluded

4    that he could be excluded from that mixture.

5         Q.    So the intervening circumstance between the November

6    28th report and the December 28th report is the set by your

7    office of a buccal swab from Mark Richardson?

8         A.    Yes.   Once we received swab or sample from Mark

9    Richardson, typed it, then we compared it to the mixture.

10        Q.    And to return, last question to this chart, which is

11   70, it's the receipt of that swab from Mr. Richardson which

12   enabled your office to both exclude him from the lamp and

13   include him in the secretion from the left breast PM2C2?

14        A.    Correct.

15             MR. BOGDANOS:   Thank you.   Nothing further.

16             MR. KLEIN:   Nothing.   Thank you.

17             THE COURT:   All right.   Then that does it, Mr.

18   O'Connor.   Thank you very much.

19             (The witness was excused and exits the courtroom.)

20             MR. BOGDANOS:   The People call to the stand Ms.

21   Daniella Keller.

22             (The witness, Daniella Keller, enters the

23             courtroom, takes the witness stand, is duly

24             sworn/affirmed in by the Clerk of the Court, responds to

25             the oath and testifies as follows:)

Glenn J. Merola, Sr. Court Reporter

DIRECT/KELLER/PEOPLE

1           THE COURT CLERK:  Do you solemnly swear or

2       affirm the testimony you are about to give shall be the

3       truth, the whole truth, and nothing but the truth, so

4       help you God?

5           THE WITNESS:  I do.

6           THE COURT OFFICER:  Have a seat, please.  Just

7       pull your chair up.  If you could, just state your name

8       for the record and spell your last name.

9           THE WITNESS:  Daniella Keller.  K-e-l-l-e-r.

10          MR. BOGDANOS:  May in inquire, Your Honor.

11          THE COURT:  You may.

12          MR. BOGDANOS:  Thank you.

13  DIRECT EXAMINATION

14  BY MR. BOGDANOS:

15      Q.   Good afternoon, Ms. Keller.  Thank you for your

16  patience today.  Ma'am, would you tell us the county you live

17  in?

18      A.   Queens County, New York.

19      Q.   And without telling us your current address how long

20  have you lived at your current address?

21      A.   Approximately seven months.

22      Q.   Do you go to school?

23      A.   Yes.

24      Q.   Where do you go to school and what are you studying

25  and what year are you in?

Glenn J. Merola, Sr. Court Reporter

DIRECT/KELLER/PEOPLE

1       A.    I go to St. John's University, School of Law.  I am

2   studying law.  And I am a third year student.

3       Q.    And did you -- were you employed this past summer?

4       A.    Yes.

5       Q.    By whom and in what capacity?

6       A.    I was employed by the New York County District

7   Attorney's Office.  I was a legal intern.

8       Q.    Meaning what?

9       A.    Meaning that basically I worked with the Special

10  Narcotics Bureau as intern, did some research assignments, and

11  also worked in Trial Bureau 50.

12      Q.    You did legal assignments and whatever assistant

13  district attorneys told you to do, basically?

14      A.    Yes.

15      Q.    Did you receive an assignment of relevance to this

16  case and this jury?

17      A.    Yes.

18      Q.    Would you please explain how you received that

19  assignment and what it was?

20      A.    I was asked to work on this trial by ADA Bogdanos,

21  you, and I reviewed video clips from the Wagner Houses and

22  basically one camera and reviewed it looking for specific

23  individuals as well as trying to figure out the time of death

24  for the victim.

25      Q.    Now, the individuals you were asked to look for, do

Glenn J. Merola, Sr. Court Reporter

DIRECT/KELLER/PEOPLE

1    you remember their names?

2        A.   Yes.

3        Q.   Could you say their names?

4        A.   Helen Abbott.  Cheryl Abbott.  Mark Richardson.

5    Anthony Hall.

6        Q.   Please continue.  Any other individuals unnamed?

7        A.   Yes.

8        Q.   How many?

9        A.   Two.

10       Q.   And what did you know about them, about their

11   physical appearance?

12       A.   One we referred to as Hoody or B Cap.  That's

13   basically attire that he wore during the first time that he was

14   spotted on camera and the other man was named Umbrella Man.

15   I'm sorry.  I misspoke.  Umbrella Man was also referred to as B

16   Cap.

17       Q.   And then one other person was wearing a hoody?

18       A.   Yes.

19       Q.   Had you ever met any of these six individuals in

20   person?

21       A.   No.

22       Q.   Were you given any tools to assist you in being able

23   to find any of those six people on the videos that you were

24   watching?

25       A.   Yes.  I was given a document which had video stills

Glenn J. Merola, Sr. Court Reporter

DIRECT/KELLER/PEOPLE

1  in which each of the individuals I was looking for were

2  depicted.  I also reviewed the video clips that depicted these

3  individuals with you.

4       Q.   And would you describe precisely the instructions you

5  were given with regard to these six individuals?

6       A.   That I was to look for them, to document any time

7  that I saw them enter and exit the building.  Also describe

8  maybe what they were wearing, their demeanor, they were

9  carrying anything.  And if they were ever to be seen then I was

10 supposed to note that on the excel sheet.

11      Q.   Were you given specific instructions as to how you

12 were to view the video and what you were to do?  Is the answer

13 yes?

14      A.   Yes.

15      Q.   Would you please give us those exact instructions?

16      A.   I was to view the video and do nothing else.  Such as

17 look at a cell phone.  Take a break.  Have lunch.  I was

18 instructed to just watch the video and the video alone and have

19 that be the only task I was doing while I was watching it.

20      Q.   Were you instructed what to do if you got tired, or

21 your eyes got tired, anything like that?

22      A.   Apparently in the Marine Corp there's a thing called

23 looking at the green --

24           MR. KLEIN:  Judge, let her answer the question.

25           THE COURT:  She's getting there.

Glenn J. Merola, Sr. Court Reporter

DIRECT/KELLER/PEOPLE

1    A.   So whenever my eyes became fatigued I would look at

2    something green or better yet take a break and then return to

3    the video.

4    Q.   Were you instructed with regard to whether or not you

5    could fast forward the video at any point?

6    A.   Yes.   I was instructed not to do that.

7    Q.   And did you carry out that assignment?

8    A.   Yes.

9         MR. BOGDANOS:   And I would ask now that the

10   witness be handed what has previously been -- actually, what I

11   request be deemed marked 73, Judge, for identification.

12        THE COURT:   73 -- I do see it.

13   BY MR. BOGDANOS:

14   Q.   Please take a look at that chart.   Have you seen that

15   chart before coming into court?

16   A.   Yes.

17   Q.   Have you had an opportunity to review it?

18   A.   I have.

19   Q.   And does that chart fairly and accurately indicate

20   the times that you were responsible for viewing one of the

21   cameras?

22   A.   Yes.   To the extent that they are approximate times.

23   Q.   Explain that?

24   A.   On this chart, let's say that I watched from January

25   12th starting at 10:45 and I started around that time, I

DIRECT/KELLER/PEOPLE

1  believe it was 10:50 I started viewing, and I ended the tape it

2  said on here at  11:55 p.m. on the 13th of January, 2008, it

3  might have actually ended two minutes later.

4       Q.   Is the point that you are making to us that what you

5  watched, whatever the clip was, you watched the entire clip and

6  that figure on the chart rounds off?

7       A.   Correct.  It rounds it.

8       Q.   Thank you.  I have nothing further on that.

9            Which camera did you watch?

10      A.   I watched camera that was entitled 1B.

11      Q.   And what did that show?

12      A.   It was placed in the lobby and faced out towards the

13  entrance door.

14      Q.   Of where?

15      A.   Of the Wagner Houses.

16      Q.   Is that 2400, the Second Avenue building here in

17  Manhattan?

18      A.   Correct.

19      Q.   And now tell us the times that you watched that

20  camera?

21      A.   I watched from 10:50 p.m. on the 12th of January,

22  2008, through 24 hours later, approximately --

23            THE WITNESS:  Do you mind if I look at my

24  notes?

25            THE COURT:  No.  Go ahead.

                    Glenn J. Merola, Sr. Court Reporter

DIRECT/KELLER/PEOPLE

1      A.    Approximately midnight on the 13th of 2008.  Of the

2  13th of January.

3      Q.    Did you watch every single second of that camera for

4  that time period?

5      A.    I did.  And sometimes even twice.

6      Q.    At any point in that time period did you ever see

7  Helen Abbott?

8      A.    No, I did not.

9            MR. BOGDANOS:  I would ask that the witness now

10  be handed what I request be deemed marked 74 and since the

11  exhibit itself is in two, perhaps 74A and 74B.

12            For the record, a two chart time line.  If you would,

13  please take and show that to the witness.  Thank you.

14  BY MR. BOGDANOS:

15      Q.    Please take a look at what's been marked 74A and b.

16  Do you see those charts?

17      A.    I do.

18      Q.    Have you seen them before?

19      A.    Yes.

20      Q.    You have had an opportunity to review them prior to

21  coming into court?

22      A.    I have.

23      Q.    Are any of the entries on the charts yours that you

24  made?

25      A.    Yes.

Glenn J. Merola, Sr. Court Reporter

DIRECT/KELLER/PEOPLE

1      Q.    What are the entry numbers?

2      A.    Entry Number 74 and 93 and 98.

3      Q.    I am going to Number 74.  Would you tell us what it

4   is and exactly how you made that entry?

5      A.    I apologize.  I misspoke.  It's Actually 73 there.

6      Q.    All right.  Okay.  Go to 73, please, and tell us

7   exactly what it is and how -- withdrawn.  Tell us what it is

8   and tell us how you made that entry?

9      A.    It's an entry that states that male exits building.

10  It was made at --

11     Q.    Let's start with the camera.  What camera is it?

12     A.    I apologize.  I am having a little trouble viewing

13  this.  I actually did not make the entry. I apologize.

14          THE COURT:  Let's put it on an easel it's moving

15  around.  Are you moving it?

16          MR. KLEIN:  We need a bunch of interns.

17          MR. BOGDANOS:  There are five interns to testify

18  to put it in, Judge.

19          THE COURT:  All right.  Show it to her without

20  showing it to the jury on the easel.  You want to go to 93.

21     A.    Yes.  93 and 98 were actually the entries I made.

22     Q.    So let's start with 93.  Tell us, and if you would,

23  do you have a copy of it in front of you?

24     A.    I do.

25     Q.    So to make the Court Officer's life easier, you have

Glenn J. Merola, Sr. Court Reporter

DIRECT/KELLER/PEOPLE

1    an exact copy of it so, can we just but the chart down, is that

2    all right with the court?

3              THE COURT:   Fine with me.

4        Q.    Would you turn to your left and you can see the

5    monitor where you are?

6        A.    Yes.

7        Q.    Would you describe from the panel what you did, just

8    for 93, we'll do it the one time, explain to Ms. Powell what to

9    do on the hard drive.

10       A.    So for 93 that was camera 1B.  So I click on that.  I

11   went to the clip known as 3:20, or that is the time as 3:20

12   a.m. or -- sorry -- 3:20 p.m., on the 13th of January, 2008.

13       Q.    Let her catch up to you.  It's takes a moment for it

14   to open.

15       A.    As you will see the clip before was the time on that

16   was 2:58 a.m..  It was 3:20 p.m..  Sorry.

17             (Pause).

18       Q.    Okay.  So now she's opened the clip entitled 320.

19   Now what?

20       A.    My apologies.  But this is a clip from twelve hours

21   earlier so my entry wouldn't be on here but I can continue to

22   describe what I would have done.

23       Q.    I'm sorry.  Are we not at 320 p.m.?

24             (Pause).

25             MR. BOGDANOS:   I'm sorry, Judge.

Glenn J. Merola, Sr. Court Reporter

DIRECT/KELLER/PEOPLE

1      Q.    Okay.  Now what?

2      A.    On the entry it says that I saw this individual 8

3   minutes and 57 seconds into the clip.  So I would have --

4      Q.    And, I'm sorry, what individual?

5      A.    Cheryl Abbott.

6            (Videotape being played in open court.)

7      Q.    And is that what we're looking at right now?

8      A.    Correct.

9      Q.    Thank you.  I have nothing further on that.

10           And with regards to 1B -- Withdrawn.  Did you do the

11   exact same thing with regard to entry 98?

12     A.    Yes.

13     Q.    So we should just ignore when you said 74?

14     A.    Yes.  I apologize.  I saw 1B on the -- yeah.

15     Q.    It's okay.  So entry is 93 98 were your entries?

16     A.    Yes.

17     Q.    How did you determine the correct time based on the

18   name of the clip?  Just give us 93.

19     A.    Okay.  So for clip 93 the clip ends at 3:20 p.m..  So

20   the clip before it that I was mentioning ended at 3:05 p.m..

21   So I would take the time 3:05 five p.m. add the 8 minutes 57

22   seconds that I saw on the clip to that and I would get the

23   approximate time which is 3:14 p.m.

24     Q.    And you did that for 98 as well?

25     A.    Correct.

Glenn J. Merola, Sr. Court Reporter

DIRECT/KELLER/PEOPLE

1    Q.   As you were going through the viewing of the video,

2   did you notice a discrepancy in the time between 1B and every

3   other camera?

4    A.   Yes.

5    Q.   Could you please explain to the jury.

6    A.   Camera 1B was on a different DVR system then the

7   other cameras so it's approximately three minutes off in time

8   from the other cameras.

9    Q.   So three minutes faster?

10   A.   Faster, yes.

11            MR. BOGDANOS:   Thank you.   I have nothing

12   further.

13            MR. KLEIN:   Nothing.

14            THE COURT:   No questions?

15            MR. KLEIN:   No.

16            THE COURT:   All right.   That completes your

17   testimony Ms. Keller.   Thank you very much.

18            (The witness was excused and exits the courtroom.)

19            MR. BOGDANOS:   I do have one more intern.

20            THE COURT:   I don't think we have enough time.

21   We have some calendar cases left.

22            Ladies and gentlemen, that will do it for today.   And

23   we will start at the regular time tomorrow morning 9:45.

24            I have been discussing the overall schedule with both

25   sides and it appears that while we have made a lot of progress

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   so far but I do not believe we will get the case to you for

2   deliberations this week.

3           It's far more likely that you will get the case on

4   Monday of next week.  But I don't believe it would be beyond

5   Monday, Monday is the outside day, and you may again either

6   have a short day this Friday or we'll have no session at all.

7           Again, I have this other assignment that I am working

8   on getting rid of but I still haven't.   I'll give you more

9   information as we go through the week.  So we're on schedule

10  but we're not really ahead of schedule.  That's the overall

11  message.

12          So that's it.  See you tomorrow morning.  Please do

13  not discuss the case.  Thank you.

14          (The year was excused and exits the courtroom.)

15          (The trial was adjourned to Tuesday morning,

16  September 20, 2011.)

17

18

19

20

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

**LIBRARY** 687

```
 1   SUPREME COURT        NEW YORK COUNTY
     TRIAL TERM           PART 45
 2   ------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK : INDICTMENT #
 3                                       : 3534/08
                                         :
 4        AGAINST                        : CHARGE
                                         : MURD 2
 5   MARK RICHARDSON                     :
                                         :
 6              Defendant.               :
     ------------------------------------x TRIAL
 7

 8                     111 Centre Street
                   New York, New York  10013
 9                   September 20, 2011

10

11   B E F O R E:
```

**FILED**

```
12        HONORABLE BRUCE ALLEN
              JUSTICE OF THE SUPREME COURT
```

JUN 2 5 2012

```
13
```

SUP COURT, APP. DIV
FIRST DEPT.

```
14
15   APPEARANCES: (Same as previously noted)

16   -----------------------------------------------------

17             THE COURT CLERK:  Case on trial continued.  The

18   People of the State of New York against Mark Richardson.

19   The defendant, his attorneys, and the assistant district

20   attorney are present.  Jury is not present at this time.

21             THE COURT:  Thank you.  Good morning everyone.

22   Both sides ready to proceed?

23             MR. BOGDANOS:  Yes, Judge.

24             MR. KLEIN:  Yes.

25             THE COURT:  May we have the jury, please.
```

<u>Proceedings</u>                                      688

```
 1            (Jury entered the courtroom.)
 2            THE COURT CLERK:  Case on trial continued.  The
 3    People of the State of New York against Mark Richardson.
 4    The defendant, his attorneys, and the assistant district
 5    attorney are present.  Both sides stipulate all jurors are
 6    present and properly seated?
 7            MR. BOGDANOS:  Yes.
 8            MR. KLEIN:  Yes.
 9            THE COURT:  Thank you.  Good morning,
10    Mr. Bogdanos.
11            MR. BOGDANOS:  People next call to the stand
12    another intern your Honor, Ms. Marla Duncan.
13            (Witness entered the courtroom.)
14    M A R L A   D U N C A N , called as a witness by and on behalf of
15       the People, having been first duly sworn and/or affirmed,
16       testified as follows:
17            THE WITNESS:  Yes.  I do.
18            THE COURT OFFICER:  Have a seat, please.  Pull
19    your chair up a little bit.  For the record just state your
20    name and spell your last name.
21            THE WITNESS:  Marla Duncan, D-U-N-C-A-N.
22            MR. BOGDANOS:  May I inquire?
23            THE COURT:  Yes you may.
24    DIRECT EXAMINATION
25    BY MR. BOGDANOS:
```

1    *Q*    Good morning, Ms. Duncan.

2    *A*    Good morning.

3    *Q*    Ma'am, tell us what county you live in?

4    *A*    New York County.

5    *Q*    And without telling us your current address, would you

6    tell us how long you have lived at your current address?

7    *A*    I have lived at my current address for the last month.

8    I have lived in New York for the last year.

9    *Q*    And do you go to school in New York?

10   *A*    Yes, I do.

11   *Q*    So would you please tell us the school, what you are

12   studying, and the year you are in?

13   *A*    I go to Columbia Law School and I am in my second year.

14   *Q*    Were you employed -- withdrawn.  What is your

15   undergraduate degree?

16   *A*    I went to the University of Chicago.

17   *Q*    And what did you study?

18   *A*    I studied Comparative Human Development.

19   *Q*    Were you employed this past summer and if so by whom

20   and in what capacity?

21   *A*    Yes, I was.  I was employed by the Manhattan District

22   Attorney's Office and I was an intern.

23   *Q*    And did you have occasion to -- as an intern this past

24   summer to receive an assignment of relevance to this case and

25   this jury?

1   *A*   Yes.

2   *Q*   Would you please tell the jury what the assignment was

3   and how you received it.

4   *A*   I received the assignment by getting an email asking

5   for an intern of volunteers to work on a surveillance videotaped

6   project.  The project was to look at surveillance videotapes of

7   the Wagner houses, and we were assigned certain amount of hours

8   and a particular camera to watch.

9   *Q*   And were you given any specific instructions as to whom

10  you were going to be looking for on that video?

11  *A*   Yes, we were told to look for six people of interest

12  while we were watching our segments.

13  *Q*   And did any of those people have names?

14  *A*   Yes.

15  *Q*   How many?

16  *A*   Four.

17  *Q*   Do you remember the names?

18  *A*   Yes.

19  *Q*   Tell us.

20  *A*   Mark Richardson, Anthony Hall, Helen Abbott and

21  Cheryl Abbott.

22  *Q*   And were there two other individuals as well whose

23  names you were never told?

24  *A*   Yes.

25  *Q*   And how would you describe them or how did you refer to

1 | them?

2 | **A**      There was one gentleman who was wearing a Hoody.

3 | That's sort of how we described him, and there was another

4 | individual wearing a baseball hat that was frequently holding an

5 | umbrella and that's how we described him.

6 | **Q**      And before you began the assignment, were you given any

7 | tools or were you aided in any way -- withdrawn.  I am sorry.

8 |          Have you ever met any of those six people in person.

9 | **A**      No, I have not.

10 | **Q**      Were you given any tools to enable you to identify

11 | those people on the videotape?

12 | **A**      Yes.

13 | **Q**      And we are saying videotape.  It is actually a digital

14 | recording?

15 | **A**      Right.

16 | **Q**      Would you tell us exactly how you were able to

17 | recognize these individuals?

18 | **A**      Sure.  We were shown video clips and identified which

19 | individuals we were asked to be followed; and then we were also

20 | given stills of those images so that we could refer to them as

21 | we were watching our particular segments.

22 | **Q**      And were you given specific instructions how to

23 | watch -- I keep calling it a video, so forgive me; my generation

24 | -- were you given specific instructions on how to watch the

25 | video?

1    *A*    Yes.

2    *Q*    What were those exact instructions?

3    *A*    We were told under no circumstances to fast forward the

4    video or drag the bar, so that we were skipping maybe portions

5    of the video that didn't have anybody on it.  We were also told

6    that if we were tired or distracted or got a text message or,

7    you know, a phone call that we needed to pause the video; and if

8    we were tired, we were given advice as to, you know, strategies

9    to help maybe relax our eyes if you were watching long portions

10    or just to take a break and go do something else.

11    *Q*    And did you do as you were told?

12    *A*    Yes, I did.

13    *Q*    And do you remember which camera angle you were

14    assigned?

15    *A*    Yes, I was assigned Camera 1B.

16    *Q*    1B was which camera?

17    *A*    1B is in the lobby facing towards the door.

18    *Q*    I am going to hand you what has previously been

19    marked -- I am sorry it hasn't been previously marked -- 73 for

20    Identification.  Please take a look at that chart.  You've seen

21    it before?

22    *A*    Yes, I have.

23    *Q*    And if we can just put it on an easel.  Apparently

24    yesterday Ms. Keller said she was having trouble seeing it.

25                THE COURT:  Was 73 admitted yesterday?

1          MR. BOGDANOS:  I don't think so.  I didn't offer

2     it because there are still more people who have to look at

3     it.

4          THE COURT:  All right.

5     *Q*     Do you recognize that chart?

6     *A*     Yes, I did.

7     *Q*     You've examined it before coming to court?

8     *A*     Yes, I have.

9     *Q*     And does it fairly and accurately reflect the hours

10    that you looked?

11    *A*     Yes, it does.

12    *Q*     Are the hours rounded off though?

13    *A*     They are.  They are approximations.  Some of the, for

14    example, some of the videotapes don't start on the same number;

15    so one could start at 47 and one could start at 45; so if it

16    says, you know, 'til 10:45 that's the approximation of when the

17    videos were --

18    *Q*     But did you -- we understand it's been rounded off but

19    did you, in fact, watch when you watched a clip that covered

20    that time, did you watch the entire clip or did you stop midway

21    through the clip because you got to 10:45?

22    *A*     No, we continued and finished entire clips so that

23    would represent, you know, the clip that encompassed 10:45.

24    *Q*     And would you tell the jury, please, for 1B the hours

25    that you watched?

1     *A*    Yes, so as the chart indicates for 1B on the 11th of

2     January, 2008, I watched from 9:00 a.m. until 6:30 p.m. and then

3     on the twelfth, I watched from 8:30 'til about 9:45.

4     *Q*    8:30?

5     *A*    So 10:45 I apologize.  8:30 a.m. to 1045 p.m.

6     *Q*    That's on the twelfth?

7     *A*    Yes.

8     *Q*    Saturday?

9     *A*    Yes.

10    *Q*    And as you were -- those are the two time periods that

11    you watched?

12    *A*    Yes, it is.

13    *Q*    As you were watching were you also given instructions

14    as to how to record the events that you were seeing?

15    *A*    Yes.

16    *Q*    Explain.

17    *A*    So we were keeping our own individual spread sheets and

18    noting the clip that we saw it on; and then we had a method for

19    noting -- for computing the time that that particular event

20    happened so...

21    *Q*    We will get to that method in a moment when you look at

22    some other charts; but did you make the entries as you saw them

23    or at some point later or are you relying on your memory?

24    *A*    As I saw them.

25    *Q*    And did you do that every single time?

<u>Duncan - Direct - People</u>                                      695

1       *A*     Every single time, yes.

2       *Q*     Is there any portion of the video during those hours

3   that you did not watch?

4       *A*     No.

5       *Q*     Are you absolutely certain?

6       *A*     Yes.

7       *Q*     At any point did you ever see Helen Abbott?

8       *A*     During my scheduled hours, no.

9       *Q*     Are you sure?

10      *A*     I'm positive.

11      *Q*     After -- did you have occasion to look at any other

12  cameras other than 1B?

13      *A*     Yes.  So the way that the project worked was if you saw

14  a person of interest, person that I noted before, you were then

15  to follow them on the other cameras and record those notations

16  as well.

17      *Q*     And did you have all six people or did you get one in

18  particular or two?

19      *A*     I was assigned two individuals for my first segment.

20  It worked for the first 18 hours we were assigned specific

21  people, so I was assigned the individual with the umbrella and

22  the baseball hat and the individual with the hood.

23      *Q*     The person you've talked to, referred to as Hoody and

24  then baseball hat or B-Hat                          ?

25      *A*     Right.

1  *Q*   So you've finished watching all your time on 1B.

2  Explain how you would then trace each individual that you saw,

3  that you were assigned?  We know you were assigned just to those

4  two; right?

5  *A*   Right.  The way it worked my hours no matter who I saw

6  even if I weren't assigned to them, I would note 1B I saw that

7  particular person at a certain time.

8       When that session of the project was completed, we

9  submitted all of our information and then where we saw another

10  intern, we see another particular person of interest and have to

11  go back through and basically double check and see who the

12  person was on the other cameras.

13  *Q*   So for every single person of interest, those six

14  people, there were always at least two people watching that

15  person?

16  *A*   Right.

17  *Q*   So now you've -- you have been assigned -- let's stick

18  with one, let's say Hoody?

19  *A*   Sure.

20  *Q*   You got Hoody.  You see him coming in on 1B.  Now what

21  did you do?

22  *A*   If I see him coming in on 1B he would probably -- he

23  would have to come in 1A first so even though 1B is second, I

24  would go back and look at 1A, 1B.

25  *Q*   Which is 1A?  What camera is that?

1      *A*     1A is looking the opposite way of 1B so it's facing

2   towards the elevators essentially from the outside.

3      *Q*     So it's the outside building looking in?

4      *A*     Right.

5      *Q*     Then so you trace them on 1A, 1B.  What's next?

6      *A*     Then there is 2.

7      *Q*     What's 2?

8      *A*     Two is also in the lobby but facing sort of the side

9   angle of the elevators.

10     *Q*     Continue.

11     *A*     Then you would check both elevators which had different

12  cameras, 3 and 4, and to make sure which elevator they were on

13  and where they got off.

14     *Q*     And as you sit here now do you know where -- do you

15  remember which cameras was in Elevator A and which camera was in

16  Elevator B?

17     *A*     I would have to refresh my recollection.

18     *Q*     Would looking at the chart of the lobby refresh your

19  recollection as to which the -- what the numbers were?

20     *A*     I believe so, yes.

21     *Q*     Take a look at that.  It's in evidence.  Stick it up on

22  the TV.  At this time if you could see it from where you are,

23  great.  If you need to stand up, with the Court's permission.

24  Are you --

25                 THE COURT:  You could stand up.

1      **A**    I could see it.

2      **Q**    You could see it?  Does it refer -- we could leave it

3   up.  It is in evidence.  All right so you already told us about

4   two.  Tell us about Elevators A and B?

5      **A**    So as I mentioned before Elevators A and B were cameras

6   3 and 4, which this confirms that Elevator A is camera 3 and

7   Elevator B is camera 4.

8      **Q**    So now you've traced let's say Hoody into one of the

9   elevators.  Now what -- what -- now what did you do?

10      **A**    We also look to see what floor they got off; and if for

11   some reason you didn't see somebody in a particular elevator,

12   you would look potentially also at the stairs to see if for some

13   reason they took the stairs, for example.

14      **Q**    Do you remember how many stairwells the building 2400

15   has?

16      **A**    As far as I know there is two.

17      **Q**    And did each one have a camera?

18      **A**    Yes.

19      **Q**    And so you would trace that individual up to whatever

20   floor?

21      **A**    Right, and then note where -- what floor they got off.

22      **Q**    So now that person is in the building?  Now what did

23   you do?

24      **A**    You do the same thing.  You have to trace them exiting

25   the building.  If you see them say, later, I see somebody

1  leaving on 1B.  They had to also get on an elevator or stairs

2  and exit the same way they came in, so we had to follow them

3  both in and out of the building.

4      *Q*    So what if they leave eight to ten hours later?

5      *A*    The way that the system works is that even if they left

6  eight to ten hours later somebody watching 1A or 1B would see

7  them leaving and have -- if they left, then you knew at this

8  point they had to then also get in the elevator and leave at

9  this particular time.

10     *Q*    And did you do everything you just described to this

11  jury for each of those two individuals?

12     *A*    Yes, I did.

13     *Q*    And did you make the entries the same way you described

14  for Camera 1B?

15     *A*    Yes, I did.

16            MR. BOGDANOS:  I am going to ask the witness now

17     be shown 74A and 74B.  They are in that order and these are

18     not in Evidence yet so if we could put this on the easel,

19     please.

20     *Q*    Does that start with one?

21     *A*    This one?

22     *Q*    Do you see any entries on the chart -- withdrawn.  I am

23  sorry.  You've seen this chart before?

24     *A*    Yes, I have.

25     *Q*    You had an opportunity to examine it before?

1      **A**    Yes.

2      **Q**    And does the chart fairly and accurately summarize

3    whatever entries you have on it?

4      **A**    Yes.

5      **Q**    So let me put that a different way.  You have entries

6    on this chart?

7      **A**    I do.

8      **Q**    That you've verified on the video?

9      **A**    Yes.

10     **Q**    Those entries the ones that you verified, are they

11   accurately recorded on this chart?

12     **A**    Yes, they are.

13     **Q**    Can you just pick one for the jury, please.

14     **A**    Sure.  So, for example, No. 31 would be mine.

15     **Q**    Okay.  Okay, and what do you now if we -- we can put

16   that down please -- so what I will ask you to do, Ms. Duncan,

17   you told us that entry No. 31 is your entry?

18     **A**    Yes.

19     **Q**    Would you please -- do you see to the left --

20           MR. BOGDANOS:  I am sorry.  You could put it down.

21     We are done with the chart.  I shouldn't have said that out

22     loud.  I thought it to myself.

23     **Q**    Now take a look at the monitor.  Do you see the hard

24   drive that'S mapped in front of you?

25     **A**    Yes.

1    *Q*    You have seen that before?

2    *A*    Yes.

3    *Q*    Many times?

4    *A*    Countless times.

5    *Q*    And would you now explain to the jury starting with

6    that, exactly how you would find entry No. 31?

7    *A*    So I would go to where it says 1B and then I would go

8    to the clip number; so where it says 111 and then -- I am sorry.

9    I would have to refresh my recollection as to 31.  Can I look

10   at -- this is the same copy?

11   *Q*    I have to say that.

12   *A*    I apologize.

13   *Q*    I have a job.  Do you have in front of front of you a

14   printed version of that chart?

15   *A*    I do.

16   *Q*    Would looking at it refresh your recollection?

17   *A*    Yes.

18   *Q*    Go ahead and take a look at it.  You are on 31?

19   *A*    Yes, so I would go to the clip that says 1133 for

20   January 11, 2008.

21   *Q*    And would you tell the jury what 1133 means?

22   *A*    So 1133 is the end time of that clip.

23   *Q*    So what's the beginning time of that clip?

24   *A*    It would be 1119.

25   *Q*    How do you know?

<u>Duncan - Cross - Defense</u>                    702

1    *A*    Because the previous clip is also the end time.

2    *Q*    And have you verified that throughout the entire time

3    that you've viewed that the name of the clip is always the end

4    of the clip?

5    *A*    Yes.

6    *Q*    Now --

7              MR. BOGDANOS:  Expand that please.  Hit play.

8    *Q*    Now tell us what you do.

9    *A*    Since we are on clip 31 -- clip 1133 we would scan in

10   four minutes and forty seconds.

11             (Videotape is playing.)

12   *Q*    Is that -- have we watched that clip?

13   *A*    Yes.

14   *Q*    And is that the clip that you entered onto the chart?

15   *A*    Right, yes.

16   *Q*    And did you do that for every single entry for your

17   time period?

18   *A*    Yes, that's the system I always used.

19   *Q*    Thank you.  Nothing further.

20             THE COURT:  Thank you.

21   CROSS-EXAMINATION

22   BY MR. KLEIN:

23   *Q*    Good morning, Ms. Duncan.

24   *A*    Hello.

25   *Q*    Ms. Duncan, do you recall -- did you ever become aware

1   how many floors there were in this apartment building?

2       *A*      Yes.

3       *Q*      Do you remember?

4       *A*      I -- I have an idea but I don't want to guess so...

5       *Q*      Okay, at least twelve?

6       *A*      Yes.

7       *Q*      Actually there were more than twelve, right?

8       *A*      Again, I don't want to speculate but at least twelve.

9       *Q*      And it appeared that the apartment building was

10  inhabited by a relatively large number of people?  Is that fair

11  to say from what you saw?

12      *A*      Yes.

13      *Q*      Okay.  And you watched many hours of what we call

14  video, yes?

15      *A*      Yes.

16      *Q*      And some of the times that you'd be watching there

17  would be more people coming in and out; and some of the times

18  there would be fewer people coming in?  Is that right?

19      *A*      Yes.

20      *Q*      And you were told to specifically focus on six specific

21  individuals; is that right?

22      *A*      Yes.

23      *Q*      And you did try to focus on those six individuals?

24      *A*      Yes.

25      *Q*      And, in fact, you didn't just try but you did focus on

704

1   them; right?

2      *A*     Yes.

3      *Q*     It would be accurate to say you also saw other people

4   going into the building?  Yes?

5      *A*     Yes, that's correct.

6      *Q*     And other people coming out, right?

7      *A*     Yes.

8      *Q*     Some of the people that you saw come out -- you saw

9   come out more than once, right?

10     *A*     Yes.

11     *Q*     Some of the people that you saw go in, you saw go in

12  more than once, right?

13     *A*     Yes.

14     *Q*     Some of the people that you saw used keys, right, to

15  get in?

16     *A*     Yes.

17     *Q*     And some didn't, right?

18     *A*     Yes.

19     *Q*     And some of the people who you saw go in would it be

20  accurate to say you never saw them come out again?  Would that

21  be fair to say?

22     *A*     I would say that probably is fair, yes.

23     *Q*     And some who went in, you also did see come out, right?

24     *A*     Yes.

25     *Q*     And some spent a long time inside and then they came

<u>Duncan - Cross - Defense</u>                                705

1  out and other people spent less time inside before they came out

2  again; right?

3      **A**    I can't think of specific people but that seems

4  reasonable to me.

5      **Q**    Some people you saw just one time, right?  Of the

6  other -- most of the six other people, some you just saw one

7  time, right?

8      **A**    Sure, yes.

9      **Q**    Some people you saw more than one time?

10     **A**    Yes.

11     **Q**    Okay, and some of the people you saw go in, you saw

12 them go in by themselves, right?

13     **A**    Yes.

14     **Q**    Some people you saw go in, you saw them go in with

15 other people, right?

16     **A**    Yes.

17     **Q**    Some of the people that went in by themselves, then

18 also at some time came out with other people; didn't they?

19     **A**    Again, I can't think of specific examples so I don't

20 want to say concretely.  I saw somebody leave, come in with just

21 themselves, and leave with other people but again that seems

22 reasonable.

23     **Q**    Would it be accurate to say that also from the period

24 that you saw, you saw some people who went in without bags,

25 right?

1    *A*    Did I see people go in without bags.

2    *Q*    Yeah.   Yes?

3    *A*    Yes.

4    *Q*    You saw some people go in with knapsacks?

5    *A*    Yes.

6    *Q*    And also it would be accurate you did see not the six

7    other people?  You saw other people who came out with bags,

8    right?

9    *A*    Are you referring to the same people that went in with

10   nothing?

11   *Q*    No, no, just --

12   *A*    Did I see people exit with bags, yes.

13   *Q*    And as far as you know some of the people who exited

14   with bags, didn't have bags when they went in, right?

15   *A*    Again I can't be specific to specific people or

16   specific examples.

17   *Q*    Okay.

18   *A*    So I don't want to speculate.

19   *Q*    Thank you very much.

20             THE COURT:  Thank you, ma'am.

21             THE WITNESS:  Thank you.

22             MR. BOGDANOS:  I have one more intern this

23   morning, Christopher Fell.

24             (Witness exited the courtroom.)

25             (Witness entered the courtroom.)

```
 1  C H R I S T O P H E R   F E L L , called as a witness by and on
 2       behalf of the People, having been first duly sworn and/or
 3       affirmed, testified as follows:
 4                THE WITNESS:  I do, sir.
 5                THE COURT OFFICER:  Have a seat, please.  State
 6       your name and spell your last name for the record.
 7                THE WITNESS:  Christopher Fell, F-E-L-L.
 8                MR. BOGDANOS:  May I inquire, Judge?
 9                THE COURT:  Yes.
10                MR. BOGDANOS:  Thank you.
11  DIRECT EXAMINATION
12  BY MR. BOGDANOS:
13       Q    Good morning, Mr. Fell.
14       A    Good morning.
15       Q    Would you tell us what county you live in, please.
16       A    New York County.
17       Q    Without telling us your current address, would you tell
18  us how long you lived at your current address please.
19       A    About four months.
20       Q    Do you go to school?
21       A    I do.
22       Q    Would you tell us where, what year, and what you're
23  studying?
24       A    I am a third year student at Fordham Law School.
25       Q    And were you employed this past summer?
```

<u>Fell - Direct - People</u>                                              708

1     *A*     I was at the New York County District Attorney's Office

2  as a --

3     *Q*     In what capacity?

4     *A*     As a legal intern.

5     *Q*     And at some point during the summer while you were here

6  at the DA's Office, did you receive an assignment of relevance

7  to this jury and this case?

8     *A*     I did.

9     *Q*     Would you tell us what that assignment was and how you

10 received it?

11    *A*     Yes.  You assigned several interns about four or five

12 to watch surveillance video of the building in question or the

13 building.

14    *Q*     Do you remember the address of the building?

15          I didn't mean to stump you so quickly.

16    *A*     I can't recall.

17    *Q*     It's okay.  Does 2400 Second Avenue Wagner houses, does

18 that sound --

19    *A*     Wagner houses, yes.

20    *Q*     And were you specifically instructed to look for any

21 individuals?

22    *A*     Yes six specifically.

23    *Q*     And did you have names of any of them?

24    *A*     Four of them.

25    *Q*     Would you tell us the names.

<u>Fell - Direct - People</u>                                                709

1      *A*    Mark Richardson, Anthony Hall, Cheryl Abbott, and
2   Helen Abbott.
3      *Q*    And the other two individuals?
4      *A*    We referred to them as B-Hat and Hood.
5      *Q*    Because that's how they appear in the video?
6      *A*    Yes.
7      *Q*    Have yo ever met any of these six people in your life?
8      *A*    I had not.
9      *Q*    So were you given -- were you given any tools to enable
10  you to identify them if you saw them on the surveillance videos?
11     *A*    Yes.  We sat down --
12     *Q*    Explain.
13     *A*    We sat down with you in your office before we began
14  this project; and we went through several clips of videos where
15  we saw each of the six people entering the camera view at
16  different angles at different points at different times.  We saw
17  each of the six people and in several different clips and also
18  we were given stills of each of these people.
19     *Q*    And did you have sufficient time to see how these
20  individuals looked, appeared, walked from all different angles?
21     *A*    Yes.
22     *Q*    And after -- after that, were you assigned a particular
23  portion of the videos?
24     *A*    I was.  We split up the times.
25              MR. BOGDANOS:  I would ask that the witness now be

1   handed -- I keep forgetting -- 73?

2              THE COURT:  73.

3              MR. BOGDANOS:  Thank you.

4   **Q**   73.  This is not in Evidence yet.  Take a look at that

5   chart.  You've seen it before coming into court?

6   **A**   I have.  I recognize it.

7   **Q**   You had an opportunity to examine it?

8   **A**   I have.

9   **Q**   Does it fairly and accurately show the times that you

10  viewed the video?

11  **A**   Yes, it does.

12  **Q**   Which camera were you assigned initially?

13  **A**   I was assigned to 1A and this is the camera that is

14  outside of the building.

15  **Q**   Looking in?

16  **A**   Looking in, yes.

17  **Q**   And what hours did you watch?

18  **A**   I watched from January 11, 2008, at approximately 12:00

19  a.m. until 9:00 a.m.; and then 6:30 that evening continuing

20  until midnight of the eleventh -- of the twelfth.  That would be

21  then; and then the early hours of that morning until 8:30 am.

22  **Q**   And these times on the chart appear to be rounded off

23  to you?

24  **A**   Yes, they are.

25  **Q**   Did the clips always end at that exact time?

<u>Fell - Direct - People</u>                                711

1    *A*    No, they did not end at that time.

2    *Q*    And if a clip went longer than one of those rounded off

3    times, did you stop watching it or watched the whole clip?

4    *A*    No, we watched the whole clip.

5    *Q*    Did you at any point fast forward or skip any portions?

6    *A*    No, sir.

7    *Q*    Doing other things while you were watching, email,

8    text; something like that?

9    *A*    Never.

10   *Q*    Explain.

11   *A*    When we were assigned this assignment the importance of

12   it was impressed upon us.  We were told we had to watch every

13   second of the video; and we were told that if we needed to take

14   a break, pause it, and take a break; and we were given -- even

15   given procedures as to how to relax our eyes, how to focus

16   better and so --

17   *Q*    I am sorry.  Did you follow all of those instructions?

18   *A*    Yes, sir.

19   *Q*    Exactly?

20   *A*    Yes.

21   *Q*    Is there any portion of your time period that you

22   missed?

23   *A*    No.

24   *Q*    And were you also given instructions on how -- what to

25   do when you actually saw any of these six individuals?

1    **A**    Yes, when we saw them on our camera, we were to follow

2    them on each next camera; so if I saw them on 1A, then I would

3    follow them on 1B which is also the entrance and then follow

4    them on Camera 2, which views the lobby, and then watch which

5    elevator they went in; whether it was three or four, three being

6    Elevator A and four being Elevator B.  Watched it.  Watched them

7    get in the elevator.  Follow them up and then --

8    **Q**    What if they didn't take the elevator?

9    **A**    Then follow the stairs or look for them on the stairs.

10    **Q**    And you followed them until they get off the elevator

11    or out of the view in the stairwell?

12    **A**    Yes.

13    **Q**    And then what?

14    **A**    Then I would watch Elevator A or B until I saw them

15    again and follow them back down.

16    **Q**    And did you do that for every person that you were

17    assigned?

18    **A**    Yes.

19    **Q**    And how -- do you remember which -- were you assigned

20    all the people; just specific people?

21    **A**    I was assigned all the people during the hours that I

22    gave.

23    **Q**    And was there anyone else double checking your work?

24    **A**    Yes.

25    **Q**    To make sure you did it accurately?

<u>Fell - Direct - People</u>                                    713

1     *A*   Yes, sir.

2     *Q*   For every single moment?

3     *A*   Yes.

4     *Q*   During the time period -- and all these items did you

5   record any of these entries?

6     *A*   I did on a spread sheet.

7     *Q*   And did you record them as you were watching or did you

8   do it later on based on memory?

9     *A*   I would pause the video and record the entries as I was

10  watching.

11    *Q*   Did you do so accurately?

12    *A*   I did.

13    *Q*   At any point during your portion did you see

14  Helen Abbott?

15    *A*   I did.

16         MR. BOGDANOS:  If we can have the witness shown

17     74, really just A.  Thank you.  That's not in Evidence yet.

18    *Q*   If you would take a look at -- actually with the

19  Court's permission I am just going to turn 74B up for one

20  moment.  Please can you see from where you are?

21    *A*   Yes.

22    *Q*   I am sorry if I am blocking your view.  Have you seen

23  these charts before?

24    *A*   I have.

25    *Q*   Have you had an opportunity to examine them before?

1    *A*    Yes.

2    *Q*    And are there entries on these charts that are yours?

3    *A*    Yes.

4    *Q*    Don't need to go into them but every entry that's yours

5    have you checked to insure that it is accurate?

6    *A*    I have.

7    *Q*    Whichever entries are on these charts that reflect your

8    viewing, do they accurately summarize your entries?

9    *A*    Yes.

10   *Q*    Now, you mention that you saw Helen Abbott; is that

11   correct?

12   *A*    Yes, sir.

13   *Q*    So if we could you originally had -- you started with

14   1B; is that it?

15   *A*    1A, sir.

16   *Q*    1A, thank you.  So can we start.  Take a look at entry

17   25?

18   *A*    I can.

19   *Q*    Is that your entry?

20   *A*    It is.

21   *Q*    Would you tell the jury -- and do you have in front of

22   you a typed version of that chart?

23   *A*    I do.

24              (Transcript continued on the next page.)

25

DIRECT/FELL/PEOPLE

```
 1  T-2 - Peo. V Mark Richardson, Ind. #3534/08

 2  September 20, 2011:

 3  CONTINUED DIRECT EXAMINATION

 4  BY MR. BOGDANOS:

 5      Q.   So that the jurors can -- we don't block their view

 6  anymore -- can we take 74 down.  If you could open that, the

 7  printed version that you have in your hand.

 8      A.   Sure.

 9      Q.   I said 25, right?

10      A.   You did.

11      Q.   Would you tell the jury, now look over your left

12  shoulder, you see the monitor?

13      A.   Yes.

14      Q.   You recognize that hard drive the map that you see to

15  that hard drive?

16      A.   Do I --

17      Q.   Have you seen that before?

18      A.   I have.

19      Q.   Can you tell us how many times?

20      A.   Ha Ha.  I was laughing to myself.  Yes, I seen it

21  many, many times.

22      Q.   Will you please tell us exactly how to get to clip

23  Number 25?

24      A.   Yes.  You would, like 1A, front door outside, and

25  then since the time that we're looking for is 3:20, the way
```

DIRECT/FELL/PEOPLE

1    that the clips are organized is the name of each file.  You see

2    the first one says 12:00 a.m.?  Well, that means the back clip

3    ends at 12:00 a.m..

4            So in order to figure out the time you want you have

5    to look at the preceding file and you start from that time.  So

6    for the 25 is 3:20 a.m..  So the time before that matches 3:10

7    a.m..  So we would actually open 3:38 a.m.

8        Q.    The clip entitled 3:38?

9        A.    Yes.  The clip entitled 3:38.  And you would open

10   that clip and fast forward it about ten minutes to get to 3:20.

11       Q.    Don't tell us about tell us exactly how far to fast

12   forward it.

13       A.    9 minutes 32 seconds.

14       Q.    And is that the clip that you actually watched?

15       A.    Yes.

16       Q.    And you did, the procedure you just outlined, you did

17   that every single time you made an entry?

18       A.    Well, I would watch the entire clip.

19       Q.    Right.  But when you made the entries, that's what

20   the entries signify, you used the same taxomity each time?

21       A.    Yes.

22       Q.    That was the question.  I'm sorry it was very poorly

23   worded.  Thank you. And if we could go to one other of your

24   clips, please.

25       A.    Sure.

Glenn J. Merola, Sr. Court Reporter

DIRECT/FELL/PEOPLE

1      Q.   Did you have clip Number 2?

2      A.   Yes.

3      Q.   And then after -- withdrawn.   On Clip Number 2 did

4   you see individuals?

5      A.   Yes.

6      Q.   Did you then trace them on Clip Number 3?

7      A.   Yes.

8      Q.   Okay.   So let's go to Clip Number 3, please.

9      A.   Sure.

10      Q.   And tell us but please get us there.

11      A.   Right.   So you are going to open 1B, front door

12   inside, and we're going to open the folder -- 12:36.

13      Q.   Well, which file are we going to open first, it's

14   Number 3.

15      A.   The 12:36 a.m. file and fast forward it 16 minutes 30

16   seconds.

17      Q.   Okay.   Stop.   Stop.

18           I understand you are telling us the original time.

19   What's the name of the file that's being opened?

20      A.   Oh.

21      Q.   That you have to open to get to that time period?

22      A.   1B.

23      Q.   Okay.   That's the camera.   What's the clip?   I'm

24   sorry.   What's the name of the clip?

25      A.   Oh.   It's 12:57.

Glenn J. Merola, Sr. Court Reporter

DIRECT/FELL/PEOPLE

1      Q.   Thank you.

2      A.   Apologies.

3      Q.   No.  That's okay.  And now we understand.  What's the

4  beginning time of this clip?

5      A.   The beginning time of this clip is 12:36.  You open

6  the file that says 12:57.

7      Q.   Got it.  Now, if you expand that, please.  Hit play.

8  Now, tell us how far to go into this clip.

9      A.   15 minutes 13 seconds.

10     Q.   Which makes it what, real time?

11     A.   12:52 a.m..

12          (Video being played in open court.)

13          (Pause.)

14     Q.   Who were you told that first person is?

15     A.   That is Anthony Hall.

16     Q.   Okay.  And the second person?

17     A.   We refer to him as B Hat.

18     Q.   Continue.

19          (Videotape playing.)

20     A.   That is Mark Richardson.

21     Q.   And then the next one?

22     A.   Hood.  Refer to him as Hood.

23     Q.   These four individuals is this the first time any of

24  them appear on this video?

25     A.   Yes.

DIRECT/FELL/PEOPLE/CROSS

1     Q.    On 1B, of course they entered from 1A?

2     A.    Right.

3     Q.    Which you would see the back of their head, right?

4     A.    You can actually see there faces.

5     Q.    Or the side.  Thank you.  But just so we're clear,

6  this particular video we have just watched, these four

7  individuals entering at 12 -- approximately 12:52 a.m. on

8  January 11th, this is the first time you see these four people?

9     A.    Yes.

10          MR. BOGDANOS:  Thank you.  Nothing further.

11  CROSS EXAMINATION

12  BY MR. KLEIN:

13    Q.    Mr. Fell, you watched hours of video, right?

14    A.    Yes.

15    Q.    You saw people coming in and out of the front door,

16  right?

17    A.    Yes.

18    Q.    All right.  You saw women, right?

19    A.    Yes.

20    Q.    And beside the six people that you have identified as

21  focusing on, you saw other women beside Helen Abbott, right?

22    A.    Yes.

23    Q.    And you saw other men beside the five males that you

24  were focused on, right?

25    A.    The four males, yes, sir.

Glenn J. Merola, Sr. Court Reporter

CROSS/FELL/DEFENSE

1    Q.   The four males.  I'm sorry.  Yes?

2    A.   Yes.

3    Q.   You saw at times young males, that is kids, right?

4    A.   Yes.

5    Q.   You saw males who appeared to be teenagers, right?

6    A.   Yes.

7    Q.   Some males who appear to be in their Twenties, right?

8    A.   Yes.

9    Q.   And you also saw older males, right?

10   A.   Right.

11   Q.   Both coming in and out of the building, yes?

12   A.   Yes.

13   Q.   Now, you indicated to us that you saw Helen Abbott go

14   out the first time at approximately 3:20 in the morning on

15   1/11, right?

16   A.   That's correct, sir.

17   Q.   And you also told us it was about 12:52 a.m., on

18   1/11, that that was the first time that you see those four

19   individuals go into the building, right?

20   A.   Yes.

21   Q.   And that's true, right?  That is what you saw, right?

22   A.   Yes.

23   Q.   All right.  Now, you indicated to us that you were

24   brought in and you were made part of a project to watch video,

25   right?

CROSS/FELL/DEFENSE

1      A.    Yes.

2      Q.    And you sat down and you split up the times that you

3  were going to watch, right?

4      A.    Yes.

5      Q.    And be accurate to say that the times that you were

6  told you were going to watch was from midnight on the 10th

7  going into the 11th and then going forward, right?

8      A.    Yes.

9      Q.    So the 12:52 time, that was actually 52 minutes after

10  where you began to watch video, right?

11      A.    Yes.

12      Q.    You weren't given any video to watch of the evening

13  of the 10th, right, going up to midnight?

14      A.    I was not given, no.

15      Q.    And as far as you know, when the times were split up,

16  no one was given any video of the evening of the 10th to watch,

17  were they?

18      A.    That's correct, sir.

19            THE COURT:  Thank you.  Mr. Bogdanos.

20            MR. BOGDANOS:  No, nothing.  Thank you, Mr.

21  Fell.

22        (The witness was excused and exits the courtroom.)

23            THE COURT:  Next witness.

24            MR. BOGDANOS:  The People next call to the stand

25  Norman Marin from the Office of Chief Medical Examiner.

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

```
 1                    THE COURT:  Thank you.
 2                    (The witness, Norman Marin, enters the
 3            courtroom, takes the witness stand, is duly
 4            sworn/affirmed in by the Clerk of the Court, responds to
 5            the oath and testifies as follows:)
 6                    THE COURT CLERK:  Do you solemnly swear or
 7            affirm the testimony you are about to give shall be the
 8            truth, the whole truth, and nothing but the truth, so
 9            help you God?
10                    THE WITNESS:  Yes.
11                    THE COURT OFFICER: Have a seat, please.
12                    THE WITNESS:  Thank you.
13                    THE COURT OFFICER: State your name for the
14            record and spell your last name.
15                    THE WITNESS:  Sure.  My name is Norman Marin. .
16            Last name is, M-a-r-i-n.
17                    MR. BOGDANOS:  May I inquire, Judge?
18                    THE COURT:  Yes, you may.
19   DIRECT EXAMINATION
20   BY MR. BOGDANOS:
21       Q.   Good morning, Mr. Marin.
22       A.   Good morning.
23       Q.   Would you tell us by whom you are employed and for
24   how long you have been there?
25       A.   I have been employed with the Office of the Chief
```

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1  Medical Examiner for about ten years now.

2      Q.    In what capacity?

3      A.    I work go in the Department as a Criminalist in the

4  Special Investigations Unit.

5      Q.    And what is the Special Investigations Unit?

6      A.    Special Investigations is a unit that primarily deals

7  with forensic science issues, things like Crime Scene

8  reconstruction, bloodstain pattern analysis, bullet protectory

9  reconstructions, those sort of forensic techniques.

10     Q.    And would you tell the jury what kind of training and

11 education you had to qualify you for your current position at

12 SIU?

13     A.    I have a bachelor of science in forensic science from

14 John Jay College and also had about six months of in-house

15 training as well as 80 hours of bloodstain pattern analysis

16 training.

17     Q.    And the SIU itself, Special Investigations Unit, is

18 part of the larger office of Chief Medical Examiner as you told

19 us, yes?

20     A.    Yes.

21     Q.    The same office that has a Forensic Biology Unit?

22     A.    That's right.

23     Q.    And the same office that has the Medical Examiner,

24 people who do autopsies?

25     A.    That's right.

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1     Q.    Same -- withdrawn.  Jurors already heard about the

2  Office of Chief Medical Examiner so we're not going to go into

3  all that, okay?

4     A.    Okay.

5     Q.    You told us that what you do and so is it may we take

6  it that you have seen various crime scene shows on television?

7  Which ever one, pick one, anyone?

8     A.    I try not to watch.

9     Q.    So, but your unit is just like CSI?

10    A.    Absolutely not.

11    Q.    Explain, please, very briefly.

12    A.    Our unit is basically two criminalist, myself and one

13  other criminalist right now, and we examine crime scenes,

14  physical evidence, whatever the case may be, just to try to

15  tease out more information from the case on the physical

16  evidence that's available.

17    Q.    And did you receive an assignment of relevance to

18  this case and this jury?

19    A.    Yes, I did.

20    Q.    Would you tell us what that assignment was, please?

21    A.    I received a phone call from Detective Dimuro asking

22  us, if we would be willing to look at the crime scene in this

23  case.

24    Q.    Do you remember when that was?

25    A.    That was the 18th of January, 2008.


                    Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1    Q.    And did you then go to the crime scene?

2    A.    Yes, I did.

3    Q.    When was that?

4    A.    We scheduled to go to the crime scene 22nd of January

5    in 2008.

6    Q.    And is that the day you actually went?

7    A.    Yes.

8    Q.    And where did you go?

9    A.    It was 2400 Second Avenue, apartment 12E.

10   Q.    Now, you had some information about the crime itself

11   and about how the scene was found earlier?

12   A.    Yes.  I had discussion with Detective Dimuro about

13   the case.  I also had discussed the case with ADA Hinkley,

14   which was the prosecutor on the case at the time.  And I also

15   had a discussion with Doctor Tranchida who was the Medical

16   Examiner on the case at the time.  He informed me of some of

17   the injuries sustained by the victim.

18   Q.    So you were aware that the body of Helen Abbott had

19   actually been found on January 13th?

20   A.    Yes.

21   Q.    Nine days before you went to the crime scene?

22   A.    That's correct.

23   Q.    What was the condition -- withdrawn.  Isn't nine days

24   too long to go back and see what else you can find?

25   A.    Not necessarily.

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1    Q.   Explain.

2    A.   You are limited in what you can do, definitely,

3  previous processing of the crime scene by the Crime Scene Unit,

4  even by the Medical Legal Investigator Staff, can cause

5  alteration to the scene.  But sometimes you can still find

6  things like bloodstain patterns that may have some significance

7  but you become limited in what you can interpret.

8    Q.   And when you arrived can you tell us about whether

9  any steps had been taken to secure or whether it appeared to

10  you that any steps had been taken to secure the crime scene in

11  the intervening nine days?

12    A.   Well, I believe the apartment was locked.  I believe

13  it was also a seal on the door.

14    Q.   One of those yellow NYPD crime scene tapes?

15    A.   A green sticker.

16    Q.   So you actually arrive on the 22nd?

17    A.   Yes.

18    Q.   About what time?

19    A.   It was about quarter to one in the afternoon.

20    Q.   About how long are you at the scene all together?

21    A.   Little under five hours.

22    Q.   And would you tell the jury, please, do you have a

23  standard procedure that you follow at such scenes, generally?

24    A.   Yeah.  We usually get a walk through of the

25  apartment.  The detective explains to us some of the details of

Glenn J. Merola, Sr. Court Reporter

1    the case, where the victim was positioned, where they noticed

2    some of the bloodstains that they found, and after that we will

3    then start to diagram the crime scene and take what we call

4    establishing photography, photography to show the overall

5    condition of the crime scene.

6        Q.    I would ask that -- and did you do that in this case?

7        A.    Yes.

8        Q.    And did you actually do a crime scene sketch, a

9    diagram of the apartment?

10       A.    Yes.

11              MR. BOGDANOS:  I would ask that the witness now

12   be handed 17 in evidence.  If you can put it up perhaps that

13   monitor might be best.  Definitely on its side.  Please.

14   BY MR. BOGDANOS:

15       Q.    If you would take a look at that.

16              MR. BOGDANOS:  And for the record, overlay 17B

17   is on it.

18       Q.    You were not present at that scene on January 13th,

19   is that correct?

20       A.    That's correct.

21       Q.    So the only time you were present in that apartment

22   is January 22nd?

23       A.    That's right.

24       Q.    This particular diagram of the apartment, 17 in

25   evidence, do you recognize it?

DIRECT/MARIN/PEOPLE

1      A.    Yes.

2      Q.    How do you recognize it?

3      A.    This is a finalized diagram that I prepared.

4      Q.    It's a blowup of the one you did?

5      A.    Yes.

6      Q.    And you did it fairly and accurately?

7      A.    Oh yes.

8            MR. BOGDANOS:  If we could just leave that up

9   for a moment.

10     Q.    In addition to drawing the diagram of the

11  apartment -- and it's not to scale?

12     A.    No, it's not to scale.

13     Q.    In addition to drawing the diagram of the apartment

14  did you take any photographs?

15     A.    Yes.

16     Q.    Explain, just very generally, walk us through that if

17  you would.

18     A.    Walk you through --

19     Q.    Taking the photographs.  Tell us what you did?

20     A.    Start at the entry way, just using a wide angle lens,

21  taking photographs of the kind of the overall condition of the

22  scene, trying to overlap photographs so that they can be laid

23  side-by-side and you can see the continuation from one

24  photograph to the other.

25            I don't recall exactly the path I took, entry,

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1   kitchen, living room, and then to the bathroom and bedrooms in

2   the back.  Bedroom two was the only one that was very difficult

3   to document because it was completely crammed with items.

4        Q.   And you did take a series of photographs?

5        A.   Yes.

6              MR. BOGDANOS:  I am going to ask you to take a

7   look at what I have marked People's 75 through 82, for

8   identification, copies of which previously been given to the

9   defense.  For the record, SIU photographs or some of the SIU

10  photographs.

11       Q.   Please take a look and if you can keep them in order

12  that would be great.

13             (Handing exhibits to the witness.)

14             (Pause.)

15       A.   Okay.

16       Q.   Do you recognize those photographs?

17       A.   Yes, I do.

18       Q.   Do they fairly and accurately depict the scenes in

19  the apartment in the various locations in the apartment as you

20  saw them on January 22nd of 2008?

21       A.   Yes.

22             MR. BOGDANOS:  I will offer those into evidence

23  as 75 through 82.

24             MR. KLEIN:  I have seen them.  Thanks.

25             THE COURT:  No objection?

                    Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1           MR. KLEIN:   No.

2           THE COURT:   75 through 82 are all admitted.

3           (People's Exhibits 75 through 82, photographs,

4  was received in evidence.)

5  BY MR. BOGDANOS:

6      Q.   Hold on to those in a minute we'll come back to the

7  photos.   You mentioned one of the other things you do is

8  bloodstain pattern analysis?

9      A.   That's right.

10     Q.   Could you explain exactly what that is?

11     A.   It's looking at bloodstains trying to identify a

12  mechanism by which they formed and using those concepts to try

13  to interpret what may have caused the formation of those

14  bloodstains.

15     Q.   And are there different types of bloodstains?

16     A.   Yes.

17     Q.   Could you tell us some, please?

18     A.   They can be generally categorized as blood that has

19  been deposited as a contact mechanism, meaning that if you have

20  blood on an object, an object touches something else, comes

21  into contact with something else, and there's a transfer of

22  blood.

23          And there is also blood that could have been

24  spattered.   For example, so if you have liquid blood, and there

25  is some force applied to that liquid blood, it can cause it, a

DIRECT/MARIN/PEOPLE

1  dispersment in the form of very small droplets.

2      Q.   And is there a term called cast-off?

3      A.   Yes.  There's a term called cast-off.  Cast-off

4  usually refers to when there's liquid blood on an object and

5  that object is swung the inertia that's generated from swinging

6  the blood will cause an amount of blood to come off of.

7      Q.   So you are saying an object, I understand the

8  universe is endless, things like knives, scissors, things like

9  of that nature?

10     A.   Objects, knives, scissors, pencils, your hands.  If

11 you have liquid blood on your hand and you swing it blood can

12 come off of it that would be considered a cast-off.

13     Q.   So we understand a little more precisely.  By

14 cast-off you mean the blood is actually coming from the

15 instrument itself?

16     A.   That's right.

17     Q.   And that cast-off, in other words, blood that comes

18 from the instrument looks different then -- differently, then

19 spatter?

20     A.   It can.  It can also be -- well, let me start by

21 saying that if you have a cast-off pattern they can appear to

22 be very linear in their distribution.  For example, if you were

23 to take like a stick, dip it in blood, swing it, it would have

24 a very linear distribution of blood.

25          There are times where the droplets can be small or

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1    approximately the same size as droplets from a spattered

2    pattern as a result of an impact and, therefore, they can be

3    indistinguishable from each other in the overall pattern.

4         Q.    What about airborne droplets.

5         A.    Airborne droplets simply refers to blood that is

6    being projected through the air.  So we have and impact on to

7    liquid blood you have a small droplet that's coming out of that

8    that's being dispersed from that, we tend to call that an

9    airborne droplet.

10             MR. BOGDANOS:  I ask that the witness now be

11   shown what's previously been received in evidence as 21, 22,,

12   33 and 32.  For the record, I'm just going to show Mr. Klein.

13             So it's 21, 22, 33, 32.

14             (Handing exhibits to the witness.)

15        Q.    Please take a look at those photos.  You seen them

16   before?

17        A.    Yes.

18        Q.    I'm sorry.  I should wait until you finish.  You seen

19   these before?

20        A.    I have seen these before.

21        Q.    You had an opportunity to examine them before?

22        A.    Yes.

23        Q.    And do you see how in the photos there's certainly

24   blood?

25        A.    Yes.

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1          MR. BOGDANOS:  And what I am going to ask, with

2   the Court's permission now, we can do what we did before, and

3   have the witness approach here -- or did we do it there, the

4   photos?

5          THE COURT:  Over here.

6          MR. BOGDANOS:  Okay.  Can I have an easel put

7   up.

8          THE COURT:  Wherever you would like.

9          MR. BOGDANOS:  With the Court's permission can

10  Mr. Marin approach.

11         THE COURT:  Yes.  You may step down Mr. Marin.

12  BY MR. BOGDANOS:

13     Q.    Please try as hard as you can -- you are right handed

14  right?  You are right handed?

15     A.    Yes.

16     Q.    If you can step to the side and not block the photos

17  with your body.  I am going to display on here 21, 22, 33, 32.

18  And then just admitted 81 and 82.

19         And if we could start, just for now, just limit it to

20  blood spatter analysis and we'll save, there's more questions

21  in a moment on other fluids but let's start with this.

22         Can you explain to the jury, starting with each photo

23  at the top, 21, 22, and show some of the blood and explain what

24  we're looking at.  And use your terminology, spatter, cast-off,

25  contact, pool, airborne, droplets, whatever's appropriate.

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1       A.   Okay.  Starting from this photograph.

2                 MR. BOGDANOS:  Sure.  21 for the record.  Of Ms.

3    Abbott.

4       A.   Just concentrating on the areas of the floor.

5    There's an obvious area of pool blood and there's also, looking

6    on the TV shelf, there's some blood droplets that appear to be

7    what we refer to as airborne droplets.  So these are not of a

8    contact mechanism.  Over here.

9       Q.   22.

10      A.   When facing the photograph, on the right side of the

11   TV stand, you see what's referred to as a contact transfer.  So

12   that is an indication that something had touched that surface

13   and with some motion behind it and there was a transfer of

14   blood.  This is closer view.

15                THE COURT:  32.

16                MR. BOGDANOS:  32.

17                THE COURT:  I'm sorry.  33.

18      A.   This is a closer view of the left side of that TV

19   stand.  There's also just a better view of the airborne

20   droplets.  Here you can also see some droplets around periphery

21   of the pool blood also appear to be airborne in nature.

22           And --

23      Q.   32.

24      A.   32 is a closer view of the right side of that TV

25   stand.  Just a better view of that contact.  There's also some

                    Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1    contact stains on the floor here.

2         Q.   81.

3         A.   This photograph shows another distribution of

4    apparent blood on the wall just past the left side of the TV

5    stand.  And then --

6         Q.   82.

7         A.   Here these are some blood stains on the floor that

8    have been treated with a chemical that's called lucocrystal

9    violet.

10        Q.   Well, let's hold off -- there appear to be some

11   colors in that.  Let's hold off on that for a moment.  You are

12   going to get to that in-depth in a moment, what you treated,

13   how you -- alternate light sources you use.  But just talk

14   about the blood itself and the spatter pattern.

15        A.   Okay.  All you are really seeing in this photograph

16   is the area where the victim was in contact with the floor and

17   the remnant of that pool of blood in addition to the contact on

18   the television stand as well as the spattered blood on the

19   other side of the television stand.

20        Q.   Now, did you -- can you comment on the height of the

21   blood spatter pattern surrounding the body, particularly the

22   head of Ms. Abbott?

23        A.   It appears from the scale that's on over here we have

24   a height of about 17 inches that's about --

25                  THE COURT:  Exhibit 33.

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1                    MR. BOGDANOS:  Yes.  Thank you, Judge.  33.

2      A.   I'm sorry.  Not 17 inches.  Correction.  19 inches

3  off the ground and back on the wall, I would say everything was

4  at about no more than a height of about two feet.

5                    MR. KLEIN:  I'm sorry.  I just couldn't hear the

6  answer?

7      A.   I'm sorry.  In this photograph --

8                    THE COURT:  81.

9      A.   The apparent bloodstains were really no more than a

10  height of about two feet.

11     Q.   Okay.  For purposes, one last question on the blood.

12     A.   Sure.

13     Q.   Assume, for purposes of this question, that People's

14  21 is exactly how Helen Abbott's body was found in that

15  position and particularly with those wounds on the left side of

16  her head, can you see that?

17     A.   Yes.

18     Q.   Assume, for purposes of this question, that Helen

19  Abbott received injuries on People's 56 -- I am just going to

20  put it up for a moment.

21                   Assume, for purposes of this question, that Helen

22  Abbott received injuries that are shown on People's 56 --

23                   MR. BOGDANOS:  Can I just approach to point

24  out?

25                   THE COURT:  Yes.


                   Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1      Q.   And you can see these red marks.   Assume these are

2   abrasions and lacerations, and both blunt and sharp force

3   trauma to the left side of the face, do you see that?

4      A.   Yes.

5      Q.   Okay.   So, assume, for purposes of this question,

6   those are the injuries to her face, better shown in People's

7   21, assume that she fell there.   Okay?   Assuming that.

8           Assume also, for purposes of this question, and the

9   ultimate question at the end is going to be:   Was there

10   anything inconsistent about your findings with the facts I have

11   asked you to assume?

12           Okay.   Assume, for purposes of this question, that

13   after Ms. Abbott was stabbed, generally in the front, at least

14   22 times and fell face down on the floor, exactly as you see

15   her on her right-hand side with her left side up.

16           Assume that those injuries on her face, the

17   lacerations, the cuts, the incisions, the sharp and blunt force

18   trauma, had started to bleed.   Assume there was some blood.

19           Assume that after she fell to the floor or as she was

20   falling to the floor, very close to the floor, she was struck

21   another time with some blunt force trauma after she was already

22   down in that position and assume that that table was exactly

23   there and TV was exactly there when she was down and struck one

24   more time, is there anything that you see in the photographs or

25   from your examination, that is inconsistent with the facts as I

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1   have asked you to assume for purposes of this question?

2       A.   No.

3                MR. BOGDANOS:   Thank you.   You can retake your

4   seat.

5       Q.   Now, I stopped you a moment ago, and so now let's go

6   back to the rest of your examination and let me do it in

7   reverse if I could.   Did you search the entire apartment for

8   blood?

9       A.   With the exception of bedroom two, yes.

10      Q.   Right.   The room you couldn't get in.   Thank you.

11  How, the rest of the apartment, how did you search for blood,

12  the entire apartment, how did you search for blood except for

13  bedroom two?

14      A.   Well, visually inspecting it, flashlights, looking

15  around for anything that may appear to be a bloodstain.   And

16  then another thing that was done was we prepared a chemical

17  that's called lucocrystal violet, it's a colorless liquid that

18  turns purple when it comes in contact with heme, h-e-m-e, heme

19  components of blood and then that chemical is basically

20  sprayed, a spray bottle is used and then it's deposited on

21  walls, floors, so you can treat many areas very quickly to

22  identify blood that's very difficult to visualize.

23      Q.   So if there is no blood visible to the naked will

24  lucoscrystal violet, will spraying lucocrystal violet

25  potentially allow that blood to be seen?

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1    A.   Yes.

2    Q.   How?

3    A.   As long as it's not diluted past the protection limit

4  of the chemical.

5    Q.   And how would it be diluted?

6    A.   With water.

7    Q.   So, assuming it's not been diluted, you have an area,

8  you spray it --

9    A.   Right.

10   Q.   -- now what?  And imagine that it has blood of

11  course.

12   A.   If there is blood present there's immediate reaction

13  with the chemical within a couple of seconds the chemical will

14  go from colorless liquid to purple.

15   Q.   And then what happens after a few minutes to that

16  area that's been treated?

17   A.   Well, after some time, depending on the formulation

18  of the chemical, it can completely oxidize and everything will

19  eventually turn purple, the entire liquid will turn purple.

20   Q.   So if you spray an area with lucocrystal violet it's

21  only the initial purple that counts as blood?

22   A.   That's right.

23   Q.   And after that it's the entire spray?

24   A.   Right.

25   Q.   So you have to document pretty quickly?

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1      A.    Yes.

2      Q.    With the concentration that you use how quickly

3  before everything turns purple?

4      A.    Well, I usually have a camera ready and it's

5  photographed right away, as soon as it turns purple I take a

6  photograph of it.

7      Q.    But how long do you have, are we talking hours,

8  minutes,?

9      A.    Again, it depends on the formulation.  It can be

10 anywhere from fifteen minutes to half hour before you start

11 getting --

12     Q.    You did that here?

13     A.    Yes.

14     Q.    I cut you off before.  In some of these photos we can

15 see a lot of purple.

16     A.    Yes.

17     Q.    And is that because -- is that blood or is that the

18 violet being oxidized?

19     A.    That's the violet because some time has passed.

20     Q.    Did you find blood anywhere in the apartments other

21 than bedroom three?

22     A.    No.

23     Q.    And you looked?

24     A.    Yes.

25     Q.    In addition to searching for blood did you search for

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1  any other biological fluids?

2      A.   Yes.  We did use an alternate light source to look

3  in, excuse me, bedroom three where the victim was found.  We

4  used alternate light source to look for any florescent stains.

5  Usually florescent stains are indicative of biological fluids.

6  So we did that examination in the bedroom and did find some

7  areas where there was some florescent.

8      Q.   Would you explain to us, please, very briefly, what

9  does that mean, alternate light source?

10     A.   Alternate light source is just like a lamp that you

11 can fine tune the wavelength of light that's coming out of it.

12          By doing that you can impart some energy of the light

13 into a particular fluid and it will spit that light back out at

14 you at a different wavelength.  So that's generally referred to

15 as florescent so it lights up.

16     Q.   When you used an alternative light source in this

17 case are you using your naked eye?

18     A.   Yes, you are using your naked eye.  But you have to

19 use what is called a barrier filler, it comes with some goggles

20 that basically blocks out the light from incident so whatever

21 you are seeing is the light from whatever is florescent.

22     Q.   And you did that here?

23     A.   Yes.

24     Q.   Did you find, did anything floures?

25     A.   Yes.

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1     Q.    How many all together?

2     A.    There were four areas on the floor that showed

3  florescent.

4     Q.    And how did you mark those items?

5     A.    While they were fluorescing they were outlined with a

6  black marker and they were labeled N1 through N4.

7     Q.    So just so we understand.  You got your goggles on

8  and you just draw a circle around it?

9     A.    That's right.

10    Q.    Was there also N5?

11    A.    Yes, there was an N5.  N5 was a bed sheet.

12    Q.    And did you do the same, same procedure N5, you used

13  the light source, you use the goggles?

14    A.    Yeah.  N5 was also examined with a light source and

15  it was also some blood, visible bloodstains on there.

16    Q.    And if we could go --

17         MR. BOGDANOS:  I'm sorry to do this.  Can we

18  take the velcro down for a moment.  It's going to come right

19  back up.

20  BY MR. BOGDANOS:

21    Q.    Going back to 17.  In fact, are N1 --?

22         MR. BOGDANOS:  May I approach, Judge again?

23  It's my eyes.  I can't read that from here.

24         THE COURT:  Yes.

25    Q.    Are N1 through 4 shown on the chart itself?

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

```
 1    A.   Yes, they are.

 2    Q.   And is that where you found N1 through N4?

 3    A.   That's approximately the location.

 4    Q.   Again not to scale?

 5    A.   Correct.

 6    Q.   But you drew that, the N1 you drew that?

 7    A.   Right.

 8    Q.   N2 and 3 and 4?

 9    A.   That's right.

10    Q.   And where is N5?

11    A.   N5 is not on there.  N5 was initially found right at

12 the opening of the door, the bedroom door.

13    Q.   Let's me grab a pen.  It's in black, right, let's go

14 with blue.  Would you show me where approximately, we know it's

15 not to scale, show me approximately where N5 was.  I will draw

16 it you just point.

17         (Witness points.)

18    A.   Right around there.

19    Q.   Am I doing it right, right there?

20    A.   Yes.

21         MR. BOGDANOS:  We know it's not to scale and I

22 am going to draw it large.  N5. I am doing that for the record

23 in blue ink on 17B.  And I will put in blue ink your last name

24 Marin.

25    Q.   Have I done that accurately?
```

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1    A.    Yes.

2    Q.    Okay.  Thank you.  Did you take photographs of N1

3    through N5?

4    A.    Yes, I did.

5    Q.    Let's specifically talk about --

6              MR. BOGDANOS:  If I can get the velcro back up

7    again, please.  Thank you.  And I will put -- May I put these

8    on, Judge, is that all right?

9              THE COURT:  Yes.

10             MR. BOGDANOS:  It will be 77 through 80.  And if

11   Mr. Marin can approach.

12             THE COURT:  Yes.

13   BY MR. BOGDANOS:

14   Q.    Same deal, Mr. Marin, if you can possibly avoid

15   blocking the photographs from the jury.  And I think I done it

16   left to right it will be 77, 78 and then 79 at the top and then

17   80.  So start with 77.  Tell us what that shows.

18   A.    77?

19   Q.    Yes, that's 77.  Thank you.

20   A.    This is the area floor between the door and the TV

21   stand.

22             THE COURT:  There's no microphone over there so

23   you have to project your voice a bit.

24             THE WITNESS:  I will try my best sorry.

25   A.    These photographs are a little bit out of sequence.

Glenn J. Merola, Sr. Court Reporter

DIRECT/MARIN/PEOPLE

1   This is the area floor between the door and TV stand and this
2   is after the room was examined with the light source and the
3   floors were treated with lucocrystal violet.
4          So here there are some areas where there's some
5   reaction with the chemical.
6      Q.   Indicating --
7      A.   Indicating that there's blood in that area.
8      Q.   Got it.  That's on 77.  And just if you would -- in
9   77 that white table at the very top, that's the same plastic TV
10  stand we have been talking about?
11     A.   Yes.
12     Q.   Got it.  Obviously there is no body there anymore?
13     A.   No.
14     Q.   Now go to 78, please.
15     A.   This is kind of like an overall photograph of the N1
16  and N2 after they were circled with a marker, after this area
17  was examined with a light source.
18     Q.   And if we can orient this photograph for the jury.
19  You see is that the bed, right foreground?
20     A.   This section of the bed corresponds to this corner
21  and this is the corner of the -- when I am facing the
22  photograph the right side of the television stand.
23     Q.   So going to, just backing up for a moment.  You
24  physically backed up.  If you wouldn't mind and take a look at
25  17, the chair that's in 78, can you show us where the chair is?

DIRECT/MARIN/PEOPLE

1      A.   That would be this chair right here.

2      Q.   On 17.  And so the two stains we see in front of the

3   chair on 78, identify them and point them out on 17, please?

4      A.   That would be these two stains.

5      Q.   But you have to identify.  You can't say this for the

6   record.

7      A.   Sorry.  Stains N1 are here, N1 and N2, basically in

8   front of the chair.

9           MR. BOGDANOS:  For the record, on the diagram,

10   the top -- top is really terrible way to describe it.

11           Top one is N1 and bottom one on two dimensional

12   diagram is N2?

13      A.   Yes.

14           (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1  DIRECT EXAMINATION CONT'D.:

2      *Q*    And you've already indicated on 78 you circled it?

3      *A*    Yes.

4      *Q*    Now go to -- 78, 79, top.

5      *A*    This is a close-up photograph of stain N-1; and the

6  photograph below it is a photograph taken with the alternate

7  light source on, and there is an orange filter over the camera

8  to show you the fluorescence of that stain.

9      *Q*    When you were examining the scene and taking the

10  photographs, doing everything you just described, were there any

11  New York City detectives present?

12     *A*    Yes.

13     *Q*    Do you remember who?

14     *A*    Detective Dimuro and Detective Henriquez.

15     *Q*    And after you took the photos, did you take any steps

16  to preserve any of these items?

17     *A*    The fluorescence stains that were noted were all

18  collected with swabs.

19     *Q*    Who did that?

20     *A*    I did that.

21     *Q*    And you used sterile swabs?

22     *A*    Yes sterile swabs.

23     *Q*    Sealed package?

24     *A*    Single packet swabs.

25     *Q*    Standard procedure?

1    **A**    Yes.

2    **Q**    What did you do with those actual swabs N-1 through

3    N-4?

4    **A**    They were then packaged in envelopes and then sealed,

5    initialed, and dated.

6    **Q**    Who did all that?

7    **A**    I did that.

8    **Q**    You?

9    **A**    Yes.

10   **Q**    And then you -- after you sealed them and signed them

11   and did all that, what did you do with those sealed swabs?

12   **A**    It was transferred to Detective Henriquez.

13   **Q**    You gave them to him?

14   **A**    Yes.

15   **Q**    And ultimately -- and I am sorry you could take your

16   seat now.

17            (Witness resumed the witness stand.)

18   **Q**    And ultimately were you made aware that N-1 and N-3

19   were actually semen stains?

20   **A**    No.

21   **Q**    Your office didn't tell you that?

22   **A**    No.

23   **Q**    And what happened with N-5?

24   **A**    N-5 was just photographed and collected.  It was placed

25   in a bag and then sealed, initialed and dated and transferred to

<u>Marin - Cross - Defense</u>                746C

1   Detective Henriquez.

2            MR. BOGDANOS:  And I would ask that, finally,

3   Mr. Marin be handed 70 and 71.  You can just put it right on

4   top of the Velcro and then I am done.  You could start with

5   70.  Yeah, that's the big one.  Great.

6       **Q**   Take a look at 70 and if you would look and you see

7   N-1, N-3 and N-5.  You see that?

8       **A**   Yes.

9       **Q**   And those are your swabs?

10      **A**   Yes.

11      **Q**   N-1 -- I am sorry N-1, N-3 is your swabs?  N- -- 5?

12      **A**   N-5 is the bed sheet.

13      **Q**   The bed sheet and then I am going to put 71 up and see

14  if I could do this faster.  And if you look at 71, you see N-2

15  and N-4, those are your stains?

16      **A**   Yes.

17            MR. BOGDANOS:  Got it.  Nothing further, sir.

18            THE COURT:  Thank you.  Mr. Klein.

19  CROSS-EXAMINATION

20  BY MR. KLEIN:

21      **Q**   Good morning, Mr. Marin.

22      **A**   Good morning, Mr. Klein.

23      **Q**   Mr. Marin, you and I have discussed this case about

24  over two years ago; yes?

25      **A**   Yes.

<u>Marin - Cross - Defense</u>                    746 D

1   *Q*   I came to your office with another attorney?

2   *A*   That's right.

3   *Q*   And we went over your findings at that time?

4   *A*   That's right.

5   *Q*   Now I want you to assume something for a second.

6   *A*   Sure.

7   *Q*   Assume that a person suffers an incised wound at a

8   first location, but there is either no external bleeding from

9   the incised wound or whatever bleeding there is, is absorbed by

10  the clothing and none gets on the floor.

11       The lack of finding of any blood on the floor at the

12  first location is not inconsistent with the wound having been

13  inflicted in the first location, right?

14  *A*   That's right.  I mean you can have an assault occur

15  anywhere in the apartment and you could have absorption of blood

16  through clothing.  You could have no bleeding resulting from an

17  injury.  These things, yeah, I mean the incident could have

18  initiated anywhere.

19              MR. KLEIN:  Thank you, very much.

20              THE COURT:  Mr. Bogdanos?

21              MR. BOGDANOS:  Nothing.  Thank you.

22              THE COURT:  That completes your testimony,

23      Mr. Marin.

24              THE WITNESS:  Thank you.

25              THE COURT:  This a good place for a break,

746 E

1    Mr. Bogdanos?

2              MR. BOGDANOS:  As you wish, Judge.

3              THE COURT:  Ladies and gentlemen, let's take a

4    short recess.  You could all step outside.  Please do not

5    discuss the case.  Thank you.

6              (Jury exited the courtroom.)

7              THE COURT OFFICER:  Courtroom is clear.

8              THE COURT:  Mr. Richardson a break?

9              (Short recess.)

10              (Transcript continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    THE COURT:  Back to the trial.  Bring the jury in,
 2       please.
 3                    (Jury entered the courtroom.)
 4                    THE COURT CLERK:  Case on trial continued.  The
 5       People of the State of New York against Mark Richardson.
 6       The defendant, his defense attorneys, and the assistant
 7       district attorney are present.  Both sides stipulate that
 8       all jurors are present and properly seated?
 9                    MR. KLEIN:  Yes.
10                    MR. BOGDANOS:  Yes.
11                    THE COURT:  Thank you.  Mr. Bogdanos.
12                    MR. BOGDANOS:  The People next call to the stand
13       Nicole Van Maanen.
14                    THE COURT:  Thank you.
15                    (Witness entered the courtroom.)
16  N I C O L E   V A N  M A A N E N , called as a witness by and on
17        behalf of the People, having been first duly sworn, and/or
18        affirmed testified as follows:
19                    THE WITNESS:  Yes, I do.
20                    THE COURT OFFICER:  If you could have a seat,
21       please.  Pull your chair up a little bit to the microphone.
22       State your name for the record spelling your last name.
23                    THE WITNESS:  Nicole Van Maanen, V-A-N,
24       M-A-A-N-E-N.
25                    MR. BOGDANOS:  May I inquire, Judge?

<u>Van Maanen - Direct - People</u>                           748

1                    THE COURT:  Yes.

2    DIRECT EXAMINATION

3    BY MR. BOGDANOS:

4        *Q*    Thank you.  Good afternoon, ma'am.

5        *A*    Good afternoon.

6        *Q*    Ma'am, would you tell the jury your occupation, please.

7        *A*    I am a cell site analyst.

8        *Q*    By whom are you employed?

9        *A*    The New York County District Attorney's Office.

10       *Q*    And how long have you been so employed?

11       *A*    Since July of 2010.

12       *Q*    What did you do before that?

13       *A*    I had some temporary employment and was in graduate

14   school.

15       *Q*    Would you tell the jury, please, what training and

16   education you have had that qualifies you for your current

17   position as a cell site analyst?

18       *A*    In cell sites I have had on-the-job training since I

19   started in July of 2010.  I have had some mapping, training in

20   the mapping software ARCGIS.  Sent to 40 hours of training by

21   the New York County District Attorney's Office; and I took a

22   graduate level course in ARCGIS.

23       *Q*    You are saying ARCGIS.  I am sorry, you know what it

24   is, we don't; so can you say out loud please --

25       *A*    It is a mapping software created by ESRI, which stands

1  for Environmental Systems Research Institute.

2  *Q*     And you said you had -- I am sorry you said you had 40

3  hours of training in that particular software?

4  *A*     Yes, I was sent to training by the office in that

5  software.

6  *Q*     When you say the office you mean the Office of the

7  District Attorney of New York?

8  *A*     Yes.

9  *Q*     And you also mentioned that you have on-the-job

10 training in cell site analysis.  Could you be more specific

11 please.

12 *A*     Another cell site analyst trained me in reading of cell

13 site records and in analyzing them.

14 *Q*     And what are your duties specifically within the

15 District Attorney's Office concerning the cell sites?

16 *A*     I review court ordered subpoenas to cell phone

17 providers, reviewing the records returned, analyzing them for

18 cell suit data, and I make maps and charts for investigative and

19 trial purposes.

20 *Q*     And approximately how many times would you say you have

21 examined cell site or -- I am sorry -- cell site records?

22 *A*     I have worked on approximately 80 cases.

23 *Q*     And in each of those cases you just have one set of

24 cell site records?

25 *A*     Sometimes.  Sometimes there is more.

<u>Van Maanen - Direct - People</u>                    750

1    *Q*   Can you explain, please.

2    *A*   Sometimes the assistant district attorney would get

3    several cell site request back from a provider and I would

4    review them.  Sometimes it's one phone call -- one phone number

5    and sometimes it's several.

6    *Q*   You also said part of your duties is taking those cell

7    site records and creating maps based on that?

8    *A*   Yes.

9    *Q*   Approximately, how many times have you done that?

10   *A*   I made approximately 125 maps.

11   *Q*   And have you testified previously in courts of law?

12   *A*   Yes.

13   *Q*   Approximately, how many times have you done so?

14   *A*   Three.

15   *Q*   Three including today?

16   *A*   Today would be four.

17   *Q*   Can you tell -- withdrawn.

18       Did you receive an assignment of relevance to this case

19   and this jury?

20   *A*   Yes.

21   *Q*   Can you sell the jury what that assignment was and how

22   you received it.

23   *A*   I received records pertaining to a particular phone

24   number in this case.  The records were cell site records, and

25   cell site key which I analyzed and I created several maps for.

1         MR. BOGDANOS:  I would ask that the witness now be

2    handed what has previously been received in Evidence as

3    People's 37.

4         *Q*    Please take a look at these records and tell the jury

5    whether or not you recognize those records.

6              (Handing.)

7         *A*    Has this been previously entered?

8         *Q*    Yes.

9         *A*    Sorry, I can't find the --

10        *Q*    Ma'am, just tell the jury if you recognize what's been

11   handed to you?

12        *A*    I have.  I do.

13        *Q*    What do you recognize it to be?

14        *A*    The cell site call detail records and the cell site

15   key.

16        *Q*    Call detail I am sorry?

17        *A*    I am sorry for phone No. (917) 731-8269.

18        *Q*    And are these records that you used in order to carry

19   out your assignment?

20        *A*    I did.

21        *Q*    And would you please explain to the jury in detail both

22   what these records show and how you used them to create maps.

23        *A*    Sure.  The call detail records indicate a phone number,

24   a date, initiation time, duration, a type, and the originating

25   and terminating cell site location.  The cell column indicates

1  which cell site was used to transmit the call; and I then look

2  at the I.D. and the cell site key, which indicates the latitude

3  and longitude; and I use that in the mapping software to plot

4  the location of the cell site.

5      *Q*     The cell site that is used for each particular call?

6      *A*     Yes.

7      *Q*     And did you prepare maps in this case?

8      *A*     Yes.

9              MR. BOGDANOS:  I would ask that the witness now be

10  handed what I request be deemed marked People's 83 through

11  86; copies of which have previously been shown to the

12  defense.

13              (Handing.)

14              MR. BOGDANOS:  Perhaps on the easel I need

15  Ms. Maanen to take a look at them to see if she recognizes

16  them.

17              THE COURT:  There are four of them?

18              MR. BOGDANOS:  There are four altogether, Judge.

19  83.

20              THE COURT:  Through 86?

21              MR. BOGDANOS:  Through 86.

22      *Q*     Just take a look momentarily at each to make sure that,

23  in fact, you recognize each one.  I will start with 83.  Do you

24  recognize it?

25      *A*     I do.

1    Q    You prepared it?

2    A    Yes.

3    Q    Go to 84.  Please same question.  Do you recognize it?

4    A    I do.

5    Q    You prepared it?

6    A    Yes.

7    Q    85, please.  Recognize it?

8    A    Yes.

9    Q    You prepared it?

10    A    Yes.

11    Q    86.  Same two questions, do you recognize it?

12    A    Yes.

13    Q    And did you prepare it?

14    A    Yes.

15    Q    Thank you.  When you prepared these maps, did you use

16   any particular software?

17    A    I used the ARCGIS program.

18    Q    Is the one you told us about before?

19    A    Yes.

20    Q    In layman's terms can you explain to us what this

21   software enables you to do based on the cell site information?

22    A    The cell site information contains the latitude and

23   longitude, and the mapping software program allows me to plot

24   that on the map.

25    Q    It is the latitude and longitude of?

<u>Van Maanen - Direct - People</u>                    754

1    *A*    Of the cell site.

2    *Q*    That's used for each call?

3    *A*    Yes.

4    *Q*    And did you do that fairly and accurately in this case?

5    *A*    I did.

6    *Q*    And those four maps that you've seen you obviously

7    inspected them before coming to court.  You made them?

8    *A*    Yes.

9           MR. BOGDANOS:  I will offer them in Evidence as 83

10          through 86; copies of which were previously given to

11          defense.

12          MR. KLEIN:  Okay.

13          THE COURT:  Thank you.  All four are admitted.

14   *Q*    Okay, if we could start with 83, please, and if we

15   could put it up on the monitor, and it is suppose to be the one

16   that has all calls.  I hope I did that right.

17          THE COURT OFFICER:  All calls on January 10th.

18          MR. BOGDANOS:  Yes, okay.  I need to come up.  May

19          I, Judge?

20          THE COURT:  Yes.

21   *Q*    Would you please orient the jury on the map.  Before we

22   talk about any of the boxes or the region, just orient what they

23   are looking at geographically please.

24   *A*    Geographically it is upper portions of Manhattan,

25   portions of the Bronx; and a little bit of Randall's Island.

1   There is streets and buildings, roads, bridges.

2       *Q*    And the green is?

3       *A*    Parks.

4       *Q*    And the thing that appears to be a river is?

5       *A*    A river.

6       *Q*    There we go.  Now if you would tell us -- and is there

7   a north looking arrow on here?

8       *A*    No.

9       *Q*    But north is generally?

10      *A*    North, yeah.

11      *Q*    The top looking up?

12      *A*    Yeah.

13      *Q*    Could you now tell us what this particular map is

14  specifically.

15      *A*    Specifically, it is -- it indicates cell tours that

16  were initiated.  Communication for the phone number

17  (917) 731-8269 between the time of January 10, 2008, at 12:20

18  a.m. and January 11, 2008, at 4:59 p.m.

19      *Q*    And the two white boxes or text boxes, would you tell

20  us what those purport to show?

21      *A*    Sure.  They point to red circles and the text boxes

22  indicate the time -- the date the call was made; the time it was

23  made; whether it was an ingoing or outgoing phone call indicated

24  by and I or an O; and a phone number that was either in-called

25  or calling.

 1                    MR. BOGDANOS:  With the Court's permission, may

 2         the witness approach?

 3                    THE COURT:  Yes, you may.

 4         *Q*    If you would please -- and if you would show us

 5    where -- show us where on the map -- and if you just as best you

 6    can be conscious of blocking any of the juror's view?

 7                    THE COURT:  Also there is no microphone over there

 8         so try to speak a little bit louder.

 9                    THE WITNESS:  Okay.

10         *Q*    Would you just point to where 2400 Second Avenue is,

11    please.

12         *A*    (So indicating.)

13         *Q*    Thank you.  And now you've explained, would -- the

14    first text box you've already explained those are series of

15    telephone calls, yes?

16         *A*    Do you mean this one?

17         *Q*    Yeah.  I am sorry thank you.  You are great.  Point to

18    the first text box in white.

19         *A*    This one over here?

20         *Q*    You are right.  I am going to come up.

21                    MR. BOGDANOS:  May I, Judge?  She is way too

22         precise for me.

23         *Q*    The big one, thanks.

24         *A*    (So indicating.)

25         *Q*    What -- tell us what that shows on this map.  You told

1  us about the individual calls; so what do all those calls have

2  in common to be in the same box?

3      *A*     The cell site records indicate that the -- this call

4  used this cell site to initiate the communication.

5      *Q*     So every --

6              MR. BOGDANOS:  Can I just come back and forth as

7      many times I need to without asking you every time.  Thank

8      you, Judge.

9              THE COURT:  Yes, of course.

10     *Q*     So every call that is in this box used a cell site at

11 this location?

12     *A*     Yes.

13     *Q*     Is the same true for this box every call used the same

14 cell site?

15     *A*     Yes.

16     *Q*     Would you please point to the jury please and just hold

17 where that other one is.

18     *A*     For these calls it's here.

19     *Q*     That's in the Bronx?

20     *A*     In the Bronx.

21     *Q*     And then the other three boxes just to fast forward all

22 have a single call?

23     *A*     Yes.

24     *Q*     Indicating a different cell site?

25     *A*     Yes.

 1    *Q*     Could we then go, please, to the next chart and that
 2    should be the pre 3:02 calls, the before.  Hopefully it's 84.
 3              THE COURT REPORTER:  Is that a time, Mr. Bogdanos?
 4              MR. BOGDANOS:  It's 2:48 actually.
 5    *Q*     The same geographic area?
 6    *A*     Yes.
 7    *Q*     So you have to orient for us again 2400 hasn't moved;
 8    same place?
 9    *A*     Same place.
10    *Q*     What does this chart purport to show?
11    *A*     Similar to the first one.  It is just a smaller time
12    frame.  It indicates all calls between January 10, 2008, at
13    12:20 a.m. to January 11, 2008, and 2:58 p.m.
14    *Q*     And do the -- you are being precise again so let me do
15    it -- the two white text boxes, do they indicate the same thing
16    as they did on the first chart; that is, if a call is in the
17    same box it means it used the same cell site?
18    *A*     Yes.
19    *Q*     If we can go to the next chart please and that should
20    be calls after 3:02 so from 3:02, 4:59; but not the one that is
21    terminating.
22    *A*     Yeah.
23    *Q*     This is the good one?  That's right.  This is the one?
24    So now would you, same area?
25    *A*     Same area.

1    *Q*    Same 2400 Second Avenue?

2    *A*    Yes.

3    *Q*    Tell us what this chart shows.

4    *A*    This chart shows again just a separate time period

5    January 11, 2008, 3:02 p.m. to 4:59 p.m.; and then similar to

6    the other one it has the white text boxes indicating the

7    originating cell suit; but I've also placed the cell I.D. and

8    the sector information, which I received from the key.

9    *Q*    You are saying sector?

10   *A*    Sorry.

11   *Q*    So we are just -- so the jury understands the sectors

12   that are in a cell site that's something for an RF engineer to

13   testify about?

14   *A*    Yes.

15   *Q*    What they mean?  What they do?

16   *A*    Yeah.

17   *Q*    And if we can go to the last one, please.  Would you

18   tell us -- we take it, it would be the same map?

19   *A*    Yes.

20   *Q*    Same 2400 Second Avenue?

21   *A*    Yes.

22   *Q*    Now tell us what this -- how this chart differs from

23   the others, please.

24   *A*    In this one I looked at the terminating cell site in

25   addition to the originating; so when it differed, when the cell

1  I.D. differed but the latitude and longitude remained the same,

2  I indicated with asterisk next to the phone call; and then when

3  the cell tour changed latitude, longitude I indicated it with

4  than arrow with the word terminated on it.

5      *Q*    Just so we understand again, we will have an engineer

6  to testify to all of this in much more detail; but just so we

7  understand when you say originating, you mean the beginning of

8  the phone call?

9      *A*    Yes.

10     *Q*    Terminating the end of the phone call?

11     *A*    Yes.

12     *Q*    So there are occasions -- just one question -- there

13 are occasions that a telephone call -- a cell phone call will

14 start at one cell site but finish at another?

15     *A*    Yes.

16             MR. BOGDANOS:  Thank you.  I have nothing further,

17     ma'am, and nothing further, your Honor.

18             THE COURT:  Mr. Klein?

19             MR. KLEIN:  No.

20             THE COURT:  Ms. Van Maanen, that completes your

21     testimony.

22             THE WITNESS:  Thank you.

23             MR. BOGDANOS:  People next call to the stand

24     Detective Caryn Eldridge.

25             (Witness exited the courtroom.)

```
 1                    (Witness entered the courtroom.)
 2   DT.  C A R Y N   E L D R I D G E , called as a witness by and on
 3        behalf of the  People, having been first duly sworn and/or
 4        affirmed testified as follows:
 5                    THE WITNESS:  I do.
 6                    THE COURT OFFICER:  If you could just have a seat,
 7        please.  Just pull your chair up to the microphone.  In a
 8        loud clear voice if you could state your name, spell your
 9        last name, give your shield number, and your present
10        assignment.
11                    THE WITNESS:  Detective Caryn Eldridge,
12        E-L-D-R-I-D-G-E, Latent Print Section, shield number is
13        3691.
14                    MR. BOGDANOS:  May I inquire, Judge?
15                    THE COURT:  Yes.
16   DIRECT EXAMINATION
17   BY MR. BOGDANOS:
18        Q    Good morning -- good afternoon, detective.  Would you
19   tell the jury please how long you've been on the New York City
20   Police Department and how long you have been a detective.
21        A    I have been on the New York City Police Department for
22   seventeen and a half years, and I have been a detective since
23   2001.
24        Q    And your current assignment again, please.
25        A    I am Latent Print Section.
```

1   *Q*   How long have you been at the Latent Print Section?

2   *A*   Since 1999.

3   *Q*   And what are your official duties at the Latent Print

4   Section?

5   *A*   We receive cases from different units, Crime Scene and

6   Evidence Collection Teams; and we analyze, compare, evaluate and

7   verify the cases that we get for crime scene runs.

8   *Q*   And you actually do the analysis and comparison of

9   known versus unknown prints?

10   *A*   Correct.  Yes.

11   *Q*   Could you tell the jury, please, what training and

12   education you have had in order to qualify you for your position

13   as a latent print examiner?

14   *A*   We first come into the unit.  We are trained.  We have

15   an eight-week science fingerprint course; with the FBI a

16   two-weeks course we take.  Every year we have training.  We have

17   a palm class.  About twice a week they come in and they train

18   us.

19   *Q*   And you have been doing that for that training for how

20   long?

21   *A*   Since I've gotten to the unit, since about '99.  Yeah,

22   end of '99.

23   *Q*   And can you tell the jury approximately how many prints

24   you have analyzed in the course of your career?

25   *A*   It's been thousands.

1    *Q*   And can you tell the jury approximately how many
2  comparisons you have made?

3    *A*   Thousands also.

4    *Q*   And when you make comparisons, are you also able
5  eventually, possibly to make identifications?

6    *A*   Yes.

7    *Q*   Approximately, how many identifications would you say
8  you have made in your career?

9    *A*   Thousands also.

10    *Q*   Have you ever testified as an expert in the field of
11  latent print examination analysis and comparison?

12    *A*   Yes, I have.

13    *Q*   Approximately how many times have you done so?

14    *A*   Twenty-two times.

15    *Q*   Where and what courts?

16    *A*   In Queens Supreme Court and also Manhattan Supreme
17  Court.

18         MR. BOGDANOS:  I would offer the detective as an
19     expert in the field of latent and inked fingerprint
20     comparison and identification.

21         MR. KLEIN:  Okay.

22         THE COURT:  Application granted.

23    *Q*   What is an inked fingerprint?

24    *A*   An ink fingerprint is a purposeful impression.  We put
25  it on a contrast background with the printers ink or live scan

1  print which we do now digitally for identification purposes.

2      *Q*      So if someone is applying for a job, this is what we

3  are talking about?

4      *A*      Correct.

5      *Q*      And is the development of an inked fingerprint having

6  someone roll their finger and put it on a contrast background

7  considered accurate?

8      *A*      Yes.

9      *Q*      What is a latent print?

10     *A*      It is a chance impression that needs to be developed

11  with either a dust, dusting, or development medium for us to see

12  it.  It is not seen by the naked eye.  We have to develop it.

13     *Q*      And can you explain how it is that someone may leave a

14  latent print on a surface?

15     *A*      It could be a conducive area.  Smooth, clean.  They

16  could be sweating that day.  There could be just dirt on their

17  hands and just could be the surface takes that print.  It has to

18  be processed for us to see it and lift it up.

19     *Q*      Just because someone touches something does it

20  necessarily mean they have left a latent fingerprint?

21     *A*      No.

22     *Q*      Explain that please.

23     *A*      They could be what we call a nonsecretor.  Somebody who

24  does not sweat or have gloves on.  There could just be a cold

25  day out where there is just not enough pressure or not enough

1   pressure.  It could be cold.  Just not leaning their print that

2   day.  A dirty surface.  Different -- different things.

3       *Q*   Are all surfaces equally conducive to leaving a latent

4   print?

5       *A*   No, sir.

6       *Q*   Can you look around you and give us three that are good

7   in front of you.

8       *A*   TV screen.  Side of a glass, and probably the container

9   there, the plastic container right there.

10      *Q*   The water?

11      *A*   Yes, that container also and also the water jug, yes.

12      *Q*   Now, give us -- look around you and give us three

13  surfaces that are not conducive?

14      *A*   The back of the chair right there.  Wood is very hard

15  to receive it from because it's porous.  It has like porous

16  tendencies and paper, paper has to be processed.  It is also

17  hard to receive it unless you have it processed.

18      *Q*   Now, you are saying wood.  Would it matter if the wood

19  were covered with varnish or some kind of --

20      *A*   If it was very shiny -- this unfortunately is not

21  shiny -- if it was varnished and shellacked, yes, it would be a

22  little easier if there was a shiny surface.

23      *Q*   And when -- assuming someone does leave, they are a

24  secretor -- and when you say a secretor you mean secreting amino

25  acids.

1    **A**    Sweat, amino acids.  That's basically what fingerprints

2    are; sweat, amino acids.  That's what's basically left.

3    **Q**    And so assume that -- how is it that -- what are the

4    basic factors that enable a fingerprint to be used for

5    comparison purposes?

6    **A**    It has to be enough points of identification that we

7    call it of value fingerprint.  There is enough ridges for us to

8    make an identification on.  A no value print there isn't enough

9    points of identification.  Bifurcations, points, dots, any

10   ridges, that all make up the fingerprint's enclosure.  Everybody

11   has them and it makes up our points of identification.

12   **Q**    Now you used a term a moment ago -- let me ask you to

13   explain that, please.  You already told us that just because

14   someone touches something doesn't necessarily mean they have

15   left a print?

16   **A**    Correct.

17   **Q**    But even if they touch it, you said something about of

18   value.  Can you explain that?

19   **A**    Well, the of value print is what we are able to

20   identify.  There was enough points of identification for us to

21   make a hundred percent positive identification confirmation.

22   **Q**    So even if someone leaves a print, it might not be

23   enough of a print?  Explain.

24   **A**    It's what we call of no value prints.  There is just

25   not enough information.  It could be a piece or a little tiny

1   four points.  There is not there for us to identify.

2       *Q*    I just remembered my earlier question.  How long can a

3   fingerprint stay on the surface, a latent print stay on the

4   surface?

5       *A*    We have no proof of how long, how long the prints ever

6   stay.  There have -- cases have been there ten, twenty years.

7   The prints are still there.  We receive prints from the scene so

8   there is no scientific research on that, how long they last.

9       *Q*    But you -- there are some -- some dividing lines

10  though, like the last time the item is cleaned?

11      *A*    Oh, true.  If they came over here and cleaned this

12  whole surface and cleaned this where I just left my prints, they

13  would be wiped away, of course.

14      *Q*    And what kind of cleaning does it take to get rid of

15  prints?

16      *A*    Just like a good wipe down.

17      *Q*    That would do it?

18      *A*    Sure.

19      *Q*    So all you can say about a print on an item is it was

20  placed after the last time the item was wiped down?

21      *A*    Correct.

22      *Q*    That's it?

23      *A*    From my knowledge, yes.

24      *Q*    You can't tell -- you can't say this fingerprint was

25  left at exactly 3:05 p.m.?

1    **A**    Nothing has been proven with that.

2    **Q**    What happens if someone touches an item and then

3    someone else places their hand and leaves a print in the exact

4    same spot?

5    **A**    We call that a double tap.  It's hard to read because

6    it's overlapping ridges so if we have enough information that we

7    can deem from one hand or one fingerprint, then we can make that

8    identification.

9    **Q**    And if you are looking at a latent print that has been

10   lifted, taken off the surface, can you tell if that particular

11   latent print is or is not a double tap?

12   **A**    Yes.

13   **Q**    What happens if someone touches an item and then

14   someone else comes and wipes that same area with their bare

15   hand?

16   **A**    It would be hard -- it would be a smudge.  It's hard

17   for us to tell.  What we could tell when we get the lift if

18   there is a smudge there, we would be unable to read it.  It

19   would be deemed of no value print.

20   **Q**    You could tell if an item was -- a lifted latent print

21   was a smudge?

22   **A**    Right, because it looks like a streak.  It looks like a

23   streak.

24   **Q**    Do you recall and did you receive any latent prints of

25   relevance to this case and this jury?

1    *A*    Yes, I did.

2    *Q*    How many prints did you -- prints of value did you

3    receive altogether?

4              THE WITNESS:  May I look at my notes?

5              THE COURT:  Yes, you may look at your notes.

6    *Q*    Do you have your case file with you?

7    *A*    I do.

8    *Q*    If you need to look at your case file, please do so.

9              MR. BOGDANOS:  For the record a copy of which has

10   previously been furnished to the defense.

11   *A*    Okay, the first one was the Crime Scene Unit.

12   *Q*    Do you know the particular detective?

13   *A*    Detective Hernandez.  It was Crime Scene Unit run

14   number 08 slash 078.

15   *Q*    On what date?

16   *A*    This was 1/14 of 2008.

17   *Q*    And did you receive any latent prints from that -- from

18   that run?

19   *A*    Yes.

20   *Q*    How many altogether?

21   *A*    Two (2).

22   *Q*    And do you remember how they were marked?

23   *A*    On this, this is the latent -- crime scene report.  It

24   was DH1 and DH2.

25   *Q*    And I am going to hand you what's now been received in

1  Evidence as People's 26, DH1.

2              (Handing.)

3      *Q*   Please take a look at that item.

4      *A*   Thank you.

5      *Q*   Tell the jury -- tell the jury whether or not you

6  recognize it?

7      *A*   Yes.

8      *Q*   How do you recognize it?

9      *A*   As being from this case folder.

10     *Q*   And so you, obviously, since it was in your folder you

11  had an opportunity to look at it before coming to court?

12     *A*   Yes, sir.

13     *Q*   And what do you recognize it to be precisely?

14     *A*   This is -- this was recovered from the black handle

15  broom on handle lift No. 1, DH1, from 2400 Second Avenue,

16  Apartment 12-E.

17     *Q*   So this is one of the lifts that you told us about,

18  that you received from Detective Hernandez, Crime Scene Unit?

19     *A*   Correct.

20     *Q*   Would you explain, please -- and if you could hold it

21  up for the jury and just show the jury -- when you say a lift

22  explain what exactly they are looking at.

23     *A*   Okay, this is what we call -- get from our Crime Scene

24  Unit.  This is the taped side.  This is -- they lifted this with

25  white powder.  The tape goes down over that like that; and this

1  is the actual print right here.  It's in white powder on a

2  contrast background, the black.

3      *Q*    And did you then take DH1 and analyze it?

4      *A*    Yes, I did.

5              MR. BOGDANOS:  I would now ask that the witness be

6          handed whatever -- up to 87.  People's 87 for Identification

7          for the record palm handprint of Mr. Richardson.

8              (Handing.)

9      *Q*    Do you see the item -- do you see the item the court

10 officer has handed you?

11     *A*    Yes.

12     *Q*    Do you recognize it?

13     *A*    Yes, I do.

14     *Q*    What do you recognize it to be?

15     *A*    This is the -- we call these major case prints.  It's

16 the palm and fingers and joints of a particular person.  This is

17 from a Mr. Mark Richardson.

18     *Q*    And how did this -- withdrawn.  Did this come into your

19 custody as well?

20     *A*    Yes.

21     *Q*    And it went into your case file?

22     *A*    Yes, it did.

23     *Q*    How did this particular exhibit, People's 87, come into

24 your custody?

25     *A*    It was dropped off to us by Detective Raymond.  I can't

1   recognize the name Bruna (phonetic).

2      *Q*   Would it be Brennan?

3      *A*   Brennan.

4      *Q*   Also Detective Henriquez?

5      *A*   Yes.

6      *Q*   And did you have occasion to take that People's 87 and

7   compare that entire -- what you call major case with the full

8   handprint to People's 26?

9      *A*   Yes, I did.

10     *Q*   By the way People's 26 is what part of the hand?

11     *A*   It's -- actually it's a palm.  It's the interdigital

12  part of the hand right here.

13     *Q*   And which hand?

14     *A*   On the right palm.

15     *Q*   And, I am sorry, if you would just point to the record.

16  Indicate what you are pointing to for the record.

17     *A*   The interdigital part of the right hand.

18     *Q*   So I will do that in English, so what you are pointing

19  to is the inside of your palm near the top of your hand at the

20  bottom of your fingers?

21     *A*   Correct.

22     *Q*   Got it.  Thank you.  And that's what this 26 is?

23     *A*   It's a palm piece, yes.

24     *Q*   Now, in comparing -- when you compare this, did you

25  also -- did you prepare a chart to show the jury your

1   comparisons step-by-step?

2      **A**   Yes, I did.

3            MR. BOGDANOS:  I would ask that next Exhibit 88 be

4      handed to the witness.  For the record fingerprint chart,

5      copy which has previously been given to the defense.

6            (Handing.)

7      **Q**   Take a look at that.  Do you recognize it?

8      **A**   Yes.

9      **Q**   How is it you recognize it?

10     **A**   This was all -- we did this in my office.

11     **Q**   You prepared it?

12     **A**   Yes.

13     **Q**   And did you prepare it fairly and accurately?

14     **A**   Yes.

15     **Q**   It's blown up?

16     **A**   Yes, its blown up for courtroom purposes.

17     **Q**   So now on the left-hand side, what is shown?

18     **A**   This is the inked palm print.

19     **Q**   Okay, and whose inked palm print is it?

20     **A**   From that display from Mr. Mark Richardson.

21     **Q**   And so that's People's 87 that you just had in your

22     hand?

23     **A**   Correct.

24     **Q**   It's just a blowup?

25     **A**   This is a blowup of that, correct.

1    **Q**    And when you blowup a print whether it's an inked
2    print, a known or a latent unknown print, do you alter the print
3    in any, way, shape or form other than you just make it larger?
4    **A**    No, sir.
5    **Q**    And did you do that in this case with this palm print?
6    **A**    Alter it, no.
7    **Q**    No?  Thank you.  Did you increase it's size?  Blow it
8    up?
9    **A**    Yes, sir.
10   **Q**    Then what's on the right-hand side of that chart?
11   **A**    This is the Crime Scene lift that we had showed you
12   before.
13   **Q**    Same deal, is this a blowup of People's 26?
14   **A**    Right.  Crime Scene DH1.
15   **Q**    Would using that chart enable you to describe for the
16   jury your findings on the comparison?
17   **A**    Yes, sir.
18            MR. BOGDANOS:  I will offer that chart into
19       Evidence as People's 88.
20            MR. KLEIN:  Fine.
21            THE COURT:  Admitted.
22            MR. BOGDANOS:  With the Court's permission could
23       it be placed on the monitor.  I guess it's probably easier
24       and maybe the detective approach.
25            THE COURT:  Yes, but bear in mind the time.

1        MR. BOGDANOS:  You tell me.

2        THE COURT:  No, you pick a good spot.  You want a

3    couple of minutes?

4        MR. BOGDANOS:  Sure.  Perhaps a few minutes and

5    then we will break.

6        THE COURT:  You can step down, detective.

7        MR. BOGDANOS:  If that's all right with you.

8    *Q*    Orient for the jury please the left side.

9    *A*    Okay.

10   *Q*    What are we looking at?

11   *A*    It is interdigital part between the three and the four

12   finger right here.

13   *Q*    Of?

14   *A*    Of the right palm.

15   *Q*    And then on the right side?

16   *A*    Okay, now since this was a broom handle it is a little

17   bit stretched because it is just the way you hold this.  You are

18   stretching your hand out.  The ridges look a little stretched

19   here but it is the same relative position as right here.

20   *Q*    And on -- based on your training, education, and

21   expertise, were you able to reach a conclusion to within a

22   reasonable degree of scientific certainty as to the identity of

23   the latent palm print from the broom?

24   *A*    Yes, sir.

25   *Q*    And?

1     *A*    With a hundred percent certainty.

2     *Q*    What's the answer?

3     *A*    That it's Mr. Mark Richardson's right palm

4   interdigital.

5     *Q*    Now can you explain the basis for that opinion?  Walk

6   us through it.

7     *A*    Now this is the ridges.  In this point are black

8   because it is lifted.  I have a copy of it.  Do you want it?

9              THE COURT:  That's okay.

10    *A*    This is from -- this is processed.  The ridges are in

11  white, so we go from A.  We are going to go from A jumping

12  around.  A is ending ridge right here.  You see it comes down to

13  the end.  That's the point of identification.  It is hard to see

14  here but this is A also.

15          It is just because the white is a little bit harder,

16  harder to see.  Count over one, two, three was -- B is another

17  ending ridge.  Count over one, two, three.  B is right here.

18  Follow it up, count over one, two ridges.  C it's a bifurcation,

19  two ridges that come out and bifurcate right here.  You see it

20  right here.  It is right there.

21          Jump up to D, counting over to one, two, three, four

22  ridges and also bifurcates right here.

23    *A*    From C, one, two, three, four, it's right here.  One

24  two.  Jump up to E.  One, two right here.  Another ending ridge.

25  We have up to E, one, two -- I mean F one, two.  Right here one,

1  two.  You could tell how it is stretched out a little bit here.
2  It is just larger, a larger gap.
3         Count over to one, two, three ridges.  It is a
4  bifurcation.  The ridge comes down and bifurcates.  Also right
5  here for G, ridge goes down and bifurcates.  H which we jumped
6  back a little bit -- bifurcates right here.  It comes down and
7  bifurcates.  One, two, three, four, five ending ridge come up
8  right there.  One, two, three, four and five.  It is hard to see
9  but it comes up.  That's a little bit closer.  Count over one --
10 one, two, three, four, five.  From I to J, one, two, three, four
11 and three, five.

12    *Q*    Now have you listed every single point of comparison?

13    *A*    No.

14    *Q*    Okay, you could keep going?

15    *A*    I could.

16    *Q*    I am not asking you.  I am just asking you could keep
17 going?

18    *A*    I could point out some more points of identification,
19 correct.

20    *Q*    I am not asking for it now.  Do any two people in the
21 world have the same fingerprints?

22    *A*    It has not been proven, no.

23    *Q*    It's never been seen?

24    *A*    Never been seen.

25    *Q*    You could retake your seat.

1          MR. BOGDANOS:  Judge, I have just three or four
2      questions and I am done with direct.  Should I go?
3          THE COURT:  Go ahead.
4      *Q*    Detective please, take your seat.  You received another
5  print of value, DH2?
6      *A*    Correct.
7      *Q*    And has that been identified as belonging to anyone
8  that you know of?
9      *A*    No, it has not.
10     *Q*    You have not made any identification?
11     *A*    No, we have not, no.
12     *Q*    Do you remember what that came off of, DH2 came off of?
13     *A*    I could check.
14     *Q*    Yes, please do if you need to.
15         (Witness perusing documents.)
16     *A*    Recovered from the site of DH15, Bud light beer can.
17     *Q*    And that -- you had not made any identification on that
18  Bud light beer can?
19     *A*    No, I have not.
20     *Q*    Finally, you mention that all surfaces are not equally
21  conducive.  Let me ask you about a wallet in particular; an old
22  wallet.  Would you expect to find fingerprints on that?
23     *A*    Depending on the texture of the wallet.  If it's an old
24  leather wallet it would be hard to do.  If it's a smooth surface
25  like a patent leather, we might be able to do it.

1        MR. BOGDANOS:  I would ask that this be deemed
2    marked People's 89 for Identification.  If I could have that
3    handed to the detective.

4        (Handing.)

5    **Q**   Please take a look and if you would look at the bag.
6  It doesn't matter.  Break the seal anywhere you want.

7        (So done.)

8    **Q**   Now opening that up if you just pull out -- pull out.
9  Inside looking at it, would it surprise you to learn that, that
10 wallet did not yield any prints of value?

11   **A**   No, it does not.

12   **Q**   Why not?

13   **A**   It's -- it's a rough surface like we spoke about.  It
14 is a nonporous surface so it is just hard with the ridges on
15 there for us to receive any ridges of value from this surface.

16   **Q**   Thank you.

17        MR. BOGDANOS:  Nothing further.

18        THE COURT:  Unless it is five minutes or less, we
19    have to break for lunch.  All right, we will take our lunch
20    break now.  Please come back in one hour fifteen minutes.
21    That will be 2:25.  Please do not discuss the case.  Thank
22    you.

23            (Jury exited the courtroom.)
                (Witness exited the courtroom.)
24            THE COURT:  All right, that's it.  2:25.
                (Luncheon recess.)
25            (Transcript continued on next page.)

PROCEEDINGS

1   T-4 - Peo. V Mark Richardson, Ind.#3534/08

2   September 20, 2011:

3        A F T E R N O O N        S E S S I O N

4              THE COURT CLERK:  Case on trial continued.  The

5   People of the State of New York against Mark Richardson.  The

6   defendant, his attorneys, and the assistant district attorney

7   are present.  The jury is not present in the courtroom at this

8   time.

9              THE COURT:  Thank you, very much.  And are both

10  sides ready to proceed?

11             MR. BOGDANOS:  Yes, Judge.

12             THE COURT:  Thank you.  May we have the jury

13  please.

14        (The jury enters the courtroom.)

15             THE COURT CLERK:  Will both sides stipulate all

16  jurors are present properly seated.

17             MR. KLEIN:  Yes.

18             MR. BOGDANOS: Yes.

19             THE COURT:  Thank you very much.

20        Good afternoon, ladies and gentlemen.

21        (The witness, Karen Eldridge, resumes the witness

22  stand.)

23             THE COURT:  You may be seated.  Mr. Klein, do

24  you have any questions?

25             MR. KLEIN:  No, Your Honor.


                    Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1              THE COURT:  That completes your testimony.  You

2    are excused.  Mr. Bogdanos.

3              (The witness was excused and exits the courtroom.)

4              MR. BOGDANOS:  Yes, Your Honor.  The People call

5    to the stand Craig Huemmer, please.

6              Judge, I'm sorry.  I just realized, one of the

7    witnesses had an issue.  Do you mind if I change my order?  I

8    apologize.

9              THE COURT:  Not at all.

10             MR. BOGDANOS:  Rich, I can't pronounce his last

11   name, the R.F. Engineer.  Richard -- begins with a W.

12             (The witness enters the courtroom, takes the

13             witness stand, is duly sworn/affirmed in by the Clerk of

14             the Court, responds to the oath and testifies as

15             follows:)

16             THE COURT CLERK:  Do you solemnly swear or

17             affirm the testimony you are about to give shall be the

18             truth, the whole truth, and nothing but the truth, so

19             help you God?

20             THE WITNESS:  Yes.

21             THE COURT OFFICER:  Have a seat, please.  Pull

22             your chair up to the microphone phone.  In a loud clear

23             voice, if you could state your name, spell your last name

24             for the record.

25             THE WITNESS:  Richard Lee Woitkowiak,

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1        W-o-i-t-k-o-w-i-a-k.

2                MR. BOGDANOS:  May I inquire, Your Honor?

3                THE COURT:  Yes, you may.

4    DIRECT EXAMINATION

5    BY MR. BOGDANOS:

6        Q.    Good afternoon, sir.

7        A.    Hi.

8        Q.    Sir, would you tell us what county you live in?

9        A.    Nassau County.

10       Q.    And without telling us your current address, how long

11   have you lived at your current address?

12       A.    Little over a year.

13       Q.    What do you do for a living?

14       A.    I am an R.F. Engineer.

15       Q.    What does that mean?

16       A.    In my capacity R.F. Engineer means working on cell

17   phone networks for cell phone providers and operators.

18       Q.    What does R.F. stand for?

19       A.    Radio Frequency.

20       Q.    Thank you.  And how long have you been an R.F.

21   Engineer?

22       A.    Almost eleven years.

23       Q.    And what kind of training and education have you had

24   to qualify you for your current position?

25       A.    I have bachelors degree in physics and that got me

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1  the job starting as engineer.

2      Q.   And then after that?

3      A.   After that -- currently I work for Erickson Services

4  and with that company I'm required to take forty hours of

5  training every year to keep up on my standing.

6      Q.   Well, you say what you're currently in.  Perhaps it

7  would be better if you could do it chronologically.  So you

8  began as engineer about eleven, twelve years ago?

9      A.   Yeah.

10     Q.   With whom?

11     A.   With NEXTEL Communication.

12     Q.   And when you joined NEXTEL in what capacity did you

13  join NEXTEL?

14     A.   I was assistance performance engineer basically entry

15  level engineer working on a network.

16     Q.   And then did you receive training and education to

17  get to the next level of engineer?

18     A.   Yes.  I received a promotion based on my work and my

19  training.

20     Q.   In what -- that's the point I am trying to get you

21  to.  What training did you receive?

22     A.   In radio frequency engineering.

23     Q.   And then how long were you at NEXTEL?

24     A.   I was with NEXTEL until NEXTEL merged with Sprint and

25  which point it became Sprint/NEXTEL.  I continued to work on

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1   the NEXTEL network that was in 2005 when that merger took place

2   and following that Sprint out sourced it's engineering

3   department to Erickson so I continued to work on the NEXTEL

4   Network even though I no longer work for Sprint/NEXTEL.

5       Q.   So, basically, you haven't changed in the last eleven

6   to twelve years, it's just structuring of the company, is that

7   a fair way to put it?

8       A.   Yes.  Basically my function in working on the NEXTEL

9   network has remained mostly the same -- well, with obvious

10  promotions, things like that, but the companies have reformed

11  and reshaped.

12      Q.   And what is your current job title?

13      A.   My current job title is R.F. Engineer 2.

14      Q.   And is there an R.F. Engineer 1?

15      A.   Yes, there is R.F. Engineer 1 and R.F. Engineer 3.

16      Q.   Which one's better?

17      A.   R.F. Engineer 3 is the more senior position.

18      Q.   And in order to become an R.F. Engineer 2, what have

19  you had to do over the course of the last eleven to twelve

20  years?

21      A.   Maintain good performance reviews.  Do good work on

22  the network.  Make sure the network is operating at its' peek

23  possibilities.  Also take the required training and maintain my

24  knowledge of radio frequency.

25      Q.   What is the required training?

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1    A.    Right now it's forty hours annually with the company.

2    Q.    And could you give us just a little bit of detail in

3    what those forty hours include?

4    A.    Various radio frequency courses on optimizing cellar

5    networks, antenna systems, basically the inner workings of cell

6    sites and cell networks.

7    Q.    And have you testified previously in the area of

8    cellar network operations?

9    A.    Yes.  I testified for the U.S. -- An Assistant U.S.

10   Attorney in the Eastern District of New York.

11   Q.    Okay, in federal court?

12   A.    Yes.

13   Q.    As an expert?

14   A.    Yes.

15          MR. BOGDANOS:  I will offer Mr. Woitkowiak as an

16   expert in the field of cellar network operations.

17          MR. KLEIN:  Fine.

18          THE COURT:  Granted.

19   Q.    How does a cell phone work?

20   A.    A cell phone works by transmitting and receiving

21   radio frequencies between cell sites or cell towers as some

22   people know them.  Cell sites have antennas and radios that

23   transmit, receive the signals, enrich stronger levels of the

24   phones so they cover a certain amount of area and then the cell

25   sites are all able to work with each other to allow, you know,

DIRECT/WOITKOWIAK/PEOPLE

1   phone calls to exist as phones move around.

2        Q.    And can you describe those operations in Manhattan?

3        A.    Yeah.  Generally in Manhattan most cell sties aren't

4   towers they are on top of buildings, rooftops.

5        Q.    What's the difference between a cell site and cell

6   towers?

7        A.    There is no difference.  If you are in a more rural

8   area most cell sites are on the tallest poll or polls so people

9   just call them towers.  And I worked in Washington, D.C. Metro

10  area, New York Metro area, so cell sites terminology I learned

11  because most cell sites in those areas are on buildings.

12       Q.    And what do they look like, what are they?

13       A.    Generally, New York City specifically?

14       Q.    Yes.

15       A.    You got mostly apartment buildings so the most part

16  you got antenna arrays on top of the buildings or the sides of

17  buildings.  Most of the cell sites -- well, most cell sites in

18  New York City are 3 and a half multiple sectors on each cell

19  site.

20            A sector is basically pointing the signal in a

21  direction.  So for as a rural area, rural areas you have one

22  sector sight sort of a big circle.  Whereas, New York City, you

23  have three sector sites pointing signals in three different

24  directions to better utilize the frequency.

25       Q.    So we understand, every question from now on is New

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1    York City, Manhattan or the Bronx, specifically.

2           You have a sell site which you said could be in an

3    array of antennas either on or on the side of the building?

4        A.   Yes.

5        Q.   And then the cell site, this array of antennas, has

6    sectors?

7        A.   Yes.

8        Q.   With in it, sometimes three, but you said sometimes.

9    Does that mean sometimes more than three, fewer than three?

10       A.   Well, in New York City, for example, you will have in

11   buildings sites so those could range from one to several

12   sectors.   But most outdoor sites are three sector sites.

13       Q.   And the sectors are numbered A, B, C, 1, 2, 3?

14       A.   1, 2, 3, or alphabet, depending on --

15       Q.   And they just make a circle around the sight?

16       A.   Yes.

17       Q.   So one sector goes in one direction, one another and

18   the third in a different?

19       A.   Yes.

20       Q.   Okay.  Now, when I or anyone uses their cell phone

21   and makes a call, how does the cell phone know what cell site

22   to use?

23       A.   The vast majority of the time the cell phone is going

24   to use site that has the strongest signal.   In other instances

25   it may use a site that has a slightly weaker signal due to

DIRECT/WOITKOWIAK/PEOPLE

1    maybe the stronger receiving site may have, maybe overloaded

2    with users and they would have to chose the next best option.

3         Q.   And so is that always the closest cell site?

4         A.   Usually but not always.

5         Q.   Explain that?

6         A.   Especially in New York City you could have a cell

7    site that's very close to where you are but that cell site

8    might be blocked by another taller building and then you might

9    have a site farther away that's on a taller building and,

10   therefore, would provide stronger signal.

11        Q.   And if the closest cell site or the strongest signal

12   cell site has to be used to much or it's at its capacity, then

13   what?

14        A.   Then it will allow the phone to look for other

15   options with signal strong enough to provide service.

16        Q.   Even if it's farther away?

17        A.   Yes.

18        Q.   And what if any impact atmospheric conditions have on

19   cell phone usage and, specifically, which cell site is used?

20        A.   None.

21        Q.   So hurricane, thunderstorm, doesn't matter?

22        A.   As long as -- I mean the site can be impaired if the

23   site -- you know, recently with the weather we had we had cell

24   sites flooded due to the flooding.  Site loses power just like

25   your house.  If the site loses power there is battery back up

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1    but that only lasts so long but the sites can go out of service

2    if their inner workings are damaged.

3        Q.    And just a few more questions cell towers and then

4    we'll move on to this specific case.   Presumably most people

5    had the occasion, my cell phone will work in my apartment one

6    day and the next day it won't work in the exact spot, is there

7    an explanation for that?

8        A.    The signal isn't -- it's not a constant, it wavers,

9    and usually, you know, the measure we use to measure the signal

10   is decibel and decibels it can range by 8 to 10 decibels, you

11   know, over seconds in time.   So that can -- you can experience

12   that.

13           You can also experience it if your site is

14   overloaded.   Like I was talking before if the site is

15   overloaded and there is no other next best option then you may

16   not be able to get on the site and you may not have any signal.

17       Q.    And if I am on a cell phone and I am not moving, I am

18   right there, how is it a call can drop, how can you lose a

19   signal?

20       A.    Same sort of idea, signal fades in and out and it's

21   not exact, it's not constant, it does fluctuate.

22       Q.    And what if an individual, say I am on my phone and I

23   am walking down the street, it's a long call, probably my

24   mother, and I am moving block to block, to block, to block, I

25   am still on the phone, am I still using the same cell site?

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1      A.   It depends on how far that site can serve.  If you

2   walk into an area where there's another site that is a lot

3   better than the site you are on we'll try to pass your call to

4   the better site.

5      Q.   Is there a name for that?

6      A.   It's a hand off.

7      Q.   And this hand off, can someone who is on the phone

8   tell?

9      A.   No.   The phone is constantly sending out messages to

10   the cell site even when you are not on the phone the cell site

11   and the phone are still talking to each other.

12      Q.   So, is it possible then to have a cell phone, have a

13   different terminating and beginning cell site and then a

14   different originating cell site from the terminating cell oath?

15      A.   Yes.

16      Q.   Does that necessarily mean that phone was moving?

17      A.   No.

18      Q.   You given us all, I am not going to make you repeat

19   them, you given use all the reasons why in the middle of a call

20   you can change cell site?

21      A.   Yes.

22      Q.   And nothing changed?

23      A.   No.

24      Q.   Okay.   Turning to this case.   Have you had occasion

25   to review records of relevance to this case and this jury?

DIRECT/WOITKOWIAK/PEOPLE

1      A.    Yes.

2            MR. BOGDANOS:   I would ask that the witness be

3   handed what's previously been received in evidence as People's

4   37 and if we could have handed People's 83 to 86, please.

5      Q.    What I would ask, if you can just take a real quick

6   look of the records, and then the four maps in front of you,

7   just make sure you recognize them.   You seen these all before?

8      A.    Yes.

9      Q.    Okay.   Just let the court officer go through all four

10  just to make sure we're talking about the same four.   And you

11  seen these four maps before?

12     A.    Yes.

13     Q.    And the information contained thereon?

14     A.    Yes.

15     Q.    And you seen the records that you have in front of

16  you before?

17     A.    Yes.

18     Q.    If we could start with looking at page -- at People's

19  37 in evidence and looking at the calls on January 11th of

20  2008, beginning at 3:02 and running to 4:16 and if I could get

21  the map that has 3:02.

22            THE COURT:   Is that a.m. or p.m.?

23            MR. BOGDANOS:   Good point, Judge.   P.m..   Thank

24  you.

25     Q.    If you could take a look.

                Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1           MR. BOGDANOS:  Just for the record, the first

2  chart, the map we'll start with is the 3:02 to 4:59 map that

3  has the sectors on them.  You seen that before?

4           THE COURT:  I'm sorry.  What is the exhibit

5  number?  Do you know what number it is?

6           MR. BOGDANOS:  Yes, is the answer to that.  It

7  would have to be 85.

8      Q.   If you would take a look at People's 85, in light of

9  People's 37, the phone records, and do you see --

10          MR. BOGDANOS:  May I approach again, please,

11  Judge.

12          THE COURT:  Yes.

13     Q.   You see in the phone records there are series of

14  phone calls that begin at 3:02 and I am going to stop at 4:16.

15  Now, that's from the phone records, right?

16     A.   Yes.

17     Q.   You looked at them before coming to court?

18     A.   Yes.

19     Q.   And, in fact, had you a copy of them?

20     A.   Yes.

21     Q.   I mean your own copy that you reviewed?

22     A.   Yes.

23     Q.   Okay.  Now, looking at this particular chart that's

24  in evidence as 85, you see that a series of the phone calls use

25  a cell tower, a cell site, I'm sorry, a cell site, at the

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1    corner of Second Avenue and 126th Street?

2        A.   Yes.

3        Q.   But you also see that two calls within this time

4    period use a cell site in the Bronx.  Does that mean that, and

5    to be more precise, at 3:32 p.m. on the 11th, this phone,

6    917-371-8269, makes an outgoing phone call and it uses the cell

7    site at 126th, yet two minutes later, at 3:34, it used, the

8    same phone uses a cell site in the Bronx.

9         Does that mean the phone left that area and went to

10   the Bronx?

11       A.   No.

12       Q.   Can you explain?  Would it be easier if you came

13   around?

14       A.   Yes.

15            MR. BOGDANOS:  Is that all right, Judge?

16            THE COURT:  Yes.

17       (Witness steps down from the witness stand and

18   approaches the exhibit.)

19       A.   All right.  So, even though the site is farther away,

20   we verified that it was Sector 3 on this site on both of these

21   calls.  That Sector 3 points 270 degrees, which is due west, so

22   that points directly in this direction.  Also because of the

23   water in between it's very likely that this site could have

24   just as strong a signal as this site and also --

25       Q.   When you're saying -- and I'm sorry, just for the

DIRECT/WOITKOWIAK/PEOPLE

1    record, you are saying, this and this, we have to put it on the

2    record -- You are saying this site, the Bronx site, could have

3    as strong a signal as 126th Street site?

4        A.   Yes.

5        Q.   Okay.  Please continue.  I'm sorry.

6        A.   So, since there's no building clutter, there's really

7    nothing to obstruct the signal as it goes across the water.

8    Water, generally, is sort of like a zero field when it comes to

9    R.F., it just let's it pass right through without blocking it.

10            Whereas, buildings, concrete, steel, very, very

11   reduced signal very quickly, all right?  So in this case the

12   water just let's the signal pass right through.

13            And, in addition to that, you also have this area,

14   the busiest time of day for these sites along, actually all of

15   these sites, I verified this, the busiest hours of usage on

16   these sites is generally between 12 p.m. and 5 p.m..  So it's

17   also very likely that this site here in Manhattan may have been

18   over utilized and needed to off load the call to another site.

19       Q.   And turning to the 4:13 phone call, if you look, and

20   before you get to that, if you look at 120 -- let's call it

21   126th Street cell site -- if you look at that particular box

22   you see that there's a 4:10 call from that phone, outgoing

23   call, right?

24       A.   Yes.

25       Q.   And then at 4:13 that phone uses the Bronx cell site,

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1    right?

2        A.    Yes.

3        Q.    And then at 4:14 it uses 126th Street site again?

4        A.    Yes.

5        Q.    So, does that mean that the phone, in a matter of

6    four minutes, managed to go from Manhattan, cross the water, go

7    to the Bronx and, again, under four minutes make the round trip

8    back to Manhattan, is that the explanation for using a

9    different cell site?

10       A.    No.  It's the same as before.  At this time of day

11   this site may have been overloaded and just needed to off load

12   call traffic to another site.  So this site is very well a

13   candidate to off load the call to.

14       Q.    Now, turning to the west of 126th Street, again, if

15   you go to 126th Street cell site, is it reflected that there is

16   a call at 3:25 p.m.?

17       A.    Yes.

18       Q.    From 126th Street.  Then a call at 3:25 p.m. from 119

19   Street, I'm sorry that's wrong, 124th street, right?

20       A.    Yes.

21       Q.    And then at 3:26 it's right back at 124th, right?

22       A.    Yes.

23       Q.    And then at 3:27 it's at 127th Street, right?

24       A.    Yes, that's correct.  3:27.

25       Q.    So, in the course of two minutes, did the phone

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1   travel five avenues, then back, then six avenues and two

2   blocks, and then back, in the course of two minutes, is that

3   what the phone did?

4        A.   No.   It's very likely the phone stayed in the same

5   place and similar type of thing happened where this site needed

6   to -- it had too many users and it allowed another site with

7   sufficient signal to take the calls on both this 55201 and

8   34098.

9        Q.   And, if you could stay there, please, for a moment

10  and we can go to People's 83, which is all calls.  Go to 83.

11            And in 83 what does all the calls for the day tell us

12  about the Bronx cell site?

13       A.   This shows the Bronx cell site was very normal

14  pattern of usage to be the second best cell site for that

15  location.

16       Q.   And anything unusual about that?

17       A.   No.

18       Q.   Standard, in your view?

19       A.   Very standard.

20       Q.   Okay.  Thank you.  I have nothing further on that

21  particular chart.  Now, if we can go to 86, which will be the

22  one with different terminating numbers, that's the one that has

23  the asterisk on them.

24            If you could take a look at this chart, please.  Do

25  you see the woman who had made this map actually has indicated

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1    that on certain occasions the cell site was different for

2    terminating -- I keep doing that -- originating and terminating

3    in the same call?

4        A.   Yes.

5        Q.   And that's supported in the records, what the records

6    indicate, correct?

7        A.   Yes.

8        Q.   Can you walk us through, please, each of the calls

9    that originate and terminate in a different cell site.   Start

10   right at the top if you would.

11       A.   All right.   So the first one that terminates at a

12   different location is 3:31 call.

13       Q.   Okay.   Keep going.

14       A.   The next one is the 3:58 p.m. call.   And then the

15   last one is the 4:08 p.m. call.

16       Q.   And let me back up if I could for a moment.   Start

17   with the 3:25 call.   The 3:25 outgoing call to 719-547-3201, do

18   you see that?

19       A.   That would be this call.

20       Q.   Okay.   And do you see how that particular call starts

21   at 124th Street but then ends at a different cell site?

22       A.   Yes.

23       Q.   So that one itself --

24            MR. BOGDANOS:   And I am just going to approach

25   again, Judge.   I'm sorry.

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1      Q.    So this particular call, the first call on the

2    chart -- I am doing it in a terrible way and I apologize -- the

3    first call on the chart starts and ends same cell site?

4      A.    Yes.

5      Q.    The second call, these are all just calls after 3:02,

6    the second call starts, the call itself starts at this normal

7    cell site at 124th and then finishes at 124th and Madison, is

8    that correct?

9      A.    Yes.

10     Q.    All the same possible reasons you explained before?

11   We're not going to repeat them.

12     A.    Yes.

13     Q.    Okay.  Then moving to the next call, you shown us the

14   asterisks, there are three calls, 3:31, 3:58 and 4:08, can you

15   explain what those, what that means, how those calls differ,

16   the three asterisks, I mean does that accurately indicate those

17   calls?

18     A.    Yes.  All three of those calls --

19     Q.    No one in the back can see it.  So if you can just

20   read for the jury what that asterisk indicates, please.

21     A.    Yes.  The 3:31 p.m. call started, or originated,

22   terminated, at two different sites.  As well as 3:58 p.m. call

23   which started and ended on different site.  And then the 4:08

24   p.m. call also started and ended on different cell site.

25     Q.    So the cell ID is different but it has the same

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1  latitude and longitude for those three calls, is that correct?

2  And if you need to look at the records, please, let use know.

3      A.   Sorry.  Can you rephrase the question.

4      Q.   Sure.  See the 3 in the upper right hand corner?

5      A.   This one?

6      Q.   Correct.  So the three asterisk calls indicate that

7  the terminating, the ending cell ID, is different than the

8  originating but it uses the same latitude and longitude, is

9  that correct?

10     A.   Yes.

11     Q.   What's a cell ID?

12     A.   Cell ID is five digit number that is used, is one of

13  the ways we use to decode which site -- it's an identifier,

14  cell identifier number.  Each sector of each site has a unique

15  identifier so that we know into exactly what sector of what

16  site was used for each call.

17          So these three cases, the calls may have started on

18  Sector 3 of this site and ended on Sector 2 of this site, still

19  the same geographic location for that cell site but the sector

20  pointing in a different direction.

21     Q.   And now if you would go to call 4:13.  Lower right

22  hand corner.  See it, 4:13 call?

23     A.   4:13 p.m. call.

24     Q.   That call originated at the Bronx cell site?

25     A.   Yes.

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1    Q.    And terminated where?

2    A.    On the 126th Street cell site.

3    Q.    So the big box cell site that got most of the calls?

4    A.    Yes.

5    Q.    Now, go to the upper left, 3:27 call, you see it?

6    A.    Yes.

7    Q.    Where did that originate?

8    A.    It originated on this cell site.

9    Q.    Read -- you can't say this.  You can say this but you

10   have to tell us what you mean.

11   A.    Madison Avenue, 127th, cell site.

12   Q.    And where did it terminate?

13   A.    It terminated on the East 126th Second Avenue cell

14   site.

15   Q.    And then the 3:25, go down, the next box, 3:25, where

16   did that originate?

17   A.    That originated on the -- well, this call originated

18   on this cell site on the 124th Madison Avenue cell site.

19   Q.    And then, finally, let's go to 4:59, please.  That

20   would be this call on the sell site at Lexington Avenue at

21   119th Street.  That particular call, the 4:59 -- by the way,

22   the word "empty" where does that come from?

23   A.    Sometimes if there's call record that is a little bit

24   incomplete, is incomplete, you can have missing data field and

25   this case that would be missing data field.

Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1          It may have been aborted call, a failed call,

2   registration problem, there's various reasons why that could

3   take place.

4          Q.   But it's clear that's a call?  I mean someone had to

5   hit the send button on the cell phone for it to register at

6   all?

7          A.   Yeah.  This was a zero second call.  So it was very

8   short term of some sort for that phone to register on that cell

9   site in the network.

10         Q.   And just so we're clear, for the record, and we're

11   just about done, are actually 2 of the 22 phone calls on this

12   map, which are in the record as People's 37, there are actually

13   two calls that was missing a field and the field that was

14   missing was the phone number, correct?

15         A.   Yes.

16         Q.   And, again, you seen that before, for the reasons you

17   just explained?

18         A.   Yes.

19         Q.   So this 4:59 call originated and terminated at that

20   cell site?

21         A.   Yes, the Lexington 119th site.

22         Q.   So, unlike these other calls, where you shown us

23   where they either originate, terminate, 126th, the 4:59

24   originates and terminates at 119th Street?

25         A.   Yes.


                    Glenn J. Merola, Sr. Court Reporter

DIRECT/WOITKOWIAK/PEOPLE

1      Q.    And, final question, it's fair to say, or is it fair

2  to say, that you cannot say anything about the movement of the

3  telephone based on these records?

4      A.    That's correct.

5      Q.    You can't say it left the building or not?

6      A.    I could not tell you if it stayed in one exact

7  location or if it, you know, took couple of blocks trip around

8  a couple of blocks.  All I know is it stayed in this general

9  location based on the call data.

10                MR. BOGDANOS:  Got it.  Thank you.  Nothing

11  further.

12                MR. KLEIN:  Thank you.  I'm sorry.  I am saying

13  done.  Finished.

14                THE COURT:  All right.  That does complete your

15  testimony, sir.  Thank you.

16            (The witness was excused and exits the courtroom.)

17                MR. BOGDANOS:  The People call Mr. Craig

18  Huemmer, please.

19                (The witness, Craig Huemmer, enters the

20            courtroom, takes the witness stand, is duly

21            sworn/affirmed in by the Clerk of the Court, responds to

22            the oath and testifies as follows:)

23                THE COURT CLERK:  Do you solemnly swear or

24            affirm the testimony you are about to give shall be the

25            truth, the whole truth, and nothing but the truth, so

Glenn J. Merola, Sr. Court Reporter

DIRECT/HUEMMER/PEOPLE

1        help you God?

2                    THE WITNESS:  I do.

3                    THE COURT OFFICER: Just have a seat, please.

4        Just pull your chair up.  In a loud clear voice, just

5        state your name, spell your last name for the record.

6                    THE WITNESS:  Craig Huemmer.  H-u-e-m-m-e-r.

7                    MR. BOGDANOS:  My I inquire, Your Honor?

8                    THE COURT:  Yes.

9    DIRECT EXAMINATION

10   BY MR. BOGDANOS:

11       Q.   Good afternoon, sir.

12       A.   Good afternoon.

13       Q.   And thank you for your patience today.  Mr. Huemmer,

14   would you tell us what you do for a living, please?

15       A.   I am a Criminalist at the New York City Police

16   Department Laboratory.

17       Q.   How long have you been with the New York City Police

18   Department Laboratory?

19       A.   Little over four years.

20       Q.   And what are your duties and responsibilities as

21   criminalist?

22       A.   I examine evidence for trace materials.  I perform

23   fiber analysis and comparisons.  I screen hair for DNA.  And I

24   do physical fit analysis.

25       Q.   And would you tell the jury your level of education,

DIRECT/HUEMMER/PEOPLE

1   please, that qualifies you for your current position?

2       A.   I have a bachelors of science and textiles and

3   apparel with a fiber sense concentration from Cornell

4   University and masters of science, forensic science from John

5   Jay College Criminal Justice.

6       Q.   In addition to your education what training have you

7   had to qualify you for your current position?

8       A.   I have undergone various training programs at the

9   laboratory.   In addition, I had external training both with

10  people who have been brought into the lab to teach courses and

11  I gone to off site training.

12      Q.   Such as?

13      A.   Such as, microscopy training, classes at Crones

14  Institute Chicago.   Textile training at North Carolina State

15  University.

16      Q.   Can you tell this jury approximately how many

17  evidence examinations you have conducted in your career?

18      A.   Roughly a hundred-fifty.

19      Q.   You mentioned among your duties, "physical fit."  Can

20  you briefly, at this point, explain what that is and then tell

21  us what training and experience you had in that field?

22      A.   Physical fit examinations are based on when an item

23  fractures.   Often the way that it breaks is random so unique

24  edges to those materials are present and then the analysis

25  involves looking at those materials and fitting them together.

Glenn J. Merola, Sr. Court Reporter

DIRECT/HUEMMER/PEOPLE

1              Sort of like a jigsaw puzzle to see if they have a

2    common origin.  My training in that area of the lab involved

3    reading material, couple of workshops, and some examinations.

4         Q.   And have you testified in your career in court of law

5    as an expert in these fields?

6         A.   I have testified in the field I am qualified in.

7         Q.   How many times?

8         A.   Three times once as an expert.

9         Q.   And the one time as an expert, in what field, in what

10   area were you qualified?

11        A.   In fiber analysis and comparisons.

12             MR. BOGDANOS:  I will offer Mr. Huemmer as an

13   expert in the area of physical fit at this time.

14        Q.   This would be your first time testifying as expert in

15   physical fit?

16        A.   That is correct.

17             MR. BOGDANOS:  I will offer him as an expert.

18             MR. KLEIN:  Okay.

19             THE COURT:  Application granted.

20   BY MR. BOGDANOS:

21        Q.   Did you receive an assignment of relevance to this

22   case and to this jury?

23        A.   Yes.

24        Q.   When was that and what was the assignment?

25             THE WITNESS:  May I refer to my notes?

Glenn J. Merola, Sr. Court Reporter

DIRECT/HUEMMER/PEOPLE

1           THE COURT:  Yes, you may.

2        A.    On September 29, 2010, I was assigned to perform a

3    physical fit analysis of a cord and a lamp.

4        Q.    And did you receive the cord and the lamp?

5        A.    Yes, I did.

6        Q.    Explain how and when you received each and the

7    condition each was in, please?

8        A.    I received both of them on October 1, 2010.  The lamp

9    was packaged, it was wrapped in paper and in the packaging with

10   the lamp was four other envelopes and the cord was packaged

11   separately by itself and there was a separate envelope in the

12   cord as well.

13       Q.    And what was in the envelope -- you said there were

14   four envelopes with the lamp?

15       A.    Yes.

16       Q.    What were in those envelopes?

17       A.    I did not open the envelopes but I can tell you what

18   they were labeled as.

19       Q.    Please do.

20       A.    One was labeled to contain ten pieces of broken

21   glass.  One was labeled to contain a plastic piece.  Another

22   envelope was labeled containing chards of broken glass an

23   debris from packaging.  And the last was labeled swab from

24   lamp.

25       Q.    And when you received the lamp it was sealed in some

DIRECT/HUEMMER/PEOPLE

1   packaging?

2       A.   Yes.

3       Q.   What kind of packaging?

4       A.   It was in a brown paper bag.

5       Q.   And did you break the seal on that bag?

6       A.   Yes, I did.

7       Q.   Did you examine the lamp?

8       A.   Yes, I did.

9       Q.   And, for the record, what condition was the lamp in?

10      A.   It was wrapped in paper when I received it.

11      Q.   Right.  After you broke it, you said you broke it,

12  you opened it?

13      A.   Oh, the lamp itself there was brown paper wrapped

14  around the body of the lamp.

15      Q.   Did you open that packaged or did you leave that

16  alone?

17      A.   I left that alone.

18      Q.   So what portion of the lamp were you able to see?

19      A.   I was able to see the top of the lamp and the bottom

20  of the lamp and my examination focused on the bottom cord of

21  the lamp.

22      Q.   So you didn't need the rest of the lamp for your

23  purposes?

24      A.   Yes.

25      Q.   Did it appear to you from your handling of the

DIRECT/HUEMMER/PEOPLE

1    package of the body of the lamp, if you could tell, that the

2    lamp appeared to you to be broken?

3         A.   Yes, it did.

4         Q.   Again, did that have any impact at all on your

5    ability to do a physical fit analysis?

6         A.   No, it did not.

7              MR. BOGDANOS:  I will ask that the witness now

8    be handed People's 28 -- 27 and 28 in evidence.  These are the

9    crime scene photos previously in evidence from the lamp.

10             And then I would ask that these next be marked 90

11   through 94 and shown.

12             MR. KLEIN:  All right.

13   BY MR. BOGDANOS:

14        Q.   Start with the ones already in evidence.  Would you

15   take a look at those two photographs and do you recognize -- we

16   understand that you didn't -- the base of the lamp had

17   packaging but you could see portions of it?

18        A.   Yes.

19        Q.   Do you recognize what is shown, from what you could

20   see, do you recognize what is shown in those two photographs

21   that you have in front of you?

22        A.   Yes.  It appears to be the bottom and the top portion

23   I was able the see of the lamp.

24        Q.   Of the lamp that we have been discussing?

25        A.   Yes.

Glenn J. Merola, Sr. Court Reporter

DIRECT/HUEMMER/PEOPLE

1     Q.    Okay.  You can put those photos down now.  And now if

2  you can go to, it should be 90 to 93, four photographs.

3              THE COURT:  It should be five photographs 90 to

4  94, right?

5              THE WITNESS:  Yes.

6     Q.    Do you recognize those photographs?

7     A.    Yes, I do.

8     Q.    How do you recognize them?

9     A.    These are photographs that I took during my analysis

10  of the case.

11     Q.    Are each over them fair and accurate photographs of

12  either the lamp or the cord as you photographed it during your

13  analysis?

14     A.    Yes, they are.

15              MR. BOGDANOS:  I will offer those into evidence

16  as 90 through 94, copies of which have previously been admitted

17  to the defense.

18              THE COURT:  Admitted.

19              (People's Exhibits 90 through 94, photographs,

20  were received in evidence.)

21  BY MR. BOGDANOS:

22     Q.    Start with 90.  If you could hold that up.  Show it

23  to the jury.  And tell the jury what that is?

24     A.    It is a photograph I took of the bottom of the lamp,

25  the underside of it.

Glenn J. Merola, Sr. Court Reporter

DIRECT/HUEMMER/PEOPLE

1       Q.    And then 91 through 94 are what?

2       A.    They are photographs I took through a microscope of a

3   comparison between the cord from the bottom of the lamp and the

4   separate cord.

5             MR. BOGDANOS:  Thank you.  If I can place that

6   velcro up on the monitor.  And if I can an approach, Judge.

7             THE COURT:  Yes.

8             MR. BOGDANOS:  With the Court's permission could

9   the witness approach the board.

10            THE COURT:  Yes, he may.  You may step down.

11            MR. BOGDANOS:  Go around to the board.  Please

12  make sure you don't block the jury from seeing your photos.

13  BY MR. BOGDANOS:

14      Q.    Were you able to reach an opinion to within a

15  reasonable degree of scientific certainty, as to whether or not

16  the cord matched the lamp?

17      A.    Yes.

18      Q.    What was your conclusion to within a reasonable

19  degree of scientific certainty?

20      A.    That there was a physical fit between the cord and

21  the cord that was protruding from the lamp and so these two

22  items were originally one piece.

23      Q.    And will these photographs enable you to demonstrate

24  to the jury how you can reach that conclusion?  D?

25      A.    Yes.

Glenn J. Merola, Sr. Court Reporter

DIRECT/HUEMMER/PEOPLE

1    Q.   Tell use exactly how you made these photographs and

2    then explain?

3    A.   These photographs were made by comparing the two

4    samples, the cord from -- the separate cord and the cord from

5    the lamp under a microscope a t the same time and then

6    photographs were taken.

7         When I am doing my analysis I am looking at the edge

8    details.  I am looking for -- first I look at the two materials

9    to see if they are similar in color, shape, and size, and seem

10   to be of the same composition.  Then I look at the edges.  In

11   this case I was using edge pattern details from the edge of the

12   sheaf surrounding the middle wire and I am looking for

13   corresponding parts.

14        For instance, on this cord right here, which is a

15   separate cord, there is a three step layer coming from where it

16   comes up and three step progression that corresponds down here

17   on the cord from the lamp where there is strips going down in

18   the same positioning, same size, so that these ones would fit

19   into those notches.

20   Q.   And, obviously, you took photos so you actually had

21   the cord itself?

22   A.   Yes.

23        MR. BOGDANOS:  I would ask that the witness now

24   be handed People's 50 in evidence.  And if it's all right with

25   the Court can he just stay where he is?

Glenn J. Merola, Sr. Court Reporter

DIRECT/HUEMMER/PEOPLE

1                THE COURT:  Yes.

2    BY MR. BOGDANOS:

3        Q.    Take your gloves.  And if you would go ahead put the

4    gloves on and then examine the content of People's 50.

5                (Witness complies.)

6                MR. BOGDANOS: And while you are doing that I am

7    just going to put the other two photos up.

8                (Short pause.)?

9                MR. BOGDANOS:  Pull that item out so that the

10   jury can see.

11   BY MR. BOGDANOS:

12       Q.    Do you recognize the markings?

13       A.    Yes, I do.

14       Q.    Explain?

15       A.    These are my markings of my laboratory number and my

16   initials on the packaging.  In addition, this is my initials on

17   the seal where I had made an opening and then sealed up at the

18   completion of my analysis.

19       Q.    Why don't you put the laundry bag down and go ahead

20   and take that out, please.  Examine it.  Make sure you know

21   exactly what i tis.  And then once you are satisfied tell the

22   jury.

23       A.    This is the cord that I examined.

24       Q.    How do you know?

25       A.    This is my tag with my labels or my laboratory

Glenn J. Merola, Sr. Court Reporter

DIRECT/HUEMMER/PEOPLE

1    number, the item number, my initials, and the date that I

2    examined the evidence.

3         Q.    And it's your testimony that cord, 50, came from this

4    lamp in the photograph?

5         A.    Yes.

6                   MR. BOGDANOS:  Okay. Thank you.  I have nothing

7    further on that.  You can put that all away.  And I have no

8    further questions.

9                   THE COURT:  Thank you, Mr. Bogdanos.

10                  MR. KLEIN:  No questions.

11                  THE COURT:  All right, Mr. Huemmer, you are

12   excused.

13             (The witness was excused and exits the courtroom.)

14                  MR. KLEIN:  Judge, can we come up for one

15   second?

16             (Bench conference was held off the record with the

17   Court and counsel.)

18             (Bench conference concluded, back in open court.)

19                  THE COURT:  All right, ladies and gentlemen,

20   there is more but we're going to take a short break first.  I

21   am going to ask all of you to wait outside for a few minutes.

22   Please do not discuss the case.  Thank you very much.

23             (The jury exits the courtroom for a break.)

24             (Short break taken.) (Continued on next page.)

25

Glenn J. Merola, Sr. Court Reporter

<u>Proceedings</u>                                          814

1            THE COURT:  Both sides ready to proceed?

2            MR. BOGDANOS:  Yes, Judge.  If we can go on the

3    record for one second.

4            THE COURT:  Yes.

5            MR. BOGDANOS:  For one of the parks employees I am

6    going to be putting in the defendant's employment records.

7    There are tons of stuff in there Mr. Klein doesn't want.

8    Fine.  Whatever he doesn't want in.  All I want is the time

9    cards and, you know, the certifications.

10           THE COURT:  Just admit the records subject to

11   redaction.

12           MR. BOGDANOS:  Whatever he wants out, we will take

13   out.

14           THE COURT:  Agreed Mr. Klein?

15           MR. KLEIN:  Fine.

16           THE COURT OFFICER:  Jury entering.

17           (Jury entered the courtroom.)

18           THE COURT:  Jeanette.

19           THE COURT CLERK:  Case on trial continued.  The

20   People of the State of New York against Mark Richardson.

21   The defendant, his attorneys, and the assistant district

22   attorney are present.  Both sides stipulate that all jurors

23   are present and properly seated?

24           MR. BOGDANOS:  Yes.

25           MR. KLEIN:  Yes.

```
 1                    THE COURT:  Thank you.
 2                    MR. BOGDANOS:  Your Honor, the People next call to
 3       the stand Ms. Christine DiDomenico.
 4                    THE COURT:  Thank you.
 5                    (Witness entered the courtroom.)
 6  C H R I S T I N E   D i D O M E N I C O , called as a witness by
 7       and on behalf of the People, having been first duly sworn
 8       and/or affirmed, testified as follows:
 9                    THE WITNESS:  I do.
10                    THE COURT OFFICER:  If you could just have a seat,
11       please.  Pull your chair up a little bit to the microphone.
12       If you could just state your name and spell your last name
13       for the record.
14                    THE WITNESS:  Christine DiDomenico, D-I-D-O-M as
15       in Mary E-N as in Nancy I-C-O.
16                    MR. BOGDANOS:  May I inquire, Judge?
17                    THE COURT:  Yes.
18  DIRECT EXAMINATION
19  BY MR. BOGDANOS:
20       Q    Good afternoon, ma'am.
21       A    Good afternoon.
22       Q    Ma'am, would you tell us what county you live in?
23       A    I live in New York County.
24       Q    And without telling us your current address, how long
25       have you lived at your current address?
```

1   *A*   Since September 1st.

2   *Q*   Of this year?

3   *A*   Yes.

4   *Q*   You go to school so where and what year?

5   *A*   I go to NYU School of Law, and I am in my second year.

6   *Q*   And this past summer, were you employed?  If so, by

7   whom and in what capacity?

8   *A*   Yes, I was employed by the New York County District

9   Attorney's Office as a summer legal intern.

10   *Q*   At some point during the summer, did you receive an

11   assignment of relevance to this case and this jury?

12   *A*   Yes, I did.

13   *Q*   Would you tell us please what that assignment was and

14   how you got it?

15   *A*   They asked the interns to volunteer -- the New York

16   County District Attorney's Office asked interns to volunteer to

17   watch videotape, video surveillance for the case.

18   *Q*   And you were one of those?

19   *A*   Yes.

20   *Q*   And before you began actually watching the surveillance

21   video, were you given instructions as to whom you would be

22   looking for?

23   *A*   Yes.

24   *Q*   How many individuals altogether?

25   *A*   Six.

1      Q      And how many -- had you met any of those six before in
2    your life?
3      A      No.
4      Q      Did you have names for all six?
5      A      I had names for four of them.
6      Q      Tell us the names, please.
7      A      Mark Richardson, Anthony Hall, Cheryl Abbott and
8    Helen Abbott.
9      Q      And the other two individuals, how did you refer to
10   them?
11     A      One of them we were shown a video image of him.  He had
12   an umbrella and the other one had a hooded sweat shirt.
13     Q      And the individual who had an umbrella, did he have
14   anything else distinguishing about him?
15     A      The umbrella person and the hooded sweat shirt?  I
16   don't -- I don't recall.
17     Q      It's okay.
18     A      We watched video and saw how they walked and
19   everything.
20     Q      And what -- what instructions -- withdrawn.
21            What preparations were made to enable you to recognize
22   these people?
23     A      We were shown video clips so we were shown images of
24   their faces as well as video clips, so we could see how they
25   walked and how they moved.

1    *Q*    And what assignment did you get?  If you tell us first

2    the camera you got and then the hours.

3    *A*    I had Camera 1A; and from 10:45 p.m. on January 12,

4    2008, to 10:00 p.m. on January 13th.

5    *Q*    So taking a look for a moment please at 73, please,

6    you've seen that chart before?

7    *A*    Yes.

8    *Q*    You recognize it?

9    *A*    Yes.

10   *Q*    Your name is on there?

11   *A*    Yes.

12   *Q*    Does that chart accurately summarize the camera and the

13   times that you watched the surveillance?

14   *A*    Yes, it does.

15   *Q*    Thank you.  I have nothing further on that.

16          Were you given specific instructions about how to watch

17   any or all of the hours that you were assigned?

18   *A*    Yes.

19   *Q*    And they were?

20   *A*    So I was to watch the twenty-three (23) hours and mark

21   down anytime that I saw any of the six individuals or someone

22   who I thought might be one of the six individuals and record it;

23   and as to how I watched the videos, they are marked by the time

24   that they end at; so we would take note of that; and when we saw

25   something, we would mark by the end of the video beforehand, the

1  end time of the previous video; and we would add on how ever

2  many minutes and seconds had passed in this current video.

3      *Q*   To arrive at the real time?

4      *A*   Right.

5      *Q*   And were you given instructions as to whether you

6  should look carefully or not?

7      *A*   Yes.

8      *Q*   Or engage in other behavior?  Any of this ring a bell?

9      *A*   Yes.

10     *Q*   Could you describe that for us.

11     *A*   We were very, very, very thoroughly instructed that we

12 would want to avoid any concerns about perjury, any concerns

13 about mistake; and we were to watch very, very carefully and if

14 we needed, to take all breaks necessary.

15     *Q*   And did you do as you were instructed?

16     *A*   Yes.

17     *Q*   And did you watch every minute you were -- every second

18 you were suppose to?

19     *A*   Yes.

20     *Q*   You are absolutely certain?

21     *A*   Yes.

22     *Q*   Couldn't be mistaken?

23     *A*   Yes.

24     *Q*   And at any point during the portion that you watched,

25 did you ever see Helen Abbott?

1      *A*    No.

2      *Q*    Could you be mistaken?

3      *A*    No.

4      *Q*    Now, were you given any other assignment to follow any

5   of the people or did you just have the camera?

6      *A*    I actually just had the camera.

7      *Q*    You told us is 1A?

8      *A*    Yes.

9      *Q*    The view for 1A again please?

10     *A*    Yes, is people coming into the building.

11     *Q*    From?

12     *A*    From the outside, yes.  50B is 1A.

13     *Q*    If I could have the witness look at 73 -- 74A and B.

14   Take a quick look at these.  Tell the jury whether or not you

15   have seen them before.

16     *A*    Oh, yes.  Yes, I have seen those.

17     *Q*    You had an opportunity to examine them before coming

18   into court?

19     *A*    Yes.

20     *Q*    Whenever you saw those six individuals, you never saw

21   Helen Abbott?  Whenever you saw anyone else you told us that you

22   recorded that?

23     *A*    Yes.

24     *Q*    Did you do it later on from memory or did you do it at

25   the exact moment when you saw it?

1        **A**    No, I did it when I saw it.

2        **Q**    Did you do it accurately?

3        **A**    Yes.

4        **Q**    And are any of the entries that are on 74A and B from

5   you?

6        **A**    Yes, clip 92.

7               MR. BOGDANOS:  Clip 92.

8        **Q**    You see the monitor to your left?

9        **A**    Yes.

10       **Q**    You have seen that drive before, the architecture of

11  that hard drive before?

12       **A**    Yes.

13       **Q**    More than once?

14       **A**    Yes.

15       **Q**    Would you please now tell the jury exactly how we get

16  to clip 92.  Direct us.

17       **A**    Okay, so you would go to 1A and so you would want to

18  find the 321 video.

19       **Q**    On what date?

20       **A**    On the thirteenth.

21       **Q**    Is it January 13th of '08?

22       **A**    Yes.

23               MR. BOGDANOS:  Blow it up please.

24       **Q**    How far in?

25       **A**    It's four minutes and twenty-seven (4:27) seconds.

1                 (Video playing.)

2        *Q*    What did we just see?  Back up.  You need to -- tell us

3    what we are watching.

4        *A*    We are watching Cheryl Abbott enter the building.

5        *Q*    What time is that, real time?

6        *A*    It would be 3:11:00 p.m. because it's the last tape

7    ended at 007 add 4 minutes and 27 seconds.

8        *Q*    That's the first time you saw Cheryl Abbott entering

9    the building?

10       *A*    I don't have the full record but I believe so, yes.

11   Yes, I do.

12       *Q*    Yes?  The answer is yes?

13       *A*    Okay.

14              MR. BOGDANOS:  I don't have anything else.  Thank

15       you.

16              THE COURT:  Mr. Klein.

17              Ms. DiDomenico, thank you very much.

18              MR. BOGDANOS:  The People next call to the stand

19       Ms. Christine Ortiz.

20              (Witness exited the courtroom.)

21              (Witness entered the courtroom.)

22   C H R I S T I N E   O R T I Z , called as a witness by and on

23       behalf of the People, having been first duly sworn and/or

24       affirmed, testified as follows:

25              THE WITNESS:  Yes.


                        *Penelope Messina, RPR*
                        *Senior Court Reporter*

1          THE COURT OFFICER:  If you could just have a seat,

2    please.  Pull your chair up to the microphone.  If you could

3    just in a loud clear voice, state your name and spell your

4    last name for the record.

5          THE WITNESS:  My name is Christine Ortiz,

6    O-R-T-I-Z.

7          MR. BOGDANOS:  May I inquire, your Honor?

8          THE COURT:  Yes.

9  DIRECT EXAMINATION

10  BY MR. BOGDANOS:

11    **Q**    Good afternoon.

12    **A**    Good afternoon.

13    **Q**    Ma'am, tell us what county you live in.

14    **A**    I live in Queens County.

15    **Q**    Without telling us your current address, how long have

16  you lived at your current address?

17    **A**    A year.

18    **Q**    Do you go to school?  If so where and what year?

19    **A**    I go to CUNY School of Law in Queens County and I am a

20  second year law student.

21    **Q**    Were you employed this past summer, and if so by whom

22  and in what capacity?

23    **A**    I was employed this summer at the New York County

24  District Attorney's Office in the Special Victims Bureau as a

25  legal intern.

1    *Q*    Did there come a time when you received an assignment
2    of relevance to this case and this jury?
3    *A*    Yes.
4    *Q*    Would you please tell the jury briefly how that came
5    about and what that assignment was.
6    *A*    We got an email I guess from legal hiring about an
7    assignment that was only available to students who will be
8    here -- who go to school in New York and the assignment was to
9    work for yourself.
10   *Q*    Doing what?
11   *A*    We were to look at surveillance videos.
12   *Q*    And you volunteered for that?
13   *A*    Yes.
14   *Q*    And ultimately after you -- withdrawn.
15          When you got that assignment, were you given specific
16   instructions onto what to do with regard to the video -- videos
17   themselves?
18   *A*    Yeah.
19   *Q*    Explain.
20   *A*    We were suppose to look at four, five -- five people
21   throughout the videos and see if we found them on the videos;
22   and we were constantly reminded that under penalty of perjury to
23   make sure that these were the people that we saw.
24   *Q*    And did you have the names of any people?
25   *A*    Yes.

1      *Q*      How many people did you have names of?

2      *A*      I had the names of four people.

3      *Q*      Tell us the names?

4      *A*      Mark Richardson, Anthony Hall, Cheryl Abbott, and

5   Helen Abbott.

6      *Q*      And in addition to those named people, did you also --

7   were you also instructed to look for unnamed people?

8      *A*      Yes.

9      *Q*      How many?

10     *A*      Two.

11     *Q*      So four and two is?

12     *A*      Six.  Sorry.

13     *Q*      It's all right.  Would you tell us how you identified

14  those other two people?

15     *A*      The other two people we identified as B-Hat.  One man

16  was bearing a baseball cap with a B on it, and the other man we

17  named him Hoody because he was wearing a hood over his head.

18     *Q*      And were you given any tools to enable you to --

19  withdrawn.

20             Had you ever meet these people before in your life?

21     *A*      No.

22     *Q*      Were you given any tools to enable you to identify

23  those people if you saw them on the video?

24     *A*      Yes.

25     *Q*      Explain.

<u>Ortiz - Direct - People</u>                                          826

1      *A*    We met at your office, and you ran through the video to
2   show us how they moved in and out of the building, and then
3   Pekham also produced a bunch of stills of the people so that we
4   would know what they looked like so we could reference that
5   while we were looking at the videos.

6      *Q*    For the record Pekham, Ms. Pal?

7      *A*    Yes, Ms. Pal.  Sorry.

8      *Q*    Did you also have occasion to go to 2400 Second Avenue?

9      *A*    Yes.

10     *Q*    For what purpose?

11     *A*    I went to go see where the cameras were situated in the
12  building and get a general idea of what the cameras were looking
13  at and the depth of, an length of the different...

14     *Q*    In addition to being charged with viewing the video,
15  did you have an additional responsibility -- additional to the
16  other interns who were working on this?

17     *A*    Yes, I also supervised the other interns in that I
18  would look -- everyday at the end of the day they would send me
19  what they had found, what they thought they had seen; and then I
20  would look through it to make sure that what they had seen is
21  what they saw; so I basically I supervised them in making sure
22  that what was later put on the charts was accurate.

23     *Q*    And every single -- particularly with regard to
24  cameras -- the jury's heard about where all the cameras are.  We
25  don't need to go through that.  With regards to cameras 1A and

1   1B, how many people -- different people looked at each of those

2   cameras?

3        **A**   How many different people?

4        **Q**   Yes.

5        **A**   It would be the four interns and myself, so five.

6        **Q**   Now, was there any -- at any portion of Camera 1A or 1B

7   that only one person viewed?

8        **A**   No.

9        **Q**   Was there overlap?

10       **A**   Yes.

11       **Q**   By design?

12       **A**   Yes.

13       **Q**   For every camera, for every -- all of Camera 1A and all

14   of Camera 1B?

15       **A**   Yes.

16            MR. BOGDANOS:  If I could just have that put up on

17       the -- on the monitor just for a moment.

18       **Q**   It's the lobby, People's 3 in Evidence.  Do you

19   recognize that?

20       **A**   Yes.

21            THE COURT:  Mike, can you pull it so that she

22       could see it a little better.

23       **Q**   And were you present up at 2400 when Ms. Venticinque

24   from the DA's Office took the measurements for this chart?

25       **A**   Yes.

1    *Q*    And you pointed out the cameras?

2    *A*    Right, pointed out the cameras.

3    *Q*    And you have seen this?  Is this accurate?

4    *A*    Yes.

5    *Q*    Accurately shows where the cameras are?

6    *A*    Ah-huh.

7    *Q*    Thank you, nothing further on that.

8            When you -- in addition to supervising the other

9    interns, did you yourself have your own viewing

10   responsibilities; not just double checking them but your own?

11   *A*    Yes.

12   *Q*    And were the times that each of the individuals working

13   on this viewed recorded in any way?

14   *A*    Yes.

15   *Q*    I will hand you what has previously been marked 73.

16   Yes, 73 for Identification.  Please take a look at that chart.

17   Do you recognize it?

18   *A*    Yeah.

19   *Q*    What do you recognize it to be?

20   *A*    I recognize the chart of the interns and their viewing

21   times that I created.

22   *Q*    And your name is on there as well?

23   *A*    Yes.

24   *Q*    And does that chart fairly and accurately summarize the

25   time periods that each intern looked at each of the cameras that

1  are listed?

2      *A*    Yes.

3              MR. BOGDANOS:  I will offer that in Evidence now

4      as 73 for Identification, a copy of which has previously

5      been given to the defense.

6              THE COURT:  People's 73 is admitted.

7      *Q*    Now, if we could put that up on the monitor.  Taking a

8  look at 73 across the top of cameras 1A, 1B, 3/4 and 10?

9      *A*    Yes.

10     *Q*    We know what 1A and 1B are.  What is 3 and 4?

11     *A*    Three and four are elevator cameras.  Three is Elevator

12 A.  four is Elevator B.

13     *Q*    What is camera ten?

14     *A*    Ten is the camera at the end of the lobby looking out

15 the viper door.

16     *Q*    In addition -- are these the only camera angles that

17 were viewed by you and the other interns?

18     *A*    No.

19     *Q*    What other cameras were viewed?

20     *A*    We also viewed I guess whatever cameras were needed to

21 be viewed in order to follow the different individuals.

22     *Q*    Such as?

23     *A*    Such as Camera 8 in particular.

24     *Q*    What was Camera 8?

25              MR. BOGDANOS:  You could pull that down.  Take

1    that down.

2        **A**    Camera 8 was the inside staircase camera.

3        **Q**    And what about camera two?

4        **A**    Camera 2 was the lobby camera.  That was also viewed to

5    show -- to see when individuals crossed from the entrance and to

6    see which elevator camera -- which elevator they went into.

7        **Q**    And what about Camera 9?

8        **A**    Camera 9 --

9        **Q**    Is that another stairwell?

10       **A**    Camera 9 is the outside stairwell.  Was viewed by --

11   nothing was found of substance on it.

12       **Q**    So if you found some one of these six people on 1A or

13   1B, what were your instructions?

14       **A**    Instructions were to finish viewing the times that we

15   are suppose to view and just make a note and then later we would

16   go back and follow them from Camera 1A through all the way into

17   the building and then out the building again.

18       **Q**    And then in and out?

19       **A**    In and out as many times as they came in and out.

20       **Q**    Did you do that?

21       **A**    Yes.

22       **Q**    And did you -- when you saw any of these six

23   individuals at any camera angle 1A, 1B, 2, 3, 4, 8, 9, 10, did

24   you make entries as to where you saw them?

25       **A**    Yes.

1   **Q**   Did you do that from memory or did you do it at the
2   exact moment you were viewing the video?

3   **A**   At the exact moment I was viewing the video.

4   **Q**   Did you do so accurately?

5   **A**   Yeah.

6   **Q**   You told us at the end of each day the individuals who
7   were working that day, would then give you their results?

8   **A**   Ah-huh.

9   **Q**   You just took their word for it?  You just typed it in?

10  **A**   No.

11  **Q**   What did you do?

12  **A**   I would follow every single individual that they
13  thought they had seen; and I would insure that the times were
14  accurate.

15  **Q**   And did you then form the basis of a timeline if you
16  will?

17  **A**   Yes, from my own entries and their entries I had
18  verified, we formed the master timeline.

19                  MR. BOGDANOS:   I now ask the witness be shown
20      People's 74A and 74B.

21  **Q**   Please take a look at that and tell the jury if you had
22  seen that chart before?

23  **A**   Yes.

24  **Q**   Have you verified every single entry on both of those
25  charts?

<u>Ortiz - Direct - People</u>                                    832

1    *A*    At least three times, yes.

2    *Q*    You are absolutely certain?

3    *A*    Yes.

4    *Q*    You did so accurately?

5    *A*    Yes.

6    *Q*    And do those -- do those two charts summarize

7    accurately, record the events that are listed?

8    *A*    Yes.

9              MR. BOGDANOS:  I will offer 74A and B into

10   Evidence at this time, copies of which had previously been

11   given to defense.

12             THE COURT:  They are now admitted.

13             MR. BOGDANOS:  And now, your Honor, it really is

14   impossible to see from this angle so with the Court's

15   permission I would like to publish to the jury copies of 74A

16   and B.  I have already shown to defense so they could follow

17   along.

18             THE COURT:  Mr. Klein, no objection?

19             MR. KLEIN:  Fine.

20             THE COURT:  All right.

21             (Handing.)

22   *Q*    All right, while you are doing that, is it fair to say

23   this timeline doesn't capture -- doesn't -- on the charts

24   itself, the blown up charts they don't record every single thing

25   you saw in video; is that correct?

1        *A*    No.

2        *Q*    And in particular with regard to, for example, for

3   Cheryl Abbott, you saw Cheryl Abbott come in and out many more

4   times than are actually on the chart?

5        *A*    Yes.

6        *Q*    You recorded that but the chart itself is really a

7   summary?

8        *A*    Right, the chart is a complete summary.

9        *Q*    But does the chart itself include every single time you

10  saw Mark Richardson anywhere on any of the cameras in the

11  building?

12       *A*    Yes.

13       *Q*    And Mark Richardson is indicated on the chart as how?

14       *A*    He is indicated as male.

15       *Q*    With regard to Hood or what you were saying Hoody, does

16  this record every single time you saw Hood or Hoody coming in

17  and out of the building?

18       *A*    Yes.

19       *Q*    Dots it record every single time you saw Helen Abbott

20  coming in and out of the building?

21       *A*    Yes.

22       *Q*    But it does not record every single time you saw

23  Anthony Hall or B-Hat; is that fair?

24       *A*    Yes.

25       *Q*    Those were recorded?

1       *A*     Ah-huh.

2       *Q*     Every single time?

3       *A*     Yeah.

4       *Q*     But the chart being just two pages does not include

5    those?

6       *A*     Correct.

7       *Q*     In addition to this longer chart of approximately 99

8    entries, was this chart further summarized?

9       *A*     Yes.

10      *Q*     In a smaller chart?  Yes?

11      *A*     Yes, it was.

12      *Q*     Okay.

13              MR. BOGDANOS:  Now I got to find it.  95 for

14      Identification.

15      *Q*     You see 95 entitled Viper Video Timeline Selected?  You

16   see that?

17      *A*     Yes.

18      *Q*     Is this the chart you were just talking about a moment

19   ago that's actually much briefer but whatever the entries are on

20   here are the same entries?  They just have fewer as 74 -- excuse

21   me -- A and B?

22      *A*     Yes.

23      *Q*     Completely accurate?

24      *A*     Yes.

25              MR. BOGDANOS:  I will offer this in Evidence as

1    95.

2                    MR. KLEIN:  Okay.

3                    THE COURT:  95 is admitted.

4    **Q**    Okay, and if we can, same deal publish --

5                    THE COURT OFFICER:  You want this up?

6                    MR. BOGDANOS:  No, it is not necessary, and I have

7    given Mr. Klein a copy.  We could publish that to the jury.

8    **Q**    Ms. Ortiz, you have copies of both, right?

9    **A**    Yes.

10   **Q**    Hold on.  Okay now, Ms. Ortiz, starting with 74A --

11   withdrawn.

12         You could go right to 95.  Do you have 95 in front of

13   you?  You know what?  It would be better.  Thanks.  I am sorry.

14   You were right.  You have 95 in front of you?

15   **A**    Yes.

16   **Q**    Does 95 list every single time Mark Richardson came in

17   and out of the building?

18   **A**    Yes.

19   **Q**    Would you tell us please the first time he came in the

20   building that you saw on the video?

21   **A**    Okay.  The first time.

22   **Q**    Tell us the real time?

23   **A**    All right, the real time is 12:49 a.m. on January 11,

24   2008, clip No. 2.

25   **Q**    And he arrived with whom?

1      *A*    He arrived with Hood and Anthony Hall.

2      *Q*    And where was B-Hat at that point?

3      *A*    B-Hat was waiting by the door.  He wasn't able to get

4   in.

5      *Q*    So who arrived at the building first?

6      *A*    B-Hat arrived first.

7      *Q*    And then what did the four of them do?

8      *A*    Then the four of them entered the building once

9   Anthony Hall opened the door.

10     *Q*    Using keys?

11     *A*    Using keys.

12     *Q*    And what did those four do?

13     *A*    The four of them entered the lobby and took the

14   elevator.

15     *Q*    Go ahead.  Look at your notes if you need to.  The

16   large -- you had to look at the larger timeline to see what

17   elevator they got on.

18     *A*    Right.

19              (Perusing document.)

20     *Q*    When you do identify something tell us the number, the

21   far left hand corner number that you are using so that the jury

22   can and defense can follow along.

23     *A*    Looking at clip 5 -- 4 at 12:50 a.m. on January 11,

24   2008, all four men entered Elevator A and seen through Camera 2.

25     *Q*    And what did they do?

1     **A**     They rode the elevator up to the twelfth floor which is
2     clip No. 5.
3     **Q**     And what did all four do when they got to the 12th -- I
4     am sorry?
5     **A**     Sorry.
6     **Q**     Know my fault.  What did all four do when they got to
7     the 12th floor?
8     **A**     They all exited on the 12th floor.
9     **Q**     And then what's the next thing you saw?
10    **A**     The next thing was at 2:29 a.m. clip, B-Hat entered the
11    elevator alone at twelve and rode the elevator down to the lobby
12    and exited the building.
13    **Q**     And moving to 3:10, what do you see?
14    **A**     At 3:10 a.m. clip 18 Mark Richardson and Hood entered
15    Elevator A at the eleventh floor and exited the elevator at the
16    lobby and then the building.
17    **Q**     Now, you are sure it was the eleventh floor?
18    **A**     Yes.
19    **Q**     You can actually see that on the video?
20    **A**     Yes.  Elevator A has the numbers clearly depicted on
21    the door, so it's easy to tell which floor people were getting
22    on and off at.
23    **Q**     And then what do Mark Richardson and Hoody do after
24    they get on the elevator at 11?
25    **A**     11, they exit at the lobby and then they exit the

1   building.

2       *Q*    And then who is the next -- so at this point

3   Mark Richardson, Hoody, and B-Hat are out of the building?

4       *A*    Yes.

5       *Q*    But Anthony Hall is still in?

6       *A*    Yes.

7       *Q*    Where is Helen Abbott?

8       *A*    Helen Abbott we see exiting the building clip 22 at

9   3:19 a.m.  She enters Elevator B alone and exits the building.

10  She takes the elevator down to the lobby and then exits from the

11  lobby through the front entrance of the building.

12      *Q*    And how long is she gone?

13      *A*    She is gone about eight minutes.

14      *Q*    And then what happened?

15      *A*    And then she comes back into the building at around

16  3:28 a.m. which is clip 26.  She enters Elevator B alone and

17  exits at the 12th floor.

18      *Q*    Do you see Mark Richardson again?

19      *A*    Yes.

20      *Q*    When is that?

21      *A*    A couple of hours later at 11:20 a.m. clip No. 30 we

22  see Mark Richardson enter the building alone.

23      *Q*    How does he get in?  Does he have keys?

24      *A*    No.

25      *Q*    So what does he do?

1    **A**    So he waits until someone comes and opens the door and
2    he enters; and he takes Elevator A at the lobby alone and he
3    exits at the 12th floor.

4    **Q**    While he is at the lobby, could you tell what floor he
5    presses?

6    **A**    You mean inside the elevator?

7    **Q**    Inside the elevator?

8    **A**    Yes, inside the elevator I could tell which floor he
9    presses.

10   **Q**    Which floor did he press?

11   **A**    He pressed floor 12.

12   **Q**    Did he get off at 12?

13   **A**    Yes.

14   **Q**    And when was the next time you see Mark Richardson?

15   **A**    The next time at 11:57 a.m.

16   **Q**    That's approximately 35 minutes later?

17   **A**    Yes.

18   **Q**    Where do you see him?

19   **A**    We see him enter Elevator A at the eleventh floor
20   alone.

21   **Q**    And what does he do?

22   **A**    He rides the elevator down to the lobby and he exits
23   the building alone.

24   **Q**    And then when do you see him again?

25   **A**    Then about 18, 19 minutes later, clip 38

1   Mark Richardson enters the building alone.  We see him enter

2   Elevator B at the lobby alone and then we see him press 12 and

3   exit and --

4      *Q*   Can you tell what floor he exits on when he leaves B

5   this time?

6      *A*   No.

7      *Q*   Why not?

8      *A*   Because B does not have the floors clearly marked.  I

9   know that he presses the 12th floor, but I am not a hundred

10  percent sure he leaves on that floor.

11     *Q*   And then do you see him again?

12     *A*   Yes.

13     *Q*   When and how much later?

14     *A*   About 45 minutes later we see him at 1:37 p.m. clip 42

15  enter Elevator A.

16     *Q*   I am going to stop you.  Sorry.  Forgive me for the

17  interruption.  Good thing you are in law school.  12:18 and 1:37

18  is 45 minutes?  Fine.  You know what.  It speaks for itself.  No

19  more math.

20         You see him at 11:37 again?

21     *A*   Yes 1:37.

22     *Q*   What do you see him doing?

23     *A*   I see him entering Elevator A at the eleventh floor

24  alone.

25     *Q*   So every time you've seen him so far it's been going to

1  twelve but getting back on the elevator at 11?

2  **A**   Yes.

3  **Q**   Three times and all three times you see him getting

4  back on at 11?

5  **A**   Yes.

6  **Q**   Tell us what he does this third time?

7  **A**   This third time he rides the elevator to the lobby and

8  he exits the building alone.

9  **Q**   And does he return a fourth time?

10  **A**   Yes.

11  **Q**   When is that?

12  **A**   At 2:14 p.m. clip 46, he enters the building alone.

13  **Q**   Same as with all the other times, does he have keys?

14  **A**   No.

15  **Q**   So he waits?  Someone else let's him in?

16  **A**   Yes.

17  **Q**   Please continue.  What does he do?

18  **A**   He entered Elevator A at the lobby alone and he exits

19  at the 12th floor.

20  **Q**   And you know it's the 12th floor because?

21  **A**   Because the elevator door opens and you see twelve on

22  the Elevator A.

23  **Q**   So A is the one that always has the numbers?

24  **A**   Yes.

25  **Q**   And you have to look to see what numbers been pressed?

1    *A*    Exactly.

2    *Q*    And the camera is such -- I mean it is in evidence so
3  the jury can see it -- but the camera in the elevators are such
4  that you could actually see which buttons are pressed?

5    *A*    Yeah.

6    *Q*    Do you see -- so now he has entered; gets off on the
7  12th floor at 2:15 p.m. on January 11th?

8    *A*    Yes.

9    *Q*    When is the next time you see Mark Richardson?

10   *A*    Clip 71 at 4:49 p.m.  He enters Elevator B alone and
11 then he --

12   *Q*    Can you tell what floor?

13   *A*    No.

14   *Q*    Why not?

15   *A*    Because Elevator B does not have signage as to what
16 floor -- it doesn't show what floor it's on, it is stopping on,
17 or opening at.

18   *Q*    Is there anything particularly distinctive about the
19 floor itself as you look through the open door that you can tell
20 the difference between 12 and 11?

21   *A*    No.

22   *Q*    And you looked to see if there was?

23   *A*    Yes.

24   *Q*    So please continue.  He gets on at some floor Elevator
25 B?

<u>Ortiz - Direct - People</u>                                    843

1    *A*    Right.

2    *Q*    And what does he do?

3    *A*    He rides Elevator B to the lobby and then he exits the

4    building at 4:50 p.m. clip 74.

5    *Q*    And if we can go to --

6          MR. BOGDANOS:  This will be the only clip, Judge.

7    I am mindful of the time.  If we can take that down.  If we

8    can actually go to clip 71.

9    *Q*    You said that Mark Richardson gets on Elevator B?

10   *A*    Ah-huh.

11   *Q*    At 4:49 p.m.?

12   *A*    Yes.

13   *Q*    And that's -- so that's Elevator B would be camera 4;

14   is that correct?

15   *A*    Yes, camera four, clip 4:57 which is the end time of

16   the clip and then you would just go to 21 minutes and 47

17   seconds.

18          (Videotape playing.)

19   *Q*    Could you please tell us what, we are looking at.

20   *A*    We are looking at Mark Richardson enters the elevator

21   on an unknown floor.

22   *Q*    This is the last time you see him at all?

23   *A*    This is the last time I see him at all.

24   *Q*    For the rest of the weekend?

25   *A*    Yes.

*Penelope Messina, RPR*
*Senior Court Reporter*

1  **Q**    Also fourth time you have seen him in and out that day?

2  **A**    Yes.

3  **Q**    Tell us which elevator this is again?

4  **A**    This is Elevator B.

5            (Videotape is playing.)

6  **Q**    Okay, you can stop it.

7            (Videotape stopped playing.)

8            MR. BOGDANOS:  Thank you, Ms. Ortiz.  Nothing

9  further, your Honor.

10            THE COURT:  Any questions?  All right.  That

11  completes your testimony, Ms. Ortiz.  Thank you.

12            THE WITNESS:  Thank you.

13            (Witness exited the courtroom.)

14            THE COURT:  Just pass them down, folks.  That will

15  do it for today.  Once again I ask all of you to be here

16  tomorrow morning at the usual time 9:45.  Please do not

17  discuss the case with anyone between now and then.  Thank

18  you very much.

19            (Jury exited the courtroom.)

20            THE COURT:  That's it.  Time for the parties --

21            THE COURT OFFICER:  Courtroom is clear.  We are

22  done.

23            (Trial was adjourned to September 21, 2011.)

24

25