Colloquy

```
 1  SUPREME COURT         NEW YORK COUNTY
    TRIAL TERM            PART 45
 2  ------------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK  x  IND#
 3                                       x  3534/08
                                         x
 4     -against-                         x
                                         x  CHARGE:
 5  MARK RICHARDSON,                     x  MURD. 2
                                         x
 6                   Defendant.          x
    ------------------------------------x
 7  JURY TRIAL CONTINUING

 8                        111 Centre Street
                          New York, N.Y. 10013
 9                        September 21, 2011

10

11  B E F O R E:

12              HONORABLE BRUCE ALLEN,
                JUSTICE OF THE SUPREME COURT
13

14

15  A P P E A R A N C E S;  (Same as previously noted)

16  ----------------------------------------------------------

17              THE COURT CLERK:  Case on trial continued.  The

18  People of the State of New York against Mark Richardson.  The

19  defendant, his attorneys, and the assistant district attorney

20  are present.  The jury is not present at this time.

21              THE COURT:  Thank you very much.  Mr. Bogdanos.

22              MR. BOGDANOS:  Yes.  Just one matter, Your

23  Honor.  Mr. Klein and I obviously understand Your Honor's

24  ruling with regard to February 5th.  Effectively, if the door

25  is opened, the door is opened.
```

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1          But Mr. Klein, I think fairly, has asked that the

2   existence of police interaction with Mr. Richardson on February

3   5th be introduced for purposes that Mr. Klein will put to use

4   for his defense.

5          As I said before, the People's position, is that's a

6   fair request and we're going to do it on direct.  I just want

7   to notify the Court and Counsel, I know Mr. Klein sometimes

8   doesn't like, what he perceives to be leading questions, I am

9   going to gently lead the detectives into and out of February

10  5th with a series of four, five questions, so that we don't get

11  into any of the substance.

12         So, I just wanted all parties on alert as to that,

13  and then I am just going to move into it and get off of it.

14              MR. KLEIN:   I think that's appropriate.

15         I just would hope that, there's some debate about

16  whether they were bringing him in as a suspect or a witness, so

17  I would hope there would be no leading question that says we

18  were bringing him in kind of as a witness in the case.

19         That there be no asking for his subjective state of

20  mind, that is of the detective's state of mind, why they were

21  doing it and I don't plan to go into it.

22              MR. BOGDANOS:   Well, there is going to be one

23  question as to:  You planned to interview Mr. Richardson?

24  Why?  We didn't know.  We had no idea what his involvement

25  was.  This is the answer, I believe, we're going to get.

                    Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1          We didn't know what the involvement was but we just

2   wanted to interview him as someone that may have had

3   information about the case.  Did you interview him?  Yes.

4   February 5th.  That's it.

5          THE COURT:  If that's going to be the answer why

6   don't you lead them into that answer as opposed to asking a

7   "why" question in front of the jury.  The answer might be

8   different.

9          MR. BOGDANOS:  I will be happy to do it.

10          MR. KLEIN:  The problem -- that's not really

11   accurate.  The problem is that opens up the whole issue of why

12   they were actually interviewing him.

13          As a matter of fact, they had got a whole bunch of

14   information together by then, and they had an accusatory

15   statement by Desiree Allen implicating the defendant in the

16   crime in terms of, as you know, basically she says he had

17   confessed to it and said words to the effect of, don't let what

18   happen to her happen to you, and tried to strangle me.  That's

19   what the real truth of that is.

20          THE COURT:  Well, how would you have it

21   phrased?

22          MR. KLEIN:  I wouldn't have him say anything.

23   We didn't know what we had, or anything like that, or any why.

24   Just?  Did you bring him in?  Did you interview him?  Did you

25   then bring him home?

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1        If you want to ask how long was he there.  I don't
2   know what the thought is, an hour, something like that.  But
3   none of the "why" or the "wherefore" or what the thought was
4   around it.
5        MR. BOGDANOS:  One problem with that argument.
6   Again, Mr. Klein is trying to get in some but not the totality
7   of the circumstances.  The truth, as told to me by the
8   detectives, as told by the detectives to Mr. Klein, at the
9   hearing, under oath, is they didn't know on February 5th what
10  his involvement was and he was just another person, like
11  everybody else in this case, Sidney Gotler, Anthony Hall, I am
12  not going to go into any of that but that's the truth.
13       The truth is he did go home.  They didn't know if he
14  was a suspect or a witness.  And, in fact, were kind of hoping,
15  I am not going to get into, they were hoping he was a witness,
16  they had him and they thought he would give them a lead in
17  getting to the murderer.
18       So, the truth, as in indicated before, is exactly
19  what I said, which is when you -- why were you doing this, and
20  I will lead him through it.  At this point what did you know
21  about Mr. Richardson?  We identified him from the video.  And
22  to us he was just a person who might have information about the
23  murder of Helen Abbott.  Period.
24       I am happy to go into the entire day of February 5th
25  if that's what the defense wants but you can't have it both

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   ways.

2              MR. KLEIN:  I am not trying to have it both

3   ways.  But when Mr. Bogdanos says, Judge, the truth is, and

4   then here was an answer to, was given to Mr. Klein during the

5   hearing, nothing establishes that as the truth.

6              I understand in the hearing, I was there, he said we

7   didn't really know what we had.  We weren't just interested in

8   speaking to him as a witness.  On the other hand, he said,

9   things like, you know, I didn't care what he said because I

10  just wanted to lock him into a statement.  Any statement he

11  gave was good for me.  Even if he locked himself into an alibi

12  because I knew I had him on video.

13             That doesn't really sound like seeing someone as a

14  witness.  Because, obviously, if someone is a witness the last

15  thing you want to do is lock them into a statement that then

16  your stuck with forever, right?  Especially if it may not be

17  true.

18             So, if there's a question as to what did they really

19  have him there for now, we know what the dangers are.  And Mr.

20  Bogdanos says you can't go into any of those areas or you have

21  to go into it completely.  You drawled on that but then it goes

22  both ways, we have to stay out of it, we can't can ask him for

23  his thought process and there is no reason to go into it in

24  this time.  There's just none.  It's irrelevant.

25             MR. BOGDANOS:  A speculating jury is a dangerous

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   jury.  Mr. Klein wants the jury to know that there was police

2   interaction with Mr. Richardson and the detectives on February

3   5th for his purposes.  Yet, he doesn't want the jury to know

4   that the nature of that going in was the detectives didn't know

5   what they had or what Mr. Richardson's involvement was.

6          Truth, not truth, bad turn of a phrase on my part.

7   As a matter of record.

8                MR. KLEIN:  Okay.  They --

9                MR. BOGDANOS:  Let met finish.

10               MR. KLEIN:  Go ahead.  Sorry.

11               MR. BOGDANOS:  So that's all I am asking, if Mr.

12   Klein wants the February 5th, which he does, nobody wants a

13   speculating jury:  Wait.  There's interrogation on February

14   5th.  I wonder what was it about.  I wonder why they had him.

15   Umm.  All those things.  Why weren't we being told that.

16          Rather than have any of the speculation a simple one

17   question and answer will put all that to rest.  He was someone

18   we thought may have information about the homicide.  We

19   interviewed him.  Brought him home.  End.  And we move on.

20               MR. KLEIN:  Judge, they introduced the video

21   clip.  It's in the video clip.  If they didn't want there to be

22   any thought about the February 5th interaction then they could

23   have said, Your Honor, we have a 16 minute clip the rest is

24   suppressed but these 16 minutes talk about something that's

25   never going to be explained so take it out.

                    Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1            They decided not to put that in.  They can't now say

2     so the jury may speculate about something that we put into

3     evidence so we have to be able to put our spin on what it was

4     so if they are going to think about it they think about it in a

5     way that's appropriate to the prosecution's position.

6            I just don't think that's fair.  And there's no

7     relevance.

8            THE COURT:  Well, I do think the jury is

9     entitled to hear at least this, and you may ask this question

10    Mr. Bogdanos:  Did you have some basis for speaking to him on

11    that day.  Without saying what the basis was.

12            In other words, so it wasn't out of the blue, but,

13    yes, they did speak to him.

14            MR. BOGDANOS:  And so no answer -- so the

15    answer:  We thought he might have information about the

16    homicide.

17            THE COURT:  That I think is a dangerous answer.

18            MR. BOGDANOS:  Really?

19            THE COURT:  Yes.  Based on your investigation

20    that you have some basis to speak to him.

21            MR. BOGDANOS:  Well, yeah.  I mean --

22            THE COURT:  That's enough.

23            MR. BOGDANOS:  Hold on, Judge.  You are not

24    saying that I can't say they saw him on the video?  I mean

25    that's the basis.  What -- you're arguing two different things

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   now.

2                   THE COURT:  You can first bring out:  Did you

3   see him on the video?

4                   MR. BOGDANOS:  And identify him.

5                   THE COURT:  Based on your investigation did you

6   have some reason to talk to him?  And that's it.  Not the

7   particulars.

8                   MR. BOGDANOS:  Okay.  I got it.

9                   MR. KLEIN:  Okay.  Now, Judge I also, I made it

10  very clear, that I am not challenging in any way the propriety

11  of the arrest of the defendant.  I made that clear on the

12  record.  I made it clear in my opening statement.  And I am

13  making it clear again here.

14                  Nor have I, in any way, launched a thoroughness in,

15  attack, excuse me, on the thoroughness of the police

16  investigation.  That is anything the detective did.  I have

17  raised some issue with forensic biology about things they did

18  in the lab but nothing about the work of these police officers,

19  these police detectives, and I don't plan to.

20                  However, I am concerned about, what often happens

21  when police detectives come in and testify, is they talk about

22  all the work that they did and then reasons they had about it

23  and thoughts they had about it, and they then get to a

24  conclusion, that after doing all this work and speaking to all

25  these people, I then arrested the defendant, Mark Richardson.

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1          And it then sounds to a jury like, obviously, they

2   spoken to all of these people and, therefore, it's clear that

3   the evidence really points at the defendant.

4          And they can -- I don't know, they may testify and

5   say, like we spoke to Anthony Hall and after that we arrested

6   Mark Richardson.  We spoke to, I don't know, Desiree Allen, and

7   after speaking with her we arrested Mark Richardson.

8          And that makes it sound like Mark Richardson was

9   arrested in part because all these people said something about

10  him, and Anthony Hall, who they may say we didn't arrest,

11  somehow's able to convince him that he wasn't guilty, and all

12  of that is inappropriate.

13         Not just in appropriate but I think violates the

14  defendant's confrontation rights under the U.S. and New York

15  Constitution and is irrelevant really to any issue here.

16         The propriety of the arrest is completely irrelevant

17  and the District Attorney's Office shouldn't be able to use, in

18  the guise of saying, I want to know that they did a good job,

19  the right to bring in that kind of evidence.

20         Whether they did a good job or not a good job isn't

21  the issue.  The issue in this case is whether or not he's the

22  person that's guilty of the crime and, therefore, I ask that it

23  be -- not be permitted that kind of testimony.

24              MR. BOGDANOS:  Again, there's two separate

25  things going on in here with Mr. Klein's argument.  One isn't

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   going to happen, in this courtroom, from this assistant

2   district attorney.  And the other is Mr. Klein saying, oh, by

3   the way, I don't want you to do anything at all to show the

4   jury that the detectives acted reasonably in this

5   investigation.

6            First, at no point on questioning of any detective am

7   I going to say anything remotely resembling:  And then you

8   interviewed this person, this person, and then you arrested the

9   defendant.  I'm not going to do that.  So that's just jousting

10  at shadows.  That's not going to happen.  Put that aside.

11           Now, Mr. Klein doesn't want me to be allowed on

12  direct examination to say:  Detective, did you do an

13  investigation?  Whether Mr. Klein attacks the officers or not,

14  the People, who have the burden of proof, have the right to

15  present to the jury the reasonableness of their actions

16  throughout the course of the investigation.

17           The jury does not need an overt argument on the part

18  of Mr. Klein, in words, sum or substance, saying and they

19  focused like a laser right on Mark Richardson from day one to

20  the exclusion of all the others.  The jury doesn't need him to

21  say that for them to be concerned about that.

22           Again, speculating juries are an anathema to justice

23  and so the People have every intention of briefly, up front,

24  having the detectives explain to the jury exactly what their

25  investigation was in broad terms.

          Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1        But at no point will there be any causal connection

2   related between what they did and whom they spoke to and then

3   suddenly pounce on Mark Richardson.  That is not going to

4   happen.

5        But it is absolutely not fair, unless Mr. Klein is

6   going to change the burden of proof, or to get up say the

7   police acted reasonable, affirmatively say that, and say that

8   they didn't focus too early on Mark Richardson, unless he's

9   going to say all of those things, how is that in any way fair

10   to the People, who still bear the burden whether he overtly

11   says it or not.

12        So, I'm sorry, Judge, again, I submit that is not a

13   reasonable approach to the People's manner in which we meet our

14   burden of proof.

15        MR. KLEIN:  Judge, first of all, when I said

16   that the concern I had about, here's what we did and then you

17   arrested Mark Richardson, I obviously wasn't saying that I

18   thought Mr. Bogdanos was going to do it in that form but that

19   would be the point that the jury would finally get and that's a

20   very dangerous point, obviously.

21        Whether it's asked specifically, you spoke to Anthony

22   Hall and then you arrested Mark Richardson, I don't assume he's

23   going to do that.  But that would then be the possible guise of

24   the argument if all of that information is brought out and then

25   it was just, and you arrested Mark Richardson.  However, he

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   does it that's what the jury would think.

2          With regard to him saying I have to show the

3   reasonableness of the police investigation because otherwise

4   the jury is going to speculate about the focus on Mark

5   Richardson.  I don't think there's going to be any speculation

6   about that at all.

7          Whether that's a reason to let in evidence otherwise

8   that wouldn't come into evidence, I mean, everyone is conceding

9   here there was reason to focus on Mark Richardson and there's

10  going to be no argument by me, and the district attorney knows

11  that from my opening statement, that it was appropriate to

12  focus on Mark Richardson.

13         So, to bring in evidence, to prevent the jury from

14  doing that, is really can't be for a necessary purpose.

15             THE COURT:  Thank you both.  You will have to

16  object if you believe it to be appropriate Mr. Klein.

17             In fact, I think it's time to get to witnesses.  Are

18  all the jurors here?

19             THE COURT OFFICER: Yes.

20             THE COURT:  Are both sides ready?

21             MR. KLEIN:  Yes.

22             MR. BOGDANOS:  Yes, Judge.

23             THE COURT:  May we have the jury, please.

24             MR. BOGDANOS:  And while we're getting the jury

25  I need to talk to the detectives as to your ruling because they

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   don't expect that.

2                MR. KLEIN:  I have one other point.  In sorry.

3   It has to do with -- Donna Torres is going to testify

4   apparently about some statements that the defendant made after

5   the February 5th interview.  The next day the defendant calls

6   Donna Torres and there's discussion in that phone conversation

7   about what they have talked about on February 5th, okay, they

8   both say things about what was I told before, what did I say

9   before, and all of that.

10               So I assume that's going to be gone into and neither

11  side is going to think in any way that opens the door to the

12  February 5th conversation coming in.

13               MR. BOGDANOS:  Correct.

14               MR. KLEIN:  Okay.  Because Donna Torres does

15  say, the defendant said, you told me yesterday.  And she says

16  what we said yesterday was that, well, come in, but then we're

17  not going to go into the February 5th conversation --

18               THE COURT:  He's agreed.

19               MR. KLEIN:  --  What they said.

20               THE COURT:  He's agreed.

21               MR. BOGDANOS:  I agree.

22               THE COURT:  Okay.  The jury.

23               THE COURT OFFICER:  Jury entering!

24          (The jury enters the courtroom.)

25               THE COURT CLERK:  Case on trial continued.  The

                 Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   People of the State of New York against Mark Richardson.   The

2   defendant, his attorneys, and the assistant district attorney

3   are present.   Will both sides stipulate all jurors are present

4   and properly seated.

5                   MR. BOGDANOS:   Yes.

6                   MR. KLEIN:   Yes.

7                   THE COURT:   Thank you, very much.   And good

8   morning, ladies and gentlemen.   Mr. Bogdanos.

9                   MR. BOGDANOS:   Yes, Your Honor.   The People next

10  call to the stand Ms. Amy Dorsey.   Criminologist.

11  Criminalist.   I'm sorry.

12                  (The witness, Amy Dorsey, enters the courtroom,

13            takes the witness stand, is duly sworn/affirmed in by the

14            Clerk of the Court, responds to the oath and testifies as

15            follows:)

16                  THE COURT CLERK:   Do you solemnly swear or

17            affirm the testimony you are about to give shall be the

18            truth, the whole truth, and nothing but the truth, so

19            help you God?

20                  THE WITNESS:   I do.

21                  THE COURT OFFICER:   Have a seat, please.   Pull

22            your chair up to the microphone.   In a loud clear voice,

23            if you could, just state your name and spell your last

24            name for the record.

25                  THE WITNESS:   Amy Dorsey.   D-o-r-s-e-y.

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1          MR. BOGDANOS:  May I inquire?

2          THE COURT:  Yes

3   DIRECT EXAMINATION

4   BY MR. BOGDANOS:

5       Q.   Good morning, Ms. Dorsey.

6       A.   Good morning.

7       Q.   Ma'am, would you tell the jury your occupation.

8       A.   I am a criminalist with the New York City Police

9   Department Crime Laboratory.

10      Q.   How long have you been with the New York City Police

11  Department Crime Laboratory?

12      A.   Just about ten years.

13      Q.   And what are your duties and responsibilities there?

14      A.   I work in the Latent Print Development Section and I

15  process evidence for obtaining DNA samples and for

16  fingerprints and latent prints.

17      Q.   And would you tell the jury the training and

18  education you have had to qualify you for your current

19  position?

20      A.   I have a bachelor degree in criminology, in criminal

21  justice from Niagara University.  I have masters degree in

22  forensic science from the University of New Haven.  I also was

23  field trained in crime scene processing, latent print

24  development by Charlotte Police Department where I worked for

25  several years and I received one year in-house training, latent

PROCEEDINGS

1  printed development, by a senior criminalist with the New York

2  City Police.

3      Q.   And can you tell the jury approximately how many

4  evidence examinations you have conducted in your career whether

5  it was here or in Charlotte?

6      A.   Thousands.

7      Q.   And can you tell the jury how many times you have

8  testified previously in courts of law?

9      A.   Over seventy-five.

10     Q.   In what capacity and in what areas?

11     A.   As an expert in latent print development.

12          MR. BOGDANOS:   I would offer Ms. Dorsey as an

13  expert in latent print development for this jury, Your Honor.

14          MR. KLEIN:   Okay.

15          THE COURT:   Application is granted.   Please

16  continue.

17  BY MR. BOGDANOS:

18     Q.   Ms. Dorsey, did there come a time when you received

19  an assignment of relevance to this case and this jury?

20     A.   Yes.

21     Q.   Do you remember when that was and how it came about?

22     A.   I received this case with Lab Number 08, T Thomas,

23  0242, March 11th of 2008.

24     Q.   And what was the request specifically?

25     A.   It was to obtain DNA samples and for latent print

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   development.

2        Q.   From any object in particular?

3        A.   It was a lamp.

4        Q.   And how did the lamp -- withdrawn.  And did you

5   receive that lamp?

6        A.   I did receive it.

7        Q.   At your lab?

8        A.   Yes.

9        Q.   Which is where?

10       A.   It's in Jamaica, Queens.

11       Q.   And in what condition was it when you received it?

12       A.   I received it packaged, signed and sealed.

13       Q.   And was it under a particular voucher number?

14       A.   Yes.

15       Q.   And do you remember that voucher number and if you

16  need to refer to your report go ahead.

17       A.   I would have to refresh my memory.

18            THE COURT:  Go ahead.

19       A.   I am looking at the typed report that I made in

20  regard to this case Nancy 986476.

21       Q.   Now, I would ask that the witness be shown People's

22  27 and 28 in evidence.  Take a look at those two photographs

23  and tell the jury if you recognize what's shown in those

24  photographs?

25       A.   Yes.  This is the lamp I processed in regard to this

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1    case.

2        Q.    Would you tell us -- you said the lamp came in

3    packaged and sealed.   Tell us exactly what you did?

4        A.    I received it in one brown paper bag signed and

5    sealed.   And then I will open up the case and make sure that's

6    what's listed on the voucher, what I am actually receiving,

7    that it's itemized correctly.   In this case it was itemized

8    correctly.   I did receive one lamp.

9        Q.    So then what did you do?

10       A.    I am going to open it up and I am going to obtain my

11   DNA samples first and then I am going to do the latent print

12   processing.

13       Q.    Why in that order?

14       A.    Because it's assumed that the chemicals that we're

15   using are going to destroy any DNA so we always try to get the

16   DNA samples first.

17       Q.    And when you say chemicals, the chemicals you use to

18   make latent prints visible, to find latent prints, those are

19   the chemicals you are talking about?

20       A.    Right.   Latent prints are -- latent means hidden.   So

21   that's what we're looking for.   The chemicals will make them

22   seen.

23       Q.    So you do DNA first then the prints?

24       A.    We obtain t he DNA samples first in areas that are

25   least likely to yield the latent print yet most likely to

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1    obtain a DNA sample and then you will do the chemical analysis.

2         Q.    And that's what did you here?

3         A.    I did that, yes.

4         Q.    Well, do it in your order, tell us exactly what you

5    did in order to obtain DNA or if DNA swabs from the lamp?

6         A.    Well, I am going to examine the lamp and I am going

7    to, based on my training and experience, determine where I am

8    going to swab and in this case I took two samples and they were

9    given a unique identifier.

10        The unique identifier is going to be my initials,

11   slash S1, meaning Sample 1 and Sample 2.  So they were labeled

12   ADS1, ADS2.  S1 was taken from the base of the lamp and it was

13   a blood like substance.  The sample Number 2 was taken at the

14   bottom most tier of the lamp.

15        Q.    And you have the photographs of the lamp in front of

16   you?

17        A.    Yes.

18        Q.    We no you are far from us but if you could hold up

19   the photograph showing the entire lamp and if you could display

20   it for the jury and show us where -- withdrawn.

21        We have heard about how you get swabs, you did it the

22   normal way, cotton swab, sterile?

23        A.    Yes.  We will take a bottle of sterile water and just

24   moisten the cotton swab and chose an area and rub vigorously.

25        Q.    And that's what you did here?

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1      A.    I did that.

2      Q.    Would you point to the jury where it was you swabbed

3  on the lamp and then say for the record what it is?

4      A.    Sample 1 I took from the base of the lamp, the gold

5  portion of the lamp, the bottom that you can see.  And the

6  Sample 2, what I am calling the bottom tier, is this bottom

7  most area here right underneath the body.

8      Q.    So, Swab 1, for the record, is the metal portion at

9  the base and Swab 2 is from the glass?

10     A.    Right above the base.

11     Q.    Okay.  And what did you do with those swabs?

12     A.    At the time our standard procedure was to package

13  them, label them appropriately, and then put them back in with

14  the packaging, where all the evidence, the lamp, and the

15  samples, would go down to the office of the Chief Medical

16  Examiner.

17     Q.    And that's what you did here?

18     A.    Yes.

19            MR. BOGDANOS:  May I show the witness now

20  People's exhibit 70 and 71 in evidence.  If we could start with

21  71, the smaller of the two.  If you could just put it up where

22  you want.  Put it on the monitor.  It's fine.  It's just going

23  to be up for a moment.  Really one question.

24  BY MR. BOGDANOS:

25     Q.    Okay.  You see the chart before you, that's 71, Other

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1   Items Tested?

2       A.   Yes.

3       Q.   And you have seen that or at least a smaller version

4   of it before coming into court?

5       A.   I have.

6       Q.   And you had an opportunity to examine it?

7       A.   Yes.

8       Q.   Do you see on that chart S1, The Swab, Base of Lamp,

9   S1, you see it up at the top there?

10      A.   I see that.

11      Q.   That's your swab?

12      A.   It is.

13      Q.   And you didn't do the test on it so whatever those,

14  you see where it indicates results on, whether or not there is

15  DNA, whether or not there is blood?

16      A.   Yes.

17      Q.   That's not -- you didn't do those tests?

18      A.   No.  I obtained the samples.  That's it.

19      Q.   And then the samples go to the Office of Chief

20  Medical Examiner for further testing?

21      A.   That's correct.

22           MR. BOGDANOS:  Now, if we can go to 70, please.

23  And however you want to put it up is fine.

24  BY MR. BOGDANOS:

25      Q.   S2 is pretty far up at the top.  Can you see it Ms.

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1    Dorsey from where you are?

2         A.   I see it.

3         Q.   Same question.  You have a swab, and in this case

4    it's called, Swab, Last Tier By Base, S2.  Is that your swab

5    the swab that you just described from the base of the lamp?

6         A.   It is.

7         Q.   And, again, here you see results relating to Helen

8    Abbott and others.  Not your results?

9         A.   No.

10        Q.   Again, you forward it on to the Office of Chief

11   Medical Examiner?

12        A.   Yes.

13             MR. BOGDANOS:  Thank you.  Nothing further on

14   either of those charts.

15        Q.   Okay.  So now you taken the swabs?

16        A.   Yes.

17        Q.   You sealed them up?

18        A.   Correct.

19        Q.   Now, what do you do?

20        A.   After I obtain my DNA samples I am going to start my

21   four step sequential process for latent print development.

22        Q.   And tell us exactly what you did with this lamp?

23        A.   Well, the first two steps are prior to any chemical

24   processing.  The very first step always is going to be a visual

25   examination and what we're looking for there are what we call

PROCEEDINGS

1   patent prints, P-a-t-e-n-t, and those are prints you can see

2   with the naked eye.  Prints in blood.  Prints in oil.

3   Etcetera.  Okay?  I did not see any at that point.

4         So I moved on to the second step where I am going to

5   place this entire lamp under an alternate light source, for

6   example, ultraviolet.  And what we're looking for there are

7   prints that would naturally floures, be it something in the

8   sweat, lotion, detergent on the hands, etcetera.  I didn't see

9   any sat this step either.

10         So my third and fourth step is where I am going to

11   start my chemical analysis.  This entire lamp is going to be

12   placed in a chamber and we're going to superglue, fume it, and

13   the chemical is actually cyanoacrylate,

14   C-y-n-a-n-o-a-c-r-y-l-a-t-e.  But it's superglue.

15         And we're going to select the right size chamber, put

16   it in there, and what's in there is a hot plate, a bicker of

17   water, and a small tin.  We heat it all up.  We put about a

18   quarter size dab of superglue, you can actually see it

19   reacting, the superglue will go up in a puff of smoke while the

20   evidence is in the chamber.

21         What we're doing there is where making anything

22   that's on that lamp permanent enough for me to do my fourth and

23   final process which is to take the lamp out, put it in a hood,

24   and I am going to spray a chemical on it, that's going to be

25   used in conjunction with the superglue, so if there are any

PROCEEDINGS

1    latent prints on that lamp I am going to put that lamp

2    underneath alternate light source because of the superglue and

3    because of the dye, if there are any they will floures yellow

4    and in this case I did not see any latent print on this lamp at

5    all.

6         Q.    Under any of your testing?

7         A.    That's correct.

8         Q.    Does that mean this lamp was never touched?

9         A.    Not necessarily.

10        Q.    Explain?

11        A.    It's hard to see but this lamp is extremely

12   textured.  For optimal results to leave behind a fingerprint

13   you need a smooth clean dry surface.  In this instance all of

14   the lamp surfaces are textured surfaces which is going to

15   interfere with the tiny little ridges that we call your

16   fingerprints.

17             In addition to that, any time you have and item like

18   this it could be touched numerous times.  If you touch

19   something numerous times chances are prints are going to be

20   smudged wiped off, etcetera.

21        Q.    And, finally, Ms. Dorsey, assume the following facts

22   for purposes of this question and then at the end of the

23   question, at the end of that.  I am going to ask you how that

24   can be explained.

25             Assume that before you received this lamp, this lamp

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1    was in an apartment, an and individual, or individuals, took

2    the lamp -- and you see that when you got the lamp the cord had

3    already been cut?

4        A.   Yes.

5        Q.   Assume that the cord was intact.  Assume further,

6    that an individual, or individuals, held the lamp while one of

7    them cut the cord and then used the -- put the lamp back down

8    on the sofa and then used that cord that they had just cut to

9    strangle someone to death.

10           Can you explain why you found no prints on that at

11   all?

12       A.   If the person was holding this lamp?

13       Q.   Yes.

14       A.   Well, we will determine that it's something called

15   pressure distortion.  If you are holding something very, very

16   tightly, what we're looking for are the tiny little ridge lines

17   that we call your fingerprint, as I explained before, anytime

18   you hold something very, very tight, all those little tiny

19   lines are going to go into each sort and it's going to be

20   basically nothing but a smudge.

21           Also, if you are holding something and you are doing

22   something vigorous, for example, you might have too much

23   perspiration, which would also not yield any latent print.

24           MR. BOGDANOS:  Thank you.  Nothing further.

25           THE COURT:  Mr. Klein.


                 Glenn J. Merola, Sr. Court Reporter

CROSS/DORSEY/DEFENSE

1   CROSS EXAMINATION

2   BY MR. KLEIN:

3        Q.   Hi Ms. Dorsey.

4        A.   Good morning.

5        Q.   Couple of questions.  You indicated that you got the

6   lamp, right?

7        A.   Yes.

8        Q.   It came to your lab, you showed us a picture of it?

9        A.   Yes.

10       Q.   When something comes into your lab you have to

11   document the condition it comes in?

12       A.   Yes.

13       Q.   And you do that in any case, right?

14       A.   Right.

15       Q.   You did that in this case, right?

16       A.   I did that.

17       Q.   And you also documents very carefully where you take

18   an actual swab from, right?

19       A.   Yes.

20       Q.   And you did that in this case, right?

21       A.   Yes.

22       Q.   Okay.  Because Swab 2, that was taken from the, what

23   you had described as the broken last glass -- broken last glass

24   tier of lamp directly above the base, is that right?

25       A.   Correct.

CROSS/DORSEY/DEFENSE

1       Q.    That's what you wrote down in your report, right?

2       A.    Yes.

3       Q.    Because that what you took the swab from, right?

4       A.    Right.

5       Q.    Calls it's also accurate to say that when -- you

6    didn't break the lamp in any way, right?

7       A.    No.

8       Q.    Okay.  And it's accurate to say that when you

9    received the lamp it actually came with four broken pieces from

10   the lamp, right?

11      A.    I had indicated that it was broken.  I don't recall

12   it being exactly four.  I have several in my notes.  Oh.  I'm

13   sorry.  I do have four in my written notes.  I was looking at

14   the typed.  Excuse me.

15      Q.    You first take written notes, right?

16      A.    Yes.

17      Q.    And then you type them up whenever, right?

18      A.    Yes.

19      Q.    Okay.  But the written notes are what you write down

20   when you are actually doing the work or close in time?

21      A.    Yes.

22      Q.    And, basically, to be at least accurate, if not more

23   accurate, than your typed notes, is that fair to say?

24      A.    Yes.  In my type I see several.  I do see here I have

25   four exactly.

Glenn J. Merola, Sr. Court Reporter

CROSS/DORSEY/DEFENSE

1      Q.    As a matter of fact, because when you received the

2   lamp there were four broken pieces from the lamp, right?

3      A.    Right.

4      Q.    And, by the way, did you take a picture of the lamp

5   when you received it?

6      A.    Yes.  Any time we obtain DNA samples and we see a

7   blood like substance, or anything that we can see, we have to

8   take a record shot of it so I will take overall record shot and

9   then I will take a close up of it, yes, so that's why you see

10  two record shots.

11     Q.    I'm just going to show you what I think is maybe a

12  copy of a picture that you took.  Do you have a copy of the

13  picture that you may have taken of the lamp?

14     A.    I do, yeah.

15     Q.    You do.  And that's just -- hold it up so I can see.

16  All right.  Now, that the way, would it be accurate to say,

17  that's the way you received it?

18     A.    That is the way I received it.

19     Q.    And that's a fair and accurate depiction of the

20  condition which you actually got it, right?

21     A.    Right.  This is the photo I took, yes.

22     Q.    Which shows that actually some part of the last tier

23  above base is broken, is that right?

24     A.    Yes.  You can see it here.

25                  MR. KLEIN:  Okay. Thank you.  I'd offer that

Glenn J. Merola, Sr. Court Reporter

CROSS/DORSEY/DEFENSE

1  into evidence as Defense Exhibit C.

2              MR. BOGDANOS:  Sure.  No objection.

3              THE COURT:  Defendant's C is received.

4              (Defense Exhibit C was received in evidence.)

5  BY MR. KLEIN:

6      Q.  And then we you sent the lab -- well, you re-packaged

7  the lamp, right?

8      A.  I re-packed it in the same package I received it.

9      Q.  All right.  In the same condition which you received

10 it?

11     A.  Right.

12             MR. KLEIN:  Okay.

13             MR. KLEIN:  Mr. Bogdanos.

14             MR. BOGDANOS:  Nothing.

15             THE COURT:  Ms. Dorsey, thank you very much,

16 ma'am.

17             MR. KLEIN:  Judge, I think she has to leave

18 the -- we can substitute one.

19             MR. BOGDANOS:  Sure.  I have an extra copy.  I

20 just wanted to make sure mine is good as Ms. Dorsey's.

21             MR. KLEIN:  And mines as good as yours.

22             THE WITNESS:  There are copies cop in my file

23 you can have this.  Is that all right, Judge?

24             THE COURT:  That's fine.  All right.  That's

25 it.  Thank you.

Glenn J. Merola, Sr. Court Reporter

CROSS/DORSEY/DEFENSE

1           (The witness was excused and exits the courtroom.)

2           (Continued on next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

```
 1  TK2         MR. BOGDANOS:  People next call to the stand
 2      Dt. Dimuro.
 3                  THE COURT:  Thank you.
 4                  MR. BOGDANOS:  Your Honor, with the Court's
 5      permission Ms. Pal will run the video.
 6                  THE COURT:  Yes.
 7                  (Witness entered the courtroom.)
 8  DT.  G E R A R D   D I M U R O , called as a witness by and on
 9      behalf of the People, having been first duly sworn
10      and/or affirmed testified as follows:
11                  THE WITNESS:  I do.
12                  THE COURT OFFICER:  Have a seat please.  Pull your
13      chair up a little bit.  If you could just state your name
14      for the record, spell your last name; give your shield
15      number and present assignment.
16                  THE WITNESS:  Detective Gerard, G-E-R-A-R-D,
17      Dimuro, D-I-M-U-R-O; 2615, Manhattan North Homicide.
18                  MR. BOGDANOS:  May I inquire, your, Honor?
19                  THE COURT:  Yes you may.
20  DIRECT EXAMINATION
21  BY MR. BOGDANOS:
22      Q    Good afternoon, detective -- I am sorry -- good
23  morning, detective.
24      A    Hey.
25      Q    Detective, would you tell the jury how long you have
```

1 | been on the New York City Police Department altogether?

2 | **A** About twenty-nine (29) years.

3 | **Q** How long have you been a detective?

4 | **A** About twenty-five (25).

5 | **Q** And how long have you been at the Manhattan North

6 | Homicide Squad?

7 | **A** About eleven (11).

8 | **Q** Does the Manhattan North Homicide Squad have a

9 | particular area of responsibility in Manhattan?

10 | **A** 59th street to the Riverside border -- Riverdale

11 | border.

12 | **Q** And may we take it there is such a thing as a Manhattan

13 | South Homicide Squad?

14 | **A** Yes, Manhattan is split in half.

15 | **Q** That's 59th down?

16 | **A** Right.

17 | **Q** Would you briefly tell the jury how you get an

18 | assignment?  It's obviously a homicide.  How do you get to work

19 | on an assignment?

20 | **A** Homicide occurs in the north.  We are called out to the

21 | scene and we assist the detective assigned in the precinct.  We

22 | have no case responsibility.  We are actually assisting the

23 | detective in that particular squad that catches the case.

24 | **Q** And so Manhattan itself is divided up into

25 | precincts?

1    **A**    Yes, sir.

2    **Q**    And if I could invite your attention now to January

3    13th of the year 2008, do you recall that Sunday generally?

4    **A**    Yes, I do.

5    **Q**    Were you on duty on that date?

6    **A**    Yes.

7    **Q**    And normal homicide duty?

8    **A**    Yes.

9    **Q**    And on that date did you receive an assignment of

10   relevance to this case and this jury?

11   **A**    Yes, I did.

12   **Q**    Could you briefly tell the jury what that assignment

13   was and how you received it?

14   **A**    We received an assignment about a homicide in the

15   confines of the 25th Precinct in the Wagner houses.  I believe I

16   received the call from the 25 squad itself.  We responded to the

17   scene and began the investigation.

18   **Q**    And what you've just described, is that standard

19   procedure?

20   **A**    Yes.

21   **Q**    And was there a detective -- because the Wagner houses

22   are in -- within the geographical area of 25th Precinct, was

23   there a detective from the 25th Precinct assigned to the

24   case?

25   **A**    Yes, Ruben Henriquez.

<u>Dt. Dimuro - Direct - People</u>                              878

1    *Q*    Would you spell Dt. Henriquez -- do you have it --
2    detective, did you know Dt. Henriquez before January 13th?
3    *A*    Yes.
4    *Q*    You worked with him before?
5    *A*    Yes.
6    *Q*    So your specific assignment if we understand correctly
7    is you will assist Dt. Henriquez in this homicide?
8    *A*    Yes.
9    *Q*    Do you remember approximately if you do what time you
10   arrived at the Wagner houses?
11   *A*    Sometime in the evening.
12   *Q*    And where did you go?
13   *A*    I went to the 12th floor of the Wagner houses, 2400
14   specifically I believe.
15   *Q*    2400 building?
16   *A*    Yes, I think I went directly to Apartment 12-E.
17   *Q*    And when you arrived, did you meet with anyone
18   there?
19   *A*    Ruben, his partner, Detective Rivera.  I think some
20   patrol people were on the floor.
21   *Q*    And so we are clear, when you say patrol, you mean
22   uniformed officers?
23   *A*    Yes, from the 25.
24   *Q*    And you say on the floor, on the 12th floor?
25   *A*    Yes.

1    *Q*    Do you recall whether when you arrived Crime Scene had
2    already arrived?

3    *A*    No.

4    *Q*    Once you got there -- whenever you got there, you got
5    there before Crime Scene?

6    *A*    Yes.

7    *Q*    Very generally and very briefly what's the first thing
8    you did?

9    *A*    We entered the scene.

10   *Q*    Tell us what you did?  By the scene you mean the
11   apartment?

12   *A*    Yes, I went into the apartment.  Went directly to the
13   left rear bedroom and I observed the body.  I believe that was
14   the first thing I did after I greeted everybody in the hallway.

15   *Q*    And would you describe what you remember seeing when
16   you went to the back rear left bedroom.

17   *A*    There was a bed.  There were articles on the bed.  The
18   body was adjacent to the bed I believe face down.  The pants had
19   been pulled down and the bra and shirt had been pulled up.

20   *Q*    Do you remember anything on the bed catching your
21   attention?

22   *A*    A wallet with numerous I.D.'s and a broom.

23          MR. BOGDANOS:  Forgive me, Judge, if I could have
24   one moment.

25   *Q*    When you went back and saw this, did you touch

1  anything?

2      **A**    No.

3                   MR. BOGDANOS:  May I ask that the witness be

4      handed 20, 23, 24 in Evidence.  For the record photos of the

5      body and then the bed.

6                   (Handing.)

7      **Q**    If you would please take a look at the three photos.

8  Look up when you are done?

9      **A**    Okay.

10     **Q**    Do you recognize what's depicted in those photos?

11     **A**    Yes, it's what we just talked about.

12     **Q**    And are those photos fair and accurate photographs of

13 the scene as it appeared when you arrived?

14     **A**    Yes, sir.

15     **Q**    Now, the jury has heard evidence that at some point the

16 body was turned over by the medical legal investigator by the

17 Office of the Chief Medical Examiner?

18     **A**    Yes.

19     **Q**    You were there before the body was turned over?

20     **A**    Yes, I was.

21     **Q**    And were you there when the body was turned over?

22     **A**    Yes, I was.

23     **Q**    You also mentioned a moment ago about seeing a broom on

24 the bed?

25     **A**    Yes.

<u>Dt. Dimuro - Direct - People</u>                          881

1    *Q*   You've seen that broom since then?

2    *A*   Yes, I have.

3    *Q*   Many times?

4    *A*   Yes.

5    *Q*   Can you see from where you are right now the broom?

6    *A*   Yes, I can.

7    *Q*   Do I need to bring it up.  I can if you need to see it.

8    *A*   No.

9    *Q*   Do you recognize it?

10   *A*   Yes, I do.  That's the broom that was present at the

11   crime scene.

12            MR. BOGDANOS:  And for the record People's 25 in

13   Evidence.

14   *Q*   You recognize that?

15   *A*   Yes, sir.

16            MR. BOGDANOS:  I would now ask that the witness be

17   handed People's 89 for Identification.

18            (Handing.)

19   *Q*   Detective, you could take People's 89 -- for the record

20   the wallet -- and go ahead if you would put a glove on please

21   and once you have, take the wallet out of the bag just to make

22   sure you are able to recognize it.

23   *A*   That's it.

24   *Q*   You have seen it before?

25   *A*   Yes, I have.

1    *Q*    When you say that's it, can you be more precise?

2    *A*    That's the wallet that was present on the bed at the

3  crime scene.

4    *Q*    Next to the wallet, what was there?

5    *A*    Various I.D.'s.

6    *Q*    And did there come a time -- without going into

7  details -- did there come a time when you found out that one of

8  the uniformed officers had actually touched these items with his

9  bare hands?

10   *A*    Yes, I did.

11   *Q*    Don't share with us the reaction you had but --

12   *A*    Okay.

13   *Q*    -- but you knew that at the scene that some uniformed

14 officer had touched everything -- these things with his bare

15 hands?

16   *A*    I knew it very early on.

17   *Q*    But not the broom?

18   *A*    No.

19   *Q*    Just the wallet and I.D. cards?

20   *A*    Right.

21   *Q*    Had you been in that Wagner houses before January 13th?

22   *A*    Yes.

23   *Q*    Are you familiar with it's video surveillance system?

24   *A*    I am familiar with the Viper system, yes.

25   *Q*    Can you explain.  The jury's had way more testimony

1  they could possibly want about it, but could you just very

2  briefly describe it for us.

3      **A**    It is a video system set up that covers various areas

4  in the Wagner houses themselves and it's monitored by police

5  officers and a supervisor.

6      **Q**    And so your -- while your at the scene does Crime Scene

7  then arrive?

8      **A**    Yes, the ME investigator Crime Scene arrives.

9      **Q**    Very briefly would you walk us through what, if

10  anything, you did with the Crime Scene detective.

11      **A**    I didn't -- I didn't engage in too much conversation.

12  I mean they know what they are doing.  I just observed as he

13  processed the scene.  We asked him to try and see if there was

14  anything that might have been a weapon used.  We just took note

15  of what he collected, what he collected for DNA and print

16  processing, and things of that nature.

17      **Q**    And did you -- you observed him doing all these things?

18      **A**    Yes, I did.

19      **Q**    And did you observe him attempting to lift prints

20  from -- throughout the apartment?

21      **A**    Yes.

22      **Q**    And did you observe him actually lift a print from the

23  broom; that is, People's 25 in Evidence?

24      **A**    Yes.

25      **Q**    And by the ay, I am saying him and I am sorry -- that's

1  Dt. Hernandez of the crime scene?

2    *A*    Yes, sir.

3    *Q*    Had you met him before that day?

4    *A*    I believe so.

5    *Q*    So you're done -- at some point you are done in the

6  apartment?

7    *A*    Crime Scene is done.  The body is removed, yes.

8    *Q*    And do you begin the investigation?

9    *A*    Yes.

10   *Q*    Without going into any specifics, would you just give

11  us a general idea of what the plan was at that point?

12   *A*    The plan is you follow the basic textbook.  We had no

13  one in mind as to who might have committed this so you cast a

14  large net.  You do your canvasses.

15   *Q*    What's a canvass?

16   *A*    Canvass is to speak to people in the building.  We

17  speak to people coming in and out of the building; and an in

18  this particular case the advantage we had there were Viper video

19  so you immediately begin the process of viewing a lot of video.

20  You confer with the Crime Scene people to see what they

21  collected; and that's basically it in the very beginning.

22  It's -- it's pretty much done on all cases.

23   *Q*    And in this particular case you told us about the

24  identification cards on the bed?

25   *A*    Yes.

1    **Q**    Did that add anything to your investigation?

2    **A**    Well, we sought to identify and speak with the people

3    whose identification cards we found.

4    **Q**    Now by seeking to speak with them, the people whose

5    identification cards you found do -- when you look to speak to

6    them -- before you have spoken to them, do you have anything in

7    mind they are a suspect; they are a witness; anything at all?

8    **A**    No.

9    **Q**    What's -- what's the approach with these people?

10   **A**    The cards are there so you have to answer it out as a

11   matter of course.  Someone's card is found within a crime scene,

12   so you want to speak to that person.  Could it have absolutely

13   no relevance?  Of course, but you have to do to as a matter of

14   procedure.

15   **Q**    And you did that in this case?

16   **A**    Yes, we tried.

17   **Q**    To the extent you could find the individuals?

18   **A**    Right.

19   **Q**    Now, same set of questions with regard to Viper video,

20   2400 is a big building?

21   **A**    Yes.

22   **Q**    Sixteen floors?

23   **A**    Yes.

24   **Q**    And do you speak to every single person?

25   **A**    No.

1    *Q*    That you see on video?

2    *A*    No.

3    *Q*    Do you speak to as many people as you could identify?

4    *A*    Yes.

5    *Q*    Same set of questions, are they suspects?  Are they

6    witnesses?  What are they?

7    *A*    No.  To the extent that we took a particular block of

8    video based on the time we thought that the incident occurred,

9    we tried to identify as many people on the video as we could and

10   speak to them.  As with the I.D. cards.

11   *Q*    And is it the same approach before you speak to any of

12   those people, are you -- in your mind are you saying must be a

13   suspect, must be a witness?

14   *A*    We had no suspects at the outset of this case.  What I

15   am talking about, the very first few hours of the case.

16   *Q*    So you told us how you begin the investigation.  Does

17   that -- that strategy continue for a period of time?

18   *A*    Sure.  You plot a long.  There is no magic involved.

19   You just plot along.  You do the basics and as the evidence is

20   gathered, you take the appropriate course and focus on certain

21   individuals as the evidence comes in.

22   *Q*    Now moving now to the next day, January 14th.  It's a

23   Monday morning.  Did you have occasion to go to the Office of

24   the Chief Medical Examiner?

25   *A*    Yes.

<u>Dt. Dimuro - Direct - People</u>                    887

1     *Q*    For what purpose?

2     *A*    To view the autopsy of Helen Abbott.

3     *Q*    Standard procedure?

4     *A*    Yes, it is required.

5     *Q*    So tell us what you did.

6     *A*    I met with Dr. Tranchita.  I sat quietly on a stool and

7 watched him perform the autopsy.

8     *Q*    And the -- just so we are clear, it's the same

9 Helen Abbott that you saw in the crime scene on the thirteenth?

10    *A*    Yes, sir.

11    *Q*    And did you notice before he actually performed -- and

12 I am not going to -- at least I am not going to ask you any

13 questions about cutting open the body but before Mr. -- Dr.

14 Tranchita actually did the autopsy, did you notice if he

15 collected anything from the body of Helen Abbott?

16    *A*    He collected -- I know he conducted a rape kit.  He

17 took swabs of the breast after he made a physical inspection of

18 the body.

19    *Q*    And did you actually observe him -- let's just limit

20 this question now to the swabs you said of the breasts.  Did you

21 observe him take swabs of the breasts?

22    *A*    Yes, sir, I did.

23    *Q*    Starting with same -- different swab for each breast?

24    *A*    Yes.

25    *Q*    Do you remember how many swabs per breast?

1    *A*    No, I don't.

2    *Q*    When you saw him -- let's start with the left breast.

3    Did you actually see him swab the left breast?

4    *A*    I saw him take the Q-tip and swab the breast, each

5    breast.

6    *Q*    Can you tell us how he did that as best you recall.

7    *A*    As best as I recall I guess in a circular motion around

8    the breast.  Then he placed it in a container of some sort and

9    packaged it and then went on to the autopsy.

10   *Q*    And just so we are clear when you saw him swab the

11   breasts, did he swab --

12              MR. KLEIN:  Objection.  Objection.  He said how he

13          swabbed.  He can ask how he swabbed.  He can't suggest an

14          answer he wants.

15              THE COURT:  Overrule.  Overruled.  You may

16          continue.

17   *Q*    When you saw him swab the breast, did you see him swab

18   the breast and only the breast?

19   *A*    Yes.

20   *Q*    And that's what he swabbed?  He swabbed -- he didn't

21   swab, go to the shoulder or any part -- other part of the body

22   or just the breast?

23   *A*    A swab of the breast is the breast.

24   *Q*    And only the breast?

25   *A*    And only the breast.

<u>Dt. Dimuro - Direct - People</u>                    889

1          MR. KLEIN:  Judge, those are leading questions,
2      are they not?  You tell me to object.  You overruled the
3      objection.  I don't know what you want me to do.  Did he
4      make them or not?

5          THE COURT:  All right, you registered your
6      complaint.  Let's continue.

7          MR. BOGDANOS:  Thank you.

8      *Q*    Now, let's go back to the investigation.  You told us
9      one of the things you did was view the Viper video?

10     *A*    Yes, sir.

11     *Q*    Was there -- did you have occasion to view Viper video
12     from all the way back to the 11th of Jan -- January 11th, the
13     Friday?

14     *A*    Yes.

15     *Q*    Was there anything that caught your attention on that
16     video, on the January 11th video?

17     *A*    As pertaining to particular individuals.

18     *Q*    Yes?

19     *A*    Yes.

20     *Q*    Explain.

21     *A*    There was an individual who I took note of that I later
22     identified.  Actually, there were a couple of individuals that I
23     later identified that were present on the video that were of
24     interest to me.

25     *Q*    And do you remember any of the names of these

1   individuals?

2        *A*     One is in the courtroom, Richardson, and the other guy

3   is a guy named Anthony Hall.

4        *Q*     Let me start with Mr. Richardson, do you know his full

5   name?

6        *A*     Mark Richardson.

7        *Q*     What about Mark Richardson caught your attention on the

8   video?

9        *A*     Nothing other than the fact that he's there.  I didn't

10  know what to make of him at that point.  It's just that he is

11  present.

12       *Q*     And you see him just once or more than once?

13       *A*     I saw him several times.

14       *Q*     And at this point same set of questions as with the

15  identification cards, is he a suspect?  Is he a witness?  What

16  is he at this point?

17       *A*     No.  I didn't know what to make of him or Hall at this

18  point.  They are just guys that I know about that I want to

19  speak to eventually.

20       *Q*     And you've indicated you see Mr. Richardson -- for the

21  record, and I would ask that Mr. Richardson be asked to stand,

22  please.

23                  (Defendant so complied with request.)

24                  THE COURT:  Thank you.

25       *Q*     If you would please for the record indicate what

```
 1  Mr. Richardson is wearing today.
 2     A    He is wearing a black sweat shirt and a -- black pants.
 3     Q    Thank you.  You could take a seat.
 4          Detective, looking at Mr. Richardson you have just seen
 5  him stand.  Do you know his height and weight?
 6     A    I'd say 6'7" maybe.
 7     Q    Now comparing his weight now to when -- withdrawn.  Did
 8  there come a time when you met Mr. Richardson back in 2008?
 9     A    Yes.
10     Q    Comparing his weight now to his weight then, what can
11  you say?
12     A    I think he lost a little weight.
13     Q    You want to give us a rough idea if you can?
14     A    I'd say anywhere between 30 and 50 pounds.
15     Q    So he's lighter now then he was then?
16     A    Yes.
17     Q    So -- you said that and let me go to -- you said,
18  mentioned a second name so we will go to that now.  The other
19  individual that you saw on video that you are able to identify?
20     A    Anthony Hall.
21     Q    Do you ever see them together?
22     A    Yes.
23     Q    Do you learn --
24          THE COURT:  I am sorry on the videotape?
25          MR. BOGDANOS:  Thank you, Judge.
```

1    *Q*    Do you see them together on the videotape?

2    *A*    Yes, I do.

3    *Q*    And do you learn where Anthony Hall lives?

4    *A*    He lives on the floor below Helen in the same building.

5    *Q*    So on the eleventh floor?

6    *A*    Yeah.

7    *Q*    Of 2400?

8    *A*    Yes.

9    *Q*    Do you learn where Mr. Richardson lives?

10   *A*    Richardson lives in Astoria, Queens.

11   *Q*    So does there come a time when you just indicated you

12   are going to interview everyone possible that has any --

13   *A*    Yes.

14   *Q*    Connection at all?

15   *A*    Yes.

16   *Q*    Does there come a time when you find and interview

17   Anthony Hall?

18   *A*    Yes.

19   *Q*    Does there come a time when you find and interview

20   Mark Richardson?

21   *A*    Yes.

22   *Q*    And do you remember the date that you interview

23   Mark Richardson?

24   *A*    The date is February 5th of 2008.

25   *Q*    And do you remember approximately how long that

<u>Dt. Dimuro - Direct - People</u>                    893

1  interview took roughly?

2      *A*    A couple of hours.

3      *Q*    And at the end of the interview what do you do with

4  Mr. Richardson?

5      *A*    I took him home.

6      *Q*    Drove him to Queens?

7      *A*    Yeah, went back to Queens.

8      *Q*    If I could now invite your attention to the next day.

9      *A*    Okay.

10     *Q*    February 6th?

11     *A*    February 6.

12     *Q*    February 6th of 2008.  At this point in the

13 investigation still doing what you've told us that is?

14     *A*    Yes.

15     *Q*    Interviewing everyone you can?

16     *A*    Yes, we are still at that point.

17     *Q*    This physical evidence that you talked about that you

18 saw Crime Scene recover, do you have any results back yet?

19     *A*    No.

20     *Q*    And how does that work?  How do you get results from

21 the Office of the Chief Medical Examiner or the New York City

22 Police Department Crime Lab?

23     *A*    We are notified by the lab of results.

24     *Q*    Whatever they are, DNA?

25     *A*    Yes.

1    *Q*    Fingerprints?

2    *A*    Well, latent prints are One PP.

3    *Q*    One PP is?

4    *A*    Police Plaza.

5    *Q*    Police headquarters?

6    *A*    Yes, they notify us of print results; and the lab in

7    Queens and ME's office notifies us of other results.

8    *Q*    So while you are waiting for the lab results, if any,

9    what are you doing?

10   *A*    The investigation.

11   *Q*    So now on February 6th, do you visit an individual of

12   relevance to this case on that date?

13   *A*    I believe I do.

14   *Q*    Do you remember her name?

15   *A*    I'm not sure of the name.  I am not sure.

16   *Q*    Well, what is her job title?

17   *A*    Oh, okay, I know where you are going now.  I do.

18   Ms. Graz -- I can't pronounce it right.

19   *Q*    How about first name?

20   *A*    No.

21   *Q*    Have you seen her today?

22   *A*    Yes.

23   *Q*    Where is she right now?

24   *A*    She is in back of us waiting to testify.

25   *Q*    She is in the witness waiting room?

1    *A*    Yes.  She works for the Parks Department.

2    *Q*    Would the name Erica Grazette sound right?

3    *A*    That sounds very right, yes.

4    *Q*    So you interview Ms. Grazette?

5    *A*    Yes.

6    *Q*    Why?

7    *A*    To verify a time, a portion of time that Richardson

8    reportedly worked.

9    *Q*    And what time was that?

10   *A*    It was Friday the eleventh from 7:00 to 3:00 or 7:00 to

11   3:30.

12   *Q*    Had Mr. Richardson told you that?

13   *A*    Yes.

14   *Q*    So what are you doing?

15   *A*    I am seeing if he is telling the truth or not.  I want

16   to verify.

17   *Q*    About what?

18   *A*    About that particular incident whether he worked or

19   not.

20   *Q*    At the -- so you go to see Ms. Grazette and what, if

21   anything, do you ask her?

22   *A*    We asked her to provide us with documentation as to

23   whether or not Mark worked that day.  She said she would and I

24   think she eventually faxed it to us.

25   *Q*    Would that be the next day?

1   *A*    Yes.

2   *Q*    Now in addition to the physical evidence that you've

3   described from the crime scene, so put that aside.

4   *A*    Okay.

5   *Q*    We know you are out there interviewing other witnesses.

6   Put that aside.  Did there come a time when you realized that a

7   telephone might have some relevance in this case?

8   *A*    Yes.

9   *Q*    Explain how that came about?

10  *A*    Family of the deceased told us that Helen had a cell

11  phone that they had given her.

12  *Q*    I am sorry by the family do you remember --

13  *A*    Cheryl.

14  *Q*    And she is?

15  *A*    The daughter.

16  *Q*    And did you look for a cell phone?

17  *A*    Yeah.

18  *Q*    Did you look --

19  *A*    No, there was no cell phone at the crime scene.

20  *Q*    So based on that, what did you do?

21  *A*    We asked for call detailing for the time and/or around

22  the occurrence of death.  I this evening.  We asked for several

23  days before and after the thirteenth when she was found; and

24  subsequent for that after receiving the detailing, we found that

25  there was activity on the phone that was of interest to us.

1    **Q**   So just so we are clear, you get -- when you say you

2 asked for, you get subpoenas?

3    **A**   Right we do --

4    **Q**   District Attorney?

5    **A**   We go to the District Attorney.

6    **Q**   Detective, you've got to -- you've got to let me finish

7 the question.

8    **A**   Sorry.

9    **Q**   Sorry.  You are not the only one who does that to me

10 but you've got to -- do you go to the District Attorney's Office

11 to get subpoenas for phone companies?

12    **A**   Yes.

13    **Q**   And ultimately you get answers to the subpoenas?

14    **A**   Yes.

15    **Q**   In the form of what?

16    **A**   Call detailing records.

17    **Q**   Telephone records?

18    **A**   Right.

19    **Q**   And do you go through the telephone records of Ms. --

20    **A**   Yes.

21    **Q**   -- Ms. Abbott?

22 Now I cut you off so forgive me.  What is it you notice

23 about Helen Abbott's telephone records that catches your

24 attention and upon which you act?

25    **A**   Well, the first thing that catches my attention is that

1   it goes dead on the eleventh meaning there is no activity after

2   Friday the eleventh.  I think we found her on Sunday so there is

3   a dead spot there; so we do as a matter of course is backtrack

4   from the last call back.

5        Now I had a particular time in mind so I looked at some

6   particular phone calls and --

7        **Q**    And let me stop you for a moment.

8        **A**    Go ahead.

9        **Q**    What the -- what you just described is basically

10  standard procedure?

11       **A**    Yeah, nothing unusual.

12       **Q**    And you've got a series of phone calls now?

13       **A**    Yes.

14       **Q**    And they are basically just the last set of phone

15  calls; right?

16       **A**    Right.

17       **Q**    And what is the goal with regard to those phone calls?

18  What do you want to do?

19       **A**    To see who those people are that were called or made

20  calls into that phone.

21       **Q**    At that point in time do you have any idea whether

22  those phone calls have any relevance at all?

23       **A**    I was clueless.

24       **Q**    So you just started calling them?

25       **A**    Calls and visits.

1    *Q*    And in addition to that also more subpoenas for more

2    telephone records for those telephones?

3    *A*    Yes, what happens -- yes, you get the number and the

4    detailing.  Then you have to apply for subscriber information

5    to.  See who that number is subscribed to by.

6    *Q*    Now did there -- we will fast forward.  Did there come

7    a time when you were able to contact -- and I am just going to

8    limit you now to the last 22 phone calls on Helen Abbott's

9    phone?

10   *A*    Okay.

11   *Q*    Right, just those last 22?

12   *A*    Okay.

13   *Q*    Did there come a time when you took steps to track down

14   or speak to the subscriber or actual user of each of those

15   telephones?

16   *A*    Yes.

17   *Q*    Generally -- we will get into specifics -- but

18   generally how did you do that?

19   *A*    Once I got the subscriber information I visited the

20   address of the residence of the subscriber.

21   *Q*    And did you do that phone number by phone number?

22   *A*    Yeah.

23   *Q*    And did you notice a pattern?

24   *A*    Yes.

25   *Q*    Which was?

1    *A*    These phone calls were related to people that

2   Mark Richardson knew who were basically family members of his.

3    *Q*    Of Mark Richardson?

4    *A*    Yes.

5    *Q*    Okay.

6           MR. BOGDANOS:  And for this I would ask if we

7    could actually put it on the easel.  Put your glasses on and

8    may the detective come and approach, Judge?

9           THE COURT:  Yes.

10          MR. BOGDANOS:  Thank you.

11          THE WITNESS:  I am getting up?

12          THE COURT:  Yes.

13   *Q*    It is called by number, which is 12 in Evidence.

14   Please take a look at this chart and please, detective, pick a

15   side but be conscious don't block the chart.

16   *A*    Okay.  I think maybe I be will go over here.

17   *Q*    Just pick a side and be where you could actually see.

18   Have you seen this chart before?

19   *A*    Yes, I have.

20   *Q*    Have you seen more importantly the records that form

21   the basis for the information on the chart?

22   *A*    Yes, I have.

23   *Q*    So you can see -- actually, I am sorry -- let me very

24   quickly just do 11 in Evidence first.

25          MR. BOGDANOS:  If you would just put that on the

1    front just for a few moments.

2        *Q*    Okay, People's 11 in Evidence you see that this is a

3    phone chart and you see that it's in chronological order if you

4    look to the left two columns, date, and time.  You see how they

5    are --

6        *A*    Yes.

7        *Q*    -- in chronological order?

8        *A*    Yes.

9        *Q*    You have seen this chart before?

10       *A*    Yes.

11       *Q*    So we don't bounce back and forth, let's take eleven

12   down and go to twelve?

13       *A*    Take this down?

14       *Q*    Yes.  Now twelve is the same exact calls but now they

15   are not divided by time anymore but they are divided by

16   number?

17                    THE WITNESS:  Okay.

18                    THE COURT:  I am sorry, detective, just step back

19       a little more.  The jurors are having trouble.

20       *Q*    Again you have seen both these charts before?

21       *A*    Right.

22       *Q*    Let's start with the first and it is no longer the

23   first call but the first set of calls that's listed.

24                    MR. BOGDANOS:  May I approach?

25                    THE COURT:  Yes, you may.

<u>Dt. Dimuro - Direct - People</u>                          902

1    *Q*    Is the first four all the same number?

2    *A*    Yes.

3    *Q*    That number I have to read it in the record

4    (212) 319-6322.  Do you recognize that number?

5    *A*    Yes, that's Mark's wife's work number.

6    *Q*    And have you -- without going into the -- you can't go

7    into contents of conversation.  It is hearsay.  You had spoken

8    to that person?

9    *A*    Yes.

10   *Q*    To her?

11   *A*    Yes.

12   *Q*    Going to the next this information here in user, that's

13   correct?

14   *A*    Yes.

15   *Q*    And now go to the next set of numbers.  It's --

16           (Whereupon, cell phone began to ring at a high

17   ring tone.)

18   *Q*    It better not be you.

19   *A*    No, it's not me.

20           THE COURT OFFICER:  It's being taken care of.

21   *Q*    The next let me read into the record --

22   *A*    It's me.

23           (Witness commenced to silence cell phone.)

24   *Q*    (212) 862-8222.  Do you know that number?

25   *A*    Yes, that's Ms. Tracy Brathwaite's number.  That's

1   Mark's sister -- stepsister.

2       **Q**   Go to the next number (347) 730-6746.  Do you know that

3   number?

4       **A**   That's Mark's home number.

5       **Q**   In Queens?

6       **A**   Yes, in Astoria.

7       **Q**   Next number (347) 860-6703, do you know that number?

8       **A**   That's Mark Richardson's wife's cell phone number.

9       **Q**   347 -- we will come back to that in a moment.

10          Next number skipping (646) 283-0883, do you recognize

11  that number?

12      **A**   That's Mark's brother Derek.

13      **Q**   And (718) 547-3201, do you recognize that number?

14      **A**   That's the number that eventually comes back to

15  Marekha Richardson, Mark's daughter.

16              MR. BOGDANOS:  That's M-A-R-E-K-H-A.  Am I right?

17      I think.

18      **A**   Okay.

19      **Q**   So the subscriber is Sabrina Bond?

20      **A**   Right.

21      **Q**   Do you go to that actual location?

22      **A**   And meet the daughter, yes.

23      **Q**   Of Mark Richardson?

24      **A**   Yes.

25      **Q**   That's at a separate location from the Queens address

1    that you were talking about earlier?

2        **A**    Yes.

3        **Q**    And then two more numbers (718) 822-1573, do you know

4    that number?

5        **A**    That's Mark's parents number.

6        **Q**    And (973) 248-6257, do you know that number?

7        **A**    That's Mark's sister in New Jersey.

8        **Q**    Now, I ask you to skip a number so now let's go back to

9    that number, the (347) 992-7267.

10       **A**    Ah-huh.

11       **Q**    Did you attempt to track down that number?

12       **A**    I tried to track it down without success.

13       **Q**    Did you actually get subscriber information and an

14   address pursuant to subpoena for that telephone number?

15       **A**    I did and it was a bogus address in the Bronx.

16       **Q**    Bogus meaning the address?

17       **A**    Not good.

18       **Q**    That's didn't exist?

19       **A**    Right.

20       **Q**    Were you ever able to find out who -- if in fact a

21   Juan Pello Perez even exists?

22       **A**    I wasn't able to find that out.

23               MR. BOGDANOS:  Thank you.  I have nothing further

24       on the chart.  Detective you can --

25               THE WITNESS:  Let me make sure this is off for

1      good.

2                      MR. BOGDANOS:  You could retake your seat.

3                      THE COURT:  This way.  Come around this way.

4                      (Witness resumed the witness stand.)

5      **Q**    Now if I could invite your attention to July 10th of

6      the year 2008?

7      **A**    Okay.

8      **Q**    Did there come a time when you placed Mr. -- or

9      Mr. Richardson was placed under arrest on that date?

10     **A**    Yes.

11     **Q**    And after he was placed under arrest, where was he

12     taken?  To what precinct?

13     **A**    The 25th Precinct.

14     **Q**    Standard procedure?

15     **A**    Standard procedure.

16     **Q**    And after he was at the 25th Precinct, did you notify

17     or was an assistant district attorney notified to come up to the

18     precinct?

19     **A**    Yes, ADA O'Connell.

20     **Q**    Do you remember her full name?

21     **A**    What's her full name?  Kerry.

22     **Q**    K-E-R-R-Y?

23     **A**    Yes.

24     **Q**    Kerry O'Connell?

25     **A**    Yes.

1    *Q*    And she was the assistant district attorney on call for
2    that day?

3    *A*    Yes.

4    *Q*    And did -- were you present when Assistant District
5    Attorney O'Connell --

6    *A*    I am sorry she wasn't on call that day.  She was
7    assigned this case.

8    *Q*    Got you.

9           Okay, but it was her case to catch if you will and she
10   came to the precinct?

11   *A*    Yes.

12   *Q*    Thank you very much, detective.

13          And did there come a time when you were present during
14   an interview between Ms. O'Connell and Mark Richardson?

15   *A*    Yes.

16   *Q*    Was that interview between the assistant district
17   attorney and Mr. Richardson videotaped?

18   *A*    Yes.

19   *Q*    Standard procedure?

20   *A*    Yes.

21          MR. BOGDANOS:  I would ask that People's 42 in
22          Evidence -- withdrawn.

23   *Q*    Before I do that, prior to Ms. O'Connell taking that
24   interview of Mr. Richardson, you had been present with
25   Mr. Richardson after his arrest?

1      **A**     Yes.

2      **Q**     At any point between the arrest and when Ms. O'Connell

3      took this statement, did you make any promises or inducements to

4      Mr. Richardson in order to get him to speak to Ms. O'Connell?

5      **A**     Absolutely not.

6      **Q**     Did you threaten or did anyone ever do so in your

7      presence?

8      **A**     No.

9      **Q**     Did you threaten or coerce him in any, way, shape or

10     form in getting him to speak to the district attorney on video?

11     **A**     No.

12     **Q**     Did anyone ever do so in your presence?

13     **A**     No.

14     **Q**     During the period of time that he was at the 25th

15     Precinct before Ms. O'Connell arrived, was he offered food,

16     something to drink?

17     **A**     Yes.

18     **Q**     And Mr. Richardson smoked cigarettes?

19               MR. KLEIN:  Judge, I am sorry to interrupt, just

20     to be clear I have an objection to this entire line of

21     questioning.  I think we should address it.

22               THE COURT:  Overruled.

23               MR. KLEIN:  After the interaction.

24               THE COURT:  You may proceed.

25               MR. BOGDANOS:  I don't know what the objection is.

1  **Q**   Mr. Richardson smokes cigarettes?

2  **A**   Yes.

3  **Q**   Was he able to smoke cigarettes --

4  **A**   Yes.

5  **Q**   -- in that time period.

6          And then there came a time when you were present.  You

7  stayed for Ms. O'Connell's statement?

8  **A**   Yes.

9  **Q**   Were you physically present in the room?

10 **A**   Yes.

11 **Q**   Can you describe that room for us?

12 **A**   It's an interview room.  I guess it's as big as from

13 here to the end of the Judge's area.  Not very wide.  It is a

14 standard interview room in the squad.  There are two of them in

15 the 25 Squad.

16          MR. BOGDANOS:  Is that eighteen (18) feet?  Does

17    that sound fair.

18          THE COURT:  I would say fifteen (15) to eighteen.

19 **Q**   And describe the lighting?

20 **A**   Normal.

21 **Q**   And this particular room, what is it used for in the

22 25th Squad?

23 **A**   Interviews.

24 **Q**   Any other purpose?

25 **A**   Lineups.

1    *Q*    It has a one-way mirror?

2    *A*    Yes.

3    *Q*    And you mentioned that you knew it was being recorded

4    at that time?

5    *A*    Yes.

6    *Q*    Is the camera actually in the room you are in?

7    *A*    No, it's in a room adjacent to the room that I was in.

8    *Q*    So you said that this room is used for lineups.

9    Describe this room.  Who is in this room?

10   *A*    The defendant, the DA, and myself are in one room; and

11   the video man is in the room adjacent by himself.

12   *Q*    If this was a lineup the video man would be where the

13   people are looking in at the lineup?

14   *A*    Yes.

15   *Q*    Right?

16   *A*    Yes.

17   *Q*    You were in the actual lineup room?

18   *A*    Yes.

19   *Q*    Every precinct has one of these?

20   *A*    Yes.

21           MR. BOGDANOS:  Now, I would ask that People's 42

22       be played for the detective and jury.

23   *Q*    And, detective, I am going to ask you to take a look at

24   People's 42 in evidence quietly and at the end I am going to ask

25   you if this is a fair and accurate recording of the -- of this

1   conversation.

2                    (Videotape commenced playing.)

3                    MR. BOGDANOS:  Go back to the beginning.  Let's

4   expand it.  Pause it.

5                    (Videotape stopped playing.)

6   *Q*   Detective, take a look at this?

7   *A*   Yes.

8                    (Videotape commenced playing.)

9                    (Transcript continue on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DIRECT/DET.DIMURO/PEOPLE

1  T-3 - Peo. V Mark Richardson,  Ind.#3534/08

2  September 21, 2011:

3           (Video being played in open court.)

4           (Video taped turned off.)

5  BY MR. BOGDANOS:

6      Q.   Detective, from where you were seated, could you see

7  that entire videotape statement that was just played?

8      A.   Yes.

9      Q.   And is that a fair and accurate recording of the

10  conversation?

11     A.   Yes.

12     Q.   Just a couple of questions about that.  At the very

13  beginning Mr. Richardson indicates either the 10th or the

14  11th.  Do you remember when he talked about the date?

15     A.   Yes.

16     Q.   That's Thursday the 10th into Friday the 11th?

17     A.   Yes.

18     Q.   And he also talked about having seen you before and

19  voluntarily spoken to you, is that the February 5th that we

20  were talking about before?

21     A.   Yes.

22     Q.   And that's when you just brought him back home?

23     A.   Yes.

24     Q.   All right.  And then, finally, on that video he had

25  indicated that earlier that day he'd been arrested at the Parks

DIRECT/DET.DIMURO/PEOPLE

1   Department legal counsel office?

2      A.   The Department of Investigation.

3      Q.   And did you chose that or did the Parks Department

4   chose that location?

5      A.   The Parks Department.

6      Q.   And you were happy to comply?

7      A.   Yes.

8      Q.   And then you took him to the 25th?

9      A.   Yes.

10     Q.   All right.  Now, you mentioned, and just so we're

11  clear, in that video -- I'm sorry -- I guess there is one more

12  question -- in that video you are seated to Ms. O'Connell's

13  right, you are not on camera but --

14     A.   Correct.

15     Q.   So when Mr. Richardson points to his left he's

16  pointing to you?

17     A.   Yes.

18     Q.   Okay.  Now, with regard to the Viper video, you told

19  us that the video was one of the things that had initially

20  alerted you to Mr. Richardson at all?

21     A.   Yes.

22     Q.   If we could go to -- I am going to ask you to take a

23  look at a series of clips.

24          MR. BOGDANOS:  I'm sorry.  Let me get the time

25  line run to the jury.  It's the smaller version of 74 A and B.

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.DIMURO/PEOPLE

1                     THE COURT:  This is the one that was handed out

2  previously?

3                     MR. BOGDANOS:  Yes, Judge, it is.

4              It's just the one not the smaller one.

5  BY MR. BOGDANOS:

6      Q.   And if we could start, Detective, with -- it will

7  be -- actually, perhaps he could have one too.

8                     MR. BOGDANOS:  Clip number one.  Set it up.

9              I am handing the detective a copy.

10                     MR. KLEIN:  Judge, I object to the, going

11  through the clips, and I believe what's coming next, for

12  reasons that we had discussed before the examination began.

13                     THE COURT:  You may continue.

14                     MR. BOGDANOS:  Go to clip, it's Clip Number 1,

15  the 12:47 a.m. clip.  Go ahead.  Open it up.

16              (Viper clip being played in open court.)

17  BY MR. BOGDANOS:

18      Q.   Just watch it.  This particular individual with the

19  umbrella and the B Hat, do you know him?

20      A.   No.

21      Q.   Every learn his name?

22      A.   No.

23      Q.   Do you remember that during Mr. Richardson's

24  statement he had indicated that Anthony Hall had greeted him

25  downstairs and said:  See you up at Ma Ma's in a minute.

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.DIMURO/PEOPLE

1    Right, remember that portion?

2         A.   Yes, I do.

3         Q.   Ma Ma is?

4         A.   Helen Abbott.

5         Q.   Do you actually know if this is the person Mr.

6    Richardson is talking about?

7         A.   No, I don't.

8              (Video clip played in open court.)

9    BY MR. BOGDANOS:

10        Q.   Do you see those two individuals that have just come

11   into the frame?

12        A.   Yes.

13        Q.   And indicate who they are, please?

14        A.   The guy in the green army jacket is Richardson.   And

15   the guy in front of him with the brown wool hat is Anthony

16   Hall.

17        Q.   And the individual in the foreground?

18        A.   Don't know who he is.

19        Q.   Did you ever learn who he is?

20        A.   No, we were never able to identify him.

21             MR. BOGDANOS:   Then we'll go to Clip 2.   Just so

22   Your Honor knows, there's light at the end of the tunnel,

23   there's total of, maybe nine minutes in total.

24             Go to clip Number 2.   Okay, 3.   Thank you.

25             (Video clip being played in open court.)

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.DIMURO/PEOPLE

1   BY MR. BOGDANOS:

2        Q.   Detective, you obviously seen this before?

3        A.   Yes.

4        Q.   It's from looking out?

5        A.   Yes.

6        Q.   Who are those two people hugging that you can see

7   better on this side?

8        A.   One's Hall.  I don't know who the other guy is.

9        Q.   That's the man with the umbrella?

10       A.   Right.

11       Q.   Before Mr. Richardson -- before that conversation we

12   just spoke about, had you shown Mr. Richardson this video?

13       A.   No.

14       Q.   Tell us who that is?

15       A.   Hall.  Then Richardson.  I don't know who that guy

16   is.

17            MR. BOGDANOS:  Okay.  If we can go to Clip

18   Number 4, please.  And now if we can go to clip number five,

19   please, inside the elevator.

20            (Video clip being played in open court.)

21       Q.   As you get off the elevator on 12 which way do you

22   turn to get to Ms. Abbott's apartment?

23       A.   To the right.

24            MR. BOGDANOS:  Okay.  Let's go to Clip Number

25   46, please.

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.DIMURO/PEOPLE

1              (Video Clip being played in open court.)

2                   MR. BOGDANOS:  You can go to clip 49 the

3    elevator.

4              (Video clip being played in open court.)

5                   MR. BOGDANOS:  Pause.

6        Q.   Okay.  This the clip, you just watched Clip Number 49

7    at approximately 2:15 p.m., who was that?

8        A.   Richardson.

9        Q.   And got off what floor?

10       A.   Twelve.

11       Q.   Now, that's at 2:15?

12       A.   Yes.

13       Q.   Now, look at the next series of entries on the time

14   line from 2:58, those series of calls.  Are these the calls you

15   just described to us?

16       A.   Yes, sir.

17       Q.   So the series of calls that you described to us

18   earlier which are 74 -- could we put it up on the easel --

19   which are 74B, the series of calls from Helen Abbott's phone to

20   Mark Richardson's family members, 19 times they call, takes

21   place after Mark Richardson gets out at the 12th floor of that

22   building?

23       A.   Yes.

24       Q.   And who lives on the 12th floor again?

25       A.   Helen Abbott.

DIRECT/DET.DIMURO/PEOPLE

1             MR. BOGDANOS:  Okay.  Put that down now but hold

2    it I will need it in a minute.  Let go to Clip 71, please.

3    Elevator B.

4             (Video clip being played in open court.)

5    Q.    And that is --?

6    A.    Richardson.

7    Q.    This is at 4:49 according to the video?

8    A.    Yes.

9    Q.    So, from 2:15 -- please just continue watching -- but

10   from 2:15 to 4:49, while those calls you just testified to are

11   being made, Mr. Richardson is in the building?

12   A.    That's correct.

13            MR. BOGDANOS:  Pause that for a moment.

14   Q.    By the way, this is January 13, 2008?

15   A.    No.

16   Q.    I'm sorry.  Thank you.

17   A.    January 11th.

18   Q.    January 11th of 2008.  Was it unseasonably warm on

19   January 11, 2008, I am talking about outside?

20   A.    I don't recall if it was or not.  Maybe it was a

21   little warmer than usual.

22            MR. BOGDANOS:  Hit play.

23            (Video clip being played.)

24            MR. KLEIN:  Judge, I hope he's not going to ask

25   the witness to describe -- to ask what he sees in the video,

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.DIMURO/PEOPLE

1  right.

2              MR. BOGDANOS:  Could you back it up, please.  If

3  he's asking if I am going to ask him to describe to the jury --

4  the jury can see what they can see.  Hit play.

5              (Video clip being played in open court.)

6              MR. BOGDANOS:  Now if we can go to 73.

7  BY MR. BOGDANOS:

8      Q.   And while we're pulling that up, Detective, do you

9  recall during the conversation that Ms. O'Connell had with Mr.

10  Richardson, he indicated that immediately after he saw Anthony

11  Hall stab Ms. Abbott with something he left and saw uniforms,

12  blue coats?

13      A.   Yeah.  He described them as blue coats entering the

14  building.

15      Q.   Uniformed police officers?

16      A.   Yes, sir.

17              MR. BOGDANOS:  Hit play.  Thank you.

18              (Video clip being played in open court.)

19              MR. BOGDANOS:  Pause.

20      Q.   That person in the left, left foreground, that is --?

21      A.   A police officer.

22              MR. BOGDANOS:  Hit play.

23      Q.   And the person entering there right now?

24      A.   Lieutenant.

25      Q.   A Lieutenant, New York City Police Department?

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.DIMURO/PEOPLE

1      A.   Yes.

2           MR. BOGDANOS:   Okay.   Now back up, if you would,

3    and play that again.

4           (Video clip being played again.)

5      Q.   You watched this video before, the front door video?

6      A.   Yes.

7      Q.   All these hours?

8      A.   Yes.

9      Q.   Is there any other time where you see Mr. Richardson

10   bumping into, if you will, or exiting, the same time uniformed

11   police --

12          MR. BOGDANOS:   Pause.   Back up.

13     Q.   Sorry.   Is there any other time that you saw Mark

14   Richardson exit as uniformed blue coats were coming in?

15     A.   No.

16     Q.   This is it?

17     A.   This is it.

18     Q.   At 4:50 in the afternoon of January 11th?

19     A.   Right.

20          MR. BOGDANOS:   Okay.   Hit my.

21          (Video clip continues to play.)

22          MR. BOGDANOS:   Back up again, please, and hit

23   play.

24          (Video clip being played.)

25     Q.   Can you see his right hand from where you are?

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.DIMURO/PEOPLE

1      A.   Yes.

2      Q.   The bag?

3      A.   Yes.

4           MR. BOGDANOS:  Nothing further.  Thank you,

5   Detective.

6           THE COURT:  We should take a break now?

7           Ladies and gentlemen, time for a short recess.  I am

8   going to ask all of you to wait outside.  Please leave those

9   papers on your chairs and we'll pick them up.  Please do not

10  discuss the case.

11          (The jury is excused for a break and exits the

12  courtroom.)

13          MR. KLEIN:  Can I make the record and then we'll

14  take the break?

15          THE COURT:  Yes, Mr. Klein.  Go ahead.

16          MR. KLEIN:  Judge, I am asking for a mistrial at

17  this time, based on what I saw as a misuse and a prejudicial

18  use of the pretrial ruling by Judge Carruthers on this matter.

19          First of all, as the Court knows, there's been no

20  attempt, by myself, to litigate the voluntariness of the

21  statement.  And we have all agreed that the February 5th

22  statement isn't coming in.  Which would really give me my

23  ground to try to argue it.

24          But the district attorney and the Court knows, from

25  reading the ruling, that in fact Judge Carruthers ruled that

PROCEEDINGS/ARGUMENT

1   the police officers, including Detective Dimuro, had acted

2   inappropriately with the defendant.  They had questioned him

3   without rights.  They had made statements to him without

4   rights.  Then the defendant then made a statement which was

5   suppressed.

6        The defendant also invoked his right to counsel and

7   they had taken him into the bathroom and they induced him to

8   speak again and then he agreed to speak and another statement

9   was taken and that statement was suppressed because that was

10  considered unconstitutional and inappropriate behavior by the

11  police officers.  So that whole thing is out of the case.

12       Now, I don't believe it's then appropriate for the

13  district attorney to say in that period were inducements given

14  for the defendant to speak because, in fact, inducements were

15  given for him to speak.

16       Inducement being basically the functional equivalent

17  of interrogation before rights.  Inducement such as:  We know

18  we got you.  Or, you know, we got your DNA on the breast.

19  You're on the video.  This is evidence against you.  These are

20  all inducements to make someone speak.

21       In fact, Justice Carruthers' ruling is really

22  precisely that, that inducements were given.  Once that's taken

23  out of the case the District Attorney's Office can't use that

24  ruling then in a sense as sword against the defendant and say

25  we're not going into that but let's talk about what didn't

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/ARGUMENT

1   occur in there, which is the same thing as talking about what
2   did occur in there.
3           Because he says, for example, did you give any
4   inducements to the defendant to speak?  And the fact is it was
5   found by another Judge inducements were given.
6           I mean, I have to say, I was astounded to hear that
7   and I did object and I said I was objecting to this whole line
8   of questions.  The court over turned my objection but I don't
9   know how that can be cured now.
10          I am not going to open the door now to answer it, to
11  say, let's talk about what the inducements were, right?  How
12  can I do that?  Obviously I am not going to do that.
13          I think it was a violation of the ruling.  Violation
14  of the defendant's Fifth Amendment rights and New York and
15  Federal Constitution.  I think it was inappropriate action by a
16  prosecutor in this case and I think that there should be a
17  mistrial.
18          MR. BOGDANOS:  Uncharacteristically for Mr.
19  Klein he's misstating Justice Carruthers ruling.  There are two
20  separate rulings that always takes place in any statement.
21          Due process and procedural voluntariness and factual
22  voluntariness.  Justice Carruthers found that the violation was
23  the not giving Miranda.  Period.  End of story.  He found the
24  statements to be factually voluntary.
25          So, for Mr. Klein to sit up here and say the Court

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/ARGUMENT

1    found inducement, is actually factually inaccurate.  The Court

2    found prior to questioning, or the functional equivalent of

3    questioning under Farrow, the detectives should have given

4    Miranda.  They did not.  Therefore, those statements are

5    suppressed.

6            The proof, beside Justice Carruthers own words, is

7    that he allowed the subsequent statement to ADA O'Connell to

8    come in and he allowed the subsequent statement after the Q&A,

9    after the videotaped Q&A, to Detective Henriquez, to come in

10   because there was no factual involuntariness.

11           So, that's just wrong on the record, it's wrong on

12   the facts.  Now, the people introduced the Q&A, the Court is

13   going to instruct the jury that they may only consider that

14   statement if they find that statement to have been voluntary.

15           The defense gets two bites at the apple.  It is what

16   it is.  The burden is on the People to prove the voluntariness

17   of the portion of the statement that Justice Carruthers

18   admitted, regardless of his finding, that it was voluntary to

19   do it again.

20           And so, I asked Detective Dimuro, factually accurate

21   questions:  Did you make any promises or inducements or did

22   anyone do so in your presence?  The factually true -- I don't

23   want to offend Mr. Klein -- the fact of record is that he did

24   not.  That's what he testified to the at the hearing and that's

25   the finding of Justice Carruthers at the hearing as to

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/ARGUMENT

1   Detective Dimuro.

2           So I don't under -- when I said I don't understand

3   the objection, when Mr. Klein made the objection, I didn't

4   understand.  I had no idea what he was talking about when he

5   had objected to my asking:  Did you threaten him and any way,

6   shape or form?  If anyone do so in your presence?  Did you make

7   any promises or inducements?  Did anyone do so in your

8   presence?

9           He did not.  That's it.  I have to prove that.  And

10  the fact that a prior statement has been suppressed for a

11  Miranda violation doesn't absolve me of the responsibility of

12  proving, or prevent me from proving the factual voluntariness

13  of the subsequent statement.  And that's what I did in this

14  case, correctly, legally, appropriately, in this case for this

15  jury.

16           MR. KLEIN:  Well, Judge, if you rule against me

17  and should there be a conviction an appellate court will rule

18  on the issue.  But I stand by what I said.  I was surprised and

19  I think it was very egregious error in this case.

20           I understand he has a burden to show the

21  voluntariness of this statement, the ruling is what the ruling

22  was:  Don't go into that area.  You can't then use it as a

23  sword against the defendant.

24           THE COURT:  Thank you both.  The motion is

25  denied.

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/ARGUMENT

1                    MR. KLEIN:  Can I take a break?

2                    THE COURT:  Yes.  Mr. Richardson you want a

3    break this is the time.

4               (Short break taken.)

5                    THE COURT:  Case on trial continued.  The jury,

6    please.

7               (The jury enters the courtroom.)

8                    THE COURT CLERK:  Case on trial continued.  The

9    People of the State of New York against the defendant Mark

10   Richardson.  The defendant, his attorneys, and the assistant

11   district attorney are present.  Will both sides stipulate all

12   jurors are present and properly seated.

13                   MR. BOGDANOS:  Yes.

14                   MR. KLEIN:  Yes.

15                   THE COURT:  Thank you.  May we have the witness,

16   please, Detective Dimuro.

17              (The witness, Detective Dimuro, resumes the witness

18   stand.)

19                   THE COURT:  Detective, you are still under

20   oath.

21                   THE WITNESS:  Okay.

22   CROSS EXAMINATION

23   BY MR. KLEIN:

24        Q.   Good afternoon, Detective.

25        A.   Hi.

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

1    Q.    Detective Dimuro, I believe you said on direct
2  examination that you examined a large amount of video footage
3  from the Viper Department, is that true?
4    A.    True.
5    Q.    And it would be accurate to say that when you watched
6  VIPER video you took notes on the sections that you were
7  watching, right?
8    A.    Yes.
9    Q.    And Detective Henriquez -- he's in the back room,
10 right?
11   A.    Yes.
12   Q.    He also watched a lot of the VIPER video, right?
13   A.    Correct.
14   Q.    And just with your notes would it be accurate to say
15 that you have notes that reflect watching it, watching the
16 video from January 11th, right?
17   A.    Yes.
18   Q.    And some on January 12th, right?
19   A.    Yes.
20   Q.    And maybe even some on January 13th?
21   A.    Yes.
22   Q.    You have none on January 10th, right?
23   A.    No video was watched on the 10th.
24   Q.    That was the question I was going to ask.  It would
25 be accurate to say that neither you nor Detective Henriquez

CROSS/DET.DIMURO/DEFENSE

1    watched any video from January 10th of 2400?

2        A.    That would be correct.

3        Q.    Okay.  Now, you had realized that you saw individuals

4    that turned out to be Mark Richardson, Anthony Hall, and

5    others, at about one in the morning of January 11th, right?

6        A.    Correct.

7        Q.    Okay.  And then you saw Helen Abbott still alive

8    after that, right?

9        A.    Around three something.

10       Q.    And then you never see her alive again, right?

11       A.    Correct.  I don't see her on the video.

12       Q.    You see her come back home?

13       A.    Right.

14       Q.    But then that's it?

15       A.    That's it.

16       Q.    And then it seems like, a likely time of death, and

17   without trying to pin you down to any specific time, it appears

18   very plausible, that she dies sometime in the afternoon of the

19   11th?

20       A.    That's what I believe.

21       Q.    Okay.  So there was a certain logic that you used to

22   focus on the 11th and forward in terms of video watching?

23       A.    Yes.  From the 11th until the time the body is

24   found.

25       Q.    Okay.  But it would be accurate to say that you did

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

1  receive information concerning the life-style of Ms. Abbott,

2  yes?

3      A.   Yes.

4      Q.   Okay.  And the information that you received included

5  that, in your words, I believe, she was extremely proactive in

6  her crack smoking, right?

7      A.   Correct.

8      Q.   And that her apartment, I believe these are your

9  words, was really active 24/7, is that right?

10      A.   Right.

11      Q.   And then, your words I believe, that to support her

12  habit she allowed countless number of people to use her

13  apartment for drug use, right?

14      A.   Right.

15      Q.   And for drug sale, right?

16      A.   Right.

17      Q.   And for sex, yes?

18      A.   Correct.

19      Q.   And for sleeping, right?

20      A.   Correct.

21      Q.   That she even had am flat rate that she charged

22  people to use it, is that true?

23      A.   Ten dollars.

24      Q.   For anything they wanted to use the apartment for,

25  right?

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

1          A.    Correct.

2          Q.    Now, we just watched some video clips here, right?

3          A.    Right.

4          Q.    And we also watched a statement that Mr. Richardson

5    made, yes?

6          A.    Yes.

7          Q.    I just wanted to talk about the clips that we watched

8    for a moment, okay?

9          A.    Okay.

10         Q.    One clip was approximately 12 -- was about one in the

11   morning on the 11th, right?

12         A.    Right.

13         Q.    And in that clip you could see four people who get

14   off at the 12th floor, is that right?

15         A.    Correct.

16         Q.    Okay.  Now, in the statement that we watched, right,

17   you just watched it, yes?

18         A.    Yes.

19         Q.    Okay.  Mr. Richardson described, in his statement, an

20   independent which he says he and Hall got off on the 11th

21   floor, yes?

22         A.    Yes.

23         Q.    Okay.  And shown the video clips that we watched, be

24   accurate to say that you saw Richardson and Hall arrive and

25   another person and Hall greet someone outside before they come

                  Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

 1   in, right?

 2        A.   Correct.

 3        Q.   And would it be accurate to say that in the statement

 4   that Mr. Richardson makes, he says before that occurred this

 5   other guy, I don't know him but I guess they heard of this guy,

 6   was on the elevator, he told him we was coming up to his house.

 7   Yes?

 8        A.   I remember that.

 9        Q.   Now, you indicated that you did it large amount of

10   work on phone records, right?

11        A.   Correct.

12        Q.   Because you thought that the phone records could give

13   you important leads and eventually evidence in the matter, yes?

14        A.   Yes.

15        Q.   Okay.  And you found various numbers, yes?

16        A.   Yes.

17        Q.   And many of them, as matter of fact, almost all of

18   them in the afternoon of the 11th you were able to tie to Mark

19   Richardson, right?

20        A.   Yes.

21        Q.   But it's also accurate to say that there was one

22   number and, for lack of a better word, I will call a peculiar

23   number, is that a fair word to use?

24        A.   Are we talking about the number that I couldn't

25   identify that was on the chart?

CROSS/DET.DIMURO/DEFENSE

1      Q.   I'm sorry.  It was a bad question, Detective.  I will

2  call it 347-992?

3      A.   Yes.

4      Q.   347-992 was a call that you saw had been made at

5  about 3:24 in the afternoon, right?

6      A.   Yes.

7      Q.   And be accurate to say that -- I'm sorry, this chart,

8  People's 11, this chart begins at 3:02 in the afternoon, yes?

9      A.   Yes.

10      Q.   Thank you.  And it has a call that obviously goes to

11  Derek Richardson, right, relative of the defendant?

12      A.   Correct.

13      Q.   It's accurate to say that in your investigation you

14  actually found one of these 347-992 numbers just really four

15  minutes before that first call on there, right?

16      A.   Okay.  I am beginning to get a little confused.  Does

17  that number appear on the chart that we're talking about?

18      Q.   It's not on this chart.  Okay?  It's not on this

19  one.  Okay?  And I am not saying that it is on that one.

20      A.   Okay.

21      Q.   I am saying that, would it be true in your review of

22  the phone records, you also saw that there had been this call

23  to this individual, who you weren't able to identify, at 2:58

24  in the afternoon, that that was another call to the 347-992

25  number?

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

1      A.   Correct.

2      Q.   Okay.  And it also be accurate to say and, I believe

3  you said this on direct, that when you got Ms. Abbott's phone

4  record you actually you went back a few days, right?

5      A.   I worked back from the last call and I received

6  information for two days worth of maybe even more.

7      Q.   So you actually had calls for the 10th, right?

8      A.   Yes, I did.

9      Q.   And it would be accurate to say that in yours review

10 of the calls on the 10th you saw this number 347-992, and

11 whatever it is, called many, many times?

12     A.   That number was very prevalent in the call

13 detailing.

14     Q.   Okay.  And that's part of the reason you then made an

15 effort to try to track it down, right?

16     A.   Yes.

17     Q.   And the best you could do was find out that it came

18 up to a bogus address or whatever?

19     A.   Yes.

20     Q.   Okay.  Now, with regard to the watching of the

21 videotape, you have indicated that you saw Anthony Hall on the

22 videotape, right?

23     A.   That's correct.

24     Q.   And you saw him about 1 a.m. in the morning of the

25 11th, right?

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

```
 1        A.    Yes.
 2        Q.    And it also be accurate to say, that you then watched
 3   the video to see when it is that Hall comes out?  I am not
 4   saying that's your purpose but you do note when Hall comes out?
 5        A.    He does come out.
 6        Q.    Actually the next time that you see him or the first
 7   time that you see him come out after that, right, is at about
 8   5 o'clock in the afternoon of the 12th, right?
 9        A.    Okay.  So what you're saying is from the time I see
10   him initially at 1 the next time I see him is the 12th?
11        Q.    I am not trying to say anything.  Just tell us.  When
12   is the next time that you recall seeing Hall after you see him
13   go in at about 1 a.m. on the 11th?  And if you have your
14   notes -- I don't know if you have your notes here.
15        A.    No.
16              MR. BOGDANOS:  I can give --
17              MR. KLEIN:  Hold on.
18              (Pause)
19   BY MR. KLEIN:
20        Q.    Detective, one of the things you and Henriquez did in
21   reviewing notes -- in reviewing video, you made a bunch of
22   notes?
23        A.    Correct.
24        Q.    Some of them you actually you wrote on the same pages
25   with him, he wrote down what he was viewing, you wrote down
```

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

1    what you were viewing?

2         A.    Yes.

3         Q.    Okay.  I want to just show you some notes.  And I am

4    actually going to direct you to page four of these notes --

5         A.    Okay.

6         Q.    There's actually a circle in there, that you didn't

7    put there, just see if it refreshes your recollection to the

8    next time it was that you saw Anthony Hall on the video?  Or if

9    you want to look at all the notes you can do that too.

10        A.    Okay.

11              (Handing document up to the witness.)

12              (Pause.)

13        A.    Indication here is that Hall, he leaves at 17:13.

14   According to my notes it appears that I see him at a particular

15   segment.  Those times aren't accurate because of what we

16   discussed with not having the right time frame there.

17        Q.    Right.  And by not accurate, they are accurate to

18   within 20, 30 minutes, half hour, an hour, whatever you want,

19   right?

20        A.    What I was told was I incorrectly assessed the time.

21   Right.  I should have went from the previous segment and added

22   the time rather then the segment I was watching and added the

23   time.  So, whatever it is, it's wrong.

24        Q.    Okay.  You were told, I think by the district

25   attorney it was wrong, within 20 or 30 minutes, is that right?

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

1    A.    Yes.  Depending on what I am looking at.

2    Q.    But your notes indicate that it was 17 --

3    A.    Thirteen.

4    Q.    Thirteen.  Which is 5:13 in the afternoon regular

5    peoples time?

6    A.    Right.

7    Q.    And that was on the 12th?

8    A.    I believe it was the 12th.

9    Q.    Okay.  Thanks.  Detective, some of the work you did

10   on this case you did with Detective Donna Torres, yes?

11   A.    Yes.

12   Q.    And she's another detective in Manhattan North

13   Homicide?

14   A.    Yes.

15   Q.    Helped you at times in this case?

16   A.    Yes.

17   Q.    And sometimes if you and her go out and do a piece of

18   investigation on a case sometimes either you or her will fill

19   out what's called a DD5, right?

20   A.    Yes.

21   Q.    And the DD5 basically lists the work that you did on

22   a certain day, on a certain case, is that fair?

23   A.    Correct.

24   Q.    Okay.  Would it be accurate to say that on, in March,

25   really, there was a time that you went out and watched Mark

CROSS/DET.DIMURO/DEFENSE

1  Richardson walk?

2      A.   There was several occasions when we tried to follow

3  Richardson.

4      Q.   Okay, several.  And would it be accurate to say that

5  one of them was on March 13th?  If you don't recall, fair

6  enough, and I will show you something.

7      A.   Yeah.  March 13th.  I really -- it's pretty much in

8  the time frame that we were following him.

9      Q.   And would it be accurate to say that it was the

10 afternoon, and it was, you knew where he lived, right?

11     A.   Yes.

12     Q.   Right.  And you kind of setup in a location where you

13 thought he might walk by, right?

14     A.   Yes.

15     Q.   And you were hoping to catch him as he came home from

16 work, right?

17     A.   Yes.

18     Q.   And catch him, I just mean observe him, not grab him

19 or anything?

20     A.   Right.

21     Q.   And would it be accurate to say that you saw what he

22 was wearing when you saw him?  And if you don't remember just

23 ask me I will show you the 5.

24     A.   I can recall that sometimes he wore the army jacket.

25 I think he word a blue hoody at some point.

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

1      Q.    Okay.  Well, this time would it be accurate to say he

2   had blue jeans and green army jacket?

3      A.    Sounds right.

4      Q.    Also accurate to say you observed him carrying a

5   black plastic bag in his hand?

6      A.    I do remember that, yes.

7      Q.    Thank you.  Now, one of the things -- oh, I'm sorry,

8   you told us that you were present when that MLI or the Medical

9   Legal Investigator showed up at the scene, right?

10      A.    Fredericks, yes.

11      Q.    Mr. Fredericks.  And you saw him begin to examine Ms.

12   Abbott, right?

13      A.    Yes.

14      Q.    And you actually saw what Ms. Abbott was wearing at

15   the time, right?

16      A.    Yeah.

17      Q.    And I see you filled out a 5 about getting to the

18   scene and watching Fredericks?

19      A.    Respond to the scene DD5.

20      Q.    Would it be accurate to say she was waring blue

21   dungarees?

22      A.    Yes.

23      Q.    A white bra?

24      A.    Yes.

25      Q.    Blue panties?

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

1       A.   Yes.

2       Q.   A black belt?

3       A.   Yes.

4       Q.   And white socks?

5       A.   Yes.

6       Q.   And be accurate to stay you also noted she was

7    wearing a grey sweatshirt, right?

8       A.   Yes.

9       Q.   And the condition of the grey sweatshirt you actually

10   noted down in your 5, didn't you?

11      A.   I believe so.

12      Q.   That it was bloody, yes?

13      A.   Yes.

14      Q.   You indicated to the district attorney that you gone

15   to the autopsy, right?

16      A.   Yes.

17      Q.   The autopsy wasn't performed by a Doctor Graham but a

18   Doctor Tranchida, correct?

19      A.   Correct.

20      Q.   You indicated that it was procedure, that in a

21   homicide you are really required to go, is that right?

22      A.   Yes.

23      Q.   And you are using it as a, in general, as a source to

24   see what information can you get to guide your investigation?

25      A.   Yes.

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

1    Q.    Okay.  And you indicated that you watched as the

2  Medical Examiner, Doctor Tranchida, gathered evidence from the

3  deceased, yes?

4    A.    Correct.

5    Q.    Now, at times you carry a spiral notebook, right?

6    A.    Yes.

7    Q.    And in a spiral notebook you can jot down information

8  that you are observing so you have some notes, right?

9    A.    Yes.

10    Q.    So you can use the notes too at a later time, you can

11  fill out police documents, right?

12    A.    Correct.

13    Q.    Such as DD5, right?

14    A.    Yes.

15    Q.    And at times you did that in this case, correct?

16    A.    Yes.

17    Q.    One of the reasons you make notes is that you know in

18  any investigation, especially in a homicide, you may be called

19  upon to give information about something you observed even

20  years later, right?

21    A.    True.

22    Q.    Okay.  So you take the notes as carefully as you can,

23  right?

24    A.    I try to.

25    Q.    And you do your Fives, by that I mean your DD5s, the

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.DIMURO/DEFENSE

1   best you can, right?

2       A.   Yes.

3       Q.   You indicated that you saw -- by the way, you

4   actually made some notes, right, as you observed Doctor

5   Tranchida doing the autopsy?

6       A.   I believe I did.

7       Q.   And you watched as he did swabs, right?

8       A.   Yes, I did.

9       Q.   And you watched also the fingernails were scraped,

10  right?

11      A.   Yes.

12      Q.   And you made a note of that, right?

13      A.   Yes.

14      Q.   And you watched as, what's known as the whole rape

15  kit was completed, right?

16      A.   Yes.

17      Q.   And you noted that in your spiral notebook, right?

18      A.   Correct.

19      Q.   Be accurate to say that you also saw that there was a

20  cord that was wrapped around in some fashion around Helen

21  Abbott's neck, right?

22      A.   That's correct.

23      Q.   And it would be accurate to say you watched as the

24  cord which had been around the next was swabbed by Doctor

25  Tranchida, right?

CROSS/DET.DIMURO/DEFENSE

 1      A.    Correct.

 2                  MR. KLEIN:  Detective, thank you very much.

 3                  THE COURT:  Mr. Bogdanos.

 4                  MR. BOGDANOS:  I do have redirect.  We can break

 5      now or --

 6                  THE COURT:  Yes, it is one o'clock.

 7            All right.  Thank you.

 8            Ladies and gentlemen, we will take our lunch break

 9      now and we will resume the trial at 2:15.  Please do not

10      discuss the case.

11                  (The jury was excuse for a luncheon recess and exits

12      the courtroom.)

13                  (The Trial was adjourned for a luncheon recess.)

14                  (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25


                    Glenn J. Merola, Sr. Court Reporter

```
 1              A F T E R N O O N   S E S S I O N
 2              THE COURT:  Are both sides ready for the jury?
 3              MR. BOGDANOS:  Yes, Judge.
 4              THE COURT:  May we have the jury, please.
 5              (Jury entered the courtroom.)
 6              THE COURT:  All right, Jeanette.
 7              THE COURT CLERK:  Case on trial continues.  People
 8      of the state of New York against Mark Richardson.  The
 9      defendant, his attorneys, and the assistant district
10      attorney are present.  Would both sides stipulate all jurors
11      are present and properly seated?
12              MR. BOGDANOS:  Yes.
13              MR. KLEIN:  Yes.
14              THE COURT:  Thank you.  Good afternoon, ladies and
15      gentlemen, we are going to go back to Detective Dimuro.  I
16      believe Mr. Klein has a few more questions.
17              MR. BOGDANOS:  And for the record no objection.
18              THE COURT:  Thank you.
19              (Witness entered the courtroom.)
20              THE COURT:  Good afternoon, detective.  You are
21      still under oath.  Mr. Klein is going to question you
22      further.
23  CROSS-EXAMINATION
24  BY MR. KLEIN CONT'D.:
25      Q    I am sorry.  Very brief.
```

1    **A**    Okay.

2    **Q**    I think you and I made a mistake and I want to see if

3    we can clear it up, okay?

4    **A**    We have made mistakes, yes.

5    **Q**    You said in response to my questioning that the next

6    time you saw Hall leave was at 1713 on the twelfth, right?

7    **A**    Friday -- it's -- you know, there is other times that

8    he is on the video but that's the last time I think we see

9    him.

10   **Q**    Let's -- I am going to show you your notes.

11   **A**    All right.

12   **Q**    Okay.

13          (Handing.)

14   **Q**    And first let me just ask you a question about the

15   notes, okay?

16   **A**    Okay.

17   **Q**    It's accurate to say that on the left side columns you

18   have the date and then the times you're watching?

19   **A**    Right.

20   **Q**    Right; and then you have some notations like 1713,

21   Anthony Hall?

22   **A**    Yes.

23   **Q**    Right?  But the 1713 doesn't really refer to the time

24   in real life that he is leaving?  That refers to a clip time,

25   right?

1    *A*    Yes.

2    *Q*    And actually we are talking about seeing him leave in

3  the morning hours of the twelfth, right?

4    *A*    Yes, several times.

5    *Q*    Okay, so he leaves then some time around nine in the

6  morning on the twelfth, right?

7    *A*    Yes.

8    *Q*    And then he comes back some time in the afternoon of

9  the twelfth also, right?

10    *A*    Yes.

11    *Q*    And then also in the evening, he goes out and then

12  comes back very late morning hours of the thirteenth.  Do you

13  remember that?

14    *A*    I don't remember the 13th but what you say is correct.

15  He is seen leaving several times throughout the day on the

16  twelfth.

17    *Q*    Okay, is it accurate though -- the first time you

18  observe him leaving on the twelfth -- and look at your notes if

19  you want?

20    *A*    Okay.

21    *Q*    -- is that 9:00, 9:45ish time?

22    *A*    I am not sure of the exact time but it is true he

23  leaves in the morning.

24    *Q*    Of the twelfth?

25    *A*    Yes.

```
 1          MR. KLEIN:  Thanks a lot.
 2          THE COURT:  Thank you, Mr. Klein.  Mr. Bogdanos.
 3          MR. BOGDANOS:  Yes, very briefly.
 4  REDIRECT EXAMINATION
 5  BY MR. BOGDANOS:
 6      Q    Detective, you mentioned to Mr. Klein a moment ago and
 7  to the jury earlier that you have watched this video, the Viper
 8  video often?
 9      A    Often?
10      Q    Yes.  We are not going to ask you how many hours but a
11  lot of hours?
12      A    Yes.
13      Q    Both in the Viper office itself?
14      A    Mostly in the 25.
15      Q    And -- thank you -- and then the 25th Precinct as well?
16      A    Right.
17      Q    Have you also had occasion to watch it in my office, in
18  the District Attorney's Office?
19      A    Yes.
20      Q    Again no one is going to ask -- for hours and hours?
21      A    Yes.
22      Q    And have you had the opportunity to -- withdrawn.
23          You mentioned that there was an issue with the timing
24  and it was explained to you how your timing was off?
25      A    Yes.
```

1    Q    You thought the name of the clip meant the beginning of
2    the clip?

3    A    Yes.

4    Q    And it's really the end?

5    A    Yes.

6    Q    But that -- that -- when you were talking to Mr. Klein
7    before about your mistake that's what you were talking about;
8    confusing the end with the beginning of each clip when he was
9    asking you about timing?

10        You want me to rephrase that question.

11   A    Well, I mean -- how can I put -- I am not sure if
12   that's what Mr. Klein was saying my mistake was.

13   Q    I am not talking about now just a moment ago.  We are
14   going to get to Anthony Hall in a second.

15   A    Okay.

16   Q    Earlier before lunch?

17   A    Yes.

18   Q    You had said to Mr. Klein I made a mistake?

19   A    Yes, in writing the times down I erroneously put the
20   time as the beginning of the tape I was watching rather than --

21   Q    It's the end?

22   A    Exactly.

23   Q    So just so the record is clear that's what you were
24   talking about earlier before lunch?

25   A    Yes.  Yes.  Yes.

1     *Q*    So now we will -- what you and Mr. Klein was talking

2 about afterwards.

3     *A*    Okay.

4     *Q*    And you have seen as you just told us that video for

5 hours and hours in my office?

6     *A*    Yes.  Yes.

7     *Q*    And have you had an opportunity to review a timeline of

8 the sightings of Mark Richardson, Anthony Hall, Hoody, Umbrella

9 Man?

10     *A*    Yes.

11     *Q*    B-Hat, all those people?

12     *A*    Yes.

13     *Q*    I would ask that the detective be handed what I request

14 be deemed marked People's 96.

15            (ADA Bogdanos conferred with Defense Attorney

16    Klein.)

17            MR. BOGDANOS:  It was the 1 through 111.  I am

18    sure I have an extra copy if you can't find it.  This is 96.

19            For the record this is the complete timeline, not

20    the one that was shortened for the charts.

21     *Q*    Do you have it?  Copies have been given to the defense

22 but I could get you -- you are good.

23            All right, see this particular timeline?

24     *A*    Yes, I do.

25     *Q*    Start and it's got actually 111 different entries?

1  *A*   Yes.

2  *Q*   And does this timeline fairly and accurately show --

3  actually all of the times that Mark Richardson, Anthony Hall,

4  B-Hat -- who am I forgetting -- Hoody; and Helen Abbott and

5  Cheryl Abbott up until the end appear on that video on Friday,

6  Saturday and Sunday?

7  *A*   I believe it does.

8        MR. BOGDANOS:  Thank you.  I will offer that in

9  Evidence as People's 96.

10        THE COURT:  I am sorry.

11        MR. KLEIN:  Let me see just once more.  I know we

12  made so many copies.

13        MR. BOGDANOS:  I could give you more copies.

14        (Defense Attorney Klein conferred with defendant.)

15        MR. KLEIN:  Fine.  No objection.

16        THE COURT:  People's 96 is admitted.

17  *Q*   And just -- just so we are clear, detective, for the

18  record, the only difference between this one and the shortened

19  one or edited one you looked at before is this has all the

20  entries and the other one you were working from before just had

21  a selection?

22  *A*   Correct.

23  *Q*   Other than that there is nothing different about them?

24  *A*   No.

25  *Q*   Thank you.  And, in fact, I am not going to ask you to

1   go through them and I am not going to turn -- put the video up,

2   but that lists all of Anthony Hall's entries and exits?

3       **A**   Yes.

4       **Q**   Now if you would go to the exhibit itself, 96 in

5   Evidence, and I think it's 9:44 Saturday morning, the twelfth,

6   if you could look at that entry.

7       **A**   Okay.

8       **Q**   Read that entry into the record?

9       **A**   9:44 a.m., Hall enters Elevator B at 11.

10      **Q**   So that's the first -- time just so we are more

11  precise -- that's the first time Hall is seen after being seen

12  getting off the elevator with Richardson earlier that Friday

13  morning?

14      **A**   It's the first time that we are talking about him on

15  video after we discuss the condensed version, right.

16      **Q**   You got it.  So he is seen at 9:44?

17      **A**   Correct.

18      **Q**   He is actually leaving the building?

19      **A**   Yes.

20      **Q**   Does he leave the building?

21      **A**   Yes.

22      **Q**   When does he come back?

23      **A**   He comes back in at 3:59.

24      **Q**   3:59 p.m. on the twelfth?

25      **A**   Yes.

1    *Q*   And does he leave again?

2    *A*   Yes.

3    *Q*   When?

4    *A*   9:27 p.m.

5    *Q*   Saturday night?

6    *A*   The twelfth, yes.

7    *Q*   Does he come back?

8    *A*   Yes.

9    *Q*   When?

10   *A*   12:50 a.m. on the thirteenth Hall enters building.

11   *Q*   And does he leave again?

12   *A*   No.

13   *Q*   Eventually he does?  Isn't it 1:11.  Is there an AH?

14   *A*   It says N -- again AH enters building at 5:24 p.m.

15   *Q*   Got it.  I have nothing further on that.

16             MR. BOGDANOS:  And nothing further of the

17   detective.  Thank you.

18             MR. KLEIN:  Thank you, detective.

19             THE WITNESS:  Thank you.

20             THE COURT:  That completes your testimony.  Thank

21   you.

22             THE WITNESS:  Thank you.

23             (Witness exited the courtroom.)

24             MR. BOGDANOS:  The People next call to the stand,

25   your Honor, Ms. Erica Grazette of the Parks Department.

1                    (Witness enters the courtroom.)

2  E R I C A    G R A Z E T T E , called as a witness by and on

3      behalf of the People, having been first duly sworn and/or

4      affirmed, testified as follows:

5                    THE WITNESS:  Yes.

6                    THE COURT OFFICER:  Have a seat, please.  If you

7      could just pull your chair up to the microphone; and for the

8      record if you could just state your name and spell your last

9      name?

10                   THE WITNESS:  My name is Erica Grazette, last name

11     G-R-A-Z-E-T-T-E.

12                   THE COURT:  Thank you.

13                   MR. BOGDANOS:  May I inquire, your Honor?

14                   HE COURT:  Yes.

15  DIRECT EXAMINATION

16  BY MR. BOGDANOS:

17     **Q**    Thank you.  Good afternoon, Ms. Grazette.

18     **A**    Good afternoon.

19     **Q**    Ma'am, thank you for your patience today.  I know you

20  have been waiting a long time.  Ma'am, what do you do for a

21  living?

22     **A**    I am an employment counselor for the Parks Opportunity

23  Program.  That is with the Parks Department.

24     **Q**    And this Parks Opportunity Program, you call it POP?

25     **A**    Yes.

1    *Q*    How long have you been with the Parks Department
2    altogether?

3    *A*    Since '93.

4    *Q*    And how long have you been with the POP Program?

5    *A*    I would say about 2002, 2003.

6    *Q*    And what are your responsibilities within the POP
7    Program?

8    *A*    Basically our responsibilities to teach people how to
9    find employment.  Welfare to work program.  Our clients are sent
10   to us by Human Resources Administration; and basically they come
11   to the Parks to work for six months and during that six months,
12   they are enrolled in a job search program; so basically that's
13   where I come in and I teach classes on how to, you know, fill
14   out an application, how to do a resume, how to interview.
15   Things like that.

16   *Q*    Did there come a time in the very end of December, 2007
17   or the beginning of January 2008, when you had occasion to meet
18   an individual named Mark Richardson in your capacity as a
19   counselor in the POP Program?

20   *A*    Yes.

21   *Q*    Do you see Mark Richardson in the courtroom today?

22   *A*    Yes.

23   *Q*    Would you please point to him and indicate for the
24   record what he is wearing today.

25   *A*    Black sweater, black pants, black sneakers.

1          MR. BOGDANOS:   Indicating the defendant, your
2      Honor.

3          THE COURT:   Yes.

4          MR. BOGDANOS:   Thank you.

5      **Q**    Ms. Grazette, do you have a recollection of exactly
6  when you met or just a rough time frame?

7      **A**    Probably just a rough time frame; around that time
8  2007, 2008.

9      **Q**    And specifically now the beginning of January of 2008,
10  what was the relationship between you and Mr. Gra -- between you
11  and Mr. Richardson -- excuse me -- if you could explain please.

12      **A**    Again I was his employment counselor so he would come
13  to me twice a month for his employment classes.

14      **Q**    And are you familiar with where he was on the day of
15  the January 10, 2008?

16      **A**    No, I don't really.

17      **Q**    Would looking at the Parks Department records for
18  Mark Richardson refresh your recollection?

19      **A**    Yes.

20      **Q**    And you've actually reviewed them before coming to
21  court?

22      **A**    (Nod head affirmatively up and down.)

23      **Q**    If I could have this deemed marked People's 97 for
24  Identification; and offer it into Evidence as the Parks's
25  Department records for Mr. Richardson with our earlier

1    understanding?

2              MR. KLEIN:  Fine.

3              THE COURT:  People's 97 is so admitted.

4    *Q*    So if you would please take 97 in Evidence,

5    Ms. Grazette, and if you would actually go you will see there

6    are blue tabs at the side.  If you go to the third blue tab and

7    just take a look at that document and just see if it refreshes

8    your recollection.

9    *A*    Okay, yes, this is a pay letter that we give our

10   clients either when they go out to do job search or they come to

11   our office for anything.  Basically this gives them credit or an

12   hour credit for the day.

13   *Q*    And so indicating that on January 10th having looked at

14   that, that record, what did Mr. Richardson do to the best of

15   your recollection?

16   *A*    It's signed by Mrs. Marcia Fletcher, which was the job

17   developer at the time, so he was probably approved for some sort

18   of job search activity.

19   *Q*    You don't know what it was?

20   *A*    No.

21   *Q*    And because he was approved for the job search, he

22   would have gotten paid for the whole day?

23   *A*    For the whole day.

24   *Q*    Regardless of where he was?

25   *A*    Right.

 1              MR. BOGDANOS:  Thank you.  I have nothing -- you

 2      may need it again so why don't you hold onto it for a

 3      moment.  You could put it on the counter if you want.

 4      Q    Now if we could move -- would you see -- when

 5 Mr. Richardson -- withdrawn.  This is going to be a terrible

 6 question so I will start all over again.

 7              How often on average would you see Mr. Richardson.

 8      A    Like I said before twice a month.

 9      Q    And where was your office located in 2008?

10      A    Queens, Passerele Building.

11      Q    Spell that for reporter.

12      A    P-A-S-S-E-R-E-L-E.

13      Q    But you wouldn't see Mr. Richardson on a day-to-day

14 basis if you were working?

15      A    No.

16      Q    Just the counseling?

17      A    Just the counseling piece.

18      Q    Now if I could fast forward to March -- February 6th of

19 2008.  Do you recall seeing Mr. Richardson on that date on

20 February 6th of 2008?

21      A    Yes.

22      Q    Would you tell the jury how that came about?

23      A    Okay, Mark was in the building for I believe he was

24 doing his taxes because we do the taxes for our clients at that

25 time.  After he got his taxes done on that day, came back to my

1  office just to say, hey.  I kind of asked him, you know, how can

2  I help you.  Basically he kind of needed a letter.

3      *Q*    If you are saying his words, you have to tell us who is

4  speaking.

5      *A*    Oh, sorry, I guess Mark.

6      *Q*    It's okay.  Tell us what he said.

7      *A*    He needed -- if I could help him out with a letter that

8  he needed for his parole officer stating where his whereabouts

9  were on I guess that specific day.

10     *Q*    And what specific day did he ask you to write a letter

11 about?

12     *A*    January 10th I believe that's --

13     *Q*    Do you remember as you sit here now exactly what days

14 it was?

15     *A*    Not offhand.

16     *Q*    Did you write a letter for him?

17     *A*    Yes, I did.

18     *Q*    Would looking at the letter refresh your recollection

19 as to which days or day or days he asked?

20     *A*    Yes.

21            MR. BOGDANOS:  I would ask that this be deemed

22     marked People's 98 for Identification.  For the record it is

23     the letter from Ms. Grazette.  I will hand it to the

24     witness, please.

25            (Handing.)

1    *Q*    Take a look at that letter.  Just read it to yourself.

2    *A*    Okay.

3    *Q*    And does that refresh your recollection as to the days

4    he was asking you to write a letter saying that he was working?

5    *A*    Yes.

6    *Q*    Which days?

7    *A*    Well, on January 10th he was on a preapproved job

8    search.

9    *Q*    Wait.  That's not the question yet.  Which days is he

10   asking you to say you can vouch for his whereabouts?

11   *A*    The tenth.

12   *Q*    Any other day?

13   *A*    No.

14   *Q*    Read the rest of the letter.

15   *A*    Okay.

16          THE COURT:  To yourself he means.

17   *A*    Okay.

18   *Q*    Any other days?

19   *A*    January 11th.

20   *Q*    So, wait.  Don't read the letter yet -- don't read it

21   out loud.  It is not in Evidence.  The two days --

22   *A*    Okay.

23   *Q*    -- the two days he asked you to vouch for his

24   whereabouts was January 10th and January 11th of 2008?

25   *A*    Ah-huh.

1   *Q*   You are certain?

2   *A*   Ah-huh.

3         THE COURT:  Is that a yes?

4         THE WITNESS:  Yes.  Sorry.

5   *Q*   You have -- so what did he tell -- ask you to do based

6   on those two days.

7   *A*   Basically, he needed a letter like I said before.

8   *Q*   He said to you I need a letter?

9   *A*   I need a letter.

10  *Q*   I am sorry to do this to you so many years later,

11  please tell us what he said as best you can.  I know it's a long

12  time.

13  *A*   I need a letter to give to my parole officer in

14  connection I guess to where his whereabouts were as to that

15  specific day.  I went back into the records to check for his

16  activity; so when they do job search they are to fill out an

17  activity report, so that I can verify that information.

18        Then also he asked me to put in the letter that he was

19  actually working on the eleventh and, you know, stayed past to

20  do some overtime on that specific day.

21  *Q*   And with regard to the tenth, were you able to verify

22  that, in fact, he had been approved for some job search on the

23  tenth?

24  *A*   Yes.

25  *Q*   With regard to the eleventh before you wrote the letter

1    for him, were you able to verify that he was, in fact, working

2    on the eleventh; and according to him had actually even stayed

3    extra and worked overtime on the eleventh?

4        **A**    No, I did not verify that.

5        **Q**    But you wrote it -- you wrote the letter?

6        **A**    I wrote it.  Good faith.

7        **Q**    And is this -- is this the letter that you wrote?

8        **A**    Yes.

9        **Q**    Did you write it right in front of him?

10       **A**    Yes.

11       **Q**    He was sitting right next to you?

12       **A**    Yes.  Well, not next to me but --

13       **Q**    I get it, across from the desk?

14       **A**    Yes.

15       **Q**    And did you write it first and then type it or just

16   type it directly?

17       **A**    Just kind of typed it directly.

18       **Q**    And is he sitting across your desk from you as you are

19   typing?

20       **A**    Yes.

21       **Q**    And may we take it, it's a computer not a typewriter?

22       **A**    Right.

23       **Q**    And so are you saying it out loud?  Are you taking

24   dictation?  Explain to us the process of how you're typing this

25   letter for him.

1    **A**    Not really.  He pretty much told me what he needed the

2  letter for so I just kind of went into that mode.  Typed it up.

3  Didn't really take any notes or anything.

4    **Q**    Okay, and then -- and then you finished?

5    **A**    Yes.

6    **Q**    Did you read it back to him and then print it or did

7  you print it right away?

8    **A**    No, I printed it.  Printed it on letterhead and signed

9  it.

10    **Q**    And then what did you do with it?

11    **A**    Handed it to Mr. Richardson.

12    **Q**    You gave it to him?

13    **A**    Ah-huh.

14    **Q**    Did you make yourself a copy?

15    **A**    Yes.

16    **Q**    Is that what we have here in front of us?

17    **A**    Yes.

18    **Q**    Has that been altered or tampered with in any, way,

19  shape or form from the time you prepared, typed, and signed that

20  letter for Mr. Richardson?

21    **A**    No.

22    **Q**    I think it has -- maybe it's got some holes in it?

23    **A**    Some holes in it.

24    **Q**    Apart from that, it is the same letter?

25    **A**    (Nod head affirmatively up and down.)

1          MR. BOGDANOS:  I will offer that in evidence
2      People's 98.
3          MR. KLEIN:  No objection.
4          THE COURT:  Thank you.  98 is admitted.
5      *Q*     Then later that same day, do you recall meeting a New
6      York City police detective?
7      *A*     Yes.
8      *Q*     Male or female?
9      *A*     Female.
10     *Q*     Do you happen to remember her name?
11     *A*     Just the first name Donna.
12     *Q*     And by the way have you seen her recently?
13     *A*     I think so.
14     *Q*     Do you think she is in the witness waiting room?
15     *A*     Yeah, I think so.
16     *Q*     All right, and when you met this detective, the female
17     detective, did she ask you anything?
18     *A*     She asked me about Mark Richardson, you know, a client
19     for the Parks Department.  Did I know where he was, you know.  I
20     mentioned he was here earlier today.
21     *Q*     I am sorry I don't think we got all of that.
22     *A*     Sorry.
23     *Q*     It's, all right, you said you had mentioned he was here
24     earlier today?
25     *A*     Yes.

1    *Q*    To the detective?

2    *A*    To the detective.

3    *Q*    When you say "he" meaning Mr. Richardson?

4    *A*    Mr. Richardson.

5    *Q*    And you told the detective that?

6    *A*    Yes.

7    *Q*    And she asked -- did she ask for anything from you?

8    *A*    His -- a copy of his time card because they were in

9    question about his day I guess he was working for the Parks

10   Department.

11   *Q*    And did you happen to mention in this conversation with

12   detective -- with detective we will call her Donna, did you

13   happen to mention that you had written a letter for him?

14   *A*    I don't remember.

15   *Q*    Did she ask you to fax her anything, any material when

16   you had it?

17   *A*    Yes.  Once I got a copy of the time card, I was, you

18   know, to fax it to her.

19   *Q*    So let's move now -- let me -- let's finish this and

20   then we will come back.  Let's move to the next day February 7,

21   2008.  Did you fax her anything?

22   *A*    Yes, the time card when I finally got a copy of it, I

23   faxed it to her office.

24   *Q*    And did you also fax a copy of the letter?

25   *A*    Yes.

1    MR. BOGDANOS:  I would ask that the witness be

2  handed I request marked 99 for Identification.  For the

3  record a faxed copy of that.

4  *Q* Please take a look at that.  It is being handed to you

5 now.

6    (Handing.)

7  *Q* And do you recognize it?

8  *A* Yes.

9  *Q* Is that the actual fax copy that you faxed of the

10 letter to the detective, the female detective?

11  *A* Yes.

12  *Q* I will offer -- that hasn't been altered or tampered

13 with in anyway other than when you faxed it, other than a faxed

14 time stamp on it?

15  *A* No.

16    MR. BOGDANOS:  I will offer that in Evidence

17  People's 99, a copy of which has been previously given to

18  defense.

19    THE COURT:  Admitted?

20    MR. KLEIN:  Yes.

21  *Q* Now, let me go back to February 6th again, do you have

22 any additional contact with Mr. Richardson on the sixth?

23  *A* On the sixth, after I spoke to Donna and I realized

24 what was going on, I did try to contact Mr. Richardson to say

25 hey, you know, there has been some activity here.  I think you

1   need to reach out and see what's going on.

2       *Q*    And did you actually talk to Mr. Richardson?

3       *A*    Yes.

4       *Q*    So what you just told us you actually said?

5       *A*    Right.

6       *Q*    Fair enough.  And did -- when the female detective

7   left, did she leave you anyway of getting a hold of her?

8       *A*    Yes, she left me her business card.

9       *Q*    And did her card have her cell phone number on it?

10      *A*    I believe so.

11      *Q*    And did you give Mr. Richardson anyway of contacting

12  this female detective?

13      *A*    Yes, I gave him the information.

14      *Q*    Which means you gave him?

15      *A*    The telephone number.

16      *Q*    And presumably her name.  If it's her card, she had her

17  name on it?

18      *A*    Yes.

19      *Q*    And so you gave that to Mr. Richardson over the phone

20  or in person?

21      *A*    Over the phone.

22             MR. BOGDANOS:  Nothing further.  Thank you very

23      much, Ms. Grazette.

24             THE COURT:  No questions.  Thank you very much.

25             (Witness exited the courtroom.)

```
 1                    MR. BOGDANOS:  People next call to the stand
 2          Mr. Frank Ricotta, please.
 3                    (Witness entered the courtroom.)
 4    F R A N K   R I C O T T A , called as a witness by and on behalf
 5          of the People, having been first duly sworn and/or affirmed,
 6          testified as follows:
 7                    THE WITNESS:  Yes.
 8                    THE COURT OFFICER:  You could just have a seat,
 9          please.  In a loud clear voice, if you could just state your
10          name, spell your last name for the record.
11                    THE WITNESS:  It's Frank Ricotta, R-I-C-O-T-T-A.
12                    THE COURT OFFICER:  Just give your shield number.
13                    THE WITNESS:  Shield 179.  I work for the New York
14          City Department of Parks and Recreation.
15                    MR. BOGDANOS:  May I inquire, your Honor?
16                    THE COURT:  Yes.
17                    MR. BOGDANOS:  Thank you.
18    DIRECT EXAMINATION
19    BY MR. BOGDANOS:
20        Q    Good afternoon, Mr. Ricotta.
21        A    Good afternoon.
22        Q    Thank you.  And I am sorry, I know you have been
23    patiently waiting today.  Thank you for that.  Would you tell us
24    your occupation?
25        A    I am a principal park supervisor.
```

1      *Q*   If you could do that again.

2      *A*   Principal park supervisor for the Department of Parks.

3      *Q*   How long have you been with the Department of Parks?

4      *A*   Twenty-nine (29) years.

5      *Q*   And how long have you been in your current position?

6      *A*   Six (6) years.

7      *Q*   And would you briefly tell us your duties and

8  responsibilities.

9      *A*   Set up work crews, work assignments.  Get the crews out

10 in the morning.  Do inspections.  Go to meetings.

11     *Q*   Do you have any involvement with the job training

12 program and the Parks Opportunity Program?

13     *A*   Yes, I use to have involvement with that.

14     *Q*   Explain that very briefly.

15     *A*   I use to do the training when it first started in

16 Queens.  Trained what they called JTP's.  Trained them to do

17 work and then get them on my crew, my work crew, and get them to

18 do various work assignments.

19     *Q*   Work assignments in the New York City parks?

20     *A*   Yes, just for the Parks Department.

21     *Q*   Wherever the park is?

22     *A*   Yes.

23     *Q*   In that capacity if I could invite your attention now

24 to late 2007, the November, December timeframe into January of

25 2008.  Do you recall that timeframe generally?

1    **A**    Yes.

2    **Q**    And during that timeframe did you have occasion to meet

3    an individual named Mark Richardson?

4    **A**    Yes.

5    **Q**    Do you -- you met him in your capacity as in the JTP or

6    Parks Opportunity Program?

7    **A**    Yes.

8    **Q**    Do you see Mr. Richardson in the courtroom today?

9    **A**    Yes.

10   **Q**    Would you please point to him and for the record just

11   give us some -- something he is wearing, some article.

12   **A**    He is right there in the black sweat shirt.

13           MR. BOGDANOS:  Indicating the defendant for the

14      record.

15           THE COURT:  Yes.

16   **Q**    When you -- after you met Mr. Richardson, what was

17   your, you know, business relationship with Mr. Richardson?

18   **A**    I met him at a different work assignment.  He was at

19   our main office headquarters first so I told him I was going to

20   get him on my crew because of his size.  It is a waste to have

21   him cleaning bathrooms when I could have him on my crew doing

22   fence work and asphalt.

23   **Q**    And you did that?

24   **A**    Yes.

25   **Q**    And who was respons -- withdrawn.  Did Mr. Richardson

1    have a particular set hours he was to work?

2        *A*    Yes.

3        *Q*    And was there any record keeping associated with his

4    work?

5        *A*    Yes.

6        *Q*    What was that?

7        *A*    As far as his time when he worked, time card, we would

8    punch in.  We had a punch clock.  He would punch in and out.

9    His days off were probably Saturday and Sunday.

10       *Q*    Who was responsible for the maintenance of his time

11   cards?

12       *A*    I was.

13       *Q*    And who would sign his time cards?

14       *A*    I would.

15       *Q*    And would you verify whether he was or was not working

16   in order to get paid by the city?

17       *A*    I would.

18       *Q*    And did you do that?

19       *A*    Yes.

20       *Q*    If I could invite your attention -- ordinarily what

21   were his hours?

22       *A*    Probably 7:00 to 3:30.

23       *Q*    An as you said Monday through Friday?

24       *A*    Yes.

25       *Q*    Ordinarily -- let's pick Friday.  He would work 7:00 in

Grazette - Direct - People                                      969

1  the morning Friday to 3:30 p.m.?

2      *A*    Right, or weekends and overtime.

3      *Q*    So if he worked weekends he would get paid overtime?

4      *A*    Yes.

5      *Q*    During the week of January 6th of 2008, to January 12th

6  of 2008, were you his supervisor?

7      *A*    Yes.

8      *Q*    Were you responsible for his time cards?

9      *A*    Yes.

10     *Q*    Did you, in fact, sign his time cards for those dates?

11     *A*    Yes.

12     *Q*    Have you had an opportunity before coming to court to

13  review those time cards for those dates --

14     *A*    Yes.

15     *Q*    -- of Mr. Richardson?

16     *A*    Yes.

17     *Q*    And did you find your handwriting and your signature?

18     *A*    Yes.

19         MR. BOGDANOS:   I ask that the witness now be

20  handed what's previously been received in Evidence as 98 --

21  97 -- 97.

22         (Handing.)

23     *Q*    If you would take a look at those certified records and

24  just you don't -- don't go through all of them.

25     *A*    Right.

1    **Q**   They are tabbed on the side.  I think it is the second

2  blue tab.  Just open that up and tell us if you recognize that

3  page.

4    **A**   Yes, I do.

5    **Q**   You've seen it before?

6    **A**   Yes.

7    **Q**   You've had an opportunity to examine it before?

8    **A**   Yes.

9    **Q**   And then go to the next page if you would.  Same

10  question.

11    **A**   Yes.

12    **Q**   Can you explain how a time card really looks.  These

13  are copies?

14    **A**   Well, this is front and back.

15    **Q**   So what appears as one page in the records are the

16  front of the time cards and then the second page are the back?

17    **A**   Yes.

18    **Q**   But in reality it's a normal time card front and

19  back?

20    **A**   Yes.

21    **Q**   How many time cards for a week?

22    **A**   For one person?

23    **Q**   One person, one week.

24    **A**   Oh, one card per week.

25    **Q**   One card, one person per week?

1    **A**    Right, from Sunday -- from Sunday to Saturday.

2    **Q**    So for the week for Mr. Richardson for the week

3    beginning the sixth and including Thursday the tenth and Friday

4    the eleventh, do you have that page opened in front of you?

5    **A**    Yes.

6    **Q**    And does your signature appear on that time card?

7    **A**    Yes.

8    **Q**    Where was Mr. Richardson on Thursday, January 10th of

9    2008?

10   **A**    He was at a POP counseling.

11   **Q**    So not with you?

12   **A**    No.

13   **Q**    And how do you know he was at POP?

14   **A**    Because I put down POP and if I put on the back, if I

15   signed it, it's documented with my initial.  That means he gave

16   me a letter that he got paid for that day that he was there.

17   **Q**    And now if we can go to Friday, January 11th?

18   **A**    Okay.

19   **Q**    Was Mr. Richardson working on Friday January 11th?

20   **A**    No.

21   **Q**    How do you know?

22   **A**    Cause I scheduled him a day off.

23   **Q**    How do you know that?

24   **A**    Cause, well, on the back of time card I wrote down

25   preschedule which means he told me in advance that he needed

<u>Grazette - Direct - People</u>                                   972

1   that day off and I signed it approved it and he got paid for the
2   day.
3       *Q*    And there is an entry on the time card itself that says
4   for that Friday it says eight and then it appears to say P/B.
5   What is that?
6       *A*    It's a personal business day, and he got paid eight
7   hours for the day.
8       *Q*    Okay.
9       *A*    Well, it was prescheduled P/B.
10                  MR. BOGDANOS:  So if I could ask that the witness
11              now be handed People's -- you know what, I don't need to
12              hand it to him.  I will read it.
13      *Q*    Mr. Ricotta, if you would listen to this statement on
14   People's 98; and please tell us if this is true or false:  "It
15   should be noted that January 11, 2008, was a payday.
16   Mr. Richardson stated that he worked that day and stayed after
17   work to receive his paycheck."  Is that true or false?
18      *A*    That's false.
19      *Q*    Thank you.  Nothing further.
20                  THE COURT:  Mr. Klein?  All right, that completes
21              your testimony, sir.
22                  (Witness exited the courtroom.)
23                  MR. KLEIN:  Can we come up?
24                  (Off-the-record bench conference.)
25                  THE COURT:  Ladies and gentlemen, sorry about

1     that, we are going to take our break now.  The next witness

2     will be a longer one and it will take us to the end of the

3     day; so it's best to rather than interrupt her testimony, we

4     will take the break now.  Get you right back in the

5     courtroom.  Please do not discuss the case.  Thank you.

6                    (Jury exited the courtroom.)

7                    (Short recess.)

8                    (Transcript continued on the next page.)

DIRECDT/DET.TORRES/PEOPLE

1   T-5 - Peo. V Mark Richardson, Ind.#3534/08

2   September 21, 2011:

3                    THE COURT:   Ready for the jury?

4                    MR. BOGDANOS:  Yes.

5                    MR. KLEIN:  Yes.

6                    THE COURT:   The jury, please.

7               (The jury enters the courtroom.)

8                    THE COURT CLERK:  Case on trial continued.   The

9   People of the State of New York against Mark Richardson.   The

10  defendant, his attorneys, and the assistant district attorney

11  are present.  Will both sides stipulate that all jurors are

12  present and properly seated?

13                   MR. BOGDANOS:  Yes.

14                   MR. KLEIN:  Yes.

15                   THE COURT:   Thank you.  Mr. Bogdanos.

16                   MR. BOGDANOS:  Yes, Your Honor.  Before

17  proceeding the People would respectfully offer into evidence

18  People's Exhibit 89 for identification, the wallet.  I didn't

19  formerly offer it when the detective was on the stand.  Sorry.

20                   MR. KLEIN:  That's okay.

21                   THE COURT:   People's 89 is now admitted.

22                   (People's Exhibit 89, wallet, was received in

23  evidence.)

24                   MR. BOGDANOS:  And the People now call to the

25  stand Detectives Donna Torres.

                      Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

```
 1                      (The witness, Det. Donna Torres, enters the
 2              courtroom, takes the witness stand, is duly
 3              sworn/affirmed in by the Clerk of the Court, responds to
 4              the oath and testifies as follows:)
 5                      THE COURT CLERK:  Do you solemnly swear or
 6              affirm the testimony you are about to give shall be the
 7              truth, the whole truth, and nothing but the truth, so
 8              help you God?
 9                      THE WITNESS:  I do.
10                      THE COURT OFFICER:  Have a seat, please.  In a
11              loud clear voice, if you could, state your name, spell
12              your last name, gave your shield number and present
13              assignment.
14                      THE WITNESS:  Detective Donna Torres.
15              T-o-r-r-e-s.  Shield 2904, Manhattan North Homicide Task
16              Force.
17                      MR. BOGDANOS:  May I inquire, Your Honor?
18                      THE COURT:  You may.
19      DIRECT EXAMINATION
20      BY MR. BOGDANOS:
21          Q.    Good afternoon, Detective.
22          A.    Good afternoon.
23          Q.    Would you tell us how long you have been on the New
24      York City Police Department all together?
25          A.    I had just started my 28th year in July.
```

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1      Q.   And how long viewed be a detective?

2      A.   Seventeen years.

3      Q.   And how long have you been at Manhattan North

4  Homicide?

5      A.   Since February of 2002.

6      Q.   And do you know a Detective Gerry or Gerard Dimuro?

7      A.   Yes.  He is one of my partners.

8      Q.   Up in the Homicide Squad?

9      A.   Yes.

10      Q.   Were you aware, going back if we could to 2008, were

11  you aware that Detective Dimuro had received an assignment of

12  relevance to this case and this jury?

13      A.   Yes.

14      Q.   And very, very briefly, the assignment was what?

15      A.   To investigate the homicide murder of Helen Abbott.

16      Q.   And he had picked it up, the way you all homicide

17  detectives pick it up, you assist another precinct detective?

18      A.   Yeah.  We're more of a support group.  We support the

19  precinct detective and we each take turns, who's next, who's

20  next, who's next, just as the squad does.

21      Q.   And this just happened to be Detective Dimuro's next?

22      A.   Yes.

23      Q.   And, although, were you assigned to that case at all?

24      A.   No.  I was actually on another case.

25      Q.   Nonetheless, over the course of the last several

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

```
 1    years, have you periodically had some involvement in the case

 2    in your capacity as a homicide detective?

 3         A.   In this case, yes.

 4         Q.   Do you know an individual named Mark Richardson?

 5         A.   Yes, I do.

 6         Q.   Do you see him in the courtroom today?

 7         A.   Yes.

 8         Q.   Would you please point to him, indicate for the

 9    record, what he's wearing today?

10         A.   Mr. Richardson's wearing a black sweatsuit, black

11    shoes.

12              MR. BOGDANOS:  Indicating the defendant for the

13    record.

14              THE COURT:  Yes.

15    BY MR. BOGDANOS:

16         Q.   Detective, without going into any details, were you

17    with Detective Dimuro on February 5th when he interviewed Mr.

18    Richardson?

19         A.   Yes.

20         Q.   And, I'm sorry, February 5th of 2008, for the record?

21         A.   Yes.

22         Q.   And were you also with him when you dropped Mr.

23    Richardson home in Queens after the interview was over?

24         A.   Yes.  We drove him home to Astoria.

25         Q.   Did you have occasion the following day to meet an
```

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1    individual named Erica Grazzet?

2        A.    Yes.

3        Q.    Where was that?

4        A.    The Parks Department, the pot program, which is

5    located in Flushing Meadows Park.

6        Q.    In Queens?

7        A.    In Queens.

8        Q.    Did you go there in person?

9        A.    Yes.   Detective Dimuro and myself.

10       Q.    And did you have occasion to meet Ms. Grazzet?

11       A.    We did, yes.

12       Q.    And did you ask her for any information?

13       A.    Yes.   I asked her to verify that Mark Richardson had

14   worked there and the days that he was at work.   Basically

15   looking for his time records.

16       Q.    And do you remember the specific days you were asking

17   about?

18       A.    I believe it was February 10th -- January 10th and

19   11th of 2008.

20       Q.    And did Ms. Grazzet have the information at hand or

21   did she need to get it for you?

22       A.    No, she didn't have access to it.   She had to reach

23   out to another employee who wasn't available and she had said

24   she would contact me when she got it and would get it to us.

25       Q.    Did you give her any means of contacting you?

DIRECDT/DET.TORRES/PEOPLE

1      A.    I gave her my business card with my cell phone

2  number.

3      Q.    And moving, just for a moment, to the next day, the

4  7th, did she in fact fax you the material that you asked for?

5      A.    The next day she called me and left a message on my

6  phone.  I was off that day.  We were both off, Gerry and I.

7  And I returned her call later in the morning.

8      Q.    And then, ultimately, she faxed you the material?

9      A.    She said she had the paperwork and she would fax it

10  to my office and I told somebody in my office to get it, to

11  leave it on my desk until I came back.

12      Q.    And when you came back on duty you found it?

13      A.    Yes.

14      Q.    So now let's go back to the 6th if we can.  After you

15  gave your card and cell phone number to Ms. Grazzet, did you

16  receive a phone call later that same day?

17      A.    Yes, I did.

18      Q.    Do you remember approximately what time you received

19  that phone call?

20      A.    I believe it was some time after 8 p.m.

21      Q.    And just, did you, over the course of the next month

22  receive several phone calls?

23      A.    Yes.

24      Q.    And as you received the phone calls did you take any

25  steps to memorialize what was said on the telephone calls?

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1      A.    Yes.   I typed a DD5 which is a police information

2  sheet.

3      Q.    And you typed that while the events were fresh in

4  your mind?

5      A.    Yes.

6      Q.    Indeed on one of those calls when did you start

7  typing?

8      A.    When?

9      Q.    You started typing during one of the calls?

10      A.    No, I was at my desk.

11      Q.    Did you type the notes while the events were still

12  fresh in your mind?

13      A.    Yes.

14      Q.    And do you have those notes with you?

15      A.    I do.

16      Q.    Please don't refer to them unless you need to.   If

17  there is any portion of any of the phone calls you can't

18  remember and you need to look at your typed notes to remember,

19  please ask the Court's permission to do so, okay?

20      A.    Okay.

21      Q.    All right.   So that first phone call you said

22  slightly after 8 o'clock p.m.?

23      A.    Yes.

24      Q.    Who was that from?

25      A.    It was from Mark Richardson and it was on my cell

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1  phone.

2      Q.   How do you know it was Mark Richardson?

3      A.   He said it was Mark Richardson.

4      Q.   And in addition to that did you recognize his voice

5  from the previous day?

6      A.   Yes.

7      Q.   And when you received that call what was your first

8  reaction?

9      A.   I was surprised.  Where did you get my cell phone

10  number from?

11      Q.   And can you now walk us through that conversation as

12  best you can.  We get it, three and half years later, but as

13  best you can, give us your words, his words, your words, his

14  words.

15      A.   Began with him asking, or I asked him, where did you

16  get my cell phone number from?  He said Ms. Grazzet gave it to

17  him.  And he wanted to know why Detective Dimuro and I had made

18  a visit to Ms. Grazzet, as well as his brother Derek, why did

19  we go there, why.

20          And I informed him that it was common practice, we

21  already spoke with him, and we're following up on what he had

22  told us where he was this day and that day.  And that was

23  basically the conversation there that day.

24      Q.   And did you ask him anything about -- withdrawn.  So

25  you explained to him that's pretty much standard police

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1   procedure?

2      A.   Right.

3      Q.   For everybody not just him?

4      A.   Right.

5      Q.   And did you ask him while you were on the phone with

6   him on that first conversation whether he had used Helen

7   Abbott's phone?

8      A.   I did.

9      Q.   Just tell us that?

10      A.   I had asked him, did you use Helen Abbott's phone to

11   call your brother Derek Richardson.  And he said he didn't even

12   know that lady had a phone.  Meaning Ms. Helen Abbott.  And

13   that his brother should have told me about Desiree.  He kept

14   talking about Desiree.  I said, no, your brother never

15   mentioned a Desiree at all.

16      Q.   So at any point during that conversation did he ever

17   withdraw that statement, the statement you just gave us, that

18   he didn't even know that lady had a phone?

19      A.   No.

20      Q.   During that conversation did you also ask him about

21   leaving the building on the Friday, January 11th?

22      A.   I asked him if he recalled that day leaving the

23   building, did he see any police officers in the building at the

24   time he was leaving, and he had said, yes, he did, had seen

25   uniformed officers coming into the building.

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1    Q.   And, finally, on that phone call, did you ask him

2  anything about whether or not he had been carrying anything in

3  his hand when he left?

4    A.   Yes.  I asked him if I was carrying anything.  He

5  said he had a bag with his uniform in it, carrying his uniform.

6    Q.   This is simple possible question, can you give us a

7  rough idea how long this phone call lasted?

8    A.   It was pretty brief.  I don't know, fifteen minutes.

9    Q.   And did you then have -- did you then receive another

10  phone call?

11    A.   Yes.

12    Q.   From Mr. Richardson?

13    A.   Yes.

14    Q.   Do you remember when that was?

15    A.   That was on the 18th just before 4 p.m. because I was

16  getting ready to go home.

17    Q.   And 18th of what month?

18    A.   February.

19    Q.   Again, of 2008?

20    A.   2008.

21    Q.   And tell us exactly what happened then, please,

22  again, as best you can recall?

23    A.   It was again on my cell phone that I received a

24  call.  Mr. Richardson wanted to know why Detective Dimuro was

25  harassing his family.  I said what are you talking about?  He

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1   said, why are you going to my father's house?  Why are you

2   harassing my daughter?  You are going to all my family.

3          I said, Mark, explain to me how all of these phone

4   numbers are coming back to your relatives?  We don't know who

5   these people are.  We knew that Derek had the same name,

6   Richardson, but the others people didn't have a common name.  A

7   name in common with him.

8          He kept saying I told you about Desiree.  I told

9   you -- and I said, what are you saying, that she made these

10  phone calls?  He's saying I'm not saying that.  Umm, whatever

11  whatever, he was pretty upset that day.

12  Q.   Okay.  And did -- when he said Desiree, did you

13  understand whom he was talking about?

14  A.   Desiree Allen, yes.

15  Q.   At that point his girlfriend for a period of time?

16  A.   She was a girlfriend for a period of time.  I think

17  she was also a co-worker for awhile.

18  Q.   And did you explain to him why you were going to each

19  of these people?

20  A.   Yes.

21  Q.   And what was his reaction when you told him you are

22  just going to all the phone numbers that were dialed?

23  A.   He just didn't understand.  He kept saying, you know,

24  well, why are you going -- I said, well, because their phones

25  are being called from this dead woman Ms. Abbott's phone.

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1    Who's calling them from her phone?  And he just didn't -- he

2    just kept saying I told you about Desiree.  I am being

3    harassed.

4         Q.   And did you specifically ask him if he was saying

5    that Desiree made these phone calls?

6         A.   I did.

7         Q.   And what did he say?

8         A.   He didn't answer yes or no.  He just kept saying, you

9    know, Desiree.  He said he lived with her for a while, she was

10   like a girlfriend, and she had made calls t o his house

11   before.  And I said, well, does she have -- how does she have

12   your phone numbers to call your house and your family?  Does

13   she know your family?

14        Q.   Did he answer that?

15        A.   Yes.  He just kept saying, you know, I told you about

16   Desiree.  He wouldn't give a clear answer as to why Desiree

17   would be calling his family or how she would have numbers.

18        Q.   Or how she would have access to Ms. Abbott's phone?

19        A.   Right.

20        Q.   And, again, about how long did this particular call

21   last?

22        A.   This call lasted a good forty minutes, about 40, 50

23   minutes.

24        Q.   Are you sure about that?

25        A.   It was after -- I know it was after four and I was

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1    looking to go home.

2         Q.   I have the virtue of having your notes in front of

3    my.  You what to take a look at your notes from this second

4    call.

5         A.   16:40.  I get off duty four o'clock.

6         Q.   Go to paragraph two.

7         A.   I'm sorry.  It says the call lasted 7 minutes 58

8    seconds when I informed him I was going off duty.

9         Q.   Does the sound right now?  Again, we understand it's

10   three and a half years later.

11        A.   I mean he called at 16:40.  I thought I was going off

12   duty at 16.  It could have been I was still there later.

13        Q.   Did you then receive a third phone call from Mr.

14   Richardson?

15        A.   Yes.

16        Q.   When was that?

17        A.   That was in March.

18        Q.   Do you remember the exact date?

19        A.   March 11th, I believe, 2008.

20        Q.   Do you remember roughly what time that was?

21        A.   I have to refer to my notes.

22             MR. BOGDANOS:  Sure.  If it's okay with the

23   Court.

24             THE COURT:  Yes.

25        A.   That was at 23:00 hours, 11 p.m..

                Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1    Q.    And where did you get that phone call?

2    A.    That call came to my office on the land line the

3   Homicide Squad phone.

4    Q.    Do you have any idea how Mr. Richardson got your

5   direct -- the direct number to the Homicide Squad?

6    A.    Probably from Ms. Grazzet who gave him my cell phone

7   number as well.

8    Q.    Would that number also had been on your card?

9    A.    Yes.

10    Q.    So, again, as best you can recreate that phone call

11   for us, this is your third one so, please, just tell us what

12   you said, what he said?

13    A.    Mr. Richardson was upset again, saying that his

14   family was being harassed, we didn't have to go to his family.

15          I kept asking him:  Explain to me how these phone

16   calls are being made from this dead womans phone to your

17   family?  We don't know it's your family members.

18          Again, he kept throwing Desiree's name there.  He

19   said my brother told you about Desiree.  I said I never spoke

20   to your brother about Desiree.  My memory knocking on his

21   brother door:  Are you his brother?  He said yes.  Does he call

22   you?  He says he calls me everyday.  Which brothers do.  He

23   never mentioned anybody named Desiree.

24          At one point he stated, you know, Desiree, she's out

25   to get me, you know, she called my wife, she called my house,

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1    she told my wife that I'm her man, she's sucking my dick.

2            And he kept rambling on about Desiree.  I said, Mark,

3    explain how these people are being called from this dead ladies

4    phone?  He said his family wanted to know the same thing.  They

5    wanted to see the phone records, like who's this dead ladies

6    phone calling their house. I said they can get their own

7    records.

8        Q.    And did anything about and individual named rocked

9    Roxsy come up in that conversation?

10       A.    Roxsy is Mr. Richardson's wife and he wanted to know

11   why Detective Dimuro had called her.  And, again, that was the

12   same thing because this phone was used to call her job.

13           MR. BOGDANOS:  Just bear with me one minute,

14   your Honor, please.

15   BY MR. BOGDANOS:

16       Q.    And for all of these visits to various family

17   members, were each and everyone of them as a result of tracking

18   down a telephone number on Helen Abbott's phone?

19       A.    Yes.

20       Q.    Was there any conversation between you and Mr.

21   Richardson during this third telephone call about the phone

22   itself, the physical phone?

23       A.    Yes.

24       Q.    Explain.

25       A.    I had asked him, explain to me how the phone is being

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1    used to call members of your family if you don't even know she

2    has had a phone.  And he said, well, you got the phone why

3    can't you get the fingerprints off of it.  I said, well, Mark,

4    you know that we don't have the phone.

5         Q.    And did he reply to that?

6         A.    He just changed the subject and went back to Desiree

7    calling his house.

8         Q.    And was there any conversation about him having been

9    at work that day, the day of the 11th?

10        A.    On that conversation?

11        Q.    On that conversation.  And if you need to look at

12   your notes, again, I have the virtue of having them right in

13   front of me.

14             THE WITNESS:  May I?

15             THE COURT:  You may look at them.

16        A.    Yes.

17        Q.    Okay.  Explain.

18        A.    He had said, I told you I was at work that day, Ms.

19   Grazzet wrote me a letter.  And I explained to him that letter

20   doesn't say you were at work.  It says to whom it may concern

21   Mr. Richardson asked me to write this letter saying he was at

22   work.  There was no verification that the letter confirmed he

23   was working.

24        Q.    And, in fact, during that conversation did Mr.

25   Richardson actually say to you, you got proof that I was at

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1   work?

2        A.   Yes.

3        Q.   Did you have proof that he was at work?

4        A.   No.

5        Q.   And did he then, when you -- did you confront him

6   with the fact that you did not believe he was at work on that

7   date?

8        A.   I don't recall.

9        Q.   You want to look again?

10            MR. BOGDANOS:   If it's okay with the Court.

11            THE COURT:   Yes?

12       A.   I said the letter doesn't prove that you were at

13   work, Mark, it doesn't say anything, it says that you wanted

14   people to say that you were at work.

15       Q.   And how did that conversation end, that third one?

16       A.   It just ended.  It just ended.  It was like I had

17   enough, you know, you can't explain why the calls are being

18   made to your family.

19            MR. BOGDANOS:   Thank you.  I have nothing

20   further.  Oh, I'm sorry.  I do.  I do.

21   BY MR. BOGDANOS:

22       Q.   The building 2400 Second Avenue, you been to that

23   building?

24       A.   Yes.

25       Q.   More than once?

DIRECDT/DET.TORRES/PEOPLE

1      A.   Quite often.

2      Q.   Familiar with the Wagner Houses?

3      A.   Yes.

4      Q.   And was there -- did you have occasion to go up to

5   the Wagner Houses at 2400 building and, particularly, go to the

6   two elevators A and B?

7      A.   Yes.

8      Q.   And the jurors already seen plenty of video footage

9   of the elevators.  One elevator has a door that opens out?

10     A.   Yes.

11     Q.   One elevator has a sliding door?

12     A.   Yes.

13     Q.   Were you asked to go up and take a photograph of the

14   elevator panel of the elevator with the sliding door?

15     A.   Yes.  I used my I-phone, took a photo.

16          MR. BOGDANOS:  I would ask that the witness now

17   be handed what is previously been marked People's 100 for

18   identification.  For the record, photograph of an elevator

19   panel.  Previously shown to the defense.

20   BY MR. BOGDANOS:

21     Q.   Do you recognize that photograph?

22     A.   Yes.

23     Q.   And, in particular, do you recognize what's depicted

24   in that photograph?

25     A.   Yes.  It's the elevator panel, 16 floors, with the

Glenn J. Merola, Sr. Court Reporter

DIRECDT/DET.TORRES/PEOPLE

1    push buttons, And it was elevator B.

2         Q.    And is the panel in A and B, are the buttons

3    configured in exactly the same way in A and B?

4         A.    Yes.  The only difference the way the door opens.

5         Q.    And is that a fair and accurate photograph of how the

6    elevator panel appeared in January of 2008?

7         A.    I wasn't at the scene that day but it should be

8    pretty much the same.

9         Q.    Let me do it a different way.  I'm sorry.  I am not

10   asking --

11                    MR. KLEIN:  We have no problem with it being

12   admitted.

13                    MR. BOGDANOS:  Okay, fine.  Thank you.  Offered.

14                    THE COURT:  People's 100 is admitted.

15                    MR. BOGDANOS:  Thank you.  Now I have nothing

16   further.

17                    THE COURT:  Mr. Klein.

18                    (People's Exhibit 100 was received in evidence.)

19   CROSS EXAMINATION

20   BY MR. KLEIN:

21        Q.    Detective, going to the March 11th phone call, you

22   explained to the jury about DD5s, what they were.  Those are

23   where you put in the information about the phone call itself,

24   right?

25        A.    Yes.

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.TORRES/DEFENSE

1    Q.    Those are what's called detective follow-up reports?

2    A.    Right.

3    Q.    Would it be accurate to say that the phone

4    conversations that you got on the 11th is on the 11th but the

5    5, the DD5 you write, actually write on the 12th?  If you want

6    to look that's okay.

7    A.    Yes.

8    Q.    Okay.  But would it be accurate to say that you also

9    actually make some other notes about the contents of the phone

10   conversation that you have on the 11th?

11   A.    I actually didn't make notes.  I mean the phone call

12   came in at 23:00, 11 p.m., so when I type it the computer is

13   set at as soon as you go after midnight it's going to go into

14   the next date.  I just typed it from my memory from my

15   conversation with him.

16   Q.    I am going to show you what I'd ask be deemed marked

17   Defense Exhibit C.  Just could you take a look at those couple

18   of pages.

19   A.    Yes.  These are my -- I guess you would call this my

20   time line.

21   Q.    Okay.  Now, some of it actually has notes about the

22   conversation on 3/11, is that right?

23   A.    Right.

24   Q.    I think the way it goes you have to give it back and

25   then I will ask you.  But those are some notes you made so

Glenn J. Merola, Sr. Court Reporter

CROSS/DET.TORRES/DEFENSE

1  would it be accurate to say that Mark said the following to you

2  during that conversation:  I am tired of Officer Dimuro

3  harassing my family.  He called my wife at my job tonight the

4  bullshit is getting thick.  I came in willingly to speak.  I

5  didn't have to.  Then he said -- words to that effect, right?

6      A.   Yes.

7      Q.   And he also said to you, you said he was with someone

8  called Whitey and Anthony, and that Dimuro had said that he,

9  Mark, was the first one being interviewed, that neither Whitey

10 or Anthony had been spoken to but that he knew that that wasn't

11 true, that he had figured that out from something Dimuro said?

12     A.   That's what he said, yes.

13     Q.   Okay.  And would it also be accurate to say that some

14 point during the conversation he asked you what day was that

15 lady killed?

16     A.   Yes.

17     Q.   And you told him, you said the day the calls were

18 made from your house to your family, the day you said you were

19 in her apartment, that's the day she was killed?

20     A.   Yes.

21          MR. KLEIN:  Okay.  Thank you very much

22 detective.

23          MR. BOGDANOS:  Nothing.

24          THE COURT:  Nothing further.  All right,

25 Detective, thank you very much.

                    Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

1                    (The witness was excused and exits the courtroom.)

2                    MR. BOGDANOS:  The People next call to the stand

3     Detective Ruben Henriquez.

4                    (The witness, Det. Ruben Henriquez, enters the

5          courtroom, takes the witness stand, is duly

6          sworn/affirmed in by the Clerk of the Court, responds to

7          the oath and testifies as follows:)

8                    THE COURT CLERK:  Do you solemnly swear or

9     affirm the testimony you are about to give shall be the

10    truth, the whole truth, and nothing but the truth, so

11    help you God?

12                   THE WITNESS:  Yes ma'am.

13                   THE COURT OFFICER:  Have a seat, please.  Pull

14    your chair up to the mic.  And in a loud clear voice, if

15    you could, state your name, spell your last name, give

16    your shield number and present assignment.

17                   THE WITNESS:  Sure.  My name is Ruben

18    Henriquez.  My last name, H-e-n-r-i-q-u-e-z.  My shield

19    is 2495.  I work out of the 25th Precinct, Manhattan, New

20    York.

21                   MR. BOGDANOS:  May I inquire, Your Honor?

22                   THE COURT:  Yes.

23                   MR. BOGDANOS:  Thank you.

24    DIRECT EXAMINATION

25    BY MR. BOGDANOS:

                    Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

1    Q.    Detective, would you tell us, please, how long you

2  have been on the New York City Police Department and how long

3  you have been a detective?

4    A.    Sure.  I was hired in June, 1992, and I went to the

5  25th Precinct right out of the police academy, which is January

6  of '93.  And I worked in the 25th Precinct so far my whole

7  career and 2002 is when I went up to the detective squad within

8  the same command.

9    Q.    Until then you were uniformed police officer in the

10  25th Precinct?

11    A.    Yes.

12    Q.    And now you are a detective in the 25th Precinct?

13    A.    Correct.

14    Q.    Where is the 25th Precinct house located, please?

15    A.    It's located on East 119th Street between Park and

16  Lexington Avenue.

17    Q.    And what's the area that it covers?

18    A.    It covers 115th Street to 142nd Street, Fifth Avenue,

19  Paladino, and underneath the Triborough Bridge.

20    Q.    And are you familiar with the Wagner Houses?

21    A.    Yes.

22    Q.    Are the Wagner Houses within the area of the 25th

23  Precinct?

24    A.    Yes.

25    Q.    Is it fair to say that over the course of your career

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

```
 1    you responded to the Wagner Houses many times?

 2         A.    Correct.

 3         Q.    And specifically the 2400 building of Second Avenue?

 4         A.    Correct.

 5         Q.    I invite your attention now to January 13th of 2008,

 6    were you on duty?

 7         A.    Yes, I was.

 8         Q.    And did you receive an assignment of relevance to

 9    this case and this jury?

10         A.    Yes.

11         Q.    And that was?

12         A.    I was told to respond to 2400 to apartment 12E and

13    there was a suspicious DOA.

14         Q.    And did you do that?

15         A.    Yes, I did.

16         Q.    Do you remember roughly what time you arrived?

17         A.    It was I'd say a little before -- a little after 4

18    o'clock, 4 p.m.

19         Q.    And were you -- did you -- were you assigned a

20    detective from the North Homicide Squad to assist you?

21         A.    Yes.

22         Q.    Standard procedure?

23         A.    Correct.

24         Q.    And who was that person?

25         A.    Gerald Dimuro.
```

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

1    Q.    And after you arrived at 2400 what apartment did you

2  go to?

3    A.    I went to apartment 12E.

4    Q.    And after you arrived, very briefly, tell us what you

5  did in the apartment?

6    A.    Okay.  When I arrived at the apartment I walked in, I

7  took a look around, things in the apartment.  We were escorted

8  back to one of the furthest rooms in the apartment where

9  happened to see a person horrifically murdered on the floor.

10    Q.    And can you tell us the person's name, please?

11    A.    Helen Abbott.

12    Q.    And the juries already seen photos so we don't need

13  to describe that at all.  Did there come a time when the crime

14  scene detective arrived?

15    A.    Yes.

16    Q.    And what, if anything, did you do with regard to the

17  crime scene detective?

18    A.    I stood there at the scene when they arrived and they

19  processed the location.

20    Q.    And did you point out areas to the detective that you

21  might want processed for evidence?

22    A.    Yes.

23    Q.    The building itself, 2400, do you know how many

24  floors it has?

25    A.    The building has 16 floors.

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

1    Q.   Are there any fire escapes?

2    A.   No, there are not.

3    Q.   Are you familiar with any video in the building?

4    A.   Yes.

5    Q.   Describe that very briefly for us?

6    A.   The video, the entire Wagner Housing Development is

7   run by a police video surveillance unit called VIPER 12 and

8   there are cameras in the building and on the outside of the

9   building also.

10    Q.   Have you had occasion to actually look at each of the

11   cameras in the first floor and in the elevators of 2400?

12    A.   Yes.

13    Q.   Is there anyway possible to get in or out of that

14   building without being viewed on camera?

15    A.   There's no way to get in and out without being viewed

16   on camera.

17    Q.   After a crime scene arrived -- withdrawn.  And all

18   the evidence was packaged whatever happened we already heard

19   about it so we're going to skip that.  Do you start watching

20   video?

21    A.   Yes.

22    Q.   Is there anything about the video that catches your

23   attention early on?

24    A.   Yes.

25    Q.   What is that?

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

1     A.    On the video I see what appears to be a large male

2   wearing a green army jacket entering, exiting the building.

3     Q.    More than ones?

4     A.    More than once, yes.

5     Q.    And did you later learn the identify of that

6   individual?

7     A.    Yes.

8     Q.    And his name, please?

9     A.    Mark Richardson.

10    Q.    And did you see him on the video in the presence of

11  any other individuals at any point?

12    A.    Yes.

13    Q.    Who in particular?

14    A.    Anthony Hall.

15    Q.    And you had occasion to me an interview Anthony Hall

16  since then?

17    A.    Yes.

18    Q.    Do you see Mark Richardson in the courtroom today?

19    A.    Yes.

20    Q.    Would you please point to him and indicate for the

21  record what he's wearing today?

22    A.    He's sitting right next to Tom Klein, he's wearing a

23  black sweatshirt.

24          MR. BOGDANOS:  Indicating the defendant, Your

25  Honor.

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

1                    THE COURT:  Yes.

2    BY MR. BOGDANOS:

3         Q.    And with regard to Mr. Richardson, were you present

4    on July 10th of 2008, when he was arrested?

5         A.    Yes.

6         Q.    Moving forward, did you have occasion, specifically

7    now I am going to ask you to direct your attention to October

8    15th of the jury 2008.  Do you remember that day generally?

9         A.    Yes.

10        Q.    On duty?

11        A.    Yes.

12        Q.    Did you see Mr. Richardson on that date, on October

13   15th of 2008?

14        A.    Yes.

15                   MR. BOGDANOS: I would ask that the witness now

16   be handed what has previously been received in evidence as 87.

17   BY MR. BOGDANOS:

18        Q.    Please take a look at that and tell the jury if you

19   recognize that item?

20        A.    Yes.  This is a print card.  And I recognize this

21   item because it's a major case print card and it has my writing

22   on it, my signature, and the date.

23        Q.    And whose print is that?

24        A.    Mark Richardson's print.

25        Q.    How do you know?

                 Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

```
 1      A.   Because I was there.

 2      Q.   Printed him?

 3      A.   Yes.

 4      Q.   On October 15th?

 5      A.   Yes.  I was there when he was printed, yes.

 6      Q.   And what did you do with that card after you printed

 7 him?

 8      A.   We put it into the -- we safeguard it and it went

 9 into police custody.

10      Q.   And did it also go to the Latent Print Unit at 1

11 Police Plaza or police headquarters?

12      A.   Yes, it did.

13      Q.   If I can get that back.  On the same date did you

14 have additional contact with Mr. Richardson?

15      A.   Yes.

16           MR. BOGDANOS:  I am going to ask that this item

17 be handed up.  I would ask that the detective be handed

18 People's 68 in evidence.

19      Q.   Do you recognize that item?

20      A.   Yes, I do.

21      Q.   What do you recognize it to be?

22      A.   It's a DNA buccal swab collection kit.

23      Q.   And how do you recognize that?

24      A.   I recognize it because my handwriting is on it.  The

25 seal has my initials on it and I recognize this to be my
```

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

1   handwritting.

2        Q.    The seals been broken so, go ahead, open the box up,

3   please, and tell us if you recognize what's inside of it as

4   well?

5        A.    Yes, I do.

6        Q.    What's inside it?

7        A.    These are the actual swabs.

8        Q.    Explain exactly how this came to be?

9        A.    Okay.  While he was at the --  while Mark Richardson

10  was --

11                  MR. KLEIN:  Could I just -- I think you should

12  lead.

13                  MR. BOGDANOS:  I will lead.  I got ya.

14  BY MR. BOGDANOS:

15       Q.    On October 15th you told us already that you got his

16  palm print?

17       A.    Correct.

18       Q.    While he was with you did you also get a buccal swab?

19       A.    Yes.

20       Q.    Tell us what you did to Mr. Richardson?

21       A.    All right.  Well, I put on gloves and I unpackaged

22  the swab and I handed the swab to Mr. Richardson.  He swabbed

23  himself numerous times on the inside of his mouth and then I

24  held the container and put the buccal swab into the holding

25  kit.

                Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

1      Q.    And did you actually watch him swab himself inside

2  his cheek?

3      A.    Yes.

4      Q.    Standard procedure?

5      A.    Correct.

6      Q.    And then you sealed it?

7      A.    Yes.

8      Q.    For follow on testing?

9      A.    Correct.

10            MR. BOGDANOS:  Thank you.  Nothing further of

11  the detective.

12            MR. KLEIN:  No questions.

13            THE COURT:  All right.  That completes your

14  testimony.  Thank you very much.

15            (The witness was excused and exits the courtroom.)

16            (Bench conference was held off the record with the

17  Court and counsel.)

18            (Bench conference concluded, back in open court.)

19            THE COURT:  We were just discussing scheduling,

20  ladies and gentlemen, that detective will be the last witness

21  for today.  So we're going to call it a day.  Good news is I do

22  believe that both sides will be resting tomorrow.  And, in

23  fact, it might even be a shorter than usual day.  The reasons I

24  will explain in greater detail tomorrow.

25            We still are going to schedule deliberations,

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

1   summations and charge and deliberations for Monday of next

2   week.  Which was the original target date.

3          So, that's it, we'll see you tomorrow morning 10

4   o'clock, please.  And if you wish to make some sort of plans on

5   Friday you may do so, we will not be in session on Friday.

6          All right, thank you very much.  10 a.m. tomorrow

7   please do not discuss the case.

8          (The jury was excused and exits the courtroom.)

9          THE COURT:  All right, that's it.  Thank you

10  all.

11         MR. KLEIN:  Can we do one more thing, I'm sorry,

12  can we stay on the record.

13         THE COURT:  Yes.  Mr. Klein.

14         MR. KLEIN:  I keep forgetting, I had wanted to

15  make a court exhibit of those four photographs of Detective

16  Henriquez.  Could we just -- I don't know who has them.

17         MR. BOGDANOS:  I do.  Sure.

18         MR. KLEIN:  Is that okay if they are presented

19  in evidence, Judge?

20         THE COURT:  We will make them a court exhibit.

21         MR. KLEIN:  Whenever we get them it doesn't

22  matter.

23         MR. BOGDANOS:  What I will do since it's

24  polaroids I will have the photo unit take photographs of each

25  of those and then place those in and I will bring them in the

Glenn J. Merola, Sr. Court Reporter

DIRECT/DET.HENRIQUEZ/PEOPLE

1   morning.

2                     THE COURT:  Very good.

3                     MR. KLEIN:  Thank you.

4             (Trial was adjourned to Thursday, September 22,

5   2011.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

```
1   SUPREME COURT        NEW YORK COUNTY
    TRIAL TERM           PART 45
2   ----------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK : INDICTMENT #
3                                       : 3534/08
                                        :
4                                       :
         AGAINST                        : CHARGE
5                                       : MURD 2
    MARK RICHARDSON                     :
6                   Defendant.          :
    ----------------------------------x TRIAL
7
                        111 Centre Street
8                     New York, New York  10013
                        September 22, 2011
9

10
    B E F O R E:
11
           HONORABLE BRUCE ALLEN
12                JUSTICE OF THE SUPREME COURT

13

14  APPEARANCES: (Same as previously noted)

15  ----------------------------------------------------

16            THE COURT CLERK:  Case on trial continued.  The

17       People of the State of New York against Mark Richardson.

18       The defendant, his attorneys, and the assistant district

19       attorney are present.  The jury is not present at this time.

20            THE COURT:  Thank you, very much.  Good morning

21       everyone.  Mr. Bogdanos.

22            MR. BOGDANOS:  Matthew Bogdanos for the People.

23       Good morning, your Honor.  Your Honor, through one hundred

24       percent my incompetence, I neglected to ask Detective Dimuro

25       a couple of questions.  It was on my notes.  I didn't ask
```

1  him about where Anthony Hall is now; and whether

2  Detective Dimuro has attempted to find him.

3     I have informed the Court and counsel beforehand

4  and respectfully requesting permission to fix my screw up,

5  and recall Detective Dimuro for that purpose.  Mr. Klein has

6  asked if I do so that I also ask if back in 2008,

7  Detective Dimuro knew that Anthony -- Mark Richardson was on

8  parole, yes.  For a drug related offense, yes; and I am

9  happy to ask that -- those questions as well.

10     THE COURT:  Mr. Klein.

11     MR. KLEIN:  Fine.

12     THE COURT:  Thank you.  Are both sides ready for

13  the jury?

14     MR. KLEIN:  Yes, your Honor.

15     THE COURT:  May we have the jury, please.

16     MR. BOGDANOS:  For the record, Judge, I will be

17  resting immediately after I recall Detective Dimuro; and

18  moving all the exhibits into Evidence with the exception of

19  People's Exhibit 5 which was only ever marked for I.D.  It

20  was the command log from the Viper room and then one through

21  a hundred -- with the exception of five will be moved in

22  because I haven't moved the Viper video in either, which is

23  four.

24     THE COURT OFFICER:  Jury entering.

25     (Jury entered the courtroom.)

1            THE COURT CLERK:  All right, will both sides

2     stipulate that all jurors are present and properly seated?

3            MR. BOGDANOS:  Yes.

4            MR. KLEIN:  Yes.

5            THE COURT:  Thank you, very much.  Good morning,

6     ladies and gentlemen.  Mr. Bogdanos.

7            MR. BOGDANOS:  Thank you.  Your Honor, the People

8     next call to the stand Mr. Michael Mannion of the District

9     Attorney's Office.

10            THE COURT OFFICER:  Witness entering.

11            (Witness entered the courtroom.)

12  M I C H A E L   M A N N I O N , called as a witness by and on

13     behalf of the People, having been first duly sworn and/or

14     affirmed, testified as follows:

15            THE COURT OFFICER:  I do, yes.  If you could have

16     a seat, please.  Pull your chair up in a loud clear voice.

17     State your name, spell your last name.

18            THE WITNESS:  My name is Michael Mannion,

19     M-A-N-N-I-O-N.

20            MR. BOGDANOS:  May I inquire, your Honor?

21            THE COURT:  You may.

22  DIRECT EXAMINATION

23  BY MR. BOGDANOS:

24     *Q*    Good morning, Mr. Mannion.

25     *A*    Good morning.

1  **Q**    Sir, will you tell us your occupation; then by whom you
2  are employed.

3  **A**    I am the manager of the Visual Evidence Unit and
4  employed by the New York County DA's Office.

5  **Q**    And how long have you been with the New York County
6  District Attorney's Office?

7  **A**    Since 1979, 32 years.

8  **Q**    Doing the math for you.  Thank you.

9        Mr. Mannion, what are your duties and responsibilities
10  within the District Attorney's Office?

11  **A**    Well I manage three units, which is the video,
12  photography, and engineering unit and as a manager I have the
13  full complement of bureaucratic duties; but since I began there,
14  I have been working with the video unit and daily performed the
15  duties of a video technician.

16  **Q**    And have you testified previously in your capacity both
17  within the video unit itself and then for your own duties and
18  then as a supervisor?

19  **A**    Yes, I have.

20  **Q**    Approximately, how many times would you say you have
21  done so?

22  **A**    Well over a hundred times.

23  **Q**    Did you receive a request of relevance to this case and
24  to this jury?

25  **A**    I did.

1    *Q*    And did you have occasion -- withdrawn.  And the
2    request was?
3    *A*    The request was to make -- to make clips in a
4    chronological fashion so that a bunch of -- well, so that a
5    number of video files could be seen in a timeline.
6    *Q*    And in order to fulfill that did you have occasion to
7    visit the Wagner houses?
8    *A*    I did.
9    *Q*    Would you explain for what purpose and very briefly
10   what you did there?
11   *A*    I had access to the files that came originally from the
12   Wagner houses.  Those files didn't have an imprint on them of a
13   date and time; so I returned to the Wagner houses to see if
14   those files still exited on the DVR's or some kind of a server
15   to see if I could export them again with that date and time.
16        I was unable to do that.  I also wanted to see the
17   location.  Take a look at the DVR's, the camera positions, that
18   sort of stuff.
19   *Q*    And it's fair to say that when you went up to see if
20   the original files from January of 2008 still existed, they did
21   not?
22   *A*    They did not.
23   *Q*    But none -- but prior to that the files had been
24   exported?  Did I say the right verb?
25   *A*    That's correct.

1    *Q*    Exported an external hard drive?

2    *A*    That's correct.

3    *Q*    You had an opportunity -- withdrawn.

4           Were those files then downloaded in your unit?

5    *A*    Yes, they were.  They were -- you are correct.

6    *Q*    You were going to give us a really long answer.

7    *A*    An explanation that was unnecessary.  They were put on

8    a network drive.  They were put on a portable drive, and then

9    put on a network drive and they were -- yes; essentially the

10   short answer, yes.

11   *Q*    The movement of any of these files from Viper video DVR

12   of 2400 Second Avenue to external hard drive to a network, to a

13   local drive, do any of these movements in any, way, shape or

14   form alter the files themselves?

15   *A*    No, they did not.

16   *Q*    Now, you mentioned that you went to the Wagner houses

17   and this jury has already heard plenty of evidence about the

18   thirteen different cameras, so we are not going to go into that;

19   but the jury has also heard evidence that twelve of them were on

20   one DVR, and one was on a separate DVR.  Is that what you found

21   with your files?

22   *A*    That's correct.

23   *Q*    And the jury has also heard evidence that one of the

24   cameras appear to be approximately three minutes ahead.  Can you

25   explain that.

1        **A**      At Wagner houses they have -- they have a room where

2     all of their DVR's are kept, and rather than there being some

3     kind of network time that runs across all of the DVR's, each DVR

4     has its own internal clock that is to be set manually; so it

5     would be as if each of the jurors had a watch and you each set

6     your watch for whatever time you thought it was.  I am sure

7     there would be at least a three to five minute variance.

8        **Q**      So what about all the cameras on a single DVR?

9        **A**      If they are on a single DVR the time will be universal

10     across those cameras; but if there were -- if there was a single

11     camera on another DVR because that time is set manually, there

12     could be a difference there.

13       **Q**      And that's what you saw in this particular case?

14       **A**      That's correct.

15       **Q**      And the files themselves?

16            And if you could look to the monitor to your left and

17     this monitor is actually it's one of yours, correct?

18       **A**      That's correct.

19       **Q**      As is the one right here is also one of yours?

20       **A**      That's correct.

21       **Q**      And the laptop is yours?

22       **A**      That's correct.  Well, it belongs to the City of New

23     York.

24       **Q**      We got it.  Thank you very much for the use of it.

25            And finally for our second one, the architecture, the

1    mapping, the files.

2        *A*     File system.

3        *Q*     I don't know what to call that.  Those are the files

4    you were talking about that you are looking at right now?

5        *A*     That's correct.

6        *Q*     And these are the files that are also unchanged from

7    all the movement even into this courtroom?

8        *A*     That's correct.  Those are the folders.  The files are

9    within the folders.

10       *Q*     Within the folders.

11           And is it fair to say that that's all you -- those were

12   all the folders and files you have?  You don't have anything

13   more than the dates here, the 11th to the 13th of January of

14   2008, with regard to this case?

15       *A*     That's correct.

16       *Q*     You don't have the 10th of January?

17       *A*     I do not.

18       *Q*     You don't have the 14th of January?

19       *A*     I do not.

20       *Q*     And when you went up there, they didn't exist?

21       *A*     I did not -- I did not find them.  They did not exist

22   on their DVR's.

23       *Q*     So these 13 separate cameras, the jury has already

24   heard evidence that it covers roughly midnight Thursday the

25   tenth into the morning of the eleventh up until roughly midnight

1   of Sunday the thirteenth across all three cameras, correct?

2       *A*    That's correct.

3       *Q*    That's what you found?

4       *A*    That's correct.

5       *Q*    Which means it's 72 hours.  Did I do that right.

6   Seventy-two hours of video times thirteen cameras?

7       *A*    That's correct.

8       *Q*    So that the jury don't need to go through all of that

9   if they want, were you asked to make a smaller compilation?

10      *A*    That's correct.

11      *Q*    If you will from whatever 72 times 13 is?

12      *A*    That's correct.

13      *Q*    936?  Does that sound right?  Don't answer that.

14      *A*    You have done more math than I have.

15      *Q*    Don't answer that.  And did you have a timeline that

16  you used in order to make the smaller clip?

17      *A*    I did.

18              MR. BOGDANOS:  It should be 74A and B.  May I ask

19      that the witness be handed what's previously been received

20      in Evidence as 74A and B and really just put them both on

21      the board and show them to him.

22      *Q*    Mr. Mannion, I am going to ask you to take a look at

23  these two charts.  The only question, you have seen these

24  before?

25      *A*    I have.

1   *Q*   You saw it when it was --

2         THE COURT:  It was upside down.

3   *Q*   You saw it when it was upside up?

4   *A*   It's fine.

5   *Q*   Are these charts that -- the timeline -- I will do that

6   again.

7         Do these charts represent the timeline that you used to

8   create the smaller clip?

9   *A*   Yes, they do.

10  *Q*   And instead of being 936 hours -- is that what we

11  agreed -- it's like 25 minutes?

12  *A*   It's like 25 minutes.

13  *Q*   Look to your left, do you see that clip that you

14  have -- is clip the right word?

15  *A*   Yeah, we can use that.  Yes.

16  *Q*   Do you see the clip that you created?

17  *A*   Yes, I do.  I just entitled it timeline.

18  *Q*   That's there before you on the monitor?

19  *A*   That's correct.  It's the quick time movie versus the

20  folders.

21  *Q*   And when you did that, did you do it fairly and

22  accurately?

23  *A*   I did.

24  *Q*   How?

25  *A*   I -- each of the clips that are pointed out on the

1  Excel chart I took a look at that chip; went to the time and

2  place indicated within that file; and basically I was cutting

3  and pasting.  I would mark in and out.  Move it to my timeline.

4  Go to the next clip and do it.  I did everything chronologically

5  based on the chart.

6      *Q*    You did that fairly and accurately?

7      *A*    I did.

8              MR. BOGDANOS:  I will offer the timeline --

9      actually, the entire hard drive into Evidence as People's 4

10     unless the Court wants me to mark the timeline separately?

11     Does Mr. Klein care?

12              MR. KLEIN:  Could I ask a question.

13              THE COURT:  Sure.

14  VOIR DIRE EXAMINATION

15  BY MR. KLEIN:

16     *Q*    So we have this 25 minute clip right?

17     *A*    That's correct.

18     *Q*    You saw that some of the cameras actually focused on a

19  certain area of the building, right?

20     *A*    That's correct.

21     *Q*    So, for example, if the jury wants to look at the front

22  door, right, and look at the front door for any period of time,

23  right like for a two hour, three hour period, the jury can still

24  do that?

25     *A*    They can do that.  They wouldn't be looking at the

```
 1   timeline clip.  They would be looking at the clips within the
 2   folders marked front door outside, front door inside.
 3       Q    Those are actually still there and accessible?
 4       A    They are.
 5            MR. KLEIN:  Okay, no objection.
 6            MR. BOGDANOS:  So I will just mark the entire hard
 7       drive it's People's 4 and move the entire hard drive in
 8       Evidence, all 936 hours and 25 minutes.
 9            THE COURT:  Agreed.  People's 4 is admitted.
10   DIRECT EXAMINATION CONT'D.:
11       Q    Mr. Mannion, I am going to ask you to watch while we
12   play it.
13            THE COURT:  The 25 minutes?
14            MR. BOGDANOS:  Yeah.  You can hit play.
15            (Videotape commenced to play.)
16            MR. BOGDANOS:  Pause.  Pause.  I am sorry, Judge.
17       Can I -- since we have the copies again, can I publish the
18       exact same copies we have been publishing to the jury in
19       case they want to look down.
20            (Handing.)
21       Q    Mr. Mannion, I am sorry, so, the clips themselves they
22   don't -- they just keep running?  This is a continuous -- one
23   continuous clip that you have edited that reflects the clips 1
24   to 99 I think, right?
25       A    That's correct.  There is no -- they run right after
```

1    the other.  There is no separation between them.

2        *Q*    So other than the fact that the view will change, you

3    know 1A will be from the outside, 1B will be from the inside.

4    That will be the only indication we are on to a new original

5    clip?

6        *A*    That is correct.

7        *Q*    Correct?

8        *A*    That's correct.

9        *Q*    Thank you.

10              MR. BOGDANOS:  If we can hit play again, please.

11    I am sorry.

12              (Videotape commenced playing.)

13              MR. BOGDANOS:  Your Honor, I am going to be asking

14    Mr. Mannion a few questions.

15              THE COURT:  You want to stop it.

16              MR. BOGDANOS:  It could keep running.  Could you

17    hand Mr. Mannion a copy of the same timeline that we have.

18    Pause.

19              (Videotape stopped playing.)

20        *Q*    Mr. Mannion, for the record I paused it at the end of

21    clip 29, still on 29, but it's going to be over in a few

22    seconds.  You have the copy of the timeline in front of you?

23        *A*    I do.

24        *Q*    What I am going to ask you to do now for the next 19 --

25    actually twenty -- from 30 to 49 clips -- as we move through

1   those clips just give us the clip number; so just say 30, you

2   know, clip 30, 31, 32, et cetera, as we go into it.

3       **A**    Understood.

4       **Q**    Thank you.

5               MR. BOGDANOS:  May it, please.

6               (Videotape commenced playing.)

7       **A**    This is clip 30.  Clip 31.  Clip 32.  We are now

8   watching clip 33.  We are now watching clip 34.  This is clip

9   35.  Clip 36 and clip 37.  Now we are onto clip 38.  Viewing

10  clip 39.  This is clip 40 and 41.  Okay, this is now clip 42.

11  This is clip 33 -- 43, excuse me.  Forty-four (44).  And now

12  clip 45.  Now this is clip 46.  This is clip 47.  This is clip

13  48.  Now clip 49.

14              MR. BOGDANOS:  Pause.

15              (Videotape stopped playing.)

16      **Q**    I just paused at clip 49.  Now the next series of

17  entries on the timeline 52, 70 that purports to be telephone

18  calls?  You have nothing to do with that, correct?

19      **A**    Nothing whatsoever.

20      **Q**    You pick up again at 71?

21      **A**    That's correct.

22      **Q**    And just so we are clear if the jury wants to look at

23  any individual clip longer either before or after the file name

24  is in the right-hand column?

25      **A**    The file name is the far right-hand column.  You will

1  see the camera No. which is 1A.  Then you would see -- let's

2  take a look at 71.  It says camera 4, 457.  Those will be

3  included in file name and then within that 427 and 2147, one of

4  those is linear time and the other would be actual time of day.

5  When I say lineal time, I mean the time counter.  Right now the

6  linear time is 22.  That would be the reference.

7       *Q*     The jury heard plenty of evidence about how to find the

8  clip.  I just want to make sure if the jury wants, to understand

9  if they want to see the longer clip, they could see it in more

10 context?  They could still go to the original file and find it?

11      *A*     Absolutely.

12      *Q*     Now, if we could pick up in a moment from 71 and if you

13 would continue to the end to do exactly what you've been doing

14 so far.

15                  (Videotape commenced playing.)

16      *A*     Okay, we are now looking at clip 71.  We are now

17 viewing clip 72; and now 73 and clip 74.  Now this is clip 92.

18 There was no 75.

19                  MR. BOGDANOS:  Pause.

20                  (Videotape stopped playing.)

21      *Q*     Thank you for pointing it out.  75 is another phone

22 call.  You have nothing to do with it?

23      *A*     No.

24                  MR. BOGDANOS:  Thank you, please continue.

25                  (Videotape commenced playing.)

1       *A*      I believe I just said this is clip 92.

2       *Q*      And now clip 93.  This is clip 94.  Now viewing clip

3   95.  This is clip 96.  Clip 97.  This is now clip 98 and finally

4   clip 99.

5                    (Videotape stopped playing.)

6                    MR. BOGDANOS:  Mr. Mannion, thank you very much.

7        I have nothing further, your Honor.

8                    THE COURT:  Mr. Klein.

9                    MR. KLEIN:  Just a couple of questions, Judge.

10  CROSS-EXAMINATION

11  BY MR. KLEIN:

12      *Q*      You indicated you actually went up to 2400 Second

13  Avenue yourself, right?

14      *A*      That's correct.

15      *Q*      To see if you could get the original Viper video?

16      *A*      That's correct.

17      *Q*      Could you tell the jury when it was that you did that?

18  Not exactly.  Just the season of the year.

19      *A*      I believe it was the end of August.  It was late

20  August; late August early September or I think late August.

21      *Q*      Of which year?

22      *A*      This year.

23      *Q*      That's when you went to make the inquiry?

24      *A*      That's correct.

25      *Q*      You were informed then that January 10th no longer

1  existed, right?

2      *A*    I actually had someone from the Viper Unit search their

3  files to see if it existed; so I saw for myself it didn't exist.

4      *Q*    It no longer exited?

5      *A*    That's right.

6      *Q*    Did you find out when it was that, that had been

7  destroyed?

8      *A*    I did not.  Normally if it's stored in the DVR it is on

9  a cycling thing and whatever their schedule is -- if it is 60

10 days or 90 days, it is automatically rerecorded over so I have

11 no way of knowing whether it was separated other than the export

12 NYPD did that we have; or whether it was left in the DVR or

13 recorded over in its normal cycle; but I don't know specifically

14 when it was done.

15     *Q*    Do you know when specifically what cycle they were on?

16 A 60 or 90 days?

17     *A*    No, I don't.

18                 MR. KLEIN:  Thank you very much.

19                 THE COURT:  Mr. Bogdanos?

20                 MR. BOGDANOS:  Nothing.

21                 THE COURT:  Mr. Mannion, thank you.

22                 THE WITNESS:  Thank you.

23                 (Witness exited the courtroom.)

24                 MR. BOGDANOS:  Your Honor, at this time as

25     indicated previously the People are respectfully requesting

1  permission to recall Detective Dimuro for a series of

2  questions that I just forgot to ask.

3            MR. KLEIN:  No objection.

4            THE COURT:  Detective Dimuro, please.

5            (Witness entered the courtroom.)

6            THE COURT:  Good morning, Detective Dimuro.  You

7  are still under oath.

8            THE WITNESS:  Okay.

9            THE COURT:  Mr. Bogdanos.

10            MR. BOGDANOS:  May I inquire?

11            THE COURT:  Yes.

12 REDIRECT EXAMINATION

13 BY MR. BOGDANOS CONT'D.:

14    *Q*    Detective, I am sorry to recall it.  It is totally my

15 fault.

16    *A*    Yeah, it's your fault.

17    *Q*    You got it out.  You are happy.  I am sorry.  I really

18 do apologize.

19         Very briefly.  When you testified yesterday you

20 mentioned an individual named Anthony Hall?

21    *A*    Yes, I did.

22    *Q*    Do you know where Anthony Hall is now?

23    *A*    No.

24    *Q*    Any idea?

25    *A*    No.

1   *Q*   Have you attempted to find him?

2   *A*   Yes, we have attempted on several occasions to try and

3   track him down.

4   *Q*   Approximately, how many times have you been -- have you

5   tried to find him?

6   *A*   Should I give specifics and location?

7   *Q*   Sure, but very generally just --

8   *A*   Okay.  We tracked him down upstate and was successful

9   and had him brought back into Manhattan; and since that time at

10  the Manhattan location, I myself have gone at least ten times.

11  *Q*   And did you find him at all?

12  *A*   No.

13  *Q*   And, finally, going back to 2008, you know the

14  defendant was on parole at that time?

15  *A*   Yes.

16  *Q*   And that was for a drug-related offense?

17  *A*   Yes.

18  *Q*   Thank you.

19          MR. KLEIN:  I don't have any further questions of

20  the direct.  Thank you very much for coming down today.

21          THE WITNESS:  Thank you.  Bye.

22          THE COURT:  Thank you very much, detective.  That

23  completes your testimony.

24          (Detective exited the courtroom.)

25          THE COURT:  You have a few exhibits outstanding?

1      MR. BOGDANOS:  Yes, your Honor.  We are

2   currently -- not currently and it will be finally -- there

3   are People Exhibit's 1 to 100 with the exception of

4   People's 5 -- for the record a command log, which was just

5   used to refresh an officer's recollection -- the People are

6   respectfully offering all those exhibits into Evidence.  I

7   believe all of them are already in, but it is for the record

8   making it clear it is one to four and six to one hundred.

9      THE COURT:  Thank you very much.  All are

10   admitted.

11      MR. BOGDANOS:  Judge, with that in the matter of

12   the People of the State of New York against Mark Richardson,

13   the People rest.

14      THE COURT:  Mr. Klein?

15      MR. KLEIN:  Defense rests.

16      THE COURT:  Ladies and gentlemen, as you have just

17   heard both sides have rested.  And now you are all wondering

18   what the schedule will be for the rest of the day.  We have

19   summations, charge, and deliberations coming up.  Before we

20   can do any of that; however, we have to go over some legal

21   matters this -- this happens in everything case.

22      After conferring with counsel, I don't think there

23   really is enough time today to get to the summations, and

24   even if there were enough time, we wouldn't have enough time

25   to get the case to you for deliberations.  We have already

1   agreed to not be in session tomorrow.  I know some of you

2   have -- have plans for tomorrow; so after thinking it all

3   over, I've decide the best way to proceed is to let you go

4   at this point so you could have a rest; and then we will

5   pick it up on Monday morning; and we will first thing on

6   Monday morning, you will hear from the attorneys with their

7   closing arguments or summations; and later on, on that same

8   day on Monday, you will begin to deliberate on this case.

9              All right, is that clear to everyone?  You are

10  free to go at this point.  Please do not discuss the case

11  with anyone between now and Monday morning.  I ask all of

12  you to -- yes, we will pick all those up and please be here

13  at 9:45.  Obviously, it is going to be a very busy day.

14  Please be prompt.  If you are running late since some of you

15  have already done, please give us a call so we know what's

16  going on.  All right, have a great weekend.  See you on

17  Monday.

18              (Jury exited the courtroom.)

19              (Transcript continued on the next page.)

20

21

22

23

24

25

TOD/CHARGE CONFERENCE

1  T-2 - Peo. V Mark Richardson, Ind. #3534/08

2  September 22, 2011:

3                 THE COURT:  And at my request Mr. Klein you

4  agreed to rest before actually making your 290.10 motion.

5            At the close of the People's case you may now make

6  that motion as if you had not yet rested.

7                 MR. KLEIN:  Thank you.  Yes.  We are moving for

8  a trial order of dismissal of all of the charges on the ground

9  that the People have not made a prima facie case as to the

10  elements of the crime nor as to the identity of the individuals

11  who committed the crime, especially as to Mark Richardson.

12            In addition, were specifically asking that the Court

13  dismiss the charge of Sexual Abuse in the First Degree and the

14  felony murder charge related that, as there was no prima facie

15  case presented as to that charge, either of those charges,

16  against Mr. Richardson.

17                 THE COURT:  Thank you.  Mr. Bogdanos.

18                 MR. BOGDANOS:  Considering the light in which

19  the Court must consider the motion at this point, the People

20  respectfully request, that the Court deny the defense motion.

21            And, specifically, with regard to Sexual Abuse, the

22  saliva or sweat of the defendant is on the victim's left

23  breast, it's an intimate part of her body, it constitutes

24  sexual contact, which constitutes sexual abuse, which forms a

25  basis for sexual contact, which forms a basis for sexual abuse,

TOD/CHARGE CONFERENCE

1   which forms a basis for felony murder.

2              THE COURT:  Yes, the motion is denied.

3              There is legally sufficient evidence as the term is

4   defined.  And I take it you now renew the motion at the close

5   of all the evidence Mr. Klein?

6              MR. KLEIN:  Yes.

7              THE COURT:  Anything further Mr. Bogdanos?

8              MR. BOGDANOS:  No.

9              THE COURT:  And that one is denied as well.

10  Meaning that the case will go to the jury.

11             Now, why don't you both step up for a moment and

12  we'll that talk about the charge or anything else.

13             (Bench conference was held off the record with the

14  Court and counsel.)

15             (Bench conference concluded, back in open court.)

16             THE COURT:  All right, we will pick things up at

17  2:30.  The record should reflect we had a discussion at the

18  bench concerning certain charges, issues, and, hopefully, we'll

19  be able to resolve those issues at 2:30.

20             (The trial was adjourned to 2:30 p.m.)

21   A F T E R N O O N           S E S S I O N

22             THE COURT CLERK:  Case on trial continued.  The

23  People of the State of New York against Mark Richardson.  The

24  defendant, his attorneys, the assistant district attorney are

25  present.  The jury not present at this time.


                    Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1          THE COURT:  Thank you.  Are both sides ready to

2   make formal charge requests?

3          MR. BOGDANOS:  Yes, Your Honor.

4          MR. KLEIN:  Yes.

5          THE COURT:  You are on your feet Mr. Klein so

6   you can go first.

7          MR. KLEIN:  Yes.  Judge, I wondered how much of

8   a discussion the Court wanted about the affirmative defense.  I

9   am prepared to discuss it.

10          MR. BOGDANOS:  None.  Not necessary.

11          MR. KLEIN:  Okay.  So I assume that's going to

12   be charged?

13          THE COURT:  Yes.  We discussed it informally and

14   I will charge it.

15          MR. KLEIN:  I think the more serious concern is

16   to whether or not the defendant is entitled to a Robbery in the

17   Third Degree.  Given there is a section in which the defendant

18   states, basically, the following:

19          MR. BOGDANOS:  Forgive me.  Just one second.

20   Just so I understand the argument.  Is this under each of the

21   robbery counts individually?

22          MR. KLEIN:  Yes.

23          MR. BOGDANOS:  Okay.  That's it.  Thank you.

24          MR. KLEIN:  I am basically using the district

25   attorney's video transcript that he gave us and on Page 6, the

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1  defendant saying: "So I'm not saying I'm better than nobody,

2  but this house is a little crazy."

3          And he's like -- he's obviously talking about

4  Anthony: "Yo, I'm gonna get your money, hold on, hold on, she

5  got your money.  So I'm looking, they still beefing.  He

6  grabbed her puts her up on the thing, yo, give me my, I pushed

7  them apart."

8          ADA: "On what thing?"  "On the refrigerator.  I

9  pushed them apart.  Then he's saying, no, she got your money,

10  she got your money.  She says, I don't know what you call this

11  nigger in here for.  I don't know what you call this big nigger

12  in here for, I ain't giving him shit.

13          So I'm looking I say, look, Miss, I don't know what's

14  going on with you and him, but the money you owe him goes to

15  me.  Well, I ain't giving you shit, da, da, da.  So I looked, I

16  seen the money in her blouse.  I took my money.

17          She grabbed up on me, and I like pushed her away from

18  me, and I went out the -- the umm -- the entrance to go out the

19  door.  She was pulling on my shirt, the guy Johnny grabs her by

20  the neck.  Anthony runs in the kitchen and comes out -- excuse

21  me -- Anthony runs in the kitchen comes back out the kitchen, I

22  didn't know what he had in his hand, so as I'm going to the

23  door I thought he punched her in her stomach."

24          And then it goes on from there.  And I think there's

25  a fair reading of that statement that gives us a reasonable

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1  view of the evidence looked at, obviously, in the light most

2  favorable to the defendant, that what the defendant did there

3  was Robbery in the Third Degree.

4         Now, I am well aware of the line of cases, and Mr.

5  Bogdanos gave me one of these cases, People v Negron, that

6  talks about the Scarborough line of cases, that indicate that

7  if a defendant makes, or anyone makes a statement, if a witness

8  makes a statement, and there's no reason to attack a part of a

9  statement, say that's not true, but that part is true, there's

10  no reason to do that, then you can't craft like a lesser

11  included out of an integrated statement by saying, believe that

12  part, believe that part, if there is no rational basis to say

13  that.

14         But that's not what I'm am saying here.  I am instead

15  saying, that if you believe all of that statement, credit all

16  of that statement, there is a logical, reasonable argument,

17  that what the defendant did was a Robbery in the Third Degree

18  of his own regardless of what the other individuals were

19  doing.

20         The Court wondered about situations where like if

21  everyone is involved in an assault can someone come up and

22  commit a robbery.  And, actually, there are cases like that.

23  There are a line of cases in the First Department.  The main

24  case was People v Morales.  It's a 1987 case.

25         And what happened in that case is, there was a group

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1    of people who were assaulting someone and someone came up and

2    then in the middle of it engaged in a robbery.  And the

3    question was, did that kind of prove that the other

4    individuals, who had simply done the assault, were part of the

5    robbery?  Or, did they not have to show that they all shared an

6    intent to steal?  And even if it all happened at the same time,

7    that someone could do an assault -- some people could do an

8    assault and some people could do a robbery in the exact same

9    criminal transaction?

10            So, the fact that this all happens, almost

11   simultaneously, I don't think defeats our analysis that what

12   happened here, or what we think we could legitimately argue to

13   you, a jury, is that -- and I am just going to call the third

14   person the third man -- that Anthony Hall and the third man had

15   their own dispute with this individual.

16            Anthony Hall and the third man were doing something

17   to her, assaulting her, the defendant came up and then did

18   commit, I can't deny that's a robbery because in his statement

19   he says: "She grabbed up on me, and I like pushed her away from

20   me, and I went out the entrance to go out the door."

21            That clearly shows he's taking money.  There can't be

22   a claim of right, it's fungible property, she's obviously

23   trying to stop his retention of the money and, therefore,

24   there's the use of physical force.

25            The question is, what do we do with:   She was

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1  pulling on my shirt, the guy Johnny grabs her by the neck.
2  Anthony runs in the kitchen comes out of the kitchen and then
3  they assault her.  Is there a reasonable view of the evidence
4  that the defendant, by that statement, was not aided by another
5  doing a robbery and instead did a robbery of his own?
6        That the third person didn't share the same intent
7  that the defendant did.  That third person wasn't in any way
8  trying to aide a robbery by the defendant but what the third
9  person was doing was trying to continue his own assault on
10  her.
11        In addition, how do we analyze the statement that the
12  defendant makes?  Is it clear from the statement that while
13  she's pulling on the shirt that's precisely when Johnny grabs
14  her by the neck.
15        For example, even if the district attorney could some
16  how show, or argue, or we had a case where it was clear that
17  Johnny grabbed her by the neck and Johnny also had an intent to
18  steal, do we know that he grabs her by the neck at the same
19  time as she was pulling on the shirt?
20        Or, would it be reasonable for me to argue to the
21  jury, that a fair reading of that, of that entire paragraph, is
22  that:  Yeah, the defendant does his robbery, he's going away,
23  she pulled on his shirt some point in that, very close in time,
24  but we don't know if it's simultaneously, the guy Johnny grabs
25  her by the neck and then continues whatever he does.

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1          I am not saying believe part of it and disbelieve

2    another part of it.  I'm saying that the reading of it, that

3    the district attorney would like to do, that it's clear that

4    all happens at the same time.  That's a fair reading.  But my

5    reading of it also is a reasonable reading if you look at that

6    in the light most favorable to the defendant.

7          That's why I believe that Negron really isn't an

8    opposite case in this discussion.  Because I'm really saying,

9    even if we credit what he's saying, what are the reasonable

10   ways to read that statement.

11         And I think it's important to note, along this line,

12   that there has been a change in the law regarding affirmative

13   defenses.  Because there was a very significant case, a First

14   Department case, that's called People v Devinish.

15         Which was a case where a defendant is seen, he's

16   coming through the window into a building and then at this

17   floor are tools.  And there's a statement by someone who

18   actually lives in the building, I don't know, those could have

19   been my tools.  And there was an argument about whether or not

20   the defendant was entitled to an affirmative defense of

21   trespass, Okay?

22         And the Court in the First Department said, you know,

23   the defendant has to really, like show something, put something

24   in the case to show why they should get the affirmative defense

25   such as trespassing.  They can't just rely on, what may be in a

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1  sense, a reasonable inference from the evidence that's there

2  before the court.  So the court didn't give the affirmative

3  defense.

4          And there was a dissent by Justice Sacks, who, you

5  know, went through, you know, the normal stuff, it must be

6  impossible to commit the greater offense.  There must be a

7  reasonable view of the evidence.  And he also went through the

8  Scarborough analysis.  But he said, in a sense, it's not like

9  the defendant has to come in and say, see, they asked him the

10  question:  Richardson, what are you saying, at the time when

11  she was pulling on your shirt did -- is that the same time that

12  Johnny was grabbing her by the neck?

13          And that Richardson would have to say, and it would

14  have to be in here, she was pulling on my shirt and then she

15  let go and I'm out the door and then the guy Johnny grabbed her

16  by the neck.

17          Like that doesn't have to be clarified by the defense

18  to get a lesser included.  It's the opposite.  It has to be

19  clarified by the prosecution to defeat the lesser included

20  defense.

21          And what's interesting, the reason I bring up

22  Devinish, is because Devinish is a case where the defendant

23  hasn't really proved anything, and it followed this long line

24  of cases in the First Department.  I know because we could

25  never get lesser included.  They say you're trying to

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1  speculate, you're trying to argue inference from the lack of

2  evidence, in a sense.

3          And then, you know, in 2005, the Court of Appeals,

4  right, at 26 NY 3d 727, it overturned Devinish and on the lines

5  of what had been written in the dissent.  That was their

6  ruling.

7          And, I just think, what it proves to me, and what it

8  stands for, is where there is a record basis on which a jury

9  can reasonably conclude that the prosecution has failed to meet

10  its burden of proof on the distinguishing elements of the

11  greater crime, has failed to prove, for example, that this was

12  happening simultaneously.  Has failed to prove that they were

13  acting in concert anywhere.

14          Even when there is no evidence affirmatively

15  indicating that the defendant is innocent of the greater and

16  that he's only guilty of the lesser, that, in that situation,

17  Devinish makes clear a charge down is required upon request.

18          Putting it slightly differently, it's not improper

19  speculation, right, which is often the district attorney's

20  argument to try to defeat, it's not improper speculation to

21  treat equivocal facts, because that's what we have here

22  equivocal facts, equivocal statement, a statement I can read

23  one way and they can read another way, and they are both

24  reasonable ways, it's not improper to read equivocal facts or

25  deficiencies in the prosecutions proof as the aggravating

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1    element as the basis of a reasonable view of the evidence, that

2    the jury could or should convict only on the lesser included

3    offense.

4           I should also say that Devinish did site Scarborough

5    in support of it's ruling there.  And that's why I think the

6    defendant is entitled to the lesser included and it would be a

7    denial of his right to due process under both the U.S. and New

8    York Constitution if it wasn't given.

9           Thank you, Judge.

10          THE COURT:  Thank you.  Mr. Bogdanos.

11          MR. BOGDANOS:  Yes.  Your Honor, as I indicated,

12   I think there is a reasonable reading of the evidence that

13   entitles the defense to the affirmative defense so the People

14   are conceding that.

15          I hope at this point, in both my career and this

16   trial, I convinced the Court that I don't make arguments simply

17   to make them, but rather when Mr. Klein, the defense, makes a

18   good argument you heard me say, oh, good idea, I change my

19   mind.

20          On this one, however, we do not have a meeting of the

21   mind.  But I want to be abundantly clear, we agree that the

22   jury may choose, even in the testimony of a single witness, and

23   here we're talking about the statement of Mr. Richardson, the

24   jury may choose to accept some portions, reject other.

25          And I don't want to stand here and say that I am

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1   going to, in any way, argue to the jury to accept all or

2   nothing.  And, so, I don't want to mislead the Court, I do

3   intend to suggest, where there's evidence to show, that the

4   defendant's statement is inaccurate.  I will show where that

5   is.

6          So, starting from that premise, it is none the less

7   the People's position, in this case, that what Mr. Klein is

8   asking the Court to do, is actually to countenance a selection

9   dissection of the integrated testimony of the single witness in

10  this case, Mr. Richardson.

11         I have an extra copy for Your Honor, do you want

12  Negron?  Sure.

13         (Handing up to the Court.)

14         MR. BOGDANOS:  But I understand Mr. Klein's

15  argument.  Here's the problem with Mr. Klein's argument.  He

16  wants the argument to rely on the temporal nature of Mr.

17  Richardson's description of the event and that's too narrow a

18  focus.

19         It's also -- you can't just look at both charges.

20  That's why I asked before, are we asking for a charge down on

21  Rob 2, or Rob 1, or both.  It's both.  It's fair.

22         But let's look at them separately.  Start with

23  Robbery in the Second Degree, aided.  Clearly Robbery in the

24  Third Degree is a lesser included provided there's a reasonable

25  viewing of the evidence that supports it.

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1         But what is the reasonable viewing of the evidence?

2    Well, putting aside all the other testimony, your allowed to

3    have contradicting testimony.  No argument there.  But the

4    medical testimony is pretty clear that this is not a one person

5    operation given the nature of all the injuries.

6         But it doesn't mean that they don't get a charge down

7    based on the medical testimony.  But Mr. Klein's argues that

8    it's the defendant's statement that offers them a charge down

9    on Rob 2.  But the defendant's statement in this regard is a

10   single integrated whole.

11        Mr. Klein read it properly, it's, if your using the

12   transcript, of course which isn't in evidence, but it's Page 6,

13   starting at Line 20, when Mr. -- according to Mr. Richardson:

14   Hall is banging Helen Abbott up against the refrigerator. "I

15   pushed them apart.  Then he's saying no, she got your money,

16   she got your money."  She then says: "I don't know why you call

17   him here -- sorry, I don't use that word.  I ain't giving him

18   shit."

19        And at that point he reaches over, Mr. Richardson

20   says in this integrated moment, "the money you owe him goes to

21   me."  And he reaches over and takes it.

22        Prosecutors in every court room, in this court house,

23   are always saying when you have intent you have to actually

24   look into the inner operation of the individuals mind.  It's

25   not as if someone pulls out a gun and says I want to kill you

TOD/CHARGE CONFERENCE

1   and then pulls the trigger.

2         Well, we have that here.  We have exactly that here.

3   We have the exact words of Mr. Richardson and why Anthony Hall

4   was grabbing her.  She got your money.

5         So, this particular, the request to charge not on Rob

6   2 aided isn't just unreasonable, it's inconceivable.  The jury

7   would have to believe, dissect a single sentence of his

8   testimony -- and Hall didn't say she got your money but was

9   banging her up against the refrigerator and he did reach over

10  and grab the money.

11        How is that conceivable in this particular case, on

12  this record, before this Court?  The People submit Rob 3

13  just -- there is no reasonable view of the evidence in which

14  Rob 2 gets charged down to Rob 3.

15        Turning to Robbery in the First Degree.  It's a

16  different analysis because it's a different portion of the

17  evidence.  Same thing now, it's the transcript at Page 7, and,

18  of course, you know, the People will provide to the Court the

19  DVD or, if it's okay with the defense now, the transcript, if

20  he agrees, for the Court's consideration.  Just for the Court's

21  consideration.  If the Court wants to take this under

22  advisement.

23        But with regard to Robbery in the First Degree here's

24  his exact words: "She was pulling on my shirt, the guy Johnny

25  grabs her by the neck.  Anthony runs in the kitchen and comes

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1   back out of the kitchen, I don't know what he had in his hand."

2   And then he talks about the stabbing.

3           How is there any reading of that that isn't

4   simultaneous?  But even, my argument is, even if it isn't,

5   there is no requirement that it be simultaneous.

6           Because on the facts of this case, not some other

7   case, this case, we know for a fact that the defendant, that

8   the kitchen, is a few feet from the front door.  That's the

9   evidence on record in this case.  The evidence, the

10  uncontradicted evidence in this case, according to the

11  defendant's statement, is that the stabbing took place in the

12  hallway after he left the kitchen.  Well, that's a few steps to

13  the front door.  A few steps.

14          So, under the reading of the evidence in this case,

15  Mr. Klein is asking Your Honor to somehow assume, not a hallway

16  of a few steps to the front door, but some much larger area, in

17  some other case, not this case.

18          And there is no reasonable view of the evidence that

19  supports that.  According to his statement, she, Ms. Abbott, is

20  grabbing the defendant's shirt after he's out, out of the

21  kitchen into the hallway.

22          "And she was pulling on my shirt, the guy Johnny

23  grabbed her by the neck."  If it's not happening simultaneously

24  it is, none the less, and the People argue it does, it is, but

25  it is none the less happening while the defendant is still in

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1  possession of the money.  Which makes any force used while he's

2  in possession of the money Robbery in the First Degree.

3          So, for a slightly different reason, it's the

4  People's position that Robbery in the First, a charge down to

5  Robbery in the Third Degree, is not supported on this record.

6          THE COURT:  Thank you.  Anything further Mr.

7  Klein?

8          MR. KLEIN:  No.

9          THE COURT:  Any other charges or requests?

10          MR. KLEIN:  No.

11          MR. BOGDANOS:  I have a couple that I think are

12  standard but it's better to be safe than sorry.

13          THE COURT:  Yes.

14          MR. BOGDANOS:  With regard to assessorial

15  liability, or acting in concert, and I am using CJI, Your

16  Honor, you know, varies -- fine -- slightly.  Fine.

17          I want to make sure there is no claim of mere

18  presence in this case and no evidence so I assume Your Honor is

19  not including the optional language of mere presence in the

20  assessorial liability section.

21          And, I shouldn't assume, I am asking Your Honor not

22  to include --

23          MR. KLEIN:  Well, Judge, I don't mean to

24  interrupt.

25          MR. BOGDANOS:  That's okay.  That's fine.

                    Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1          MR. KLEIN:  I want that in there.  I don't know

2   what the jury will make of this evidence here in terms of

3   whether the defendant was merely present when all of this went

4   down.  I have no clue.  There's no reason to take that out of

5   the case if someone is merely present.

6          If a juror says, you know, how the defendant knew all

7   of this, you know, how he knows this, he saw this all happen?

8   He was there.  He saw it all happen.  That's how the defendant

9   knows this stuff.  He doesn't know much about it.  Some juror

10  can say he was merely present there.

11         You can't take that out of the case because we didn't

12  affirmatively show that perhaps he was merely present, that

13  that's a reason if you find someone isn't present, it can help

14  support Mr. Bogdanos' position, that he must have been

15  present.  You don't take it out of the case because there isn't

16  any way that they showed that he was merely present when this

17  happened.

18         THE COURT:  Thank you.  Mr. Bogdanos.

19         MR. BOGDANOS:  Nothing additional on the mere

20  presence.  The second, again, still sticking with assessorial

21  liability, there is a paragraph in CJI:  Acting in concert with

22  a person who is not here on trial.  I am specifically

23  requesting that Your Honor include that language.

24         I see Your Honor nodding.  I will take that as a

25  yes.  And that's it on the acting in concert.

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1           MR. KLEIN:  I guess in there I can't object to

2    this but also I think the Court would have to fashion something

3    about, don't speculate about what's going on with Mr. Hall,

4    right?

5           MR. BOGDANOS:  Right.  I mean, certainly, I

6    pulled it up this morning and the language is:  You must not

7    speculate on the present status of that person.  I plan, I am

8    fine, and I just gave Mr. Klein a copy.

9           THE COURT:  That would be a standard charged.

10          MR. BOGDANOS:  I am fine with the standard

11   charge.  The next charge, circumstantial evidence.

12          Now, I recognized this is not an entirely

13   circumstantial evidence case but I -- but there is a portion of

14   the circumstance -- if Your Honor is already planning giving it

15   you can just tell me to stop I don't feel the need to keep

16   arguing.

17          THE COURT:  Well, let's hear from Mr. Klein.

18          MR. BOGDANOS:  It's the next page in the CJI.

19   And there's a section in the CJI that talks about two types of

20   evidence, namely direct and circumstantial.  The first section

21   is, whenever there is circumstantial evidence, and then there's

22   a section, that if the entire case, obviously, I am just asking

23   that you give it up until, I have got a line on there where it

24   is.

25          I mean I got an extra copy for the Court if it makes

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1   it easier.  Here's the circumstantial evidence charge.  It's

2   the first page of CJI and then the, up to the first complete

3   paragraph of the second page, where it indicates the law

4   drawing no distinction between circumstantial and direct, and

5   then the rest talks about if the entire case rests on

6   circumstantial evidence, which obviously this one doesn't, and,

7   again, exactly as is in CJI is what the People are asking.

8              MR. KLEIN:  I'm sorry.  I'm confused.

9              THE COURT:  This is basically a charge on

10  circumstantial evidence versus direct evidence, revering the

11  two, isn't that correct, isn't that what you're asking for Mr.

12  Bogdanos?

13             MR. BOGDANOS:  Yes, Your Honor.

14             MR. KLEIN:  Why are we taking out the

15  circumstantial evidence if it involves drawing the inferences?

16  That's the part that is taken out because of the suggestion

17  here?

18             MR. BOGDANOS:  Because that particular

19  paragraph, if you read it, says guilty based solely on

20  circumstantial evidence.  Everything from that paragraph on is

21  only applicable to cases that are solely based on

22  circumstantial evidence.  I mean I didn't write this, I didn't

23  draft this, I printed this.  See, the last sentence is solely

24  based --

25             MR. KLEIN:  Judge, I understand what Mr.

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1  Bogdanos is saying, but I don't think that's a basis to take
2  out the whole explanation here.   I think what the Court has to
3  do is to say circumstantial evidence requires the drawing of
4  inferences, I will explain the process involved in analyzing
5  that type of evidence.   Period.
6         Takes out the next two lines and then adds in the
7  whole discussion of what do you do with circumstantial
8  evidence.   How do you draw appropriate inferences.   Not the --
9  like that doesn't come out just because there's other
10 evidence.   There is also circumstantial evidence in the case
11 and they have to know how to analyze that and the rest of it
12 doesn't seem that this is only appropriate to a solely
13 circumstantial case.
14        MR. BOGDANOS:   Actually, that is what CJI says,
15 if you go to the front page, it says circumstantial evidence,
16 entire case, and it indicates that's where you stop.   I am not
17 making this up this is where -- Your Honor, there is a second
18 charge on circumstantial evidence versus direct.
19        THE COURT:   Generally, or something like that,
20 where the evidence is based in part on circumstantial evidence.
21        MR. BOGDANOS:   That's fine.
22        THE COURT:   Is that what you're requesting?
23        MR. BOGDANOS:   I am requesting that.
24        THE COURT:   Because that has some of the
25 language that you crossed out in.

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1            MR. BOGDANOS:  Totally fine.  I mean my access
2   to CJI were all webb base now and the webb base version, public
3   case of CJI, didn't have a separate charge, it just indicated
4   where to stop.  I am fine if you have a separate charge I have
5   no problem with that.
6            THE COURT:  We do.
7            MR. BOGDANOS:  Okay, then that's totally fine.
8   Then the next, I would ask for an expanded charge on intent,
9   again, right out of CJI, that's the next page, for all the
10  ropes that Mr. Klein just mentioned in the lesser included
11  argument, I adopt everything he said in terms of intent for
12  purposes of the expanded charge on intent.
13            THE COURT:  Well, when it's requested I normally
14  give it.  Do you have any opposition to it?
15            MR. KLEIN:  No.
16            THE COURT:  All right.
17            MR. BOGDANOS:  And then the next request I would
18  make is the standard consciousness of guilt CJI provides.
19            In this case, the People contend, Your Honor can
20  offer, say that, or just leave it up to the People on
21  summation.  I don't feel strongly about that.  But if we're
22  clear the People's argument about the consciousness of guilt
23  will be both the false exculpatory statement of a false alibi,
24  asking someone to provide a false alibi, and also the flight
25  from the apartment building itself. ;.

                    Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1          But I don't need the Court, if Mr. Klein objects to

2   the Court saying that, I can say that on summation but I am

3   asking for the charge.

4          THE COURT:  Mr. Klein.

5          MR. KLEIN:  I'd ask that the Court not give the

6   examples that the district attorney finds but I don't have a

7   basis for saying that there can't be a consciousness of guilt

8   charge.  However, I think that it should end where it says the

9   weight and importance you give the evidence offers to shows

10  consciousness of guilt depends on the facts of the case.

11         MR. BOGDANOS:  Fine.  Fine.  That's fine.

12         THE COURT:  You don't like the last sentence?

13         MR. KLEIN:  Right.

14         MR. BOGDANOS:  That's fine.  I don't care.  It's

15  an argument anyway.  If it's not anything more that's fine.

16         MR. BOGDANOS:  And then the last page is

17  corroboration of statement.

18         THE COURT:  No problem with that, I take it?

19         MR. KLEIN:  I'm sorry.  I apologize, Judge.

20         THE COURT:  Corroboration of statement.

21         MR. KLEIN:  Can't object to that.

22         MR. BOGDANOS:  Nothing else.

23         THE COURT:  All right.  Thank you both.  This is

24  what I am going to do since we have the luxury of time.  I am

25  going to take a little time to mull over some of these

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1   requests, certainly the request for a charge down to Robbery in

2   the Third Degree is a very, very important issue, or could be a

3   very important issue in the case so what I will do is this.

4           I will let each side know informally, tomorrow, what

5   the ruling will be.  And that way you will be ready to prepare

6   for summations on Monday and then we'll make a formal record of

7   things on Monday before you actually begin your summations.

8           So if you call chambers or come by the courtroom at

9   some point tomorrow I will give each side the answer.

10          MR. KLEIN:  Can we just come up for one second?

11          THE COURT:  Yes.

12          (Bench conference was held off the record with the

13  Court and counsel.)

14          (Bench conference concluded, back in open court.) (.

15          THE COURT:  So, that's it, unless there is

16  something.

17          MR. BOGDANOS: Yes, there is.  Mr. Klein had

18  asked for the Polaroid photographs to be marked as a court

19  exhibit so I have taken the photos of that and I got them now

20  in my file.  So I will just offer them as a court exhibit, for

21  the record, four Polaroid photographs that were taken by

22  Detective Henriquez at the crime scene on January 13th.

23          THE COURT:  Can you just confirm with Mr. Klein.

24          MR. KLEIN:  That's fine.

25          THE COURT:  They will be Court Exhibit 1 through

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1  4.

2           MR. BOGDANOS:  And then, with regard to court

3  exhibits, since we're preparing a record, the People would like

4  then to provide, I will do it tomorrow, it DD5s that the People

5  offered to the Court for the Court's decision on Brady, perhaps

6  they ought to be a court exhibit as well.

7           THE COURT:  I have them all up here so we can do

8  that.

9           MR. BOGDANOS:  Do you want me to mark those?  I

10  can get more copies.  So, whatever Your Honor wants, whatever

11  is easiest.

12           THE COURT:  You probably should get another set,

13  show it to Mr. Klein, and once we are in agreement we'll mark

14  it.

15           MR. BOGDANOS:  Fine.  I will take care of that.

16  Thank you.  With regard to defense exhibits, I want to make

17  sure I understand, A1 to 19, then B and C, I have in evidence.

18           And the only thing that's not is D which was shown to

19  Detective Torres to refresh her recollection.  I just want to

20  make sure I have that accurately.

21           THE COURT:  I believe that's correct.  Mr.

22  Klein, Ms. Legler?

23           MS. LEGLER:  That's correct, Judge.

24           MR. BOGDANOS:  And with regard to C, the People

25  had mentioned B, that you were referring to B, that there were

Glenn J. Merola, Sr. Court Reporter

TOD/CHARGE CONFERENCE

1    two hearsay statements that the People had requested be

2    redacted so, there was no objection subject to redaction, it's

3    the window, period, of date last seen and we found portion.

4            So I just want to make sure that I done that

5    correctly with the defense and then I guess the defense copy

6    could just be redacted appropriately.

7            MR. KLEIN:  Okay.

8            MR. BOGDANOS:  I guess we can do that before it

9    goes to the jury.  Same thing with i DNA files, I had pulled

10   out of the DNA files all the hearsay that Mr. Klein had talked

11   about, I think I got it all, we can do that before.

12           MR. KLEIN:  We'll also have to do it if they

13   request personnel records from the Parks Department.

14           MR. BOGDANOS:  We have to do that too, right.

15           MR. KLEIN:  We can take care of all of that.

16           MR. BOGDANOS:  But that's it Judge.

17           THE COURT:  All right, Monday morning, 9:45.

18           (The trial was adjourned to Monday, September 26,

19   2011.)

20           (Continued on next page.)

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

                        Colloquy

1   SUPREME COURT          NEW YORK COUNTY
    TRIAL TERM             PART 45
2   ------------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK  x  IND#
3                                        x  3534/08
                                         x
4       -against-                        x
                                         x  CHARGE:
5   MARK RICHARDSON,                     x  MURD. 2
                                         x
6                      Defendant.        x
    ------------------------------------x
7   JURY TRIAL CONTINUING

8                        111 Centre Street
                         New York, N.Y. 10013
9                        September 26, 2011

10

11  B E F O R E:

12                  HONORABLE BRUCE ALLEN,
                    JUSTICE OF THE SUPREME COURT
13

14

15  A P P E A R A N C E S;  (Same as previously noted)

16  ----------------------------------------------------------

17                  THE COURT CLERK:  Case on trial continued.  The

18  defendant, his attorneys, and the assistant district attorney

19  are present.  The jury is not.

20                  THE COURT:  Good morning, everyone.

21                  MR. BOGDANOS:  Good morning, Judge.

22                  MR. KLEIN:  Good morning.

23                  THE COURT:  We did have a brief discussion at

24  the bench concerning the charge.  Does either side wish to be

25  heard further?

                Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS

1          MR. KLEIN:  No.

2          MR. BOGDANOS:  No, Judge.

3          THE COURT:  And are both sides ready to address

4  the jury?

5          MR. KLEIN:  Yes.

6          MR. BOGDANOS:  Yes, Judge.

7          MR. KLEIN:  Didn't you have to put on the record

8  that you are giving the Rob 3?

9          THE COURT:  Perhaps.  I don't know if that's on

10  the record or not.  The parties have been notified that I have

11  granted the defense request to charge down to Robbery in the

12  Third Degree on both of the robbery counts.

13          And there was one other issue, I will be giving the

14  full charge on acting in concert.  I know Mr. Bogdanos had

15  asked to eliminate one sentence, or one portion of it, but I

16  think the law requires otherwise.

17          And I have added a little bit to the circumstantial

18  evidence charge as requested by Mr. Bogdanos.

19          Other then that, I think everything is the same.

20          MR. BOGDANOS:  Thank you, Judge.

21          THE COURT:  Are you ready Mr. Klein?

22          MR. KLEIN:  Yes.

23          MR. BOGDANOS:  And, Judge, I will need just a

24  few moments in between summation, it's purely logistical, just

25  to setup.

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1           THE COURT:  I will inform them.

2           MR. BOGDANOS:  Thank you.

3           THE COURT:  And if either side goes on for

4    extended period of time and in my view the jury might benefit

5    from some sort of recess I will let you know.

6           All right.  May we have the jury, please.

7           (The jury enters the courtroom.)

8           THE COURT CLERK:  Case on trial continued.  All

9    parties are present, the defendant is present, all jurors are

10   present and properly seated.

11          THE COURT:  Thank you very much.  Good morning,

12   ladies and gentlemen.  Welcome back.  As you know we're going

13   to begin this morning with the summation, closing argument of

14   the People, Mr. Klein will go first.

15          MR. KLEIN:  Thank you, Judge.

16          This may be a moment of great disappointment if

17   you're expecting soaring orator on behalf of a defendant.

18   You'll be sorrily disillusioned.  Or, a passionate urging that

19   you find some fundamental worth, even in that man, and, thus,

20   not hastily condemn him, then you are listening to the wrong

21   speaker.

22          Or, you are expecting me to convince you, there lies

23   an innocent man wrongly accused of a terrible crime.  Then you

24   came in with a false expectation that I can't hope to fulfill.

25          Because I will not, and do not, speak for that

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1   individual man.  And I am not a mouth piece for Mark

2   Richardson.  And will not defend him as an unjustly accused

3   member of our civil society.  It's not my job as a lawyer in

4   this courtroom and it's not my role as a human being on this

5   earth.

6          My work here, at least my understanding of my work

7   throughout this trial, is to encourage you to put certain

8   principles into practice as you decide that mans faith, and to

9   ensure, as well as I can, that all that is put before you here

10  in this courtroom, is seen from the perspective of those ideals

11  and those rules, to urge you to believe that those principles

12  must inform the decision that you will be called upon to make.

13         That the burden to persuade you of guilt lies totally

14  upon the prosecution.  That a man who was accused of terrible

15  crimes need not prove his innocence in order to justify his

16  acquittal.  That the burden is to prove guilt beyond a

17  reasonable doubt.  That the law uses that term for a specific

18  reason.  To tell you how convincing the evidence of guilt must

19  be, in fact, to permit a verdict of guilty.  That a man must be

20  presumed innocent, not as an innocent before God, but of the

21  crimes for which he's charged and that that presumption demand

22  that you acquit him in light of the horrors placed down before

23  you unless the prosecution proves beyond a reasonable doubt

24  that he's in fact guilty of those very crimes.

25         My role is, thus, narrowed, as it has been I think

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1   throughout this trial.  And, thus, what I say will be limited,

2   not in scope, and not in the material that I plan to cover, but

3   rather in the passion of advocacy, to call you all to a certain

4   result.

5          My personal feelings about Mark Richardson are truly

6   private and irrelevant.  My desire for a certain verdict is

7   inconsequential.  My fervor that you hear in my voice, I hope

8   you understand it, as merely urging you to follow and apply the

9   rules as we must and I trust that this body will come to its

10  own equitable and just verdict.

11         And I will tell you something else, in lieu of a

12  formal introduction, in case any of you thought this was all

13  going to be easy.  No matter which side of the equation that

14  you may now think you sit on, for those of you who thought,

15  hey, it's murder, that's the charge, as it's clear from this

16  evidence, he must have killed her, so this will be no tough

17  jury deliberation, it's clearly guilty, let's go home.

18         Or, for those of you who thought, instead, hey, it's

19  murder but there is no real evidence that he's the one who

20  killed her so we'll bring in this unpleasant acquittal in a

21  flash and go on with our lives.

22         If you hold either of those positions and, thus,

23  thought you were somehow going to get off easy in this matter,

24  at least in your role, then you will be sorrily disappointed

25  again.


           Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1          After we finish the Judge will tell you what the

2     specific charges mean in this difficult case.   Mr. Richardson

3     is not charged with being the one who actually killed Ms. Helen

4     Abbott.   Mr. Richardson is not accused of being the one who

5     most of you would consider being the murderer.

6          The prosecution need not prove that he ever touched

7     that cord or plunged those scissors again, and again.   Or, in

8     fact, prove that Mark Richardson ever touched the person of Ms.

9     Helen Abbott.

10         The defendant is charged with murder, yes, with

11    murder as serious as it exists under our law and as vile as

12    exists in civil society, as if he were the one who did any of

13    those actions.   Yet he's charged with a particular concept

14    called felony murder.

15         The Judge will define it.   It's his role not mine.

16    You will be called upon to determine not if he had killed Ms.

17    Abbott with a wanton intent to kill but rather if acting alone

18    or with others on January 11th he committed and attempted to

19    commit the crime of robbery or sexual abuse and in the course

20    of, and in furtherance of those crimes, or in the immediate

21    flight therefrom, he caused the death of Helen Abbott.

22         You will be called upon to determine not if he's the

23    one who actually committed the murderous acts, but rather if he

24    committed or attempted to commit a robbery or a sexual abuse

25    and alone or with others and, in furtherance of those crimes,

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1   caused the death of the victim in this matter.

2          And, obviously, you will be called upon to decide if

3   he committed the related crimes of robbery and sexual abuse.

4   And to this, to these crimes, as you will find as you sift

5   through the evidence, guided by the instructions that his Honor

6   will give you, no easy and quick answer will fall into any of

7   your laps.

8          Nobody will be able to go in the back thinking the

9   issue was simply.  One, was it proven, did he kill her or not?

10  This is simple.  Let's vote and reach a meritorious verdict.

11  Whether he's one of the people that actually did some or most

12  of the heinous acts that took that womens life that belief

13  won't answer the questions that you are called upon to

14  determine or whether you believe that the proof here fails to

15  convince you that he killed her, that he's one of the ones that

16  actually did the physical acts that caused her death.

17          Even if you think that the proof here fails to prove

18  that, you are still called upon to consider another different

19  particular crime of felony murder.

20          The issue is complex and demands all of your focused

21  attention.  But instructions are for the Judge I am just giving

22  you a hint of what's coming and the enormity of the task that

23  now lies ahead for each of you.

24          I want to return to my job.  My function.  My role.

25  And what I said I did and did not want to do here, and be here,

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1    in not wanting to defend the moral integrity of that

2    individual, in fact, in refusing to accept any responsibility

3    or vouching for any action or words of Mr. Mark Richardson.

4         Yet, gladly defending the moral integrity of a system

5    in which I am called upon to serve, I think there's no better

6    place to start then in evaluating the words of my client, to

7    consider the 16 minutes of videotaped statement of his words

8    that you saw presented on those screens.

9         The display of his:  This is the real truth.  That he

10   uttered up there.  Remember that ghastly moment in the midst of

11   a trial filled with blood, death, a daughter's pain, and as

12   Detective Hernandez put it, a horrific murder that he came upon

13   in that back room.

14        Remember how Mark Richardson began to try to convince

15   the district attorney that he was now ready to come clean and

16   tell all.  What did he do?  The doffing of his hat.  Miss

17   should I take off my hat?  To show his supposed enormous

18   respect for a district attorney who had now come to speak to

19   him.

20        Oh, rest assured, what I say now will be the gospel

21   truth because I obviously hold this proceeding in such serious

22   and high regard.  As if that district attorney, or any district

23   attorney, or anybody, would be taken in, conditioned to believe

24   that what was now going to be laid out before her, by such a

25   phony display of obsequious respect, was going to be the actual

SUMMATION/DEFENSE

1  truth.

2       And I trust that none of you were, likewise,

3  influenced by the so sincere tone of Mr. Mark Richardson to

4  think, wow, I guess a true confession, the real deal was now

5  going to be actually forthcoming.

6       I trust that watching that video and comparing it to

7  the enormity of what really must be explained here, made you

8  realize that my client was engaging purely in, at least giving

9  the least pejorative expression I can find, a pathetic and

10 trite act of pure denial.

11      And I think you all realize that what I told you in

12 my opening statement has now come to pass that you would find

13 Mr. Richardson, my client, was a liar, a big mouth, a man who

14 would callously lie to the police into the investigation of a

15 poor womens death.  Who's words would be totally funneled to

16 only one real concern, how to protect me, poor Mr. Richardson.

17      The truth was a concept far from his concerns as he

18 stumbled around trying to figure a convincing way to get me out

19 of trouble.  If that we would be presented with a man who would

20 ay anything and everything to make sure that he never goes down

21 for a murder, let alone get in trouble with state parole.

22      He'll lie big.  He'll lie small.  He even lies about

23 his motivations for lying.  He wants the police and the

24 district attorney to believe that he's telling the truth now.

25 That he should be believed now because he's coming clean about

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1  why he lied before.

2       It was just that I am on parole, see, and I can't be

3  found to have been missing work and to being in a crack house.

4  It's not like I am lying because I have some involvement in a

5  scene in which a woman was killed.

6       You want to know where his seldom believing and

7  deceit must begin, at least as far as that case, not that we

8  need to believe it only began here, is it began the very first

9  time he went with the police.  You think you know what happened

10  in February, with that February 5th meeting, because you

11  weren't presented with the actual evidence of what happened

12  when he went and spoke with Detective Hernandez, Dimuro and

13  Detective Torres, you want to know what it was that actually

14  occurred in that conversation, you heard more then enough to

15  understand what must have gone down.

16       Richardson probably even lies as he describes how he

17  went to the police.  I went voluntarily, you know, I didn't

18  have to go, I just volunteered.  Gee, gosh, I had nothing to

19  hide.  He thinks we should believe that because he says it so

20  heartfelt.

21       Yet, what is so interesting, is the startling lack of

22  self-awareness that his own words portrays the total failure to

23  understand what he actually says would actually be on anyone

24  who listen to his words.  I mean he truly thinks that by

25  telling the ADA, and you, that he went voluntarily down with

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1  the police, that shows his good will that should help you,

2  convince you, that he's a down to earth honest guy now.

3       Because in the next paragraph, in the very next

4  paragraph, he describes how he voluntarily went down to the

5  police and told a complete fabrication as truth as he attempted

6  to mislead the police.

7       I mean follow the logic.  Although, of course there's

8  no logic to follow, see I'm a good guy, you should believe me

9  now up in that screen because I voluntarily went down and then

10  told a good lie.  Believe me now when I talk because no one

11  forced me to lie before, see, I'll just do it on my own if it

12  serves my own purpose.

13       Sadly, not that it matters much too, how he analyzes

14  his words and his actions but it does seem that Richardson even

15  fails to understand the absurdity of the logic he employes as

16  he performs his supposed act of contrition and true

17  confession.  You should believe me now because before I

18  voluntarily went to the police and lied to them.  See, I lied

19  when no one even told me I had to lie.

20       What a cogent and coherent defense strategy.  Perhaps

21  he should really be his own lawyer given the impressive display

22  of logical thought.  He even lies on that video as he recounts

23  what he says he had told the police back in February.  He says,

24  listen to his words, he says, I told them everything I told

25  you.

Glenn J. Merola, Sr. Court Reporter

1064

SUMMATION/DEFENSE

1        I was there but I left -- the thing I left out was

2   the part about this guy hitting that woman with whatever object

3   he had in his hand.  I mean, sure, I guess that's conceivable.

4   It's possible that he told Dimuro and Henriquez and Donna

5   Torres that back in February.  But do you believe that's truly

6   what occurred on February 5th?

7        Certainly stretches our understanding of police

8   practices to believe that as they were trying to figure out

9   what had happened to this woman that they would have let him go

10  if he told them he had snatched the money from the woman, that

11  the woman fought back, that he pushed her off and then he's

12  going out the door and Johnny grabbed her in a headlock.  That

13  he admitted to them that he engages in that.

14       What you would learn from the Judge will be an act of

15  criminal robbery.  Robbery.  And saw the start of a violent

16  attack and then was permitted by the police to just then walk

17  out the door.  No.  Even given a ride home.  And thanks for

18  your help, Dude.

19       He lies in the presence of the very cops who were

20  there and know what he said in his first statement in

21  February.  He's both brazen, yet frivolous, in the very same

22  breath.  He speaks to the cops on February 5th and then runs

23  the next day to concoct an alibi.

24       Now, suppose you all determine, with regard to this

25  act, further shows more then a cunning, clever, and cult signs

Glenn J. Merola, Sr. Court Reporter

1065

SUMMATION/DEFENSE

1   of knowing how to protect himself or, instead, a further

2   example of his strange sense of illogic logic as he tries to

3   mount his defense against what he sense must be coming, a

4   further investigation in some kind of serious criminal charge.

5           I mean he speaks about a certain day in the police

6   station on February 5th and then runs and tries to create the

7   paper trial he will use to convince the cops that he was at

8   work on the very day he just discussed.

9           Then he realizes he doesn't even know what day he was

10  really talking about after he's gone and created his alibi and

11  has to ask Detective Donna Torres about it during one of his

12  pathetic and whiney phone calls.

13          By the way, don't get me wrong, I am not saying that

14  Mark Richardson's so mentally simple to know how to act in his

15  own pure self interest and to concoct and connive for pure self

16  preservation and, thus, we should some how excuse the

17  ridiculous act, the fake contrition that he displayed on that

18  seen, I am just saying that his sense of logic must leave us

19  all somewhat astounded.

20          And another display of effective advocacy.  He calls

21  the cops and lies about the use of the dead womens phone.

22  Confronted by the obvious irrefutable evidence that he had made

23  all those phones calls he replies:  Me?  I didn't even know the

24  lady had a phone.  Must have been Desiree.

25          And then when Detective Donna asked:  Desiree?  Are

Glenn J. Merola, Sr. Court Reporter

1066

SUMMATION/DEFENSE

1   you saying it was Desiree who made the calls?  He seems to be

2   momentarily stumped by his own absurdity of trying to deflect

3   blame.  Then he repeats:  No, I'm not saying that.

4           But there is no answer for the question Detective

5   Torres appropriately possess to him.

6           Then July 10th he now comes forth and in a fluid

7   attempt to impress the district attorney and the defendant,

8   with his new found sincerity, tells them about his character

9   and how shocked he was to find himself in this untidy crack

10  house.

11          I mean, says this man, in the same breath as he

12  announces that he's on parole and he has done time before, he

13  says:  See, I'm from Queens.  I mean, this stuff going on here,

14  I mean I am not better than anyone but I never seen a place

15  like this.  Oh, the goings on in there were really too much for

16  me and nothing in which I would ever partake.

17          Now he realizes, I assume, that he better come up

18  with something really good and convincing.  Since he knows that

19  all his previous lying has only gotten him there in that chair,

20  in that room, in the police station, and under arrest for

21  murder.

22          And then, apparently, so far no one has credited a

23  word that he said, you know, he must think and think quickly.

24          Or, perhaps, I don't know, it's been germinating in

25  his mind since he must, somewhere, come on, in the back of his

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1    mind know this day of reckoning would soon be acoming.

2           In his head he must be figuring it all out along the

3    lines of, well, let's see, it didn't work when I denied any

4    participation in the facts of the day.

5           My alibi turned out to be shit.  So I better give

6    them something that offers something more than complete

7    denial.

8           It's not rocket science to figure out his own logic.

9    He must be saying, you know, I just left, I got out of there

10   before anything stared, so I'll give them a little something

11   that ties me in just a bit and that he believes will have a

12   good ring of truth and will again some how get him off the

13   hook.

14          Hell, maybe if he says it well enough, they'll even

15   give him a ride home to his more worthy borough of Queens.

16          He concocts now a tale of grabbing at money.  Some

17   how seeing the money in a blouse.  Which, of course, we know

18   she wasn't wearing, since we know what she was wearing when she

19   was found slaughtered in that back room.

20          I grabbed it, of course, but I am not really

21   admitting anything bad because he thinks, I suppose, that

22   taking something from someone who owes something to someone

23   else, well, that's not really stealing.  But, then again, I'm

24   not taking myself totally out of the action, that maybe the DA

25   will believe what I said.


                 Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1          I am not denying that I am not involved more then I

2    said before, and since I am being more, supposedly forthcoming,

3    then you have to believe it, that this rendition is how it

4    really went down.

5          See, I was even there when the violence began.  Not

6    that I had any role in it.  How was I to know that Johnny was

7    about to put her in a choke hold and Anthony was to begin

8    stabbing her in the stomach.  But I was there just getting my

9    money and then hurrying away.

10         Quite obviously this new version, oh, believe me now

11   because I've admitted that I've lied before.  Is it not truth

12   at all.  The stories absurd and flies in the face of both logic

13   and all that we know.  It's another self serving tale and

14   deserves no respect.  It's so convenient she happens to have

15   just the right amount of money sticking out of her blouse.  He

16   said I took my money.  Not that he grabbed all the money she

17   had but his money.

18         So obviously compelling.  He did something that he

19   certainly shouldn't have done but no criminal culpability can

20   ensue from such a petty act.  So, utterly convenient he takes

21   himself out of the place as the real violence begins.

22         Yet, we reject this story, not merely because we

23   suspect it's real motivation, we reject it for more solid

24   grounds because it flies in the face of what we know to be

25   true.  Takes the money sticking out of her blouse.  But we know

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1    she's wearing a sweat shirt with a bra underneath.  No blouse

2    is recovered because none must have been worn.

3             He sees Anthony stab her in the stomach and the blood

4    flows on to the shirt.  Yet there's no defect in this sweat

5    shirt.  So what did he do first, pull her shirt up and then

6    insert the scissors into her stomach?

7             And then he says she's grabbing on my shirt but he's

8    not wearing a shirt as he goes out, he's wearing his army

9    jacket as he goes out the door.  And, sure, our understanding

10   of his generic motivations warns us away to give any credence

11   to this tale.  We find no reason to credit a self serving story

12   of taking the money.

13            He deserves no reason to give any credence to this

14   man in that position trying to finagle himself away from a

15   criminal charge.  No reason to give any.  Believe in a man who

16   announces:  Believe me now because I lied before.  Believe me

17   now because I do nothing but fabricate.  Believe me now because

18   I am not guilty of any crime.  In his mind he's, once again,

19   admitted to nothing and is, therefore, not worthy of an iota of

20   truth.

21            But why the specific lies that he tells?  But what's

22   he lying about?  And, even more importantly, what is it that

23   he's hiding?  What are Mark Richardson's particular reasons for

24   lying?

25            It's not enough to say we understand why people in

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1 general in his position shouldn't be trusted.  It's a much

2 deeper question that we're called upon here to probe.  And we

3 don't start our examination of this question with why he says

4 he lied.  There's no reason to credit that either.

5         If it's not parole, that he simply didn't want his

6 drug related parole violated because he's, once again, involved

7 in a crack house, if that doesn't explain it then why does he

8 lie and do it in that video in his own particular way?

9         Listen, folks, no one can or will ever critique you

10 if you draw what is certainly a reasonable inference and find

11 that the defendant is minimizing his role and must be guilty of

12 murder if you find that he minimizes his role in what must be

13 his actual partaking in a hideous crime.

14         After all, he's shown his willingness to lie.  He

15 spins an unbelievable tale.  And certainly has an enormous

16 motivation to not want to be convicted of what a true

17 confession might make all but inevitable.

18         I mean, all of you, as reasonable people, had to be

19 considering that as the probable and likely answer to the

20 question of:  Why was he saying what he said?  At least after

21 the second time that the video was shown to you in this

22 courtroom.

23         Yet, how do we know, how do we know what, in fact, is

24 being truly hidden by his self-serving tale?  Is the only

25 reasonable inference that he's hiding a true tale of murder?

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1    Is the only reasonable inference that he's motivated by hiding

2    an act which would make him guilty of felony murder robbery or

3    sexual abuse.

4              In his mind, absolutely,  Whatever he actually did,

5    whatever he truly did in that house, surely makes him guilty of

6    something.  And, thus, can never be exposed.  In his mind.

7    Sure.  Whatever he actually did, what ever level of

8    participation he engaged in, in his mind, makes him guilty of

9    something he can never admit to and must never be revealed to a

10   jury.

11             But how are we possibly secure in our feeling that we

12   know what that hidden reality must be?  Are we really so

13   confident from what we seen in this case, from the evidence

14   given to us for the past two weeks, not only that it's

15   reasonable to assume that he's hiding acts of participation in

16   robbery, sexual abuse, and murder, but that is the only

17   reasonable hypothesis, the only reasonable inference to gain

18   from those lies.

19             We're so certain that the only reason he would make

20   up another lie is because he had to cover-up what he knows is

21   his true role in her death.  Whatever's presented to us makes

22   us so certain that that's the solution to the conundrum we face

23   here.  Sure it's an attractive option.  No doubt.  After all,

24   we want an explanation for a death, and if he gives a phony

25   explanation that fails to account for that death, then we

SUMMATION/DEFENSE

1    logically assume what was lacking in the true explanation is

2    that very death.

3            It's not only attractive but we feel in a way

4    compelled to accept it given the horror for which someone must

5    stand to account.  It's not only enormously alluring but it

6    would serve him right, after all, he's the one who makes it so

7    difficult to find out the true circumstances of Ms. Abbott's

8    death.

9            But doesn't it have a certain, it's almost magnetic

10   sense of attraction, also serve to warn us off from jumping to

11   quickly?  Do the rules of this courtroom permit us to easily

12   accept such a solution?  Are we really so certain that that's

13   the only answer to the question you face?

14           Are we really certain that what his lies prove is

15   that he's covering up his guilt for the crimes of which he

16   stands accused?  Or, are we, on that fundamental question, not

17   really convinced?

18           Is it not reasonable to think, to consider, that

19   there may be other reasons beside abject guilt of murder for

20   why he would come in with a perjurious tale?

21           In fact, just open your eyes to what we know about

22   this case and this house.  Reasonable hypothesis abound.  We

23   simply need to be willing to not shut our eyes and not

24   conveniently ignore what we know in a mad rush for what we,

25   even too, would be a justifiable view because there are plenty

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1   of ugly reasons, other than those of guilty for these crimes,

2   for why Mr. Richardson would utter this preposterous tale and

3   here lies the true difficulty in this most sordid case.

4           Sure, who could deny that it's reasonable to think

5   that, as the prosecution will argue, that Richardson did not

6   that, not just what he says, but much more, that he must have

7   participated in a felony murder.

8           And who can say that's not a plausible motivation for

9   his lies.  And, in fact, would be the truth of the case.  But

10  is that really the only reason all inferences that can be made

11  concerning why he, in particular, would lie in this situation,

12  knowing what we have learned about him and his actions and that

13  house?

14          So how do we know that what he really did with that

15  woman must amount to guilty of those crimes for which he's been

16  charged?  Yeah, he thinks that if the truth came out he would

17  be in terrible jeopardy.  But what's the truth that must not be

18  revealed?  How much did he see?  What did he actually do?  What

19  bad acts, ugly acts, which may indeed fall short of

20  participating in felony murder, is he trying to hide by telling

21  what he thinks is a self exculpating story?

22          I mean we can't ignore the evidence that's been

23  placed before us and be unwilling to explore what we know about

24  that apartment.  It's unattractive.  I know.  And it's smacks

25  what I am going to do of victimizing the victim.  Yet, I'm

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1    sorry, I won't leave any rock unturned.

2          It's a crack house that apartment.  That's what it

3    is.  And it doesn't change that simply because Ms. Abbott's

4    death came about there.  Nor because she has a wonderful

5    daughter.  Doesn't matter that she has grandchildren or a

6    husband who severed in the Air Force.  She's also a crack

7    addict and was in the middle of using crack when she died.

8          There's evidence of semen and sex abounding in that

9    back room.  And she's not too old in her wig to be attracted to

10   men.  She wouldn't engage in reckless sexual acts of her own

11   given what we know of her own apparently reckless behavior.

12         Yet, don't besmirch the dead.  Yet we can't sanctify

13   them either.  It's ten dollars a hit and any unknown stranger

14   gets use of that room for, in Detective Dimuro's words,

15   whatever, 24/7, she allows strange people to do what they

16   want.

17         And, what, we should assume she just stands away from

18   the fray, she just runs this crack hotel or she's part of the

19   scene?  Look at that place.  Anything and everything goes.

20         Listen, I wasn't there and neither were you, I don't

21   know what went on in there any more or less than you do, or the

22   prosecution does, but I know, and so do you, what it's logical

23   to infer, not by making it up or spinning tales out of thin

24   air, not by speculating about scenarios for which there is not

25   a shred of evidence, but instead looking at this evidence

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1   straight in the mouthy.

2            What's Mark, Mark Richardson and her stuff doing

3   together, mixed in semen there in that back room there on the

4   floor?  Why is his sweat on her breast or his saliva on her

5   nipple?  Wherever it is and whatever it is, it's there on what

6   we know is an intimate part.

7            Did he grab money out of her bra?  We know that's

8   where she keeps it.  So, yeah, I guess that's a reasonable

9   inference we can make.  But not inconsistent with consensual

10  sex.

11           Did he get all the money out of her bra?  Did she get

12  dressed again, go back out in the hall?  Did he steal all her

13  money?  Again, as he leave the apartment, does he

14  surreptitiously take her wallet, flip that on the bed, after he

15  searched through it for any possible scraps?  Is he clever

16  enough to make sure she doesn't see what he's doing?  Does he

17  see Johnny and Anthony begin their own drug related assault,

18  who decide on their own, let's see what else we can steal.

19           After all, isn't it Anthony who she knows, as he

20  lives in the building and, thus, Anthony, who can never leave

21  her alive as a witness to his own ugly acts?  Isn't that what

22  we all know about crack and it's violent result?

23           Does he watch it begin and do nothing to stop it?

24  Does he not only watch it but could careless about what's going

25  on?  Maybe even thinks it's funny that a woman is dying that

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1   death.

2          We know he sees enough to tell us in his own

3   distorted version that something, that in fact we know did

4   happen, did happen.  That she was assaulted around the neck and

5   eventually stabbed with some silverish object.

6          What goes on in that crack house that nobody, and not

7   just make Mark Richardson, ever admitted it?  Why does she have

8   the DNA of two separate men, or donors on her right breast?

9          Why does she have the DNA of Male Donor C under her

10  nails?  Who did she have intimate contact with on that day and

11  who decided to assault her?  Was Mark Richardson the one who

12  decided to kill her or, rather, the one who first sucked on her

13  breast?

14         Did Richardson have his own sexual pleasures and then

15  watch and others did assault and abuse her?   Who is Male Donor

16  C?  Remember it's neither Mark Richardson nor Anthony Hall.

17  And what a was his role, what was the order of pleasure or

18  pain, and who took part in what?

19         Why is Mark Richardson's DNA found in a swab with no

20  blood?  And the three other swabs appear to be positive for

21  human blood?  What does that tell us, if anything, about the

22  order of contact?

23         Why does Mark Richardson almost himself apparently

24  have no blood on his clothes?  Oh, there is one piece of

25  evidence that you have to consider, which should make it

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1  implausible that he wasn't involved in a violent assault, the

2  phone calls, the cell phone and his calls.

3        And we know, don't we, that she wouldn't certainly

4  give up her cell phone without a violent struggle at the very

5  least.

6        So let's examine the cell phone and see what its

7  proven.  Is there a hypothesis consistent with guilt, a

8  reasonable hypothesis, that can logically be drawn?

9  Absolutely.  You heard Ms. Cheryl Abbott describe to you she

10  loves her phone, carries it around with her, keeps such good

11  contact with her mother, that's how she knew something terrible

12  had occurred.

13        So, whoever had the phone must have taken it with

14  violence.  But then you heard something else.  That Cheryl

15  Abbott never sees her mom on crack.  That her mother has a side

16  of her life that she keeps away from her daughter.  That she

17  was surprised one day to see another man coming out of that

18  part of the apartment.  A man who she knew was a drug related

19  resident of the building.  That her mother told her it's none

20  of your business who I decide to have in the house.

21        And she doesn't know how her mother gets money for

22  drugs.  That she never heard what the detective knew that it

23  was 24/7, ten dollars a pop.  And that she doesn't know how her

24  mother acts on crack.  Which apparently is a significant part

25  of her life.

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1        And just not so inconceivable then, not so

2   unreasonable to assume then, that in the middle of a joint drug

3   binge, she would let that man use her phone.  I mean, you know,

4   folks, we have to be able the distinguish here between how

5   evidence uncovered during an investigation can lead to the

6   reasonableness of arresting a man.

7        That, obviously, once the detectives found this

8   strange cell phone use that it made it enormously sensible to

9   focus on him.  But then don't assume that's the evidence that

10  necessarily points even absorbently to guilt.

11       In this courtroom you take a cautious and an

12  appropriate look at what evidence means and does not.  Yeah, I

13  know it's nice to think that it proves that he had killed the

14  lady, and now took her phone and since he has her phone he must

15  have taken it by violence.

16       But if we're going to focus on the phone do it

17  fairly.  Look at the phone records, not just January, look

18  back, look at two numbers, those mystery numbers to that fact

19  by the 347-992, whatever, but 646-546 whatever.  You have the

20  phone records.  See how many dozens of times those numbers are

21  called all throughout January when we have no reason to think

22  that Richardson was ever at her house.

23       Look how often those two numbers are called and she's

24  not calling her daughter but it shows her own strange activity

25  both all day and all night.  Those numbers obviously have no

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1   connection to Richardson nor to anyone in his family even on

2   the evening of January tenth.

3          Look, she calls the number seven times.  Those

4   numbers are both called when we know that Mark Richardson was

5   in the building on January 11th and when he wasn't in the

6   building on January 11th.  On 1/11 at 12:33 a time for which

7   video exists and we know that Richardson is not there because

8   they start watching the video at midnight, the number is

9   called, Richardson is not in the building.

10         At 12:40 it's called again.  Richardson isn't in the

11  building.  Richardson doesn't have her phone then does he?

12  It's clearly a number that's called by her not by Richardson.

13  The 992 number, it clearly intrigues the cops a lot too because

14  it's a phone number she's calling 24/7.  And then not only is

15  it called, obviously by her at 2:58, four minutes before

16  Richardson begins his series of calls, but it's called again at

17  3:34 in the middle of his series of calls.

18         Obviously reason to assume that she's making that

19  call if it's a number that she regularly uses and not Mark

20  Richardson.

21         Yet, if she uses is it then, in the middle of series

22  of phone calls, then it's simple to assume that the phone

23  possession, the obvious bounty of a violent attack, phone calls

24  don't show that Mark Richardson wasn't involved in a violent

25  attack, he just walks away with a phone that at some point he

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1    was obviously given permission to use.

2            He then tosses the phone once he realizes it's

3    evidence of whatever larcenous acts he has committed.

4            I'm sorry, we don't know that he lies because he

5    murdered Ms. Abbott.  All we no in this case is it that he lies

6    to cover up his own lousy misdeeds, whatever they are.

7            The fact that she is murdered does not mean that it's

8    necessarily participation in felony murder that he needs to

9    conceal.

10           What else have we learned that might shed light on

11   the critical issues?  Unfortunately, much that we learned seems

12   to point in so many directions.  We can create a web of facts,

13   reasonable inferences, that show he must have done the crime.

14           (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

1          MR. KLEIN:  Or a web of circumstances which leads

2     us with doubts based on reason.  We know that he left with a

3     bag that he didn't have when he entered; a plastic bag that

4     he tells Detective Torres on the phone that he had his

5     uniform in.

6          Now, there is no special reason to trust him; and

7     I am not -- certainly not insinuating that what he says

8     should be believed -- but before we assume that, oh, that's

9     where he must have hid now his bloody clothes and let's

10    examine what the evidence did show us.

11         We know he is seen much later, right?  They are

12    looking at him coming home with the same kind of bag as he

13    comes how many times from work.  It is not so ridiculous to

14    think he could have had his work clothes he had on that

15    Thursday eve when he came from whatever special work program

16    he apparently did go to on Thursday.

17         Yet he didn't come in with it; so the bag must

18    have the bloody clothing he's decided to hide but does it?

19    Why?  What evidence proves that?

20         Why do we think -- what compelling reason is there

21    for this jury or anyone in this courtroom to assume that the

22    video that is shown to us consists of all the times or

23    necessarily the first time Mark Richardson comes into that

24    building on the evening of June 10th and in the the early

25    morning hours of June -- January 11th?  I am sorry.  Because

1     that's all that's shown to you; therefore, it's all that you

2     must consider -- like if the district attorney doesn't bring

3     you evidence of what the video would have shown in the late

4     hours of January 10th and you are not to consider what such

5     evidence may have shown and some how assume that everything

6     of relevance must have been presented to you in all those

7     clips that were brought into this courtroom, that you are

8     not permitted when you decide what's proven to consider the

9     lack of evidence that is presented on a critical point.

10          You know, it's really pretty extraordinary.  My

11    conversation I guess you could call it, a cross examination

12    of Detective Dimuro.  We discussed, you know, detective

13    there was a certain logic, right, of going forward and

14    getting the stuff from January 11th, going forward until she

15    is killed.  You wanted to see who is around her at the time

16    she is killed.

17          But is there some reason to think that

18    Mark Richardson and his buddies go into the building the

19    first time at 1:00 a.m., from thinking that the forward

20    moving evidence is appropriate to watch as the investigation

21    begins, to somehow thinking that that's all the appropriate

22    evidence to collect as the investigation unfolds?

23          In fact, someone -- the DA video guy at least

24    apparently did think three years later we should probably

25    get January 10th too; but by then it's too late.  Why,

1    though, when you see a guy and Hall and others come in a
2    first time at 1:00 a.m. you would not go back a few hours to
3    check?  I mean they even get the phone records for January
4    10th.
5              Let's see what Richardson was wearing the very
6    first time he went in.  Let's see what he was carrying the
7    first time he went in before we assume guilt out of a black
8    plastic bag.
9              Listen, guys, more power to those two detectives
10   and the work that they do and Detective Torres and Dimuro,
11   they obviously know how to do their stuff.  They've got
12   years of experience that they can clearly call into play;
13   but none of us are beyond making an error in judgment.  What
14   Dimuro says when I said to him -- remember after lunch I put
15   him back on the stand.  I said I thought we had made a
16   mistake.  He said, yeah, we'd made them before.
17             Okay, he should have gone back and gotten
18   January 10th, but that's not really the issue.  The issue
19   here is that an innocuous act by the detectives then creates
20   and feeds miscalculations that are made by others; and then
21   the reality of an already complex affair gets unfairly
22   distorted.
23             Listen, Dimuro and his team don't get any video
24   from January 10th.  Okay.  They don't.  All right, but they
25   don't come in and say ignore anything that may have occurred

1    on January 10th.  You didn't hear that out of Dimuro's

2    mouth.  They don't come in and say we collected everything

3    of relevance to this case and this jury; but then the

4    Prosecution's taking the limited thing that they got and

5    pushes us to focus on a vision of a partial reality.

6         I mean, you know, there is a problem with the

7    creation of reality by video that it gets shown to you so

8    many times that you think that all the relevant, world time

9    events are contained in that video.  You begin to think I'm

10   sure that since the first time you saw Mark Richardson was

11   at 1:00 in the morning, then in truth that's the first time

12   that he went into that building when you have no rational

13   basis to make such a decision.

14        Critical and unfair inferences get made by that

15   strain of the directors's cut.  He doesn't have the bag

16   Wednesday he first goes in; but what's the time he first

17   goes in and it doesn't just affect the bag.  It's not about

18   the bag that I'm wasting your time.  It's about a much

19   larger issue.  It's not just about a bag.  It's about who

20   was in the house when the killing began.

21        I mean I hope you all get the gist of what the

22   Prosecution was trying to prove here with all that

23   extraordinary -- it is extraordinary video, Viper footage.

24   They were trying to show not only what Mark Richardson was

25   like -- we see that also.  Great.  They were trying to show

1    something else; that it had to have been only two people
2    inside that house.  It's Hall and it's Richardson and nobody
3    else.

4            See, that killing must have been done by two
5    people clearly.  It is too much for one and nobody else was
6    there; so it must have been these two, those two Hall and
7    Richardson acting in concert.  Who cares whether we know who
8    did what -- acting in concert together just those two in the
9    manner the Judge will define; and if it's only those two,
10   then it must have been those two and there is no escape
11   valve in that house -- not in reality -- for
12   Mr. Mark Richardson.  You are in for a penny.  You are in
13   for a pound, buddy.  It was you and your buddy and nobody
14   else.

15           It took two and it's only him and you who were in
16   the house.  You are in for it now.  You tell us there was a
17   guy named Johnny who began the real violence against
18   Helen Abbott.  We are going to take your fictitious
19   invention of a third man right out of this case.  Forget
20   your bull crap, Richardson.  We got the video to prove what
21   we know.  See, we got four.  We got the four possible guys
22   and the interns to watch them.

23           We got four guys and that's the universe of
24   potential perps.  We got four guys and we got names for each
25   one.  We got Mark Richardson.  We got Anthony Hall and we

1    got Hoody and Mr. Umbrella; and if we could eliminate two,

2    there is only Mark Richardson and Hall left in the apartment

3    with Helen Abbott still alive; and we are not simply going

4    to suggest this says the Prosecution proved it to you beyond

5    a reasonable doubt and crush Mr. Richardson and reduce his

6    lawyer to futile crocodile tears.

7          We have interns and they know what they saw; and

8    what they saw leads us no doubt in comes Umbrella and

9    Umbrella then leaves. In comes Mr. Hoody but Mr. Hoody

10   leaves too.  In fact, he leaves with Mark Richardson when we

11   know Helen Abbott's still alive; so it's proven beyond any

12   doubt that it's only Mark Richardson and Helen Abbott who

13   were there in the apartment at the cold killing time; but

14   where do they get this notion from that if they can

15   eliminate those two people, if they could eliminate Hoody

16   and Umbrella, then no other perpetrators can possibly be on

17   the scene.

18         You know, I don't really know.  I don't really

19   know but I get a sense that the Prosecution got this notion

20   from something the defendant said and they got pushed into

21   an evidentiary distortion by both relying, God knows why, on

22   something he says and on a misreading of something

23   Mark Richardson said.

24         Like they were trying to understand the

25   defendant's logic -- a difficult enough task in itself --

1    and then thinking that they understood it and could then

2    show that they could eliminate the existence of Johnny right

3    out of the case, cause the Prosecution seems to have found

4    itself in an odd position as if given the very likelihood

5    that given what we know about Helen Abbott's apartment that

6    men stayed there all the time; and that's why they would be

7    surprised to learn that one of them might know Hall, who

8    lived on the floor below, and be confederate in this God

9    awful crime.

10          Given what we know there was, in fact, DNA of

11   other people on one of her breasts.  Given the objective

12   likelihood that there could have been a third person in the

13   apartment, we have to eliminate the possibility that that

14   likelihood is right cause if the likelihood remains right;

15   if there is a reasonable inference that there was, in fact,

16   a third man in that apartment, a Mr. Johnny, then my God,

17   Mark Richardson may just not be guilty.

18          Oh, we can't have that.  So the Prosecution is

19   taking as the jumping off point what the defendant says,

20   tries to eliminate the third person.  It's absurd in so many

21   ways.  Fine, you want to beat him down.  Okay, beat him down

22   clearly but unavailable logic, don't beat him down by

23   creating a distortion of the appropriate video and how many

24   times to examine it because the very unfairness of that

25   attack leads credence to the notion that, hey, maybe there

1    was a third man in that apartment.

2            After all you know, guys, it's really weird what

3    the defendant says not just once but twice and I'll be

4    damned if I could figure out why he would make this part up.

5    I mean I know why Mark Richardson has a motivation to want

6    to put another person there even if there was no other

7    person.  That we can all figure out.  I get that; but why

8    does he say in the conversation that it's the detectives who

9    first spoke about it cause, listen, to what he said to

10   Donna Torres.

11           And remember I asked Detective Donna Torres about

12   it in the phone call he says -- Mark Richardson says

13   referring to the February 5th meeting between him and the

14   detectives, he said you guys said I was with someone named

15   Anthony and Whitey.  Not that the defendant had said it to

16   them but they had said it to him.

17           Now I am sorry, I can't figure out a reason why

18   Mark Richardson would have made that up in a conversation

19   with Detective Torres.  Then four months later when he talks

20   about it again he says, listen -- these are his words.  They

21   are up there.  I can't get in the house without Anthony.  We

22   went back in the living room.  He started showing me

23   trophies of basketball trophies of his sister and him, this

24   and that and the other.

25           As we were leaving he grabbed the beer and drank

 1   the beer.  Before that occurred this other guy, I don't know
 2   him, but I guess they heard -- he says glancing at the
 3   detectives who were there in the room -- that this guy was
 4   on the elevator.  He told them he was coming up to his
 5   house.  He was telling them that I am going up to momma's
 6   house.  Yeah, I will be there in a minute.  I am just
 7   backtracking and going back forward again.
 8            DA said, so Anthony said I'll be there in a
 9   minute.  Yeah, I'll be there in a minute.  We go upstairs
10   through the elevator.  He knocks on this lady's door on the
11   twelfth floor.  She opens the door.  Let's us in.  He
12   introduces me.  Oh, this is momma.  Momma, this is my man --
13   uh, uh, uh -- and I am walking past their kitchen.  The guy
14   Johnny sitting up there.  He is smoking.  She is back in the
15   kitchen.  I go sit in the living room and on and on.  What's
16   going on here?
17            Is Johnny the same guy who was in the elevator?
18   Is there some cogent reason to think that?  And then think
19   that if we can eliminate the guy in the elevator from being
20   around, we could then show there is no Johnny that could
21   have been in the house.  Is Whitey who the detectives were
22   talking about, is he the guy had was in the elevator but a
23   different guy from the Johnny who was up in the apartment?
24            Is Whitey the guy who the detectives knew his name
25   was actually Johnny and is he the guy who ended up being the

1    third guy in the apartment?  I don't know the answer.  It

2    certainly seems reasonable to infer that there was a third

3    person there; not because the defendant said it; not merely

4    because of the DNA under her nails of Male Donor C, who is

5    not Anthony Hall nor Mark Richardson, but because these

6    seasoned detectives who were investigating this case

7    apparently had reason to believe it themselves.

8         Now it's even more complicated.  I mean it is

9    really complicated.  I've got to tell you because it's clear

10   that the defendant is not talking when he describes running

11   into this person on the elevator.  He is not talking about

12   an event that's on any of the video clips that have been

13   shown to you on this jury.

14        When he talks about going up to Helen Abbott, how

15   long is he talking about; a time he apparently goes up which

16   isn't reflected in the video you saw?  Well, that makes

17   sense.  Why should it when the video collection for some

18   arbitrary reason starts at midnight of the tenth and the

19   eleventh.  He says look, Miss DA and detectives, we go to

20   Anthony's.  He takes me to his house on the eleventh floor;

21   so it's logical to think he gets off on the eleventh and the

22   defendant says this guy was on the elevator.  Not that I

23   arrived there with this guy.

24        Like you see in the clip.  So then wouldn't it

25   make sense to look and see if this clip existed to see if

1    there is a video clip on the tenth, the late hours of the

2    tenth, you know, only an hour before the clips do start,

3    which could be shown, which shows an incident like this

4    comes off with Anthony, then the guy in the elevator and

5    Anthony Richardson and the guy gets off.  I am not saying it

6    because he says it.  I am not saying believe it because he

7    says it; but don't not believe it because you find something

8    that only contradicts something that he never said.

9              He didn't say look at that clip.  That's the other

10   guy who was there.  That's Johnny.  See that guy in the

11   hood, that's Johnny; or that guy with the umbrella, that's

12   Johnny.  He didn't say look at that clip.  See that guy who

13   arrived at the apartment building with -- the guy we know

14   who left, Hoody.  That's Johnny.

15             He says, I met a guy on the elevator while we were

16   going up to the eleventh floor.  That's the guy who the

17   detectives think is Whitey.  That guy was going to

18   Helen Abbott.  When I got there, a guy Johnny was there.

19             The Prosecution spends hours and hours here

20   disproving something the defendant never said to you and;

21   thus, they will ask you to believe there was no third

22   person.  Beyond this, why shouldn't we believe there were

23   other people there?  Not primarily because the defendant

24   says it; not even basically because the defendant says it;

25   not even at all because the defendant says it -- but what do

1    we know independent of the defendant?  What do we know?
2    What does Cheryl Abbott say?

3         The short time before this murder October
4    something, December there was a guy from the building
5    staying in those back bedrooms; a guy who would have no
6    reason to show up on the video.  Big surprise he would know
7    Anthony Hall and act together with him and another guy in
8    the building.  Another great character.

9         Why do I think it is a hundred percent absurd that
10   more folks than Hall and Richardson weren't in that
11   apartment?  Because we even see that, that people are coming
12   in and out of the building who are never identified, because
13   Dimuro says it -- the detective -- that, that apartment,
14   that was active 24/7 and that she would have people who
15   would come to stay there for sex, to use drugs, for
16   whatever.

17        The DNA says it.  It's two people's DNA on the
18   right breast.  Not Hall and not the defendant under her
19   nails.  Why arbitrarily eliminate this third person?  Why
20   this visceral need, this compelling need to get the third
21   man out of the case?  Why?  Because, otherwise, the jury
22   might find Mark Richardson not guilty of felony murder.

23        So what?  Then the chips fall where they may.  I
24   am going to go back to the video for a minute because you
25   see the defendant says something else that can certainly

1    turn back against him.  The defendant says, you know, I am
2    telling you folks in his great story all this happened in
3    this little short period of time, you know, around the time
4    when he says he went in for the last time.

5             Remember?  And then comes out and sees the blue
6    coated cops, so we know when the end is.  He says -- listen
7    in his statement -- I went in with Anthony and I met a guy
8    in the elevator and pretty soon after that, I left after the
9    whole thing happened; and then went down and saw the blue
10   coated cops.

11            I only went into that building one time and this
12   stuff happened right then.  Yet we know that's not true.  We
13   know he went into the building multiple times.  We know he
14   didn't go into the building the last time, the time before
15   he leaves forever with Anthony Hall; that he didn't meet
16   anybody on the elevator the last time.  He went in by
17   himself.  It's there on the video.

18            The last time he went in with Anthony was one in
19   the morning; and it's clearly in his statement not that 1:00
20   a.m. entrance that he is talking about when he talks in the
21   video cause in that 1:00 a.m. entrance, he is meeting a guy
22   outside the door and he was already arriving with Hoody.

23            I mean just get us January 10th and maybe we can
24   make some sense out of this all.  I mean it is so bizarre.
25   What do you know now according to the prosecution?  Use

Mark Richardson's own words against him to show there is no
third man.  Use an account of an act that is never reflected
in the video clips.  Pretend that it was, in fact, reflected
in the video clips; and then show if we accept that
illogical supposition, then we can eliminate any third man.

I mean I don't want to demean my opponent here.
He does his work well nor cast any doubt on the value of the
work done by his interns and staff and not say the video
doesn't have it's own value in aiding us to figure out what
must have gone on here; but what is so clear that maybe
Richardson is either intentionally making up a story about
the circumstances of his entries into that building, or
unintentionally conflating months later as he tries to
recall it; at least four different entries and presenting it
all as one.

Then the lack of logic in his recounting makes it
impossible to use a supposed logic to attack the notion that
a third man was present.  Supposedly, the Male Donor C's DNA
it's just there.  I know we would all like to say it must
have been Mark and Anthony all up at that death scene; but
we can't artificially pull and push at evidence to get to an
arbitrary yet desirable result.

If the real possibility exists, the likelihood
that there was a third man and it makes it all the more
difficult to understand what really did occur up there at

1    that time, then you draw the necessary conclusions and come

2    up with appropriate verdicts.  We can't reshape reality

3    merely to insure that we feel justified in condemning that

4    man that the police have apparently not been able to

5    definitively do.

6            You have the man they thought was Whitey; but may,

7    in fact, had been Johnny and that they have arrested

8    Richardson and are still hunting Hall.  Does not mean that

9    these two -- Hall and Richardson -- are necessarily the only

10   two actors of relevance to an understanding of this case.

11           That's just the way it is and no video montage can

12   change that reality.

13           Finally, it is obvious we need to consider the

14   other crime scene and scientific evidence to evaluate its

15   contribution to our need to comprehend what actually

16   occurred in that apartment on the afternoon in question.

17   Does it help us to understand what did occur in those rooms;

18   or only emphasize the lack of clarity about what went down

19   at that time and in that place?

20           The Prosecution in voir dire reasonably forewarned

21   us that we should anticipate no miracles from any forensic

22   crime scene results; that forensics would never give us the

23   answers to everything that might be helpful to know; that

24   there was no TV-like science that could demonstrate every

25   move that Mark Richardson made that terrible afternoon; and

1    that certainly makes sense and proof beyond a reasonable
2    doubt does not demand that you be able to track
3    Mark Richardson's every move.

4            It only commands that the crimes themselves and
5    who did them be proven beyond a reasonable doubt; but the
6    Prosecution also assured us of something that we would be
7    given enough facts, enough proof to know the answers to the
8    pertinent questions that are at issue here and will not be
9    dissuaded from asking the relevant questions.

10           Telling us that we cannot get the answers to
11   everything to what we need -- to everything we might want to
12   know can't lead us to thinking that we have necessarily been
13   provided with enough information to make the critical
14   decisions.  Telling us that we cannot expect to learn
15   everything we might like to know shouldn't influence us into
16   accepting the notion that, well, what you see is what you
17   get; and that's just the best that can be offered to a jury.

18           If the answers that are provided in this case by
19   the modern science of crime detection, video, phone tracking
20   cell towers, fingerprints, physical fit, DNA are employed
21   together failed to provide the relevant and necessary
22   information we need, then we can't simply say it's our fault
23   that we came in with a false set of expectations and blame
24   ourselves because we believe that answers would be provided
25   that simply were not.

1      If all of that science doesn't give us the

2  relevant information, we don't now turn against ourselves

3  and assume that we've been conditioned by TV to expect too

4  much and, thus, lower our own reasonable expectations and

5  there is more.  Cause there is a pernicious effect here that

6  would influence us all when faced with a failure of

7  scientific proof.

8      If all that we get are the meager results that we

9  get here, we cannot somehow now lower the burden of proof

10  based on some notion that they did the best that they could;

11  and so we must convict him on what's been provided in the

12  courtroom because that's all there is.

13      We don't turn it around.  We don't flip it against

14  the person on trial and say, well, I mean proof beyond a

15  reasonable doubt can't demand that we be given answers to

16  the questions that weren't answered here.  We don't lower

17  the burden in a criminal case saying they did what they did.

18  We step back.  We pause.  We reflect and we decide.

19      Is it really enough to know that Mark Richardson

20  was there and lied about it and went in and out and in and

21  out and in and out and in and out?  That he sweats; that he

22  wipes sweat on his way in and on his way out?  That he's all

23  hepped (sic) up at times and at times more relaxed?  That he

24  cares less about what happened to Ms. Helen Abbott; that he

25  leaves his sweat or saliva on some part of his (sic) breast,

1      his own semen contribution mixed with Helen Abbott on the

2      floor in a room used for sex; his prints on a broom and that

3      he clearly uses her phone.

4              Three and a half years after this crime was

5      committed, two and a half years after the arrest of my

6      client, the Prosecution itself was apparently asking for

7      more testing, obviously concerned that what they gathered

8      might not be enough to insure a verdict of guilt, that that

9      their answers to their continued concerns turned up knowing

10     that implicates Mark Richardson but only gave us the DNA of

11     a third man under Ms. Abbott's nails tells legions about

12     what remains known or unknown about what actually occurred

13     and warns us not to ignore the relevance of the very

14     questions they themselves were still trying to answer.

15             Let's see what is proven.  What leads us adrift?

16     The broom, what do we know?  What do we know about the

17     broom?  We have no idea of how or why it got where it is.

18     Oh, yeah, we could make it sound guilty.  It is not hard.

19     We can create a scenario where he must have used it to

20     threaten Ms. Abbott or clean up the blood even if there is

21     no blood on the broom and that it wasn't actually used in

22     the ultimate assault.

23             After all it ends up a feet -- on a bed just feet

24     from her body.  Is that the logical way to view it and to

25     connect it with the rest of the proof in the case because

1     the specter of the broom seems so terrible and ghastly

2     situated as it is just feet from a dead woman's head?

3              Good.  They finally got around to examine it for

4     blood even if not done until long after Mark Richardson was

5     arrested; but the lack of any blood on it does make you

6     wonder if it had anything at all to do with the crimes that

7     were committed.  I mean it looks so bad there though.  It

8     looks so bad.  There is her body.  There is the wallet and

9     there is the broom.

10             Look at the crime scene photo that is shown to

11    you.  Apparently, the broom's even on top of the wallet so

12    whoever touched it must have put it there after rifling

13    through the wallet but we know that's not true.  If the

14    picture shows that, then we are just getting a misfortunate

15    distortion because a cop -- PO Fabrizi -- picked up the

16    wallet and threw it back on the bed; and what we see in that

17    photo can't be; but a print is found on it, a clean print, a

18    good one, an undeniable one.  It means he touched that and

19    that originally seemed to be a damning accusation in itself.

20             Sure other people could have touched it.  Someone

21    else could have touched it after he did but why is his print

22    the only one that's found?  Sure, he could have just touched

23    it.  Could have been lying around.  I mean you know it

24    wasn't everywhere.  It could have been placed -- it wasn't

25    in the broom closet because we know the place was a mess;

1    but still why is it only his print the only one that's

2    found?

3          But then we learn something in here.  We learn --

4    we can reach unfounded conclusions unless we understand all

5    the science and we learn something new in a very undetective

6    way.  We get the necessary education not from the man who

7    recovered the broom who got the seeming link, inculpatory

8    print; but instead from another person who had nothing to do

9    with that critical find.

10          It's the NYPD lab criminalist, the woman who

11   actually teaches us something critical about the leaving of

12   the prints.  It's the lab criminalist who examined it, the

13   lab technician who comes in and informs us -- what does the

14   criminalist who examines the lamp comes in and tells us?

15   While speaking about the lamp, while I am sure making each

16   one of you to think about the broom that was found, she

17   explained why people sometimes leave a print and why they

18   don't.  Why they do and why they don't.

19          She explains that if you simply -- simply as you

20   inadvertently touch an object, there is a greater likelihood

21   of leaving a readable print than if you picked it up and

22   hold it, hold it tightly like in anger.  If you grab it

23   tightly as you would, of course, if you were using it as a

24   threatened weapon, then the ridge lines she told us they get

25   mushed together and tend to leave an unreadable print; and,

1       thus, whoever grabbed that broom and tossed it up on the bed

2       is less likely to have left a print than the man who simply

3       touched it yet never employed it as anything at all.

4                    It is even bigger that testimony than the.

5                    Relevance of the broom alone.  You know what it

6       does?  It kind of says something to us, warns us don't jump

7       towards any untoward conclusions just because some piece of

8       evidence seems to intuitively push us towards a judgment of

9       nonguilt or guilt.  She informs us of avoid thinking you

10      could easily infer guilt or innocence from a piece of

11      forensic evidence unless you truly understand all the

12      scientific science for why evidence can be found and not

13      found on any object that's recovered, and what the finding

14      and not finding of evidence really means.

15                   The fact that Mark Richardson's DNA isn't on that

16      lamp doesn't prove he never held it.  That his DNA is found

17      on a breast doesn't mean he had violent, physical contact

18      with her either.

19                   Listen, I want to be crystal clear about

20      something.  I am not saying that every exam under the sun in

21      my examining questions, every exam under the sun has to be

22      done in any case; that we need an invention of some kind of

23      a new forensic tool like a microchip implanted in that guy

24      so we could figure out exactly what he did or that you can't

25      find guilt simply because a test you would like to have seen

1   done wasn't performed.  I get it and I got it.

2           We have got to go back at the beginning of the

3   case.  It's like when that crime scene guy came in and said

4   he was confronted with this huge mass of stuff.  What did I

5   say to him?  You can't collect everything.  You do the best

6   that you can.  With a huge mass of possible evidence you've

7   got to chose what might seem relevant.

8           Sure, you would like to collect everything but who

9   knows what's really going to turn out to be relevant once it

10  gets to the DNA place.  I am not complaining about that but

11  I do have a wonder.  It's about the lack of testing on stuff

12  that they did recover.  I mean they recovered the homicide

13  clothing.  It's there with the body, removed under

14  appropriate care by a medical doctor.

15          We then learn they developed DNA techniques that

16  could see who touches the clothing.  They've got a technique

17  that could give us some answers.  Why wasn't this done?  The

18  Prosecution tries to get the High Sensitivity guy, remember,

19  Mr. O'Connor to say who knows if we would have gotten useful

20  results.  Maybe the clothes would have been too bloody to

21  give us a reading of someone else's DNA.

22          Yet sure, sure, that's true but I asked about

23  those clothes about the very condition of those clothes to

24  people who saw them, not Mr. O'Connor who never saw the

25  clothes.  I asked Ms. Philipps -- you know, my one real

1      friend in this courtroom, Ms. Philipps -- about the

2      underwear.  She told us that some parts were bloody and some

3      parts were not.

4            I asked Detective Dimuro about the condition of

5      the clothes that he saw when he got to the crime scene.

6      Remember?  He said -- he described the sweat shirt as bloody

7      while giving no such description of the other clothes

8      Ms. Abbott was wearing.  For God's sake, they even in 2011

9      for who knows what reason do examine a piece of clothing.

10     They examine a hat; a hat that was found in the living room.

11     Maybe hoping to find Mark Richardson's DNA since he claims

12     to have been in the living room before the violence

13     occurred.

14            Fine.  Good.  Dandy.  Do it.  More power to you

15     but yet why not examine the very clothes that were relevant

16     to the case because these were recovered on the People's

17     body.  Who pulled down the underpants?  Who grabbed at her

18     bra and left her like that on the floor?  Answer those

19     questions and then ask for your verdict.

20            I am not asking that more be collected but that

21     simply what's collected is dealt with appropriately.  Look,

22     everyone knows the lamp and the cord are critical to the

23     case.  The District Attorney's Office tells the OCME group,

24     the forensic biology, that they think the cord was obviously

25     used to strangle Ms. Abbott and the cord was obviously taken

1   from the lamp.  We didn't need physical fit to show us that.

2   We get it.  Let's examine the cord and the lamp to find out

3   who held the weapon.

4           I asked Crime Scene Detective Hernandez --

5   remember weeks ago -- tell me about the cord when you got

6   there.  You could see it in the pictures.  Parts of it were

7   bloody and parts of it appeared not to be bloody.  That's

8   what he says.  Listen, I get it.  Parts were too bloody.

9   The cord ends were swabbed and showed nothing of any

10  relevance to this case and to this jury; but the cord

11  mixtures showed a mixture of Ms. Abbott and a minor

12  contributor.

13          Is it really so silly at that point to think about

14  let's try again and see what else you could find?  Is that a

15  notion that deserves to be dismissed with Ms. Philipps --

16  Ms. Philipps' expert testimony; and the plot only thickens

17  when I inquire some more.  Remember the questions I asked

18  Ms. Philipps I believe she courteously answered?

19          If I get an object along with a swab, you want to

20  process that swab in addition to doing your own?  I think at

21  some point she finally did say, yes, to that cause the first

22  swab may have recorded the relevant DNA, right?  You

23  certainly wouldn't ignore it, right, because it could have

24  the critical stuff, which a second swab would then miss; and

25  I then asked if she didn't receive a swab with the cord --

1      cause we know that the cord did get swabbed by the medical

2      examiner as he did the autopsy.  Dimuro was present.  He is

3      the one guy who was present and assures us it did.

4             Not only did the medical examiner swab those

5      breasts -- Dimuro assures us -- but there was another swab,

6      a swab taken from the cord by the medical examiner.  Why is

7      it never taken down to the DNA lab?  I don't know.  Your

8      guess is as good as mine, but I don't think the fact that it

9      never made it down there, that it didn't exist.

10            Remember what Ms. Philipps said about the cord;

11     that it had to be tracked down to find it.  We had to send a

12     detective after it because it hadn't been sent down with the

13     rape kit.  It was transferred, a routine bureaucratic

14     transfer, and something gets lost in the shuffle.  Something

15     was a little awry and a critical swab gets lost in the move.

16            What do we say about that?  We shouldn't expect

17     too much from OCME, or just assume that the swab would have

18     either said nothing or implicated Mark Richardson too or

19     presented more proof of the acts of the third man.  Giving

20     us the results of the swab, that swab would ask for your

21     verdict.

22            The lab itself seems to be in the middle of a

23     farce.  You heard it.  The lamp was first dusted by Crime

24     Scene for prints although we learned that dusting could

25     actually destroy prints and that thing wasn't going to have

1       prints anyway.  None was recovered.

2               After that, we then bring it to the Police Lab.

3       By the time it arrives there, it is already broke.  She,

4       however, tries to dust it again now using super glue but

5       knowing that this can destroy DNA swabs, swabs before, of

6       course, we learn that swabbing for a touched item is a

7       delicate operation best done by the special OCME swabs that

8       Crime Scene apparently doesn't use, but they swab and get

9       S-1 and S-2.

10              Again there is one part that's never swabbed

11      because it's in an envelope.  The thing then goes to OCME

12      where it has now gone from four pieces in the bag to a

13      mysterious ten.  They are told listen, guys, we think

14      someone either really held this.  This is critical, so let's

15      try again to swab it where it's held.

16              Of course, they are never shown a picture, which

17      would have shown them where to look, what the lamp actually

18      looked like when it was held back at the crime scene.  More

19      importantly and seriously, what do we do with Male Donor C

20      whose male DNA was found under her nails?

21              You heard the evidence.  What's under the nails

22      can be terribly relevant.  As a matter of fact you heard it

23      argued both ways.  Even this argument about how this piece

24      of evidence sheds its own light on this matter.  No doubt

25      about one thing, that's one area of the body on which

1    special precautions are taken, obviously, precisely because
2    this evidence may be crucial.
3             Nails are carefully scraped by the medical
4    examiner.  Three years later the work is finally done with
5    the obvious hope on the part of someone that the work will
6    finally prove that man's irrefutable guilt; but what's
7    really critical -- subtle but critical -- is that they
8    already know when that work was requested that there were no
9    so called defensive wounds on that woman's hands.
10            I mean think about the chain of events here.
11   Autopsy is done on January 14th, the day after this crime.
12   Those pictures of her hands with no injuries on them are
13   taken on that day; so it's already known back then that the
14   state of her hands shows that she may not have been able to
15   make a physical defense to the man or men who attacked her
16   yet the analysis of the scrapings is done anyway three years
17   after the crime because it's so critical to the case.
18            It's so critical that it's the one piece of
19   evidence -- the one and only one that when regular DNA can't
20   come up with a result is sent upstairs to the real
21   specialized DNA folks; and then when the result doesn't
22   support a conviction, an attempt is made in this courtroom
23   to tell you that the result really has little relevance at
24   all.
25            The DA asked the medical examiner, don't you often

1   see defensive wounds when someone is attacked?  Yes, of
2   course.  And isn't the lack of injury consistent with
3   someone not being able to fight back?  Yes, of course.  And,
4   thus, we are told whatever is found under her nails probably
5   did not come from the incident cause if it did, then she
6   would probably have defensive wounds too because if she was
7   clawing at the guy who attacked her, then we would expect
8   she would also have wounds on her hands.
9         So who cares whose DNA is found under her nails?
10  But they knew there were no wounds when that examination was
11  ordered.  Yet they ordered them anyway thinking it would
12  provide relevant results.  If the thought was that it might
13  yield relevant evidence, why is an attempt made now in this
14  courtroom to diminish the relevance of evidence when it
15  yields unhelpful results for the very people who asked for
16  the test.
17        And even here, you know, it's like with the broom.
18  It is really like with the broom and the video clips.  Its
19  bigger, bigger than any piece of evidence alone.  Again we
20  are pushed to consider issues larger than just the piece of
21  evidence.  There is more at stake.
22        (Transcript continued on the next page.)
23
24
25

SUMMATION/DEFENSE

1   T-3 - Peo. V Mark Richardson, Ind.#3534/08

2   September 26, 2011:

3             MR. KLEIN:  This is all we seen, just

4   objectively presented, or have we been pushed to see evidence

5   through a lens that tends to distort it all towards guilt?

6             The district attorney may tell you, it's really quite

7   simple, this whole case isn't so complicated, just take Mark

8   Richardson's own statement, just believe enough of it, and find

9   a version of guilt about what he says, even though he may be

10  hiding more, it must be at least as bad as he says, so just go

11  with that and convict him based on his supposed true

12  confession.

13            It's tempting.  After all, after all he said, who

14  would blame you if you convict him on what he uttered with his

15  own story and we take an easy short cut, forget all the

16  conflicting evidence, forget the sense, just go with the

17  momentary suspicion of disbelief.  Pass upon judgment

18  concerning the fine mental implausibility of his narrative of

19  his story and convict him simply on what he does say.

20            I guess, you know, doing that and using it to convict

21  him would certainly be a good example of the concept of poetic

22  justice.  While I wouldn't dignify Mark Richardson's statement

23  with that much reliability, perhaps the DA will and try to

24  create a scenario of guilt based on Richardson's own words

25  alone.

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

```
 1              But even there if you do that you are going to run
 2    into problems.  The Judge is going to instruct, you think it's
 3    complicated, the Judge is going to instruct you on something
 4    called "affirmative defense" to felony murder and you will have
 5    to consider it if you want to credit Richardson's own words.
 6    If you want to believe what he says then you believe what he
 7    says.  But on those words alone it doesn't appear that he
 8    participated in nor anticipated the violent attack and that's
 9    what the felony defense to felony murder basically discusses as
10    the Judge will instruct you.
11              If you want to listen to his words, if you want to
12    put credence into Mark Richardson's own words, God knows why
13    you would, but if you do, then you will also have to consider
14    the charge of Robbery in the First Degree that the Judge is
15    also going to give you to consider the idea here being that
16    maybe Richardson was acting alone in his attempt to steal Ms.
17    Abbott's money.
18              I guess if you are going to listen to his words then
19    you will listen to his words.  He comes back into the kitchen
20    during this ongoing dispute, not his dispute, a different
21    dispute between Ms. Abbott and Anthony Hall, with Hall's
22    behavior, witnessed by Johnny, Hall banged her in the frig,
23    Richardson pushes them apart, magnanimous as he always is I'm
24    sure, and takes what he believes as peace maker, just his own
25    money.
```

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1        In this account Ms. Abbott resists, Mark Richardson
2  pushes her off, and that pushing her away turns a simple
3  larcenous taking into a robbery, as some sort of physical force
4  is employed.
5        Yeah, then Johnny jumps in, not Mark Richardson, as
6  he's going out the door, not to assist Mark Richardson's
7  attempt to flee with what Richardson thinks he has an able
8  right to take.  Johnny pushes her back so that he and Hall can
9  continue their own escalating drug driven assault.
10        What can I tell you.  I wouldn't credit Mark
11  Richardson's words but if you want to I guess it's not right to
12  pick and chose and then you convict him of Robbery in the Third
13  Degree.
14        Listen, I'm done, and I know it's a very unsatisfying
15  ending, and I hope I am not being presumptuous if I say that I
16  have a vague sense of how you all must be feeling, my
17  discussion of the evidence leaves us all in a very vulnerable
18  spot.
19        I am not telling you my client is not guilty of a
20  crime.  Yet, I also think it would be inappropriate to even
21  come close to conceding his guilt of these charges, not on this
22  evidence.  Because whose really so sure?  Who knows what really
23  went on in that house?  What is it that Mark Richardson is
24  truly guilty of?
25        But do we find a man not guilty and remain in the

Glenn J. Merola, Sr. Court Reporter

SUMMATION/DEFENSE

1   dark?  Do we not bring a definitive answer to the Abbott

2   families justified need to know?  Can we really endure that as

3   a final conclusion?

4           And isn't the evidence here enough to show that Mark

5   Richardson is probably guilty.  Yet if he's probably guilty

6   then maybe he's not.  Do we acquit a man when that's where we

7   come down at the end?  Don't we follow our laws even in a

8   matter of such utter destruction and deadly.

9           Thank you.

10          THE COURT:  And thank you Mr. Klein.

11          Ladies and gentlemen, we'll take a short recess.  You

12  have been sitting there for awhile but then we'll get to Mr.

13  Bogdanos.  I am going to ask all of you to step outside for a

14  few minutes.  Please do not discuss the case.  Thank you.

15          (The jury is excused and exits the courtroom.)

16          (Short break was taken.)

17          THE COURT:  Okay, both sides ready?

18          MR. BOGDANOS:  Yes.

19          MR. KLEIN:  Yes.

20          THE COURT:  May we have the jury, please.

21          (The jury enters the courtroom.)

22          THE COURT CLERK:  Case on trial continues.  All

23  parties are present.  The defendant is present.  Jurors are

24  present.

25          THE COURT:  Thank you very much.

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1          Ladies and gentlemen, Mr. Bogdanos is next.  For

2    obvious reasons I would like to go past the one o'clock hour if

3    necessary so that we can finish his summation but then take a

4    break for lunch and after lunch we'll have the charge.

5          So, Mr. Bogdanos, the floor is yours.

6          MR. BOGDANOS:  Thank you.

7          Not precisely when.  But who?  Not exactly where.

8    But who?  Not even particularly how many, two or three, but

9    who?  And, ultimately, not even exactly how, but who?

10          If mark Richardson had Helen Abbott in a choke hold

11   while other, or others, stabbed and searched for money, he's

12   guilty of the charges in the indictment.

13          If Mark Richardson searched for money while others,

14   or other, or others, choked and stabbed, Mark Richardson is

15   guilty of all the charges.

16          And if Mark Richardson stabbed, while Anthony Hall

17   searched, and Male Donor C choked, well then, Mark Richardson

18   is guilty of all of the charges.

19          It is just that simple.  And simply because we're in

20   a court room, and we have a prosecutor, and a defense attorney,

21   and a Judge, and a court reporter, doesn't mean it has to be

22   more difficult.

23          It doesn't mean you have to engage in any arcane

24   processes and take out every possible outcome.  It doesn't mean

25   you have to adopt any kind of process that you don't use in

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1    your daily lives.

2           I asked you at the beginning, and I ask you now, when

3    you come into this courtroom, bring your common sense, your

4    knowledge of the world, and your fundamental decency to bear.

5           Nothing has changed.  But in order for the case to be

6    as simple, as I submit to you it is, as we walk through the

7    evidence there is a catch, a secret if you will, you must rely

8    on the evidence and what you may reasonably infer from the

9    evidence, on that, and on nothing else.

10          You must set aside all manner of irrelevancies that

11   have nothing to do with the evidence.  Speculation, conjecture,

12   have no place in the jury deliberation room.

13          Well, what would have happened if such had been

14   done?  And where would we have gone?  And who would have

15   known?  And how big would that person have been?  These are all

16   inappropriate questions.  What ifs.

17          Every time in the jury deliberation room a fellow

18   jurors says:  What if?  You're doing a disservice to your oath

19   and to the system.  So I urge you to follow your oaths, your

20   conscience, and your duty, and do exactly what you told us that

21   you would do, which is follow the evidence and what you may

22   reasonably infer from the evidence.

23          I stress this up front because there are really two

24   ways you could approach this case.  The first, and certainly

25   the easiest, is we're never going to find out what exactly

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1   happened in apartment 12E on January 11th.

2          It's just to complicated, to difficult, and so you

3   could just say, since I can't find out everything, I don't have

4   enough.  And you could go back and you could talk among

5   yourselves and you could say, yeah, you know, Mr. Klein is

6   right, he's probably guilty.

7          But probably isn't enough.  I mean I wanted to

8   convict but it's not enough because I wanted the DA to have

9   more.  I wanted more.

10          Okay.  That's fair.  What would more be?  I am

11   curious, what would that more be?  This is murder!  The only

12   witness is dead!  That's how it works in murder.  You kill the

13   witness.  That's what happened here.

14          And, so, if you require some kind of clarity as to

15   precisely what happened in that apartment, and how it happened,

16   aren't you, in effect saying, well, I guess that's just the way

17   it is with murder.

18          Aren't you, in effect, changing the law?  Aren't you,

19   in effect, changing the burden of proof?  Aren't you, in

20   effect, rewarding those who commit sexual abuse, or those who

21   commit robbery, and have the good presence of mind to kill the

22   only non participants, haven't you just said, well, there you

23   go, there's the perfect crime, kill the only non participant in

24   the sexual abuse or robbery.

25          I will assume, of course, that you will not do that

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1  in this case because you promised you wouldn't.  You promised

2  you would follow your oaths and you would require the People,

3  put the People to the burden of proof, of proving beyond a

4  reasonable doubt.

5          And, ultimately, if you look at it all, as Mr. Klein

6  has indicated, there are five charges in the indictment, his

7  Honor is going to read you the charges, not my place to do so,

8  but you have already heard them.

9          Briefly, it's Sexual Abuse in the First Degree, two

10  counts of Robbery, Robbery in the First Degree and then Robbery

11  in the Second Degree, you will also hear about Robbery in the

12  Third Degree and, finally, Murder in the Second Degree, felony

13  murder, as Mr. Klein accurately stated.

14          I submit to you that there is a fundamental way of

15  addressing the case you have before you and given the posture

16  of the case and the nature of the charges and the nature of the

17  events here, really there are three questions that I submit to

18  you need to be asked and answered.

19          And the first question is, did the defendant, acting

20  alone or with others, commit Sexual Abuse in the First Degree.

21  In other words, did he subject Helen Abbott to sexual contact

22  by forcible compulsion.  Did he touch an intimate part of her

23  body without her consent by force.

24          Well, we know that he touched her.  We have his DNA

25  on her left breast.  We have either saliva or sweat on her left

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1   breast.  Mr. -- So that's a done deal.  We got the sexual

2   contact.  So now the only question is:  Was it by forcible

3   compulsion.

4          Mr. Klein would you have you speculate:  Well, just

5   maybe, umm, it was consensual sex going on between Ms. Abbott.

6          And Mr. Klein -- Really?  Really?  You know I read

7   every page of the transcript over the weekend.  I couldn't find

8   a single page, not a single question, not a single iota, not a

9   single scintilla of evidence suggesting that there was anything

10  consensual about Helen Abbott's life ending sexual encounter.

11         What about this strikes anyone as -- Yes, I'm sorry,

12  I told you before this isn't social work -- What about this

13  strikes anyone as anything as consensual?  How is this

14  consensual?  How does this not speak volumes about forcible

15  compulsion?

16         So, let us put aside speculation and conjecture of

17  about, perhaps, maybe, I think, it could be, possibly, that

18  they had sex and it was consensual.  The evidence tells you

19  otherwise.  The evidence tells you that there was nothing

20  consensual about this.

21         So, frankly, the Sexual Abuse in the First Degree,

22  straight forward.  I submit to you that the evidence on sexual

23  abuse you needn't spend a whole lot of time on that.  You have

24  it.  You have it before you in unmistakable detail and

25  uncontradictable detail.

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1          And in order to consider the crime of Sexual Abuse in

2    the First Degree, consider also the condition of her body was

3    in.  But then, again, don't speculate, don't speculate why her

4    pants were pulled down and her panties were pulled down.  And

5    don't speculate as to the semen stain, N1, that was next to her

6    body.  Don't speculate about whether it got next to her naked

7    body before she died, while she was dying, or after she died.

8          Because I said, I submit to you, that this charge is

9    really straight forward.  So that's the first question, if you

10   will, I submit, in addressing the charges.

11         The second question you should ask yourselves, again,

12   I submit is, did the defendant, acting alone or with others,

13   forcibly take money from Helen Abbott?  That's it.  Just that

14   simple.  Did he do that.  Did he forcibly take money from her?

15         What does the evidence show?  We'll cover it in more

16   detail.  But consider his own words in that regard and bring

17   your knowledge of the world to bear on why Hall was banging Ms.

18   Abbott against the refrigerator.  Why the defendant got up in

19   the middle of this assault to say:  Yo, where's my money.  And

20   ultimately he takes the money while this assault is going on.

21   Done.  Finished.  Over.  Done.  Done.  Robbery Second Degree,

22   Done.  Done.  That is Robbery Second Degree.  Guilty.

23         And then the third question.  Was Ms. Abbott killed

24   during, and furtherance of, and during the course of either the

25   sexual abuse, this forcible touching, or the robbery.  No

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

 1    matter which one of them killed her, we should be abundantly

 2    clear on this, his Honor will give you the instructions on

 3    this, if the defendant committed the robbery, or the sexual

 4    abuse, and anyone in that room killed her in furtherance of

 5    that, or immediately thereafter, as Mr. Klein accurately

 6    stated, then he's guilty of felony murder.

 7            Well, what do you know?  She's dead.  And you also

 8    know she died during the taking.  More on that in a moment.

 9    But we know there's no time pass between the taking and the

10    death.  You know that from the M.E. who told you all the

11    injuries are within minutes of each other.

12            So, you know that she's dead, immediately after or

13    during the taking of her property and so all of those

14    individuals in that apartment, two or three, are guilty of

15    felony murder.

16            And to see how truly straight forward, I don't mean

17    in any way to over simplify the case, but I am just offering a

18    different way of looking at the case so that you don't have to

19    struggle with the sheer volume of the information.

20            And to see how straight forward it is, let's go on a

21    journey together, and let me show you twelve facts that are

22    uncontradictable, not capable of being contradicted.  Twelve

23    facts that have been proven throughout the course of this trial

24    that show you why the answer to each of those questions is yes

25    and why the ultimate answer is guilty as to all the charges.

                    Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1      And I know this was a long and often tedious and
2  cumbersome trial and surely there were times you felt like the
3  guy who asked your friend:  What time is it?  And your friend
4  started telling you how to build a watch.
5      I know I gave you more DNA and telephone records and
6  video then you could have possibly have wanted or expected.
7  But now that we built the watch together let me tell you what
8  time it is.  Because we know where he was and we know what he
9  did.
10      So let's start with the first incontrovertible fact
11  and that is the video.  The VIPER video that lays out the time
12  and as you consider the time let's do this backward for a
13  moment.  We know which time the defendant is talking about.
14  Mr. Klein would have you speculate, humm, maybe he was talking
15  about December, and maybe he was talking about January 10th.
16  No.  He was talking about the time he left the building and let
17  two blue coats, uniformed officers, into the building.
18      How do we know that?  Because it's on video.  And
19  when is that?  4:50 on the afternoon of January 11th.  So we
20  know when the events that Mr. Richardson are talking about
21  occurred.  They occurred ending at 4:50 when he walks outside,
22  opened the door, and let two uniformed officers in.  That's
23  when it happened.
24      Continuing to move back.  Just for a moment.  When
25  did she die?  She was already dead.  She was already dead at

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1    that point.  Even by his own words.  Because she was stabbed.

2    And we know from the medical examiner she could not have lived

3    more than a minute or two after the initial stabbing.  No sign

4    of healing.  All of those wounds were, remember his

5    word, peri-mortem, with in one to two minutes of death, the

6    first wound to the last wound was one to two minutes of death.

7    So we know when she died.  She died Friday afternoon.

8              We know what he's talking about in his videotape

9    statement.  He's talking about Friday afternoon.  Not some

10   imaginary unicorn, like Alice through the looking glass, humm,

11   December, January, other time frame, this time frame.  January

12   11th.

13             And what do we know?  He enters at about 12:50 with

14   three people on that Friday morning, Anthony Hall and two

15   others, unidentified, never been identified to this date.  When

16   he comes in what does he have in his hand?  A paper bag.  And

17   nothing else.  And, yes, defense is absolutely right, he was

18   jacked up, he was jacked throughout the course of that time on

19   the video.

20             What do we know about the rest of the day?  We know

21   that four different times he gets off the elevator at twelve

22   and turns to the right.  Well, let's look at twelve.  Gets off

23   the elevator, turns to the right, yeah, that would be Helen

24   Abbott's apartment.

25             So we know that he at least turned to go to Helen --

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1    in the direction of Helen Abbott's apartment four times.  How
2    many times did he get in?  We don't know that.  We don't know
3    that.  The 2:15 was the first -- wasn't the first time that he
4    got in.  Right?  We should be clear on this.  He got off the
5    elevator four times on twelve throughout the course of the day
6    but we don't not about how often he got into the apartment.

7              Except, that he did tell us, that would be one time
8    and we'll show you that in just a moment.  But then he gets off
9    on each occasion at eleven.  Three times he gets off, gets back
10   on the elevator, eleven.  One time you can't tell whether it's
11   eleven or twelve.

12             And how do we know that that date is the first time
13   he had ever been to that apartment?  How do we know that --
14   how are we absolutely sure that that is the first time, that
15   Friday, just before he sees the police officers at the door,
16   the visit prior to that, is the first time he's ever been in
17   the apartment and the first time he's ever met Helen Abbott?

18             Play the Q&A please.  At 18 hours 22 minutes and 20
19   seconds into the Q&A.  Listen.

20             (Videotape being played.)

21             (Videotape stopped.)

22             MR. BOGDANOS:  He's introduced that night.  The
23   night he let's the police officers in, Friday, after January
24   11th, he's met Helen Abbott for the first time.  So all this
25   other speculation about prior events, about prior meetings,

SUMMATION/PEOPLE

1    about prior sexual contact, not only is it abject gross

2    unadulterated, unmitigated speculation, it's false.  He met

3    Helen Abbott that night.

4         So, whatever evidence he left in that apartment,

5    whatever witnesses he left to his presence, he left that Friday

6    afternoon.  And so what are, what witnesses did remain in the

7    apartment after he killed Helen Abbott?

8         Well, the prints on the broom are the second

9    uncontrovertible fact.  He left his palm print on the broom.

10   It's the defendant's palm print.  His right palm.  Had to be

11   that Friday.  Never been in the apartment before.  It's on the

12   bed next to Helen Abbott's dead body.

13        Remember, it's a clean print, no smudge, no double

14   tap.  He's the last person to touch that broom.  It's on the

15   bed next to her body.  The bed is made.  Whatever the apartment

16   was looking like that bed was made.  You will see in People's

17   24 the bed is made.  It's a little -- the cover is pulled down

18   because that's actually Ms. Abbott's body that has pulled down

19   the cover.  But look at it.  It's made.

20        So, whoever was sleeping there was doing this before

21   the defendant put the broom on the bed.  Before the defendant

22   used the broom in the bedroom on Friday, January 11th, right

23   before she died.

24        No.  He wasn't using it to mop up the blood.  There's

25   no blood on it.  But there are injuries on her body that are

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1   consistent with this having been used.

2          We know where he was and we know what he did.

3          Moving to the third uncontrovertible fact.  It is his
4   sweat or saliva on here naked breast.  Again, had to be left
5   that Friday.  Never been there before.  And, yes, now the
6   numbers, in order for it to be someone else you need three
7   planets, 1 in 18 billion, minimum number is 1 in 18 billion.
8   So it's the defendant.  It's the defendant's saliva or sweat on
9   her breast.  Uncontrovertible.

10         Now, defense argues, well, yeah, but there is also
11  DNA on the right breast and we don't know who that was.  Humm.
12  Actually, it's not that you don't know who it is -- don't
13  speculate.  Page 541 of the transcript.

14         "Question:  Cross examination by Mr. Klein. "With
15  regard to PM2C4, the secretion on the right breast, is
16  consistent with Helen Abbott -- your results did not simply
17  state that the results of PM2C4 were consistent with the DNA of
18  Helen Abbott, did they?"

19         "No.  The DNA on PM2C4, the right breast, is
20  consistent with Helen Abbott, a minor contributor, but there
21  wasn't enough information from the minor contributor to make a
22  comparison to who could have contributed to that DNA."

23         Apparently he accident like the answer because he
24  asked it three more times, word for word, and the fourth
25  time: "There was a mixture of DNA on Helen Abbott's right

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1   breast it was Helen Abbott and another individual but there is

2   not enough information present in the mixture in order for us

3   to make a comparison."

4           So it isn't that it wasn't tested.  There wasn't

5   enough DNA to establish a profile on the right breast.  No idea

6   whose it is.  You can't speculate on that.

7           We do no whose DNA is on the left breast.  Four,

8   there is a semen stain, stain N1, for which Helen Abbott, Male

9   B and the defendant's are included.  Unlike the other semen on

10  the bed in that room, that appeared to have at least been

11  fresh.

12          How can the evidence suggest that?  Again, the bed is

13  made and the semen that was found on the bed was on sheets and

14  on blankets that were folded up.  But this one was on the

15  floor.  Clearly suggesting that it had been deposited another

16  time or certainly more recently than the bed had been made.  N1

17  was, in fact, inches from the naked body of Helen Abbott on the

18  floor.

19          Cheryl Abbott, when she found her mother's body,

20  thank God that her mother didn't appear to have been raped

21  before the murder but semen on the floor, the condition of

22  Helen Abbott's body, and clothing, the defendants saliva and

23  sweat or sweat on her breast and another man's DNA under her

24  fingernails.

25          We can only shutter at how that semen was deposited

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1    there. Whether it was, again, before, during, or after the

2    murder.

3               (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

1       MR. BOGDANOS:  And indeed were the murder itself
2   any less horrific, perhaps, there would be enough emotion
3   left to pause on that stain, N-1, but instead we move on;
4   and we do so because we know where he was; and we know what
5   he did and so we come to five, the phone Mr. Klein would
6   have you believe the phone means nothing.

7       The evidence strongly suggests otherwise and what
8   does the evidence show?  The defendant enters the building
9   the fourth time that day at 2:15 p.m.  This is actually the
10  first time that there is any evidence that he is in the
11  apartment because he is using her phone.  Now he enters at
12  2:15.  Gets off at 12.  Turns to the right as always; and
13  then there are a series of calls, twenty-one calls
14  altogether.  Two of those phone calls you heard are
15  unrecorded.  They come up with unknown or the word empty.

16      Sprint just didn't catch those numbers but they
17  are clearly phone calls.  You remember from the expert it
18  just didn't record those numbers; so you have twenty-one
19  calls.  Two of them are unrecorded so put them aside.  You
20  have nineteen left.  Of those nineteen, eighteen are made to
21  the defendant's family.  Remember, the eighteen that are
22  made to the family are minutes -- according to the
23  defendant -- are at least a period of time after she's been
24  murdered.

25      Here is 4:50 when he walks out and sees the police

1    officers, so they are all -- these calls are before that.

2    Eighteen calls to his family.  Is that really surprising?

3    Who would you call if you were in a jam?  But the defense

4    says, well, how can you explain the 7267 number, the

5    (347) 992-7267, the Juan Pello Perez?  You heard evidence

6    that person doesn't exist.  It is a fake name.  Whoever it

7    is has a boost phone; one of those prepaid phones you heard

8    about.

9             Well, that person is right in the middle of all

10   these calls to the defendant's family and that particular

11   phone number is a phone number that appears on

12   Helen Abbott's phone records prior to that date.  You also

13   heard however that the defendant was living with

14   Desiree Allen at this time.

15             Please play 18:55:55.

16             (Videotape commenced playing.)

17             (Videotape stopped playing.)

18             MR. BOGDANOS:  So we know he is living with

19   Desiree Allen at the time.  You have Desiree Allen's

20   telephone records in Evidence.  This number (347) 992-7267

21   shows up on Desiree's Allen phone records 24 times in the

22   month of -- from January 1st to January 10th and then most

23   tellingly, ten times after Helen Abbott is dead; so the

24   defense suggests that this number must be connected to

25   Helen Abbott.

1    That's nice.  The evidence suggests otherwise.
2  The evidence suggests that this number is connected like all
3  the other numbers that are called is connected to the
4  defendant.  She still gets calls after she is dead.  It is
5  People's -- for the record -- No. 39 in Evidence; and so
6  every single phone call -- and you might be saying to
7  yourself well, would you?  Nineteen phone calls?  That's a
8  frantic -- that's the word you are looking for -- frantic.
9  That's the word, frantic.
10    Nineteen phone calls and repeatedly 325, 326, 327,
11  329, 331, frantic.  How would you be if you just killed
12  someone?  Frantic might be one of those words.  In the
13  context of this case, frantic has another word, guilty; and
14  then let's look at this last call, the 4:59 call.
15    This call is after the defendant has left the
16  building; after he has let the police officers into the
17  front of the building.  4:59, well, so he is outside the
18  building.  Do we have any evidence that the phone is outside
19  the building?  Go to People's 86 and what do you notice
20  about the 4:59 call?  There is no technology that exists
21  that can pinpoint the exact location of a telephone.  You
22  heard that from the expert.  That doesn't exist in real
23  life; but let's look at all the telephone calls that are
24  made from 2:58 on.
25    You notice that each and everyone of those calls

1    either originates, starts or terminates, ends at the 126th

2    cell site, right?  Some of them bounce out.  There is some

3    overuse across the river and some of them bounce to 124th,

4    and some of them bounce over to Madison Avenue; and the

5    engineer explained that's what he would expect to see high

6    peak time, Friday afternoon, when calls are made, and that

7    cell site appears to have been overloaded so the calls

8    bounced.

9         What's the only call that doesn't do that?  The

10   4:59 call.  The 4:59 call starts and ends on 119th Street

11   cell site.  What could possibly explain that?  What could

12   possibly explain that the phone is using a completely

13   different cell site from the rest of the day?

14        We know where he was and we know what he did, and

15   this occasion we know what he took with him when he left the

16   room.  We know that's one of the things that was in that

17   plastic bag and that is Helen Abbott's phone continuing to

18   make a phone call from Helen Abbott's phone after he left

19   the building.

20        Six, you know as you have seen on the video that

21   the defendant leaves at 4:50 that afternoon.

22        Go to clip 73, please.

23        (Videotape commenced playing.)

24        MR. BOGDANOS:  He opens the door for the police

25   and let's them in.  Surely as you were looking at that and

1    as you are about to look at just this one clip now, you may

2    have been thinking to yourself, well, he sure doesn't look

3    like some one who has just murdered somebody.  Of course,

4    the question I would have for you if that's the thought, if,

5    what does somebody who murdered someone look like exactly?

6              Backup for a minute.

7              (Videotape still playing.)

8              MR. BOGDANOS:  There is that bag never seen

9    before.  There are the police officers.

10             Pause.

11             (Videotape stopped playing.)

12             MR. BOGDANOS:  So since I don't think anyone has

13   ever figured out what a murderer already looks like or

14   someone who just murdered someone would look like, what does

15   he look like?  Certainly an argument can be made is he looks

16   like someone who thinks he could get away with it.

17             I would submit to you only if you let him.  And

18   where -- what's in the bag?  Where does it come from?  Well,

19   he's only got one hand on the bag because the other hand as

20   you know from having watched the video is he is wiping his

21   face, wiping his face with his entire shirt; wiping a face

22   drenched in sweat; and surely one of the questions you

23   should be asking yourselves is, oh, this is January.  It's

24   about in the 40's that day.

25             What could he possibly have been doing that would

have caused him to sweat so much that he would have needed
to use his shirt to dry his face?  What happened on 12 that
made him sweat?

We know where he was and we know what he did, and
so now let's look at what he did and that's, seven, the
condition of the body.  This was a serious, major league
brutal beating.  There is no other way to describe it.  You
have seven fractured ribs.  Six fractured ribs.  One is
fractured in two places.

Those seven, seven fractures on the ribs had to
have been done with a blunt forced instrument, a nonsharp
instrument.  A broom will do nicely for that on a 69 year
old woman with arthritis.

There were also three additional blunt force
traumas to the head.  There was also in the autopsy you will
see bleeding on the brain.  Her brain was hemorrhaging.  She
was struck so hard in the head that her brain was bleeding.
Surely, that took a tremendous amount of force on this
woman.  You'd have to be pretty big to generate that much
force.  Six seven (6'7"), three hundred (300) ought to just
about do it.  Ought to be enough to generate just enough
force when you are 6'7", 300 on a five foot five (5'5"), one
hundred twenty (120) pounds.  Generate enough force to get
bleeding on the brain and as you heard twenty-two (22) stab
wounds; all but three on the left side generally left to

1  right indicating that the individual was facing her; someone
2  using their right hand to come across.

3        Seven, as you know would have been fatal if given
4  enough time but again there wasn't enough time because the
5  ligature strangulation, the electrical cord stopped the
6  heart from beating, killed her before the heart beat enough
7  for blood to enter the lungs or the stomach in any capacity.
8  What does that mean?  As we said before, the first time from
9  the very first stabbing to -- to her death one to two
10 minutes.

11       You also know that there were injuries on her neck
12 particularly on the left side that were -- appeared to be in
13 addition to or consistent with something in addition to the
14 ligature, a choke, a choke in which the right arm is put
15 over the neck and the radial bone of the forearm is pressed
16 against the neck.

17       The bottom line for all of this is that this was a
18 lot to be done in one to two minutes.  Not a one person job.
19 No, in fact, the violence in this case -- and indeed the
20 word overkill could surely had been invented for this case.
21 If the word overkill didn't invent -- didn't exist before
22 January 11th, it would now.  Overkill by multiple people.
23 Not possible for one person to have done all of this damage
24 in that short amount of time.

25       Remember the wounds are ligature is from the back;

1  the choke is from the back; the stabbing is from the front;

2  and whatever happened, she had to have been restrained in

3  some fashion whether it was because when she was choked, she

4  was unconscious as the medical examiner indicated was a

5  possibility; or whether it was because the clothing was

6  pulled up and that pinned her arms.

7          Whatever the mechanism was she had to have been

8  restrained during the stabbing because there were no

9  defensive wounds on her hands, front or back.  No incised

10  wounds.  No slashings.  Nothing.

11          This had to be at least one person, two or three.

12  Whatever it was this was a team effort.  Whatever this was

13  this was all in.  Whatever this was, a drug induced frenzy.

14  Whatever it was, this was everybody making sure there is no

15  witness left alive.

16          Then you come to nine, the electrical cord.  You

17  remember, the cord was cut from a lamp that was in the

18  living room.  Remember also the timing of the events.  The

19  cord had to be used within a minute or two of the first

20  stabbing; meaning the evidence strongly suggests the cord

21  had to have been cut before the first stabbing.  Not enough

22  time.

23          Look at the apartment diagram and look at the

24  layout of the apartment.  The lamp from which the cord was

25  cut was in the living room.  She was killed in the bedroom

1  all the way down in the back; and you know there is no

2  evidence of blood anywhere whatsoever in the apartment.  Two

3  different Crime Scene Units went to that location.  You

4  remember they did ultraviolet light.  They did -- whatever

5  that purple spray is called.  Can't remember -- leukocrystal

6  and there was no blood anywhere else in the apartment; so

7  you know the blood, the stabbings that caused the blood, the

8  jugular, aorta had to take place in the bedroom.

9         That's -- the evidence is clear on this; but the

10  cord was cut in the living room.  The cord had to be cut

11  before the first stabbing.  Who was in the living room?  Who

12  was in the living room?  Who was alone in the living room?

13  Who was alone in the living room while they were beefing

14  momma.  Where is the money, momma?  Where is the money?

15         While Anthony Hall is saying momma, where is the

16  money, who is alone in the living room?  Oh, yeah,

17  Mark Richardson.  Mark Richardson is alone in the living

18  room; while everyone else is in the bedroom beefing, give me

19  the money.  Give me the money.

20         And what do we know about the cord?  Well, let's

21  take a look at the cord.  We know that a pair of scissors is

22  in play here.  We know that a pair of scissors -- it is

23  not -- we know from the medical examiner that they are

24  paired wounds.  Paired wounds that appear to be shaped

25  exactly like scissors and appear to have two prongs.  Not

1   consistent with a fork.  Consistent with scissors.

2           Obviously, we don't have the scissors because we

3   know why we don't have the scissors, but we will come to

4   that in a moment.  Well, did you ever try to cut a thick

5   cardboard with a pair of scissors?  You know how when you

6   cut a piece of thick cardboard, you start cutting and then

7   halfway through you continue cutting, and it has like a gap

8   in it or a place where it is not straight across but where

9   it just sorts of moves out.

10          Pretty much exactly like this.  Exactly what you

11  see in the cut of the electrical cord.  Pretty much exactly

12  that way and so it is fair to conclude from this evidence

13  that the scissors were used to cut the cord.  Scissors were

14  used to murder Helen Abbott.  The cord -- let's do this --

15  let's do some logic.  Scissors were used to cut the cord.

16  The cord was cut in the living room.  Mark Richardson was

17  sitting in the living room alone.

18          What would that conclusion be?  What may you

19  reasonably infer from the evidence to that?  Mark Richardson

20  cut the cord.  Mark Richardson had the scissors.

21          Next, the clothing of Ms. Abbott, we know that the

22  clothing was pulled up before the stabbing.  Had to be.

23  There is no holes in the clothing.  Well, that's right

24  because they were looking for the money and it seems clear

25  on this evidence that whatever money she had in her bra, it

1    just wasn't enough and so the frenzy continued.

2            Where is the rest of the money?  Where is the rest

3    of it?  They already used a broom.  It is not working.  The

4    broom isn't scaring her enough.  The broom gets discarded on

5    the bed.  Where is the rest of the money?  Don't make me use

6    the cord.  Where is the rest of the money as they pull her

7    shirt up if she hid money in the bra or maybe elsewhere; and

8    they pull her pants down or force her to pull her own pants

9    down to prove that she doesn't have anymore money.

10           Next, the false alibi, the defendant is

11   interviewed on February 5th in connection with the murder of

12   Helen Abbott; and the very next day, February 6th, he goes

13   to his supervisor and asks his supervisor to write a letter

14   saying he was at work all day on the eleventh and had some

15   counseling on the tenth.

16           Well, we know he wasn't working on the eleventh

17   not just from the video but his supervisor actually

18   testified and said, no, that was false.  That was a lie.  He

19   wasn't working on January 11th.  Why would he lie about

20   that?  Defense would have you believe it is just what he

21   does.

22           It's what you do when you are guilty.  It is

23   called consciousness of guilt.  In fact, it's so well-known,

24   so prevalent there is a word for it, a phrase for it;

25   consciousness of guilt.  His Honor will instruct you on how

1    you could use this as consciousness of his own guilt.  He

2    knows he's guilty.  He tries to come up with a false alibi;

3    and by virtue of the false alibi, that is one more piece of

4    evidence indicating his guilt and on the -- on the

5    consciousness of guilt, let's go to twelve, the existence of

6    the telephone.

7            Defense would have you believe as we talked about

8    the phone meant nothing.  Well, it sure did mean something

9    to the person who took it.  Of all the people in the world

10   who knew that the phone meant something?

11           You could get fingerprints off the phone.  You

12   could get DNA.  Of all the people in the world who knew that

13   the phone had relevance?  The person who took it.  The

14   person who took it from the dead woman.  Well, so who has

15   the greatest incentive to lie about the existence of a

16   phone?  The person who took it from the dead woman,

17   Mark Richardson.

18           You know where he was and you know what he did;

19   and so defense would call this a stupid lie.  The law calls

20   it consciousness of guilt, conscience of one's own guilt of

21   the crimes.

22           Now against these uncontroverted facts, the

23   defense argues, well, there is an affirmative defense of

24   felony murder.  The defendant was just sitting there merely

25   present while these other people murdered her.  Sure, he did

1  the robbery.  Got the money so he is guilty of the robbery;

2  but not the murder because he is just merely present

3  standing there while they -- they murder her for their own

4  purposes.

5          His Honor will instruct you -- not my place, not

6  my job -- but when his Honor does instruct you in a moment

7  when we talk about this, under 125.25 Subsection 3A, in

8  order for the defendant to get the affirmative defense of --

9  to the crime of felony murder, he has to prove to you -- he

10  has to prove to you by a preponderance of the evidence that

11  he did not in any way solicit, request, command, importune,

12  cause, or aid the commission of the murder.

13          Let's count how many times he actually solicited,

14  commanded, and importuned and aided the commission of the

15  murder as we walk through his statement.  Defense would also

16  argue, well, they should have tested the cord.  They should

17  have tested the cord because if they tested the cord maybe

18  perhaps, probably, pretty sure you could speculate there

19  might be some conjecture that the real killer's DNA will be

20  on that.  Really?  Really?

21          Page 563, cross of Ms. Philipps, why wasn't the

22  cord further tested?  The cord was analyzed and there was

23  blood found on it and when it went for DNA typing, the DNA

24  was consistent with Helen Abbott and there was a minor

25  source; but again there wasn't enough information for

1    further comparison.  That's not enough.

2          Page 574.  In the cord's center we were able --

3    still cross of Ms. Philipps -- in the cord's center we were

4    able to develop a DNA profile that was consistent with

5    Helen Abbott but there was also a possible minor

6    contributor; and there wasn't enough information in order

7    for us to make a DNA comparison to the possible minor

8    contributor.  Not enough.

9          Let's ask it again.  631, Mr. O'Connor; so,

10   Mr. O'Connor even if it were sent, even if the cord, the

11   swabs from the cord were sent for High Sensitivity testing,

12   it would be expected that the DNA from the blood would

13   overwhelm any DNA that would have come from the few skin

14   cells that may or may not had been on the cord itself?

15         There is a reason the swabs weren't further

16   tested.  There was not enough.  They told you that

17   repeatedly.  The lamp, lamp should have been swabbed.

18   Actually, yeah, the lamp should have been swabbed more.

19   Page 650 -- how many swabs were there altogether -- cross of

20   Mr. O'Connor, four swabs were used from the body, two were

21   then collected from the neck, and three swabs from the base.

22   That's four, two -- that's nine swabs from the lamp, none of

23   which yielded sufficient DNA; but the pieces were broken.

24   Surely that mattered, meaning the pieces, the pieces were

25   broken that somehow affected the integrity of the testing.

1     Cross of Mr. O'Connor -- it says cross -- you have
2     broken pieces from that exact lamp.  You could still take a
3     swab, correct?  Correct.  You could take a swab from the
4     pieces.  Is the fact that it is broken change the ability to
5     develop a DNA profile from the lamp?  No.  Weren't there
6     more swabs taken from the lamp even before it was broken
7     anyway?

8          Page 864, Amy Dorsey, you will forgive me for
9     spending too much time on this issue, but I don't want this
10    to distract you.  The lamp was tested.  There was no DNA
11    sufficient to determine who, in fact, touched the lamp.

12         864, Ms. Dorsey, swab 1 for the record is the
13    metal portion at the base; swab 2 is from the glass at the
14    bottom.  No prints.  No DNA from the lamp.  Insufficient DNA
15    from the cord.

16         Now let's turn finally to the defendant's
17    statement.  As I said the defense has already suggested that
18    the defendant was merely present and the mere presence after
19    he does his own robbery makes him guilty of robbery but not
20    murder.  I imagine the argument continues, well, those other
21    two must have killed -- but they must have killed her for
22    their own reasons.  It was just a coincidence that we were
23    all there together.  We were all using force together and;
24    therefore, I don't know why they killed her but they killed
25    her for some other reason; and I am not guilty of murder.

1          Okay, here is what you have to accept in order to
2    accept that argument.  What is the defendant's -- what is
3    the version of the story that supports that argument of mere
4    presence?  Defendant saw the money and the shirt and took it
5    gingerly, of course.  It happened to be the $30 that Hall
6    owed to the defendant.  This five foot five, one hundred
7    twenty pound woman that grabbed the defendant's shirt, he is
8    wearing a shirt right underneath the jacket?  Yeah.

9          She grabs his shirt in the kitchen where this
10   happens.  You remember, it happens in the kitchen.
11   According to the defendant the kitchen is so full of good
12   samaritans that two men leap to the defense of a six seven,
13   three hundred pound Mark Richardson and defends himself
14   against a 69 year old arthritic Helen Abbott.

15         Johnny grabs her around the neck and Anthony Hall
16   begins stabbing her in the chest, and he sees her shirt
17   filled with blood, and then he runs for his life.  Gets out
18   of there as fast as possible.  Whatever Johnny and
19   Anthony Hall did after he was gone, well, that's on them.  I
20   don't know whatever they did after I was gone, that's --
21   that's their issue.  Not mine.

22         Really?  That's what -- that's the story you have
23   to accept to find the defendant not guilty of murder.  Let
24   me say that again.  That's the story you have to accept in
25   order to find the defendant not guilty of murder.

1    Honestly, there is nothing funny about murder and

2    for those of us who deal with this on a daily basis, it is

3    never funny; but that story would get a belly laugh in other

4    contacts if you were telling that story to someone else

5    other than this courtroom, other than under such horrific

6    circumstances.

7    It is not deserving of anymore credibility here as

8    the defense has admirably conceded, so let's look at exactly

9    what did happen.  The defendant says he saw the money.  Of

10   course, there is a problem with that.  She is wearing a high

11   neck sweat shirt, thick heavy shirt, People's 46, and the

12   money is in her bra.

13   You saw the Bobby pins -- safety pins; so there is

14   no way he sees -- he does see the money.  Absolutely true.

15   Every now and then the truth leaks out.  He does see the

16   money.  He sees it after they lift up her shirt and after he

17   reaches in and grabbed her breast and takes the money,

18   leaving his saliva and sweat and you know he sweats on her

19   breast taking the money.

20   So he runs out; so we know that's not true.  He

21   runs out for his life.  Okay, this man running out of the

22   apartment for his life has the presence of mind to grab a

23   plastic bag, a plastic bag that there is no evidence he ever

24   had it before.  There is no evidence he ever had it before;

25   that there is no evidence he ever had before.

He comes in with a small paper bag.  Leaves the next three times.  Comes in empty handed.  Leaves with a plastic bag.  You need not speculate what was so important about the contents of the plastic bag.  You may not speculate about what happened to the scissors.  You need not speculate about what happened to the phone.  You know he took the phone with him.  That, you have that evidence.

You need not speculate about what else he was wearing in the apartment; but you know that whatever happened, he had the presence of mind to get a plastic bag, fill it up, and walk out the door.  You need not speculate whether it was his idea to make sure to get the plastic bag and fill it with whatever he needed.

You need not speculate whether it was his idea or whether it was, in fact, any of these people's idea when he talks to Derek Richardson for five minutes and then again just before he leaves for five more minutes.  You need not speculate about what -- what advice he may have gotten on the phone from those frantic phone calls he made after murdering Helen Abbott.

(Transcript continued on the next page.)

SUMMATION/PEOPLE

1   T-5 - Peo. V Mark Richardson, Ind.#3534/08

2   September 26, 2011:

3           MR. BOGDANOS:  He made, after murdering Helen

4   Abbott, you need not speculate what advise he may have gotten

5   from any of the people he may have spoken to, except what you

6   don't have to speculate about, is that he took a plastic bag

7   out of there filled and the scissors and the phone are gone.

8           He also in his statement says that it happened in the

9   kitchen.  Of course you know it didn't happen in the kitchen.

10  Why does he say it happened in the kitchen?  Distancing himself

11  as far as possible from the bedroom.  As far as possible from

12  the area where he left his palm print.

13          Remember, it's interesting, though, remember that the

14  palm print, remember the comparison of the palm print,

15  comparison of the palm print isn't until October.  After the

16  July 10th statement.

17          Doesn't know about the palm print.  Doesn't know he

18  left evidence in the back bedroom.  So he couldn't fix, fashion

19  his statement around the palm print in the bedroom.

20          And, finally, with regard to this particular

21  statement, think about the biggest absurdity of all, he stood

22  idly by while two people murdered Helen Abbott.  That's his

23  story.  And they let him leave.

24          What?  They let him leave?  The people that did

25  this -- you don't need to see the photos -- the people that did

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1   this are extraordinarily brutal and dangerous.  We can all

2   agree.  There is no argument there.  The people that did this

3   are mind numbingly brutal and violent.

4         And they saw him, because he was there, they were

5   talking to him, and they let him leave and the let him live?

6   These people who did this, these other people, these

7   unbelievably dangerous people, left a witness alive?  Really.

8   How absurd is that?

9         The only reason he's still alive, the only reason he

10  got out of the apartment alive, is he's one of them, he's a

11  participant not a witness.  No witness was getting out of 12E

12  alive.  Period.  End of story.

13        Because if your not a participant, your a witness,

14  and if your a witness, your a threat.  And you have already

15  seen what these people will do.

16        And, so, as the defense stood before you earlier and

17  made seeming concessions.  Do not be misled by any concessions

18  that the defense, or the defendant made in his statement, or by

19  the seeming candor of the defense, the defendant's statement in

20  this case and the defense, and I am not disparaging, the

21  defense has done an honorable, fair, respectful job in this

22  case, but the defense in this case is nothing more than

23  admitting what you can't deny, denying what you can't admit.

24        Your DNA puts you on her body.  You got to admit it.

25  Can't come up with something.  The fingerprint puts you in the

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1    back room.  You got to admit it.  Don't be misled by that

2    admitting what you can't deny, can't deny the obvious, deny

3    what you can't admit, don't admit the murder.

4         This really is simply just another way, we talked

5    about this on jury selection, four people do a robbery, four

6    people confess, all four people are the getaway driver.  It's

7    just the way it is.  And that's what you have here in the

8    defendant's statement.

9         So, now let's step back, let's step back and now

10   let's look at the statement carefully and let's see what it

11   actually shows us about what really did happen.

12        We know, uncontroverted, what happens when you owe

13   the defendant money.  Owing the defendant money is just, put it

14   mildly, a scary proposition.  He lent Anthony Hall $28 because

15   Desiree, his live in girlfriend said to.  But the lending came

16   with a warning.  19:45.

17        (Videotape of defendant's statement being played.)

18        MR. BOGDANOS:  Stop.  He just told the woman

19   that east living with:  He doesn't pay me my money I'm going to

20   see you for my money.  There's an insight into Mark

21   Richardson.  There's an insight.

22        You want motive?  You may not accept it, it may not

23   comport with any sense of human decency that you abide by, or

24   that any of us abide by, but you want -- rewind -- you want a

25   clearer indication --

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1              (Videotape being played.)

2              MR. BOGDANOS:  Stop it.  I am going to see you

3    for my money.  So now we know and we know what he did.  We know

4    he wanted his money on the night of the murder.  We know that

5    the reason that he went to Helen Abbott's apartment was to get

6    his money.  18:21:25, please.

7              (Videotape being played.)

8              MR. BOGDANOS:  Stop.  Don't make him blow up.

9    Don't get in his face.  Well, we have seen his handy work so we

10   know what happens when he blows up wanting his money.  We know

11   exactly what he means when he says: I didn't want to blowup in

12   that apartment.  And so to get the defendant his money Anthony

13   Hall takes him upstairs to twelve.  There is no way Anthony

14   Hall wants to face the defendant without money.

15              18:23:25.

16              (Videotape being)

17              MR. BOGDANOS:  Stop.  That's why -- there.

18   There.  He jumps up:  Look, my man, what's up with my money?

19   That's the reason they're there.  That's the reason Anthony

20   Hall is beefing with Helen Abbott, to get Mark Richardson, the

21   money you don't want mad at you, you do not want him coming

22   after you for money, and Anthony hall did not want that.

23              Fear is a great motivator.  And fear by Anthony Hall

24   is exactly what you see.  And so once he jumps up and says:

25   What's up with my money?  Anthony Hall redoubles his efforts.

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1             23:53, please.

2             (Videotape being played.)

3                   MR. BOGDANOS:  Stop.

4             Can't you just hear the fear in Anthony Hall's

5     voice?  Hold on.  Hold on.  Hold on.  She's got your money.

6     Hold on.  Hold on, big man, she's got your money.

7             That's what's happening in that apartment.

8             But, you see, Helen Abbott doesn't scare so easy.

9     Helen Abbott doesn't scare as easy as Anthony Hall.  Helen

10    Abbott, feisty, flawed, Helen Abbott, who's lived her life,

11    doesn't scare.

12            Helen Abbott is about to make the greatest mistake of

13    her life.  Helen Abbott has made plenty of mistakes in her

14    life, plenty of good things, but plenty of mistakes, but all

15    the mistakes Cheryl Abbott told us about, crack pales in

16    comparison, that Helen Abbott is about to make -- she's about

17    to stand up to mark Richardson in the condition that he's in,

18    you see him on the video coming in and out of the elevator, you

19    see what it's like, she's about to stand up to him and now, you

20    know, it's the last mistake she ever made.

21            Hit play.

22            (Videotape being played.)

23                  MR. BOGDANOS:  Stop.

24            Last mistake of her life.  Telling Mark Richardson,

25    in that condition, on that day, January 11th, that she was not

                  Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1    giving him the money.  The money that he wanted.

2          Now, in fairness to Helen Abbott, she didn't see him

3    up and down the elevator like you have.  She didn't see how

4    jacked up he was.  She didn't see how throughout the course of

5    the day this was a barely controlled energy that you can just

6    feel by looking on the video, that build as the day went on,

7    but she was about to see the results.

8          And as the defendant told us, Johnny grabbed her

9    around the neck.  Ironically that part probably appears to be

10   true.  This is Male Donor C under her fingernails.

11   Exactly -- someone who grabbed you around your neck exactly

12   where your fingernails would go.

13         So, whoever this person is, that person appears to

14   have been the one who choked her around the neck.

15         And when that choke took place, before the defendant

16   used the broom, or after he used the broom, irrelevant.

17   Doesn't matter.

18         Whether the defendant had already pulled her shirt

19   and bra up looking for the money or did it while she was in a

20   choke hold.  Irrelevant.

21         Whether he had already struck her, the defendant,

22   before or after, or after she was down.  Irrelevant.

23         And you want to know how the defendant struck her?

24   You want to now how  6 foot 7, 300 pounds, could generate such

25   force to create a brain trauma?  Play.


              Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1          (Videotape being played.)

2              MR. BOGDANOS:  Stop.  That's it.  That's Robbery

3   in the Second Degree right there.  Done.  Over.  Finished.  I

4   told you some things are just this straight forward.  He

5   grabbed the money, while he's still in possession of the money,

6   what the law calls immediate flight therefrom, someone comes to

7   his aid acting in concert, accessorial liability, you will hear

8   all about it, Johnny grabs her around the neck to stop her from

9   getting her money back.

10             I told you Helen Abbott is a feisty woman, it was a

11  mistake, but give her credit, she went down fighting.

12             Play.

13             (Videotape being played.)

14             MR. BOGDANOS:  Hold it.  Right there.  Back up.

15  Rewind.  If you can.  Thank you.  You want to now how you use

16  that force?  Hit play.

17             (Videotape being played.)

18             MR. BOGDANOS:  There you go.  Stop.  Now look at

19  the wound.  Watch that.  Watch it again and again and again and

20  then read the autopsy and then look at all the wounds on her

21  body and look how the wounds on the let side of her body is

22  perfectly consistent with that motion that he just showed right

23  there.

24             With the scissors that were used to cut the

25  electrical cord, the electrical cord that was cut in the sofa

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1   in the living room, that Mark Richardson was alone in.

2            And, then as you know from the crime scene, she

3   dropped where she lay.  She wasn't moved.  There was no smudge,

4   no smudge marks, she dropped right where she lay in that floor

5   in the bedroom.

6            Sure there are unanswered questions.  Why was she

7   struck again after she was already down?  You know, the blood

8   spatter indicates she was struck at least one more time on the

9   left side of her head after she was down.  Why?  I can't answer

10  that.

11           Why was she gyrated with the cord?  Why?  Can't

12  answer that.  Why were per her pants pulled down with that

13  semen stain right next to her?

14           It's not just that some questions don't have

15  answers.  Sometimes it's better not even to consider the answer

16  for questions such of these.  And, fortunately, in this case,

17  none of those questions need to be answered.

18           All that needs to be answered in this particular case

19  is who, and of all the people in the universe, put everyone

20  together, only one person is seen on the video who used her

21  phone, who left his DNA, who left his palm print, and all of

22  that fits perfectly, allies of evidence converged on a single

23  person.

24           And whether he held the scissors or not, whether he

25  had held the cord or not, whether he held the broom or not,

Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1   whether he held her or not, whether he pulled up her clothing

2   or not, or whether he just beat her face in for 30 dollars, 28

3   dollars, they were all in it together and she died at their

4   hand.

5          And the law has a word for that, it is called

6   guilty.  And, so, in a little while you will be asked to go in

7   the back and render a verdict based solely on the evidence.

8          You need not step back or recoil from your sworn duty

9   to follow the law.  Your oaths and your conscience and the

10  evidence will not lead you astray.

11         And, so, I leave you now and thank you for your

12  service, but as I do, I want to leave you with the words my

13  grand mother told me growing up.  She said it in Greek.  I will

14  translate.  Everybody wants to go to heaven but nobody wants to

15  die.

16         And in our context, everybody wants justice done, by

17  some other people, and some other place, at some other time.

18         It is my sworn duty to tell you that this is the

19  time, here is the place, and you are the people that ensure

20  justice is done.

21         And justice here speaks with a clear voice, justice

22  here speaks, cuts through all the white noise, like a charring

23  call, and justice in this case says Mark Richardson, for the

24  murder of Helen Abbott, the sexual abuse of Helen Abbott, and

25  for the robbery of Helen Abbott, you are guilty.

          Glenn J. Merola, Sr. Court Reporter

SUMMATION/PEOPLE

1        And now I ask you to find him so.  Because he is.

2   Thank you.

3              THE COURT:  And thank you Mr. Bogdanos.

4        Ladies and gentlemen, your lunch has arrived and

5   we'll serve it to you in the jury room.

6        We will pickup the trial at 2:45 and at that time I

7   will give you my final instructions.  Please do not discuss

8   during this interval.

9        Thank you very much.  You may all step into the jury

10  room.

11             (The jury exits the courtroom and enters the jury

12  room for their luncheon recess.)

13             (The trial was adjourned for a luncheon recess.)

14             (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

1      THE COURT CLERK:  Case on trial continues.  The

2 parties are present.  The defendant is present.  Jury is not

3 present.

4      THE COURT:  Both sides ready?

5      MR. BOGDANOS:  Yes.

6      MR. KLEIN:  Yes.

7      THE COURT:  May we have the jury, please.

8      THE COURT OFFICER:  Jury entering.

9      (Jury entered the courtroom.)

10      THE COURT CLERK:  Case on trial continues.

11 Parties are present.  The defendant is present.  All jurors

12 are present and properly seated.

13      THE COURT:  Thank you, ladies and gentlemen, I

14 will now give you my final instructions on the law

15 pertaining to this case.  When I am finished you will retire

16 to deliberate.  At the outset I thank all of you for your

17 patience and attention throughout these proceedings.  I also

18 commend the attorneys, Mr. Bogdanos, Mr. Klein, and

19 Ms. Legler for the very capable manner in which they have

20 carried out their responsibilities.

21      Please keep in mind that you must accept the law

22 as I give it to you whether or not you agree with it.

23      As in every case the charge will be divided into

24 three distinct parts.  First, I will go through a series of

25 general instructions on specified topics, such as

1   credibility and reasonable doubt.  Later on in part two, I

2   will instruct you as to the elements of the specific crimes,

3   which will be submitted for your consideration in this case;

4   and then at the end in part three, I will provide some brief

5   instructions on the deliberations themselves.

6            It's -- unfortunately, it's a bit longer than the

7   typical charge largely because of the number of crimes

8   involved, offenses.  Usually the charge takes about 30 to 35

9   minutes.  My best guess is this one will take about 45

10  minutes and, in fact, if I start to lose my voice and get

11  tired, I may resort to sitting over here and turning on the

12  microphone.  I don't like to do it that way because it's --

13  I can see the stuff better when I am standing up; and I

14  probably will have to put on my reading glasses if I sit

15  over there.  If I do that, that's why.  That's the only

16  reason.

17           All right, the first topic, general topic, is

18  called fundamental principles of law.  During the jury

19  selection process and again in my preliminary remarks to

20  you, I made reference to certain fundamental principles of

21  criminal law.  Because of their obvious importance, I will

22  now reemphasize some of them.

23           This document, ladies and gentlemen, is a copy of

24  the indictment in the case.  Once again, the indictment

25  itself is not evidence of anything and it cannot be taken by

1    you to be evidence of anything.  An indictment is merely the

2    means by which a defendant is informed of the charges

3    against him and brings him into court to face those charges.

4    Likewise an arrest is not evidence that a crime was

5    committed.

6              As the defendant Mr. Richardson sits there now and

7    as he has throughout this trial, he carries with him the

8    presumption of innocence.  He will continue to have that

9    presumption even when you enter the jury room to begin your

10   deliberations.  The presumption of innocence will leave the

11   defendant only if during the course of your deliberations,

12   you determine that the People have proved the defendant's

13   guilt beyond a reasonable doubt.

14             It is the People's burden to prove beyond a

15   reasonable doubt the defendant's guilt of each of the

16   elements of the offenses submitted for your consideration.

17   If the People have not met their burden as to a particular

18   offense, then you must find the defendant not guilty of that

19   offense; however, if you determine that the People have

20   proved the defendant's guilt beyond a reasonable doubt as to

21   an offense, then you must find the defendant guilty of that

22   offense.

23             Keep in mind that it is the People's burden to

24   prove the defendant's guilt.  That burden never shifts from

25   the People.  There is no burden on the defendant to prove

1   anything or to do anything at any time during the course of
2   a trial.
3           You, the jury, are the sole and exclusive judges
4   of the facts.  It is your job to examine the evidence in
5   order to determine what the facts are.  You will take the
6   facts as you find them and then apply them to the law in
7   order to reach your verdict.
8           Reasonable doubt, topic number two, as indicated
9   the law requires that the People prove a defendant's guilt
10  beyond a reasonable doubt; thus, the evidence must satisfy
11  you beyond a reasonable doubt that the crimes charged were
12  committed and that the defendant is, in fact, the person who
13  committed the crimes.
14          The law does not require that the People prove the
15  defendant's guilt beyond all possibility of a doubt or
16  beyond a shadow of a doubt or to a mathematical certainty.
17  Those standards are virtually impossible to attain.
18          On the other hand, it is not sufficient for the
19  People to prove that the defendant is probably guilty.
20  Rather you must be firmly convinced as to the defendant's
21  guilt, and in legal terms that means proof beyond a
22  reasonable doubt.
23          So the question arises how does one define the
24  term beyond a reasonable doubt?  Unfortunately, there is no
25  precise definition of the term because it depends on the

1   evidence presented in a given case and how the jury assesses

2   that evidence.  As I have told you the evidence consists of

3   the sworn testimony of the witnesses and the physical items

4   that were received into Evidence and any stipulations that

5   were agreed to by the parties.

6           In addition, the evidence also includes any

7   reasonable inferences that can be drawn from the testimony,

8   the exhibits, and the stipulations.

9           In order for a doubt to be reasonable, it must be

10  based on the evidence or the lack of evidence in the case.

11  A doubt is not reasonable if it is based upon anything else.

12  For example, a doubt is not reasonable if it is based on

13  whim or speculation.  A doubt is not reasonable if it is

14  based on emotion, bias, prejudice, or sympathy.  A

15  reasonable doubt is a doubt based upon reason.  It is a

16  doubt for which a juror can give a reason if called upon to

17  do so in the jury room.

18          That does not mean, however, that a juror is

19  required to articulate the reason.  Once again, to be a

20  reasonable doubt, the doubt must arise because of the nature

21  and quality of the evidence in the case or from the lack or

22  insufficiency of the evidence.

23          To be a reasonable doubt, it should be one which a

24  reasonable person acting in a matter of this importance

25  would be likely to entertain because of the evidence or the

1   lack of evidence in the case.

2            Credibility, next topic, as judges of the facts,

3   ladies and gentlemen, you alone determine the truthfulness

4   and accuracy of the testimony of each witness.  You must

5   decide whether a witness told the truth and was accurate or

6   instead testified falsely or was mistaken.  There is no

7   particular formula for evaluating the truthfulness or

8   accuracy of another person's statements or testimony.

9            You bring to this process all of your varied

10  experiences.  Some of the credibility factors that you may

11  wish to consider are as follows:  Did the witness have an

12  opportunity to see or hear the events about which the

13  witness testified?  Did the witness have the ability to

14  recall those events accurately?  Was the testimony of the

15  witness plausible and, therefore, likely to be true; or was

16  it implausible and, therefore, not likely to be true?

17            Did the manner in which the witness testify

18  reflect upon the truthfulness of the witness's testimony?

19  To what extent, if any, did the witness's background,

20  training, education, or experience affect the witness's

21  believability; and, finally, did the witness have a bias,

22  hostility, or some other attitude that affected the

23  truthfulness of the witness's testimony?

24            In addition -- still on the topic, general topic

25  of credibility -- you may consider whether a witness had an

1    interest in the outcome of this case or instead whether the
2    witness had no such interest.  You are not required to
3    reject the testimony of an interested witness or to accept
4    the testimony of a witness who has no interest in the
5    outcome of the case.
6            You may, however, consider whether an interest in
7    the outcome or the lack of such interest affected the
8    truthfulness of the witness's testimony.
9            You may also consider whether a witness had or did
10   not have a motive to lie.  If a witness did have a motive to
11   lie, you may consider whether and to what extent, if any,
12   that motive affected the truthfulness of the witness's
13   testimony; and if a witness did not have a motive to lie,
14   you may consider that as well in evaluating the witness's
15   truthfulness.
16           You may also consider whether a witness's
17   testimony was consistent with the testimony of other
18   witnesses or with other Evidence in the case.  If there were
19   inconsistencies by or among witnesses, you may consider
20   whether they were significant inconsistencies related to
21   important facts or instead were the kind of minor
22   inconsistencies that one might expect with multiple
23   witnesses to the same event.
24           And, finally, if you find that any witness has
25   intentionally testified falsely as to any material fact, you

may then disregard that witness's testimony in its entirety.
On the other hand, you may disregard so much of it as you
find was untruthful and you may accept some much of it as
you find had been given truthfully and accurately.

Next topic, inconsistent statements, you may
consider whether a witness made statements at this trial
which were inconsistent with each other.  You may also
consider whether a witness made a previous statement, which
was inconsistent with the witness's testimony at trial.  The
contents of any prior, inconsistent statement are not proof
of what happened.  You may use evidence of a prior
inconsistent statement only to evaluate the truthfulness or
accuracy of the witness's testimony at trial.

Police testimony, you should use the same
standards and tests in evaluating the testimony of a police
officer as you would use in evaluating the testimony of any
other witness.  The fact that a person is a police officer,
does not entitle that person to any greater credibility or
lesser credibility than any other witness.

Expert witness, ladies and gentlemen, you will
recall that a number of witnesses were qualified as experts
in their respective fields in this case.  Ordinarily a
witness is limited to testifying about facts and is not
permitted to give an opinion.  Where, however, a scientific,
medical, technical, or other specialized knowledge will help

1      the jury to understand the evidence or to determine a fact

2      in issue, a witness with expertise in a specialized field

3      may render an opinion about such matters.

4           You should evaluate the testimony of any such

5      witness just as you would the testimony of any other

6      witness.  You may accept or reject such testimony in whole

7      or in part just as you may with respect to the testimony of

8      any other witness.  In deciding whether or not to accept

9      such testimony, you should consider the following:  The

10     qualifications and believability of the witness; the facts

11     and other circumstances upon which the witness's opinion was

12     based; the accuracy or inaccuracy of any assumed or

13     hypothetical fact upon which the opinion was based; the

14     reasons given for the witness's opinion and whether the

15     witness's opinion is consistent or inconsistent with other

16     evidence in the case.

17          Defendant not testifying, ladies and gentlemen,

18     the fact that the defendant Mr. Richardson did not testify

19     is not a factor from which any inference unfavorable to him

20     may be drawn.

21          Inference versus speculation, as I said earlier

22     you are not -- you are permitted to draw reasonable

23     inferences from the evidence.  You are not, however,

24     permitted to speculate.  An inference is a conclusion based

25     on evidence which is derived at by application of reason or

logic to the evidence.  A speculation on the other hand is a
conclusion based on evidence, which is insufficient to
warrant that conclusion.  It is, in essence, a guess or
conjecture.

Circumstantial evidence, in this case the People
are relying in part on circumstantial evidence to prove the
defendant's guilt.  Let me now explain the difference
between direct evidence and circumstantial evidence.  Direct
evidence is evidence which standing alone would be
sufficient to establish a desired fact.

For example, the testimony of a witness who saw an
entire crime as it happened would be direct evidence.
Circumstantial evidence is also evidence of some fact or
facts but circumstantial evidence does not directly
establish the desired fact; rather, circumstantial evidence
of some fact or facts is known as the circumstantial facts,
which give rise to a reasonable inference of the desired
fact.

The law draws no distinction between
circumstantial evidence or direct evidence in terms of
weight or importance.  Either type of evidence may be enough
to establish guilt beyond a reasonable doubt depending on
the facts of the case as the jury finds them to be.

While the People may prove a desired fact through
circumstantial evidence, their burden remains proof beyond a

reasonable doubt.  This requires a two-step process.  First
the circumstantial facts must be proved beyond a reasonable
doubt in the same manner as direct evidence.

Second, the jury must find that the existence of
the desired fact is logically compelled beyond a reasonable
doubt from the existence of the circumstantial facts; thus,
to find a fact beyond a reasonable doubt through
circumstantial evidence, the jury must find that the
existence of the desired fact may be reasonably and
naturally inferred from the circumstantial facts and that
any alternative inference may be eliminated beyond a
reasonable doubt.

Next topic, Anthony Hall, there has been testimony
at this trial concerning Anthony Hall.  You are not to
speculate on the present status of Mr. Hall.

Consciousness of guilt, in this case the People
contend that the defendant engaged in conduct that
demonstrated a consciousness of guilt.  In determining
whether conduct constitutes a consciousness of guilt, you
must consider whether the conduct has an innocent
explanation.

Common experience teaches that even an innocent
person who finds himself under suspicion may resort to
conduct which gives the appearance of guilt.  The weight and
importance you give to evidence offered to show

1  consciousness of guilt depends on the facts of the case.

2           Punishment, let us now discuss something which is

3  the concern of the Court rather than the jury; and I am

4  referring, of course, to the question of what the punishment

5  would be if your verdict in this case should be guilty.

6           Ladies and gentlemen, it is improper for you

7  during your deliberations to speculate about or to consider

8  in any way what the sentence or punishment in this case

9  might be.  Accordingly, you must not consider this issue in

10 reaching your verdict.

11          Other matters not to be considered as evidence,

12 next topic, as I said your verdict must be based solely on

13 the evidence or the lack of evidence in the case.  In this

14 regard I remind you that the voir dire comments by the

15 attorneys as well as their opening and closing arguments are

16 not evidence.  In particular, the summations were arguments

17 by the attorneys that the evidence you have heard supports

18 their respective positions.

19          While the arguments themselves are not evidence

20 you may, of course, adopt the reasoning of any argument if

21 you find that it is supported by the evidence.  Also not

22 evidence and, therefore, not to be considered by you are any

23 discussions between the attorneys or among the attorneys and

24 me; the objections made by the attorneys and my rulings on

25 those objections.

1        I instruct you that any matters that were stricken

2   from the record including testimony are not part of the

3   evidence in the case.  You must totally disregard any such

4   matters and they must play no part whatsoever in your

5   deliberations.

6        Part two, murder in the second degree.  The first

7   count of the indictment charges the crime of murder in the

8   second degree.  Under our law a person is guilty of murder

9   in the second degree when in the course of and in

10  furtherance of the commission or attempted commission of

11  robbery, whether robbery in the first, second, or third

12  degree or the immediate flight therefrom that person or

13  another participant -- if there be any -- causes the death

14  of a person other than one of the participants.

15       Under this law when in the course of and in

16  furtherance of the commission of robbery or the immediate

17  flight therefrom a participant in the commission of that

18  felony causes the death of a nonparticipant.  All of the

19  participants, the one who caused the death as well as the

20  other participants in the felony are guilty of murder in the

21  first degree.

22       I will now give you the specific definitions of

23  robbery in the first, second, and third degrees when I -- I

24  am sorry -- I will give you the specific definitions of

25  robbery in the first, second, and third degrees when I

1    instruct you on those crimes.  There are specific counts.
2    They are coming up.
3            In determining whether a person is in immediate
4    flight therefrom, the commission or attempted commission of
5    robbery, you may consider, one, the distance, if any,
6    between the location of the robbery and the location where
7    death was caused; two, the interval of time, if any, between
8    the commission of the felony and the causing of the death;
9    three, whether police, security personnel, or citizens were
10   in close pursuit at the time the death was caused; four,
11   whether such person possessed fruits of the crime at the
12   time the death was caused; and, five, whether such person
13   had reached a place of temporary safety before the death was
14   caused.
15           In order for you to find the defendant
16   Mr. Richardson guilty of this crime, the People are required
17   to prove from all the evidence in the case beyond a
18   reasonable doubt both of the following two elements:  First,
19   that January 11, 2009 (sic), in New York County the
20   defendant Mark Richardson, committed robbery; and, second,
21   that in the course of and in furtherance of the commission
22   of such crime or the immediate flight therefrom, the
23   defendant or another participant in the commission of that
24   crime caused the death of Helen Abbott and that Helen Abbott
25   was not a participant in that felony.

1    If you find that the People have not proven beyond
2    a reasonable doubt either one or both of those elements, you
3    must find the defendant not guilty of murder in the second
4    degree as charged in the first count.

5        On the other hand, if you find that the People
6    have proved beyond a reasonable doubt both of those
7    elements, you must consider the affirmative defense the
8    defendant has raised.  Remember, if you have already found
9    the defendant not guilty of murder in the second degree as
10   charged in this count, you will not consider the affirmative
11   defense.

12       Under our law it is an affirmative defense as
13   murder in the second degree as charged in this count that,
14   one, the defendant did not commit the homicidal act or in
15   any way solicit, request, command, importune, cause or aid
16   the commission thereafter; and two, the defendant was not
17   armed with a deadly weapon or any instrument, article, or
18   substance readily capable of causing death or serious
19   physical injury and of a sort not ordinarily carried in
20   public places by law abiding citizens; and, three, that the
21   defendant had no reasonable ground to believe that any other
22   participant was armed with such a weapon; instrument,
23   article or substance; and, four, that the defendant had no
24   reasonable ground to believe that any other participant
25   intended to engage in conduct likely to result in death or

1  serious physical injury.

2           Under our law the defendant has the burden of

3  proving an affirmative defense by a preponderance of the

4  evidence.   In determining whether the defendant has proven

5  the affirmative defense by a preponderance of the evidence,

6  you may consider evidence introduced both by the People or

7  by the defendant.

8           A preponderance of the evidence means the greater

9  part of the believable and reliable evidence; not in terms

10 of the number of witnesses or the length of time taken to

11 present the evidence; but in terms of its quality and the

12 weight and convincing effect it has.

13          For the affirmative defense to be proved by a

14 preponderance of the evidence, the evidence that supports

15 the affirmative defense must be of such convincing quality

16 as to outweigh any evidence to the contrary; therefore, if

17 you find that the defendant has not proved the affirmative

18 defense by a preponderance of the evidence, then based upon

19 your initial determination that the People have proved

20 beyond a reasonable doubt the elements of murder in the

21 second degree, you must then find the defendant guilty of

22 that crime as charged in the count.

23          On the other hand, if you find that the defendant

24 has proved the affirmative defense by a preponderance of the

25 evidence, then you must find the defendant not guilty of

1    murder in the second degree as charged in this count.

2              Second count, the second count also is for murder

3    in the second degree; but the underlying felony specified is

4    sexual abuse in the first degree rather than robbery.

5    Again, I will give you the definition of sexual abuse in the

6    first degree when I instruct you on that specific crime.

7              In order for you to find the defendant guilty of

8    murder in the second degree on the second count, the People

9    are required to prove from all of the evidence in the case

10   beyond a reasonable doubt both of the following elements;

11   first, that on that same day January 11, 2009, (sic) in New

12   York County the defendant Mark Richardson committed sexual

13   abuse in the first degree; and, second, that in the course

14   of and in the furtherance of the commission of such crime or

15   the immediate flight therefrom, the defendant or another

16   participant in the commission of that crime caused the death

17   of Helen Abbott and that Helen Abbott was not a participant

18   in that felony.

19             If you find that the People have not proved beyond

20   a reasonable doubt either one or both of the elements, then

21   you must find the defendant not guilty of murder in the

22   second degree as charged in the second count.

23             (Transcript continued on the next page.)

24

25

JURY INSTRUCTIONS

1  T-7 - Peo. V Mark Richardson, Ind. 3534/08

2  September 26, 2011:

3              THE COURT:  On the other hand, if you find that

4  the People have proved, beyond a reasonable doubt, both of

5  these elements, you must then consider the affirmative defense

6  the defendant has raised as I instructed you on the first

7  count.

8              If you then find that the defendant has not proved

9  the affirmative defense by a preponderance of the evidence,

10  then based upon your initial determination that the People had

11  proved beyond a reasonable doubt the element of Murder in the

12  Second Degree, you must find the defendant guilty of that crime

13  as charged in the count.

14              On the other hand, if you find that the defendant has

15  proved the affirmative defense by a preponderance of the

16  evidence, then you must find the defendant not guilty of Murder

17  in the Second Degree as charged in the second count.

18              Count 3, Robbery in the First Degree, under a serious

19  physical injury theory.  As noted, the third count charges

20  Robbery in the First Degree.

21              The law, as applies to this count, defines robbery in

22  the first degree as follows:

23              A person is guilty of robbery in the first degree

24  when he forcibly steals property, and when, in the course of

25  the commission of the crime, or the immediate flight therefrom,

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1   he or another participant in the crime causes serious physical

2   injury to any person who is not a participant in the crime.

3            The term stealing, which the law calls larceny, and

4   the term forcible stealing, have their own special meaning in

5   the law.

6            A person steals property and commits larceny when,

7   with the intent to deprive another of property or to

8   appropriate the property to himself or a third person, such

9   person wrongfully takes, obtains, or withholds property from

10  the owner.

11           A person forcibly steals property and commits

12  robbery, when in the course of committing a larceny, he uses or

13  threatens the immediate use of physical force upon another

14  person for the purpose of compelling the owner of such property

15  to deliver up the property, or for the purpose of preventing or

16  overcoming resistance to the taking of the property, or for the

17  purpose of preventing or overcoming resistance to the retention

18  of the property immediately after the taking.

19           The term serious physical injury means:

20           Impairment of a person's physical condition which

21  causes a substantial risk of death, or which causes death or

22  serious and protracted disfigurement, or protracted impairment

23  of health, or protracted loss or impairment of the function of

24  any bodily organ.

25           For you to find the defendant guilty of Robbery in

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1  the First Degree, on this count, the People must prove both of

2  the following elements beyond a reasonable doubt:

3          First, that on or about January 11, 2009, in New York

4  County, the defendant, Mark Richardson, personally or by acting

5  in concert with another person, forcibly stole property.

6          Second, that in the course of the commission of the

7  robbery or the immediate flight therefrom, the defendant, or

8  another participant in the crime, caused serious physical

9  injury to a person who is not a participant in the robbery,

10 specifically, Helen Abbott.

11         If you find that the People have proved both of these

12 elements beyond a reasonable doubt then you must find the

13 defendant guilt of Robbery in the First Degree.

14         However, if you find that one or both of the elements

15 has not been proved beyond a reasonable doubt then you must

16 find the defendant not guilty of Robbery in the First Degree

17 and you must then consider the lesser included offense of

18 Robbery in the Third Degree, which we'll get to momentarily.

19         Fourth count.  Robbery in the Second Degree.  The

20 fourth count charges the defendant with Robbery in the Second

21 Degree.  The law, as applies to this case, defines Robbery in

22 the Second Degree as follows:

23         A person is guilty of Robbery in the Second Degree,

24 when that person forcibly steals property and when that person

25 is aided by another person who is actually present.

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1      In order for to you find the defendant guilty of this

2  crime the People must prove beyond a reasonable doubt both of

3  the following elements:

4      First, that on or about January 11, 2009, in New York

5  County, the defendant, Mark Richardson, forcibly stole property

6  from Helen Abbott.

7      Second, that the defendant was aided in doing so by

8  another person who was actually present.

9      If you find that the People have proved both of these

10  elements beyond a reasonable doubt then you must find the

11  defendant guilty of Robbery in the Second Degree on this

12  count.

13      However, if you find that either one or both of the

14  elements has not been proved beyond a reasonable doubt, then

15  you must find the defendant not guilty of Robbery in the Second

16  Degree.

17      And, again, you must consider the lesser included

18  offense of Robbery in the Third Degree.

19      Now, Robbery in the Third Degree, as stated, Robbery

20  in the Third Degree is a lesser included offense on both the

21  third and fourth counts.  You should consider this lesser

22  included offense on the third count if, and only if, you have

23  found the defendant not guilty of Robbery in the First Degree.

24      Similarly, you should consider Robbery in the Third

25  Degree on the fourth count if, and only if, you have found the

JURY INSTRUCTIONS

1   defendant not guilt of Robbery in the Second Degree.

2         Under the law, a person is guilty of Robbery in the

3   Third Degree when he forcibly steals property.

4         For you to find the defendant guilty of Robbery in

5   the Third Degree the People must prove the following elements

6   beyond a reasonable doubt.

7         First -- the following element.  Just one.  That on

8   January 11, 2009, in New York County, the defendant, Mark

9   Richardson, forcibly stole property from Helen Abbott.

10        If you find that the People have proved this element

11  beyond a reasonable doubt then you must find the defendant

12  guilty of Robbery in the Third Degree.

13        However, if you find that the People have not proved

14  this element beyond a reasonable doubt, then you must find the

15  defendant not guilty.

16        Sexual Abuse in the First Degree, the fifth count,

17  charges the defendant with Sexual Abuse in the First Degree.

18        Under our law, a person is guilty of Sexual Abuse in

19  the First Degree, when he subjects another person to sexual

20  contact by means of forcible compulsion.

21        The term sexual contact means any touching of the

22  sexual or other intimate part of a person not married to the

23  actor, for the purpose of gratifying sexual desire of either

24  party.  It includes the touching of the actor by the victim, as

25  well as the touching of the victim by the actor, whether

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1   directly or through clothing.

2              The term forcible compulsion means:  To intentionally

3   compel either by the use of physical force or by a threat which

4   places the person in fear of immediate death or physical

5   injury.

6              For to you find the defendant guilty of Sexual Abuse

7   in the First Degree, the People must prove each of the

8   following three elements beyond a reasonable doubt.

9              First, that on or about January 11, 2009, in New York

10  County, the defendant, Mark Richardson, engaged in touching

11  with Helen Abbott.

12             Specifically, that there was touching between his

13  mouth and her breast.

14             Second, that the defendant did so without Helen

15  Abbott's consent by the use of forcible compulsion.

16             Third, that such touching constituted sexual

17  contact.

18             If you find that the People have proven each of these

19  three elements beyond a reasonable doubt then you must find the

20  defendant guilty of Sexual Abuse in the First Degree.

21             However, if you determine that any one or more of the

22  elements has not been proved beyond a reasonable doubt then you

23  must find the defendant not guilty.

24             Accessorial liability slash acting in concert.  Our

25  law recognizes that two or more individuals can act jointly to

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1    commit a crime and that in certain circumstances each can be

2    held criminally liable for the acts of the other.

3             In that situation those persons can be said to be

4    acting in concert with each other.

5             Our law defines the circumstances under which one

6    person may be criminally liable for the conduct of another

7    person and that definition is as follows:

8             Quote: "When one person engages in conduct which

9    constitutes an offense, another is criminally liable for such

10   conduct, when acting with the state of mind required for the

11   commission of that offense, he solicits, requests, commands,

12   importunes, or intentionally aids such person to engage in such

13   conduct.

14            Under that definition, mere presence at the scene of

15   a crime, even with knowledge that the crime is taking place, or

16   mere association with the perpetrator of a crime, does not by

17   itself make a defendant criminally liable for that crime.

18            In order for the defendant to be held criminally

19   liable for the conduct of another person, or persons, which

20   constitutes an offense, you must find beyond a reasonable doubt

21   as follows:

22            Number one, that the defendant solicited, requested,

23   commanded, importuned, or intentionally aided that person, or

24   persons, to engage in that conduct.

25            And, two, that the defendant did so with the state of

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1   mind required for the commission of the offense.

2       If it is proven beyond a reasonable doubt that the

3   defendant is criminally liable for the conduct of another

4   person, or persons, the extent or degree of the defendants

5   participation in the crime does not matter.

6       A defendant proven beyond a reasonable doubt to be

7   criminally liable for the conduct of another in the commission

8   of a crime is as guilty the of the crime as if the defendant

9   personally had committed every act constituting the crime.

10      The People have the burden again of proving beyond a

11  reasonable doubt that the defendant acted with the state of

12  mind required for the commission of the crime and either

13  personally or by acting in concert with another person, or

14  persons, committed each of the remaining elements of the

15  crime.

16      I am now going to give you an expanded charge on

17  intent.  Intent does not require premeditation.  In other

18  words, intent does not require advanced planning.  Nor is it

19  necessary that the intent be in a persons mind for any

20  particular period of time.

21      The intent can be formed and need only exist at the

22  very moment the person engages in prohibited conduct or acts to

23  cause the prohibitive result and not at any earlier time.

24      The question naturally arises as to how to determine

25  whether or not a defendant had the intent required for the

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1   commission of a crime.

2          To make that determination in this case you must

3   decide if the required intent can be inferred beyond a

4   reasonable doubt from the proven facts.

5          In doing so you may consider the defendant's conduct,

6   if any, and all of the circumstances surrounding that conduct,

7   including but not limited to the following:

8          What, if anything, did the defendant do or say.  What

9   result, if any, followed the defendant's conduct.  And was that

10  result the natural necessary and possible consequence of this

11  conduct.

12         Therefore, in this case, from the facts you find to

13  have been proven, decide whether or not you can infer beyond a

14  reasonable doubt that the defendant had the intent required for

15  the commission of these crimes.

16         We are almost there.  Part 3.

17         Ladies and gentlemen, we have now reached the most

18  critical stage of this trial.  And I am referring, of course,

19  to your deliberations.  During this time you will discuss the

20  evidence among yourselves in order to reach your verdict.

21         As I have stated, you should all enter the jury room

22  with open minds and as you deliberate you must also be willing

23  to listen to the arguments of your fellow jurors and to express

24  your views to them.

25         If during your deliberations you should feel free to

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1  change your mind if you find a different view point from your

2  own to be persuasive.

3         On the other hand, you should hold to your own

4  position if after due deliberations and discussion, you

5  conscientiously believe it to be the correct one.

6         The deliberations are to take place only when all 12

7  deliberating jurors and no one else are present inside the jury

8  room.  Your deliberations must cease if anyone else, such as a

9  Court Officer should enter a jury room form any reason.

10        Your deliberations must also cease whenever the full

11 jury is not present.  You are entitled to see any physical

12 exhibit that was received into evidence.  Merely write out a

13 request, signed by your foreperson, requesting the particular

14 exhibit you wish to see and it will then be made available to

15 you.

16        Now, it may be that you will have difficulty

17 recalling certain portions of the charge -- I'm sorry -- of the

18 testimony or the charge, or if you find part of the charges

19 were unclear to you, if you wish to have any portion of the

20 testimony or the charge reread to you, or if you wish to have

21 some part of the charge explained further, again, just write

22 out your request and have it signed by your foreperson.

23        Please make any such request as specific as

24 possible.  For example, you may limit a request for testimony

25 by indicating the particular subject matter of the witness or

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1   witnesses involved.  As soon as we have located the relevant

2   part of the record we will call you out and answer your

3   request.

4         You will take into the jury room with you a verdict

5   sheet, it sets out the charges which are being submitted, all

6   of the charges which are being submitted for your consideration

7   and columns marked guilty or not guilty.  You have to make a

8   separate determination with respect to each charge.  And when

9   you have reached a verdict on a particular charge you will then

10  mark the appropriate column.

11        Remember, your verdict as to each and every charge,

12  whether it is guilty or not guilt, must be unanimous.

13        Now, very quickly on note taking.  I just remind

14  those who have been taking notes, that the notes are not a

15  substitute for the official record, or for your own independent

16  recollection, and that while you may take the notes into the

17  jury room they should be -- they are for your use only and not

18  for the use of anyone else.

19        So, ladies and gentlemen, that does it.  Those are my

20  instructions on this case.  I now, under the law, I must confer

21  with counsel.  It maybe, for example, that I just said to you

22  needs to be amended or clarified in some fashion.

23        Typically, however, these conferences do take place

24  in a mater of minutes and word will be brought into you very

25  shortly.  So I am going to ask everyone, that is all 14 of you,

JURY INSTRUCTIONS

1   to gather your things, if you will, and to go on into the jury

2   room but to await further word from us.  Do not yet begin any

3   deliberations.

4           All right.  Thank you very much.

5           (The jury was excused, exits the courtroom and enters

6   the jury room.)

7           THE COURT:  Okay.  The coast is clear.  With

8   respect to the charge, any objection to the charge as given?

9           MR. BOGDANOS:  Yes, Your Honor.  Two.  And I

10  suspect both were just probably word processor errors.

11          On Sexual Abuse in the First Degree, when listing the

12  elements, Your Honor said that the first element was that the,

13  that specifically there was touching between mouth and her

14  breast.

15          I never elicited that and there is no evidence of

16  that.  That's not the People's position.  It's any touching

17  under 130.00, subsection 3, sexual contact means any touching.

18  We don't knows if it's saliva or sweat.  So that I actually

19  would ask be corrected.

20          It's the first count, should be, whether there is any

21  touching between the defendant and the victim's breast.  So

22  that's the part I think may have come from your last case or

23  something but I never said that.

24          THE COURT:  And what's your other?

25          MR. BOGDANOS:  The other one, I don't need it

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1   corrected now, but if they were to ever ask for expanded

2   intent, again, Your Honor in the expanded intent charge said

3   that -- you know I should have it in front of me -- that it has

4   to be the natural, the necessary and probable cause.  The

5   effect has to be the necessary effect.

6            That's not the law.  It's natural and probable.

7   There is no requirement under the law that the effect be the

8   necessary effect.  That's not a standard in the law.

9            So I don't know how that got -- I believe that was a

10  typo.

11            MR. BOGDANOS:  And that's what I thought, Judge.

12            MR. BOGDANOS:  I don't need that corrected just

13  if they ever ask for it again that word necessary needs to come

14  out other then that it's fine.

15            THE COURT:  All right.  Mr. Klein, do you agree

16  with Mr. Bogdanos as to the first one?

17            MR. KLEIN:  As to, umm, sorry?

18            THE COURT:  Sexual Abuse point.

19            MR. KLEIN:  You have the indictment in front of

20  you it's not in there.  It's not in the indictment.

21            MR. BOGDANOS:  Correct, it's sexual contact.

22            MR. BOGDANOS: No, I believe it.  And I think

23  it's just a typo.

24            THE COURT:  I will just change it to the

25  defendant engaged in touching with Ms. Abbott, specifically,

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1   that there was touching between defendant, any touching between

2   the defendant --

3                MR. BOGDANOS:  No, I take it back.  It's in the

4   indictment.  No.  No.  I withdraw my objection.  I will leave

5   it.  I'm sorry.

6                MR. KLEIN:  That's all right.

7                MR. BOGDANOS:  My fault.

8                THE COURT:  All right.  Square one for John

9   Paul.  Put that in the record please.  I did not have the

10  indictment in front of me.

11               MR. BOGDANOS:  Nor I.  And I didn't do the

12  indictment it wouldn't have been in the indictment if I had

13  done the indictment.

14               MR. KLEIN:  Judge, I have a request.  Are you

15  done?

16               MR. BOGDANOS:  Yes.  The second point --

17               THE COURT:  I take it you are fine to leave the

18  spin on intent until they ask for it?

19               MR. KLEIN:  Yes.

20               THE COURT:  And now your point, Mr. Klein.

21               MR. KLEIN:  I think I neglected to ask for a

22  lesser included charge.  Were there a conviction in this case I

23  think my client could probably bring a 440 based on ineffective

24  assistance of counsel, based on a reasonable view of the

25  evidence in this case.

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1       Being that the defendant, what he did was, he stole

2   the property, he stole not so much the money but that he stole

3   the phone, and if he stole the phone and there's no basis

4   really to understand how he stole the phone, then the defendant

5   could be guilty of petit larceny and not guilty of any kind of

6   robbery.

7       Because there is evidence in the case and, you know,

8   it is a confusing issue, I am not trying to excuse myself,

9   maybe this is why I missed it, because it's not clear what the

10  actual property is that the People have to prove that the

11  defendant took, and I am not saying that, therefore, they are

12  going to come in with a duplicitous verdict, but it is

13  certainly plausible that this jury will find that what the

14  defendant did and that they'll disregard his statement and say,

15  we don't believe anything the defendant says, we believe he

16  stole in some fashion Helen Abbott's phone and if he does that

17  that's petit larceny.

18      And I don't think anyone is prejudiced by the jury

19  being instructed on that as a lesser included and that's my

20  request.

21      MR. BOGDANOS:  Well, as a procedural matter, we

22  have already summed up so it's too late for that.

23      But, even putting that -- it's too late for that

24  request, it's untimely -- even putting that aside, there is no

25  reasonable view of the evidence that supports a petit larceny

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1    in this case under any circumstances.  All there is is a

2    forcible taking.

3              Helen Abbott is dead.  So, clearly force was used.

4    So, the People -- first, we oppose it as untimely.

5              So that Mr. Klein doesn't beat himself up this

6    would -- I would have opposed this had he requested it prior

7    during the charging conference prior to sum and charge, there

8    is no evidence in the record whatsoever and so the People

9    oppose.

10             THE COURT:  That application is denied.

11   Anything else on the charge?

12             MR. KLEIN:  That's it.  Thank you.

13             THE COURT:  All right.

14             Mr. Klein, on the two alternates jurors, what is your

15   position?

16             MR. KLEIN:  Let's keep them for now.

17             THE COURT:  Thank you.  And the verdict sheet.

18   Please just say whether you agree with it.

19             MR. BOGDANOS:  You don't want us to sign it?

20             THE COURT:  I don't want you to sign.

21             MR. BOGDANOS:  That's fine, Judge.

22             MR. KLEIN:  Fine.

23             THE COURT: May the Sergeant enter the jury room,

24   advise the 12 to begin and put the two alternates in a separate

25   room?

Glenn J. Merola, Sr. Court Reporter

JURY INSTRUCTIONS

1                    MR. KLEIN:  Yes.

2                    MR. BOGDANOS:  Yes.

3                    THE COURT:  Tel them they may start.

4           (Whereupon, the jury begins their deliberations.

5     Time noted is 4:05 p.m.)

6                    THE COURT:  All right, back on the record.

7                    THE COURT CLERK:  Case on trial continues.  All

8     parties are present.  The defendant is present.  The jury is

9     not present.

10                    MR. KLEIN:  Yes, I think we agreed on the

11    witness list that can go in and I have no objection that it

12    also has the names of the witnesses.  That's fine.

13                    MR. BOGDANOS:  That's fine.

14                    THE COURT:  Just so the record is clear, we did

15    receive a note from the jury, they asked for a list of numbered

16    exhibits.  We have now put together such a list and both sides

17    have agreed to it and that it will go into the jury room in

18    it's present form, correct?

19                    MR. BOGDANOS:  Yes.

20                    MR. KLEIN:  Yes, Judge.

21                    THE COURT:  All right.  Exhibit list has gone

22    into the jury room as Court Exhibit Number 5.

23           (Pause in the proceedings while the jury continues to

24    deliberate.)

25                    THE COURT CLERK:  Case on trial continues.  The

                    Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/DELIBERATIONS

1  parties are present.  The defendant is present.  The jury is

2  not present.

3              THE COURT:  Thank you.  We have received our

4  first note from the jury.  Both sides have read it.  We

5  discussed it informally.

6         The note reads as follows:  We, the jury, request,

7  quote, "we need all of the charges in writing."  End quote.

8         I believe both sides are in agreement that in

9  response to the note I will simply advise them that they we do

10 not provide written copies of the charges for the jury but,

11 rather, I must reread those charges for them if they so

12 desire.

13             MR. BOGDANOS:  The only thing I would ask, in

14 addition, if we could ask, I know you said already to be as

15 specific as possible, and I would just ask if we could ask do

16 they need the elements of the crimes or the entire charge.  It

17 might save Your Honor some voice.

18             THE COURT:  It's true.  They say charges but I

19 took it to mean various crimes but it could be more than that.

20             MR. BOGDANOS:  I do too.  I took it to mean

21 elements.  If Mr. Klein consents we can just ask them.

22             MR. KLEIN: We can ask them but they can't answer

23 now.

24             THE COURT:  I will ask them to be more specific

25 in a follow-up note.  And I am also going to advise them to

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/DELIBERATIONS

1    cease their deliberations given the hour and remind them that

2    when I said 2009 in referring to any of the elements I meant

3    2008 and they knew that.

4              Are both sides ready?

5              MR. KLEIN:  Yes.

6              MR. BOGDANOS:  And impress timeliness for

7    tomorrow morning.

8              THE COURT:  I will.  May we have the jury,

9    please.  And the alternates.

10             THE SERGEANT:  Twelve deliberating jurors

11   entering.

12             (The 12 sworn jurors enter the courtroom.)

13             THE SERGEANT:  Your Honor, the full jury is now

14   entering.

15             (The two alternates jurors enter the courtroom.)

16             THE COURT CLERK:  Case on trial continues.  All

17   parties are present.  The defendant is present.  All jurors are

18   present and properly seated.

19             THE COURT:  Thank you.  And, ladies and

20   gentlemen, in this, your latest note, you quite understandably

21   asked for the charges in writing.

22             Unfortunately, New York is one of those few remaining

23   states that does not allow a deliberating jury to have the

24   charges in writing in the jury room and that means that we have

25   to -- I have to reread the charges to you in the courtroom.

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/DELIBERATIONS

1      So, that's the first problem with this note.  The

2  second problem is, when you say charges, we're not exactly sure

3  what you are referring to, it could be the whole charge or

4  could be the elements of the various offenses that you are

5  interested in.

6      So we're going to ask you, first thing tomorrow

7  morning, to give us a follow-up note on this note and thin I

8  will read to you whatever it is that you want reread.

9      And, believe it or not, I am willing to do it as many

10  times as you need to hear it, but that's the way we have to

11  proceed.

12      In addition, when I read the charge to you and I was

13  going through the various elements it has come to my attention

14  that on a few occasions I misspoke and I gave you the wrong

15  date.  You probably picked that up.  It's 2008 not 2009.  I

16  apologize for any confusion on that.

17      After conferring with counsel, I have decided, ladies

18  and gentlemen, that we're going to call it a day at this

19  point.  You need a response to this note or it's follow-up

20  equivalent in the morning as we're now passed the 4:30 hour.

21      So, to give you the charge, let's say you wanted the

22  elements, to do that now, we could do it, but then there would

23  be very little time for you to deliberate afterward, so it

24  makes sense to call it a day and bring you in first thing

25  tomorrow morning and get a response to this note.  Give you a

Glenn J. Merola, Sr. Court Reporter

PROCEEDINGS/DELIBERATIONS

1   response to the note.

2        So, let me remind everyone, all 14 of you, that we

3   need you to be here promptly tomorrow morning, it's going to be

4   a very, very busy day, so if you are running late, of course,

5   give us a call, but please make every effort to be here by

6   9:45.  We cannot start until everyone is here.

7        And, also, since the case is at it's most critical

8   stage, I am obliged to remind you that under no circumstances

9   are you permitted t o discuss this case with anyone between now

10  and tomorrow morning.

11        So, that's it, you're good to go now and see you

12  tomorrow morning.  Thank you very much.

13       (Whereupon, the jury was excused and exits the

14  courtroom.)

15        (The trial was adjourn to September 27, 2011.)

16        (Continued on next page.)

17

18

19

20

21

22

23

24

25

Glenn J. Merola, Sr. Court Reporter

```
 1  SUPREME COURT        NEW YORK COUNTY
    TRIAL TERM           PART 45
 2  ------------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK : INDICTMENT #
 3                                      : 3534/08
                                        :
 4                                      :
         AGAINST                        : CHARGE
 5                                      : MURD 2
    MARK RICHARDSON                     :
 6                 Defendant.           :
    ----------------------------------x TRIAL - VERDICT
 7
 8                   111 Centre Street
                  New York, New York  10013
 9                  September 27, 2011
10
11  B E F O R E:
12      HONORABLE BRUCE ALLEN
              JUSTICE OF THE SUPREME COURT
13
14
    APPEARANCES: (Same as previously noted)
15
16  ----------------------------------------------------
17             (Jury deliberating.)
18             THE COURT CLERK:  Case on trial continues.  All
19      parties are present.  The defendant is present.  The jury is
20      not present.
21             THE COURT:  Thank you.  We have a note this
22      morning which reads as follows:  "We, the jury, request
23      please repeat counts three and four and five," and that
24      would be a rereading of robbery in the first degree, robbery
25      in the second degree and, of course, the lesser included
```

*Penelope Messina, RPR*
*Senior Court Reporter*

1    offense of robbery in the third degree; and then count five

2    sexual abuse in the first degree.

3              I will use the same language that I used the first

4    time around and I take it both sides are in agreement?

5              MR. KLEIN:  Yes.

6              MR. BOGDANOS:  Yes.

7              THE COURT:  Are both sides ready for the jury?

8              MR. KLEIN:  Yes.

9              MR. BOGDANOS:  Yes, your Honor.

10              THE COURT:  Thank you.  May we have the jury,

11   please.

12              Mr. Klein -- this is off the record.

13              (Off-the-record discussion.)

14              THE COURT OFFICER:  Jury entering.

15              (Jury entered the courtroom.)

16              THE COURT CLERK:  Case on trial continues.  All

17   parties are present.  The defendant is present.  All jurors

18   are present.

19              THE COURT:  Thank you, good morning, ladies and

20   gentlemen.  We have received your note.  It is very

21   straightforward.  You asked for a rereading of counts three,

22   four and five.  I will now go through it again using

23   essentially the same language.  I will try to read it a

24   little more slowly this time.  If you want something

25   repeated or you want me to back up, then say, read it again.

1    Just signify with a hand and I will be happy to do that.

2              Robbery in the first degree, the third count of

3    the indictment charges robbery in the first degree.  The law

4    as it applies to this count defines robbery in the first

5    degree as follows:  A person is guilty of robbery in the

6    first degree when he forcibly steals property and when in

7    the course of the commission of a crime or the immediate

8    flight therefrom he or another participant in the crime

9    causes serious physical injury to any person who is not a

10   participant in the crime.

11             The term stealing, which the law calls larceny,

12   and the term forcible stealing have their own special

13   meaning in the law.  A person steals property and commits

14   larceny when with the intent to deprive another of property

15   or to appropriate the property to himself or to a third

16   person, such person wrongfully takes, obtains, or withholds

17   the property from the owner.

18             A person forcibly steals property and commits

19   robbery when in the course of committing a larceny, he uses

20   or threatens the immediate use of physical force upon

21   another person for the purpose of compelling the owner of

22   such property to deliver up the property or for the purpose

23   of preventing or overcoming resistance to the taking of the

24   property or for the purpose of preventing or overcoming

25   resistance to the retention of the property immediately

1    after the taking.

2              The term serious physical injury means impairment

3    of a person's physical condition which creates a substantial

4    risk of death or which causes death or serious and

5    protracted disfigurement or protracted impairment of health

6    or protracted loss or impairment of the function of any

7    bodily organ.

8              For you to find the defendant guilty of robbery in

9    the first degree on this count, the People must prove both

10   of the following elements beyond a reasonable doubt:  First,

11   that on or about January 11, 2008, in New York County the

12   defendant Mark Richardson personally or by acting in concert

13   with another person forcibly stole property.

14             Second, that in the course of the commission of

15   the robbery or the immediate flight therefrom the defendant

16   or another participant in the crime caused serious physical

17   injury to a person who was not a participant in the crime

18   specifically, Helen Abbott.

19             If you find that the People have proved both of

20   these two elements beyond a reasonable doubt, then you must

21   find the defendant guilty of robbery in the first degree;

22   however, if you find that one or both of the elements has

23   not been proved beyond a reasonable doubt, then you must

24   find the defendant not guilty of robbery in the first

25   degree; and you must then consider the lesser included

1    offense of robbery in the third degree.

2              Count four, robbery in the second degree the

3    fourth count of the indictment charges the defendant with

4    robbery in the second degree.  The law as it applies to this

5    case defines robbery in the second degree as follows:  A

6    person is guilty of robbery in the second degree when that

7    person forcibly steals property and when that person is

8    aided by another person who is actually present.

9              In order for you to find the defendant guilty of

10   this crime, the People must prove beyond a reasonable doubt

11   both of the following elements:  First, that on

12   January 11, 2008, in New York County the defendant

13   Mark Richardson forcibly stole property from Helen Abbott.

14             Second, that the defendant was aided in doing so

15   by another person who was actually present.  If you find

16   that the People have proved both of these two elements

17   beyond a reasonable doubt, then you must find the defendant

18   guilty of robbery in the second degree on this count;

19   however, if you find that either one or both of the elements

20   has not been proved beyond a reasonable doubt, then you must

21   find the defendant not guilty of robbery in the second

22   degree; and you must then consider the lesser included

23   offense of robbery in the third degree.

24             Robbery in the third degree as stated, robbery in

25   the third degree is a lesser included offense on both the

1    third and fourth counts.  You should consider the lesser

2    included offense of robbery in the third degree on the third

3    count if and only if you have found the defendant not guilty

4    of robbery in the first degree.

5          Similarly, you should consider robbery in the

6    third degree on the fourth count if and only if you have

7    found the defendant not guilty of robbery in the second

8    degree.

9          Under the law a person is guilty of robbery in the

10    third degree when he forcibly steals property.  For you to

11    find the defendant guilty of robbery in the third degree,

12    the People must prove the following element beyond a

13    reasonable doubt; that on January 11, 2008, in New York

14    County the defendant Mark Richardson, forcibly stole

15    property from Helen Abbott.  If you find that the People

16    have proved this element beyond a reasonable doubt, then you

17    must find the defendant guilty of robbery in the third

18    degree; however, if you find that the People have not proved

19    the element beyond a reasonable doubt, then you must find

20    the defendant not guilty.

21          Finally, the fifth count sexual abuse in the first

22    degree, under our law a person is guilty of sexual abuse in

23    the first degree when he subjects another person to sexual

24    contact by means of forcible compulsion.  The term "sexual

25    contact" means any touching of the sexual or other intimate

1   parts of a person not married to the actor for the purpose

2   of gratifying the sexual desire of either party.

3         It includes the touching of the actor by the

4   victim as well as the touching of the victim by the actor

5   whether directly or through clothing.

6         The term "forcible compulsion" means to

7   intentionally compel either by the use of physical force or

8   by a threat, which places the person in fear of immediate

9   death or physical injury.

10        For you to find the defendant guilty of sexual

11  abuse in the first degree, the People must prove each of the

12  following three elements beyond a reasonable doubt, first,

13  that on January 11, 2008, in New York County the defendant

14  Mark Richardson engaged in touching with Helen Abbott;

15  specifically, that there was touching between his mouth and

16  her breast.

17        Second, that the defendant did so without

18  Ms. Abbott's consent by the use of forcible compulsion; and

19  third, that such touching constituted sexual contact.  If

20  you find that the People have proved each of these three

21  elements beyond a reasonable doubt, then you must find the

22  defendant guilty of sexual abuse in the first degree;

23  however, if you determine that any one or more of the

24  elements has not been proved beyond a reasonable doubt, then

25  you must find the defendant not guilty.

1          Ladies and gentlemen, that completes the reading

2     of those three counts.  I am, therefore, going to ask all of

3     you to return to the jury room.  Thank you very much.

4          (Jury exited the courtroom.)

5          (Jury deliberating.)

6          MR. BOGDANOS:  Your Honor, we have one matter to

7     put on the record.

8          THE COURT:  I am sorry.  Mr. Bogdanos.

9          MR. BOGDANOS:  Yes, Judge, the D.D.5's that I had

10    requested be made as a court exhibit during our earlier

11    argument on the defendant's third party exculpatory evidence

12    motion, I have them now.  I have shown it to Mr. Klein.

13    There is fifteen altogether, and I think they are

14    acceptable.

15          MR. KLEIN:  It is fine if they become part of the

16    court exhibit.

17          (Handing.)

18          THE COURT:  Mark them as court exhibits as well.

19          THE COURT CLERK:  Yes.

20          MR. BOGDANOS:  The only other thing, your Honor, I

21    know this is completely unorthodox but I would kick myself

22    if I can't say this long before the verdict, I would like to

23    thank your honor for an extraordinarily fair trial and the

24    way you treated the attorneys on both sides with respect and

25    you let us try our cases; so I want to thank the Court for

1      that consideration throughout the course of the trial.

2                  I also want to thank Mr. Klein.  There is a reason

3      he has a reputation of being one of the best attorneys in

4      the business; and he has certainly proven it on this case.

5                  THE COURT:  Thank you.  All right, you could bring

6      Mr. Richardson down.

7                  (Jury deliberating.)

8                  THE COURT:  You could show him the note.

9                  (Handing.)

10                 (Defense Attorney Klein conferred with defendant.)

11                 MR. KLEIN:  Thank you, Judge.

12                 THE COURT:  You are welcome.

13                 THE COURT CLERK:  Case on trial continues.

14     Parties are present.  The defendant is present.  The jury is

15     not present.

16                 THE COURT:  We have a new note from the jury.

17     This one reads as follows:  "We would like to hear count

18     number one again," and as before I would simply reread the

19     language given the first time around if that's acceptable to

20     both sides.

21                 MR. BOGDANOS:  Yes, your Honor.

22                 MR. KLEIN:  Yes.

23                 MR. BOGDANOS:  Judge, you caught the '09?

24                 THE COURT:  I did.  Both sides ready for the jury?

25                 MR. BOGDANOS:  Yes.

1      MR. KLEIN:  Yes.

2      THE COURT:  Thank you.  May we have the jury,

3  please.

4      THE COURT OFFICER:  Jury entering.

5      (Jury entered the courtroom.)

6      THE COURT CLERK:  Case on trial continues.  The

7  parties are present.  The defendant is present.  All jurors

8  are present and properly seated.

9      THE COURT:  Thank you.  Ladies and gentlemen, we

10  are now ready to respond to your latest note.  In this one

11  you have asked for a rereading of count number one.

12      Murder in the second degree under count one, under

13  our law a person is guilty of murder in the second degree

14  when in the course of and in furtherance of the commission

15  or attempted commission of a felony -- of a robbery whether

16  robbery in the first, second or third degree or in the

17  immediate flight therefrom that person or another

18  participant, if there be any, causes the death of a person

19  other than one of the participants.

20      Under that law when in the course of and in the

21  furtherance of or commission of robbery or in the immediate

22  flight therefrom a participant in the commission of that

23  felony causes the death of a nonparticipant, then all of the

24  participants, the one who caused the death as well as the

25  other participants in the felony are guilty of murder in the

1   second degree.

2          In determining whether a person was in the

3   immediate flight from the commission or attempted commission

4   of robbery, you may consider number one, the distance, if

5   any, between the location of the robbery and the location

6   where death was caused; two, the interval of time, if any,

7   between the commission of the felony and the causing of the

8   death; three, whether any police, security personnel, or

9   citizens were in close pursuit at the time the death was

10  caused; four, whether such person possessed fruits of the

11  crime at the time the death was caused; and, five, whether

12  such person had reached a place of temporary safety before

13  death was caused.

14         In order for you to find the defendant guilty of

15  this crime, the People are required to prove beyond a

16  reasonable doubt both of the following two elements:  First,

17  that on January 11, 2008, in New York County the defendant

18  Mark Richardson committed robbery; and, second, that in the

19  course of and in furtherance of the commission of such crime

20  or in the immediate flight therefrom, the defendant or

21  another participant in the commission of that crime caused

22  the death of Helen Abbott and that Helen Abbott was not a

23  participant in that felony.

24         If you find that the People have not proved beyond

25  a reasonable doubt either one or both of those elements,

1    then you must find the defendant not guilty of murder in the

2    second degree as charged in the first count.

3             On the other hand, if you find that the People

4    have proved beyond a reasonable doubt both of those two

5    elements, you must then consider an affirmative defense that

6    the defendant has raised.

7             Remember, if you have already found the defendant

8    not guilty of murder in the second degree as charged in this

9    count, you will not consider the affirmative defense.  Under

10   our law, it is an affirmative defense to murder in the

11   second degree as charged in this count that, number one, the

12   defendant did not commit the homicidal act or in any way

13   solicit, request, command, importune, cause, or aid the

14   commission thereof; and, two, that the defendant was not

15   armed with a deadly weapon or any instrument, article, or

16   substance readily capable of causing death or serious

17   physical injury and of a sort not ordinarily carried in

18   public places by law abiding persons; and, three, that the

19   defendant had no reasonable ground to believe that any -- to

20   believe that any other participant was armed with such a

21   weapon, instrument, article, or substance; and, four, that

22   the defendant had no reasonable ground to believe that any

23   other participant intended to engage in conduct likely to

24   result in death or serious physical injury.

25             Under our law the defendant has the burden of

1    proving an affirmative defense by a preponderance of the

2    evidence.  In determining whether the defendant has proved

3    the affirmative defense by a preponderance of the evidence,

4    you may consider evidence introduced both by the People and

5    by the defendant.

6           A preponderance of the evidence means the greater

7    part of the believable and reliable evidence; not in terms

8    of the number of witnesses or the length of time taken to

9    present the evidence but in terms of its quality and the

10   weight and convincing effect it has.

11          For the affirmative defense to be proved by a

12   preponderance of the evidence, the evidence that supports

13   the affirmative defense must be of such convincing quality

14   as to outweigh any evidence to the contrary; therefore, if

15   you find that the defendant has not proved the affirmative

16   defense by a preponderance of the evidence, then based upon

17   your initial determination that the People had proved beyond

18   a reasonable doubt the elements of murder in the second

19   degree, you must then find the defendant guilty of that

20   crime as charged in the count.

21          On the other hand, if you find that the defendant

22   has proved the affirmative defense by a preponderance of the

23   evidence, then you must find the defendant not guilty of

24   murder in the second degree on this count.

25          That completes the reading of the count, so I ask

1    all of you to return once again to the jury room.  Thank

2    you.

3               (Jury exited the courtroom.)

4               THE COURT:  All right.  That's it.

5               (Jury deliberating.)

6               (Luncheon recess.)

7               A F T E R N O O N   S E S S I O N

8               (Defense Attorney Klein conferred with defendant.)

9               THE COURT:  Let's go on the record, first.  Primo.

10              THE COURT CLERK:  Case on trial continues.  All

11   parties are present.  The defendant is present.  The jurors

12   are not.

13              THE COURT:  Thank you.  We have received a note

14   from the jury indicating that they have reached their

15   verdict.  Are both sides ready?

16              MR. KLEIN:  Yes.

17              MR. BOGDANOS:  Yes.

18              THE COURT:  Thank you.  May we have the twelve

19   deliberating jurors and the two alternate jurors as well.

20              THE COURT OFFICER:  Jury is entering.

21              (Jury entered the courtroom.)

22              THE COURT:  You may all be seated.

23              THE COURT CLERK:  Case on trial continues.  All

24   parties are presented.  The defendant is present.  All

25   jurors are present and properly seated.

<u>Verdict</u>                                                      1207

1        THE COURT:  You may proceed.

2        THE COURT CLERK:  Would the foreperson please

3   rise.  Have you agreed upon a verdict?

4        THE FOREPERSON:  Yes, we have.

5        THE COURT CLERK:  How say you as to the first

6   count of the indictment charging Mark Richardson with the

7   crime of murder in second degree, guilty or not guilty?

8        THE FOREPERSON:  Count No. 1 murder in second

9   degree, guilty.

10       THE COURT CLERK:  How say you as to the second

11  count of the indictment charging Mark Richardson with the

12  crime of murder in the second degree, guilty or not guilty?

13       THE FOREPERSON:  Not guilty.

14       THE COURT CLERK:  How say you as to the third

15  count of the indictment charging Mark Richardson with the

16  crime of robbery in first degree, guilty or not guilty?

17       THE FOREPERSON:  Guilty.

18       THE COURT CLERK:  How say you as to the fourth

19  count of the indictment charging Mark Richardson with the

20  crime of robbery in second degree, guilty or not guilty?

21       THE FOREPERSON:  Guilty.

22       THE COURT CLERK:  How say you as to the fifth

23  count of the indictment charging Mark Richardson with the

24  crime of sexual abuse in first degree, guilty or not guilty?

25       THE FOREPERSON:  Not guilty.

1        THE COURT CLERK:  Thank you.  You may be seated.

2            Listen to your verdict as it stands recorded each

3    of you say through your foreperson that you find

4    Mark Richardson guilty of murder in the second degree under

5    the first count; not guilty of murder in the second degree

6    under the second count; guilty of robbery in the first

7    degree under the third count; guilty of robbery in the

8    second degree under the fourth count; and not guilty of

9    sexual abuse in the first degree under the fifth count and

10    so say you all.

11        THE COURT:  You may poll the jury.

12        THE COURT CLERK:  Listen to your verdict as it

13    stands recorded each of you say through your foreperson that

14    you find Mark Richardson guilty of murder in the second

15    degree under the first count; not guilty of murder in the

16    second degree under the second count; guilty of robbery in

17    the first degree under the third count; guilty of robbery in

18    the second degree under the fourth count; and not guilty of

19    sexual abuse in the first degree under the fifth count.

20    Juror No. 1, is that your verdict?

21        JUROR NO. 1:  Yes.

22        THE COURT CLERK:  Juror No. 2, is that your

23    verdict?

24        JUROR NO. 2:  Yes.

25        THE COURT CLERK:  Juror No. 3, is that your

1      verdict?

2                  JUROR NO. 3:  Yes.

3                  THE COURT CLERK:  Juror No. 4, is that your

4      verdict?

5                  JUROR NO. 4:  Yes.

6                  THE COURT CLERK:  Juror No. 5, is that your

7      verdict?

8                  JUROR NO. 5:  Yes.

9                  THE COURT CLERK:  Juror No. 6, is that your

10     verdict?

11                 JUROR NO. 6:  Yes.

12                 THE COURT CLERK:  Juror No. 7, is that your

13     verdict?

14                 JUROR NO. 7:  Yes.

15                 THE COURT CLERK:  Juror No. 8, is that your

16     verdict?

17                 JUROR NO. 8:  Yes.

18                 THE COURT CLERK:  Juror No. 9, is that your

19     verdict?

20                 JUROR NO. 9:  Yes.

21                 THE COURT CLERK:  Juror No. 10, is that your

22     verdict?

23                 JUROR NO. 10:  Yes.

24                 THE COURT CLERK:  Juror No. 11, is that your

25     verdict?

1              JUROR NO. 11:  Yes.

2              THE COURT CLERK:  Juror No. 12, is that your

3      verdict?

4              JUROR NO. 12:  Yes.

5              THE COURT CLERK:  Your Honor, the jury has been

6      polled.

7              THE COURT:  Thank you.

8              Ladies and gentlemen, just a few more words and I

9      will let you go.  I want to thank all of you for your

10     service on this case.  Part of my job, of course, is to

11     keep an eye on things as we go along but I certainly thought

12     this group was focused and attentive throughout.

13             I mean the stakes are very high.  You really can't

14     get any higher.  I think you all understood that, and I am

15     certainly satisfied you all gave the case careful

16     consideration.  You have been down here for what probably

17     seems like weeks and weeks so you had a chance to see how

18     our system works firsthand.

19             You might not agree with me right now but if you

20     think about it over time, I think you will agree that our

21     system does work pretty well.  I can tell you in this

22     particular case we had really the highest level of advocacy.

23     Both sides were well prepared and certainly made all the

24     legal arguments, many of which were behind the scenes, that

25     needed to be made; and it was a pleasure to work with them.

1  They are a credit to the profession, all of them; all three
2  of them.

3          I also like to remind juries that we have a
4  tremendous staff, folks who work here.  This is a tough
5  environment.  Look at this place.  It is not the most
6  comfortable place to work but the officers here led by
7  Sgt. Lovrich, they perform at a very high level of
8  professionalism.  I am sure you were treated with courtesy
9  and respect throughout your time here.

10         The reporters, Penelope Messina right in front of
11 me and her partner Glenn Merola, it is incredible how they
12 can take down all this stuff without missing a beat.

13         Our clerk Primo Torres just got back this week.  I
14 know that his house was flooded out in New Jersey but he
15 still managed to come in.  The brains of the operation
16 John-Paul Mayer my law clerk, without him I probably would
17 have to retire but all in all, it -- we can come down here
18 everyday because we believe that something important is
19 happening in this courtroom and in the other courtrooms
20 across the way; but its folks like yourselves who have the
21 final vote.  You make the system what it is.

22         It's been my honor really to be able to preside
23 over these trials all these years.  I know the system works.
24 I don't think any of us could come up with a better one if
25 we tried to invent one; but again it's only when the

1  citizens are willing to step forward and do the heavy work

2  that it makes -- that's what makes the system work so no one

3  is going to give you any kind of an award when you leave,

4  just a quiet pat on the back if you will for your service

5  here; and the reward I think I mentioned this at the outset

6  is we don't ask you to come down again for eight --

7            THE COURT CLERK:  Eight years.

8            THE COURT:  So there will be plenty of time to get

9  ready for the next time.  I won't be here I don't think, but

10  who knows.  Maybe I will.

11            For those who are -- who would like to ask a few

12  questions if you wait behind in the jury room, I'll try to

13  come in and then try to answer those questions.  For

14  everybody else, you are free to go and thanks again.  That's

15  it.

16            (Jury exited the courtroom.)

17            THE COURT:  A date Mr. Klein?

18            MR. KLEIN:  How is October 27th?  It's a Thursday.

19            THE COURT:  That's fine.

20            MR. BOGDANOS:  Judge, I would ask the defendant be

21  remanded.

22            THE COURT:  Yes, if he is not already, he is now

23  remanded.  10/27.

24            MR. KLEIN:  What time, Judge?

25            THE COURT:  In the morning.

1     MR. KLEIN:  Okay.

2     MR. BOGDANOS:  9:45 is that good?

3     THE COURT:  Yes, please.  Are there any jurors

4   waiting to --

5     THE SERGEANT:  They are all back there.

6     (Case adjourned to October 27, 2011.)

7          oOo


8   I hereby certify the foregoing to be a true and
9   accurate transcript of the original stenographic record
    in the above proceedings.
10
11     Penelope Messina
       Senior Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SUPREME  COURT              NEW  YORK  COUNTY
     CRIMINAL  TERM                   PART  45
 2   - - - - - - - - - - - - - - - - - - - - - - -
     THE  PEOPLE  OF  THE  STATE  OF  NEW  YORK      INDICTMENT #
 3                                                        3534/08

 4                           -against-

 5
     MARK  RICHARDSON,
 6

 7
                                    Defendant      Sentence
 8
     - - - - - - - - - - - - - - - - -- - - - -
 9
                                   111  Centre  Street
10                              New  York,  New  York  10013
                                   October  27,  2011
11
     B  E  F  O  R  E:
12
                   THE  HONORABLE  BRUCE  ALLEN,  J.S.C.
13                      JUSTICE  OF  THE  SUPREME  COURT

14
     A  P  P  E  A  R  A  N  C  E  S:
15
     For  the  People:         CYRUS  R.  VANCE,  ESQ.
16                             District  Attorney  New  York  County
                               New  York,  New  York
17                             By:  Matthew  Bogdanos,  Esq.
                                  (For  the  People)
18

19   For  the  Defendant:

20                             THE  LEGAL  AID  SOCIETY
                               By:  Thomas  Klein,  Esq.
21                             New  York,  New  York
                        (Attorney  for  defendant  Mark  Richardson)
22

23

24

25      Lourdes  Torres-Fuster,  Senior  Court  Reporter
```

1      COURT CLERK:  This is Number 3 on the calendar, 3534
2   of'08, Mark Richardson.
3      MR. KLEIN:  Legal Aid Society by Thomas Klein.
4      MS. LEGLER:  Sara Legler.
5      MR. BOGDANOS:  And, Matthew Bogdanos for the People.
6   Good morning, your Honor.
7      THE COURT:   Good morning, everyone.
8   Good morning, Mr. Richardson.
9      THE DEFENDANT:  Good morning.
10     THE COURT:   Are both sides ready to proceed?
11     MR. KLEIN:  Yes.
12     MR. BOGDANOS:  Yes.
13     COURT CLERK:   Mr. Richardson--
14     THE COURT:   Well, before we get to the actual sentence
15  there are a couple of preliminary matters.
16     MR. KLEIN:  Yes.  The defendant had filed a 3.30 motion
17  asking that the verdict be overturned on the grounds --
18  well, first of all, I should say that in the motion itself
19  there was an allegation about ineffective assistance of
20  counsel and I spoke to the defendant about that.  He does
21  not want that to be part of the motion in any way and he's
22  actually asking that part be withdrawn.
23     But, there was an allegation about the defendant's
24  constitutional rights having been violated during the trial
25  because of the failure to provide any kind of Brady remedy

1    for what we perceive to be, Mr. Richardson and his lawyers

2    perceive to be as violations of the defendant's Federal and

3    New York rights under the Brady doctrine and certainly we

4    do adopt that and I had told Mr. Richardson, yes, we're

5    going to adopt that as we do think that it was wrong the

6    Court's ruling with regard to the Brady issues not only

7    in-- well, not only in substance but also that it made it

8    really impossible for us to show some things that we

9    thought were critical and which actually existed in the

10   case.

11       One, that there had been other people who got in and

12   out of the house and had access to the house and may have

13   been the actual perpetrators of the crime.

14       And, two, that after the time that the prosecution

15   allege that the defendant had killed the victim or

16   participated in the death of the victim that another

17   individual, at least one other individual we know, had gone

18   into the crime scene and therefore the integrity of the

19   crime scene certainly may have been compromised.

20       And, with the Court's ruling that no DD5s could had

21   come into evidence in any way did make it impossible for us

22   to put forward to the jury part of the complexity of what

23   we actually thought existed around this case and that's why

24   we join in Mr. Richardson's motion.

25       THE COURT:  Thank you.

1     And, Mr. Bogdanos.

2     MR. BOGDANOS:  Yes, your Honor.

3     Although the People were not served with a copy of the

4     motion the Court was kind enough to let the People read the

5     defendant's motion this morning here in court.

6     There's nothing new in the motion that hasn't been

7     addressed before so the People adopt all of our earlier

8     argument with regard to the defendant's claim about Brady,

9     alleged Brady violations, specifically late disclosure.

10    It is clear that the motion itself is a boiler plate

11    Rikers Island motion so there was some things in there that

12    may or may not have been intended.

13    There was a claim of a Rosario violation.  The People

14    oppose that in any way, shape or form.  We engaged in an

15    open type discovery with Mr. Klein in this case and so

16    there was absolutely no Rosario violation nor Mr. Klein

17    ever claimed one to the extent that that is a new

18    allegation and not just like you check the wrong box when

19    he was printing it out, Mr. Richardson did.

20    So, the People are responding in that way.

21    For all of the other rest of the motion the People

22    adopt my earlier response.

23    THE COURT:   Yes.  The motion itself is denied.

24    And, of course, the issue itself is suffice and may be

25    raised on appeal.

1    MR. KLEIN:  We are ready to proceed with the predicate

2    felony statement.

3    COURT CLERK:   I don't have one.

4    (Handing).

5    COURT CLERK:   Ready?

6    MR. KLEIN:  Yes.

7    COURT CLERK:  Mr. Richardson, the District Attorney's

8    office has filed a predicate felony statement stating that

9    you have previously been convicted of a felony.

10   Have you received a copy of that statement?

11   THE DEFENDANT:  Yes.

12   COURT CLERK:   The statement sets forth the date and

13   place of the felony conviction.  The statement reads as

14   follows:

15   On December 6, 2002 in Supreme Court in New York County

16   in the State of New York you were convicted of a felony of

17   attempted sale of controlled substance in the third

18   degree.  And, on December 6, 2002 in Supreme Court New York

19   County State of New York you were convicted of the crime of

20   attempted sale of a controlled substance in the third

21   degree.  And, on March 31, 2000 in Supreme Court in the

22   State of New York you were convicted of a felony of bail

23   jumping in the first degree.

24   You may dispute any charge made in that statement.  To

25   do so you may specify a particular charge.

1    Do you wish to dispute any charge made in that
2    statement?
3        THE DEFENDANT:  No.
4        COURT CLERK:  Do you challenge the constitutionality of
5    your prior conviction?
6        THE DEFENDANT:  No.
7        COURT CLERK:  Thank you.
8        THE COURT:  Very well.
9        Mr. Richardson is adjudicated a predicate felon and we
10   may proceed with sentencing.
11       MR. BOGDANOS:  If I could ask the Court to indulge me.
12   The family had told me they were beyond security just a few
13   moments ago.  They are not here yet.
14       I had notified counsel and the Court that they wanted
15   to make a victim impact statement so I beg the Court's
16   indulgence.  I apologize.  I really didn't think they
17   wouldn't be here.
18       (Pause).
19       MR. BOGDANOS:  I do have five family members who would
20   like to make a statement, victim impact statement.
21       I have instructed all of them on the proper parameters
22   and I'm confident they will all stay within those proper
23   parameters, two grandchildren, two brothers and a daughter.
24       THE COURT:  I take it you would prefer to have them
25   speak first?

| | |
|---|---|
| 1 | MR. BOGDANOS:  Yes, please. |
| 2 | If that's all right with the Court. |
| 3 | THE COURT:  Yes. |
| 4 | Are you ready, Mr. Klein? |
| 5 | MR. KLEIN:  Yes. |
| 6 | THE COURT:  You may call them one at a time, Mr. |
| 7 | Bogdanos. |
| 8 | I'm going to turn on the microphone so they can speak |
| 9 | there at the podium. |
| 10 | MR. BOGDANOS:  State your full name for the record, |
| 11 | indicate your relationship to the victim. |
| 12 | MS. GROGAN:  Good morning, your Honor.  My name is |
| 13 | Renee Grogan. I am Helen Abbott's daughter.  I'm her oldest |
| 14 | child. |
| 15 | I just want to say that my family was deeply, deeply |
| 16 | hurt by what happened to my mother, the cruelty of her |
| 17 | being stabbed and beat up and strangled. |
| 18 | I mean, it was a hard crime for an elderly woman.   It |
| 19 | wasn't -- you know, he wouldn't like if somebody did that |
| 20 | to his mother and I feel that it took emotional toll on all |
| 21 | of us in our family and really took a toll on me. |
| 22 | (Crying). |
| 23 | It took a toll on me and it's hard.  I miss my mother |
| 24 | and I ask that no one should have to go through something |
| 25 | like that.  I mean, if she's 69 years old let her die of |

1  natural causes not in the hands of that monster there that

2  beat my mother to a pulp.

3      But, I just want to say if I can may I show you

4  something, the toll that it took on me?

5      THE COURT:  Of course.

6      MS. GROGAN:  I would like to let you see what happened

7  with me and how it deteriorated me.  I'm going to show

8  you.

9      (Takes off her wig in open court).

10     I lost all my hair for all the stress and emotion that

11 we had to go through with our family with this.  I mean, it

12 took, I mean it broke all of us down and it was all the

13 worriation that I have for not knowing who was the killer.

14     This is my hair because of the killer and the person

15 that, you know, did this to our mother.  So right now I'm

16 really, really it's deteriorating me for all the worry.

17     But, I'm happy today to say that I hope this monster

18 stays in jail for the rest of his life.  He needs to stay

19 there so he won't be able to hurt no one else in this world

20 because he's a monster.  He is a monster and that's what I

21 want to say to represent my family.

22     I hope this never happens to know one else again.

23     Thank you, your Honor.

24     THE COURT:  Thank you, ma'am.

25     MR. HOWARD:  Robert Lee Howard, III.

1   I am Helen Abbott's grandson and I want this man to
2   stay in jail for the rest of his life.  If they let him out
3   one of your family member will be a victim from this man.
4   I'm very up set that my grandmother is gone out of my life.
5       I feel -- I hope he stays in jail for the rest of his
6   life.
7   MR. GROGAN:  My name is Richard Grogan.  I'm Helen
8   Abbott's grandson.
9       I just want to say to you you took a very important
10  life out of our whole life and it's nothing you can do that
11  will bring her back.  There is nothing that we can do to
12  bring her back.  I just want to say, what was going through
13  your head when you were doing that?  Like, what was you
14  thinking an elderly woman that couldn't defend herself?
15      All she wanted to do is be happy, tell jokes.  You
16  know, you took that away from her.  I used to live in the
17  same projects with my grandmother.  I'd see her everyday.
18      You know, the last time I saw my grandmother is when I
19  had my kids with me.  That's the last time they seen their
20  grandmother.  She gave them a dollar.  Now they won't, when
21  they grow up they won't even see their grandmother no
22  more.  The only grandmother is my mother right here.
23      You know, it's sad.  It's sad to take somebody's life
24  away and the way you did it she didn't deserve that.
25      Now I hope at night I hope you really dream about it.

1  I hope you can't sleep and I hope everybody that is in
2  there do the same thing you did to my grandmother to you.
3      Look at me in the eye.
4      MR. BOGDANOS:  No.  No.
5      MR. GROGAN:  Thank you, your Honor.
6      THE COURT:  Thank you.
7      MR. FRANKLYN:  Joseph A. Franklyn, Helen Abbott's
8  brother.
9      This is really a tragic thing that happened to my
10  sister.  You know, I was in a war, Vietnam war, and I
11  didn't do an action like that, you understand.  And, when
12  my family go through things like that, you know, you lose
13  your brother, sister, especially a mother, sister, whatever
14  in a tragic way that was done to her it wasn't right at all
15  and action should be taken.
16      You know, when I came from Vietnam years ago she really
17  helped me out a whole lot.  I went through a lot of
18  changes.  The way that happened shouldn't happen to
19  nobody's family like that.
20      You know, he should be recognized and what he got to go
21  through now should be definitely permanent.
22      You know, it would take me an hour to say what I got to
23  say but, you know, he won't listen to nobody.  My family
24  went through a lot of things.  You understand what I mean?
25      But, come on now, does he have a mother?

1 | (Crying).

2 | Would he like something like that happen to his mother

3 | like this or anybody in his family?  It's not good.

4 | I've been in war, a decorated veteran, nothing happened

5 | like that to my unit.

6 | That's all I got to say.

7 | THE COURT:  Thank you, sir.

8 | Anyone else, Mr. Bogdanos?

9 | MR. BOGDANOS:  One more, her brother.

10 | MR. WILSON:  Kenneth Wilson, your Honor.

11 | I'm Helen's adopted brother.  I can't express how I

12 | feel because she spent some real good time with me.  I

13 | remember when I was going through a lot of changes I was

14 | going down a spiral.  When I got put out of my house she

15 | adopted me.  She took me in.  She adopted me as a brother.

16 | When I was homeless she fed me.  If I needed a shoulder to

17 | cry on she was there for me.

18 | I mean, it's like a piece of my heart is gone and I can

19 | never get back.

20 | I can never express how I feel right now because the

21 | love that she had was deep and the love that I had for her

22 | even though I was not even related to her by birth but she

23 | loved me like a sister love a brother and I loved her like

24 | that.  She never got a chance to see the impact she had on

25 | my life because now I'm a licensed minister now and I'm

1     reaching out to people and whatever this man did, I know he

2     has problems, but he should be put in a position where he

3     can never take someone's life away because he can never get

4     back what he took, never.

5        Thank you.

6        THE COURT: Thank you, sir.

7        MR. BOGDANOS: That's it, your Honor.

8        COURT CLERK: Mr. Richardson, you are before the Court

9     for sentencing following your conviction after trial for

10     the crime of Murder in the Second Degree, Robbery in the

11     First Degree, first count under Count 3, and Robbery in the

12     Second Degree, forth count.

13       Before sentence the Court will allow you, your attorney

14     and the District Attorney an opportunity to address the

15     Court with any matter relevant to sentence.

16       For the People.

17        MR. BOGDANOS: Yes, your Honor.

18       It is impossible to follow the words of the family so

19     let me be more precise.

20       Twenty five years to life isn't enough for someone with

21     his record.

22       Twenty five years to life isn't enough for someone with

23     seven felony convictions.

24       Twenty five years to life isn't enough for someone

25     whose first robbery was 1979. His second robbery was

1    1984.  His third conviction for robbery was 1989.  And, on

2    and on it goes.

3        Twenty five years to life isn't enough for that kind of

4    a record.

5        Twenty five years to life isn't enough and won't bring

6    back a great-grandmother to eight or grandmother to seven,

7    a mother to Renee, Norman, Joseph and Cheryl.

8        Twenty five years to life will not bring what Macbeth

9    called even-handed justice.

10        It will not undo the last moment of Helen Abbott's

11    life.   It will not undo the 22 stab wounds, the beating,

12    the strangulation with the electric cord.

13        Twenty five to life will not undo any of those things.

14        Twenty five to life will not explain how his saliva or

15    sweat got on her naked body.

16        If justice is the hope of all who suffer and the dread

17    of all who wronged, well twenty five to life isn't enough

18    to undo either of those things.

19        In this case twenty five to life isn't enough to

20    capture the horror of what the defendant did.

21        I know your Honor does not need a reminder of how Helen

22    Abbott's life was ended at the hands of the defendant.

23        Each of us in this courtroom who was present for the

24    evidence when it was being offered whether we wanted it or

25    not had a glimpse into the very debts of human depravity.

1  |  We were given a brief but unforgettable look into the
2  |  absolute worst of a human condition.

3  |  Twenty five years to life will not even begin to wash
4  |  away the horrors, the demons, from what the defendant
5  |  did.

6  |  Absolute justice the law does not concern itself but a
7  |  relative justice the law knows some.

8  |  So, in this case the best we, by "we" I mean society
9  |  and justice can do is twenty five to life and so I ask your
10 |  Honor to impose that sentence on this defendant as well as
11 |  the maximum on each of the robbery counts because few if
12 |  any people who have come into this building have ever
13 |  earned it more.

14 |  Thank you.

15 |  THE COURT:   Thank you, Mr. Bogdanos.

16 |  Mr. Klein.

17 |  MR. KLEIN:  Your Honor, I could talk to you about the
18 |  crimes here, about how no one actually knows who really
19 |  committed what inside of that house and I can talk to you
20 |  about how, although, the legislature says the penalties of
21 |  intentional murder and felony murder may be the same that
22 |  that is not always appropriate.   Or, I could talk about my
23 |  client about his own life and tell you things that I
24 |  learned about him, how a drug habit that began at a very
25 |  early age led him to situations that obviously he wish he

1    never was in.   Or, I could talk to you about his family

2    and I could do that extensively about people who love him,

3    who are themselves loving people, about a brother, a wife

4    and a mother.   Especially perhaps about a brother who

5    called me weekly to ask what was going on with his

6    brother's case.   A mom who always stood by him and a wife

7    who has always been by his side.  All folks who saw

8    something, a basic worth in their son, in their brother, in

9    their husband.  Or, I could talk to you about what I

10   intuited and what the District Attorney in this case

11   actually confirmed to me while he was in jail.  He's been

12   in jail for a long time in Rikers.  He was pretty well

13   liked by almost everybody there.  He was genuinely,

14   extremely well behaved.

15       In fact, as the Court recalls there was at some point

16   some discussion about an informant and how maybe the

17   informant had to be moved.  One of the reasons he might be

18   moved is the defendant was so well liked.  He was even well

19   liked by corrections officers who might side with him

20   against the informant or something like that.

21       But, it was clear that in three years of confinement

22   the defendant didn't rule his section by fear or get

23   involved in any kind of gang activity.   He was well

24   respected as a senior member of that society which is not

25   simply made up of a dishonorable man.

1      I only choose to talk to you, your Honor, about

2  something else and that what I know best which is what Mr.

3  Richardson gave me because he actually gave me something

4  enormous.  This is what I know best and it's also what I

5  think reveals him to me and I hope to the Court.

6      I should tell you about the context.  Obviously Mr.

7  Richardson and I have been involved in a three-year

8  struggle.  Often an interpersonal struggle.  We had our

9  highs and lows.  To say that at times it has been

10  conflictual, repeat to say, very little.

11      Obviously, as in any three-year long relationship there

12  have been periods of estrangement, periods of alienation

13  and I even, I dear say, very significant periods of

14  intimacy that I will never forget.

15      Primarily, though, there was always a challenge coming

16  from him.  There was, hey, Mr. Klein, what's the theory

17  here that you're going forward with?  Hey, Mr. Klein,

18  what's the argument that you are going to raise for

19  suppression of the statements?  And, Mr. Klein, what were

20  the acts that were done by the detectives involved in the

21  case, how are you going to talk about that?  Mr. Klein,

22  what's with the body temperature?  Mr. Klein, what does our

23  pathologist say?  Mr. Klein, what does all of the evidence

24  in this case actually show?  Mr. Klein, what's with the

25  Brady motion, what are you doing about that?

1        And, he would constantly demand explanations and
2    basically he would demand that I work direct on his
3    behalf.
4        What was interesting in this relationship was that he
5    was never making these demands in a winding fashion but it
6    was more as a challenge I always thought to me.
7        He would say, what are you doing anyway, Mr. Klein, are
8    you just going through the motions and, therefore, are you
9    simply the personification of the stereotype of a public
10    defender who pays lip service to representing people who
11    are charged in horrendous crimes or are you actually going
12    to fight for me and actually do what you proclaim you do
13    for clients?
14        Mr. Richardson would even say to me, he would say, you
15    know, Klein, I even know about your reputation because we
16    did spend three years together.  He'd say, I know all about
17    you.  Everybody says you're good, you're experienced and
18    everyone says you're arrogant too.  He'd say to me, you
19    know, it is easy to ride on all of that whether you really
20    deserve your representation or not will define you.  And,
21    he would always kind of say to me that, you know, your
22    representation and who you say you are, well, that just
23    gives you the right to take on this assignment.  He'd say
24    to me that just gives you the right to take the test and to
25    see whether you will actually put in practice what you

1    proclaim you believe your job is.

2         But, then he would say to me but only if you are, in

3    fact, what you think you are then you deserve to be called

4    a public defender.   He'd say, let's see if you're going to

5    put it all on the line here, if you're going to do the

6    work.   Let's see if you will push yourself, spend every

7    weekend on this case.   Let's see if you're going to fight

8    this case to thin nail regardless of how or perhaps because

9    of how unattractive some of the facts of this case may

10   appear and how unattractive I myself, that is Mr.

11   Richardson, may appear to others and let's see, Mr. Klein,

12   if you're going to treat even me with respect.

13        He would say if you do that, here is what I understood

14   him to be saying, if you do that, if I see that, if I'm

15   confident that that's what you are really are about then I

16   will entrust my life to you.  I'm not going to ask for 18B

17   although everyone tells me in a murder case you always

18   should.   And, then if you actually do all of that then you

19   have a right to call yourself what people say you are which

20   is an honest public defender which, of course, I myself

21   consider one of the highest compliments that can ever be

22   given by a criminal defendant.

23        Now, after losing this case, I mean I lost his case,

24   after choosing a losing argument, after choosing a losing

25   tragedy, Mr. Richardson did just that.   He called me and he

1    said you know, Klein, I want you to know something, you are

2    my lawyer forever because you were there for me despite of

3    anything.   And, I felt that what he was really saying was

4    because you know what, Klein, it's true you really are a

5    public defender which I consider an enormously high

6    compliment and he gave me that gift and for that I will be

7    forever grateful.

8        And, in giving that gift to me to his losing lawyer I

9    think he realized himself in a very fundamental way as a

10   very complex, thoughtful and at times very caring human

11   being even one with a great spirit of generosity and

12   because of all this I think he's worthy of the Court's

13   careful consideration in fashioning an appropriate

14   sentence.

15       THE COURT:  Thank you, Mr. Klein.

16       Mr. Richardson, you also have a right to make a

17   statement before I sentence you.

18       THE DEFENDANT:  All right.

19       THE COURT:  If you wish to do so we'll put the

20   microphone up.  Thank you.

21       THE DEFENDANT:  First, I'd like to say to the family,

22   the Abbott family, that my heart goes out to your loss of

23   your mother.  No person, no human being should lose a love

24   one, a parent, a mother, because they say paradise is at

25   the foot of a woman.  Meaning reverence is to the woman

1    that put us in this existence.

2        My heart truly goes out to you for your loss and I have

3    a mother also and when I look at her and I think about the

4    situation that your family is going through if my family

5    was to go through the same thing I would probably go maybe

6    even crazier than what you all are going through right now.

7        My heart sincerely goes out.  I pray for yah that you

8    might find tranquility that she's in a better place.

9        I also want you to know that I am not the culprit in

10    the crime that was committed.  I was there but I was not

11    the one that participated in the death of your love one.  I

12    surely have nothing to do with that crime.

13        You know, the DA has done his job as far as feeling

14    that he felt he had evidence to convict me for the crime.

15    And, if this brings consoling to you I hope it does but the

16    true consoling comes when you find the real culprit that

17    hurt your loved one or murder your loved one.

18        For surely it was not myself and I pray that with the

19    time that goes on now that you will find real consoling

20    when you find the person or the D.A.'s office or the police

21    find the person that truly committed this crime.

22        I don't doubt the D.A.'s job because the D.A.'s job is

23    to convict, but also if they have evidence to show that it

24    wasn't an individual that's being accused of a crime they

25    suppose to pursue that issue to which I feel was not

1    done.

2         Like I said, my heart goes out to you, your

3    grandchildren, the daughters, the brothers, but I hope

4    you're truly confident when you find the culprit and I

5    believe the D.A.'s office has that information on those

6    individuals that are still out there that committed this

7    crime.

8         And, that's all I have to say.

9         And, to the Court, you did your job as you suppose to

10   have done it but I'm too totally innocent of these charges

11   and that's all I have to say.

12        THE COURT:  Thank you, Mr. Richardson.

13        MR. BOGDANOS:  Your Honor, forgive the interruption.

14   We didn't put on the record the absence of the interview.

15        I don't know if that should be on the record.

16        THE COURT:  Well, we did discuss briefly off the record

17   the fact --.

18        MR. KLEIN:  There is no problem.

19        THE COURT:  -- he wasn't produced for the interview.

20   If he's not produced it does not mean that the sentencing

21   could not go forward.

22        MR. KLEIN:  Yes, thank you.

23        MR. BOGDANOS:  Thank you.

24        THE COURT:  Well, first of all, Mr. Richardson, I want

25   to say that I never make a sentencing decision until the

1   very last moment.

2       I listened carefully to the family members and

3   obviously we all feel great sympathy for them and we cannot

4   undo what was done to Helen Abbott and their feelings are

5   well expressed.

6       As you know the crime of Murder in the Second Degree

7   carries a minimum of 15 to life and a maximum sentence of

8   25 to life.

9       Mr. Bogdanos has argued that the maximum is appropriate

10  in this case.

11      Mr. Klein although he didn't pick a number obviously

12  he's arguing that something much less should be imposed.

13      It is true that the conviction was for felony murder as

14  oppose to intentional murder and the evidence at the trial

15  suggested that at least one other person was involved,

16  nevertheless your guilt was proved beyond a reasonable

17  doubt.

18      I accept the jury's verdict.  I do not quarrel with it

19  in any way.  And, I am going to impose the maximum sentence

20  of twenty five to life on the murder count.

21      On the lesser counts which run concurrent by operation

22  of law the range goes up to 25 on the robbery.  I'll pick

23  20, plus five years post release supervision.  That's on

24  the Robbery in the First Degree.

25      On the Robbery in the Second Degree I'll pick 15 years,

1 | plus the five years of post release supervision.

2 | But, again, all of that runs concurrent to the top

3 | sentence of twenty five to life.

4 | It was a hard fought trial.  There was a long record

5 | and I can tell you that the Appellate Courts will look at

6 | the case very closely and the issue mentioned this morning

7 | can be one of the issues on appeal.

8 | It was a horrible tragic night and you were involved.

9 | You have 30 days to appeal.

10 | And, you also must pay a court fee called a surcharge

11 | but you'll be given plenty of time to do that.

12 | And, that's it.

13 | MR. KLEIN:  Your Honor, that can't be waived?

14 | THE COURT:  Not in this case.

15 | MR. KLEIN:  I'm notifying the defendant of his right to

16 | appeal and a notification of appeal will be filed on his

17 | behalf by the Legal Aid Society.

18 | ********************

19 | (Proceedings were concluded)

20 |

21 | I hereby certify the foregoing to be a true and

22 | accurate transcript of the original stenographic record in

23 | the above proceedings.

24 | Lourdes Torres-Fuster,

25 | Senior Court Reporter