USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/22/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

MARK RICHARDSON,                           :
                                                              :
                                 Petitioner,     :
                                                              :              18-CV-7694 (VEC)
              -against-                             :
                                                              :        OPINION AND ORDER
MICHAEL CAPRA, Superintendent of Sing Sing    :
Correctional Facility;                          :
                                                              :
                                 Respondent.  :

------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

On August 23, 2018, Mark Richardson ("Petitioner") filed a petition pursuant to 28

U.S.C. § 2254 (the "Petition") challenging his state court conviction for murder in the second

degree, robbery in the first degree, and robbery in the second degree. *See* Pet., Dkt. 1. The

Court referred the Petition to Magistrate Judge Wang for the preparation of a report and

recommendation ("R&R"). *See* Order of Reference, Dkt. 8. On January 23, 2023, Judge Wang

recommended that the Petition be granted. *See* R&R, Dkt. 27. Respondent objected to the R&R,

*see* Resp't Objection, Dkt. 28, and Petitioner responded to his objection, *see* Pet'r Response, Dkt.

31. For the following reasons, the Court rejects the R&R, and the Petition is DENIED.

## BACKGROUND[1]

On January 13, 2008, shortly before 4:00 p.m., Helen Abbot ("Abbot") was found dead in

her apartment in Manhattan. *See* Suppression Hearing Tr., Dkt. 25, at 85, 89, 164. Detectives

Gerard DiMuro ("Det. DiMuro") and Ruben Henriquez ("Det. Henriquez") were assigned to

---

[1]        All suppression and trial hearing transcript page numbers reflect the page numbers as indicated in the PDF reader.

investigate her death.[2]  *Id.* at 85–86, 140–41.  Law enforcement recovered DNA evidence from Abbot's breast and surveillance video of the apartment building showing Petitioner entering and leaving the building several times on January 11, 2008.  *Id.* at 87, 112–13, 170.  Around two weeks later, Petitioner's then-girlfriend advised the police to "look at" Petitioner as part of their investigation.  *Id.* at 95–96.

## I.  Petitioner's Statements

### A.  The February 5 Statement

On February 5, 2008, Dets. DiMuro, Torres, Flynn, and Watts waited outside of Petitioner's apartment until he came home from work.  *Id.* at 97.  Petitioner agreed to accompany them to the police precinct; he waived his *Miranda*[3] rights and was questioned about Abbot's death.  *Id.* at 100, 179–80.

During that interview, Petitioner said that he had gone to Abbot's apartment on January 11, 2008 with Anthony Hall ("Hall") to collect money Hall owed him from Abbot.  *Id.* at 101–02, 177.  According to Petitioner, while in Abbot's apartment, Hall and Abbot began to argue, Hall demanded his money from Abbot, and Hall slammed Abbot against the refrigerator.  *Id.* at 102.  Petitioner separated them and left the apartment; Hall and Abbot were still arguing when Petitioner left.  *Id.*

---

[2]     Detectives Donna Torres ("Det. Torres"), Kevin Flynn ("Det. Flynn"), and Watts ("Det. Watts") also investigated the case.  *See* Suppression Hearing Tr., Dkt. 25, at 99–100; Suppression Hearing Tr., Dkt. 25-1, at 67. The record does not reflect Det. Watts's first name.

[3]     Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), a criminal suspect in custody cannot be interrogated by law enforcement until the suspect is made aware of the right to remain silent, the right to consult with and insist on the presence of an attorney, the right to have an attorney appointed if indigent, and the fact that anything he says may be used against him.  A suspect may waive his rights so long as the waiver is made voluntarily, knowingly, and intelligently.  *Id.*

Petitioner signed a written statement recording his oral rendition of what happened that night (the "February 5 Statement"), *id.* at 101–03, Pet'r Mem., Dkt. 6, at 9, and Det. DiMuro took Petitioner home, Trial Tr., Dkt. 26-2, at 49.

Law enforcement later obtained records for Abbot's cell phone.  Those records showed that, on January 11, 2008, several calls had been made on Abbot's cell phone from inside her apartment to members of Petitioner's family.  Suppression Hearing Tr., Dkt. 25, at 106–10.

### B.  The July 10 Early Morning Statement

At about 7:20 a.m. on July 10, 2008, Petitioner was arrested and brought to the precinct. *Id.* at 122.  Without first reading Petitioner his *Miranda* rights, Det. DiMuro questioned Petitioner about the February 5 Statement, and Petitioner responded to questions for about 45 minutes (the "July 10 Early Morning Statement").  *Id.* at 125–26.  Toward the end of that questioning, Det. DiMuro confronted Petitioner with the fact that records showed calls being made from Abbot's cell phone to members of Petitioner's family and that Petitioner's DNA matched DNA recovered from Abbot's breast.  *Id.* at 123–24, 265.  Petitioner became "very agitated" and said that "theoretically [Abbot] could have been sitting on [his] lap and [he] could have been sucking on her titties."  *Id.* at 265.  He also said that the February 5 Statement was "[his] statement" and that he did not want to speak to police further.  *Id.* at 124–25, 265–66.  Det. DiMuro then read Petitioner his *Miranda* rights, and Petitioner said "emphatically" that he would not answer any more questions.  *Id.* at 125.  Petitioner was transferred to a holding cell.  *Id.* at 129–30.

## C.  The July 10 Late Morning Statement

After about thirty minutes, Det. Henriquez escorted Petitioner to the toilet upon his request.  *Id.* at 309–10, 316.  On their way to the toilet, Petitioner asked Det. Henriquez, "How serious is this?  Am I going to do a lot of time for this?"  *Id.* at 312–13.  Det. Henriquez responded that Petitioner's situation was "bad" because he was facing a murder charge, and repeated the information recently obtained about the DNA results and cell phone evidence.  *Id.* at 313.  Det. Henriquez also questioned the accuracy of Petitioner's February 5 Statement and how it would "play out" in a courtroom.  *Id.* at 314.  Petitioner began to cry, and Det. Henriquez told him that the police would give him "every opportunity to tell [his] side of the story."  *Id.* Petitioner responded, "I can't, I can't talk to them."  *Id.*  Det. Henriquez encouraged Petitioner to express anything "heavy in his heart" and reminded him that he had a family.  *Id.* at 314–15. After Petitioner was silent for a few seconds, Det. Henriquez asked if there was "something he need[ed] to say" and offered to take him back to the interview room.  *Id.* at 315.  Petitioner said he would speak to the police, and Det. Henriquez placed him in the interview room.  *Id.* at 315, 317.

Shortly before noon, Dets. Henriquez and DiMuro returned to the interview room to speak with Petitioner.  *Id.* at 131.  Det. DiMuro told Petitioner that if he wanted to talk, he would need to provide new information.  *Id.* at 278.  Det. DiMuro again read Petitioner his *Miranda* rights, and Petitioner waived them.  *Id.* at 132–33.  Petitioner then gave a new account of what happened at Abbot's apartment on January 11, 2008 (the "July 10 Late Morning Statement").  *Id.* at 133–34, 136–37.  Petitioner stated that he saw money sticking out of Abbot's bra and reached into her shirt to take the money.  *Id.* at 134.  According to this new version of events, Abbot hit Petitioner in the face, and Petitioner pushed her away when she grabbed him as he turned to

4

leave.  *Id.*  Hall picked up "something silver" from the kitchen, hit Abbot, and eventually stabbed her.  *Id.*  As Petitioner left the apartment, another man was holding Abbot and she was screaming.  *Id.*

### D.  The July 10 Video Statement

Petitioner was left alone in the interrogation room for about five hours until Assistant District Attorney Keri O'Connell ("ADA O'Connell") arrived to question him on videotape. ADA O'Connell read Petitioner his *Miranda* rights once again, and they discussed the case for about two hours (the "July 10 Video Statement").  *See* July 10 Video Statement Tr., Dkt. 6-1, at A2–95.  Dets. Henriquez, DiMuro, and Torres were present in the interview room and periodically interrupted ADA O'Connell's questioning.  *See id.*; Suppression Hearing Tr., Dkt. 25, at 321.  Petitioner gave ADA O'Connell the same account of events as in his July 10 Late Morning Statement; he was asked about his prior statements, his reaction to the DNA evidence, the confrontation in Abbot's kitchen, and the calls made to his family from Abbot's home.  *See* July 10 Video Statement Tr., Dkt. 6-1, at A6–10; A15–64.

### E.  The July 10 Post-Video Statement

After providing the July 10 Video Statement, Petitioner remained in the interview room. Hearing Tr., Dkt. 25, at 321–23.  After about twenty minutes, Det. Henriquez returned to check on Petitioner, and Petitioner said "the phone belonged to the old lady."  *Id.* at 322.  Det. Henriquez questioned Petitioner without again reading *Miranda* warnings.  *See generally id.* at 324.  Petitioner said that he had used Abbot's phone to call his brother and his wife.  *Id.*  Det. Henriquez wrote down Petitioner's statement, and Petitioner signed it (the "July 10 Post-Video Statement").  *Id.* at 324–26.[4]

---

[4]       The July 10 Post-Video Statement was not introduced at trial.  *See People v. Richardson*, 147 A.D.3d 577, 580 n.* (1st Dep't 2017).

## II.        The Suppression Hearing and State Court Decisions

Petitioner moved to suppress all of his statements to law enforcement.  *See* Carruthers

Decision, Dkt. 17-2, at RA1.  Justice Richard D. Carruthers ("Justice Carruthers") of the

Supreme Court, New York County, conducted a suppression hearing in March 2010.

### A.  The Suppression Hearing

During the suppression hearing, Petitioner's counsel drew the Court's attention to

*Missouri v. Seibert*, 542 U.S. 600 (2004), in which the Supreme Court held that a Mirandized

confession made after an unlawful, unwarned confession must be suppressed if two conditions

are satisfied.  *See* Suppression Hearing Tr., Dkt. 25, at 268–70.  First, the Mirandized confession

was elicited as part of a "deliberate, two-step strategy" intended to undermine the suspect's

*Miranda* rights.  *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring).  Second, law enforcement

failed to engage in any "curative measures . . . designed to ensure that a reasonable person in the

suspect's situation would understand the import and effect of the *Miranda* warning and of the

*Miranda* waiver."  *Id.* at 622.

Det. DiMuro's testimony regarding the interrogation that elicited the July 10 Early

Morning Statement was key to the *Seibert* analysis.  Det. DiMuro testified that he spent most of

that morning with Petitioner reviewing the statement he'd made months earlier on February 5,

2008, as well as phone records and video surveillance.  *See* Suppression Hearing Tr., Dkt. 25, at

260–64.  Toward the end of the interview, Det. DiMuro "hit" Petitioner with the newly-

discovered evidence that linked his DNA to DNA recovered from Abbot's breast to see whether

that evidence would "throw[] him off[,]" but it did not.  *Id.* at 265.  Det. DiMuro did not expect

Petitioner to explain the DNA evidence by asserting that he had sucked on her breasts the night

she was killed.  *Id.*  Upon not being able to shake Petitioner with information regarding his DNA,

Det. DiMuro read Petitioner the *Miranda* warnings.  *Id.* at 273.

Det. DiMuro denied that he had given Petitioner a "spiel" that morning.  He testified that

at the time of the interview, he was "confident" law enforcement had enough evidence to convict

Petitioner, and that any preliminary discussion with Petitioner was not to "elicit a response" from

him.  *Id.* at 252–53, 269–70.[5]  When Petitioner's counsel asked Det. DiMuro why he had not

read Petitioner his *Miranda* warnings when they first began speaking that morning, Det. DiMuro

responded:

> I think in my mind -- again, I don't know if it was right or wrong -- I
> thought that I was going to be on safe ground as long as I didn't break any new
> ground, you know what I mean?  As long as I reviewed what had already been
> done in February, I wasn't too concerned about throwing Miranda out there.  And
> I don't know if that's the right way to think about it or not, but I felt let's review.
> Let's see what we did and what you said.  And then when I got to a point, like I
> said before, when at the end of that long session when I wanted to jolt him, that's
> new ground -- the saliva on the breasts is something he never knew about -- and
> then I said, well, at that point -- well, at that point when I made that statement I
> knew I was done.  But at that point I was going to read his Miranda because I
> said, oh, I am approaching new information here.  That's the way I thought about
> it.  Like I said, rightly or wrongly, in retrospect maybe I should have done it right
> away, but it was a review for me.

*Id.* at 272–73.

### B.  The State Decisions On the Motion to Suppress

#### i.  Justice Carruthers's Decision

Justice Carruthers granted in part and denied in part Petitioner's motion to suppress.

Specifically, he granted the motion to suppress (1) the July 10 Early Morning Statement; and (2)

---

[5]      When summarizing *Seibert*'s holding during the suppression hearings, Petitioner's counsel explained that
he had asked Det. DiMuro about whether he had used a "spiel" when questioning Petitioner to shed light on whether
Det. DiMuro had violated Petitioner's *Miranda* rights under *Seibert*.  *See* Suppression Hearing Tr., Dkt. 25, at 269–
70.  Petitioner's counsel further noted: "[Det. DiMuro] sa[id] he didn't do that in this case, so I guess he didn't.
That's his testimony.  We'll see.  There are other witnesses, but he does certainly say that he throws stuff at a
defendant, you know, it would be my theory. . . . It is appropriate under 542 U.S. 600, 2004, Missouri vs. Seibert for
the Court to be able to judge the motivations of the police officer in doing that, whether there was a policy or it was
just inadvertent that he does it.  And I think the answer is this is his policy to do it in this way."  *Id.* at 270.

the July 10 Late Morning Statement, and denied the motion to suppress (1) the February 5

Statement; (2) portions of the July 10 Video Statement; and (3) the July 10 Post-Video

Statement. *See* Carruthers Decision, Dkt. 17-2, at RA1–44.

Justice Carruthers did not suppress the February 5 Statement Petitioner provided after

waiving his *Miranda* rights because he concluded that it had been voluntary. *Id.* at RA19–21.

Justice Carruthers suppressed the July 10 Early Morning Statement because he concluded

that the detectives should have read Petitioner *Miranda* warnings before embarking on a 45-

minute discussion and locking him into potentially incriminating statements. *Id.* at RA29–34.

The July 10 Late Morning statement was suppressed because it was tainted by the earlier

improper interrogation, including by Det. Henriquez's comments on the way to the toilet. *Id.* at

RA34–37.

As for the July 10 Video Statement, Justice Carruthers concluded that the prior improper

interrogations had not tainted two portions of that statement: (1) Petitioner's admission that he

grabbed for cash from Abbot's bra and saw Hall stab Abbot, and (2) Petitioner's description of

the February 5 Statement and how the police obtained it. *Id.* at RA37–39.

Applying *People v. Chapple*, 38 N.Y.2d 112 (1975), and its progeny, Justice Carruthers

concluded that earlier *Miranda* violations had not tainted those portions of the July 10 Video

Statement because (1) Petitioner was in custody as a result of a lawful arrest; (2) there had been

no "flagrant" police misconduct; (3) Petitioner initiated a conversation with Det. Henriquez after

invoking his right to silence; (4) Det. DiMuro's two un-Mirandized interview sessions with

Petitioner on July 10, 2008 were "relatively brief" and were followed by a five-hour break before

the July 10 Video Statement, allowing Petitioner to "gain control of his emotions"; (5) ADA

O'Connell administered *Miranda* warnings before the videotaped statement; and (6) ADA

8

O'Connell conducted the "greater part of the questioning" during the videotaped interview.  *Id.*

at RA39–41 (citing, *inter alia*, *Chapple*, 38 N.Y.2d at 115; *People v. Paulman*, 5.N.Y.3d 122,

130–31 (2005)).[6]

As part of his analysis, Justice Carruthers opined:

> Although it would have been eminently reasonable to expect [Petitioner] to say
> something upon learning about the DNA evidence, [Det. DiMuro] testified that he
> did not anticipate that [Petitioner's] reaction would be a statement.  The Court
> accepts [Det. DiMuro] at his word.  After all, he candidly acknowledged that he
> had not been 'too concerned about throwing *Miranda* out there' before broaching
> the subject of DNA, and admitted '[i]n retrospect, maybe I should have done it
> right away, but it was a review for me.'  The Court must observe further that [Det.
> DiMuro's] newly formed reservation about his interview strategy is well founded.
> The entire session amounted to an interrogation  . . . . As the Supreme Court
> stated, in *Missouri v. Seibert*, 542 U.S. 600, 612 (2004), *Miranda* is to be
> provided at the beginning of interrogation, not after the suspect has been
> prompted to make an incriminating statement.

*Id.* at RA33–34.  Justice Carruthers also concluded that Det. DiMuro's *Miranda* violations had

been "the result of misjudgment rather than deviousness."  *Id.* at RA40.

Although Justice Carruthers cited *Seibert* in his opinion, he did not explicitly determine

whether law enforcement had engaged in a "deliberate, two-step strategy" intended to undermine

Petitioner's *Miranda* rights, nor whether law enforcement had engaged in any "curative

measure" to ensure that Petitioner would understand the import and effect of waiving his

*Miranda* rights.  *See Seibert*, 542 U.S. at 621–22.

### ii.  The Appellate Division's Decision

Following a jury trial in the Supreme Court of the State of New York, New York County,

Petitioner was convicted of murder in the second degree and robbery in the first and second

---

[6]     Justice Carruthers suppressed the remaining portions of the July 10 Video Statement because they would
have revealed the existence and content of suppressed statements.  *See* Carruthers Decision, Dkt. 17-2, at RA42.
Although Justice Carruthers did not suppress the July 10 Post-Video Statement, *see id.* at RA43, it was not
introduced at trial.  Petitioner's argument that it should have been suppressed is, therefore, moot.  *See Richardson*,
147 A.D.3d at 580 n.*.

degrees.  *See People v. Richardson*, 147 A.D.3d 577, 577 (1st Dep't 2017).   He was sentenced

to an aggregate term of 25 years to life.  *Id.*

Petitioner appealed his conviction in part on the grounds that (1) his statements to law

enforcement should have been suppressed because Det. DiMuro "made a conscious decision to

question [Petitioner] without reading him his *Miranda* warnings" and engaged in "coercive

tactics" to obtain a confession from him; (2) law enforcement failed to scrupulously honor his

invocation of his right to remain silent; and (3) the July 10 Video Statement should have been

suppressed in its entirety as "fruit of the poisonous tree."  *See* Pet'r Mem. in Supp. of Appeal,

Dkt. 17-2, RA127–54.

Affirming Petitioner's conviction and applying *Chapple* and its progeny, the Appellate

Division concluded that Justice Carruthers properly admitted portions of Petitioner's statements

because, *inter alia*, ADA O'Connor was the sole questioner in the portion of the July 10 Video

Statement that was admitted, Justice Carruthers admitted only portions of the July 10 Video

Statement, Defendant provided the July 10 Video Statement approximately five hours after the

initial *Miranda* violation, Defendant "seemed alert and relaxed in the video" rather than "nervous

or intimidated," and Petitioner made "no pre-*Miranda* inculpatory statements."  *Richardson*, 147

A.D.3d at 581–82.  The Appellate Division further noted that neither Petitioner's invocation of

his right to remain silent nor "the other alleged improprieties regarding the suppressed

statements" required suppression of the July 10 Video Statement in its entirety.  *Id.* at 582.  The

Appellate Division did not cite *Seibert* in its opinion.

The New York Court of Appeals denied Petitioner's motion for leave to appeal.  *See*

*People v. Richardson*, 29 N.Y.3d 1085 (2017).[7]  Petitioner remains incarcerated.

---

[7]      Before seeking relief in federal court, a petitioner must have exhausted his remedies in state court.  *See* 28
U.S.C. § 2254(b)(1)(A); *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011).  Because Petitioner raised these issues

**DISCUSSION**[8]

United States District Courts can entertain a petition for relief from a state court prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When a state court prisoner raises a claim that was adjudicated on the merits in state court, "relief may be granted only where the state court's decision[9] was either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented.'" *Cardoza v. Rock*, 731 F.3d 169, 177 (2d Cir. 2013) (quoting 28 U.S.C. § 2254(d)).

A state court's decision is contrary to clearly established federal law if (i) it applies a rule that "contradicts the governing law" set forth in the Supreme Court's cases or (ii) upon confronting "a set of facts that are materially indistinguishable" from a Supreme Court decision,

---

in his application for leave to appeal to the highest New York state court, the exhaustion requirement has been satisfied. *See Simone v. Lewin*, No. 05-CV-8925 (BSJ) (JCF), 2006 WL 2468624, at *2 (S.D.N.Y. Aug. 11, 2006) (deciding a federal habeas petition after the New York Court of Appeals denied leave to appeal the appellate division's decision).

[8]   In reviewing an R&R, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). When specific objections are made to an R&R, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). Because Respondent properly objected to the R&R in its entirety, *see* Resp't Objection, Dkt. 28, the Court reviews *de novo* the R&R's conclusion that the Appellate Division improperly failed to apply *Seibert*. Because the Court concludes that the Appellate Division's decision was not contrary to or unreasonable in light of clearly established federal law, it does not review the R&R's conclusion that any error was not harmless.

[9]   Federal courts generally review the "last reasoned" state court decision when deciding habeas petitions. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991). If the relevant state court decision does not discuss the "reasons" behind its conclusion, but rather, for example, merely affirms or reverses a lower court decision, then the federal court should "look through" the unexplained decision "to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). This Court, therefore, when necessary, "looks through" the Appellate Division's decision to Justice Carruthers's decision. *See Musaid v. Kirkpatrick*, No. 19-CV-7944 (AT) (RWL), 2023 WL 1342161, at *3 (S.D.N.Y. Jan. 31, 2023) (concluding that a report and recommendation's reading of the Appellate Division's "one-sentence affirmance" of the trial court's decision as a summary decision, not an explanatory opinion, was not clear error); *Hayes v. Lee*, No. 11-CV-1365 (KMK) (PED), 2015 WL 5943677, at *36 (S.D.N.Y. Oct. 13, 2015) (taking a claim-by-claim approach to whether the trial court decision or the appellate division decision was the "last reasoned" state court decision).

it reaches a different result from the Supreme Court. *Fuentes v. T. Griffin*, 829 F.3d 233, 244 (2d Cir. 2016) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)).  A state court's decision is an unreasonable application of clearly established federal law if it "identifies the correct governing legal principle" but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 244–45 (quoting *Lockyer*, 538 U.S. at 71–72).

For habeas relief to be available in federal court, it is not sufficient for the state court to have applied clearly established federal law erroneously or incorrectly; relief is only available if the decision is "objectively unreasonable." *Id.* at 245 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004)); *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").  Put differently, federal habeas review is "highly deferential" to state courts. *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (noting that state court decisions must be given "the benefit of the doubt") (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011)).

Even if this high standard is satisfied, Petitioner must "*also* demonstrate by a preponderance of the evidence that his constitutional rights have been violated . . . ." *Garner v. Lee*, 908 F.3d 845, 860 (2d Cir. 2018) (internal quotation marks and citations omitted); *see also Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008) ("[T]he burden rests on the accused to demonstrate a constitutional violation.") (internal quotation marks and citation omitted).

Findings of fact from the state court are "presumed to be correct;" the petitioner needs clear and convincing evidence to rebut that presumption. *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012) (citing 28 U.S.C. § 2254(e)(1)); *see also Smith v. Mann*, 173 F.3d 73, 76 (2d Cir. 1999)

(noting that the presumption of correctness applies to decisions regarding witness credibility). The presumption of correctness applies to findings by both trial and appellate courts. *Galarza v. Keane*, 252 F.3d 630, 635 (2d Cir. 2001).

**I.    The Decisions of the State Courts Were Not Contrary to or Unreasonable in Light of *Seibert***

The decisions of the state courts were not contrary to or unreasonable in light of *Seibert* because they determined, as a matter of fact, that Det. DiMuro did not intentionally undermine Petitioner's *Miranda* rights, and because the facts of this case do not sufficiently resemble those in *Seibert*.

**A.  Legal Standard**

The Fifth Amendment of the U.S. Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ." U.S. Const. Amend. V. The Fourteenth Amendment secures the same privilege against state invasion of the right against self-incrimination. *See* U.S. Const. Amend. XIV; *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). So does Article I of the New York State Constitution. *See* N.Y. Const. Article I § 6.

The Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), that statements obtained from a criminal suspect while in custody without a full warning of the suspect's constitutional rights are inadmissible unless the prosecution demonstrates the use of procedural safeguards to secure the suspect's Fifth Amendment's privilege against self-incrimination.

The Supreme Court subsequently held in *Oregon v. Elstad*, 470 U.S. 298, 317–18 (1985), that a suspect's un-Mirandized statement does not render a second, Mirandized statement inadmissible so long as the second statement was "voluntary." Law enforcement's "simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances

calculated to undermine the suspect's ability to exercise his free will" does not require

suppression of a subsequent, Mirandized statement. *Id.* at 309; *see also Parsad v. Greiner*, 337

F.3d 175, 183 (2d Cir. 2003) (noting that courts consider "1) the accused's characteristics, 2) the

conditions of the interrogation, and 3) the conduct of the police" when assessing the

voluntariness of the accused's statements under *Elstad*) (citation omitted)).

In *Seibert*, the key case at issue here, the Supreme Court addressed the constitutionality

of the tactic of deliberately interrogating suspects in "successive, unwarned and warned phases

. . . ." 542 U.S. at 609.  Patrice Seibert's Mirandized confession was properly suppressed, the

Supreme Court concluded, because she confessed initially in response to custodial interrogation

conducted without *Miranda* warnings. *Id.* at 617.  The interrogating officer testified that he had

made a "conscious decision" not to read *Miranda* warnings when he first questioned Seibert,

"thus resorting to an interrogation technique he had been taught: question first, then give the

warnings, and then repeat the question 'until I get the answer that she's already provided once.'"

*Id.* at 605–06.

*Seibert*'s plurality opinion instructed courts, regardless of whether the interrogating

police officer intentionally engaged in a two-stage interrogation, to consider "a series of relevant

facts" to determine whether *Miranda* warnings delivered midstream were sufficiently effective to

prevent a constitutional violation: "the completeness and detail of the questions and answers in

the first round of interrogation, the overlapping content of the two statements, the timing and

setting of the first and the second, the continuity of police personnel, and the degree to which the

interrogator's questions treated the second round as continuous with the first." *Id.* at 615.

Concurring, Justice Kennedy articulated a "narrower" test applicable "only in the

infrequent case" in which a "two-step interrogation technique was used in a calculated way to

undermine the *Miranda* warning." *Id.* at 622.  In that case, as in *Seibert*, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.*  On the other hand, if law enforcement did not use a calculated two-step interrogation, then the admissibility of postwarning statements is governed by *Elstad*, which requires courts only to assess whether the post-warning statement was voluntary.  *Id.*  The parties do not dispute that because Justice Kennedy's fifth vote determined *Seibert*'s outcome, his narrower opinion governs.  *See United States v. Moore*, 670 F.3d 222, 228 (2d Cir. 2012) (noting that Justice Kennedy's concurrence is "controlling" and that *Seibert* therefore "lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession") (internal quotation marks and citation omitted).

The New York Court of Appeals (the "Court of Appeals") has adopted a distinct, and in some ways more defendant-friendly, approach to safeguarding a suspect's Fifth Amendment rights.  In *Chapple*, the Court of Appeals held that *Miranda* warnings must always precede custodial questioning for a suspect's statements to be admissible, "unless there is such a definite, pronounced break in the interrogation" that the suspect has returned "to the status of one who is not under the influence of questioning."  38 N.Y.2d at 115.

In *People v. Bethea*, 67 N.Y.2d 364, 366 (1986), the Court of Appeals concluded that the rule it articulated in *Chapple* remained valid despite *Elstad* because New York's constitutional prohibition against compelled self-incrimination "would have little deterrent effect if the police know that they can as part of a continuous chain of events question a suspect in custody without warning, provided only they thereafter question him or her again after warnings have been given."  The Court of Appeals in *Bethea* concluded that the defendant's second, Mirandized

statement had to be suppressed because of the "close sequence" between that statement and the defendant's previous, unwarned custodial statement, rendering the defendant's statements "a single continuous chain of events." *Id.* at 367–68 (internal quotation marks and citation omitted).

In *People v. Paulman*, 5 N.Y.3d 122 (2005), the Court of Appeals concluded that a defendant's Mirandized statements had been properly admitted despite a prior, unwarned statement.   Recognizing that the New York Constitution "may provide rights broader" than those protected by the Fifth Amendment to the United States Constitution, the Court of Appeals explained that, unlike the Supreme Court in *Elstad*, New York courts require "more" to prevent a constitutional violation than merely uttering warnings before a second round of interrogation. *Id.* at 130.  To determine whether there is a "single continuous chain of events" between statements such that failure to provide *Miranda* warnings to a suspect once taints subsequent, Mirandized statements, New York courts consider several factors, including "the time differential between the *Miranda* violation and the subsequent admission; whether the same police personnel were present and involved in eliciting each statement; whether there was a change in the location or nature of the interrogation; the circumstances surrounding the *Miranda* violation, such as the extent of the improper questioning; and whether, prior to the *Miranda* violation, [the] defendant had indicated a willingness to speak to police." *Id.*  at 130–31.  Each case "must be viewed on its unique facts." *Id.* at 131.

### B.  Application

The Appellate Division's decision affirming Justice Carruthers' suppression of some of Petitioner's post-arrest statements was not contrary to or an unreasonable application of clearly established federal law; it applied *Chapple* and its progeny to assess the adequacy of ADA

O'Connor's *Miranda* warnings.  New York caselaw requires not merely determining whether a Mirandized statement following an un-Mirandized statement was voluntary, as in *Elstad*, but also whether the statements constituted a "continuous chain of events" such that both must be suppressed.  *See People v. Guilford*, 21 N.Y.3d 205, 209 (2013) (noting that a "more precise showing" is required to establish that *Miranda* warnings following an un-Mirandized statement were adequate under New York's constitution, notwithstanding *Elstad*'s holding that *Miranda* warnings "will ordinarily suffice to demonstrate the voluntariness of statements subsequently made").

New York's "continuous chain of events" test applies regardless of whether law enforcement deliberately intended to thwart *Miranda*'s safeguards and, therefore, applies more broadly than *Seibert*, which only applies if law enforcement used an improper two-step interrogation technique.  *See Paulman*, 5 N.Y.3d at 134 n.6 (emphasizing that although New York's rule is "similar[]" to the plurality's test in *Seibert*, New York's rule "does not depend on the presence of intentional police misconduct, but is applied whenever a Mirandized statement follows an unwarned statement"); *Jenkins v. Lee*, No. 11-CV-6806 (PAE) (DF), 2014 WL 5861987, at *21 (S.D.N.Y. Nov. 12, 2014) (noting that *Seibert* "actually stands for a narrower principle" than *Chapple* because *Seibert* only "prohibits police interrogators from intentionally withholding *Miranda* warnings as a tactic to aid in obtaining an incriminating statement, and then re-eliciting the same statement after giving warnings").

Petitioner insists that the Appellate Division's decision was contrary to clearly established Supreme Court precedent because Det. DiMuro used a "deliberate two-stage" interrogation strategy, thus requiring evidence of "curative measures" by law enforcement to render Petitioner's Mirandized statements admissible under *Seibert*.  *See* Pet'r Mem. at 60–63.

But the Appellate Division concluded that "alleged improprieties" surrounding Petitioner's interrogation did not change its analysis, *Richardson*, 147 A.D.3d at 582, thus affirming the trial court's finding of fact that Det. DiMuro's *Miranda* violations had been "the result of misjudgment rather than deviousness," Carruthers Decision, Dkt. 17-2, at RA40. It was, therefore, reasonable for the state courts implicitly to conclude, as a matter of law, that no deliberate two-stage interrogation as was at issue in *Seibert* took place in this case.

Petitioner has not identified any clear and convincing evidence to rebut the presumptively correct finding of fact underpinning the state court decisions. *See Epps*, 687 F.3d at 50; *Mann*, 173 F.3d at 76. Det. DiMuro's hindsight acknowledgement that he should have administered *Miranda* warnings from the get-go does not clearly contravene his testimony that his error was unintentional. And although Petitioner casts doubt on Det. DiMuro's explanation for why he read *Miranda* warnings partway through the interrogation, Petitioner's assessment of Det. DiMuro's credibility does not displace the trial court's. *See Galarza*, 252 F.3d at 635; *see also Beauharnois v. Chappius*, No. 12-CV-1283 (FJS/ATB), 2015 WL 893091, at *8 (N.D.N.Y. Mar. 2, 2015) (concluding that the petitioner's contrary testimony did not rebut the state court's "factual/credibility determination" that the petitioner's counsel had advised him of his potential exposure if he went to trial).[10]

---

[10] Petitioner also argues that, putting aside Det. DiMuro's testimony, the "objective evidence" indicates that Det. DiMuro engaged in a two-step interrogation technique. Pet'r Mem. at 62–63. As a threshold matter, review of "objective evidence" to determine whether *Seibert* applies is Second Circuit, not Supreme Court, doctrine and, therefore, not "clearly established" federal law for purposes of a 2254 petition. *See Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (noting that "circuit precedent does not constitute 'clearly established Federal law'" for purposes of habeas petitions) (citation omitted); *United States v. Capers*, 627 F.3d 470, 477–78 (2d Cir. 2010) (noting that because the record was "clear" in *Seibert* that the interrogating officers intentionally used a two-step interrogation technique, "Justice Kennedy had no reason to explore how a court should determine when a two-step interrogation strategy had been executed deliberately[,]" and opting to consider both subjective and objective factors). In any event, the state courts assessed "objective" factors such as the duration and timing of the interrogation, the extent of police misconduct, and the nature of ADA O'Connell's interrogation as part of their *Chapple* analyses, and concluded that such factors did not require suppression of all of Petitioner's statements. *See* Carruthers Decision, Dkt. 17-2, at RA39–41; *Richardson*, 147 A.D.3d at 581–82; *see also Jenkins v. Lee*, No. 11-CV-6806 (PAE) (DF), 2014 WL 5861987, at *21 (S.D.N.Y. Nov. 12, 2014) (concluding that although detectives' "deceptions . . . *could* be

Although Petitioner argues that all of his statements should have been suppressed because Det. DiMuro risked eliciting unwarned incriminating statements by initially failing to provide *Miranda* warnings, any such "risk" does not bear on whether Det. DiMuro intended to elicit an incriminating statement from Petitioner as part of an improper two-step interrogation tactic.  If anything, Det. DiMuro's decision to read *Miranda* warnings before Petitioner had made any "inculpatory" statements, *see Richardson*, 147 A.D.3d at 582, distinguishes this case from *Seibert*, further underscoring Petitioner's failure to meet the high threshold for habeas relief.

In *Seibert*, the interrogating officer testified that he had intentionally failed to Mirandize the defendant so that he could secure a confession from her, then read her *Miranda* warnings, and then continue to interrogate her until she repeated the confession.  *See Seibert*, 542 U.S. at 605–06, 617.  By contrast, here, Det. DiMuro improperly failed to provide *Miranda* warnings when he first spoke to Petitioner, but testified that he mistakenly believed that he did not need to Mirandize Petitioner until he broached new evidence with him, testimony the trial court credited. *See* Carruthers Decision, Dkt. 17-2, at RA40.  Moreover, Det. DiMuro read Petitioner his *Miranda* rights without first obtaining a confession or any inculpatory information.[11]  The possible consequence of Det. DiMuro's behavior that Petitioner identifies in his brief — an unwarned confession or inculpatory statement — did not come to pass.  *See Bobby v. Dixon*, 565 U.S. 23, 31 (2011) (highlighting that there was no evidence that law enforcement had engaged in the sort of two-step interrogation technique prohibited by *Seibert* because "there was no earlier confession to repeat").  And, unlike in *Seibert*, the trial court suppressed a significant portion of

---

seen as circumstantial evidence of [their] intent to employ a two-step interrogation strategy, it was not unreasonable for the state court to have found the facts to be otherwise, especially in light of [a detective's] testimony that he administered *Miranda* warnings as soon as [the petitioner] said something" that was arguably incriminating).

[11]     The fact that Petitioner was in the victim's apartment the day she was killed is obviously somewhat inculpatory, but he had acknowledged that fact in his original, warned, February 5 Statement.  The fact that there was also sexual contact between Petitioner and the victim did not make his presence more (or less) inculpatory.

Petitioner's statements, admitting only those statements it believed were sufficiently attenuated from Det. DiMuro's improper conduct.

Given the state courts' unrebutted finding of fact that Det. DiMuro's misconduct was not devious, and the significant factual differences between *Seibert* and this case, the Court cannot disturb Petitioner's conviction on the grounds that *Seibert* was misapplied.[12]

Petitioner argues that even if the Court concludes that *Seibert* does not apply here, all of his statements should have been suppressed under *Elstad* because, unlike in that case, Det. DiMuro intentionally decided to question Petitioner without providing *Miranda* warnings, and because Det. Henriquez coerced Petitioner into speaking when he was in an "emotionally fragile state." Pet. Mem. at 69 n.12. The Court disagrees. Although Petitioner's case is distinguishable from *Elstad*, that does not mean the state courts' decisions are contrary to or an unreasonable application of clearly established federal law.[13]

---

[12]     In reaching the opposite conclusion, Judge Wang emphasized the fact that the state courts failed to cite or explicitly discuss *Seibert*. *See* R&R, Dkt. 27, at 29, 37–38. But deciding a case under the correct legal principle "does not require citation" or even "*awareness*" of the relevant Supreme Court precedent so long as the decision's reasoning and result do not "contradict[]" it. *Early v. Packer*, 537 U.S. 3, 8 (2022); *see also Johnson v. Williams*, 568 U.S. 289, 299 (2013) (noting that a state court "may regard its discussion of the state precedent as sufficient to cover a claim based on the related federal right"); *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011) (noting that a habeas court "must determine what arguments or theories . . . could have supporte[d] the state court's decision") (internal quotation marks and citation omitted). The state courts' finding that Det. DiMuro's conduct was not intended to deprive Petitioner of his Fifth Amendment rights sufficiently justifies their minimal discussion of *Seibert*. *See, e.g.*, *Bracey v. Graham*, No. 16-CV-7919 (VSB) (DF), 2020 WL 12178000, at *30–31 (S.D.N.Y. Apr. 27, 2020) (concluding that the Appellate Division's decision to affirm the trial court's decision to admit a petitioner's second, Mirandized statement after applying *Chapple* and *Paulman* rather than *Seibert* was not contrary to or an unreasonable application of clearly established federal law because the facts were "plainly distinguishable" from those in *Seibert*, and *Elstad* applied instead); *Currie v. Graham*, No. 17-CV-1227 (BMC), 2019 WL 2451762, at *4 (E.D.N.Y. June 12, 2019) (concluding that the Appellate Division's decision to affirm the trial court's decision to admit a petitioner's second, Mirandized statement without applying *Seibert* was not contrary to or an unreasonable application of clearly established federal law because the facts presented "a far cry from the situation in *Seibert*"); *Johnson v. Warden*, No. 16-CV-5977 (JMF), 2017 WL 5624272, at *1 (S.D.N.Y. Nov. 20, 2017) (concluding that the Appellate Division's decision to affirm the trial court's decision to admit a petitioner's second, Mirandized statement without applying *Seibert* was not contrary to or an unreasonable application of clearly established federal law because the petitioner offered "no evidence" that the investigating detectives "intended to sidestep *Miranda* to secure his confession" and because the only evidence in the record "suggest[ed] that the detectives did *not* deliberately withhold *Miranda* warnings at the outset of their interview").

[13]     In conducting its analysis under *Elstad*, the Court gives deference to the Appellate Division's findings of fact but determines the legal issue of voluntariness *de novo*. *See Graham v. Leonardo*, No. 98–2042, 166 F.3d 1200

In light of Petitioner's failure to rebut the state courts' findings of fact, it is undisputed that Det. DiMuro did not intend to undermine Petitioner's constitutional rights, but rather made an error of judgment when he failed timely to provide *Miranda* warnings.  It is also undisputed that ADA O'Connell properly Mirandized Petitioner, that about five hours elapsed between Petitioner's unwarned and warned statements, that Petitioner was "alert and relaxed" rather than "intimidated" by law enforcement when giving the July 10 Video Statement, and that he consistently maintained that Hall was to blame for Abbot's murder.  *See Richardson*, 147 A.D.3d at 581–83.

Such circumstances simply do not warrant suppression under *Elstad*.  As a general matter, the state courts admitted only statements Petitioner made after being properly Mirandized.  *See United States v. Carter*, 489 F.3d 528, 536–37 (2d Cir. 2007) (concluding that the district court properly excluded prewarning statements); *cf. United States v. Moore*, 670 F.3d 222, 233 (2d Cir. 2012) (concluding that that there was "no dispute" a defendant's statement was

---

(table), 1998 WL 852942, at *4 (2d Cir. Dec. 1, 1998) (stating that the habeas court has "the responsibility to decide independently of the judgment of the state court whether [the petitioner's] confession was unconstitutionally obtained"); *Colon v. Ercole*, No. 09-CV-5168 (LTS) (AJP), 2010 WL 9401, at *32 (S.D.N.Y. Jan. 4, 2010), *report and recommendation adopted*, 2010 WL 3767079 (S.D.N.Y. Sept. 27, 2010) (stating that the "voluntariness of a habeas petitioner's confession is a question of law entitled to de novo review by a federal court" but that state-court factual determinations regarding "subsidiary questions (such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and the defendant's familiarity with the *Miranda* warnings)" are entitled to deference).

Although the Court's legal analysis is *de novo*, numerous courts have recognized that "New York's *Chapple* rule affords protections beyond those required by federal constitutional law as explicated in *Elstad*," *Celleri v. Marshall*, No. 07-CV-4114 (JFB), 2009 WL 1269754, at *8 (E.D.N.Y. May 6, 2009) (citing *Bethea*, 67 N.Y.2d at 502); *see also Clark v. Cunningham*, No. 09-CV-2578 (JFB), 2014 WL 1399416, at *19 (E.D.N.Y. Apr. 10, 2014) (same), further supporting the Court's conclusion that *Elstad* did not mandate suppression of all of Petitioner's statements.

Contrary to Respondent's assertion, Petitioner did raise the admissibility of his statements under *Elstad* in his application for leave to appeal to the Court of Appeals. *See* Initial Leave Letter, Dkt. 17-2, at RA361–62; Appellant Brief, Dkt. 17-2, at RA140 n.22. Petitioner's claim is, therefore, not procedurally defaulted. *See Morgan v. Bennett*, 204 F.3d 360, 370–71 (2d Cir. 2000) (concluding that a petitioner's statement requesting review of "all issues outlined" in his brief and *pro se* supplemental brief was "sufficiently specific" to alert the Court of Appeals of his arguments and thus preserve the issue for habeas review).

voluntary because it was "highly probative" that he decided to speak to police even after he was

properly informed of his rights) (quoting *Elstad*, 470 U.S. at 318).

Petitioner was not abused or intimidated by law enforcement, *see id.* (highlighting that

the circumstances of a defendant's unwarned questioning contained "no traces of the brutality,

psychological duress, threats, or unduly prolonged interrogation" that courts have concluded

require suppression) (cleaned up and citation omitted), and Petitioner provided the July 10 Video

Statement more than five hours after his conversation with Det. Henriquez, sufficient time for

him to assess carefully whether he wanted to speak to law enforcement or again to invoke his

right to remain silent, *see United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012) (noting that

the "two-hour passage of time" between interviews weighed in favor of the second statement's

voluntariness); *United States v. Hernandez*, No. 06-CR-46 (GEL), 2006 WL 2242318, at *6

(S.D.N.Y. Aug. 3, 2006) (noting that a "break of five or six hours" between interviews weighed

in favor of the second statement's voluntariness).

Moreover, Petitioner consistently asserted that Hall was responsible for Abbot's murder,

a "largely exculpatory" position that further underscores the voluntariness of the statement he

made after being read *Miranda* warnings by ADA O'Connell.  *Bracey v. Graham*, No. 16-CV-

7919 (VSB) (DF), 2020 WL 12178000, at *31 (S.D.N.Y. Apr. 27, 2020), *report and*

*recommendation adopted*, 2021 WL 4950890 (S.D.N.Y. Oct. 25, 2021) (noting that a petitioner's

statement was admissible under *Elstad* in part because he "denied participating" in the crime at

issue); *see also Jenkins*, 2014 WL 5861987, at *22 (concluding that suppression was not

warranted under *Elstad* or *Seibert* in part because the petitioner maintained during his unwarned interrogation that he had "nothing to do" with the victim's death).[14]

Although Dets. DiMuro and Henriquez occasionally interrupted during Petitioner's videotaped interrogation, only ADA O'Connor interrogated him in the portion of the July 10 Video Statement that was admitted into evidence. *See Maldonado v. Greiner*, No. 01-CV-0799 (KMW) (AJP), 2003 WL 22435713, at *35 (S.D.N.Y. Oct. 28, 2003) (concluding that a confession was voluntary in part because an assistant district attorney, not the detective who failed to Mirandize the suspect, conducted the interview); *Vasquez v. Senkowski*, 54 F. Supp. 2d 208, 217–18 (S.D.N.Y. 1999) (same). Moreover, Det. DiMuro's conscious decision not to read Petitioner *Miranda* warnings does not, in and of itself, warrant suppression. *See Bobby*, 565 U.S. at 25, 33 (concluding that even though detectives "decided not to provide [the petitioner] with *Miranda* warnings" out of "fear" that he would refuse to speak to them, a state court had not acted contrary to clearly established federal law by admitting the petitioner's subsequent, Mirandized statement); *Jenkins*, 2014 WL 5861987, at *21–23 (concluding that an officer's efforts to "pressure" the petitioner into confessing before providing *Miranda* warnings did not require suppression under *Elstad*); *cf. Nova v. Barlett*, 211 F.3d 705, 707–09 (2d Cir. 2000) (concluding that a defendant's confessions were admissible even though, before receiving *Miranda* warnings, "police employed several tactics to induce [the petitioner] to make statements implicating himself in the crime").

In short, the totality of circumstances surrounding the July 10 Video Statement reflects that Petitioner's statements were voluntary under *Elstad*.

---

[14]    Although Petitioner was charged with felony murder, and some of his statements were therefore inculpatory to the extent they implicated him in a robbery, Petitioner nevertheless maintained that he was not involved in Abbot's death.

## II.   The Decisions of the State Courts Were Not Contrary to or Unreasonable in Light of Clearly Established Federal Law Despite Petitioner's Invocation of His Right to Remain Silent

The decisions of the state courts were not contrary to or unreasonable in light of clearly established federal law, despite Petitioner's invocation of his right to remain silent.  The state courts concluded that Petitioner voluntarily waived his right to remain silent by initiating a conversation about the case with Det. Henriquez and that the July 10 Video Statement was not tainted by previous misconduct.[15]

### A.  Legal Standard

A suspect's invocation of his right to remain silent and to "cut off questioning" must be "scrupulously honored."  *Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975).  Law enforcement is, therefore, prohibited from continuing an interrogation upon a request to stop and from "persisting in repeated efforts to wear down [a suspect's] resistance and make him change his mind."  *Id.* at 105–06.

Questioning may resume, however, if "there is a reasonable basis for inferring that the suspect has voluntarily changed his mind."  *United States v. Collins*, 462 F.2d 792, 802 (2d Cir. 1972); *see also Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) (noting that questioning may resume despite a suspect's invocation of his right to counsel if "the accused himself initiates further communication, exchanges, or conversations with the police" despite counsel's absence).

---

[15]    Petitioner urges the Court alternatively to conclude that his statements to law enforcement should have been suppressed as "fruit of the poisonous tree" under *Brown v. Illinois*, 422 U.S. 590, 601–02 (1975).  In *Brown*, the Supreme Court concluded that "even if" statements made after an illegal arrest were "voluntary" under the Fifth Amendment, they may still be inadmissible under the Fourth Amendment if the "causal chain" between the illegal arrest and subsequent statements was not "broken."  Petitioner does not cite, and the Court is not aware of, any controlling Supreme Court precedent applying *Brown*'s analysis in addition to the Fifth Amendment analysis under *Elstad* and *Michigan v. Mosley*, 423 U.S. 96 (1975), absent an illegal arrest.  *See Brown*, 422 U.S. at 605 ("emphasiz[ing]" the "limited" nature of the Supreme Court's holding and deciding "only" that it was error to conclude that *Miranda* warnings "always purge the taint of an illegal arrest").  To the contrary, the Supreme Court concluded in *United States v. Patane*, 542 U.S. 630, 642 (2004), that there is "no reason to apply the 'fruit of the poisonous tree' doctrine" to mere failures to warn a suspect under *Miranda*.  The Court, therefore, does not find the state courts' rejection of Petitioner's argument to be objectively unreasonable.

### B.  Application

The Appellate Division's decision was not contrary to or unreasonable in light of clearly established federal law.  It affirmed the trial court's conclusion that Petitioner initiated a conversation with Det. Henriquez, thus providing a reasonable basis for law enforcement to infer that he had changed his mind.  *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983) (concluding that a suspect waived his previously-invoked right to counsel in part by asking an officer what would "happen to [him] now"); *United States v. Oehne*, 698 F.3d 119, 124 (2d Cir. 2012) (assuming, *arguendo*, that a suspect had invoked his right to silence, he would have waived it by "voluntarily initiat[ing] a conversation" with law enforcement about the investigation).

Moreover, the state courts suppressed certain statements given the taint of Det. DiMuro's unwarned interrogation, properly concluding that Petitioner's decision to initiate a conversation with Det. Henriquez was necessary, but not sufficient, to render subsequent statements admissible.  *See Bradshaw*, 462 U.S. at 1046 (noting after concluding that there was "no violation" of the rule requiring law enforcement to cease questioning once a suspect invokes his right to counsel that the "next inquiry" is whether the suspect knowingly waived his *Miranda* rights).  The state courts took into account Det. Henriquez's efforts to persuade Petitioner to speak by suppressing statements that were close in time to, and made under the improper influence of, those remarks.  *See* Carruthers Decision, Dkt. 17-2, at RA35–37.   Although the facts of *Mosley* and *Bradshaw* are distinguishable in other respects from the facts of this case, *Mosley* did not proscribe "*per se* rules governing the waiver of *Miranda* rights."  *Solem v. Stumes*, 465 U.S. 638, 648 (1984).  The state courts' conclusion that Petitioner's question to Det.

Henriquez was sufficient to open the door to continued lawful interrogation was not "objectively unreasonable." *Fuentes*, 829 F.3d at 245.[16]

## CONCLUSION

For the foregoing reasons, the Court rejects the R&R and DENIES Petitioner's request for habeas relief.  Because reasonable jurists may find it "debatable" whether Petitioner states a valid claim, *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), the Court issues a certificate of appealability as to whether the state courts clearly erred by applying *Chapple* and its progeny rather than *Seibert* when deciding Petitioner's suppression motion.  Petitioner is granted *in forma pauperis* status for the purposes of any appeal.  *See Coppedge v. United States*, 369 U.S. 438, 445 (1962) (concluding that an appeal may be taken *in forma pauperis* if made in "good faith"); *Laboriel v. Lee*, No. 18-CV-3616 (RA), 2021 WL 76170, at *6 (S.D.N.Y. Jan. 7, 2021) (issuing a certificate of appealability and granting *in forma pauperis* status).

The Clerk of Court is respectfully directed to close the case.


**SO ORDERED.**

**Date:  March 22, 2023**
**New York, NY**

**VALERIE CAPRONI**
**United States District Judge**

---

[16]     Petitioner argues that his waiver of *Miranda* rights before ADA O'Connell was "suspect" because she mentioned that Petitioner had previously spoken to the detectives about his rights and the case.  *See* Pet'r Mem. at 74.  Petitioner does not cite, and the Court is not aware of, any controlling Supreme Court precedent that stands for the principle that an officer's reference to a suspect's prior unwarned statement is impermissible or somehow converts a subsequent warned statement into an involuntary statement.